# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA



| | | |
|---|---|---|
| WARD FRANCIS WEAVER | ) | Case No.: 1:02-cv-05583 AWI |
| | ) | |
| Petitioner, | ) | MEMORANDUM ORDER |
| | ) | 1) DENYING FURTHER EVIDENTIARY |
| v. | ) | DEVELOPMENT AS TO CLAIMS 1 AND |
| | ) | 2; |
| KEVIN CHAPPELL, Warden of California | ) | 2) DENYING OF CLAIMS 1 AND 2 ON THE |
| State Prison at San Quentin,* | ) | MERITS; AND |
| | ) | 3) DIRECTING PARTIES TO FILE FURTHER |
| Respondent. | ) | BRIEFING |
| | ) | |

This matter is before the Court on the request of Petitioner Ward Francis Weaver ("Weaver") for further evidentiary hearing as to Claims 1 and 2 of his federal petition. The request is accompanied by full merits briefing of Claims 1 and 2 as well as 13 offers of proof in the form of exhibits (for which he requests record expansion). Weaver's efforts are opposed by Respondent Kevin Chappell, Warden of California State Prison at San Quentin (the "Warden"). The Court finds that Claims 1 and 2 are without merit and denies those claims on that basis. In addition, having thoroughly reviewed portions of the police reports appended to the August 10, 1982 declaration in support of Weaver's arrest for the present case, some guilt phase proceedings (including Weaver's testimony), the entirety of the sanity and penalty proceedings, a number of declarations attached to both state habeas petitions, the Court directs the parties to file further, discrete briefs on the issue of ineffective assistance of counsel and Claim 18 of the petition as described in this Memorandum Order.

\* Kevin Chappell, as Warden of California State Prison at San Quentin, is substituted for all prior Respondent Wardens of California State Prison at San Quentin pursuant to Federal Rule of Civil Procedure 25(d).

## Table of Contents

I.    Summary of the Case ................................................................................................... 1

II.   Procedural History ...................................................................................................... 4

III.  Relevant Record Proceedings ..................................................................................... 6

   A.   Sanity Phase ........................................................................................................... 7

      1.   Defense Case ...................................................................................................... 7

         a.   *Family History of Schizophrenia* ................................................................ 8

         b.   *Dysfunctional Sibling Relationship* ........................................................... 8

         c.   *Attempt to get help in Texas* ..................................................................... 9

         d.   *Mental State Evaluations Relative to the 1977 Humboldt County Conviction* ................... 9

         e.   *Mental State Evaluations Relative to the 1981 Ventura County Conviction* ..................... 12

           i.   Dr. Chappell ................................................................................. 13

           ii.   Dr. Donaldson .............................................................................. 13

           iii.   Mr. Rose ..................................................................................... 15

         f.   *"Team" Mental Evaluation regarding the Present Offense* ................................. 16

           i.   Dr. Shonkwiler ............................................................................. 16

           ii.   Dr. Dietiker ................................................................................. 18

           iii.   Dr. Lundgren ............................................................................... 19

         g.   *Long-time Friends* ..................................................................................... 21

         h.   *Special Evaluations Regarding PTSD* ............................................................. 21

           i.   Dr. Wittlin ................................................................................... 21

           ii.   Dr. Donahoe ................................................................................. 22

i

iii. Dr. Wilson .................................................................................... 23

iv. Dr. Kormos ................................................................................. 26

*i.* *Inmate Witnesses* .......................................................................... 30

*j.* *Mr. Huffman's Presence and Participation During Sanity Proceedings* ........................... 30

2. Prosecution Case ................................................................................ 36

*a.* *Prosecution Experts* ..................................................................... 36

i. Dr. Cutting ................................................................................. 37

ii. Dr. Matychowiak ......................................................................... 38

iii. Dr. Burdick ................................................................................. 40

iv. Dr. Criswell ................................................................................ 42

*b.* *Witness hired by the Defense Testifying for the Prosecution* ................................. 44

*c.* *Inmate Witness for the Prosecution* ..................................................... 46

*d.* *District Attorney Investigator* .......................................................... 47

3. Defense Rebuttal – two more inmate witnesses .................................................. 48

4. Summation ..................................................................................... 48

*a.* *Mrs. Huffman* ........................................................................... 49

*b.* *Mr. Shumaker* ........................................................................... 58

*c.* *Rebuttal* ................................................................................ 63

5. Jury Instructions ............................................................................... 66

6. Deliberations .................................................................................. 67

7. Defense Motion ................................................................................ 67

B. Penalty Phase ................................................................................... 67

ii

    1.    Prosecution Case .................................................................................... 67

        a.    *The 1977 Humboldt Conviction* ........................................... 67

        b.    *The 1981 Ventura Conviction* .............................................. 68

    2.    Defense Case .......................................................................................... 70

    3.    Prosecution Summation ......................................................................... 70

    4.    Defense Summation ............................................................................... 72

    5.    Significant Jury Instructions ................................................................. 74

    6.    Deliberations and Verdict ..................................................................... 74

  C.    Motion to Set Aside the Death Sentence .................................................. 75

IV.    Standard of Review ......................................................................................... 76

  A.    The Standard for Reviewing State Court Conclusions ............................. 76

  B.    The Standard for Reviewing State Court Factual Determinations ............ 77

  C.    The Standard or Granting Further Evidentiary Development .................... 77

    1.    Evidentiary Hearing .............................................................................. 78

    2.    Record Expansion ................................................................................. 79

    3.    Discovery ............................................................................................... 79

V.    Resolution of Claim 1 ..................................................................................... 80

  A.    Controlling Legal Principles ...................................................................... 81

  B.    Weaver's Argument .................................................................................... 81

    1.    Mr. Huffman .......................................................................................... 82

    2.    Mrs. Huffman ........................................................................................ 86

  C.    The Warden's Argument ............................................................................ 90

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.   Analysis .................................................................................................... 91

VI.   Resolution of Claim 2 .................................................................................... 96

A.   Controlling Legal Principles ......................................................................... 97

B.   Weaver's Argument ..................................................................................... 99

C.   The Warden's Argument ............................................................................ 102

D.   Analysis .................................................................................................. 102

VII.   Discussion of Other Claims ........................................................................ 105

A.   Ineffective Assistance of Counsel ............................................................. 105

1.   Mental State Evaluators from the Humboldt and Ventura Crimes ...................... 106

2.   Lack of Cohesive Presentation of the Defense Case ........................ 109

3.   Failure to Corroborate Foundational Facts ............................................. 111

4.   Puzzling Strategies ...................................................................... 113

B.   Juror Misconduct during Sanity Phase Deliberations ............................ 116

VIII.   Order . ..................................................................................................... 118

iv

I.      **Summary of the Case**

Thirty-seven year old Weaver,[1] an allegedly schizophrenic, traumatized Vietnam veteran,[2] amphetamine-addicted truck driver, was driving his fully loaded truck westbound on the Tehachapi pass (Highway 58), in Kern County, late on February 5, 1981, when he noticed a disabled automobile on the eastbound side of the highway.[3]  He turned his truck around at the next overpass and stopped to offer the stranded young couple a ride to Mojave.  They accepted.  At this point, according to the defense, Weaver was hearing conflicting voices about what to do with the young woman, Barbara Levoy.  After only about five miles of eastbound travel, Weaver pulled to the side of the road and asked the young man, Robert Radford, to help him shift the load on the flatbed trailer.  Ms. Levoy remained in the truck cabin.  Responding to the "male voice" and ignoring the "female voice," Weaver struck Mr. Radford on the back of the head with a metal "cheater" bar causing him to fall off the back of the flatbed, screaming.[4]  Weaver testified during guilt phase proceedings that he jumped off the flatbed and hit Mr. Radford a few more times to quiet his yelling.  Weaver told mental health examiners he kept hitting Mr. Radford to silence the screams, which apparently were very agitating and disturbing to him.  When Mr. Radford was found later by a passing motorist, he was still alive, but died on the way to the hospital.

After striking Mr. Radford down, Weaver returned to the truck cabin, was unsure what to do next, but in response from questions from Ms. Levoy told her that Mr. Radford would be returning shortly.  According to Weaver, at the suggestion of the male voice, he displayed a knife to Ms. Levoy, and directed her to sit with her head between her knees, hands behind her head, prisoner-style, a stance Weaver learned from his Vietnam service.  Weaver proceeded eastbound on Highway 58 and within a

---

[1]  Weaver's date of birth is February 10, 1944.

[2]  The duration of his service was two years in 1967 through 1969.  He spent one year of that service in Vietnam from May 1968 through May 1969.  He was discharged from the Army in December 1969.

[3]  The majority of this information comes from Weaver's guilt phase testimony and repeated in the testimony of various mental health experts (both prosecution and defense) during sanity proceedings.

[4]  A cheater bar is described as a metal bar "like a tire iron" weighing from four to six pounds.

1

mile and a half, reversed the direction of the truck and headed west toward Bakersfield on his way to San Francisco (his original direction of travel and destination).  After that initial displaying of the knife, Weaver testified that he did not threaten Ms. Levoy with physical force again.

Some hours later, again, allegedly responding to the dominant male voice, he raped Ms. Levoy on the way to San Francisco just past Kettleman City on Interstate 5.[5]  After depositing his load in San Francisco, Weaver, with Ms. Levoy aboard, made another pickup and delivery (from Oakland to Vallejo) and then took a circuitous route to his home in Oroville.  Weaver referred to it as "the long way."[6]  Before meeting his wife in at the restaurant where she worked, he stopped in a secluded location north of Oroville and directed Ms. Levoy out of the truck.  He bound her hands and feet with tape, but when he told her he intended to leave her overnight at this location and attempted to gag her, she bit him severely on the thumb.  The defense was that he blacked out upon being bitten and accidentally strangled her while trying to get her to release his thumb from her teeth.  Realizing she was dead, he again didn't know what to do until the male voice told him to dig a grave and bury her. He did so and met his wife as planned at the restaurant.  He then used his wife's car to return to Ms. Levoy's grave, exhumed her body, placed it in the trunk of his wife's car, and drove home.

He greeted his three children at home, who noticed his bloody thumb.  With the children in bed, Weaver placed Ms. Levoy's body in a trench for a sewer line he and his son had begun to dig earlier in his backyard.  The next day, he poured cement over this shallow grave.  Later Weaver re-exhumed the body and moved it to a deeper grave, and then built a wooden platform over it, ostensibly for his wife to use to hang out the laundry, but, as admitted on the witness stand, in reality so the ground wouldn't

---

[5]  Weaver testified during guilt proceedings that he raped Ms. Levoy twice.  Neither the time nor location of second rape is clear from Weaver's testimony.  The Court also notes that Weaver told authorities during his custodial interrogation that his second sexual encounter with Ms. Levoy was forced sodomy.  CT-1: 109-110.

[6]  The most direct route from Vallejo to Oroville was north on Interstate 80 to Interstate 5 just north of Sacramento, then north a short time until reaching Highway 99, which then turned into Highway 70 to Oroville.  The route Weaver described was south on Interstate 80, then east on the California Delta Highway (Highway 4), through Antioch and just south of Stockton before turning north on Interstate 5.  This "long way" would have taken Weaver at least 60 miles and over an hour out of his way.

sink.  Weaver was not apprehended for these crimes until after he was convicted in Ventura County for another crime that began three months later, on May 4, 1981.

On that occasion, Weaver picked up another young couple, an 18-year-old young man, David Galbraith, and his 15-year-old girlfriend, Michelle DeLong, in Medford, Oregon.  Weaver, riding with his 10-year-old son, agreed to drive the young couple to Yreka, California to stay with Ms. DeLong's uncle.  Because the uncle was not home, Weaver offered to let them sleep in his truck when he arrived home in Oroville.  A day or two later, he took them to Ventura, where he had a delivery, and offered to help Mr. Galbraith find a job.  Instead, Weaver introduced Mr. Galbraith to an acquaintance, who drove the young man into the forest, shot him three times in the head, and left him for dead.  Despite his severe injuries, Mr. Galbraith survived.  In the meantime, Weaver purportedly took Ms. DeLong to make a short delivery run.  Instead, he raped her at gunpoint, later forced her to orally copulate him, and returned to Oroville.  The next day he dropped her off in Marysville, where she eventually went to the police.  While serving time for these crimes, Weaver confessed the Radford/ Levoy crimes to a co-inmate, Ricky Gibson.  During cross examination of one of Weaver's witnesses,[7] the prosecutor, Ronald Shumaker, elicited that the Ventura charges included rape, unlawful intercourse with a minor, forced oral copulation, kidnapping, and conspiracy to commit murder.[8]

The jurors also learned that four years prior to the Radford/ Levoy crimes Weaver was convicted of assault with a deadly weapon against a woman, Bonnie Brown, in Humboldt County.[9] The incident occurred very late on the night of September 22, 1976 or very early on September 23, 1976.  From Ms. Brown's place of employment, at a Eureka bowling alley, she and Weaver drove separately for coffee and soft drinks at a local Denny's Restaurant.  They then drove (separately) to a

---

[7]  The witness was Dr. Chappell, who was one of the mental health experts who evaluated Weaver's sanity with respect to the Ventura crimes.

[8]  Whether Weaver was convicted of all the charged crimes did not come out during the trial, as the trial court elected to consider the evidence of Weaver's criminal conduct in that county under California Penal Code  § 190.3(b) (prior violent, criminal conduct) rather than under § 190.3(c) (prior felony conviction).

[9]   This information came out in bits and pieces during the testimony of some of Weaver's experts during sanity proceedings, but the complete rendition of the facts were brought out by the prosecution during the penalty phase.

truck stop where Weaver had a truck.  The reason for the assault is unclear, but what is clear is that Weaver pleaded guilty on May 2, 1977 and was paroled in February 1979.

## II.    Procedural History

After his arrest (at San Quentin State Prison where he was serving a 42 year to life sentence for the Ventura crimes) Weaver appeared in the Kern County Municipal Court on August 18, 1982 to be arraigned. CT-1: 135. The arraignment was held over to the following day, August 19, 1982, at which time David Huffman was appointed to represent him.  *Id*.: 136.  After the preliminary examination hearing, the sexual assault charges involving Ms. Levoy (rape, sodomy by force, and oral copulation by force) were dismissed for lack of evidence.  *Id*.: 137.  Following Weaver's first appearance in the Kern County Superior Court on September 19, 1982, competence proceedings under California Penal Code § 1368 were commenced.  Donnalee Mendez was appointed as co-counsel on June 8, 1983.[10] Ms. Mendez and Mr. Huffman married on September 15, 1983.  (Ms. Mendez hereafter is referred to as "Mrs. Huffman.")

Trial proceedings resumed before the Honorable William A. Stone in April 1984, with jury selection commencing on October 9, 1984.  Guilt phase proceedings concluded with the jury verdict of guilty on two counts of murder (as to both victims) and one count of kidnapping, as to Ms. Levoy, on December 19, 1984.  The death eligibility special circumstances were kidnap as to both victims and multiple murder.

The sanity phase was delayed until January 14, 1985 due to illness of Mr. Huffman, purportedly for throat problems.  The sanity phase proceedings largely were conducted by Mrs. Huffman.  Nonetheless Mr. Huffman remained present on and off through February 8, 1985, even conducting some examination and making arguments to the court.  He was not present at all on the last 10 days of the proceedings (over the period of February 11 through February 28).  After a lengthy sanity phase, the jury returned a verdict that Weaver was not insane after fewer than 42 minutes.  The

---

[10]   From having presided over another Kern County death penalty case, *Carrera v. Ayers*, case number 1:90-cv-0478 AWI, the Court is aware that Ms. Mendez concurrently represented Mr. Carrera from April 7, 1982 until October 7, 1983 for the first part of her representation of Weaver.

penalty phase trial, conducted entirely by Mrs. Huffman, began on March 5, 1985, with a verdict for the death penalty on March 7, 1985.

Weaver's automatic motion to set aside the death penalty was denied on April 4, 1985 and he was sentenced to death the same day.  On his automatic appeal, the California Supreme Court affirmed his conviction and sentence on August 20, 2001.  *People v.* Weaver, 26 Cal. 4th 876 (2001).  His first state habeas petition, filed September 28, 1998 (hereafter "First State Petition") was denied on November 14, 2001 (Case No. S073709).  The state counterparts to Claims 1 and 2, herein, were raised in this initial state petition in Claim 1 (parts B. and C.) and denied summarily on the merits with no procedural bars.

*Certiorari* regarding his direct appeal was denied by the United States Supreme Court on May 13, 2002.  A few days later, on May 17, 2002, Weaver commenced the present federal action with a request for appointment of counsel and a stay of execution of his sentence (doc. 1).  The original May 31, 2002 appointment of counsel (doc. 4) was adjusted on January 6, 2003 with the appointment of current counsel, the Habeas Corpus Resource Center and CJA attorney Karen Schryver (doc. 21).  Assisted by counsel, Weaver filed his federal petition for habeas corpus in federal court on May 5, 2003 (doc. 32).  The petition was represented to be fully exhausted, but Weaver also developed new claims he needed to present to the California Supreme Court.  He did so, on May 6, 2003 (Case No. S115683) in his second state petition (hereafter "Second State Petition").  The Warden disputed Weaver's assertion that the May 5, 2003 federal petition was fully exhausted, arguing that the legal bases for seven sub-claims and the factual bases of 29 sub-claims had not been presented to the California Supreme Court.  On January 7, 2004, the Court entered an order finding that the legal bases for two sub-claims were unexhausted, but the remainder of the claims and sub-claims either had been fairly presented or did not change the character of the underlying claim (doc. 48).[11]  The Court ordered federal proceedings to be held in abeyance pending state exhaustion proceedings on March 16, 2004

---

[11]  The legal and factual bases of the two sub-claims in the May 5, 2003 federal petition determined by the Court to be unexhausted were included in the Second State Petition.

MemODenyClaims1&2&IACBriefing-Wea

(doc. 56).  The California Supreme Court summarily denied the Second State Petition on August 26, 2009.

Weaver filed his amended federal petition on September 1, 2009 (doc. 107).  This pleading is the operative petition.  The Warden answered the petition on March 30, 2010 (doc. 116) and thereafter in a joint statement filed on May 24, 2010 (doc. 120) confirmed that exhaustion and the statute of limitations were fully satisfied.[12]  On June 2, 2010, the Court ordered briefing on the petition limited to Claims 1 and 2.  In these claims Weaver alleges deprivation of counsel at critical stages of his state trial, failure of his trial attorneys to subject the prosecution to meaningful adversarial testing under *Cronic v. United States*, 466 U.S. 648, 659 (1984), and a conflict of interest.  These claims stem from alleged mental and physical illnesses of Mr. Huffman caused by his alcoholism and Korean War combat induced post-traumatic stress disorder, as well as personal financial difficulties involving both Mr. Huffman and Mrs. Huffman.  Weaver was directed to combine his brief of these claims with a request for further evidentiary development pursuant to Rules 6 (discovery), 7 (record expansion), and 8 (evidentiary hearing) of the Rules Governing § 2254 Cases (doc. 121).  Weaver's opening brief was filed on August 8, 2011 (doc. 149), followed by the Warden's opposition on March 7, 2012 (doc. 156), and Weaver's reply on July 10, 2012 (doc. 160).

## III.   Relevant Record Proceedings

Claim 1 focuses solely on the constructive absence of counsel altogether as to sanity and penalty phases.  Although Claim 2 extends to Weaver's guilt phase proceedings as well the sanity and penalty phases, the Court finds it unnecessary to summarize the guilt phase proceedings to resolve that claim, as explained in Part VI.D., *infra*.  Accordingly, only the sanity and penalty phase proceedings will be reviewed here.[13]  Because the presentation of the sanity phase was somewhat disorganized and repetitive, references to the reporter's transcript are not provided in this summary. Commencement of

---

[12]  The Warden waived the exhaustion requirement as to one sub-claim for the sake of expediency in his answer and confirmed this fact in the joint statement.

[13]  Portions of the guilt phase proceedings plus declarations submitted to the California Supreme Court with Weaver's First and Second State Petitions are relevant to the Court's discussion of ineffective assistance of counsel and juror misconduct claims following the analysis of Claims 1 and 2.

6

MemODenyClaims1&2&IACBriefing-Wea

the sanity proceedings also was delayed.  After the jurors had reached their guilt phase verdict on December 19, 1984, Judge Stone instructed them to return on January 7, 1985.  He instructed counsel to return on January 2, 1985 to discuss evidentiary matters and scheduling.  Explanations on these topics on behalf of the defense were given largely by Mr. Huffman.  When the jurors returned on January 7, 1985, Judge Stone directed them to return on January 14, 1985 due to what he described as Mr. Huffman's lingering laryngitis.

### A.     Sanity Phase

The Huffmans organized 22 witnesses to be called in nine categories in the defense case-in-chief.  Mr. Shumaker called eight witnesses in his case, and two more witnesses were called for Weaver in rebuttal.  This evidence, argument of counsel, jury instructions, and jury deliberations are summarized below.

### 1.     Defense Case

Mr. Huffman delivered the opening statement, foretelling that the defense witnesses would show Weaver suffered from schizophrenia as well as post-traumatic stress disorder ("PTSD").  He promised the evidence would show Weaver "was predisposed to being a homicidal killer," that there was a "love-hate relationship" with this mother, and that he had a premorbid personality.  In her declaration, Mrs. Huffman avers that this "madman" portrayal, which Weaver now strongly criticized, apparently was augmented by Weaver's appearance at the sanity proceedings at the direction of his attorneys.[14]  Two of Weaver's jurors averred in post-conviction declarations that the Huffmans tried to make Weaver look mentally ill by having him appear in court dirty, disheveled, unkempt, and inappropriately disruptive.  When the penalty proceedings commenced, Weaver was neat and clean cut.  Declaration of Edmund Rice, Exhibit 17 to the First State Petition, ¶¶ 4-5; Declaration of Clara Sue Haney, Exhibit 18 to the First State Petition, ¶¶ 2-3.  Weaver's former wife, Patricia Budrow Weaver, also averred that she was surprised by Weaver's appearance when she testified at the guilt phase.  Declaration of Patricia Weaver, Exhibit 2 to the First State Petition, ¶ 33.  After the opening

---

[14]   Weaver was told not to cut his hair or shave his beard.  Mr. Huffman dressed Weaver in weird looking clothes purchased at thrift shops.  According to Mrs. Huffman in her declaration, during trial Weaver's hair was wild and he was scary looking. Exhibit 34 to First State Petition, ¶ 11.

statement, Mrs. Huffman elicited *all* evidence during the sanity proceedings, except for brief input from Mr. Huffman, as more fully explained in Part III.A.*j.*, *infra.*

### a.       Family History of Schizophrenia

Psychiatrist Albert Raitt, M.D. and Butte County Deputy Sheriff Rover Levey were called to confirm that Weaver's maternal aunt, Kathryn Bernardo, and her daughter, Lucia Bernardo (Weaver's cousin), both were afflicted with schizophrenia.[15]

### b.       Dysfunctional Sibling Relationship

Weaver's sister, Katie Smith, who was 16 months younger than he,[16] described sadistically horrible acts Weaver perpetrated on her from the time they were young children until they were young teenagers.  When Ms. Smith was five and Weaver was six, he chopped off her index finger with an axe.  Although she thought it was accidental at first, she later came to believe it was intentional.  The defense team adopted the intentional explanation.  Next, when Ms. Smith was six and Weaver was seven, he tied her to a tree and told her he was going to hang her.  He actually made a noose and started putting it around her neck but stopped when she cried and screamed.  He then took the noose off, but left her tied to the tree for some time and threatened her if she tattled to their parents.  When she was between six and nine years old, Weaver and she were in a field where there were 15 to 20 head of cattle.  Weaver intentionally "stampeded" the cattle toward Ms. Smith.  During this same three-year time period, Ms. Smith and Weaver were playing near an old tool shed.  She went in and then Weaver locked the door from the outside.  He set fire to the shed with her trapped inside, laughing the whole time before finally releasing her.  The two of them were unable to extinguish the flames which then spread into a forest fire.  When she was seven, eight, or nine years old, Weaver and his friend named Jerry Daniels,[17] tied her up and inserted sticks into her vagina to the point of hurting her.  When she

---

[15] In his federal petition, Weaver provides further anecdotal evidence that schizophrenia was a family trait among many family members.

[16] According to their mother, Dorothy Weaver, Katie Smith was born in June of 1945. Declaration of Dorothy Weaver, Exhibit 1 to First State Petition, ¶ 18.  According to Ms. Smith's widower husband, she died on July 22, 1997.  Declaration of Wayne Smith, Exhibit 7 to First State Petition, ¶ 3.

[17] Mr. Daniels' name comes up again in connection with the Ventura crimes.

8

was 12 and Weaver was 13, he raped her.  Ms. Smith told no one.  Finally, when she was 12 to 13, she saw Weaver and another boy torture a cat.

Besides testifying about the sadistic treatment perpetrated on her by Weaver, Ms. Smith also gave some insight into the family dynamics when she and Weaver were growing up.  She mentioned that although during one period of their lives growing up when their father worked nights and they rarely saw him during the week, on weekends he and Weaver spent time together working on cars or building pens for the animals Weaver was raising.  As for friends, when the family lived in Eureka, Weaver and Ms. Smith "played" with two siblings from the Lopez family, who lived nearby.  Ms. Smith also mentioned Jerry Daniels as a friend Weaver spent time with and his (Weaver's) "only real friend," Larry Digby, a "loner" like Weaver.  She stated that Weaver was happiest when he could spend time with the animals he raised and was a member of the FFA.  As far as girls, Ms. Smith mentioned Ladell, Sharon, and Ernestine before Weaver's soon-to-be first wife, Pat Budrow, moved into the Weaver home.  Ms. Smith judged the time between Pat's residence at the Weaver home until she and Weaver were married was about a year.

### c.      Attempt to get help in Texas

Weaver's paternal cousin Russell Mathiasch, from Texas, testified that Weaver and his father came to Texas to try to get Weaver admitted to two separate Veterans Administration ("VA") Hospitals to help him with his medical problems.  Neither the Dallas nor the Waco facilities could admit him.  Weaver and his father made this trip in 1977 while Weaver was under charges for assaulting Bonnie Brown in Humboldt County.

### d.      Mental State Evaluations Relative to the 1977 Humboldt County Conviction

Three mental health professionals who evaluated Weaver in connection with his Humboldt County conviction came next: psychiatrist Robert Gardner, M.D., psychiatrist Alfred Owre, M.D., and psychologist Jack Tolchin, Ph.D.

### (i)   Dr. Gardner

According to his report, Dr. Gardner evaluated Weaver on April 12, 1977, prior to sentencing, to assist the trial court with that process.  Exhibit 110 to First State Petition.[18]  He found Weaver to be mistrustful and suspicious of people almost to a "paranoid degree."  Weaver reported having very few friends because his friends took advantage of him.  Weaver did say that during his four-year marriage to his first wife he had assaulted her on a number of occasions, once seriously enough to require medical attention.  Dr. Gardner concluded that Weaver's mother was overprotective, domineering, and prone to being physically abusive. Dr. Gardner mentioned in both his testimony and in his report that Weaver's mother often awakened him by slapping him in the face.  In his report he mentioned that Weaver perceived his father as being very strict and that Weaver had trouble communicating with him. This was consistent with Dr. Gardner's testimony that Weaver perceived his father as being remote and strict.  In his report, he described that Weaver's upbringing "sounded punitive and maladaptive." Dr. Gardner felt that Weaver would be a threat to others unless he underwent psychiatric treatment after he was discharged from prison.  He did not have the impression Weaver was malingering, manipulating, or being untruthful during the interview.  His diagnosis was that Weaver suffered from a psychotic depressive reaction and reality distortion.  In the time allotted, Dr. Gardner could not discover the reason for Weaver's condition.  He opined that Weaver's intelligence was in the low-normal range. On cross examination, Dr. Gardner stated he reported that Weaver had denied hallucinations. He also testified that he had no recollection of evaluating Weaver independent of his report.  His report, however, does not state that Weaver "denied" hallucinations and delusions.  What Dr. Gardner wrote was: "there were no hallucinations or delusions found, although he [Weaver] is mistrustful of people to an almost paranoid degree."  Exhibit 110 to First State Petition, p. 2.

### (ii)   Dr. Owre

Dr. Owre evaluated Weaver upon his arrival at the California Men's Colony in San Luis Obispo.   At that time, in November 1977, Dr. Owre reported he found Weaver to be without psychiatric symptomology (including schizophrenia), but did note Weaver's relationships with women

---

[18] Dr. Gardner's report was not before the jury, but is part of the state record.

were "distorted."   Dr. Owre found Weaver's main problem to be his pathological relationship with women.   He diagnosed Weaver as having a passive aggressive personality with depressive and sadomasochistic features (because he had disturbed relationships with and derived emotional relief by inflicting pain on women). A person with this type of diagnosis would have very little impulse control. During his incarceration at the Men's Colony, Weaver was a "model inmate," being discipline-free, getting along with others, and conforming to prison rules.   Weaver was not given anti-psychotic medication during his incarceration at the Men's Colony.   Based on the history Weaver gave him, Dr. Owre felt Weaver's parents were brutal and well as over protective.   The fact that his first wife left him for another man nurtured Weaver's hatred for women.   Dr. Owre estimated Weaver's to have "high normal" intelligence.[19]

During redirect examination, Dr. Owre stated that as a result of his observations of Weaver from the witness stand, he believed Weaver was "suffering from a chronic undifferentiated schizophrenic condition . . . responding to internal messages . . . [and] to have deteriorated markedly since [Dr. Owre and staff] had last seen him at the Men's Colony."   The prosecutor made an immediate effort to minimize that observation by noting (in the form of a question) that Weaver had been smoking and conversing with other people during breaks in the proceedings and that Weaver had testified during the guilt phase in a rational manner.[20]

Outside of the jury's presence on the following day, the trial court concurred with Mr. Shumaker's disdain for Dr. Owre's declaration from the witness stand and his impression of Weaver's present mental state.   Acknowledging his responsibility under Penal Code § 1368 to call for a hearing if he had a doubt about Weaver's competence, Judge Stone stated he didn't think that the opinion Dr. Owre expressed while answering questions from counsel and without examining Weaver in five years

---

[19]   Dr. Owre was the only one of Weaver's examiners who arrived at this impression.   One of the examiners the Huffmans hired actually administered a test to measure Weaver's Intelligence Quotient and come up with a score of 85 to 90, which is in the low normal range.   Dr. Owre's opinion about Weaver's intelligence was based on his observation.

[20]   Having read the transcript of Weaver's guilt phase testimony, the Court cannot disagree with the prosecutor's assessment that Weaver testified in a rational manner.   The transcript, however, does not record pauses, gestures, or facial expressions.   There is no way to know how Weaver was perceived during guilt phase proceedings.

11

raised a doubt in his mind about Weaver's competence.  Judge Stone further stated he did not believe a doctor would be able to diagnose someone from the witness stand and after further argument from Mr. Shumaker, concluded that Weaver' current competence was not in question.  Mrs. Huffman noted only that Weaver was cooperative but didn't always understand what was going on in the proceedings.  In her post-conviction declaration she avers that she did not ask the court to declare a doubt of Weaver's competence because she personally thought "he was trial competent."   Exhibit 34 to First State Petition, ¶ 30.

### (iii)   Dr. Tolchin

Dr. Tolchin, a staff psychologist for the Men's Colony, conducted counseling sessions with Weaver for about six months during Weaver's incarceration. In October 1978, Dr. Tolchin noted that Weaver's passive aggressive personality with depressive and sadomasochistic features (the same diagnosis given by Dr. Owre) were in remission.  He clarified that Weaver did not suffer from a mental problem, but rather a personality disorder.  In his October 3, 1978 report to the board of the community parole board, Dr. Tolchin stated that Weaver was earnest in trying to work out his problems, as evidenced by his regular attendance at counseling sessions.  Exhibit 117 to First State Petition.  His testimony was to the same effect.  He hoped Weaver would continue therapy outside of prison to re-establish amicable relations with his wife and work on improving his self-esteem once he was paroled in February 1979.  Dr. Tolchin felt that Weaver's severe personality disorder carried with it a potential for violence.

### e.   Mental State Evaluations Relative to the 1981 Ventura County Conviction

The next three witnesses evaluated Weaver in 1981 relative to the May 1981 Ventura crimes.  Two of these three witnesses, George Chappell, M.D. and Theodore Donaldson, Ph.D., assessed Weaver's sanity under Penal Code § 1026.  They brought with them their prior reports and notes, but received no additional information to review from the Huffmans.  They did, however, receive additional documents from the prosecutor, Mr. Shumaker, including the transcript of Weaver's custodial statement for the Radford/ Levoy murders and the statement of co-inmate Ricky Gibson to whom Weaver divulged his involvement in the Radford/ Levoy murders.  Drs. Chappell's and

12

Donaldson's respective reports have been made part of the state court record (but not exhibits at Weaver's trial).  Exhibits 58 and 59 to First State Petition.

### i.      Dr. Chappell

At the time of their July 1981 interview, Weaver told Dr. Chappell he was taking 600 mg. of the anti-psychotic medication Mellaril.   Dr. Chappell testified he harbored doubts about this claim because Weaver showed none of the side effects for Mellaril (dry mouth and the appearance of sedation), but didn't check the medical records in Weaver's file.[21]  Dr. Chappell diagnosed Weaver with a history of amphetamine abuse, which is a psychiatric condition, and adjustment disorder with depressive reaction (because of his incarceration). He suspected, but wasn't certain, that Weaver was malingering on some symptoms.  On cross examination, he clarified that an adjustment disorder is a psychiatric condition but not a mental defect or disease.  As a result of his interview, Dr. Chappell felt Weaver was of average intelligence based on the fact that Weaver told him he completed two years of college.[22]   Dr. Chappell determined that Weaver neither described nor showed symptoms of schizophrenia or true psychosis during his evaluation.  He also testified he felt a competent mental health professional could make a diagnosis in the first hour of evaluation, and he spent twice that long. Dr. Chappell doubted Weaver experienced auditory hallucinations (as Weaver had reported to him). He also doubted schizophrenia because if Weaver had schizophrenia, he would have had an episode during combat in Vietnam.  He did not feel Weaver was insane at the time of the Ventura crimes.

### ii.      Dr. Donaldson

As a psychologist, Dr. Donaldson administered both the Minnesota Multiphasic Personality Inventory ("MMPI") and the Rorschach Projective Personality test.  He testified Weaver seemed to be

---

[21]  Dr. Chappell did not indicate his doubts in his report.

[22]  Other evidence presented at trial indicated that the coursework in which was Weaver enrolled was not academic, but rather vocational in nature (landscaping, drafting, photography, and blue printing).  *See* testimony summary of Dr. Shonkwiler (Part III.A.1.f., *infra*) and Dr. Matychowiak (Part III.A.2.a., *infra*).  Dr. Chappell's reports simply states that Weaver had "been through junior college."

somewhat out of touch during their interview.[23]   On the MMPI, Weaver scored acceptably on the L (lie) scale and the K (defensiveness) scale, meaning that he was being open and honest.  He had a very high (as in totally off the scale) on the F scale, indicating either exaggeration or a great deal of confusion.[24]   The prominent factors about his interview with Weaver were that he (Weaver) heard voices, was very angry, and was very angry with women in particular.[25]   As Dr. Donaldson understood it, these voices consisted of two competing male voices and a female voice (a total of three voices).[26] Dr. Donaldson thought, but was not certain, that the reported auditory hallucinations might have been fabricated, that Weaver "was obviously exaggerating his symptoms," but did demonstrate a "very schizoid adjustment," that is, and he was socially withdrawn.  Dr. Donaldson determined Weaver's Axis I diagnosis was dysthymic disorder (that is, depressive neurosis), which he self-medicated with amphetamines, and his Axis II diagnosis was borderline (or mixed) personality disorder.  Weaver's lack of impulse control was consistent with both anti-social personality disorder ("ASPD") and schizophrenia.  He concluded Weaver was not insane at the time he raped the 15 year old girl (from the Ventura crime) because he thought about it and did it because he wanted to.  With respect to history, Dr. Donaldson concluded that Weaver had an unhappy and sickly childhood and tended to be socially withdrawn from other people.  From their discussions about Vietnam, Dr. Donaldson learned that Weaver liked, or even loved, to blow things up while he was working demolition and had quite a bit of trouble getting into the service.[27]   On re-direct Dr. Donaldson conceded that the evaluation he did of

_____

[23]   In his report he stated Weaver's speech was clear and there were no indications of a "marked thought disorder" in his presentation, although he appeared depressed and frequently was close to tears.

[24]   Dr. Donaldson noted that the validity scales indicated that the clinical scales could not be interpreted because Weaver either was trying to "look bad" or was exhibiting a "cry for help."

[25]   According to Dr. Donaldson's report, Weaver's hatred of women was limited to those he found attractive.

[26]   Dr. Donaldson did not give too much detail about the voices except to say it was difficult to determine the extent and severity of the auditory hallucinations; he also thought there was a possibility Weaver was fabricating the voices.

[27]   The notion that Weaver had trouble getting into the Army because of his health conditions now is in dispute.  His first wife, Patricia Budrow Weaver, averred that after the marriage ended, Weaver was drafted and his mother tried to keep him out "with the heart murmur story."  However,

14

Weaver was superficial.  A longer period of observation plus interviews with parents, siblings, teachers, and similar persons would have yielded a better diagnosis.  Also, he indicated that if he had heard Weaver's confession tapes, rather than just reading the transcript, he might have had a more in-depth understanding, since he could not tell by reading the transcript that Weaver was crying when he talked about the crimes.[28]   He explained that even if he had known about a Weaver family history of mental illness, notably, schizophrenia, he would not have changed his mind about Weaver's sanity at the time of the Ventura crimes.  With respect to the Radford/ Levoy murders, Dr. Donaldson was particularly struck by the anger Weaver expressed while he was choking Ms. Levoy (as related by Ricky Gibson).  It reinforced in Dr. Donaldson's mind Weaver's "enormous" anger against women as Weaver expressed during their interview.  At the very end of Mrs. Huffman's re-direct examination, she asked if Dr. Donaldson's opinion would change if he knew that Weaver had blacked out after Ms. Levoy bit him and then didn't realize he was choking her until she was lifeless.  Dr. Donaldson testified that if Weaver had dissociated during the killing, that could have been an indication of insanity and that more investigation would have been necessary.

### iii.        Mr. Rose

The third of the Ventura offense-related witnesses was Mr. Rollin Rose,[29] a staff psychologist (with a master's degree), at the Chino correctional facility.  He gave Weaver a battery of psychological tests to determine placement for the Ventura crimes.  He provided a diagnosis of "personality disorder, passive aggressive personality with schizoid features, and sexual sadism."  He found no symptoms of psychosis.  On cross examination, Mr. Shumaker elicited a statement in Mr. Rose's report that Weaver expressed "intense hostility toward women."  Mr. Rose administered the Wechsler Adult Intelligence

---

[28] Mrs. Huffman asked her question about the transcript versus the tape of Weaver's confession in a manner to cast blame on the prosecutor for not providing the most sympathetic medium for the content of Weaver's statement.  The Huffmans provided Dr. Donaldson with *no* information or documentation.

[29] In the reporter's transcript, Mr. Rose's first name is spelled "Rolland."  During his testimony, he was asked to spell his last name but not his first.  The correct spelling of his first name is adopted from the declaration submitted in post-conviction proceedings, over Mr. Rose's signature.

once Weaver was examined by a specialist, he was "accepted into the Army."  Declaration of Patricia Weaver, Exhibit 2 to First State Petition, ¶ 27.

Scale (IQ) test to Weaver and found an IQ of 96, a low level of intellectual functioning.  Mr. Rose could not recall any information about Weaver when he was contacted by Weaver's current counsel. In his declaration he averred that this recollection could not be refreshed.  Exhibit G to Weaver's brief.

### f.    *"Team" Mental Evaluation regarding the Present Offense*

In addition to calling mental health experts who had evaluated Weaver previously and four PTSD experts, Mr. and Mrs. Huffman hired a team of mental health experts to evaluate Weaver for the schizophrenia defense relative to the Radford/ Levoy crimes.  The team consisted of psychiatrist Jack Shonkwiler, M.D. and four members from Affiliated Psychologists: psychologists, K. Edward Dietiker, Ph.D. and Kathe Lundgren, Ph.D., plus two psychologist assistants, Mary Cholet[30] and Will Powers.[31]  Each team member from Affiliated Psychologists administered various (different) psychological tests to Weaver in order to assess different parts of his mental functioning.   Dr. Shonkwiler's diagnosis of Weaver, from the perspective of a psychiatrist, was informed by those tests – particularly the Rorschach test given by Dr. Dietiker and the MMPI given by Dr. Lundgren.

### i.    Dr. Shonkwiler

A side issue respecting Dr. Shonkwiler's qualification as an expert was the fact that he was practicing psychiatry under an "impaired" license, supervised by another psychiatrist.  The reason for the impairment on his license was unrelated to his competence as a mental health expert.  During his cross examination, however, Mr. Shumaker emphasized that that Dr. Shonkwiler was on 10 years of probation with the Board of Medical Quality Assurance, beginning in 1980.   According to Mrs. Huffman in her post-conviction declaration, Mr. Huffman was very angry to learn of Dr. Shonkwiler's impaired license, but by the time he learned of it, there was no time to retain another psychiatrist.  This fact added to his already high stress level.  Exhibit 34 to First State Petition, ¶ 8.

Dr. Shonkwiler's direct examination lasted almost the entire day on February 4, 1985 through a short time after the lunch recess on February 5, 1985.  In the course of Dr. Shonkwiler's lengthy

---

[30] Mary Cholet received her Ph.D. in psychology between the evaluation and her testimony. She was called by Mr. Shumaker for the prosecution case in chief.

[31] Mr. Powers was not asked to testify by either side.

testimony, he reviewed Weaver's childhood abuse, attributes of the "disturbing" relationship with his sister, a love-hate relationship with his mother, which may have included incestuous elements, reports of other clinicians, the fact of Weaver's amphetamine abuse, and his life-long symptoms of paranoid schizophrenia, undifferentiated schizophrenia, and PTSD.  Utilizing slides from Diagnostic Statistical Manual, Volume III ("DSM III"), Dr. Shonkwiler explained the symptoms Weaver exhibited that fit the criteria established for schizophrenia and PTSD.  Dr. Shonkwiler was aware that the mother was hostile to men in that she told Weaver she wanted to line up all men (except Weaver) and cut off their penises.  Dr. Shonkwiler also interviewed Weaver's mother (for about an hour) and Weaver's sister (for about 45 minutes), as well as Weaver (for about two hours) in 1983.  He opined that Weaver was legally insane at the time of the crimes against Mr. Radford and Ms. Levoy due to his inability to conform his behavior to the requirements of law.  Although Weaver knew the difference between right and wrong, his impulse control was very poor.  He exemplified the definition of irresistible impulse.

Three aspects concerning Dr. Shonkwiler affected his credibility, all brought out by Mr. Shumaker during his cross examination.  First there was his impaired license to practice medicine, mentioned above.  Second was his conclusion that Weaver most likely suffered sadistic toilet training because of the information he read about the "blisterings," bites, and hair pulling punishment Weaver received from his mother as an older youngster and teenager.  The conclusion admittedly was speculation.  The third aspect related to how he arrived at the diagnoses for both schizophrenia and PTSD.  For schizophrenia, he relied on the reports and work leading up to the reports of psychologists Dr. Dietiker and Dr. Lundgren.  As to PTSD, he didn't consider or include this diagnosis when preparing his December 1983 report, but resisted emphasizing military experience because of his own personal "countertransference" about the Vietnam War. [32]  He adopted the PTSD diagnosis in January 1985 only after reviewing the conclusions and assessments of the four PTSD experts.

---

[32] Apparently, there was a break in the proceedings while Dr. Shonkwiler collected himself. Although this isn't evident from the transcript, it is suggested by the criticism leveled against Dr. Shonkwiler by Mr. Shumaker during summation.  *See* Part III.A.4., *infra*.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###        ii.         Dr. Dietiker

Next, Dr. Dietiker spent between 11 and 12 hours testing, interviewing, scoring, and integrating test results.  The tests were given in late August 1983.[33]  Five hours of that time was spent "face-to-face" with Weaver.  Dr. Dietiker conducted three tests, the 16 Personality Factor Test, the Wolpe's Fear Survey, and Rorschach test, plus a psychodiagnostic interview.  The actual testimony was extremely tedious and dry.  Results from the 16 Personality Factor Test showed Weaver was an extremely anxious individual with very little regard for the morals and convictions of society, as well as very little regard for controlling himself according to those morals and convictions.  In sum, Weaver indulged himself, was not dependable, followed his own urges, lived for himself, and did not respect the rights of others.  On the Wolpe's Fear Survey, Weaver scored extremely fearful to 31 of 108 items on the survey.  Typically, people do not report extreme fear on more than five items.  Another unusual factor about Weaver was that he did not feel the scale, that is 1 to 5, was sufficient to convey his level of fear; he wanted to go beyond 5.  The situations he most feared included feeling rejected, being criticized or ignored, losing control of himself, being mentally ill or a homosexual, and being in an enclosed place.  Although Weaver's unusually high score, suggested the possibility he might have been faking his anxiety, on the Rorschach test, while several of Weaver's responses were typical of normal people, the vast majority of those responses were unusual and strongly suggested marked thought disorder.  Many of his precepts were distorted, showing a great amount of preoccupation with sexual imagery while his clear responses were highly personalized in a paranoid way.  As was common for sadistic people, Weaver also saw implements of punishment or degraded human bodies where normal people would not.  His descriptions of death images were consistent with responses of depressed people and his descriptions of seeing images of someone being attacked were consistent with responses of paranoid people.

All the tests results, taken together, convinced Dr. Dietiker that Weaver suffered from psychosis, specifically, paranoid schizophrenia and a marked inability to control his impulses.  On

---

[33] A report Dr. Dietiker had written was referenced for this testimony, but apparently the actual date was not stated on the record and the report is not part of the record on habeas corpus.

cross examination, Mr. Shumaker focused on the situations in which Weaver had been able to maintain his self-control, including sitting in the courtroom while Dr. Dietiker revealed the very personal and uncomplimentary facts about Weaver's test results, suggesting that Weaver consciously acted on his desires only when he encountered an attractive woman he wanted sexually and thought he would not be caught.   In response, Dr. Dietiker conceded that Weaver's lack of impulse control upon encountering a vulnerable attractive woman could be viewed as a symptom of ASPD.  Mr. Shumaker also suggested that Weaver could have "faked sick" on the Rorschach test because he had taken the test on a previous occasion.  Dr. Dietiker did not believe it was possible for Weaver to have "faked it," as even his advanced psychology students weren't able to do so.   Mr. Shumaker emphasized Dr. Dietiker's initial impression from the Wolpes's Fear Survey that Weaver might have been faking his anxiety.  Mrs. Huffman rehabilitated him on re-direct by eliciting his conclusion that Weaver suffered from a great deal of paranoia.  Dr. Dietiker did not believe Weaver was trying to convince him that he (Weaver) was psychotic.  In the end, however, he could not say that Weaver had been out touch with reality on February 5 and 6, 1981 when the Radford/ Levoy crimes were committed.

### iii.      Dr. Lundgren

Dr. Lundgren was the leader of the psychological team that conducted testing on Weaver.  She assigned a total of 14 tests plus psychodiagnostic interviews to be administered by each of four the team members, Dr. Dietiker, Mary Cholet, Wil Powers, and herself.   Her personal evaluation of Weaver was informed by her psychodiagnostic interview, the MMPI, the House-Tree-Person Test, and the Leary Interpersonal Checklist.  She spent five and a half hours with Weaver face-to-face, plus additional time scoring and interpreting the results.  She also wrote a report and conferred with the other team members.   One of the tests administered by Wil Powers was the Wechsler Adult Intelligence Scale.  Weaver's IQ was in the 85 to 90 range, which is low normal.

Dr. Lundgren initially thought Weaver was "faking sick" on the MMPI, but after reviewing all of his test results, she concluded that he fit the profile of a schizophrenic, suicidal, depressed, and withdrawn individual.  On the House-Tree-Person Test, Weaver's drawings indicated he had a "very inadequate personality," and a "low self-concept and psychotic processes at work." She believed Weaver possibly was schizophrenic in the way he made his four drawings.  Weaver's responses on the

19

Leary Interpersonal Check List is test similarly indicated he "had about the lowest perception of self in terms of his actual character structure" compared with the way he would like to be.  His self-perception was at the bottom of the scale.  A person scoring in that manner would be at risk for suicide.  On cross examination, Dr. Lundgren testified that during the psychodiagnostic interview, Weaver told her that he picked up female hitchhikers while driving his truck and then had forcible sex with them.  He mentioned the female voice he heard, trying to talk him out of this conduct.  He made no reference to the male voice urging him to proceed with the rapes or otherwise.

Taking into account the various acts of violence and terror Weaver perpetrated on his sister Katie when they were children, Dr. Lundgren suggested that Weaver was trying eliminate his sister because he looked at their mother as the sole source for affection and he didn't want to share.  Dr. Lundgren explained that a characteristic of some schizophrenics was that love and affection were available in only very small quantities from a single person.  The solution for such a person would be to get rid of or devalue the competitor.  Weaver had such a severe personality disorder that he could transfer into psychotic thinking upon perceiving a threat to his source of affection.  His psychosis caused him to misinterpret the stress and his personality disorder dictated his inappropriate conduct.

She testified that if an examiner were to just look at and talk to Weaver, which is one method of assessing behavior, the examiner would not come up with the underlying psychosis because the personality disorder was so extreme and stood out.  Had Dr. Lundgren spent less time with Weaver and only conducted an interview with the MMPI, she would have missed the psychosis.  She would have come up with a diagnosis of a severe character disorder of a sexual sadomasochistic type. Dr. Lundgren's final diagnosis of Weaver was 1) chronic, undifferentiated schizophrenia and 2) psychopathic personality.  After conferring with the other three examiners, she did not change her diagnosis; rather the information she received confirmed her diagnosis.  Only Dr. Dietiker agreed with her that Weaver suffered from schizophrenia, but all four examiners agreed Weaver was afflicted with a sociopathic personality (ASPD).  Dr. Lundgren refused to opine whether Weaver was insane at the time of the crimes because insanity was a legal term.  She had no ambivalence or hesitation when formulating her diagnosis.

20

### g.      Long-time Friends

Next to testify were long-time friends and half-brothers Del Roy Barnett and Jesse Mooreland. Both testified they spent time with Weaver fishing, working, and "hanging out" when they were in their late teens and early twenties. They described Weaver as easy-going and someone who stood in the background. After Vietnam, however, Weaver was more prone to violence and assertiveness. Mr. Barnett noticed that Weaver didn't enjoy fishing as much as he did prior to his service. Both also testified that they had observed Weaver talking to himself. Mr. Barnett observed this when he accompanied Weaver on a long-haul drive, but Mr. Barnett did not consider it unusual because he also talked to himself when he was driving long hauls. Mr. Mooreland's experience with Weaver talking to himself occurred when the fishing boat they were in drifted over some rocks. Again, this did not seem unusual to Mr. Mooreland because as Weaver was talking to himself, Mr. Mooreland was talking to himself.

### h.      Special Evaluations Regarding PTSD

As mentioned above, the Huffmans hired four PTSD experts: Byron Wittlin, M.D., a psychiatrist from the VA Hospital  in Los Angeles; Clyde Donahoe, Ph.D., a clinical psychologist at the same VA Hospital; John P. Wilson, Ph.D., a PTSD expert psychologist from Cleveland, Ohio; and Harry Kormos, M.D., a psychiatrist in private practice from Berkeley, California.

### i.      Dr. Wittlin

Psychiatrist Dr. Wittlin examined Weaver on August 27, 1984.  He testified a great deal about Weaver's childhood and adolescence, in part based on reports prepared by other evaluators, and in part on what Weaver told him. He found that the conflicted relationship Weaver had with his mother, the disturbing interaction with his sister, the lack of friends, and the absence of a relationship with his father resulted in a very maladjusted individual. Weaver relayed to Dr. Wittlin that his mother slapped him to awaken him and punished him by pulling his hair and biting him, plus told to him that she wanted to line all men up (except for Weaver) and cut off their penises. Based on this information, Dr. Wittlin concluded Weaver's mother was brutal, repressive, and overprotective. Nonetheless, Weaver described her as "wonderful" and told Dr. Wittlin he and his mother communicated telepathically. Dr. Wittlin opined that the conflicted relationship with his mother and sadistic relationship with his sister

21

(consistent with the sister's testimony) comprised the foundation for the kind of sexually assaultive crimes Weaver later committed against women (including his first wife, Patricia).  Weaver refused to talk to Dr. Wittlin about his father.

Dr. Wittlin understood that Weaver was a "loner" who pursued recreational activities alone, started experiencing hallucinations at age 17, and was beset by grandiose psychotic thoughts, including that he could make explosives out of household products such as Tide laundry detergent and baking soda, that his heart condition was cured when he shook hands with the Army recruiting officer who told him he could enlist in the Army after having been rejected twice before, and that all women were intent on sexually stimulating him so they could frustrate him.  Weaver's manner of communicating to Dr. Wittlin demonstrated convoluted, paradoxical type thinking.  He diagnosed Weaver with schizophrenia, paranoid type, and also, after reviewing the psychological test results of Dr. Donahoe, PTSD.  He believed Weaver's schizophrenia was exacerbated by combat stress experienced in Vietnam.  Dr. Wittlin attributed Weaver's auditory hallucinations to the schizophrenia.  On cross examination, he conceded that some schizophrenics are able to control themselves and he was unable to say whether Weaver was able to control his conduct during the Radford/ Levoy crimes.

### ii.        Dr. Donahoe

Psychologist Clyde Donahoe, Ph.D., like Dr. Wittlin, evaluated Weaver in August 1984. Weaver tested positive for PTSD on the PTSD scale of the MMPI, scored high on the Combat Exposure Scale for combat action in Vietnam, scored positive for PTSD on the Symptom Check List, showed exposure to significantly high combat conditions on the Traumatic Violence Scale, and physically displayed a great deal of stress (increase in heart rate by 40 points) while watching slides of Vietnam combat scenes (as registered by the heart/ respiration monitor to which Weaver was attached) on the psychophysiological assessment.  Dr. Donahoe understood that Weaver participated in or witnessed the killing of women and children, mutilation of dead bodies, mutilation of live people, inadvertent air strikes, ambushes on U.S. or friendly troops, use of napalm, torture and killing of prisoners, mercy killing, watching a buddy die, leaving a civilian to die, taking human body parts as trophies, and bagging dead bodies.  Weaver's symptoms included re-experiencing trauma, nightmares, memory of trauma, panic attacks, inability to make friends, loss of interest in usual activities,

emotional numbness, trouble with trust, jumpiness, difficulty falling asleep, waking up in the middle of the night, trouble concentrating, memory problems, and experiencing his heart racing.   While providing his answers, there were occasions when Weaver cried.  Dr. Donahoe testified this tearfulness was typical of combat veterans who suffered from PTSD.

On cross examination Dr. Donahoe explained that the tests he administered were given to individuals who were seeking psychological help – not for forensics purposes. He conceded that some of Weaver's PTSD symptoms could be explained by his present criminal incarceration.  He also admitted that it was impossible for him to verify Weaver's self-report of Vietnam combat experience, but Weaver's service record and his involuntary reaction to combat stimuli did substantiate his combat role.  In any event, he did not doubt that Weaver suffered from PTSD, despite his inability to verify Weaver's self-report of combat service.

### iii.        Dr. Wilson

Psychologist John Wilson, Ph.D. was a nationally known expert and researcher on PTSD among Vietnam combat veterans.  He was well-published in journals, books, and revisions to the DSM III.  In addition, he testified before Congress on the plight of Vietnam veterans.  He was experienced in other areas of psychology as well, including psychosis, schizophrenia and forensic psychology, but in recent years was more focused on PTSD.  He was not board certified in forensic psychology, a fact Mr. Shumaker brought out on cross examination.  The back drop for Dr. Wilson's testimony was Weaver's performance on a test Dr. Wilson developed called the Vietnam Era Stress Inventory ("VESI").  The test was designed to assess psychosocial functioning of Vietnam combat veterans, primarily measuring war stress and PTSD.  The test consisted of 700 questions.  In Weaver's case, the test was administered by Mr. Huffman, while his responses were captured on an audio-video ("AV") tape.  The tape was then mailed to Dr. Wilson in his home state of Ohio.

Dr. Wilson reviewed reports from other examiners as well as the VESI AV tape.  He also spent three hours interviewing Weaver prior to his testimony.  In sum, he spent a total of 40 to 50 hours arriving at his diagnosis. In his opinion arriving at an accurate diagnosis would take more than two hours.  He disagreed with the conclusion of the experts who opined that Weaver's depression and suicidal thoughts stemmed from his incarceration.  Rather, Dr. Wilson concluded Weaver had a long-

standing history of mental disorder, whether paranoid schizophrenia, psychopathic personality disorder, adjustment disorder, or dysthymic personality characteristic.  Long before Vietnam, Weaver was a very disturbed and vulnerable human being, predisposed to violent behavior in response to sexual and physical abuse from his mother,[34] and as manifested by his conduct as a youngster towards his sister.  With respect to the physical discipline the mother inflicted (biting and beating with an electrical cord or leather strap), Dr. Wilson clarified on cross examination that whether there were many or only a few beatings is not as important as the victim's perception of the beatings.  Weaver began acting out his sexual and aggressive feelings towards women as "a defense against the underlying psychosis."  Although Dr. Wilson was not at first sure Weaver suffered from schizophrenia upon reviewing the many materials and AV tape, after interviewing Weaver face-to-face, he was certain Weaver suffered from paranoid schizophrenia, co-existing with PTSD and a mixed personality disorder.  Dr. Wilson believed the schizophrenia developed when Weaver was a youngster.  Mixed personality disorder referred to personality traits which were long standing and interfered with a person's adaptive functioning.   Weaver's personality disorder was pronounced and masked his underlying psychosis.  Dr. Wilson believed Weaver had been mentally ill with psychosis and the accompanying personality disorder most of his life.

During Weaver's taped sessions answering the VESI questions, Dr. Wilson felt he was being truthful.  He also felt Weaver's hallucinations, reported during the face-to-face interview, were authentic.  If they had been "fake," they would have been reported within a constrained period of time for a particular purpose.  That wasn't the case, as Weaver described to Dr. Wilson information conveyed to him by both the male and female voices which had nothing to do with the present crimes, including the female voice's discouragement of Weaver taking revenge on certain people Weaver felt were responsible for his present predicament (being on trial for the Radford/ Levoy murders), and the male voice's encouragement for him to harm two women associated with his present incarceration.  Moreover, when Weaver was talking about his hallucinations, his affect was very intense, he was

---

[34] Dr. Wilson's testimony regarding this issue echoed Dr. Shonkwiler's suggestion of some sort of incestuous activity.

spontaneous, and his speech was pressured.  He told Dr. Wilson he didn't like people crawling around inside his head and reading his thoughts.  Dr. Wilson suspected Weaver was having hallucinations during his interview, as he was getting agitated, volatile and red-faced.  Plus, he exhibited inappropriate laughter while relaying the content of the voices' respective statements.

Regarding the PTSD diagnosis, Dr. Wilson testified on direct examination he did not doubt Weaver had been involved in combat situations.  Even when Weaver was working in the lumber yard (his first assignment in Vietnam), there still were attacks on his base.  After his stint in the lumber yard, when Weaver became a "combat engineer" working with demolition, he was in heavy combat.  His job was to sweep for mines in connection with support, search, and destroy missions. On cross examination, Mr. Shumaker suggested that because there were 100 to 120 men in Weaver's company, he may never have seen combat.  During this cross examination, Dr. Wilson conceded he couldn't say with certainty that Weaver was involved in actual combat any more than on *some* occasions.

There were three combat events that stood out.  The first involved the decapitation death of a fellow soldier.  This is the occasion the male voice first came to him, telling him to turn around, which he did, and proceeded to shoot several enemy soldiers who were advancing on him.  When recounting this story to Dr. Wilson, Weaver was trembling and crying.  The second event involved the result of Weaver's refusal to detonate explosives to blow up a village that was "clean" of enemy operatives.  In light of this refusal, his sergeant detonated the explosives and many civilian villagers were killed: men, women, and children literally blown apart, body parts and blood all over.  During this recitation, Weaver's voice was halting and accompanied by shaking and crying.   The third and most gruesome event involved the questioning of a prisoner from a village in which Viet Cong operatives were suspected of hiding.  An interrogator from the Army of the Republic of Vietnam began skinning the prisoner alive in Weaver's presence.   The prisoner was screaming in ghastly pain.   Once the interrogator obtained the information he wanted, he stopped.  Weaver asked another member of the unit to shoot the prisoner to end his misery.

The fact that the Viet Cong practiced guerilla warfare made the entire combat experience for American servicemen, including Weaver, more stressful.  Dr. Wilson opined that the stress of the war eliminated whatever remaining controls Weaver has over his impulses.  When Weaver returned from

25

Vietnam, he still was an individual with psychotic tendencies and a learned psychopathic antisocial personality disorder, but now he had no means to modulate his behavior.  The re-experienced combat images made him feel vulnerable, which in turn led him to act out in an antisocial manner.  He had difficulty controlling his anger and became distant from his children.

The VESI AV tape was shown to the jury, beginning in the early afternoon.  Weaver stayed in the courtroom for the first and part of the second segments of the tape, but asked the guards to accompany him out of the courtroom because, as Judge Stone explained to the jurors, he appeared to have "become emotionally disturbed or distraught."  Weaver waived his presence for the remainder of that day (February 13, 1985) and the morning of the following day until Mr. Shumaker began his cross examination of Dr. Wilson.

On cross examination Dr. Wilson confirmed that a person who suffers from PTSD or schizophrenia is not necessarily insane, and that sanity is determined with respect to a specific act.  Although Dr. Wilson determined Weaver was insane in February 1985, when he conducted the interview, he did not actually *know* if Weaver suffered from schizophrenia in February 1981.  With respect to the prosecution psychiatrist witnesses (Drs. Criswell, Cutting, Burdick and Matychowiak) as well as the mental health experts who testified at Weaver's trial for the Ventura crimes (psychiatrist Dr. Chappell and psychologist Dr. Donaldson), Dr. Wilson believed they all missed something, that is, PTSD.  He also felt that the examinations conducted by these doctors were superficial.  On re-direct examination, Dr. Wilson confirmed his conclusion that on February 5 and 6, 1981, Weaver could not conform his behavior to the requirements of law, "absolutely."

### iv.  Dr. Kormos

Psychiatrist Harry Kormos, M.D. had extensive experience treating combat veterans during his service as a Navy psychiatrist.  He spent between 30 to 40 hours reviewing the materials (consisting of 12 inches of documents and two AV tapes), considering the matter, and writing a report.  After writing his report, Dr. Kormos also interviewed Weaver for two hours the day before his testimony.  Dr. Kormos had a much better understanding of the intensity of Weaver's confusion as well as the psychotic nature of his thinking after the interview. Focusing on his upbringing, Dr. Kormos identified three stressful aspects from his youth: his physical health; his relationship with his mother; and his

26

relationship with his sister.  Weaver's mother, in particular, created a contradictory relationship because she was both extremely important to Weaver and violently aggressive.  During the face-to-face interview, Weaver made clear that the punishment she inflicted, including the "blistering" and biting," was very painful, very severe, and recurring.  Dr. Kormos felt that Weaver's relationships with women had always been bizarre, to a pathological degree, all stemming from the conflicted relationship with his mother.

Weaver also had internal conflicts from the fact that he was beat up at school and wasn't supposed to fight back because of his weak heart.  He had to worry if he didn't get beat up, his mother would "blister" him for being truant, and if he did fight back, he would have been punished for that as well.  This created in Weaver a sense of being oppressed, wanting to strike back, and thinking others wanted to do him harm.

The relationship with his sister also was troubling.  Based on the horrible acts Weaver perpetrated on his sister, Dr. Kormos believed Weaver wanted to kill her when he cut off her finger back when they were five and six years old.  Although Mr. Shumaker downplayed the seriousness of this finger chopping incident by suggesting it was merely an accident, Dr. Kormos took this act in the context of the other cruel things Weaver did to his sister, including going through the motions of hanging her.  He maintained his opinion that Weaver wanted to kill her since the sibling rivalry and dislike was so unusually intense.

Based on his review of Weaver's military records, Dr. Kormos believed Weaver had combat experience while in Vietnam.  This impression was confirmed by Weaver's emotional responses depicted on the AV tapes, which Dr. Kormos found authentic and genuine.  Dr. Kormos also was impressed that Weaver tried more than once to enlist in the Army and would not accept the classification of unfit for military service.  At the time of Weaver's enlistment, he had suicidal fantasies.  These fantasies or thoughts, in turn, drew the attention of Weaver's friends when he gave away all his possessions, including his fishing equipment, before deployment.  On cross examination, Mr. Shumaker posed questions to cast doubt on Dr. Kormos' conclusion that Weaver had been in active combat.  This uncertainty led to considerable back-and-forth re-cross and re-direct examination about the meaning to be attributable to the fact that Weaver put Ms. Levoy in a "prisoner position"

27

when he returned to the truck after delivering the fatal blows to Mr. Radford.  Mrs. Huffman suggested this was part of a PTSD flashback to Vietnam, while Mr. Shumaker suggested this position just as easily have been learned stateside in basic training.

Dr. Kormos opined that Weaver demonstrated delusional thinking when he expressed the belief that the "hole in his heart" was healed when the Army recruitment colonel decided to pass him as fit for service.  Weaver also was afflicted with grandiose delusional thinking, with claims he could make explosives out of household items, such as Tide, nuts, and bolts.  Dr. Kormos found unusual that Weaver volunteered to mental health professional that he had been a demolition expert, enjoyed seeing things blow up, and then giggled about it.  Most veterans were aware of social mores that one should not express deriving enjoyment in destruction or explosions.  He felt Weaver's admission that he felt powerful as a combat engineer indicated to Dr. Kormos that issues of impulse control needed to be explored.  Upon Weaver's return from combat he had developed a tremendous amount of unfocused anger on reflecting that the Vietnam conflict had been senseless and that his superior officers were corrupt.

Dr. Kormos' understanding of the circumstances of the crime was consistent with the prosecution theory of the case.  Mr. Shumaker focused his cross examination on the concept of impulse control, eliciting that Weaver was able to control his behavior to initially make contact with the young couple and formulate a plan to "get rid" of the young man.  Dr. Kormos responded that even a person like Weaver, with impulse dis-control, would be able to protect the object of his impulses (that is, his desire to rape the woman).  He also noted that a person who had been sleep deprived (as Weaver was), or used drugs (as Weaver did), would have had an even lower ability to exercise impulse control.  While Dr. Kormos agreed that Weaver did not rape every attractive woman he encountered, he did have very powerful urges and emotions, which varied in intensity from time to time.  When he did commit a rape, he did so in isolated locations.  The presence of witnesses strengthened Weaver's self-control.[35]  Weaver's ability to exercise *external* self-control was manifested by his ability to drive his

---

[35] In framing the question, Mr. Shumaker suggested that Weaver carefully chose to commit rape on victims who were defenseless and isolated from public view.

truck and make deliveries.  It was the *internal* controls which troubled him.  Dr. Kormos' opinion that Weaver lacked impulse control also was not negated by the fact that he was able to converse with Ms. Levoy when they were riding together. On redirect examination, he explained that Weaver's ability to control his impulses was constantly being stretched to the breaking point.  When he did control his impulses, it required an inordinate amount of energy.  Dr. Kormos also determined that Weaver's PTSD figured into his impulse control issues because in Vietnam the acts of killing, raping, and torturing were not only permitted, they were encouraged.  Dr. Kormos opined that the male voice Weaver heard was a voice "impersonation of the whole Vietnam style of doing things, which [wa]s to disregard the rules of civilized conduct and do all those things that up to that point were forbidden." Dr. Kormos observed that a disproportionate number of veterans who experience psychiatric difficulties after Vietnam had problems before going to war.

Like Dr. Wilson, Dr. Kormos opined that many of the mental health professionals didn't go far enough in pursuing diagnostic studies and exploring PTSD.  His own diagnosis was schizophrenia of the paranoid type along with PTSD of the chronic type.  At times people afflicted with schizophrenia showed no symptoms (particularly in cases like Weaver's where he was in a controlled environment and was taking anti-psychotic medication).  The fact that Weaver held a job as a long-haul trucker and gave testimony in court also did not detract from Dr. Kormos' diagnosis.  He opined that at the time of the crimes, Weaver had been aware of the requirements of the law, but unable to conform to those requirements.  On cross examination, he clarified, "I think that the urge [wa]s so strong and his capacity at times to restrain that urge and not act on it, that capacity [wa]s so low, that the end result [wa]s the sort of things we have heard about."

Mrs. Huffman next questioned Dr. Kormos about the contents of the reports of the four prosecution witnesses, Drs. Cutting, Matychowiak, Criswell, and Burdick, none of whom had testified yet.  Dr. Kormos found similarities between his own conclusions and those of the prosecution experts. He felt, however, in many respects they didn't go far enough or consider the fact that Weaver was in a closed (incarcerated) environment under the influence of anti-psychotic medication.

### i.      Inmate Witnesses

The defense called two individuals who had been incarcerated with Weaver and observed unusual behavior.  The first was Carl Hogan, who at the time of his testimony was an inmate in the California Prison System.  He had been housed with Weaver at the Kern County Jail, Lerdo facility and had been disturbed by Weaver keeping him up all night talking to "wherever or whatever."  Mr. Hogan asked prison authorities for Weaver to leave and the next day Weaver was reassigned.  The second inmate was Richard Archuleta, who also encountered Weaver at the Kern County Jail.  In the autumn of 1984, when he and Weaver were housed together in a 12-man cell, several times, Weaver talked to himself in the middle of the night, like he was having a conversation with someone.  This happened four or five times.  No complaints were made by Mr. Archuleta or the other men in the cell and Mr. Archuleta never said anything to Weaver about this behavior.  He noted that sometimes Weaver cried in addition to carrying on a conversation.

### j.      Mr. Huffman's Presence and Participation During Sanity Proceedings

Even before the guilt phase ended, Mrs. Huffman was actively litigating the case.  Although Mr. Huffman was present during testimony of Weaver (on Monday, December 10, 1984), Mrs. Huffman conducted the direct examination for 123 pages of the reporter's transcript over two days.  Mr. Shumaker's cross examination consumed another 85 pages of transcript, followed by another 16 pages of re-direct examination before the defense rested.  Mrs. Huffman then reopened the defense case to ask Weaver more questions on Monday, December 17, 1984.  Later the same day, and through the next, Mrs. Huffman handled the summation.  The jury went out for deliberations the same day, Tuesday, December 18, 1984, and returned the next with a verdict of guilty on all counts, plus findings that the special circumstance allegations were true.  Judge Stone instructed the jurors to return on Monday, January 7, 1985 for the sanity proceedings and counsel to return on Wednesday, January 2, 1985.

On January 2, 1985, counsel for both parties returned to discuss matters of scheduling and pending legal issues.  Explanations for the defense were given mainly by Mr. Huffman.  He asked for a continuance from January 7 to 14 due to problems he was having with his voice.  He argued that he needed to be present because he had prepared the psychiatric evidence over the last 18 months and

30

couldn't expect Mrs. Huffman to take over.  The requested continuance was granted.  When the jurors

returned on January 7, Judge Stone informed the jurors that a continuance to January 14 was necessary

due to Mr. Huffman's lingering laryngitis.

Mr. Huffman's participation on that first day of sanity proceedings, January 14, 1985, was

active.  As noted above, Part III.A.1., *supra*, he delivered the opening argument.  As to the first

witness, Dr. Albert Raitt, although Mrs. Huffman conducted the direct examination, Mr. Huffman

conducted the re-direct examination.  He had no participation in the examination of Weaver's sister,

Ms. Smith, either on January 14, 1985 or the next day.  In fact, on the next day, January 15, 1985, Mr.

Huffman was absent from the proceedings with what Mrs. Huffman described as a "worsening of his

bronchial condition."  As represented to the jurors by Judge Stone, supposedly, the Huffmans had

planned to call Weaver to the stand that day, but, since Mr. Huffman had organized and prepared the

questions to be asked, and he was absent, Weaver's testimony would be postponed until later in the

proceedings, but not the next day because defense experts already were scheduled to testify.  Mr.

Huffman was back on January 16, with minimal participation.  Mrs. Huffman conducted the direct

examination of Dr. Gardner and Mr. Huffman conducted further direct examination and re-direct

examination of Dr. Gardner. Similarly, Mrs. Huffman conducted the direct examination of Dr. Owre,

and Mr. Huffman conducted further direct examination, re-direct examination, and further re-direct

examination of Dr. Owre.[36]   The treatment of Dr. Tolchin was similar, with Mrs. Huffman conducting

the direct examination, and Mr. Huffman conducting further direction examination as well as re-direct

examination.

The next day, Thursday, January 17, 1985, Mr. Huffman was not present, but Weaver told the

court he wanted to proceed.   On the record, Judge Stone mentioned that Mr. Huffman had been having

problems with a cough and Mrs. Huffman indicated he would be checking into a hospital that

afternoon or evening in Los Angeles. RT-19: 4980-81. Mrs. Huffman handled the defense for the

examination of Dr. Chappell, Dr. Donaldson, and Mr. Rose.  When the parties and jurors returned to

---

[36]   Like Mrs. Huffman, Mr. Huffman did not declare a doubt under Penal Code § 1368 about Weaver's competence to be tried when Dr. Owre stated from the witness stand that he believed Weaver then currently was exhibiting symptoms of schizophrenia.

court, on Tuesday, January 22, 1985, Judge noted for the record that Mr. Huffman was hospitalized in Los Angeles.  Mrs. Huffman explained that the hospitalization was for a "vocal cord" problem. Proceedings before the jury were continued to Monday, February 4, 1985, with counsel directed to appear Friday, February 1, 1985 for discussion about Dr. Shonkwiler's testimony and qualifications. On that Friday, Mr. Huffman was not present, and Mrs. Huffman represented the likelihood of him being present on the following Monday, February 4, 1985, was "almost nil."  *Id*.: 4986.

On that following Monday, however, Mr. Huffman was present at counsel table with Mrs. Huffman for the first day of Dr. Shonkwiler's testimony.  While Mr. Huffman did not participate in the lengthy direct examination that day, on the following day, he interposed a couple of objections during Mr. Shumaker's cross examination.  First he objected to the question asking Dr. Shonkwiler to testify about the practices of long-haul trucker drivers.  When Mr. Shumaker was questioning Dr. Shonkwiler about the notation in his report mentioning diminished capacity rather than insanity, Dr. Shonkwiler responded that when he opined that Weaver was a paranoid schizophrenic, he was calling Weaver insane.  Mr. Huffman's second objection was to Mr. Shumaker's question about legal insanity, arguing that Dr. Shonkwiler could not testify about a legal standard.  Had the court sustained the objection, Dr. Shonkwiler would have lost his qualification to testify.  Instead, the court overruled the objection.  RT-20: 5191.  Mr. Huffman objected again to the question about whether Weaver was acting under an irresistible impulse when he chopped off his sister's finger on the grounds that the subject was not material.[37]  The objection was overruled.  *Id*.: 5193.  Later that afternoon, after Dr. Shonkwiler testified he believed that all paranoid schizophrenics were legally insane.  To the question of whether all paranoid schizophrenics commit violent acts, Mr. Huffman's objection was sustained.

During a break in Dr. Shonkwiler's testimony, outside the presence of the jury, there was an argument in which Mr. Huffman was involved about a defense subpoena of Deputy District Attorney John Logan.  Mr. Logan was the Deputy District Attorney involved in prosecuting Dr. Shonkwiler for violations which resulted in the impairment of his license to practice medicine; Mr. Shumaker argued

---

[37]  Yet under the defense insanity strategy, the notion that Weaver's mental illness commenced when he was a young child was a key factor.

32

the Huffmans subpoenaed Mr. Logan for the sole reason of keeping him out of the courtroom and therefore asked for an offer of proof as to Mr. Logan's proposed testimony.  Mr. Huffman responded that because Mr. Logan was a Vietnam veteran diagnosed with PTSD, he had some expertise concerning how veterans are rehabilitated.  Mr. Shumaker's challenge to a potential breach of confidentiality about how the Huffmans concluded Mr. Logan suffered from PTSD then led Mr. Huffman to argue that Mr. Shonkwiler felt uncomfortable with Mr. Logan in the courtroom.  At first, Mrs. Huffman was able to elicit that Dr. Shonkwiler was concerned "with a threat of possible harm from Mr. Logan," *id*.: 5205, because when Mr. Logan was a patient of Dr. Shonkwiler he (Mr. Logan) tried to take records from Dr. Shonkwiler's office.  Dr. Shonkwiler further testified that two years previous, Mr. Logan had suffered an acute paranoid reaction of hoarding guns, typical of PTSD in Vietnam veterans.  The trial court rejected the defense position that Mr. Logan was a threat or a potential witness and he was allowed back in the courtroom.  *Id*.: 5207-08.

On February 5, 1985, Mr. Huffman also presented the defense argument for admission of the diagnostic evaluation regarding Weaver's parole for the Humboldt crime through the testimony of prison psychologist Bruce Sanders, Ph.D.  Although Dr. Sanders was on the psychiatric council that made a recommendation about Weaver's post-release treatment, he had not performed the psychological evaluation which formed the basis for the report and otherwise had no independent recollection of Weaver.  Mr. Huffman unsuccessfully argued that the recommendation of the psychiatric council was properly admissible because Dr. Sanders was part of that group, and further, that the report was a business record.  *Id*. 5245-53.

On the same day (February 5, 1985), in the middle of Mrs. Huffman's direct examination of Dr. Dietiker, about his assessment of Weaver's Rorschach test results, and not long before the evening recess, Mr. Huffman requested a side bar conference to discuss scheduling of witnesses the over the next few days.  *Id*.: 5282-84 Other than interrupting the proceedings, the content of Mr. Huffman's side bar was rational.  Following the interruption, Mrs. Huffman continued her direct examination.  Before the evening recess, Mr. Huffman again interrupted Mrs. Huffman's examination to ask for clarification about what Dr. Dietiker meant that Weaver had been "faking bad" on the Wolpe's Fear Factor and 16 Personality Survey.  Dr. Dietiker clarified that his initial impression about Weaver's

33

faking his symptoms was replaced by the opinion that he (Weaver) did have a diagnosable disorder, that is, paranoid schizophrenia. *Id.*: 5292-93.

The following day, February 6, 1985, began rather benignly, but as the day wore on, Mr. Huffman's composure seemed to dissipate. Rather than continuing with Dr. Dietiker's testimony first thing in the morning, Mrs. Huffman first called Weaver's friend Del Roy Barnett, summarized above, Part III.A.1.g, *supra*, and followed with the initial direct examination of Dr. Kathe Lundgren. Mrs. Huffman's last question before the lunch recess was whether Dr. Lundgren believed Weaver should have been in a mental hospital. Mr. Shumaker's objection for lack of foundation was sustained (for lack of relevance). Mr. Huffman then undertook further direct examination. He elicited that a man with the mental problems Weaver had should not have been integrated into society and that Weaver was dangerous. *Id.*: 5361-62.

After the lunch recess, Mrs. Huffman conducted a brief direct examination of Jesse Moreland (as recounted above, also in Part III.A.1.g., *supra*). During that examination, there was mention of Mr. Moreland's Doberman Pinscher, which apparently attacked Weaver during a visit. To that reference, Mr. Huffman interjected: "Could you tell us sir, how often your Doberman Pinscher pinched you?" RT-21: 5381. When Mr. Moreland mentioned that the dog attacked Weaver, Mr. Huffman again interjected, "So he started pinching right on your arm; right?" *Id*. Except for the fact that these bizarre questions were captured on the reporter's transcript, there was no mention of Mr. Huffman's conduct by any of the trial participants, including Judge Stone. It's unknown whether the jurors heard him, but there was no indication that Judge Stone thought an admonition or statement of some kind was necessary because there is nothing to reflect such a statement on the record. Following the afternoon recess on the same day (February 6, 1985), during Dr. Dietiker's detailed description of Weaver's Rorschach card responses, Mr. Huffman made an urgent side bar request, largely addressed to Mrs. Huffman. Noting that some of the jurors were "falling asleep" and that Mr. Shumaker should be given his two hours of cross examination in the morning followed by the testimony of the VA doctors, he urged Mrs. Huffman, "Just sum the damn thing up," and that he was "not even grasping what's going on." To make his point, he asked the bailiff if he was "getting it." Mrs. Huffman promised to sum up the day in 15 minutes. *Id.*: 5421-23. The evening recess was taken following this interruption, and in

34

fact, the remainder of Mrs. Huffman's direct examination was conducted on the next morning, February 7, 1985.   Mr. Huffman did not participate in the direct, re-direct, or further re-direct examination of Dr. Dietiker.

Following the lunch recess on February 7, 1985, Mr. Huffman did blurt out an inappropriate comment during the testimony of VA psychiatrist Dr. Wittlin.   When Dr. Wittlin was explaining about distorted self-impressions versus delusions, using the example of the size clothes a person wore, Mr. Huffman interjected, "What size are you?"   *Id*.: 5524.   No one responded to this question and it is unknown if any of the trial participants or jurors heard him.   Again there was no statement from the bench after this interjection.

Mr. Huffman was not present before the jury in any further sanity proceedings after February 7, 1985.   He was present, however, for legal argument and discussion outside the jury's presence on February 8, 1985 concerning admissibility of Dr. Wilson's VESI AV tape.   The difficulty the defense team had was allowing the tape to be admitted over the prosecutor's hearsay objection.   Mr. Huffman's primary argument for allowing the AV tape was a matter of safety from potential violence perpetrated by Weaver.   Mr. Huffman informed the court that when he interviewed Weaver on the AV tape, he "went easy" on his client, but if he were to put Weaver on the witness stand to answer the VESI questions, Mr. Huffman would "be very hard on him . . . to show the jury his anger and his fear and so on."   Mr. Huffman warned that if the defense put Weaver on the stand the court had better have "a lot of bailiffs standing around."   Mr. Shumaker's primary objection was that the AV tape was an excuse for Weaver not to testify, not to be under oath, and not to be subject to cross examination.   At the end of this session, after the trial judge did in fact view some of the AV tape, he decided he would have to question Dr. Wilson himself.   During this session, Weaver asked to be excused from the courtroom because he did not want to see himself on tape.   Mr. Huffman agreed it would be a good idea for Weaver to waive his presence both during this argument and during trial proceedings because, in Mr. Huffman's words, Weaver would tend "to become volatile and violent."[38]   After questioning Dr.

---

[38]   In her declaration, Mrs. Huffman averred she did not know why Mr. Huffman wanted to convey to the jury that Weaver was dangerous.   Exhibit 34 to First State Petition, ¶ 20.   It appears he also wanted to impress the trial judge with this fact.

35

Wilson on his first day of testimony and over Mr. Shumaker's objection, the court allowed the AV tape of the VESI as the basis for Dr. Wilson's opinions. Judge Stone did not attribute his ruling to the possibility that Weaver would become violent if directed to answer the VESI questions on the witness stand. Mr. Huffman's participation in this hearing was his last until the motion to set aside the death verdict pursuant to Penal Code § 190.4(c) on April 4, 1985. Dr. Wilson appeared for his testimony on February 13, 1985.

### 2. Prosecution Case

Mr. Shumaker explained that four local psychiatrists would confirm that Weaver was not insane at the time he committed the present crimes. He explained that two additional doctors he would have presented, Drs. Donaldson and Chappell, already testified. Like the local experts, the doctors who previously testified confirmed Weaver's sanity in 1981 in connection with the Ventura crimes. To further discredit the notion that Weaver was impaired at the time of present crimes Mr. Shumaker also told jurors he would call Dr. Cholet, a member of Dr. Lundgren's team who wasn't called by the defense, and that law enforcement personnel would testify Weaver's demeanor during breaks was drastically different from his demeanor while court was in session.

#### a. Prosecution Experts

Two of the experts, Paul Cutting, M.D. and Francis Criswell, M.D., were appointed in October 1982 to conduct competence evaluations on Weaver pursuant to Penal Code § 1368. The reference forms for each of these experts, however, also had the box for sanity under Penal Code § 1026 checked. Accordingly, Drs. Cutting and Criswell evaluated Weaver for competence and sanity, yet at the time of their respective examinations, the only mental state at issue was Weaver's competence to be tried. Only Richard Burdick, M.D. and Francis Matychowiak, M.D. were appointed by the court solely for the purpose of assessing Weaver's sanity after he entered the not guilty by reason of insanity (NGI) plea on May 14, 1984. Mrs. Huffman brought this point out in a chambers discussion following Dr. Cutting's testimony. She stated on the record that she should have objected before Dr. Cutting testified because of a possible confidentiality issue with a sanity evaluation, but, ultimately did not

request a limitation on the number of court appointed psychiatrists who could testify.  RT-23: 6121-23.  Nor did she raise the issue again in advance of or during Dr. Criswell's testimony.[39]

All four court-appointed doctors had significant forensic experience.   Generally, Mr. Shumaker's direct examination of these four witnesses was relatively succinct and to the point.[40]  Mrs. Huffman's cross examination, on the other hand, was drawn out, tedious, and repetitive.[41]

### i.      Dr. Cutting

Dr. Cutting reviewed some documents, but did not record or recall what he reviewed.   He found Weaver to be responsive, although at times inappropriate.  On cross examination, Mrs. Huffman elicited that Weaver's inappropriate conduct occurred when he laughed about blowing things up and stating his intention of killing his daughter's boyfriend.  Dr. Cutting also explained to Mrs. Huffman that Weaver demonstrated a defective character or personality disorder when he suggested that the victims were at fault for having died: Mr. Radford because he wasn't supposed to have died, at all, and Ms. Levoy because she bit him.  Dr. Cutting further found that Weaver was concrete, in that he could not interpret proverbs, and had a very poor self-image. Contrary to the other prosecution experts, Dr. Cutting believed that Weaver experienced the male and female auditory hallucinations he talked about.  However, he also found that Weaver did not feel compelled to follow what either voice said because he could listen to and act on whichever voice he wanted to obey.  Dr. Cutting reiterated this on cross examination, clarifying that there was no loss of impulse control.  For this reason, Dr. Cutting opined that Weaver *was* able to conform his conduct to the requirements of the law.  Dr. Cutting diagnosed Weaver with atypical psychosis and schizoidal personality disorder.

---

[39]    Nonetheless, in his filings, Weaver has informed the Court that Mrs. Huffman did file a written motion objecting to the testimony of Drs. Criswell and Cutting.

[40]   Direct examination for Dr. Cutting filled eight pages of the reporter's transcript, for Dr. Matychowiak, 12 pages, for Dr. Burdick, 11 pages, and for Dr. Criswell, also 11 pages.  These totals exclude any re-direct or further re-direct.

[41]   Mrs. Huffman's cross examination for Dr. Cutting was 66 pages, for Dr. Matychowiak was 90 pages (covering two days), for Dr. Burdick, 83 pages, and for Dr. Criswell, 44 pages.  These totals exclude any re-cross or further re-cross examination.

In addition to the points mentioned above, Mrs. Huffman successfully brought out on cross examination that: Dr. Cutting didn't know how much Mellaril Weaver was taking at the time of their interview; having hallucinations was a symptom of schizophrenia; Weaver's IQ probably was in the low average range; Weaver had a premorbid inclination toward aggression and violence prior to his Vietnam service; Weaver experienced "severe emotional rejection" by his parents; having an overprotective, domineering mother could have hindered the development of impulse control (a learned trait); Weaver's perception all women were out to destroy him bordered on delusional thinking; if Weaver claimed to have telepathic communications with his mother, that was a symptom of schizophrenia; and a person with atypical psychosis superimposed on PTSD *could* get to a point of being incapable of conforming his conduct to the requirements of law.  Less successfully, she elicited that Dr. Cutting was looking for symptoms of PTSD in Weaver but didn't find any and Weaver's idea he could make explosives from household products was grandiose and manic, not a symptom of schizophrenia.  On redirect, Mr. Cutting maintained that Weaver was sane at the time of the crimes.

## ii.        Dr. Matychowiak

Dr. Matychowiak reviewed many documents and reports in connection with his April 1984 sanity evaluation of Weaver.  He was aware that Weaver claimed to hear male and female voices.  The male voice gave Weaver advice, but Dr. Matychowiak was unsure if the voice told him what to do and Weaver went along or if Weaver told the voice what he wanted to do and the voice went along.  Regarding the crime, Weaver was *told* the young man died; he didn't think he had killed him.  As to the young woman, Weaver said she shouldn't have bitten him; he reacted to the biting and that was why she was dead.  On cross examination, Dr. Matychowiak explained that Weaver displaced responsibility for his actions.  Dr. Matychowiak knew that Weaver was a trucker and used amphetamines to stay awake, that he thought there were good, idealized women like his mother and bad ones who used sex to control and punish, that he (Weaver) felt controlled by women and resented it, that he reported heart problems as a child, that he rolled a logging truck down a 200 plus foot

38

embankment, had a motorcycle wreck, and was hit by a tidal wave.[42]   Weaver informed Dr. Matychowiak that he had been arrested prior to the Ventura crimes for "bashing in" a woman's head because "she couldn't shut her mouth" and he knew Weaver had been in the Army from 1967-69, including service in Vietnam for a year.  He opined Weaver's IQ was low average to borderline. Weaver had a personality disorder showing paranoid and antisocial traits (that is ASPD); but not a sufficient impairment to prevent him from appreciating the criminality of his actions or conforming his conduct to the requirements of the law.

During cross examination, Mrs. Huffman brought out Dr. Matychowiak's experience treating Korean War veterans at the Naval Hospital in Bethesda and that the PTSD assessments.  He, himself, considered whether Weaver suffered from PTSD, but didn't believe it was an appropriate diagnosis. Based on what Weaver told him, Dr. Matychowiak understood that Weaver followed orders in Vietnam he didn't necessarily like in order to stay alive.  He was a survivor.  Mrs. Huffman also elicited that Dr. Matychowiak did not believe Weaver was taking Mellaril at the time of the evaluation. Weaver told him that there was nothing wrong with him and that Mellaril didn't make any difference in any event.

Dr. Matychowiak observed that there were learned dissocial patterns in Weaver's life, rather than psychotic elements.  Weaver had adaptive problems, including lack of impulse control and violent behavior beginning in childhood which became fixed in adulthood.  He presented as a person who wanted to do what he wanted to do and that people should let him.  Dr. Matychowiak believed Weaver's lack of impulse control was volitional and associated with his ASPD.  He also found Weaver paranoid.  He did not find Weaver to suffer from delusions, as Mrs. Huffman tried to portray: the idea that doctors took his heart out of his body, sewed up the hole, and replaced it was exaggeration; the notion that women were out to destroy him was a paranoid projection; the claim he could made explosives out of Tide and other household products was bragging.

---

[42] Neither the motorcycle accident nor tidal wave incident was mentioned in other testimony. The Court is unaware of reports conveying this information that are part of the record.

### iii.        Dr. Burdick

Dr. Burdick interviewed Weaver two consecutive days in April 1984 for just under three hours.[43]   Prior to his first interview, he reviewed numerous reports from other examiners for three hours and 40 minutes.  On cross examination he testified that although the information provided was extensive, the case was not particularly complicated.  It was during cross examination that Dr. Burdick described Weaver's condition more thoroughly; he found Weaver had ASPD, which was marked by a generalized deficiency of conscience and indulging self-interest at the expense of others.  People with ASPD could exercise control and judgment, tending to avoid detection and not wanting to get caught or punished.  Basically, they had "adjustment difficulties."  While it was possible for ASPD to be a cover for underlying psychosis, Dr. Burdick didn't find any psychosis in Weaver's case.

Regarding the voices, Dr. Burdick felt Weaver's description of them was inconsistent with a mental or psychiatric illness since there had been there had been no decompensation in his condition and the hallucinations did not appear to be cyclical with the progression of mental illness.   As described, the voices seemed to represent conscience (female) and inner urges (male).   To the extent the voices were real and not fabricated (which Dr. Burdick suspected), neither told Weaver to kill, and in any event, responding to inner urges was consistent with ASPD.  On cross examination, he admitted that Weaver had been consistent about the voices, and acknowledged that his mother reportedly knew about them and told him not to tell anyone about them.  But in the interim, for the next several years, Weaver was able to hold down jobs and not raise anyone's suspicions about experiencing auditory hallucinations.  Also on cross examination, he testified that Weaver even made a point of telling him the voices had nothing to do with killing the young couple[44] and was under the impression that during his interview of Weaver, Weaver was not using Mellaril.  The fact that Weaver reported fewer auditory hallucinations when he was taking Mellaril did not convince Dr. Burdick the voices were real or, if real, were the result of mental illness.  First, Weaver indicated he didn't think the medication did any

---

[43] On the first day he spent one and a half hours, and on the second, one hour 25 minutes.

[44]   He also told Dr. Burdick he had not intended to kill the couple.  The male voice is said to have told Weaver to hit the young man with the pipe to get him out of the way, not to kill him.

good.  Second, the medication could have made Weaver more comfortable so he didn't complain as much about the voices.

Dr. Burdick testified he didn't believe Weaver had blacked out when he was strangling Ms. Levoy because he was able to remember and describe what he had done.  Dr. Burdick discounted the account that his first wife said Weaver had blacked out after she had bitten him.  Rather, he suggested that Weaver stopped his attack when the wife kicked him in the groin and that she was not psychiatrically trained to determine if Weaver had been in a trance.  When Weaver said that he would go "for the throat" anytime anyone bit or slapped him, this signaled to Dr. Burdick that Weaver felt justified in attacking someone who hurt him.  With respect to Ms. Levoy, Weaver already was acting under impulse when he was trying to tie her up.  That didn't change when she bit him.  Dr. Burdick concluded that Weaver was able to appreciate the criminality of his conduct and had the ability to conform his conduct to the requirements of the law.  At the time of the crimes, he made personal choices about his actions.   On his second day of cross examination, Dr. Burdick testified he disagreed with the examiners who found Weaver could not conform his conduct to the requirements of the law; Weaver knew what he was doing and was able to exercise control over his behavior.

In addition to the specific statements mentioned above, Mrs. Huffman brought out over two days of cross examination that Dr. Burdick had the impression Weaver's childhood was somewhat traumatic and that he had no doubt Weaver had been abused as a child.  Both parents expressed negative attitudes about the opposite gender.  He assessed Weaver's intelligence in the low average range, finding no "real deficiencies."  He was aware that Weaver, as a trucker, used amphetamines and stated that "enough" amphetamines could cause psychotic behavior.  But Dr. Burdick did not detect anything in his evaluation or read any reports that convinced him Weaver suffered from delusional thinking.   The thought broadcasting with his mother, for instance, did not sound genuine to Dr. Burdick.  Nor did Weaver's reticence to talk about his past demonstrate anything more than denial. Dr. Burdick described Weaver's claims of being able to make explosives from household products and having a recruitment officer heal his heart as "wishful" not delusional thinking.  He also didn't find Weaver's claim that women were out to stimulate him sexually in order to frustrate him to be any more than anger, if it were true.

41

Dr. Burdick did not detect any gross impairment of judgment.  Rather, Weaver's judgment, which was poor, was consistent with his personality disorder, not mental illness.  In commenting on Dr. Shonkwiler's description of Weaver's conduct toward his sister, Dr. Burdick noted Weaver's behavior was beyond sibling rivalry, it was "horrible."  But his conduct toward his sister had been well organized, representing Weaver's personality and parenting deficits.  Regarding PTSD, when asked whether there could have been a connection between the present crimes and PTSD, Dr. Burdick responded, "Absolutely not."  Weaver's observed symptoms, including depression and tenseness, did not include intrusive thoughts of Vietnam.  Rather, Weaver stayed away from the subject, except for describing "violent things," which he seemed to have enjoyed.  Depression, including difficulty sleeping, was the "most common disabling ailment in the white world."

### iv.        Dr. Criswell

Dr. Criswell examined Weaver in October 1982 based on a court referral as did Dr. Cutting. He extended his standard one-hour examinations to two hours due to the gravity of the charges and "the rather complex amount of information," including 276 pages of various records he received from Mr. and Mrs. Huffman.  He did not believe that spending 30 or 40 hours evaluating a patient (including reviewing records) would be beneficial to a sanity assessment.  It would give, however, a fuller picture of the patient.

Although Weaver was sad and depressed he did not exhibit a thought disorder or delusional thought and generally was cooperative.  Weaver told Dr. Criswell that he was medicated at the time of the evaluation and that he had experienced auditory hallucinations since childhood.  He also told Dr. Criswell he had cardiac problems as a child, about his enlistment in the Army, and that he liked detonating explosives during his service.  Dr. Criswell didn't believe Weaver's claim that his superiors allowed him to blow up anything he wanted to, saying it was "obviously untrue."   Dr. Criswell found no indication of any present or past psychosis.   He discounted the report of auditory hallucinations as unconvincing in nature or length of presence.  Weaver's psychopathology was of a personality disorder rather than a mental disease or defect.  He found Weaver possessed substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law at the time of the crimes.

42

On cross examination, Dr. Criswell admitted that any psychotic symptoms, including delusional thinking, Weaver may have had would have subsided he if were taking 600 mg. of Mellaril at the time of the evaluation.   Dr. Criswell doubted the psychosis claim because the doctor at the receiving prison at Chino[45] did not give Weaver any antipsychotic medication.   He did testify that Weaver told him he had received Mellaril while incarcerated in state prison.   Dr. Criswell found that Weaver responded to the interview like a frightened child.   He felt Weaver was of average intelligence and demonstrated that his abstract thinking was intact (unlike other prosecution experts).   He suffered from impaired judgment, but not in a mentally defective way.   He felt Weaver was dangerous and would remain so until enfeebled by age or heath.   He noted that ASPD tended to subside as a person reached age 40 and beyond.

Regarding the crime, Dr. Criswell had a hard time believing Weaver didn't know he had killed Mr. Radford in light of the number of times he was hit.[46]   Dr. Criswell believed Weaver that he hit Mr. Radford until he stopped screaming.

Dr. Criswell believed that Weaver suffered abuse as a child based on Weaver's description of an extremely pathological family and family environment.   It was a believable account.   He didn't think Weaver's heart condition was that severe based on the fact that he ultimately got into the service. He didn't recall Weaver telling him that his heart condition was cured by the officer who told him he could enlist.   If Weaver believed that story, he could have been delusional.   If Weaver believed that all women were out to get him, that could have been a delusional thought.   Dr. Criswell was not aware that Weaver claimed to experience thought broadcasting.   He testified that if Weaver suffered from paranoid psychosis, his amphetamine use would have exacerbated this condition and that amphetamines, themselves, can precipitate an acute paranoid psychotic state.

---

[45]   The California Institution for Men, at Chino, was the receiving prison for Weaver following his conviction of the Ventura County crimes.   It's possible that Dr. Criswell was confusing Weaver's incarceration at the Men's Colony in San Luis Obispo, where Dr. Owre testified Weaver never received any anti-psychotic medication.

[46]   Weaver testified during guilt proceedings he thought he only hit Mr. Radford three times.

43

Since Dr. Criswell served as a doctor during Vietnam, he was familiar with the symptoms of PTSD. He discussed Weaver's Vietnam experience with him but didn't record notes of that discussion in his report because he was satisfied they had no particular relationship to Weaver's subsequent behavior.[47] The fact that Weaver sometimes had suicidal thoughts (a symptom of PTSD) didn't alter Dr. Criswell's belief, since most people who are incarcerated are depressed. Weaver's sad childhood also would have produced depression. Weaver told Dr. Criswell he couldn't keep a job as a trucker[48] and Dr. Criswell admitted that inability to hold a steady job was consistent with PTSD. He was aware that Weaver startled when he heard a car back-fire, but a startle response and hypervigilance were consistent with "practically every anxiety disorder." Low self-esteem, on the other hand, was connected to personality disorders.

Dr. Criswell did not believe Weaver experienced auditory hallucinations because he heard two voices with opposite content and apparently no one ever noticed he hallucinated, since childhood and through his Vietnam service. Also, the way Weaver described his voices was not the "way people experience[d] hallucinations."[49]

### b.   Witness hired by the Defense Testifying for the Prosecution

Mary Cholet was a registered psychological assistant in 1983 working under the licenses of psychologists Kathe Lundgren and Edward Dietiker when Affiliated Psychologists undertook a comprehensive evaluation of Weaver. She earned her own Ph.D. later that same year. Prior to Dr. Cholet's testimony, on two separate occasions, February 20, and 21, 1985, there was discussion about whether her communications with Weaver were privileged as psychotherapist-patient communications (California Evidence Code § 990). According to Mrs. Huffman, Dr. Cholet asked not to testify because Weaver had threatened her, and to avoid testifying for the prosecution, she was claiming the therapist-patient privilege. On February 20, 1985, the court found the privilege did not apply for two

---

[47] Dr. Criswell's lengthy and thorough report, Exhibit 113 to the First State Petition, indeed does not mention PTSD.

[48] This fact is confirmed in Dr. Criswell's report. Exhibit 113 to First State Petition, p. 3.

[49] In Dr. Criswell's report, he noted that Weaver's description of hallucinations were "thoroughly unconvincing." Exhibit 113 to First State Petition, p. 7.

reasons.  First, she wasn't a licensed psychologist (and did not then have her doctorate) at the time of her evaluation.  Second, since she was working under Dr. Lundgren, and the privilege was waived in order elicit Dr. Lundgren's testimony, Dr. Cholet could not assert it.  RT-23:6019-36.  Just prior to her testimony on February 21, 1985, Mr. Shumaker requested clarification about another possible basis for privilege, that is under Evidence Code § 1017.[50]  Mr. Shumaker inquired whether Weaver was claiming the attorney-client privilege for Dr. Cholet's work, so the issue could be resolved by the trial court.  Mrs. Huffman clarified that neither Dr. Cholet nor any of her colleagues was appointed under Evidence Code § 1017, and the matter was settled.  RT-24:6406-09.

Her task as part of the group was to test Weaver for organicity, or brain damage, Weaver's function in interpersonal relationships, and whether he demonstrated impaired thought processes (that is schizophrenia).  She did not testify for the defense, and in fact requested that she *not* be called to testify.  This hesitancy was explained during re-cross examination when Dr. Cholet disclosed that Weaver told her he fantasized about her and that if he were released from jail, she would be one of his victims.

After conducting a series of neurological tests and interviewing Weaver for four hours, she concluded he did not suffer from organic brain injury or damage.  Regarding relationships, she found he was compulsively driven to others.  Weaver's mental status was anxious and impulsive.  His impulsiveness was a byproduct of his personality disorder rather than organicity.  She found evidence of ASPD and borderline personality disorder.  In later questioning on further re-direct examination, she told Mr. Shumaker Weaver had borderline personality disorder, not ASPD.  She stated that the hallmark of borderline personality disorder was lack of impulse control, which in turn was a learned process.

Although Weaver briefly mentioned hallucinations, Dr. Cholet observed no evidence of loosening of associations or tangential thinking, in short, no evidence of schizophrenia.  Specifically,

---

[50]  The Court notes that the content of Evidence Code § 1017 was not discussed on the record.  For clarity in the Memorandum Order, Evidence Code § 1017 provides that the therapist-patient privilege is waived when the mental expert is appointed by court order or the board of prison terms.  If the expert is appointed to assist the defense attorney and defendant to determine whether to enter or withdraw an NGI plea, however, the privilege remains.

Weaver's desire to be with people was uncharacteristic of schizophrenia.  Also, schizophrenics had problems expressing themselves.  Weaver was not troubled by this deficiency.  Dr. Cholet did not believe it was possible for his personality disorders to have masked underlying psychosis.  In her experience, residual symptoms of the illness "almost always" were noticeable.  She disagreed with both Dr. Lundgren and Dr. Dietiker that Weaver experienced delusional thoughts and suffered from schizophrenia.  She considered that Weaver may have had family members who had schizophrenia.  But, as she had written her doctoral thesis on schizophrenia, she was aware that scientists didn't actually know if schizophrenia was driven by genetic or environmental factors.  On further re-cross examination, she clarified that there is a statistical connection between parental schizophrenia and schizophrenia in children, so the fact that Weaver had family members with the disease should not be discounted.  From her interview with Weaver, she knew he had an abusive childhood, a love-hate relationship with his mother, and believed women were out to get him.   She did not find these factors to have caused Weaver to have become psychotic.

Dr. Cholet also had professional experience in dealing with combat-induced PTSD.  She found Weaver's description of his Vietnam experience to have been inconsistent with PTSD, in that he did not repeatedly recount his experiences in a flattened affect and he did not talk to her about intrusive thoughts of Vietnam.  She knew that people with PTSD used drugs to deal with their stress, but she testified they would not have used amphetamines (as Weaver did) to relieve stress.  Mrs. Huffman asked a series of questions to emphasize Dr. Cholet's *lack* of expertise in assessing PTSD, including her unfamiliarity with current PTSD research and the PTSD scale for the MMPI.

Dr. Cholet thought it was possible for a person to have been afflicted with a personality disorder, PTSD, and a psychosis.  She did not think this was possible for Weaver at the time of the crime because his descriptions of the multiple murders were very clear.  His actions, as he described them, were direct and goal-oriented.  His conduct indicated his awareness of lawful versus unlawful conduct, and he did plenty to avoid being caught.  There was no evidence of psychotic thinking.

### c.   *Inmate Witness for the Prosecution*

As noted above, in Mr. Shumaker's opening statement (Part III.A.2., *supra*), he told the jurors he would call law enforcement personal to testify about how different Weaver's demeanor was when

46

they were not in the courtroom to counter Dr. Owre's testimony that Weaver currently was suffering from schizophrenia.  *See* Part III.A.1.*d*., *supra*.  In fact, Mr. Shumaker did not present any law enforcement witnesses because Mrs. Huffman successfully argued that Mr. Shumaker's cross examination of Dr. Owre adequately covered this area.  Instead, Mr. Shumaker called an inmate witness, Cecil Sneed, to refute the notion that Weaver had been seen hallucinating at the jail.

Mr. Sneed had been housed with Weaver from August to October 1984, along with six to nine other inmates.  During this time, Weaver asked Mr. Sneed to testify for him that he was "up at night talking to people that w[ere]n't there, imaginary people, whatever."  Weaver also discussed this proposed testimony with co-inmate Richard Archuleta.  In September 1984, Sneed told Weaver's attorneys he would testify about Weaver talking to voices, even though he had never observed this behavior.

In late October or early November 1984, after Mr. Sneed decided not to testify for Weaver, and they no longer were celled together, he received an inmate letter (marked as evidence stipulated to have been from Weaver) in which Weaver wrote, "Anyone who hurt [sic] my case I would do my best to do them in."  Mr. Sneed did not bring this letter to the attention of authorities until 10 days before his testimony (on February 26, 1985).

On cross examination, Mrs. Huffman brought out incentives Mr. Sneed received in exchange for his testimony, including early release from jail and a bus ticket home.  She also pointed out that Mr. Sneed could not read and that Mr. Sneed always retired before Weaver did, so he wouldn't know one way or another whether Weaver was having conversations with auditory hallucinations.  There was no effort, however, to refute the content or import of the note.

### d.  *District Attorney Investigator*

The District Attorney's investigator, Carol Bender, explained her efforts to serve Weaver's mother with a subpoena.  Ms. Bender's testimony strongly suggested that Mrs. Weaver was avoiding service, but that she finally was served by a private subpoena service.  On cross examination, Mrs. Huffman brought out that both Weaver's father and sister, Katie Smith, were served by the District Attorney's office.  Neither of these Weaver family members were called to testify.

1

### 3.      Defense Rebuttal – two more inmate witnesses

2         Mrs. Huffman called two inmate rebuttal witnesses to discredit Cecil Sneed.  The first, Charles

3   Shannon, a current inmate at the Kern County Jail, had befriended Mr. Sneed.  Mr. Sneed told Mr.

4   Shannon that the testimony he (Mr. Sneed) intended to give in Weaver's case would be his (Mr.

5   Sneed's) "meal ticket" out of jail.  Mr. Shannon also stated that Weaver had never asked him to testify

6   in a particular manner.  Mr. Shannon thought Weaver was strange – always awake when Mr. Shannon

7   turned in.   When Mr. Shannon awoke in the middle of the night Weaver would be up talking to

8   himself.  Mr. Shannon was uncomfortable around Weaver and kept his distance.

9         The second inmate rebuttal witness was Christopher Flores, who had been celled at times with

10  Weaver, Mr. Shannon, and Mr. Sneed.  He had observed Weaver up at night, writing sometimes, and

11  Mr. Sneed, at times, conversing with Weaver.   He also had observed Weaver at night talking to

12  himself, "grinding [sic] himself, walking around the cell, just mumbo jumbo; it didn't make any

13  sense." Sometimes Mr. Flores could understand the words Weaver was saying, but not the context.  He

14  noted that Weaver isolated himself, seemed afraid of people, and afraid people would take his

15  possessions.  He (Weaver) didn't stand up for himself.  Sometimes Mr. Flores stood up for Weaver in

16  the face of adversity.  Yet Weaver was strange.  Sometimes Mr. Flores would awaken in the middle of

17  the night and find Weaver staring at him from about a foot away.   Weaver also had problems

18  controlling his bowels and these problems became progressively worse.  Weaver had "accidents."  Mr.

19  Flores recalled Sneed mentioning that he was going to use Weaver to get out of jail.  He never told

20  Weaver about this comment.

21        ### 4.      Summation

22        Following a brief jury instruction conference, Mrs. Huffman's summation extended the entire

23  day on Wednesday, February 27, 1985, for 93 pages of transcript.  The next morning, Thursday,

24  February 28, 1986, another brief jury instruction conference preceded Mr. Shumaker's summation,

25  which continued until the lunch recess, taking up 51 pages of transcript.  Mrs. Huffman's rebuttal was

26  short, having been completed after the lunch recess at 1:40 p.m. until the first afternoon recess, for a

27  total of 18 pages.

28

MemODenyClaims1&2&IACBriefing-Wea

### a.     *Mrs. Huffman*

Her theme was that Weaver's background and experiences made him into a "madman" who was legally insane when he killed Robert Radford and Barbara Levoy.   Towards the end of her summation, however, she backed off this notion and stated that Weaver was not "a constant raving lunatic," but that his mental abilities fluctuated depending on the stressors in his environment.   She noted that Weaver's childhood was unusual, as his sister's testimony confirmed.   She reminded the jurors that all examiners concluded Weaver was abused as a child.   She also stressed that a person's background was important in rendering an opinion about legal sanity.   One of those factors in Weaver's case was PTSD, which the experts who evaluated Weaver in other incarceration settings as well as the prosecution experts did not seriously consider because they lacked experience and knowledge.   The VA doctors found Weaver's symptoms consistent with PTSD.   She suggested that if the experts who found only a personality disorder in Weaver had spent more time, they might have seen that he suffered from a more serious condition.   For instance, she mentioned that both Drs. Lundgren and. Dietiker spent "like 28 hours" testing and evaluating Weaver.[51]   She argued the jurors should consider the qualifications of each expert and the comprehensiveness as well as the duration of their evaluations when evaluating their opinions.   Also with respect to the defense team evaluators, Mrs. Huffman stated Weaver was off anti-psychotic medication at the time of the evaluations.[52]   The point of this statement was that anti-psychotic medications could mask psychotic and schizophrenic symptoms, although the "overlaying personality disorder" still would be evident.   She argued Weaver unintentionally beat Mr. Radford to death after experiencing a PTSD flashback to Vietnam.   In particular, she mentioned the horrific experience Weaver had of being present when a Viet Cong

---

[51] This was an overstatement.  Dr. Dietiker testified he spent a total of 11 to 12 hours on Weaver's case and Dr. Lundgren stated she spent approximately five and one-half hours with Weaver face-to-face, plus additional time scoring and interpreting the test results.  Based on the fact that Drs. Dietiker and Lundgren were part of a team of evaluators, the Court understands some additional time was spent by all team members reviewing each other's reports and discussing their conclusions.  It's unclear how Mrs. Huffman arrived at the "like 28 hours" figure.

[52] This information was not brought out in the testimony, but the Court is aware that Affiliated Psychologists tested Weaver in August of 1983.  Dr. Shonkwiler indicated in his testimony that his face-to-face interview with Weaver also was in 1983, contemporaneous with the evaluation by Affiliated Psychologist.

prisoner was skinned alive and screamed in unbearable pain.  Weaver wasn't hitting Mr. Radford; he was hitting the scream.  With respect to Ms. Levoy, Weaver also experienced a PTSD flashback after she bit him.  The flashback was to his mother biting him.  With the bite came a trance where he didn't know what he was doing, and realized when he snapped out of it that he had choked her to death.

She discussed the testimony and import of that testimony as to each witness.  With respect to the psychologist and psychiatrist witnesses who testified regarding Weaver's Humboldt and Ventura convictions, she argued none of them spent much time taking Weaver's history, and no time to verify what background they did get.[53]  She similarly criticized the four prosecution experts for not having obtained a complete picture of Weaver because they did not spend enough time learning his background.  At the culmination of her summation, Mrs. Huffman discussed the standard of proof, that is, the preponderance of the evidence standard.  Though more experts thought Weaver knew right from wrong *and* was capable of conforming his conduct to the requirements of law, mere counting of opinions was not the correct method for making a determination.  She again urged the jurors that relative qualifications and credibility of the experts for were the key factors.

In the course of her summation, she made specific points from specific witnesses.  From the witnesses who testified that Weaver's maternal aunt and cousin suffered from schizophrenia, Part III.A.1.*a.supra*, she encouraged the jury to conclude that Weaver was predisposed to having schizophrenia. Next, she mentioned the evaluators regarding the Humboldt County crime, Part III.A.1.*d*., *supra*.  With respect to Dr. Gardner, Mrs. Huffman noted that he mentioned Weaver's abusive childhood and that Weaver enlisted to serve in Vietnam to be killed.  She stated Dr. Gardner evaluated Weaver for sanity, but this was a misstatement.[54]  As to Dr. Owre, she reminded jurors he reported that both of Weaver's parents were brutal and overprotective, that Weaver had distorted feelings about women, derived emotional release by inflicting pain on them, that Weaver has a

---

[53] Providing these doctors with background information certainly would have been an option for the Huffmans in advance of their testimony.  Drs. Chappell and Donaldson were confounded by this omission on the part of Mr. and Mrs. Huffman, as discussed in Part VII.A.1., *infra*.

[54] Dr. Gardner evaluated Weaver in connection with the sentence to be imposed by the Superior Court.

50

passive-aggressive personality with depressive sadomasochistic features, and that during his testimony, Weaver was exhibiting symptoms of schizophrenia.  She reminded jurors that the last expert among the Humboldt crime evaluators, Dr. Tolchin, noted that while Weaver was in therapy in the institutional setting he was doing well, but outside there were many more stressors which could have caused him to break down.

With respect to the Ventura crimes, Mrs. Huffman mentioned Drs. Chappell and Donaldson, who testified at Weaver's trial, as well as Mr. Rose, who evaluated Weaver's prospective placement in the prison system after his Ventura conviction.  Mrs. Huffman's argument as to these three experts came at the very end of her summation just before the evening recess.  Much of her summation regarding Dr. Chappell was incorrect.  She stated that during the Ventura trial he testified as to Weaver's competence, that Weaver had an adjustment disorder with depression and possibly psychosis, so he couldn't rule out schizophrenia.  Only the diagnosis of adjustment disorder with depression was accurate.  Dr. Chappell testified about Weaver's sanity at the time of the Ventura crimes (not competence to be tried) and stated that his adjustment disorder was not a mental defect or disease.  He further testified that at the time of his evaluation, Weaver neither described nor showed symptoms of schizophrenia or true psychosis, even taking into account Weaver's report of auditory hallucinations.  Mrs. Huffman's description of Dr. Donaldson's testimony also was inaccurate.  She stated he, in contrast to Dr. Chappell, obtained quite a bit of background information, including that Weaver was subject to child abuse, that his mother told him she wanted to line up all men (except for Weaver) and cut off their penises, and that the mother was strict, pampering, and disapproving of females.  In fact, Dr. Donaldson did not take his own history of Weaver, but rather relied on the history Dr. Chappell had conducted, and none of these facts were mentioned in his testimony at all.  Mrs. Huffman mentioned Dr. Donaldson's "opinion" that Weaver's high score on the F (confusion) scale of the MMPI meant that he was exaggerating or suffered from psychosis and possibly PTSD.  This is incorrect; he mentioned nothing about a connection with the high F scale and mental illness; he only mentioned exaggeration or *confusion* as possible causes for the high F scale.  What Mrs. Huffman did not mention about Dr. Donaldson was his uncertainty at the very end of his testimony when Mrs. Huffman posited that Weaver had blacked out after Ms. Levoy bit him.  With respect to the final

51

Ventura-related mental health professional, Mr. Rose, Mrs. Huffman said very little except about Weaver's hostility toward women. She incorrectly attributed to Mr. Rose the statement that it was possible Weaver was delusional regarding his negative feelings towards women.

Turning to the team of defense experts the Huffmans hired (Drs. Shonkwiler, Lundgren, and Dietiker), Mrs. Huffman talked about Dr. Shonkwiler the most. She pointed out that he reviewed a great deal of information in the reports of other experts, finding Weaver had been physically abused as a youngster. Although Dr. Shonkwiler knew Weaver had served in Vietnam, he did not address PTSD until he read the reports from the PTSD experts, at which time he added PTSD to his clinical impression of Weaver. To assist the jury to understand that Weaver suffered from schizophrenia, Dr. Shonkwiler went through the diagnostic criteria for schizophrenia on the DSM-III slides shown during his testimony. In addition to schizophrenia and PTSD, Dr. Shonkwiler found a personality disorder. His opinion was that Weaver was legally insane when he killed Mr. Radford and Ms. Levoy because he could not conform his conduct to the requirements of law due to a mental disease or defect. Mrs. Huffman also stressed that Dr. Shonkwiler's credibility as an expert was not compromised because he practiced under an impaired license. He was totally qualified to render a diagnosis.

She emphasized the comprehensiveness of the respective evaluations undertaken by Drs. Lundgren and Dietiker and the importance of the diagnostic interview both psychologists conducted. Dr. Lundgren attributed the high MMPI F scale results she obtained to Weaver's underlying personality disorder. Her finding was that he suffered from psychosis with an underlying personality disorder. She also determined he had been abused as a child. The MMPI and the two other tests administered led Dr. Lundgren to conclude that because of the severity of Weaver's personality disorder, it would not have taken much to have pushed him to psychosis. She did not reach her conclusion that he suffered from schizophrenia until all the testing (by all the affiliates of her group) had been completed. Because she had no experience with PTSD, she did not give an opinion on that illness. She also didn't give an opinion on Weaver's sanity at the time of the crime. With respect to Dr. Dietiker, Mrs. Huffman pointed out that he, like Dr. Lundgren, found Weaver had been abused as a child, did not address PTSD, and did not offer an opinion about Weaver's sanity at the time of the crimes. His diagnosis of Weaver was paranoid personality disorder and paranoid schizophrenia.

52

Mrs. Huffman's next subject was the testimony of the PTSD experts. The first two, psychiatrist Dr. Wittlin and psychologist Dr. Donahoe, examined Weaver at the VA in Los Angeles (Brentwood) in August 1984. Mrs. Huffman erroneously stated that Dr. Wittlin conducted many tests and an interview of Weaver.[55] Dr. Wittlin determined Weaver has suffered child abuse and diagnosed him with PTSD, schizophrenia, and personality disorder. Mrs. Huffman referred to this triple diagnosis as "a dichotomy of three" and repeatedly misused the word "dichotomy" during this portion of her summation. She noted Dr. Wittlin did not offer an opinion of Weaver's legal sanity at the time of the Radford/ Levoy murders.[56]

Mrs. Huffman reminded the jurors that Dr. Donahoe administered psychological tests including the MMPI. The tests Dr. Donahoe administered were designed to determine Weaver's combat exposure. He obtained no childhood background and gave no opinion about Weaver's legal sanity. He was certain Weaver suffered from combat PTSD. Weaver had many symptoms, including re-experiencing trauma, being withdrawn, and having sleep disturbances and nightmares. Also, Weaver's score on the Traumatic Violence Scale (another test Dr. Donahoe administered) was very high. That test measured physical symptoms of stress, including pulse, respiration and perspiration. Mrs. Huffman emphasized that Weaver could not fake his heart rate and perspiration.[57]

The next expert, Dr. Wilson, from Ohio, was a nationally known PTSD advocate. Mrs. Huffman summarized his testimony as noting Weaver had been abused as a child by this mother while his father was absent. She said he described a "love-hate" relationship to his mother. She noted that Dr. Wilson thought Weaver's understanding that his heart condition was miraculously cured when the recruiting colonel shook his hand was a manifestation of a delusion. Mrs. Huffman mentioned that Dr. Wilson testified a further delusion was evident by Weaver's belief he could make a bomb out of

---

[55] Conducting tests would have been and was the job of the psychologist, not the psychiatrist.

[56] Actually, he testified he was unable to say whether Weaver was able to conform his conduct to the requirements of the law at the time of the crimes.

[57] This was in response to Mr. Shumaker's cross examination of Dr. Donahoe that he didn't *actually* know if Weaver had been in combat. Dr. Donahoe conceded he had no way to verify Weaver's self-report of combat experience, but still had no doubt Weaver suffered from combat-induced PTSD.

53

1   household items.  Neither of these matters, however, was mentioned in Dr. Wilson's testimony.[58]  Mrs.

2   Huffman correctly stated Dr. Wilson's opinion that Weaver's stated ability to thought broadcast and

3   read minds was indicative of delusional thinking.  She noted that Dr. Wilson spent between 40 and 50

4   hours evaluating Weaver (including reviewing other reports, the AV tapes, interviewing Weaver, and

5   writing a report).  She reminded the jurors that Weaver had revealed to Dr. Wilson his presence when a

6   South Vietnamese official skinned a suspected Viet Cong operative alive to retrieve information.

7   Weaver had not told any of the other examiners this information.  Before Dr. Wilson's interview with

8   Weaver he thought schizophrenia should be ruled out, but after their interview together, Dr. Wilson

9   was certain Weaver suffered from schizophrenia, as well as PTSD, amphetamine abuse, and mixed

10  personality disorder.[59]  She did mention Dr. Wilson's opinion that while Weaver could understand

11  right from wrong, he could not conform his behavior to the requirements of law.

12      Next Mrs. Huffman discussed the testimony of former Navy psychiatrist and PTSD expert Dr.

13  Kormos, noting that after he reviewed all the same material Dr. Wilson's reviewed he concluded

14  Weaver suffered from PTSD from Vietnam combat.  The other diagnosis he gave was schizophrenia,

15  paranoid type.  Also, like Dr. Wilson, Dr. Kormos found Weaver insane because of his inability to

16  conform his conduct to the requirements of law – even though he knew right from wrong, Mrs.

17  Huffman also stressed that Dr. Kormos spend a great of time uncovering the cause of Weaver's

18  underlying mental illness, which despite what Mr. Shumaker argued was more than a personality

19  disorder.[60]

20

21      [58] They were, however, mentioned in Dr. Kormos' testimony.  *See* text and accompanying

22  footnote, *infra*.

23      [59] Surprisingly, Mrs. Huffman spent no time describing the VESI given to Weaver, though this
    subject consumed the bulk of Dr. Wilson's testimony.  Nor did she mention Weaver's abusive

24  childhood that predisposed him to violent behavior, as manifested by his conduct as a youngster
    toward his sister.  Also absent from her summation was Dr. Wilson's opinion that Weaver began acting

25  out his sexual and aggressive feelings towards women as a defense against his underlying psychosis
    and his impression that Weaver's references to auditory hallucinations seemed to him to be authentic.

26  Finally, Mrs. Huffman failed to mention Dr. Wilson's stated certainty that Weaver actually did see
    combat and experience combat related stress during his service in Vietnam despite Mr. Shumaker's

27  implications to the contrary.

28      [60] Not mentioned in her closing were: Dr. Kormos spent between 30 to 40 hours reviewing
    materials (including the two AV VESI tapes) and writing his report; after writing his report, he spent

54

As to the prosecution experts, Mrs. Huffman's review of Dr. Cutting came first.  She correctly recited that he found Weaver had suffered child abuse, but incorrectly stated Dr. Cutting did not believe Weaver's reported auditory hallucinations.  Following up on this statement, she explained that Dr. Cutting's reason for not believing Weaver experienced hallucinations was because no one observed him hallucinating.  This was completely wrong.  In fact, Dr. Cutting did testify he believed Weaver experienced auditory hallucinations of the male and female voices; he just didn't believe Weaver was compelled by the voices because he was able to choose which voice to listen to.[61]  She said he reported Weaver said his Vietnam service was positive, as he enjoyed blowing things up, thus he did not find PTSD.  Mrs. Huffman stressed that Dr. Cutting was not a combat expert and didn't conduct any tests.[62]

Mrs. Huffman recited that Dr. Matychowiak read more reports than did Dr. Cutting, including those authored by Drs. Lundgren and Shonkwiler.  She stated Dr. Matychowiak's recitation of the circumstances of the crime was logical and therefore Weaver knew right from wrong and could conform his conduct.[63]   Next, she said that Dr. Matychowiak found child abuse, a love-hate

---

two additional hours interviewing Weaver; the "cause" of Weaver's underlying mental illness was, at least in part, due to three stressors in his childhood, namely his physical health, his relationship with his mother, and his relationship with his sister; Weaver specifically told Dr. Kormos that his mother bit him as a form of punishment; based on the acts perpetrated against his sister, Dr. Kormos believed Weaver actually wanted to kill her, even with respect to the first incident, the chopping off of her finger; that Dr. Kormos found Weaver's responses on AV tape authentic and genuine; Dr. Kormos' mention of Weaver's suicidal fantasies in wanting to join the service as well as his delusional thought processes in believing his heart was healed when the recruiting colonel shook his hand and that he could make explosives out of household times; that many of the mental professionals who examined Weaver didn't go far enough in pursuing diagnostic studies and exploring PTSD; and that symptoms of schizophrenia can be masked by anti-psychotic medications as well as the subject being in an institutional environment.  Dr. Kormos also provided extensive critiques of the four prosecution psychiatrists, which might have been more helpful in rebuttal.

[61] Mrs. Huffman also did not mention that Dr. Cutting found many of Weaver's symptoms *consistent* with schizophrenia, including his auditory hallucinations, the ability to communicate telepathically, and the inability to think abstractly. What convinced him Weaver was not schizophrenic was not the absence of hallucinations, as Mrs. Huffman said, but that there was no regression from a higher level of adaptive behavior to a lower level; he testified Weaver's adaptive behavior had always been at a low level.

[62] It would not have been unusual for Dr. Cutting not have conducted any tests since he was a psychiatrist, not a psychologist.  None of the psychiatrists in this case conducted any tests.

[63] While Dr. Matychowiak did testify Weaver related to him the circumstances of the crime, he did not assign the logic of that recitation as the reason Weaver was not insane.  Rather, his opinion was largely based on the fact that Weaver had ASPD and his impulse discontrol was volitional when he

relationship between Weaver and his mother, ambivalence towards his father, a preference to being a loner, and alcohol abuse.[64]   She stated Dr. Matychowiak described Weaver's Vietnam experience as a happy one, that he was unfamiliar with extant research and diagnostic information concerning PTSD, and that since he made up his mind PTSD was not a worthwhile area of inquiry, he did not pursue it. Except for Dr. Matychowiak's lack of familiarity with extant PTSD research and diagnostic information, Mrs. Huffman's summary of his testimony misstated his testimony.[65]   She correctly summarized that Dr. Matychowiak's opinion that Weaver showed no signs of psychosis, but incorrectly stated that he didn't believe Weaver heard any voices.[66]   Dr. Matychowiak thought the doctors who found Weaver to be legally insane were wrong, but conceded that a personality disorder could be on the surface of underlying psychosis.[67]

Mrs. Huffman summarized that Dr. Burdick found Weaver had been abused as a child, had a love-hate relationship with his mother, was ambivalent as to his father, and had "problems with this sister."[68]   She stated that Dr. Burdick mentioned Vietnam, but not in depth.   His impression was

---

killed Robert Radford and Barbara Levoy. The Court does not discount the possibility, however, that some of the information Mrs. Huffman recited as having been in the doctor's testimony could have been in his report, which was neither before the jury or this Court.

[64]   Much of this summary information also was a misstatement of Dr. Matychowiak's testimony.  Rather than a love-hate relationship with his mother, Dr. Matychowiak found that Weaver idealized his mother, contrary to findings in many of the reports he had been given.  Further, Dr. Matychowiak never mentioned that Weaver experienced ambivalence toward his father.  Rather, he described his father as harsh, abusive, and discouraging.

[65]   On both direct and cross examination, Dr. Matychowiak mentioned that Weaver followed orders, even those he did not like, to stay alive.  He also testified that he *did* consider PTSD, taking into account Weaver's following orders statement, his auditory hallucinations, his unhappy childhood, and his easy anger.  He found Weaver's startle reflex to loud noises and hypervigilance were common to many anxiety disorders, not just PTSD.

[66]   Dr. Matychowiak specifically mentioned Weaver's reference to the male and female voices on two occasions during his testimony.  It was clear, however, that Dr. Matychowiak did not believe the male voice compelled Weaver's conduct; either it made a suggestion Weaver went along with, or Weaver wanted to do something the voice thought was okay.

[67]   Again, while it is true Dr. Matychowiak testified it was possible for psychosis and a personality disorder to coexist, even if the psychosis were in remission, it would be still be apparent, and it wasn't in Weaver.

[68]   The only portion of this summary that correctly characterizes Dr. Burdick's testimony is that he believed Weaver was abused as a child.  He specifically stated that he did not go into detail with

56

limited to personality disorders; he found no schizophrenic symptoms.  She incorrectly stated Dr. Burdick conceded that Mellaril and incarceration could subdue psychotic symptoms.[69]  Mrs. Huffman then criticized Dr. Burdick as superficial for failing to explain why he concluded Weaver was oriented as to time and that his memory was intact.[70]  Dr. Burdick did note some paranoid ideation, but nothing delusional.  As with Dr. Matychowiak, Mrs. Huffman argued Dr. Burdick characterized Weaver's thoughts as fantasies and grandiosity, including the notion Weaver believed he could make a bomb from Tide soap.[71]  Dr. Burdick's bottom line was that Weaver had ASPD, but conceded that when psychosis is in remission a personality defect could be apparent.[72]

Mrs. Huffman noted that Dr. Criswell made a point to say that he reviewed 276 pages of material and spent two hours with Weaver.  The background he obtained included that Weaver had a love-hate relationship with his mother, was ambivalent with his father, had an "abiding problem with his sister," and endured an abusive childhood.  Dr. Criswell then went into some detail about Weaver's lumber yard and demolitions jobs in Vietnam.  He recited Weaver's statement about liking to blow things up and that the officers would let him blow up anything.  Dr. Criswell commented that this latter statement obviously was untrue, but he didn't delve further to determine whether Weaver's statement was delusional.  Mrs. Huffman mentioned that Dr. Criswell noted twice in his report that Weaver reported being sedated or medicated with an anti-psychotic drug during their interview.  He conceded that anti-psychotic medication could subdue psychotic symptoms but added that the symptoms would

---

Weaver about his childhood and mentioned nothing in this testimony about a love-hate relationship with this mother, ambivalence towards his father, or problems with this sister.

[69] In fact he stated that he didn't think the fact that Weaver was taking Mellaril during his incarceration altered his behavior, so, by extension, the absence of this medicine did not contribute his criminal acts.

[70] These statements were not included in Dr. Burdick's testimony

[71] During her cross examination of Dr. Burdick, Mrs. Huffman gave several examples of behavior that might be considered delusional; the ability to make explosives out of household items like Tide soap, however, was not one of those examples.  It is true that Dr. Burdick found none of the examples Mrs. Huffman gave to be evidence of delusions associated with psychosis.

[72] Dr. Burdick testified, however, that even when psychosis is in remission it, still would be apparent, and wasn't in Weaver.

57

still be detectible and Weaver had none.  He found Weaver legally sane at the time of the Radford/ Levoy murders.  She stated Dr. Criswell was not, however, in total disagreement with doctors who found an underlying psychotic disorder; but this condition would have taken longer to discover.[73]

Mrs. Huffman reviewed that Dr. Cholet administered several tests and found that Weaver did not demonstrate any symptoms of organic brain dysfunction or mental illness.  Mrs. Huffman made no discernible argument to controvert or diminish the import of Dr. Cholet's unfavorable impressions.

### b.    Mr. Shumaker

Mr. Shumaker informed the jurors that the sanity issue applied to all three counts: the two murders and the kidnap of Ms. Levoy.  He stressed that mental illness or abnormality did not amount to legal insanity.  Rather, insanity required that a defendant lack substantial capacity due to mental illness either to appreciate the criminality of his conduct (which no one argued Weaver did not have) or conform his conduct to the requirements of the law.  If Weaver was intermittently sane and insane, he had the burden of showing he was insane at the time of the crimes.  Mr. Shumaker emphasized that an irresistible or uncontrollable impulse did not amount to legal insanity.  Also, a mental disease or defect could not be found merely because of repeated criminal or anti-social conduct.   Mr. Shumaker advised the jurors they would be instructed to consider evidence only from the sanity phase in making the sanity determination.   That is, they were not to consider evidence presented during the guilt phase.[74]

Aside from reminding jurors of the appropriate construction of the jury instructions, there were two main themes to Mr. Shumaker's summation.  The first was that the jurors should not consider the hardship information Weaver relayed to the various experts for the truth of the matter stated because it was unsubstantiated and contradicted.  The second theme was undermining just about everything about

---

[73] This summary was incorrect.  As noted in the summary of Dr. Criswell's testimony, Part III.A.2.*a.*,iv., *supra*, Dr. Criswell, like Dr. Burdick, rejected Mrs. Huffman's suggestion that an examiner who spent 30 to 40 hours evaluating and testing a subject would better be able to assess an individual for sanity.  He did not doubt that the examiner who spent such time would have a fuller picture, that fuller picture would not necessarily be beneficial to a sanity assessment.  Further, Dr. Criswell concluded his direct testimony with the opinion that Weaver was not psychotic at the time of the evaluation, and had not been psychotic in the past.

[74] This instruction resulted from Mrs. Huffman's successful argument to this effect.

Dr. Shonkwiler and his testimony.  Like Mrs. Huffman, Mr. Shumaker reviewed the diagnoses and opinions given by the various experts.  Also like Mrs. Huffman, there were a number of instances where Mr. Shumaker misstated the testimony of the various experts.  In comparison, with Mrs. Huffman, however, Mr. Shumaker's misstatements were far fewer.

With respect to not accepting the truth of the facts which Weaver relayed to the experts, Mr. Shumaker's first target was the VESI, designed by Dr. Wilson, and shown to the jury via AV.  The unsubstantiated "facts" relied on by the defense experts were: Weaver was a loner; his father was largely absent from his upbringing; he had been hallucinating since some time during his adolescence; after returning from Vietnam, he lost his temper and self-control more easily; he participated in active combat while in Vietnam; and he was abused as a child, including having been subjected to sadistic toilet training.  As an addendum to whether Weaver was capable of controlling his conduct, Mr. Shumaker argued that Weaver was adequately intelligent.

Based on the testimony of Weaver's sister, Katie Smith, together with brothers, Del Rey Barnett and Jesse Moreland, Mr. Shumaker refuted the notion adopted by several defense experts, including Dr. Shonkwiler, that Weaver was a loner.  Ms. Smith testified that he had friends in school, a couple of girlfriends, and was involved with FFA.[75]  Separately, she refuted the notion that their father was absent from the home during their childhood, as Weaver often would spend weekends working on cars with the father.  Messrs. Barnett and Moreland similarly contradicted the claim that Weaver had no friends and was a loner.  Both testified they went skating, fishing, and drinking with Weaver at various times.  Mr. Moreland also worked with Weaver.

With respect to hallucinations, Mr. Shumaker argued only half-brothers Barnett and Moreland provided very weak corroboration that Weaver talked to himself: in Mr. Barnett's presence on the occasion of a long-haul trucking trip; and with Mr. Moreland when the two of them experienced a fishing boat mishap over river rocks.  Neither brother thought that Weaver's self-talking was particularly unusual, since Mr. Barnett testified he also talked to himself on long hauls and Mr. Moreland testified he was talking to himself when he realized the danger in which he and Weaver had

---

[75] Ms. Smith also specifically Weaver as a "loner." *See* Part III.A.1.*b, supra.*

found themselves at the time of the fishing boat mishap.  Mr. Shumaker argued that if Weaver in fact had experienced auditory hallucinations, there would have been other accounts, including from his sister and his wives.[76]   Mr. Shumaker noted that the first time Weaver revealed his auditory hallucinations was to Dr. Chappell (appointed in August 1981 regarding the Ventura crimes).  Mr. Shumaker reminded the jurors that neither Dr. Chappell nor Dr. Donaldson (the other Ventura doctors) believed Weaver heard voices,[77] and Dr. Chappell didn't believe that if Weaver had been schizophrenic while in the Army, this factor could have been overlooked or missed by other members of the service.

Regarding Weaver's propensity for violence upon return from Vietnam, Mr. Shumaker misstated the testimony of Mr. Barnett and Mr. Moreland.  He argued their testimony supported the notion that Weaver's temper wasn't worse than normal, except when Mr. Moreland encouraged him.  To the contrary, both friends testified Weaver was much more prone to violence and talking about extreme violence against people who he felt treated him with disrespect.[78]

During Mr. Shumaker's summary of Dr. Wilson's testimony he discussed the fact that there was no actual corroboration Weaver actually had seen combat duty in Vietnam.  While Dr. Wilson relied upon the medals Weaver received for having been in actual combat, Mr. Shumaker pointed out that in fact those medals were given to all servicemen who served in Vietnam (whether in combat or not).

Mr. Shumaker controverted Mrs. Huffman's argument that all of the experts found Weaver had been abused, yet he offered no argument about which experts testified Weaver was *not* abused as a child.  In fact, all four of the prosecution psychiatrists testified they believed Weaver was abused as a child.  Mr. Shumaker devoted a good deal of time discounting the report that Weaver's mother bit him

---

[76] He did not mention or acknowledge the inmate testimony Mrs. Huffman presented from Carl Hogan or Richard Archuleta.

[77] This was an overstatement: both Drs. Chappell and Donaldson doubted, but did not completely discount, that Weaver experienced auditory hallucinations.

[78] This was a major point in Mrs. Huffman's insanity case, yet Mr. Shumaker's unfounded argument did not draw an objection.

60

as a form of punishment as uncorroborated.  Mr. Shumaker also strenuously argued (three times during his summation) that Dr. Shonkwiler's opinion Weaver *probably* was subjected to sadistic toilet training on the grounds of reported abuse "was baseless."   Another reason to be skeptical of the objectivity of Drs. Shonkwiler, as well as Wilson and Kormos, was that they *always* testified for the defense (noting Dr. Kormos once was scheduled to testify for the prosecution, but then wasn't needed).  In contrast, the four prosecution psychiatrists had extensive experience, having each conducted hundreds of evaluations and testified dozens of times.

Separate and apart from the lack of foundation for the defense expert opinions, Mr. Shumaker argued Dr. Shonkwiler's opinions were devalued because he wasn't board certified in forensic psychiatry, and he did not arrive independently at his diagnoses of schizophrenia or PTSD, but rather based his opinions on the reports of psychologist Dr. Dietiker and the VA specialists, respectively.  Mr. Shumaker also was highly critical of Dr. Shonkwiler for his behavior in the courtroom when he was testifying about his own Vietnam experience in relation to what Weaver underwent. Mr. Shumaker stated that Dr. Shonkwiler requested a break in the proceedings while testifying about Vietnam.[79]  He argued this conduct was not that of a competent professional and urged the jurors that Dr. Shonkwiler was "someone who d[id] not deserve to be heard in a courtroom offering an opinion" on a matter as serious as what was being litigated.  Finally, he reminded the jurors that Dr. Shonkwiler's license to practice medicine had been revoked for 10 years with a stay in effect so long as he practiced under the license of another doctor and that doctor was responsible for him.  In sum, Dr. Shonkwiler's opinion was "not particularly important" as it was without factual basis, and the doctor lacked qualifications.

As to the other psychiatrists and psychologists who testified, Mr. Shumaker summarized their ultimate conclusions and the relevance of those conclusions.  It was during these summarizations that the amount of time it took the experts to reach their conclusions was identified: Dr. Raitt (the examiner of Weaver's schizophrenic aunt and cousin);[80]  Dr. Gardner (who evaluated Weaver for sentencing for

---

[79]  This break in Dr. Shonkwiler's testimony was not evident from the transcript and was not subject to any further enlightening comments.

[80]  He had no opinion about the present case and he wasn't asked to provide one.

the Humboldt County crime and who Mr. Shumaker discarded because he also had no opinion about the present crime);[81] Drs. Owre and Tolchin, also in connection with the Humboldt County crime in the context of Weaver's incarceration; Drs. Chappell and Donaldson, who rendered opinions about Weaver's sanity at trial for the Ventura crimes; Mr. Rose, the intake psychologist in the Southern California receiving prison in Chino (for the Ventura crimes); the Affiliated Psychologists, Drs. Dietiker and Lundgren;  the PTSD specialists, Drs. Wilson, Wittlin, Donahoe, and Kormos; Dr. Cholet; and the four prosecution psychiatrists appointed by the trial court to assess Weaver's sanity.[82]   Mr. Shumaker pointed out that in contrast to the experts hired by the defense (Drs. Shonkwiler, Lundgren, Dietiker, Wilson, Wittlin, Donahoe, and Kormos), the four prosecution psychiatrists felt they had enough time to come to individual accurate and competent conclusions.[83]   Drs. Chappell and Donaldson also spent one to two hours for the Ventura trial. Mr. Shumaker specifically mentioned Dr. Chappell's testimony, that is, he learned early in his career, that a doctor should be able to assess a patient in about an hour.  Even defense expert, Dr. Wilson, who spent 40 to 50 hours evaluating Weaver and writing his report from review of materials and the VESI AV, didn't draw his final conclusion about schizophrenia until his face-to-face examination.  This fact also established that spending a great many hours reviewing background materials didn't amount to much.

In the course of reviewing Dr. Owre's opinion, Mr. Shumaker argued that when he stated his opinion from the witness stand that Weaver *currently* was schizophrenic based on his (Dr. Owre's) observation of Weaver during the course of his testimony, he "did as much to discredit psychiatry" as anything Mr. Shumaker could do.  He juxtaposed Dr. Owre's present impression with the impressions he had of Weaver at the time of Weaver's incarceration between 1977 and 1979, that is, a model inmate, without psychiatric symptomology, except in distorted relationships with women.

---

[81] Mr. Shumaker failed to note in his summation that Dr. Gardner was said to have written in his report that Weaver *denied* experiencing auditory hallucinations.

[82] Drs. Cutting and Criswell also were appointed to given an opinion about Weaver's competence to be tried months before the actual trial commenced.

[83]   Dr. Burdick actually spent just under three hours interviewing Weaver, plus reviewing materials provided him and presumably more time to write his report.

62

Mr. Shumaker conceded that Weaver may have had mental problems, including schizophrenia, though that was far from clear.  Even though several examiners observed Weaver had enjoyed his Vietnam service, Mr. Shumaker acknowledged the expertise of the VA doctors who found PTSD in Weaver.  Nonetheless, even with mental problems, including PTSD, Weaver was not necessarily insane in February of 1981.  Weaver's personality disorder, namely ASPD, was prevalent in all of the examiners' opinions.  When a person is sociopathic, he wants what he wants without regard to the consequences.  Mr. Shumaker explained, however, that this impulse didn't preclude Weaver from conforming his conduct to the requirements of the law.  Only by ignoring the testimony and opinions of Drs. Cholet, Cutting, Matychowiak, Burdick, Criswell, plus Drs. Chappell and Donaldson, could the jurors arrive at the conclusion that Weaver was legally insane at the time of the crimes.

He concluded by arguing that the defense had failed to meet its burden of proof.  At best, the scales were balanced, with the presumption remaining that Weaver was sane at the time of the Radford/ Levoy crimes.

### c.    Rebuttal

Mrs. Huffman's defense rebuttal was relatively short, taking up only 18 pages of transcript.  Although there was quite a bit of argument in this rebuttal that was incomprehensible, including many passages and strings of words that did not make sense, she did address some key points in Mr. Shumaker's closing argument.

Some of the less than effective points included her discounting Dr. Cholet's opinion that Weaver was sane because she (Dr. Cholet) didn't know legal terminology.  In fact, the questions posed to and answers given by Dr. Cholet demonstrated that she understood the criteria for legal insanity.  Moreover other psychologists offered opinions on the sanity issue.  Another inadequacy was her attribution to Mr. Shumaker that there could be no insanity defense unless the subject was a "raving lunatic" at all times.  He did not make this argument.  But early in Mrs. Huffman's presentation of the case, characterizing Weaver as a madman was exactly what she did.  Next, she offered a very confused explanation, noting that an uncontrollable or irresistible impulse is not legal insanity, unless as the result of mental disease or defect, the subject lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.  Regarding hallucinations, Mrs.

63

Huffman stated the issue was whether they were recurring.  What followed from this was a discussion about whether one views a half-full glass of water as would an optimist or a pessimist.

Points that she repeated from her opening summation included the argument that because there were so many opinions, the jurors needed to look at the weight of the expert testimony rather than merely the numbers.  She reiterated that when there is schizophrenia in the family, not necessarily a parent, a person is more predisposed to schizophrenia.  Similarly, she repeated that personality disorders, such as Weaver's could be superimposed over underlying psychosis.  All of the doctors testified to that.  In order to understand Weaver's mental state, all three of his conditions (schizophrenia, PTSD, personality disorder) needed to be considered together.  Mr. Shumaker looked at the components separately and out of context.  Instead, Mrs. Huffman emphasized, all three conditions worked together.

Her more responsive arguments started with a review of Weaver's auditory hallucinations.  She countered the notion offered by Drs. Chappell and Donaldson that the hallucinations were unlikely because no one in Weaver's life knew.  Mrs. Huffman reminded the jurors that, in fact, there had been testimony Weaver's mother knew about the voices and she told Weaver not say anything about them.  Weaver had been seeing mental health specialists long before he became involved in criminal behavior.[84]

She also explained that the word "forensics" simply means that a person with the certification had experience testifying in court.  Being board certified in forensics did not give an expert an advantage for diagnosing medical or mental conditions over other psychologist or psychiatrists.  Next, she briefly mentioned the AV of the VESI, which was used by Drs. Wilson, Kormos, and Shonkwiler to observe Weaver.  She reminded the jurors that Drs. Wilson and Kormos had PTSD expertise.

Turning to Dr. Shonkwiler, Mrs. Huffman argued that the fact he was practicing under an impaired license had nothing to do with his qualifications to evaluate a patient and make a diagnosis.  Of all the doctors, Dr. Shonkwiler was the only one to have talked to Weaver's mother and sister.

[84]  Dr. Burdick testified that Weaver had been to see psychiatrists all of his life, beginning as a youngster.

64

Regarding Weaver's abusive childhood, all of the doctors who testified favorably for the prosecution, including Drs. Cutting, Matychowiak, Burdick, and Criswell, testified that Weaver's childhood was abusive. They all agreed on this fact as well as the fact that Weaver suffered from a personality disorder. Nor was there total disagreement that Weaver had some underlying psychosis. The only disagreement was whether Weaver was insane at the time of the crimes.

She refuted Mr. Shumaker's argument that Weaver wasn't a loner because he had a couple of friends. Mrs. Huffman argued that being a loner was having only one or two friends "in a period of time." Ms. Smith's testimony was that he had a friend in grade school and one in high school. Weaver still could be characterized as a loner even though he had a friend here and there.[85] Moreover, she continued, being a loner, or abused, depended on the mindset of the subject, not the person or people interacting with the individual. Continuing on that subject matter she argued that just because Weaver's father spent time with him on weekends going fishing, working on cars, or building animal pens with him didn't make him a companion and a role model. The doctors thought that Weaver's father generally was absent. She argued, they couldn't all have been mistaken. During this argument, she Mrs. Huffman did not reference Ms. Smith's testimony corroborating these assertions.

She then turned to the matter of Dr. Owre declaring on the stand that Weaver was schizophrenic. She criticized Mr. Shumaker's comment that Dr. Owre had discredited psychiatry by this declaration since he (Dr. Owre) had quite a bit of experience dealing with schizophrenics at the prison. She went on to say that Weaver was housed within that quad for inmates with psychosis, suggesting the reason for that was that he was schizophrenic, and since he received no treatment following his release from that prison, his condition deteriorated. This argument, however, misstated Dr. Owre's testimony, that in 1977 Weaver was asymptomatic for psychosis.

Next, Mrs. Huffman criticized Dr. Chappell for concluding that a person with schizophrenia could never be in the service. She argued his opinion was based on "pure speculation." She urged that Dr. Chappell could not know how a person with schizophrenia would have responded; a person with

---

[85]   In fact Weaver's sister, Ms. Smith, characterized him as a loner during her testimony, a point Mrs. Huffman did not bring out.

schizophrenia was not necessarily a raving lunatic.  She then misstated Dr. Chappell's testimony, crediting him with saying that if someone claimed to have a lapse of memory during a crime, further investigation would be necessary.  In fact this testimony came from Dr. Donaldson, not Dr. Chappell.

She also mischaracterized Mr. Shumaker's summation by saying he argued that there was no schizophrenia, no personality disorder, and that PTSD was invented for this trial.  She then reminded the jurors of the qualifications of the doctors who evaluated Weaver for PTSD; this certainly wasn't invented.[86]  In conclusion, Mrs. Huffman urged the jurors to consider all three of Weaver's conditions, the mental illness or defect of schizophrenia, the personality disorder, and PTSD, to see what was going on with Weaver at the time of the crimes.  She analogized Weaver's multi-layered condition as a bed topped with many blankets.  Every time a blanket would be removed, there would be another condition underneath.  This situation, she argued, required investigation, not just looking at the surface.  A psychiatrist should always go deeper to see if the first diagnosis was correct.  She asked the jurors to look at the "case as a whole."

### 5.    Jury Instructions

In addition to the many standard instructions Judge Stone gave, the salient instructions to the presently disputed issues included: that statements made by Weaver to the doctors as the bases for the respective expert opinions were not to be considered for the truth of the matter stated; that the only evidence to be considered during the sanity phase was evidence presented during that phase; that the facts comprising hypothetical questions were not necessarily proved; that relative qualifications of the experts should be considered; and that mental illness and abnormality were not the same as legal insanity. He gave the full definition of legal insanity, discussed the fact that Weaver bore the burden of proof under the preponderance of the evidence standard and reminded jurors that while temporary insanity was recognized, an irresistible impulse was not legal insanity unless it was the result of a

---

[86]   Mr. Shumaker never discounted that Weaver had a personality disorder.  He argued numerous times that Weaver was afflicted with ASPD.  Further, while he doubted schizophrenia and cast some doubt on the PTSD diagnosis in his argument, he conceded that Weaver may have suffered from PTSD.  His point was that even if Weaver had a mental illness it did not mean he was insane at the time of the present crimes.

MemODenyClaims1&2&IACBriefing-Wea

mental disease or defect that Weaver could not appreciate the criminality of his conduct or conform his conduct to the requirements of law.

### 6.   Deliberations

The jurors retired to deliberate at 2:55 p.m. on Thursday, February 28, 1985.  Among their tasks in the deliberation room was to select a new foreman (since the guilt phase foreman had been excused).  At 3:37 p.m., just 42 minutes later, they sent the court bailiff a note saying they had reached a verdict: Weaver was legally sane at the time of the Radford/ Levoy crimes.

### 7.   Defense Motion

Before court was reconvened for the commencement of penalty proceedings on March 5, 1985, Mrs. Huffman moved for a new trial on the grounds that the jurors did not arrive at a verdict by a fair expression of opinion on the part of all the jurors.  She argued that given a new foreman had to be elected at the onset of the deliberations, there could not have been any discussion as to the weight to be given to the testimony.  Further, she argued, three jurors, Jurors 9, 10, and 11, were not paying attention during the instructions; they were talking and laughing.  These same three jurors additionally seemed not be have been listening during trial proceedings.  Judge Stone deferred ruling on the oral motion to give both sides an opportunity to brief the matter.

### B.   Penalty Phase

Mr. Shumaker presented evidence describing Weaver's criminal conduct with respect to the Humboldt and Ventura County crimes.  The Humboldt crime was presented as a prior felony conviction.  The Ventura crime was presented as evidence of prior violent, criminal conduct.   Mrs. Huffman called Weaver and relied on the mental health evidence presented during the sanity phase. This evidence, argument of counsel, jury instructions, and jury deliberations are summarized below.

### 1.   Prosecution Case

With his opening statement and presentation of evidence, Mr. Shumaker concluded his case shortly after the morning recess on March 6, 1985.

#### a.   The 1977 Humboldt Conviction

Bonnie Brown described her encounter with Weaver late on the night of September 22, 1976. Leaving her job at the local bowling alley in Eureka, close to midnight, she encountered Weaver in the

67

bowling alley parking lot.  He asked her for directions and invited her to go for a drink with him.  After an initial refusal, she consented to go to the Denny's Restaurant for coffee and a soft drink.  They went in separate vehicles.  From there, Weaver and Ms. Brown went to a truck stop to look at Weaver's truck (which he wanted her to see).  Again, they took separate cars.  After looking at his truck, Ms. Brown went to unlock her car door and felt a blow to the back of her head.  She blacked out and fell. When she awoke, Weaver was warning her not to scream, with one hand over her mouth and one around her throat.  He threatened to kill her.  She saw a light colored wooden club about the size of a baseball bat.  Weaver then forced her to get in his pickup truck.  While he was approaching the driver's door, she got out of the pickup and ran toward the truck stop screaming.  He chased her, but gave up the pursuit when a person at the truck stop yelled out at him.  On cross examination, Ms. Brown clarified that there was never any discussion about sex and that when she began unlocking her car after viewing Weaver's truck at the truck stop, he did not say anything to dissuade her.  Following this testimony, Weaver stipulated that he had pleaded guilty to assault with a deadly weapon to this crime on May 2, 1977.

### b.      *The 1981 Ventura Conviction*

The first witness to testify regarding the Ventura crime was David Galbraith.  At the time of his testimony, Mr. Galbraith was serving prison time in Washington State for burglary, but had been housed in the Kern County Jail since the beginning of the year.  Mr. Galbraith and his girlfriend, Michelle DeLong, left Washington State (hitchhiking) heading for Yreka, California, to stay with Ms. DeLong's uncle.  Before leaving Washington, Mr. Galbraith burglarized a sporting goods store for camping equipment.  Weaver picked up the young couple in Medford, Oregon.  Weaver's young son, Rodney, was with him.  When they arrived in Yreka, Ms. DeLong's uncle was not at home.  At Weaver's invitation, the couple accompanied him to Oroville, spent the night, swam with his children in the river the next day, and drove to Ventura to help Weaver with his load.  Because the uncle would not be returning to Yreka for another two weeks, Mr. Galbraith consented to Weaver's offer to help find him a job in Ventura.  Weaver introduced Mr. Galbraith to his friend Jerry Daniels, ostensibly for this purpose.  Mr. Galbraith and Mr. Daniels drove for about an hour.  They stopped along the way a few times to look at deer.  At the last stop, Mr. Daniels shot Mr. Galbraith three times, twice in the

back of the head and once in his face, through his eye.  Mr. Daniels then kicked Mr. Galbraith over the embankment.  On cross examination, Mrs. Huffman brought out that Mr. Galbraith had numerous burglary and narcotics convictions, and since his eighteenth birthday (in 1980), he had only been out of custody for about seven months.

Ms. DeLong testified next.  On both direct and cross examination, Ms. DeLong added a few facts to the description of the crimes.  First, she testified that she was 15 years old at the time of the crime (and 19 years old at the time of her testimony).  While Mr. Galbraith was off with Mr. Daniels supposedly organizing a job, she was going to accompany Weaver "to go do his trips" and they planned to reunite with Mr. Galbraith some hours later.  At some point Weaver stopped the truck and got into the sleeper compartment of the truck.  He held a gun to her to coerce her to acquiesce to the rape.  A few hours later he forced her to orally copulate him.  Mr. Shumaker elicited that he pushed her head down on himself and ultimately ejaculated.  He told her that Mr. Galbraith would be shot if she didn't do what he told her to do.  He said he checked in with Mr. Daniels.  He also made threats against her family.  After the sexual assaults, Weaver and Ms. DeLong drove back up to Weaver's home in Oroville.  The next day he told her Mr. Galbraith had been shot.  He dropped her off in Marysville at about 5:00 p.m. and said he would come collect her about 9:00 p.m., but he did not do so.  She contacted the local police authorities around 9:10 p.m. that night.

In addition to the two crime victims, Mr. Shumaker also called the former Ventura Sheriff's sergeant Charles Rudd, who worked on the Ventura case, in order to admit Weaver's second custodial statement to Ventura authorities. The direct examination was halted just after Mr. Rudd testified that Weaver accompanied him to Ventura voluntarily.  After taking further testimony outside the presence of the jury and hearing argument from the parties, the trial court denied the prosecution request to admit Weaver's second custodial statement to Ventura authorities and ruled all further testimony from Mr. Rudd would be inadmissible.  Specifically, Judge Stone found that Weaver's initial custodial statement was not given with the benefit of a *Miranda* warning, and his subsequent waiver of *Miranda*

prior to the second statement did not cure the defect.[87]  Since Mr. Shumaker had asked Mr. Rudd a few questions before the proceedings outside the jury's presence, Mrs. Huffman was permitted to cross examine him.  She elicited that Mr. Rudd informed Weaver Mr. Galbraith had been shot.

### 2.  Defense Case

The defense case consisted of Mrs. Huffman's examination of Weaver, concerning the Humboldt crime.  She waived an opening statement and called no other witnesses.  Her case was complete prior to the lunch recess on March 6, 1985.  Weaver testified that he was arrested immediately after the assault on Ms. Brown.  Thereafter, he took his family to Pocatello, Idaho for three to four weeks.  He testified he returned after learning that the police were looking for him and turned himself in at the police department.  Pending trial, he went to Texas to two Veterans' Hospitals to get mental health, but was turned down.[88]

### 3.  Prosecution Summation

Mr. Shumaker explained that jurors were to weigh mitigating against aggravating circumstances.  He discussed the circumstances of the crime factor (§ 190.3(a)) as primarily evidence from the guilt phase, including the kidnap special circumstance and the multiple murder circumstance.  Later in his summation he stressed that this was the most important aggravating factor.  He argued that Weaver's conduct for the crime was not out of character, as he had demonstrated violence toward women in the past and just three months after the Radford/ Levoy crimes, he exhibited the same conduct with respect to Michelle DeLong and David Galbraith.  The evidence pertinent to the presence of violent criminal activity (§ 190.3(b)) involved four separate acts which the jurors had to be convinced happened beyond a reasonable doubt.  The first involved Weaver's first wife, Patricia Budrow, who testified during guilt proceedings about having been beaten by Weaver periodically, and

---

[87] It has been Mr. Shumaker's intent to allege Weaver also committed attempted murder as to Mr. Galbraith.  Based on the trial court's ruling, this strategy was abandoned.

[88] This is consistent with the testimony of Weaver's cousin, Russell Mathiasch.  *See* Part III.A.1.*c.*, *supra*.

70

that she even suffered a miscarriage. Mr. Shumaker argued Ms. Budrow's account was confirmed by Weaver's own guilt phase testimony.[89]

The second violent criminal act was the 1976 assault on Bonnie Brown. Third and fourth were the rape and forced oral copulation of Michelle DeLong. Weaver used a gun to coerce Ms. DeLong in the rape and for both sexual acts threatened harm would come to Mr. Galbraith if she did not submit. Mr. Shumaker clarified that Mr. Galbraith's testimony was admitted only to corroborate Ms. DeLong's testimony. He further pointed out to jurors that Ms. DeLong was only released after Weaver learned Mr. Galbraith was alive and authorities were looking for him. The presence of a prior conviction under § 190.3(c) was satisfied by Weaver's admission to the Humboldt County offense against Ms. Brown. Mr. Shumaker mentioned whether Weaver committed the present crimes under the influence of extreme mental or emotional disturbance (§ 190.3(d)), noting that this consideration was a separate category from insanity. He made no other definitive statement about this factor. Referring to whether either victim was a participant in Weaver's homicidal conduct (§ 190.3(e)), he argued that Ms. Levoy's act of biting Weaver's thumb did not qualify. Mr. Shumaker clearly stated that the factor regarding a defendant's belief he was acting under a moral justification (§ 190.3(f)) absolutely had no application in this case. With respect to the question of whether Weaver acted under duress at the time of the crimes (§ 190.3(g)), Mr. Shumaker explained that evidence of Weaver's auditory hallucinations wasn't intended to come within this factor. The factor concerning Weaver's capacity to appreciate the criminality of his conduct or conform that conduct to the requirements of law (§ 190.3(h)), was a reprise of the sanity phase.

Weaver's age at the time of the crimes (§ 190.3(i)), was neutral, neither mitigating nor aggravating. The final factor was whether there were any other circumstances which extenuated the gravity of the crime even though not a legal excuse for the crime, or any other aspect of Weaver's

---

[89] During Weaver's guilt phase cross examination, he testified that Ms. Budrow's own account regarding his abuse of her was "almost" accurate. RT-15: 4053. It was true the physical altercations arose from arguments over Weaver's mother. He did strike her with this fists and once the beating caused her to cough up blood. He knew nothing, however, about causing her to have a miscarriage. *Id*.: 4054.

character or record offered as a basis for a sentence less than death (§ 190.3(k)).[90]   Mr. Shumaker presaged that Mrs. Huffman's summation would focus on Weaver's Vietnam service.  Mr. Shumaker's answer to this anticipated argument was that although Weaver served honorably and participated in combat, that experience did not give him license or an excuse to commit the crimes for which he was on trial.  He also mentioned Weaver's mental problems in the context of the factor (k) instruction, as well as factors (d) and (h).  While Mr. Shumaker conceded that Weaver had mental problems, there was nothing presented in the evidence to indicate that these problems should be an excuse for his crimes.  Moreover, evidence adduced during the sanity phase "simply did not come across as that persuasive."  The only common thread was that Weaver had an antisocial personality problem.  But even this was not an excuse, extenuation, or justification for a lesser penalty.  Near the conclusion of his summation, Mr. Shumaker argued that the evidence presented in the trial actually extenuated the "validity of the death penalty."  Nor was Weaver's attempt to get help from two VA hospitals in Texas mitigating; he did get help while in prison for the Humboldt crime from 1977 to 1979.  Finally, the fact that Weaver voluntarily returned from Idaho to Humboldt County to face charges for the assault also was not mitigating, since he left California in the first place to avoid apprehension.

### 4.    Defense Summation

Mrs. Huffman did not dispute the evidence summarized by Mr. Shumaker, but argued it was mitigating.  She also stressed that the decision about whether to impose the death penalty involved a moral judgment.  She pointed out that nothing had been withheld from the jurors, including the fact of Weaver's 42 years to life sentence for the DeLong/ Galbraith crimes.[91]

The particular factors that were mitigating included the fact that Weaver didn't know Mr. Radford had actually died until he was arrested.  Further, although Ms. Levoy couldn't have known the consequences of her biting Weaver's thumb, it was provocation nonetheless.  The testimony of Patricia

---

[90]   Penal Code § 190.3 (j), whether or not the defendant was an accomplice with a minor role in the crime, was omitted from consideration in this case.

[91]   The fact of Weaver's conviction of the Ventura crimes had not been presented to the jury, but this statement likely informed the jurors that Weaver was convicted of more than the sexual assaults on Ms. DeLong, especially given the testimony of Mr. Galbraith, who testified he was shot twice in the back of the head and once in the face.

Budrow confirmed that when she bit Weaver on two separate occasions, he went into a trance and she had to use violence to bring him back to consciousness.[92]  Also, the prosecution doctors during the insanity phase testified that Weaver had an extreme personality problem and that this was relevant to whether the offense was committed while Weaver was under the influence of an extreme mental or emotional disturbance.  She disagreed with Mr. Shumaker that a personality disorder could not be a mental defect.  Looking at the history, all of the doctors who looked at Weaver felt Weaver was a danger to himself and others.  Mrs. Huffman disagreed with Mr. Shumaker that Weaver received any beneficial mental health assistance, as he received only six months of therapy while in prison for the Humboldt offense and no follow up once he was released.  Mrs. Huffman stressed there was no question that Weaver committed the present crimes under the influence of an emotional disturbance. She implored the jurors not to take lightly the fact that Weaver had an extreme personality disorder. Her argument was that all of his life, Weaver was an emotionally disturbed person who lacked impulse control.  From his conception to the present "was the making of a mad man."  This fact was substantiated by the testimony of Weaver's sister.

Another potentially mitigating factor was Weaver's susceptibility to influence by the "male" voice he first encountered in Vietnam and which told him to do bad things.  Although it wasn't clear that this voice represented the domination of "another person," it was a factor to consider.  Regarding the factor (h) instruction, whether Weaver understood the criminality of his conduct and could conform his conduct to the requirements of law, Mrs. Huffman reminded the jurors that during voir dire they assured the court they would not prejudge the penalty, even if they found Weaver was not insane.

She stressed that the four prior acts of criminal activity combined to constitute one factor in aggravation.  With respect to Michelle DeLong, she pointed to the same fact as did Mr. Shumaker, that is, the fact that Weaver let her go once he found out Mr. Galbraith had been shot and was alive.  Mrs. Huffman argued that if Weaver was as homicidal as Mr. Shumaker portrayed him, it is doubtful he

---

[92]   Weaver confirmed his ex-wife's testimony during his guilt phase testimony; he recalled choking Patricia while they were play wrestling in a car and she bit him.  He did not recall what stopped him.  RT-15: 4015.

would have let the young lady go.  Further Ms. DeLong testified that both before and after the rape Weaver was very kind to her.

She pointed out that the jury instructions permitted the jurors to consider sympathy and pity for Weaver, and indeed they assured the trial court during voir dire that they would consider these qualities even if they found Weaver guilty of two murders.  She asked them to make good on that promise because Weaver started out life on the wrong foot, abused and feeling ugly, unloved, unappreciated.  He had a love-hate relationship with his mother – idealizing and fearing her all at once. He enlisted in the Army to prove to his family he was worth something.  After his service what little impulse control he had remaining was wiped out.  That is, all humanizing factors Weaver had before going to Vietnam were taken away.  She implored the jurors to look into their hearts to look for the factors in mitigation and not be misguided by passion or prejudice against him.

### 5.      Significant Jury Instructions

Unlike the instructions given previously, during this phase, jurors were informed they *could* consider sympathy and pity (but still not be influenced by prejudice or passion against Weaver).  Judge Stone reiterated the four prior acts of criminal violence, defining assault with a deadly weapon, rape, oral copulation, and battery.[93]  The jurors were instructed, however, that the criminal acts of the person who shot David Galbraith (that is, Jerry Daniels), could not be considered as a factor in aggravation of the sentence.

### 6.      Deliberations and Verdict

The case went to the jury following the afternoon recess on March 6, 1985 after both sides delivered their respective summations and the instructions were read.  Deliberations continued until mid-afternoon on March 7, 1985.  The jury had seven questions during deliberations.  The first two were submitted during the late afternoon on March 6.  They first asked for clarification about a confusing instruction concerning a rape charge.  They also wanted all photographic exhibits admitted during the guilt phase proceedings.  Following the reading of the corrected instruction, the jurors were

---

[93] The violent criminal acts which occurred in Ventura actually post-dated the present crime, but pre-dated the trial.

74

excused for the evening recess at 4:50 p.m. with the understanding deliberations were re-commence at 9:30 a.m. the following day and the photographic exhibits would be waiting for them in the deliberation room.   The other questions were on March 7.   At 10:30 the jurors asked for a read-back of testimony Weaver's penalty phase testimony from the previous day and the testimony of his cousin Russell Mathiasch given on January 15, 1985.   At 11:45 a.m., the jurors had three more requests: whether the AV of Weaver responding to the VESPI could be used as the basis for the jurors' decision; a read back of Weaver's guilt phase testimony about first seeing Mr. Radford and Ms. Levoy; and a replaying of the VESPI AV where Weaver described first seeing the young couple.   As to the first question, Judge Stone reiterated what he said previously, that is, the AV of Weaver could be considered by the jury as the basis for the experts' opinions, not for the truth of anything stated on the tape.   With respect to the read back request, that would be accomplished after the lunch break.   As to the last request, Judge Stone told the jurors no one knew where the requested excerpt could be found on the AV.   The foreman then suggested that the jurors discuss that issue further.   Following the lunch break, the requested guilt phase testimony of Weaver was reread.   After that the foreman informed the court that no further reiterations of the trial were necessary for deliberations to continue.

At 2:15 p.m. the jurors were back in the courtroom with a death verdict.   The jurors were polled and Judge Stone made closing remarks, noting the jurors considered the penalty phase process "carefully and fully."   The proceedings were then adjourned at 2:25 p.m.

### C.    Motion to Set Aside the Death Sentence

Less than a month after the penalty verdict, on April 4, 1985, Mr. Huffman had returned to his practice and argued Weaver's motion to set aside his death sentence under Penal Code § 190.4(c).   He urged the trial court to consider Weaver's schizophrenia and PTSD.   Judge Stone first stated he was satisfied the charged crimes had been committed and special circumstances were true.   As to the sentencing factors, Judge Stone found the circumstances of the crime, factor (a), Weaver's criminal activity by use of force/ violence or threat of force/ violence, factor (b), and Weaver's prior Humboldt County conviction, factor (c), to be factors in aggravation.   He found Weaver's mental problems to be mitigating under factor (d), but factor (e), the victims' participation in Weaver's conduct, factor (f), whether Weaver believed his conduct to be morally justified or extenuated, and factor (i), Weaver's

75

age, to be inapplicable.  While the court took into consideration the sanity phase testimony about Weaver's mental problems, those problems did not rise to the level of mental disease or defect under factor (h).  This factor was not considered at all in the court's decision.   With respect to other factors extenuating the penalty, factor (k), Judge Stone had considered them all with the other factors.  Finding independently that the aggravating circumstances outweighed the mitigating circumstances, the modification motion was denied.

## IV.     Standard of Review

In this case, there are three relevant standards: 1) the standard for reviewing state court conclusions (28 U.S.C. § 2254(d)(1)); 2) the standard for reviewing state court factual determinations (*id*. § 2254(d)(2)) ; and 3) the standard for granting further evidentiary development (*id*. § 2254(e)(2)).

### A.     The Standard for Reviewing State Court Conclusions

Since Weaver's initial federal petition was filed after April 24, 1996, the effective date of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), it is subject to the review provisions of that act.  *Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Federal courts have authority to grant habeas relief under 28 U.S.C. § 2254(d)(1) only where the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  The concept of "clearly established federal law as determined by the Supreme Court" is strict.  In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Court noted "it is not an unreasonable application of clearly established federal law "for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  *Id.* at 786 (quoting *Knowles v. Mirayance*, 556 U.S. 111, 122 (2009)).  The *Richter* case also clarifies the standard of review for a post-AEDPA petition arising from a California conviction where the California Supreme Court did not provide a reasoned decision for its merits denial:

> Under [28 U.S.C.] § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

562 U.S. at ___, 131 S. Ct. at 786.  The Court emphasized, "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id*. (citing *Lockyer v.*

76

*Andrade*, 538 U.S. 63, 75 (2003)).  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

### B.    The Standard for Reviewing State Court Factual Determinations

Where a petitioner challenges the state court's findings based entirely on the state record (i.e., an intrinsic review), the reviewing court must be particularly deferential and grant relief only if "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record" and "any appellate court to whom the defect is pointed would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Miller-El v. Cockerell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceedings . . .") Construing the "statutory language so as to avoid contradiction or redundancy," the Ninth Circuit has concluded that "unreasonable determination" under (d)(2) may be based on a contention "that the [state court] finding is unsupported by sufficient evidence, [citations], that the process employed by the state court is defective [citations], or that no finding was made by the state court at all, [citations]." *Taylor*, 366 F.3d at 999.

Although the Supreme Court in *Richter*, 562 U.S. at ___, 131 S. Ct. 770, did not have occasion to apply the "fairminded jurist" to an inquiry under (d)(2), the identity of the legal term of art, "unreasonable" used in both (d)(2) and (d)(1) convinces the Court to apply that standard to the (d)(2) analysis.

### C.    The Standard or Granting Further Evidentiary Development

When a petitioner presents one or more colorable claims that have survived all procedural impediments and that, despite the petitioner's diligence in state court, were not adequately developed in state proceedings, further evidentiary development in federal court may be required, including an evidentiary hearing, record expansion, and discovery.

### 1.     Evidentiary Hearing

An evidentiary hearing is authorized under Rule 8 of the Rules Governing § 2254 Cases for the development of a colorable claim when the state court has not reliably found the relevant facts and the claim, if proved, would entitle the petitioner to relief.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegation, which if true, would entitle the applicant to federal habeas relief."). "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.*; *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).   Under *Pinholster*, a federal court is without authority to consider evidence which was not available to the state court when undertaking analysis under § 2254(d)(1) as to the reasonableness of the state court decision. The rationale for this holding is, simply, that "review under § 2254(d)(1) focuses on what a state knew and did." 131 S. Ct. at 1399.  Similarly, a federal court also may not grant an evidentiary hearing without first determining whether a state court's factual determination was unreasonable under § 2254(d)(2). *Earp v. Ornoski*, 431 F.3d 1158, 1166-76 (9th Cir. 2005). This determination may be informed by the six factors identified in *Townsend v. Sain*, 372 U.S. 293 (1963). *See Earp*, 431 F.3d at 1167. Those factors are: 1) the merits of the factual dispute were not resolved in the state hearing; 2) the state factual determination is not fairly supported by the record as a whole; 3) the fact finding process employed by the state court was not adequate to afford a full and fair hearing; 4) there is a substantial allegation of newly discovered evidence; 5) the material facts were not adequately developed at the state court hearing;[94] and 6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.  *Townsend*, 372 U.S. at 313.

Entitlement to an evidentiary hearing is limited further under 28 U.S.C. § 2254(e)(2). A federal court may not hold a hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court. *Williams (Michael) v. Taylor*, 529 U.S. 420, 435

---

[94] This fact is informed by the diligence requirement under 28 U.S.C. § 2254(e)(2), discussed in the text, *infra*.

(2000) (holding that subsection (e)(2) precludes an evidentiary hearing when the failure to develop the factual basis of a claim is due to a "lack of diligence or some greater fault attributable to the prisoner or the prisoner's counsel").

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

*Id.*

## 2.      Record Expansion

The record expansion procedure under Rule 7 of the Rules Governing § 2254 Cases facilitates the consideration of evidence developed through investigation and discovery. Under Rule 7(a), a court may require authentication of the materials presented.  Record expansion follows and works in tandem with 28 U.S.C. §§ 2246 and 2247 to allow admissibility of proceedings and records conducted or filed in state court, or developed on federal habeas corpus. If the petitioner seeks to expand the record to introduce new evidence never presented in state court for the purpose of establishing the factual predicate of a claim, he or she must satisfy § 2254(e)(2) and show that he or she exercised diligence in state court to develop the factual basis of the claims for which evidence is offered in federal proceedings. *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (per curiam) (holding that § 2254(e)(2) restrictions apply to evidence presented without an evidentiary hearing). The deference due state court decisions under § 2254(d) also will be applied in the context of Weaver's record expansion requests. *See Pinholster*, 131 S. Ct. at 1398; *Landrigan*, 550 U.S. at 574.

## 3.      Discovery

Leave of court for formal discovery under Rule 6 of the Rules Governing § 2254 Cases is authorized upon a showing of good cause.  Good cause, in turn, exists where specific allegations in the petition convince the court that the petitioner may be entitled to relief if the evidence solicited were to be developed.  *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *see also Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (holding that discovery is indicated where specific allegations give the court reason to believe that a petitioner may be able to demonstrate that he is entitled to relief); *Jones v. Wood*, 114

79

F.3d 1002, 1009 (9th Cir. 1997) (discovery is appropriate to permit the petitioner to establish entitlement to relief). Because of the nature of habeas corpus, the expansive construction of relevance in civil cases – to embrace all information "reasonably calculated to lead to the discovery of admissible evidence," as specified in Federal Rule of Civil Procedure 26(b)(1) – is not appropriate. *See Harris*, 394 U.S. at 297 (holding that broad-ranging inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding). Moreover, habeas corpus is not a proceeding to *learn* facts. *See, e.g., Harris*, 394 U.S. at 297 ("broad-ranging preliminary inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding); *Rich v. Calderon*, 187 F.3d 1065, 1067 (9th Cir. 1999) (habeas corpus "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence'").

## V.   Resolution of Claim 1

In Claim 1, Weaver alleges entitlement to relief due to a complete deprivation of counsel during two crucial phases of his trial. In presenting Claim 1, Weaver incorporates by reference, among others, Claim 2.[95] Weaver alleges his representation by the Huffmans was completely ineffectual, and, in fact, actively damaging to his case. Mr. Huffman, described by Weaver as lead defense counsel, is alleged to have been severely incapacitated by unremitting alcoholism and PTSD (from his service in Korea) from the time of his appointment on August 12, 1982, until the conclusion of jury trial proceedings on March 7, 1985.[96] His last appearance before the jury was February 7, 1985 and his last participation in court proceedings without the jury was February 8, 1985 before he was hospitalized at the VA Hospital in Palo Alto for alcohol detoxification and treatment. As to second counsel, Mrs. Huffman, Weaver argues she was not able to function as co-counsel or replacement counsel because of personal lack of preparation, co-dependency in caring for her severely impaired husband, and resulting exhaustion. Weaver additionally attributes to both Huffmans a conflict of interest due to severe

---

[95]   There is quite a bit of overlap between the two claims in terms of factual foundation, although the controlling law is distinct.

[96]   He returned to his representational responsibilities for the § 190.4(c) motion to set aside the death sentence a month later.

financial distress, which befell them independently and collectively.[97]   To mitigate their financial distress, not only did Mrs. Huffman refuse opportunities to continue the case when Mr. Huffman was hospitalized, but she and Mr. Huffman formulated a plan open a law school, using video tapes of the examination of witnesses in Weaver's trial for pedagogical purposes.[98]

###### A.   Controlling Legal Principles

Both parties agree on the controlling precedent, that is, *United States v. Cronic*, 466 U.S. 648 (1984).  In that case the Court acknowledged that certain circumstances of constitutionally incompetent representation of counsel are so egregiously prejudicial that ineffective of counsel will be presumed. *United States v. Swanson*, 943 F.2d 1070, 1072 (9th. Circ. 1991), citing *Cronic*, 466 U.S. at 658.  This presumption eliminates the need for the petitioner to establish prejudice.   *Cronic* identifies three situations in which prejudice is to be presumed.  The first is when the accused is denied counsel at a critical stage of the trial.  *Id.* at 659.  The second is when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing."  *Id.*; *see also Bell v. Cone*, 535 U.S. 685, 697 (2002) (holding counsel's failure must be complete, rather than evident in discreet, specific errors or omissions during a part of the trial).  Under the third situation, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that the presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  *Cronic*, 466 U.S. at 659 (citing *Powell v. Alabama*, 287 U.S. 45 (1932)).

###### B.   Weaver's Argument

Weaver maintains that the Huffmans' "constellation of problems" must be considered cumulatively (not parsed out separately, as the Warden would do).  As to the standards of review, Weaver claims neither *Richter*, 131 S. Ct. 770, nor *Pinholster*, 131 S. Ct. 1388, preclude relief under Claim 1.  Citing *People v. Romero*, 8 Cal. 4th 738, 737 (1994), and *People v. Duvall*, 9 Cal. 4th 464,

---

[97]   Attorney conflict of interest claims are governed by *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and *Mickens v. Taylor*, 535 U.S. 162 (2002).  Weaver's conflict of interest claim is the foundation of Claim 2, and will be discussed in that context, *infra*.

[98]   The founding of the Huffman College of Law is more fully discussed in connection with Claim 2, *infra*.

474 (1995), he asserts that the state case claim equivalent to Claim 1 alleged facts sufficient for relief and the opportunity for further factual development before the California Supreme Court.   Thus the state court's decision summarily denying relief (for failure to state a prima facie case) was unreasonable under § 2254(d)(1), as construed by *Richter*.   Referring to *People v. Snow*, 30 Cal. 4th 43 (2003), Weaver further argues the California Supreme Court previously misinterpreted *Cronic* by addressing ineffective assistance of counsel under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984) (that is, addressing prejudice).   Weaver therefore suggests the California court misapplied the *Strickland* standard as to his case as well.   In his reply, he also argues that *Cronic* leaves open the possibility that other circumstances of ineffectual representation (besides those mentioned in the case itself) could qualify for a finding of *per se* ineffective assistance of counsel.   He suggests the Huffmans' deficient representation of Weaver is subject to such an application.   Citing *Wright v. Van Patten*, 552 U.S. 120 (2008), Weaver argues that the circumstances in his case were "likely to result in such poor performance that an inquiry into [their] effects would not be worth the time."   *Id.* at 125. Mr. Huffman's and Mrs. Huffman's alleged ineffectiveness is reviewed separately.

### 1.   Mr. Huffman

Weaver has substantiated that Mr. Huffman was hospitalized on six separate occasions during his representation of Weaver for alcohol detoxification, including on February 15, 1985, during the sanity phase and continuing throughout the penalty phase.   Further, even when he was physically present during part of the sanity proceedings, he did little to present the case.   He is alleged to have consumed alcohol in response to stress and he found Weaver's case extremely stressful, so much so that, according to a declaration testimony submitted with the state habeas proceedings,[99] he admitted he could no longer function.[100]   Although he was a lawyer with many years of experience (though not

---

[99]   All evidence mentioned in this argument was presented to the California Supreme Court with Weaver's First State Habeas Petition.

[100]   In the admitting notes for records of Mr. Huffman's stay at the Palo Alto VA on February 15, 1985, his history indicates "He had been involved in a very difficult criminal case.   About 2 months ago[,] the pressures of the case became too much & he stopped practicing law."   Exhibit 148 to First State Petition, Feb.15, 1985 Progress Notes.   (The many, many pages in this exhibit are unnumbered.)

necessarily productive and certainly not successful), according to Weaver, he had never tried a capital case.   Nonetheless, early in the trial proceedings, he represented to the trial court that he did have capital experience.  RT-14: 3551.[101]  Weaver has presented a great deal of evidence to the support the contention that Mr. Huffman's escalating drinking incapacitated him from functioning as an attorney.

Weaver also devotes considerable of effort to establishing the nature and extent of Mr. Huffman's impairment through the years from his service in the United States Army during the Korean War through his hospitalization on February 15, 1985.  A great many documents as well as details from people who knew Mr. Huffman, including former colleagues, his second wife, and Mrs. Huffman (his third wife) are presented about his countless efforts to obtain treatment for his alcoholism at both private and VA hospitals, automobile accidents, DUI citations, efforts to hide his drinking, and a history of his many jobs from which he was discharged due to incessant drinking in Sacramento, Butte, and Kern Counties.  One of these prior jobs involved his employment with the Kern County Public Defender's Office where he either failed to appear in court or appeared in an inebriated state.  Weaver provides two examples.  The first was in August 1981, when Mr. Huffman represented a defendant facing 10 felony counts.  The defendant, William Anderson, sought and succeeded in having the Public Defender's Office removed from his case because of Mr. Huffman's recurrent intoxication.   Mr. Anderson also wrote a letter to the Superior Court explaining his concerns for Mr. Huffman.   In another case, involving a murder case in March 1982, Mr. Huffman repeatedly appeared in court in an intoxicated state.  Ultimately, the Superior Court judge, the Honorable Robert Baca, declared a mistrial because of Mr. Huffman's condition.  Shortly thereafter, Mr. Huffman was discharged from the Public Defender's Office –less than six months before his appointment in Weaver's case on August 19, 1982. Weaver has presented evidence that Mr. Huffman's reputation for abusing alcohol was well-known in the Kern County legal community by members of the bar and local investigators.  On November 10, 1982, after his appointment in Weaver's case, Mr. Huffman accepted another appointment in a murder case that was removed to Riverside County.

---

[101]   This statement was made in the context of a hearing regarding Weaver's treatment in the Kern County Jail as a high security risk inmate.

In his reply brief, Weaver argues that no reasonable trial judge would have appointed Mr. Huffman to represent a defendant in a capital case given his instability and chronic alcoholism. He points to the declaration of a mistrial called by Judge Baca in the March 1982 murder case while Mr. Huffman was still employed at the Kern County Public Defender's Office. Even on his November 1983 honeymoon with his new wife and co-counsel, Mr. Huffman was hospitalized for alcohol related illness on three different occasions in three different states. Upon the Huffmans' return to Kern County, he was hospitalized again. Throughout pretrial and trial proceedings, Mrs. Huffman misrepresented the reasons for her husband's many absences to Judge Stone, to Mr. Shumaker, and to Weaver. The misrepresentations made during the sanity proceedings are recounted in Part III.A.1.*j.*, *supra.*

As for his own trial proceedings, Weaver is very critical of the fact that the Mr. Huffman (through Judge Stone) represented to the jury he intended to call Weaver to the stand. The relevance of this fact to Claim 1 is that Mr. Huffman did not and could not do so. Rather, he became disabled from his alcohol consumption and dropped out of the proceedings altogether. As stated by Mrs. Huffman in a post-conviction declaration, "Drinking brought him to the point where he couldn't go on anymore. . . . Eventually he became unable to function in court at all, and I had to complete the sanity and penalty trials in his place." Weaver also points out that the strategy Mr. Huffman chose, that is to show Weaver was schizophrenic, was unfounded in his own mind. According to a letter Mr. Huffman wrote to Dr. Kormos, Mr. Huffman didn't believe the jury would find schizophrenia, although he did believe Weaver would be found "schizotypal psychotic, to some degree, and dangerous to himself as well as to society." In spite of this belief, Mrs. Huffman described him in her declaration as "manic over his expressed belief in a defense of schizophrenia defense layered over PTSD. He was obsessed by it and could not be talked out of it." Exhibit 34 to First State Petition, ¶¶ 21, 28.

In the Huffmans' law office, Mrs. Huffman's son and daughter-in-law as well as a former employee, who worked there, have provided evidence that Mr. Huffman's office was at times littered with empty vodka bottles and he was having great difficulty staying focused to assist Mrs. Huffman in preparing for trial. During the months of December 1984 and January 1985, Mr. Huffman's alcohol intake is said to have increased from one-half pint to one and a half quarts per day. Ultimately, his

84

1  courtroom demeanor was affected by his drinking.  Beginning on February 4, and continuing to

2  February 7, 1985, Weaver notes that Mr. Huffman's behavior before the jury became increasingly

3  erratic.  Declaration of former employee, Esperanza Anderson, Exhibit 23 to First State Petition, p. 3;

4  Declaration of Amanda Smith. Exhibit 24 to First State Petition, ¶¶ 4-8, 12-13; Declaration of Eric

5  Smith, Exhibit 25 to First State Petition, ¶¶ 5-9.[102]

6         Mrs. Huffman drove him to the VA Hospital in Palo Alto the following week, on Friday,

7  February 15, 1985.  Once admitted, Weaver describes Mr. Huffman's revelation that he, himself,

8  suffered PTSD from his Korean War experience.  Although he researched PTSD as it applied to

9  Weaver, as Mrs. Huffman averred, he had not known treatment was available for this condition.

10  Weaver also points out that Mr. Huffman did not wish to reveal his current hospitalization, which

11  Weaver asserts is demonstrated by his ire at a staff member of the hospital who informed Mr. Huffman

12  that a defense investigator had called for him (Mr. Huffman) at the hospital.

13         This secrecy was not new.  In his factual basis for Claim 2, Weaver notes that during the pre-

14  trial period leading up to the guilt phase proceedings, the Huffmans requested numerous continuances

15  so Mr. Huffman could obtain treatment for his alcoholism, but never gave the true reason.  For

16  example, when Mr. Huffman asked for a continuance of Weaver's August 8, 1983 trial date, he

17  mentioned nothing about his own health issues, but rather focused on substantive defense work he had

18  yet to complete.  Another trial continuance was presented on March 12, 1984, and again, Mr.

19  Huffman's alcoholism issues were concealed, but details of the need to find a qualified psychiatrist for

20  a possible NGI plea were recounted.  The record supports both the false excuses provided by the

21  Huffmans as cause for the requested continuances and that Mr. Huffman was hospitalized for his

22  alcohol related illness. After his February 15, 1985 hospitalization, Weaver contends that Mr. Huffman

23  continued to "interject" himself into the trial from his hospital bed at the Palo Alto VA medical center.

24  The only support for this claim, of which the Court is aware, is that a hospital staff member, mentioned

25  above, informed Mr. Huffman that a defense investigator was trying to reach him.

26

27         [102]   The Court also observed these behaviors from reviewing the transcript and summarized

28  them in Part III.A.1.*j*., *supra*.

85

## 2.    Mrs. Huffman

Weaver recites that Mrs. Huffman (then Ms. Mendez) was appointed to Weaver's case as second counsel on June 8, 1983 on the heels of a stormy marriage to Rafael Mendez.[103]  Even before the Huffmans married, while Mr. Huffman was in Riverside on his November 1982 appointment, Mrs. Huffman (then Ms. Mendez) began making appearances on Mr. Huffman's behalf in Weaver's case. Weaver alleges the fact that Mr. Huffman and Ms. Mendez were engaged to be married was not disclosed, yet, three months from Ms. Mendez's appointment, she and Mr. Huffman were married on September 15, 1983.  Ms. Mendez thereafter assumed her husband's last name.  As noted in immediately preceding Part V.B.1., *supra*, Mrs. Huffman misrepresented the reasons for her husband's many absences in court as various illnesses, but never alcoholism.  *See also*, Part III.A.1.*j*., *supra*. Weaver alleges she and Mr. Huffman had conflicted loyalties between providing competent representation to Weaver and protecting Mr. Huffman's reputation as well as preserving both of their financial interests.

These financial and reputation concerns are alleged to have been compelling motivators for Mrs. Huffman's decision to forge ahead with Weaver's sanity trial, even in the absence of Mr. Huffman, and notwithstanding the fact that she had not worked up the trial strategy with him and had been left in the dark about the factual bases for Mr. Huffman's strategy. Weaver provides some key areas of substantiation.  After Judge Stone represented to the jury that Mr. Huffman would examine Weaver and then Mr. Huffman had to leave the proceedings before the examination could take place, Mrs. Huffman also didn't or couldn't do so because she wasn't prepared and was unaware of what Mr. Huffman intended to elicit from Weaver. Part III.A.*j*, *supra*.  According to her declaration testimony, Mr. Huffman determined the trial strategy and undertook the trial preparation, including communicating with various mental health experts, communications he did not share with his wife. Exhibit 34 to First State Petition, ¶¶ 24-25.  Mrs. Huffman also averred that Mr. Huffman never divulged to her his reservations about the claim that Weaver suffered from schizophrenia.  *Id*.: ¶¶18-

---

[103]  State court records disclose that after the Mendezes separated, Mr. Mendez angrily entered her office and shot her.  During their marriage the couple also filed for bankruptcy.

19. Nor did he advise her of what background facts Weaver relayed to the defense experts had been corroborated, including the unusually harsh treatment by his mother, his actual participation in combat during his service in Vietnam, his use of amphetamines, the truth of his sister Katie Smith's allegations about the sadistic and sexual acts Weaver was said to have perpetrated against her, and Weaver's prior head injuries. *Id.*: ¶¶ 13-14, 24. As a result of her lack of participation in development of the defense strategy or factual foundation for that strategy, Weaver argues Mrs. Huffman contributed no independent legal perspective, reasoning, or judgment to the case when she assumed the role as his sole attorney. This point is particularly stressed in Weaver's reply brief. Though she was unprepared to take over the sanity and penalty phases, she did so, declining the trial court's offer of additional time to get up to speed. Weaver describes her trial presentation as "simply parroting what Mr. Huffman – who had no way of knowing what was unfolding in the courtroom – told her to do."[104] In so doing, and quoting *Smith v. Robbins*, 528 U.S. 259, 278 (2000), Weaver argues Mrs. Huffman violated his "right to have an attorney, zealous for the indigent's interest, evaluate his case" and continuously exercise the skill and judgment necessary to represent a defendant facing the death penalty. He reiterates this notion in his reply brief:

> Despite the fact that Mr. Huffman had been responsible for designing, investigating, and preparing – however inadequately – Mr. Weaver's sanity and penalty phase defenses, once overwhelmed by his alcoholism and alcoholism-related ailments, Mr. Huffman absented himself completely from involvement in Mr. Weaver's case, leaving Mrs. Huffman to present evidence with which she had no familiarity and about which she had no understanding.

Reply Brief at p. 2.

Aside from her lack of preparation and knowledge of the case, Mrs. Huffman additionally is alleged not to have been qualified to handle a capital case. This contention is based on an assessment by the Kern County Public Defender, with whom Mrs. Huffman took up employment in the year following her representation of Weaver. Specifically, the Public Defender found her knowledge of the

---

[104] Based on the argument recited in Claim 2 that Mr. Huffman's multiple pre-trial alcohol-related hospitalizations prevented him from devoting the necessary time and energy to preparing a defense, the fact that Mrs. Huffman had a defense "script" is noteworthy and fully supported by Mrs. Huffman's declaration. Exhibit 34 to First State Petition, ¶ 22.

law poor and her competence level only sufficient to handle misdemeanor cases, and certainly not sufficient to handle a capital case.  From this evidence and the fact that she was sued for malpractice, *see infra*, Weaver argues Mrs. Huffman was incapable of providing constitutionally competent representation in Weaver's case.  Accordingly, Weaver claims the fact that Mrs. Huffman remained present during trial proceedings did not cure the deprivation of effective representation occasioned by Mr. Huffman's absence.

Weaver outlines the consequences of Mrs. Huffman's lack of personal preparation in Weaver's case and capital experience in three respects.  First, she presented evidence from her experts that Weaver presented a future danger.[105]  From Dr. Tolchin, she elicited that Weaver suffered from a "passive aggressive personality with sadomasochistic features or depressive features or both" and that Weaver's potential for violence was "very severe."  Similarly, he claims she elicited from Mr. Rose Weaver's diagnosis of a "passive aggressive personality with schizoid features and sexual sadism" and "an intense hostility toward women."  From Dr. Cholet, she elicited a reference to "the multiple murders" Weaver discussed with Dr. Cholet, that he was sexually attracted to her, and that she would be one of his victims if he were not in custody.  Second, the three experts who testified about Weaver's mental state in connection with the Humboldt County crime testified Weaver did not suffer from a mental disease or defect, conclusions which were antithetical to the goal of the sanity proceedings.  Similarly, the three experts who testified about his mental state at the time of the Ventura County crimes all concluded Weaver was sane at the time those crimes were committed (three months after the Radford/ Levoy murders).  Third, she failed to challenge the testimony of Drs. Cutting, Criswell, and Cholet, even when prompted by the trial judge and the prosecutor.  Weaver claims the testimony about his sanity from Drs. Cutting and Criswell should have been precluded because both were appointed by the court prior to Weaver's entry of the NGI plea.  The only issue was his competence to be tried under Penal Code § 1368.  He claims Dr. Cholet's testimony was subject to exclusion based on a point raised by Mr. Shumaker directly before her testimony, that is the issue of Evidence Code § 1017.

---

[105]  This is apparently consistent with the trial strategy created by Mr. Huffman and certainly a frequent description of Weaver's conduct during the sanity proceedings.  *See* Exhibit 34 to First State Petition, ¶ 20.

Separately, Weaver argues the resulting burden from Mr. Huffman's drinking and essential abandonment of the case on Mrs. Huffman became overwhelming.  As Weaver's trial drew closer and the Huffmans worked in "crisis mode" at the last minute,[106] Mrs. Huffman had no time to develop her own strategy and received "no assistance from Mr. Huffman."  Her failure to keep up with her work in Weaver's as well as other cases she handled began catching up with her; she was sued in early January 1985 for malpractice (that is, not responding to a motion to dismiss for failure to prosecute) in a wrongful death civil suit.

After Mr. Huffman's last day before the jury, February 7, 1985, and last day in court, February 8, 1985, Mrs. Huffman was not able to drive Mr. Huffman to the VA Hospital in Palo Alto until Friday, February 15, 1985.  In the meantime, she put in full days on February 11 and 13,[107] plus a half day on February 14, 1985 eliciting testimony from the defense witnesses.  All the while the proceedings were being video-taped to preserve teaching materials for the Huffmans' planned law school.  With all of these matters pending, and while handling the case alone, Mrs. Huffman became exhausted by the time the penalty phase began on March 5, 1985.  In his brief, Weaver notes that up to this time, neither of the Huffmans had prepared for the penalty phase.[108]

As Weaver points out, the prosecution of the penalty phase began on March 5, 1985 and concluded the following day, March 6.  The defense rested the same day, March 6, prior to the lunch recess.  Mrs. Huffman put on her only witness, Weaver, whose testimony took up only three pages of transcript.[109]  Weaver points out, however, that at the start of trial, Mr. Huffman represented to the court that the defense penalty presentation would require three weeks and involve fifteen witnesses. Weaver argues, in contrast, the actual penalty phase trial was marked by its paucity.  In his reply, he stresses that the foregoing circumstances surrounding Mr. Huffman's absence and Mrs. Huffman's

---

[106]   This description was given by both Mrs. Huffman's son, Eric Smith, Exhibit 25 to First State Petition, ¶ 12, and his wife, Amanda Smith, Exhibit 24 to First State Petition, ¶ 16.

[107]   February 12, 1985 was an observed National Holiday.

[108]   No reference to evidentiary support for this statement is made.

[109]   Specifically, he testified about leaving the state when charges were pending against him for the Humboldt charges of assault on Ms. Bonnie Brown.

ensuing distraction, exhaustion, and lack of preparation combined to render her so ineffectual as to be constructively absent, so that *Cronic* and not *Strickland* governs.

### C.    The Warden's Argument

The Warden's affirmative defense to Claim 1 is that the claim runs afoul of the rule against retroactivity under *Teague v. Lane*, 489 U.S. 288 (1989).  He claims that to grant relief, the Court would have to establish a new rule, namely, when a defendant expressly waives continued representation by one of two attorneys, he nonetheless is entitled to relief because of deprivation of counsel.  The Warden separately argues that Mrs. Huffman *did* subject the prosecution of Weaver to "meaningful adversarial testing."   He also maintains that Mrs. Huffman was competent to conduct Weaver's representation.

As for the application of 28 U.S.C. § 2254(d), the Warden contends the summary denial of the state equivalent of Claim 1 by the California Supreme Court was reasonable.  He asserts there is no authority for the proposition that when a defendant is represented by one attorney, having waived the presence of the other, the defendant can prevail under *Cronic*.  This is especially the case, the Warden argues, because the trial court offered Weaver an open ended continuance so Mrs. Huffman could associate new counsel and spend more time getting up to speed in the case.  Likewise, he notes, there is no authority for the proposition that a defendant has a constitutional right to the presence of both appointed attorneys.

The Warden asserts that the reason for Mr. Huffman's absence, that is his, "alleged alcoholism," is totally irrelevant since Mrs. Huffman was always present.[110]   Moreover, he maintains, alcoholism, in and of itself, doesn't permit a presumption of ineffective counsel, citing several out of circuit cases, plus *Bonin v. Calderon*, 59 F.3d 816, 838 (9th Cir. 1985) (finding defense counsel's drug usage did not constitute *per se* ineffectiveness).

Next the Warden addresses Weaver's argument that Mrs. Huffman also was totally ineffectual for lacking basic capital defense skills, having been sued for malpractice, relying on trial preparation

---

[110]    The Warden makes specific note that the California Supreme Court observed this fact, citing 26 Cal. 4th at 950 (finding there was "no question defendant was represented by counsel, as Mrs. Huffman represented defendant at all times").

1   materials worked up by Mr. Huffman, and undergoing severe personal problems.  As to the first three

2   bases, the Warden cites numerous cases refuting Weaver's position.  As to the last basis, the Warden

3   simply observes there is no Supreme Court authority to support such a claim.

### D.    Analysis

5        The lengthy review of the sanity and penalty phases supports three findings concerning Mr.

6   Huffman.  First he was physically absent from trial proceedings after Friday, February 8, 1985.

7   Second his participation in the proceedings from the guilt phase examination of Weaver on December

8   17, 1984 through sanity proceedings on February 8, 1985 was minimal, at best.  Third, his comments

9   and objections made on February 4, 6, and 7, 1985 indicate overt confusion.   A fourth proffer Weaver

10  advanced, that Mr. Huffman was "interjecting" himself in the continued representation of Weaver from

11  the Palo Alto VA, is not established.   The only support advanced is the attempt by a defense

12  investigator to reach him, a fact which provides no foundation for the proffered assertion.

13       Based on the same record review, Mrs. Huffman's representation generally was cogent, in spite

14  of her lack of personal preparation, co-dependence, financial concerns, and exhaustion.  During the

15  defense case in chief, she questioned one mental health expert about schizophrenia in Weaver's family

16  (Dr. Raitt),  three mental health experts who evaluated Weaver in connection to the Humboldt County

17  conviction (Drs. Gardner, Owre, and Tolchin), three mental state experts relative to the Ventura crimes

18  (Drs. Chappell and Donaldson, plus Mr. Rose), three doctors comprising a defense team hired defense

19  to evaluate Weaver for the sanity proceedings (Drs. Shonkwiler, Dietiker, and Lundgren), four PTSD

20  experts (Drs. Wittlin, Donahoe, Wilson, and Kormos), three lay witnesses (Weaver's sister, Ms. Smith,

21  and two friends, Messrs. Barnett and Mooreland), and two inmate witnesses (Messrs. Hogan and

22  Archuleta).  She conducted cross examination of five mental health experts put on by the prosecution

23  (Drs. Cutting, Matychowiak, Burdick, Criswell, and Cholet), and an inmate witness (Mr. Sneed).  She

24  also conducted the rebuttal case by examining two additional inmate witnesses (Messrs. Shannon and

25  Flores).  Except for the opening argument on January 14, 1985 and the February 8, 1985 conference

26  outside the presence of the jury about admission of the VESPI AV, Mrs. Huffman conducted all

27  aspects of the sanity phase.  It was a substantial, complex presentation of evidence and summation.

28  Weaver's complaint that Mrs. Huffman failed to bring independent legal perspective, reasoning, or

judgment to her role as second or sole counsel simply does not establish that she wasn't functioning as counsel, even if her alleged superficial knowledge of the case fell below applicable standards (including ABA standards) of professional competence.

Moreover, not all of the errors during the sanity proceedings Weaver attributes to her are accurate or as damaging as portrayed. While Weaver is correct to say Dr. Tolchin found that Weaver suffered from a "passive aggressive personality with sadomasochistic features or depressive features or both," Dr. Tolchin also testified that this condition was in remission at the time he was treating Weaver. Again, while Weaver is correct to say that on Mrs. Huffman's direct examination, Mr. Rose offered a diagnosis of a "passive aggressive personality with schizoid features and sexual sadism," it is incorrect to say that Mrs. Huffman also elicited the statement that Weaver had "an intensive hostility toward women." That statement was read by Mr. Rose at the prompting of Mr. Shumaker on cross examination. Finally, Weaver complains that Mrs. Huffman elicited damaging testimony from Dr. Cholet. The first of these involved his sexual attraction to her accompanied by a "threat" he would victimize her if not in custody. The second was a statement that Weaver discussed "multiple murders" with her is ambiguous. The matter of Weaver's attraction to Dr. Cholet was consistent with his statements to other examiners that he liked, and did, have sexual intercourse with attractive females he encountered hitchhiking. Since the jury was aware that Weaver had been convicted of the Ventura crimes and was serving a lengthy prison sentence with the California Department of Corrections, his stated craving could not be taken as a bona fide threat, but rather wishful thinking (as many other of his statements and boastings were found to have been by several of his evaluators). As for Dr. Cholet's mention that Weaver discussed "multiple murders," the statement was both isolated and ambiguous. The prosecution did not attempt to have Dr. Cholet elaborate on the statement and presented no independent evidence there were *other* murders besides those of Mr. Radford and Ms. Levoy. And because there had been no mention by the prosecution of other murders, this reference could easily have indicated the murders of Mr. Radford and Ms. Levoy. Dr. Cholet testified that she used the clarity of Weaver's description of the murders as the basis for rejecting the notion that Weaver suffered from delusions.

92

As for the penalty phase, although the vast majority of Mrs. Huffman's efforts during the penalty phase were devoted to the cross examination of the victims of the Humboldt and Ventura County cases, she did make her point about Weaver's voluntary decision to return to Humboldt County following the assault on Bonnie Brown and answered several points in response to the prosecution summation.  Weaver's attempts to analogize his case to the circumstances in *Swanson*, 943 F.2d 1070, cannot be sustained.  In that case, the defense attorney told the jury during summation that the evidence against his client was "overwhelming," that he didn't think the identification of his client as the perpetrator came "to the level of raising a reasonable doubt," and that he didn't want to "insult" the jurors' "intelligence" by arguing otherwise.  *Id*. at 1071.  The Ninth Circuit found that the defense attorney's concession there was no reasonable doubt regarding the only factual issues in dispute resulted in a breakdown in the adversarial system and compelled the application of "the *Cronic* exception to the *Strickland* requirement" of showing prejudice.  *Id*. at 1074.  Contrary to Weaver's contentions, Mrs. Huffman did not elicit these kinds of damning concessions or opinions from her experts.

While Mrs. Huffman's representation was not without problems, it did not amount to a total breakdown in the adversarial system of deprivation of counsel.  Under these circumstances, Weaver has not and cannot demonstrate that the summary denial of the state case equivalent of Claim 1 was unreasonable under 28 U.S.C. § 2254(d)(1) or (2).  Moreover, this Court declines Weaver's invitation to extend *Cronic* to the facts presented here, even taking them altogether. It is beyond the authority of this Court to grant relief for a claim that doesn't fall "squarely" within the purview of clearly established Supreme Court law.  *See Richter*, 562 U.S. at ___, 131 S. Ct. at 786; *Mirayance*, 556 U.S. at 122.  Finally, although Weaver argues that the California Supreme Court may have incorrectly analyzed a *Cronic* claim in *People v. Snow*, 30 Cal. 4th 43, and accordingly may have done likewise in his own case, the *Snow* case remains good law.  The defendant's petition in *Snow* for certiorari before the United States Supreme Court in that case was denied.  540 U.S. 1076 (2003).

Separately, the Court points out that Mr. Huffman's sanity phase strategy of showing that Weaver suffered from schizophrenia was not a far-fetched idea even if he believed the jury would only find Weaver to be "schizotypal psychotic" and "dangerous."  Besides the six defense experts who

93

found Weaver was suffering from paranoid or undifferentiated schizophrenia (that is, Drs. Shonkwiler, Dietiker, Lundren, Wittlin, Wilson and Kormos),[111]  Mr. Huffman garnered plenty of support for this diagnosis among the other experts as well.  Men's Colony evaluator regarding the Humboldt crime, Dr. Owre, testified from the witness stand that Weaver was, during trial proceedings, suffering from a chronic undifferentiated schizophrenic condition.  Ventura County sanity evaluator, Dr. Donaldson, noted that Weaver demonstrated "a very schizoid adjustment" and that his lack of impulse control was consistent with ASPD as well as with schizophrenia.  Mr. Rose, the Chino Prison intake evaluator for the Ventura crime, found passive-aggressive personality with schizoid features, and prosecution expert, Dr. Cutting, found atypical psychosis and "schizoidal personality disorder."  In addition, Mrs. Huffman was said to have believed that both Weaver and his mother suffered from schizophrenia and that Weaver's illness worsened during his service in Vietnam as a demolitions expert.[112]

In response to Weaver's assertion that Mrs. Huffman was not qualified to represent capital defendants, the Court notes that Mrs. Huffman (then, Ms. Mendez) represented capitally charged defendant Constantino Carrera before the Kern County Superior Court from April 27, 1982 through October 7, 1983, when Mr. Carrera's motion to set aside the death sentence was denied.  The *Carrera* case has been before this Court and the Ninth Circuit on a petition for writ of habeas corpus.  While the Court did find prosecutorial misconduct, and granted relief on the death eligibility special circumstance, the Court did not find ineffective assistance of counsel.  *See Carrera v. Warden*, Case No. 1:90-cv-478 doc. 287, filed March 13, 2008.  The Ninth Circuit affirmed.  *Carrera v. Ayers*, 699 F.3d 1104 (9th Cir. 2012).[113]

---

[111]  Dr. Lundgren diagnosed Weaver with undifferentiated schizophrenia, only.  Dr. Shonkwiler agreed with her diagnosis *as well as* Dr. Dietiker's diagnosis of paranoid schizophrenia.  All of the PTSD experts mentioned found paranoid schizophrenia.

[112]  This hearsay evidence comes from Mrs. Huffman's son, and his wife.  Exhibit 24 (Amanda Smith) to First State Petition, ¶ 16; and Exhibit 25 (Eric Smith) to First State Petition, ¶ 14.

[113]  This is not to say that Mrs. Huffman's professional performance in the *Carrera* trial was error free.  It is to say, however, that Mrs. Huffman's representation in that case was not prejudicially incompetent.

In his reply, Weaver urges that he has presented the Court with copious detailed facts illustrating how the multiplicity of profoundly serious adverse life events confronting the Huffmans converged during their representation of him.  In spite of this showing, the Court has not found a deprivation of counsel within the meaning of *Cronic*.  As a consequence of this finding, Weaver will have to demonstrate prejudice arising from the alleged myriad representational deficiencies under *Strickland*, 466 U.S. 668.  The *Strickland* test requiring prejudice applies where the error (or errors) occurred during the attorney's (or attorneys') inept attempt to present a defense, or that the attorney engaged in an unsuccessful tactical maneuver that was intended to assist the defendant in obtaining a favorable ruling.  *Swanson*, 943 F.3d at 1073.  Proof of prejudice also is required where the fundamental fairness of the proceedings has not been affected and the integrity of the legal process has not been jeopardized.  *Id.* In contrast, *Cronic* applies under "egregiously prejudicial" circumstances so that prejudice must be presumed.  None of the deficiencies noted in the Huffmans' representation, individually or cumulatively, demonstrate such egregiously prejudicial circumstances.

Weaver's request for further evidentiary development of Claim 1, including discovery, record expansion, and an evidentiary hearing, is denied.  The Court specifically denies record expansion and admission of evidence concerning Mr. Huffman's alcoholism and PTSD, including the following exhibits to Weaver's brief: Exhibit A, Declaration of psychologist David Foy, Ph.D., Exhibit J, Mr. Huffman's Military Personnel Records, and Exhibit K, medical records of Mr. Huffman at the Little Rock VA Medical Center.  The Court also denies record expansion of trial participant declarations where the declarants averred they had no recollection of the trial and that their respective lack of recollection cannot be refreshed, namely Exhibit F, declaration of psychiatrist Robert Gardner, and Exhibit G, declaration of psychologist Rollin Rose.  Next, the Court denies record expansion as to Exhibit D, the proffered declaration of psychiatrist Byron Wittlin, M.D., explaining that he had no forensic experience and was not able to connect his findings of Weaver's delusional, PTSD state to his mental state at the time of the crimes.  When one is looking for an expert in a particular field, as were the Huffmans with respect to PTSD, forensic experience is not necessarily a requirement; nor does the failure to find an expert in a particular field with forensic experience demonstrate deficient performance of counsel.  Finally, the Court denies record expansion as to all documents pertaining to

95

1  Mrs. Huffman's qualifications as a lawyer or her legal and personal troubles with her former husband,

2  Rafael Mendez, that is Exhibits H, L, and M.

3          With respect to discovery, the Court finds all document requests addressed to the Kern County

4  District Attorney's Office regarding Mr. Huffman's or Mrs. Huffman's performance are irrelevant to

5  Claim 1.   Similarly, documents sought from the Kern County Superior Court, the State Bar of

6  California, the Kern County Public Defender's Office, and the South Carolina VA Medical Center

7  regarding Mr. Huffman are irrelevant to Claim 1.   From reading Weaver's reply brief, the Court

8  discerns that documents sought from the Kern County Superior Court regarding knowledge about Mr.

9  Huffman's legal competence within the Superior Court may be linked to what Weaver's trial judge,

10  Judge Stone, knew or should have known about Mr. Huffman's qualifications. That inquiry has

11  nothing to do with Claim 1 (or Claim 2).   Documents requested from the California Department of

12  Justice and the Kern County Sheriff's Department are inadequately supported.   As explained in detail

13  in Part IV.C.3., *supra*, for specified discovery to be authorized, Weaver must make a showing of

14  entitlement to relief and may not utilize the discovery process to learn facts. While it is possible the

15  Court may consider authorizing discovery for some of the documents requested as to other claims in

16  the federal petition, those requests are denied as to Claim 1 and Claim 1 is denied on the merits.

17  **VI.     Resolution of Claim 2**

18          Claim 2 replicates Claim 1 in alleging the Huffmans' personal interests were "diametrically at

19  odds" with Weaver's need for an effective and cogent representation because of: (1) their joint and

20  separate financial problems; (2) their plan to open the Huffman College of Law, a plan that included

21  using Weaver's trial for free educational materials; (3) Mr. Huffman's severe incapacitation from

22  chronic alcoholism; and (4) the resulting incapacitation of Mrs. Huffman.[114]  The one addition is that

23  allegations concerning the financial conflict and law school adversely impacted the guilt phase

24  proceedings as well as the sanity and penalty proceedings.  Since Mr. Huffman's escalating alcoholism

25

26

27          [114]   Just as Claim 1 incorporates by reference Claim 2 (among other claims), Claim 2

28  incorporates Claim 1 (among others).

96

as well as Mrs. Huffman's co-dependency and lack of capital case experience have been addressed in Claim 1, those subjects will not be revisited with respect to Claim 2.

### A.    Controlling Legal Principles

Both parties agree that the Sixth Amendment right to counsel carries with it the correlative right to be represented by conflict free counsel. *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  Both parties also agree that an "actual conflict of interest" means "a conflict *that affected counsel's* performance – as opposed to a mere theoretical division of loyalties."  *Mickens v. Taylor*, 535 U.S. 162, 171, 172, n. 5 (2002) (emphasis added).  Reiterating the holding in *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980), *Mickens* clarifies that absent an objection at trial, a defendant must demonstrate that "a conflict of interest actually affected the adequacy of his representation."  535 U.S. at 170.

Weaver cites two pre-*Mickens* Ninth Circuit cases that considered conflicts of interest beyond the traditional representation of co-defendants with divergent interests.  He cites *United States v. Baker*, 256 F.3d 855  (9th Cir. 2001), for the proposition that if, during counsel's representation, "there was a basis for the interests of the attorney and the client to diverge with respect to any material issue or course of action – that is, that counsel actively represented conflicting interests," an actionable conflict exists. *Id*. at 860 (citing *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994).  Second, he relies on *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980) for the proposition that actual conflicts may arise where the defense counsel's judgment was affected by his own financial stake in the case. *Id*. at 1193-94.

In *Baker* the appellate court considered whether a California defendant's appellate attorney labored under a conflict of interest because at the time the direct appeal was pending, he was under investigation and eventually pleaded to two felony charges in the Southern District of New York.  At the time of oral argument for the defendant's appeal, the appellate attorney was already serving time in federal prison and he waived oral argument for the defendant's appeal before the Ninth Circuit.  256 F.3d at 858-59.   After the defendant's conviction was affirmed, he moved to vacate it because of the alleged conflict of interest.  *Id*. at 859.  The court ultimately rejected the defendant's claim because he did not show there was a basis for the interests of attorney and client to diverge with respect to any

97

material issue, that is, the defendant failed to show that counsel actively represented conflicting interests. *Id*. at 860.[115]

Hearst was before the Ninth Circuit on appeal from a 28 U.S.C. § 2255 motion following Patricia Hearst's conviction at her federal criminal trial. The court considered whether her attorney, F. Lee Bailey, labored under a conflict of interest in his strategic decisions because of a potential financial gain from a book contract. 638 F.2d at 1193. The Ninth Circuit remanded the case for an evidentiary hearing on three discrete claims: 1) that Bailey "failed to seek a continuance so public interest would not cool and competing authors would not get the jump on him;" 2) that Bailey "failed to seek a change of venue, because publicity would be maximized by a trial in San Francisco, a media center and the home of the Hearst family;" and 3) that Bailey "put her [Ms. Hearst] on the witness stand, so her story would go on the public record and he would not be constrained by the attorney-client confidentiality rules." *Id*.

Due to intervening decisions, neither of these cases is applicable in the present matter. The *Hearst* decision specifically was called into question by the Supreme Court in the *Mickens* opinion, referring to it and other circuit decisions "which have applied *Sullivan* '*unblinkingly*' to 'all kinds of alleged attorney ethical conflicts," including "when representation of the defendant *somehow* implicates counsel's personal or financial interests, including a book deal." 535 U.S. at 174 (emphasis added). The High Court then followed up these examples with the statement that Sullivan did not "clearly establish, or indeed even support, such expansive application." *Id*. A more recent Ninth Circuit opinion, *Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005), also discounts both *Baker* and *Hearst* because they were decided before *Mickens* was issued. *Id*. at 1182.[116]

While the *Mickens* decision does not categorically rule out that an attorney's financial interest may cause his litigation strategy to diverge from the best interests of his or her client, the showing

---

[115]   The court did refer to the attorney "deplorably unprofessional conduct in advising neither his client nor the court of his own conviction and sentence. *Id*.

[116]   The *Earp* court also noted that both *Baker* and *Hearst* were pre-AEDPA cases. *Id*.

must be even greater than what was presented to the Ninth Circuit in *Hearst*, where the appellate court decision noted that Ms. Hearst's allegations were "improbable" but not "incredible."  *Id*. at 1195.

### B.    Weaver's Argument

Weaver has presented a sufficient evidentiary basis to establish that both Huffmans individually brought a significant amount of debt into their marriage and that after they married, they incurred additional debt, jointly.  The gravamen of Weaver's argument in Claim 2 is that the Huffmans' joint and individual financial distress left them completely dependent on income they received from Weaver's case.  This dependency, in turn, is said to have caused them to make strategic decisions that were adverse to Weaver's interests.  Weaver provides several examples

The first two examples pertain to the Huffmans' need to keep Weaver's trial going so they would continue to receive income from the trial court: (1) when Dr. Owre stated his opinion from the witness stand that Weaver was incompetent, and neither Mr. nor Mrs. Huffman declared a doubt about Weaver's competence to proceed; and (2) Mrs. Huffman decision to decline both a continuance and the opportunity to associate in additional counsel to assist her when Mr. Huffman finally absented himself from the sanity proceedings. The proffered explanation regarding Dr. Owre's declaration is that had competence proceedings commenced, the Huffmans' income from the case would have been interrupted.  As for the offered continuance and appointment of second counsel, Weaver argues that since the Huffmans needed all the money generated by Weaver's case to keep afloat, they could ill-afford a continuance or to lose any portion of the income.

The next three examples are tied to the Huffmans' plan to launch the opening of a law school[117] that would include an AV tape library to include tapes of Weaver's sanity trial.  Weaver alleges the sanity phase presentation was staged in order to illustrate trial tactics, both poor and correct, and to provide training on substantive issues, all at the expense of focusing on securing a favorable sanity verdict.  To build a "sizable videotape library," the Huffmans realized the necessity of calling many mental health experts, even experts who the Huffmans knew had rendered unfavorable opinions as to

---

[117]  The name for the institution was Huffman College of Law, the Articles of Incorporation for which were filed with the California Secretary of State on August 20, 1986. Exhibit 92 to First State Petition.

Weaver's sanity.  Calling unfavorable witnesses to Weaver's sanity case is the first of the law school examples.  In this unfavorable witness category, Weaver mentions Ventura trial experts George Chappell, M.D. and Theodore Donaldson, Ph.D. as well as Humboldt County prison psychotherapist Dr. Tolchin who found Weaver to have a passive-aggressive personality with sadomasochistic or depressive features or both, plus a "very severe" potential for violence.  Moreover, both Drs. Chappell and Donaldson wrote reports explaining their respective findings that Weaver was not legally insane at the time of the Ventura crimes.  Rollin Rose, the Chino Prison intake psychologist for the Ventura conviction, similarly found Weaver to have a passive-aggressive personality with schizoid and sexual features, plus an intense hostility toward women. Second, Weaver contends that the goal of amassing a law school AV tape collection also dissuaded Mrs. Huffman from challenging the damaging prosecution testimony of prosecution experts Drs. Criswell, Cutting, and Cholet.  He points out that Drs. Criswell and Cutting originally were appointed by the trial court to assess Weaver's competence to be tried and Dr. Cholet could have been challenged on grounds suggested by the prosecutor and trial court.[118]  The third example is the overly lengthy examination of defense experts and cross examination of prosecution experts.

Weaver supports his allegations that the Huffmans viewed the sanity phase AV tapes to have commercial value with a number of exhibits to the First State Petition.  In Mrs. Huffman's declaration, she avers: "David and I also videotaped the testimony given in court during the sanity phase of Weaver's trial and gave the video tapes of the sanity phase to Weaver's appellate counsel."  Exhibit 34, ¶ 17.  Statements by Mrs. Huffman's former law office staff member and son also support the notion the Huffmans intended to open a law school.  Former employee Ms. Anderson stated simply, "I knew that David and Donnalee had plans to open a law school.  While I was working there I heard them talking about it on several occasions."  Exhibit 23, p. 4.  Son, Eric Smith, averred that when he and his wife (Amanda Smith) "stopped working for Donnalee and David their law school was still in

---

[118]  Weaver is extremely vague in this reference.  In the summary of the sanity proceedings, the Court has reviewed the discussion amongst counsel and Judge Stone about various reasons Dr. Cholet might not testify.  Those proceedings will be addressed in the analysis section, Part V.D., *infra*.

the planning stages. Early in 1985, they asked me to design a logo for it." Exhibit 25, ¶ 19.[119]  On August 6, 1987, Mr. Huffman wrote a letter to then-appellate counsel Richard Ross, objecting to Mr. Ross's request for the sanity phase AV tapes (when the transcript was available).  Mr. Huffman noted in his letter that he and Mrs. Huffman believed the sanity phase AV tapes could "be used for commercial purposes."  This letter is on "Huffman College of Law, Inc." letterhead.  Exhibit 94. Almost six and a half years later, on January 5, 1994, Mr. Huffman directed a letter to appellate attorney Marvin Rous demanding the return of the sanity phase AV tapes[120] in exchange for the personal delivery of nine cartons of other materials related to Weaver's case.  Mr. Huffman states in his 1994 letter that he had been trying to secure the return of those AV tapes for over five years.  This letter was written on letterhead showing Mr. Huffman's residence, which he described in the letter as his home-office.  Exhibit 95.[121]  In a letter from Mrs. Huffman to Mr. Rous dated only a little more than a month later, on February 21, 1994, she explained that former appellate counsel, Mr. Ross, took the sanity AV tapes in order to duplicate them, and then never returned them.  Exhibit 101, p. 3.[122]

Weaver's offer of proof related to the Huffmans' law school is an undated, unsigned document identified as "Note to Habeas Counsel," Exhibit I to Weaver's brief, which reads, verbatim, as follows:

PLEASE RETURN THE VIDEO TAPES

THAT WE HAD MADE DURING THE INSANITY PORTION

OF THE CASE.

THESE WERE MADE FOR TEACHING PURPOSES

---

[119]   The date or time frame of when Eric and Amanda Smith stopped working from the Huffmans is not given.

[120]   According to the California Supreme Court Dockets, appellate counsel Richard Ross was appointed June 18, 1985 to represent Weaver.  His appointment was terminated on October 11, 1990. Following the interim appointment of the California Appellate Project on October 18, 1990, Mark Farbman and Marvin Rous were appointed as appellate counsel on May 25, 1993, until Weaver's appeal was at an end and his conviction was final.

[121]   This exhibit is replicated in Exhibit 138 to First State Petition.

[122]   The notion that Mr. Ross took the AV tapes of the sanity trial is called into question by Mr. Rous's letter demanding the Huffmans' files and rejecting the couple's attempt to force appellate counsel to return the AV tapes in order to obtain other parts of the trial file.  Exhibit 136 to First State Petition, p. 1.

101

AND TO LEAVE TO OUR CHILDREN

AND GRANDCHILDREN

IF YOU WISH, WILL COME UP TO

SAN FRANCISCO TO GET THEM.

This is the only evidence mentioning that the sanity phase AV tapes were intended for "teaching purposes."

Weaver makes no offer of proof or argument about how the law school venture in any way adversely affected the guilt or penalty proceedings.  Rather, his argument is addressed to the sanity phase.  The deficient performance as to those phases of the trial would be the same those argued in Claim 1, namely Mr. Huffman's unabated alcoholism, Mrs. Huffman's co-dependency with resulting exhaustion, and severe financial stress on the part of both attorneys which impelled them to retain Weaver's case, even though they were individually and jointly unqualified.

C.      The Warden's Argument

The Warden's primary argument is that the alleged bases for Weaver's conflict of interest claim are the Huffmans' individual and joint indebtedness, their plan to use an AV recording of Weaver's sanity trial as a teaching tool at the law school they planned to open, and the heavy toll Mr. Huffman's alcoholism took on himself as well as on Mrs. Huffman.  He claims this is not sufficient to show a conflict that actually affected the Huffmans' performance.  Moreover, he cites *Mickens* for the proposition that the Court's earlier decision in *Sullivan*, 446 U.S. 335, does not support application of a conflict of interest claim where the alleged conflict involves an attorney's personal or financial interests.  535 U.S. at 175.  In light of this authority, the Warden argues, the California Supreme Court was not unreasonable for summarily denying the state petition counter-part to Claim 2.

D.      Analysis

As noted in the discussion of the controlling legal principles for Claim 2, Part VI.A., *supra*, the Court disagrees with the Warden's reading of *Mickens* as to whether a conflict of interest due to a lawyer's financial concerns can *never* be successful, or that the decision in *Sullivan* precludes such a claim.  In spite of this less constrained construction, Weaver has not demonstrated a nexus between the Huffmans' financial woes and the instances of deficient performance outlined in his argument.

102

He claims that the Huffmans failed to declare a doubt about Weaver's competence to proceed with trial following Dr. Owre's revelation on the stand that Weaver was schizophrenic because they didn't want a break in the proceedings and the concomitant interruption in income from the trial court. This notion, however, is contradicted by Mrs. Huffman's declaration that she did not ask the court to declare a doubt of Weaver's competence because she personally thought "he was trial competent." Exhibit 34 to First State Petition, ¶ 30.

Next, Weaver claims Mrs. Huffman did not request a continuance or seek to associate counsel after Mr. Huffman could no longer appear at the trial proceedings, again, so there would be no interruption in the income and the income would not have to be shared. While this contention may be a logical deduction, there is no support for it in the record and therefore it cannot be the basis for further evidentiary development. *Mickens* requires a conflict that *actually* affected counsel's performance, not one that *most likely* did so.

The Huffmans' plan to use AV tapes of the sanity phase for pedagogical purposes at their law school also fails to demonstrate that the articulated conflict *actually* affected counsel's performance. Even if the Huffmans believed the AV tapes had commercial value for teaching purposes, there is no support that taping the sanity proceedings prompted the presentation of experts who would testify unfavorably to Weaver, the failure to challenge prosecution experts, or the act of conducting overly lengthy direct and cross examinations. The primary evidence proffered to the California Supreme Court that the Huffmans believed the AV tapes had commercial value is Mr. Huffman's August 6, 1987 letter to Mr. Ross in Exhibit 94 to the First State Petition. In addition, neither the second-hand statements of a former staff member nor Mrs. Huffman's son, who were aware of or heard that Huffmans intended to open a law school, Exhibits 23 and 25 to the First State Petition, respectively, support the conclusion that the sanity phase AV tapes would be used for commercial or teaching purposes. The only proffered evidence about the alleged teaching purposes for the AV tapes is Exhibit I to Weaver's brief, as recounted above. This note, however, is totally unauthenticated and the author cannot be determined from the document. In short, Exhibit I is far too unreliable to admit following a record expansion request.

103

But even accepting the truth of the statement, Exhibit I still does not connect the commercial and teaching value of the AV tapes to the complained of deficiencies.  While Weaver suggests that the proposed law school AV tape library might contain good as well as poor examples of trial techniques, there just isn't enough in the record to support the notion that the Huffmans purposefully provided ineffectual and deficient representation for teaching purposes.  Such a conclusion would defy logic.

Further, Weaver's argument regarding the second of the identified deficiencies, that is Mrs. Huffman's failure to challenge prosecution experts Cutting, Criswell, and Cholet, is unsustainable based on the record.   As summarized in Part III.A.2.*a*., *supra*, Mrs. Huffman did bring to the trial judge's attention that Drs. Cutting and Criswell were appointed to assess Weaver's competence to be tried long before the NGI plea was entered and that their respective appointment referrals should have referenced only Penal Code § 1368 rather than both §§ 1368 and 1026.  Although she admitted during the chambers conference, she should have objected prior to Dr. Cutting's testimony, she never did request a limitation on his testimony or renew the issue prior to Dr. Criswell's testimony.   Her declaration suggests this omission may have been intentional: she stated she did not know why Mr. Huffman checked both § 1368 and § 1026 on the reference forms for Drs. Cutting and Criswell. Exhibit 34 to First State Petition, ¶ 29.[123]  Weaver's suggestion that Mrs. Huffman failed to challenge Dr. Cholet's testimony to enlarge the AV tape library at the law school is equally unavailing and unsupported.  When mentioning this omission, Weaver refers to grounds for challenging Dr. Cholet suggested by both the trial court and the prosecutor.  As noted in Part III.A.2.*b*., *supra*, all of the potential grounds for challenging Dr. Cholet's testimony were raised by the prosecutor because he wanted to ensure the testimony he sought to elicit would not be challenged.   The grounds were discussed and resolved  by the trial court.

Claim 2 is denied on the merits.  Accordingly there will be no further evidentiary development. Weaver's requests for discovery, record expansion, specifically as to Exhibit I, and an evidentiary

---

[123]  The Court agrees there was no effort by Mrs. Huffman to limit the cumulative testimony of four court-appointed psychiatrists concerning Weaver's sanity after she realized that Drs. Cutting and Criswell originally were appointed to assess Weaver's competence to stand trial.  His NGI plea was not entered until 1984, so the sanity evaluations conducted by Drs. Cutting and Criswell arguably were inappropriate.

104

1   hearing are denied.  The Court further finds Weaver has failed to argue that either the guilt or the

2   penalty phase proceedings were in anyway affected by the Huffmans' plan to open a law school.

3   **VII.     Discussion of Other Claims**

4           Two classes of claims comprise this section of this Memorandum Order.  The first involves

5   specific instances of ineffective assistance of counsel and the second, juror misconduct.  The instances

6   of ineffective assistance of counsel are by far the most numerous.  The Court will provide the parties

7   the opportunity to respond.

8           **A.        Ineffective Assistance of Counsel**

9           Briefly, to establish that trial counsel was constitutionally defective, the petitioner must

10  demonstrate (1) that counsel made errors so serious, counsel was not functioning as the counsel

11  guaranteed by the Sixth Amendment and (2) that the deficient performance prejudiced the defense.

12  *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995) *citing Strickland v. Washington*, 466 U.S. 668,

13  687 (1984).  The reviewing court need not address both prongs if the petitioner cannot satisfy one or

14  the other.  *Hein v. Sullivan*, 601 F.3d 897, 918 (9th Cir. 2010); *Strickland*, 466 U.S. at 697.

15          An important fact in the present case is that Weaver testified during the guilt proceedings

16  describing the crime, his motivations, his thought patterns, his hallucinations, and his blacking out.

17  RT-15: 3906, RT-16: 4141, and RT-16: 4273-85.  One concept he clarified was that he did not intend

18  to kill Mr. Radford when he hit the young man with the cheater pipe.  He testified that if he had wanted

19  to kill Mr. Radford, he had a knife between his seat and the driver's door and would have slit Mr.

20  Radford's throat or stabbed him in the lungs, as he learned in combat training. RT-15: 3940-41.  The

21  cheater pipe was in the back of the cab.  It never crossed Weaver's mind to kill Mr. Radford when they

22  got out of the truck.  He added, "If I would have wanted him to be dead, he would have been dead."

23  *Id*.: 3941-42.

24          Weaver's testimony constitutes part of the totality of the evidence in the case, and will be

25  considered in the context of any future prejudice evaluation to be made with respect to Weaver's

26  ineffective assistance of counsel claims.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (employing

27  the "totality of available mitigating evidence" in assessing the strength of proffered mitigating

28  evidence).  While the Court is aware that Weaver alleges ineffective assistance of counsel during guilt

105

and sanity, as well as penalty phase proceedings, Mrs. Huffman's elicitation of this testimony will not be ignored. [124]

### 1.    Mental State Evaluators from the Humboldt and Ventura Crimes

As the Court's analysis of Claims 1 and 2 suggests, Weaver has made a strong showing that his representation by Mr. and Mrs. Huffman was deficient, even though, at this point, he must still establish prejudice for that deficient performance.   Probably the most remarkable omission in the Huffmans' representation was their failure to prepare the many experts they subpoenaed.   The Court finds it puzzling that Drs. Gardner, Owre, and Tolchin, regarding the Humboldt County crime, were subpoenaed to testify but were not given any more recent reports regarding Weaver's mental state in the seven to eight years since they had evaluated him.   This is particularly true for Dr. Gardner, whose report and testimony was at least somewhat sympathetic to Weaver's sanity case.[125]   As noted above, Part III.A.*j.supra*, the Huffmans additionally attempted to introduce a report regarding Weaver's suitability for parole for the Humboldt crime, but didn't bother speaking to the subpoenaed witness, Dr. Sanders, ahead of time, so they didn't realize he was not the correct witness to authenticate the document for admission.   This is precisely the information Dr. Sanders offers in his declaration proffered with Weaver's request to expand the record.  Exhibit E to Weaver's brief, ¶¶ 3-4.

Similarly, with respect to the Ventura sanity examiners, Drs. Chappell and Donaldson, the Huffmans failed to prepare them for their testimony.   Both of their reports, like the reports of the Humboldt County evaluators, were unfavorable to Weaver's burden of establishing insanity, especially since they were written the same year as the Radford/ Levoy murders.   The reports of the Ventura evaluators have been made part of the record, and the Court has reviewed them.   Exhibits 58 (Dr. Chappell) and 59 (Dr. Donaldson) to First State Petition.    Both of the Ventura evaluators also have provided declarations included in Weaver's record expansion request in his present brief. Exhibits B

---

[124]  Weaver's present reasoning is that the guilt phase testimony demonstrated a deliberated and conscious choice which was antithetical to the sanity proceedings.  No determination has been made as to whether this argument is persuasive.

[125]  Dr. Gardner's report, Exhibit 110 to First State Petition, is discussed in Part III.A.1.*d.*, *supra.*

(for Dr. Donaldson, dated February 9, 2011) and C (for Dr. Chappell, dated February 11, 2011).   In those declarations, both experts generally relay that prior to their 1985 testimony, they received no additional information from or engaged in any discussions with the Huffmans, were not afforded the opportunity to re-examine Weaver, and had no idea why they were called to testify for the defense. Dr. Donaldson expresses bewilderment at this situation: "Given that my testimony was to be based solely on my 1981 Ventura County report finding Mr. Weaver sane and no other new information, I would have been a better witness for the prosecution." Exhibit B to Weaver's brief, ¶ 5.  Dr. Chappell avers likewise.  Exhibit C to Weaver's brief, ¶4.  Dr. Donaldson also mentions the very end of his testimony to Mrs. Huffman redirect examination where he stated that if Weaver had "blacked out" when he was strangling Ms. Levoy, he could have been dissociating and that could have been an indication of insanity.   In spite of this testimony, the Huffmans pursued no follow-up with Dr. Donaldson or further investigation.   Dr. Donaldson further avers that if he had been provided with more information, such as was given him by Weaver's habeas attorneys in paragraphs 11 through 19 of the declaration, he could have made a more complete diagnosis of an "Axis I major mental illness" and "would have had to re-evaluate Mr. Weaver with his more complete background information and diagnoses, review his statements and testimony concerning these offenses, and determine whether this would have affected his sanity at the time of the capital offenses."   In addition, he could have "provided testimony for the defense that would have been relevant to a diminished capacity defense for the guilt phase, and mitigating evidence for the penalty phase" *Id*., ¶¶ 24.[126]   Dr. Chappell similarly avers in his declaration that if he had been provided additional, available, background information, listed in a three-page exhibit to his declaration, prior to Weaver's trial he would have considered a guilt phase defense of diminished capacity and mitigating evidence for the penalty phase.  Exhibit C to Weaver's brief, ¶ 8.[127]  Among the additional information provided Drs. Chappell and Donaldson is the statement that at the Ventura County Jail in 1981, Weaver was given anti-psychotic medication,

---

[126]   The foundation for Dr. Donaldson's opinion found in paragraphs 11 through 19 has *not* been established at the present time.

[127]   A three page exhibit to Dr. Chappell's declaration contains the same information as paragraphs 11 through 19 in Dr. Donaldson's declaration.

specifically 600 mg of Mellaril, to relieve symptoms of schizophrenia and psychosis.  This is a "fact" that has not been established in the Court's review of the record thus far.  It is, however, significant because it also was not established at the time of Weaver's capital trial.  As a result, the prosecutor was able to cast significant doubt on the factual basis Weaver's statements to his various mental health evaluations that he was taking Mellaril, particularly since both Drs. Chappell and Donaldson doubted Weaver's account.  Yet instead of obtaining the Ventura County Jail records to confirm Weaver's claim (if it could be confirmed), Mrs. Huffman criticized Dr. Chappell for not checking the medical records himself.

Inasmuch as the record itself establishes that the Huffmans did nothing to prepare Drs. Chappell and Donaldson for their testimony and their respective reports and testimony definitely were adverse to Weaver's goal of having the jury reach an insanity verdict, Weaver has shown that the failure of the California Supreme Court to permit further evidentiary development of his ineffective assistance of counsel claims was unreasonable within the meaning of 28 U.S.C. § 2254(d) and the "fairminded jurist" standard of *Richter*, 131 S. Ct. 786.  The same result obtains with respect to Dr. Sanders for the Huffmans' failure to ascertain the scope of his knowledge about Weaver's parole assessment.  Further evidentiary development is warranted as to all the experts from the Humboldt County and Ventura County trials.  To be clear, the content of Exhibits B, C, and E expressly was not relied upon in making the decision that the state court was unreasonable in failing to grant Weaver's request for further evidentiary development.  *Pinholster*, 131 S.Ct. at 1398.

In reference to sanity phase ineffective assistance of counsel, Weaver's offer of proof as to Exhibits B, C, and E is granted, with the qualification that the bases for Dr. Donaldson's present opinion (found in paragraphs 11 through 19 of Exhibit B) and Dr. Chappell's opinion (found in the exhibit to Exhibit C) are *not* admitted for the truth of the matter stated, but rather, as the basis of the doctors' respective opinions.  Fed.R.Evid. 703.

While this Court is inclined to accept the notion that Weaver has established the Huffmans' deficient performance, the Warden will be directed to provide his views on this issue as well.  In addition to deficient performance, Weaver bears a "heavy burden of establishing actual prejudice." *(Terry) Williams v. Taylor*, 529 U.S. 362, 394 (2000)).  Although *Williams* involved a penalty phase

issue, the process for evaluating prejudice in the present case will be similar.  That is, the Court will consider the evidence adduced at trial against the totality of positive defense evidence developed during state habeas proceedings.  *See id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 534, 536 (2003)).  Weaver must then demonstrate a reasonable probability of a different outcome (not guilty, no special circumstances, insanity, and/or life without parole) absent his counsel's errors.  *Id.*; *Strickland*, 466 U.S. at 693-94.  Only then will the Court consider proffered evidence in addition to the exhibits to his brief for Claims 1 and 2.

### 2.    Lack of Cohesive Presentation of the Defense Case

The scheduling of so many witnesses made the defense presentation of the sanity phase disjointed and confusing.  The testimony of one of the chief defense witnesses, Dr. Kathe Lundgren, is a prime example.  Dr. Lundgren's testimony commenced on the late morning of Wednesday, February 6, 1985, until the lunch break.  Due to scheduling issues, she was not recalled to the witness stand to complete her testimony until the morning of Tuesday, February 19, 1985.  In the interim, eight other witnesses were called to the stand: 1) Weaver friend, Jesse Moreland; 2) Dr. Dietiker; 3) PTSD expert Byron Wittlin, M.D.; 4) Huffman paralegal Roger Langerstrom;[128] 5) PTSD expert Clyde Donahoe, Ph.D.; 6) co-inmate Carl Hogan; 7) co-inmate Richard Archuleta; 8) and PTSD expert John Wilson, Ph.D.

In addition, Dr. Lundgren's opinions and impressions were presented in a very desultory and disjointed manner, with much of the explanatory testimony emerging during her cross examination.  The break of nearly two weeks and eight witnesses between the two sessions of her testimony contributed to this disjointed presentation.  On the first day of Dr. Lundgren's testimony Mrs. Huffman asked that she provide an "entire profile" on Weaver.  The problem with this request was that the background information for the profile was not provided to the jury until 13 days later during Mr. Shumaker's cross examination.  Mrs. Huffman, herself, should have established that background information as a preliminary matter.  As a consequence Dr. Lundgren's testimony about Weaver's

---

[128] Mr. Langerstrom's testimony provided a foundation for admission of the AV of the VESI and was discussed in connection with Dr. Wilson's testimony (Part III.A.2.*h*.iii., *supra*) as well as Dr. Kormos' testimony. (Part III.A.2.*h*.iv., *supra*)

"profile" had no context.  This profile was illustrated by reference to a slide of a graph shown to the jurors that contrasted personality stability against the amount of stress each level of stability could endure before symptoms would arise.  One group comprised the personality disorder type.  She explained these people could not take much stress because they did not have internal controls to help them differentiate their own needs from the effect that meeting their needs had on society.  She used the picking up female hitchhiker incidents to explain.  When the women in his truck became nervous about having accepted a ride with Weaver and became fidgety or needed to use a restroom, Weaver mistook their gestures and body language as attempts to sexually excite him.  Then when the women rejected his sexual overtures, he felt "tortured" and angry.  He misperceived their actions as being directed specifically at him and for his benefit.

Further, and not insignificantly, during Mrs. Huffman's direct examination, there was very little emphasis on Dr. Lundgren's qualifications, including the fact that she was the former Chief of the Kern County Mental Health Department.  In fact, this information was conveyed as an aside when she mentioned the presence of her mentor, Dr. Guy Scott, her predecessor as Chief of Kern County Mental Health, in assisting with Weaver's evaluation.  There also was no mention of her credentials during Mrs. Huffman's summation.

Although not as striking, Dr. Dietiker's testimony, like Dr. Lundgren's testimony, also was interrupted.  His direct examination commenced late in the day on Tuesday, February 5, 1985, was continued to the afternoon of Wednesday, February 6, 1985, and completed just before the lunch recess on Thursday, February 7, 1985.  The interruption included the testimony of two of Weaver's long-time friends and colleague Dr. Lundgren.

Next is an illustration of an omission in Mrs. Huffman's summation.  By including both paranoid and undifferentiated schizophrenia in his diagnosis, Dr. Shonkwiler accommodated the conclusions of both Dr. Dietiker (paranoid schizophrenia) and Dr. Lundgren (chronic undifferentiated schizophrenia).  This concurrence regarding Weaver's diagnoses, however, was not mentioned during Mrs. Huffman's summation.

### 3.     Failure to Corroborate Foundational Facts

As the summary of the sanity phase proceedings and Mrs. Huffman's declaration demonstrate, the Huffmans failed to corroborate a number of facts with the result being that testimony Mrs. Huffman elicited was unbelievable.  The first example noted relates to the sanity phase testimony of Weaver's sister, Katie Smith, regarding Weaver's alleged childhood sexually sadistic behavior.  In his state post-conviction proceedings, Weaver has cast doubt on the veracity of Ms. Smith's claims.  First, Weaver's mother, Mrs. Weaver, averred that prior to Ms. Smith's death, she told her mother that all of her testimony at Weaver's sanity trial was untrue and that Mrs. Huffman had told her what to say. Declaration of Dorothy Weaver, Exhibit 1 to First State Petition, ¶ 81.  The only incident that Mrs. Weaver substantiated was that Weaver had *accidentally* cut off his sister's finger and that she (Ms. Smith) blamed Weaver for this all her life.  *Id*.: ¶ 30.  According to her declaration, it was Mrs. Weaver's perception that her daughter was jealous of Weaver because Mrs. Weaver gave him a lot of attention on account of his heart problems.  *Id*.:  ¶ 31.  In Mrs. Huffman's post-conviction declaration on this subject, she avers that she had no corroboration for the aggressive sexual acts Ms. Smith testified about and was unsure why Mr. Huffman wanted to present this extremely unpleasant information except possibly to show that Weaver was a schizophrenic loner since childhood.  Exhibit 34 to First State Petition, ¶¶ 13-14.  Since both Ms. Smith and Mrs. Weaver have passed away, however, it is unclear how Weaver will establish that Ms. Smith's sanity phase testimony was false (if it was false).

Another matter that has been called into question on federal habeas is how sickly a child Weaver was, if at all, from a heart condition.  In the declaration of Weaver's first wife, Patricia Weaver (Budrow), she states that Mrs. Weaver exaggerated Weaver's "minor heart murmur" to a serious heart condition.  Exhibit 2 to First State Petition, ¶ 25.  Weaver alleges his heart ailment was conjured up by his mother to keep him close to her.

Another of the many failings of the defense case in chief during the sanity proceedings was Mrs. Huffman's failure to establish that Weaver was a loner (to be consistent with a schizophrenia diagnosis).  She attempted to elicit testimony from two of Weaver's life-long friends, Del Roy Barnett and Mr. Barnett's half-brother, Jesse Moreland, for that very purpose.  Neither of these witnesses,

111

however, provided the sought after information, a point Mr. Shumaker stressed during his summation. She was, however, somewhat successful in eliciting that testimony from Weaver's sister, Ms. Smith, but then failed to argue the import of that evidence in her summation.  In light of Ms. Smith's passing, Weaver will have to direct the Court's attention to other evidence establishing this fact.

A major "fact" Mr. and Mrs. Huffman failed to corroborate was that Weaver actually saw sustained active combat duty in Vietnam.  They went to the trouble of having him evaluated by four mental health professionals to substantiate their theory that Weaver's insanity at the time of the crimes was in part due to PTSD, but failed to substantiate that Weaver actually engaged in and was involved in combat experiences during his tour of Vietnam, including the shockingly gruesome account of prisoner being skinned alive presented during Dr. Wilson's testimony.  *See* Part III.A.*h*.iii, *supra*. Although the Huffmans had been given access to Weaver's military records and presented those records to the retained experts, Mr. Shumaker, again and again, challenged the experts about how certain they could have been that Weaver was exposed to significant combat.  In Mrs. Huffman's declaration, she averred that "there was a veteran living in Sacramento who entered and left the service with Weaver and was available to testify to Weaver's experiences in Vietnam."  Exhibit 34 to First State Petition, ¶ 24.[129]  Yet this unidentified witness was not called to testify.  Mr. Shumaker suggested that Weaver's first assignment, in a lumber yard, was like a civilian position because he was not fighting.  He also suggested that Weaver's military records could not actually substantiate his combat participation because there were as many as 120 men in various of his units.  While the examiners reaffirmed their respective beliefs that Weaver had in fact seen combat based on his responses to various tests and evaluations given, they couldn't be certain of the extent of his combat involvement.

Another issue which had absolutely no foundation during trial was Dr. Wilson's testimony that Weaver may have been subjected to sexual abuse from his mother.  However, Weaver's first wife, Patricia Weaver (Budrow), noted in her declaration that Weaver slept with his mother (or at least in the same room as his mother) while growing up.  Exhibit 2 to First State Petition, ¶ 10.  The Court also is

---

[129]  It's not clear when or from what source Mrs. Huffman obtained this information for her declaration.  Moreover the identity of this veteran is not clarified in Weaver's present moving papers. It is unknown if he is still available to provide testimony (or has already provided a declaration).

aware Weaver alleges disturbing sexual depravity perpetrated by the mother, toward Weaver specifically, and by the father (as well as the paternal grandfather) toward female family members. None of this information was developed or presented despite the tip from Dr. Wilson.

A major basis for the conclusion of many experts that Weaver was abused was the "fact" that his mother bit him, with some regularity, as a form of punishment.  Along with the biting there apparently also was slapping him, pulling his hair, and "blistering" him.  The maternal biting was mentioned by Drs. Shonkwiler, Wittlin, Wilson, and Kormos.  Apparently Dr. Kormos is the first examiner who noted this behavior in his report.[130]  Dr. Kormos told Mr. Shumaker on cross examination that he thought Weaver had told him about the maternal biting and also believed he had seen a statement on which the mother and admitted to biting, but only mildly and to teach Weaver when he was a child.  When asked to produce the writing from which Dr. Kormos gained this understanding, Mrs. Huffman explained that this information actually came from statements made by Weaver's first wife.  No other evidence was offered at trial

Finally, although Mrs. Huffman was able to elicit that none of the four prosecution experts ascertained whether Weaver was on medication at the times they (respectively) examined him, she did not present any of her own evidence from Weaver's jail records substantiating that Weaver *had* been taking anti-psychotic medicine, which masked his psychotic symptoms, when he was interviewed by the prosecution experts.

In order to establish prejudice for ineffective assistance of counsel, Weaver litigation team will have to substantiate the aforementioned foundational facts.  Weaver will be given this opportunity, as set forth below.

### 4.   Puzzling Strategies

Next, the Court finds the Huffmans' decision to elicit Dr. Kormos' critique of the prosecution expert reports, *before* the prosecution case was presented, was of little help to the jury or Weaver's case.  To make his testimony worthwhile, Mrs. Huffman should have called Dr. Kormos as a rebuttal witness.  His polite agreement and gentle criticism would have been much more effective in rebuttal.

---

[130]  Dr. Kormos's report is not one of the reports that was made part of the state record.

In more detail, Dr. Kormos noted that Dr. Cutting found atypical psychosis as his Axis I diagnosis, which means he found Weaver to be psychotic, but couldn't place Weaver in any particular category. Dr. Cutting's Axis II diagnosis was schizoid personality, indicating he found the presence of schizophrenic symptoms.  Dr. Kormos reasoned that when Dr. Cutting examined Weaver, the closed environment and administration of anti-psychotic drugs would have masked the schizophrenia.  He felt Dr. Cutting didn't go far enough.  Dr. Kormos similarly felt that Dr. Matychowiak's diagnosis, that is, personality disorder with paranoid and antisocial traits, was a superficial description and not a proper Axis I diagnosis.  Rather, Dr. Kormos explained that personality disorders were Axis II diagnoses.  Dr. Criswell's reported diagnoses were ASPD, sexual sadism, and adjustment disorder with a depressed mood.  Dr. Kormos opined that while all of these attributes were accurate descriptions of Weaver's behavior, they did not reflect anything about the origin of the behavior or the actual mental picture. Dr. Criswell also found Weaver's impulse control markedly defective and insight nil, findings with which Dr. Kormos agreed.  Dr. Kormos found not only that Weaver's impulse control was "very defective," but that the impulses in need of control were "quite remarkably high."  Finally, Dr. Kormos observed that Dr. Burdick's diagnosis of Weaver was ASPD.  This was not inconsistent with Dr. Kormos' own findings, but like Dr. Cutting's evaluation, didn't go far enough.

Separately, with respect to the testimony of prosecution inmate witness Cecil Sneed, Mrs. Huffman did nothing to ameliorate the content, import, or context of the threatening note from Weaver Mr. Sneed described.  If there was no argument to have been made, the fact that she called more attention to it by cross examining Mr. Sneed is strategically questionable. Another issue Mrs. Huffman overlooked concerned two inmate witnesses, Carl Hogan or Richard Archuleta.  From the witnesses who testified that Weaver's maternal aunt and cousin suffered from schizophrenia, Part III.A.1.*a*., she encouraged the jury to conclude that Weaver was predisposed to having schizophrenia.  She did not mention in her summation either Carl Hogan or Richard Archuleta, as describing that Weaver talked to himself at the jail.

The Huffmans' failure to refute Mr. Shumaker's consistent line of questioning to experts about the fact that Weaver maintained steady employment also is an issue that has not escaped the Court's attention.  Barbara Weaver, Weaver's second wife, told investigating authorities on July 26, 1982 that

114

during her 10-year marriage to Weaver, he held numerous jobs.  CT:1-99.  She stated that Weaver worked in a saw mill, in a plywood factory, as a landscaper, and as a truck driver.  From April to December 1979, he was employed by B & D Trucking Company in Oroville.  In January 1981 (after being released from prison for the Humboldt County assault) he was employed by John Bellagante Trucking Company in Oroville as a long-haul trucker.

Dr. Criswell's report of his October 18, 1982 evaluation of Weaver, Exhibit 113 to First State Petition, corroborates the notion that Weaver's employment was far from stable.  Weaver told Dr. Criswell he could not keep a truck driving job because he (Weaver) received too many tickets.  It was for this reason, Weaver reported, that his wife, Barbara, put him to work washing dishes at the restaurant she managed.

The information clearly was available to Mr. and Mrs. Huffman.  It would not have been difficult to have requested Dr. Criswell to reiterate his report of Weaver unstable employment history from the witness stand.  The Court is unaware whether Barbara Weaver could have been called to testify on this issue.

Another line of inquiry that appears to have had potential for substantiating Weaver's claim he did not intend to kill Ms. Levoy is his past history of picking up and raping female hitchhikers (without killing them).[131]  During her penalty summation, Mrs. Huffman argued that after the sexual assaults on Ms. DeLong, he let her go.   She further argued that if Weaver was as homicidal as Mr. Shumaker portrayed him, it is doubtful he would have let the young lady go.  Moreover, Ms. DeLong testified that both before and after the rape Weaver was very kind to her.   What Mrs. Huffman ignored, however, was that Weaver reputedly picked up, raped, and let go many female hitchhikers during his employment as a trucker. This notion has support from statements Weaver's second wife, Barbara Weaver, made to police, noting that in 1976 Weaver was arrested for rape and carrying a concealed weapon, but that the charges were dropped due to insufficient evidence. Dr. Criswell's report, Exhibit 113 to the First State Petition, p. 6, also mentions Weaver told him he had been arrested for rape and

---

[131]   The Court is unaware as to whether a claim alleging ineffective assistance of counsel on this ground is unexhausted.  This information may be supplied by the Warden as indicated in Part VIII., *infra.*

kidnapping which occurred in 1975, but the charges were dropped because the victim disappeared. Additionally Dr. Criswell's report mentioned that Weaver admitted to having raped an undisclosed number of female hitchhikers, again, with no fatalities.  During cross examination, Dr. Lundgren similarly disclosed that Weaver had told her he picked up female hitchhikers while driving his truck and then had forcible sex with them.  There were no fatalities.  Dr. Kormos also suggested that Weaver had committed multiple rapes prior to the Radford/ Levoy crimes when he testified that Weaver did not rape every attractive woman he encountered.

The last puzzling strategy noted is that Mrs. Huffman's 93 pages of summation and 18 pages of rebuttal constituted 69% of the total argument, while Mr. Shumaker's 51 pages constituted 31%. While the percentage devoted to her closing argument is not in any way outrageous, the tedium of her detailed recitation of the expert testimony, coupled with the numerous mistakes she made in which witness gave what testimony, rendered her summation less that efficacious.  Whether she was or was not following a "script" provided by Mr. Huffman, Mrs. Huffman had an independent duty to be familiar with the facts elicited during the trial proceedings and formulate a persuasive summation.  She did not do so.  Although this error may be considered at a later time in the context of cumulative prejudice, it is far from clear that Weaver can show prejudice, even considering the multiple occasions of deficient performance.

The Warden is directed to respond to each of the foregoing instances to ascertain his view as to whether they do or do not constitute ineffective assistance of counsel, as directed in Part VIII, *infra.*

### B.    Juror Misconduct during Sanity Phase Deliberations

In Claim 18, Weaver alleges, among other things, that his jurors considered evidence presented at the guilt phase proceedings during sanity phase deliberations, despite specific jury instructions *not* to do so.  He contends that the 42 minutes of deliberations for the sanity phase, after a six-week trial, provides further support that the jurors prejudged the sanity issue based on evidence adduced during guilt proceedings.  Weaver adds that during those 42 minutes, the jurors also had to select a new jury foreperson (as the previous foreperson during guilt proceedings was excused from further service). Mrs. Huffman supported her written motion to set aside the sanity verdict with a declaration in which she relayed statements made by four jurors she interviewed.  She averred that the gist of their remarks

116

1   was that after the guilt phase, it would have been hard for any attorney to convince a jury of insanity.

2   Claim 18, ¶ 4.e. (quoting from the Clerk's Transcript).

3       Weaver's allegations are further supported by a declaration of Juror Michael Smith, who stated

4   that the jurors "talked about evidence that had been introduced during the guilt phase and used it along

5   with the psychiatrists' testimony to determine whether or not he [Weaver] was sane."   He then

6   continued, "I concluded that these aspects of the guilt phase evidence along with the sanity phase

7   evidence were convincing enough to vote that Ward Weaver was not insane."   Claim 18, ¶ 7.e.

8   (quoting from Exhibit 18 to Second State Petition).

9       The Court is aware that the state equivalent of federal Claim 18 in Weaver's Second State

10  Petition was procedurally defaulted by the California Supreme Court for untimeliness under *In re*

11  *Robbins*, 18 Cal. 4th, 770, 787 (1998).   Since "cause and prejudice" can excuse a procedurally

12  defaulted claim, *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007), *quoting Coleman v.*

13  *Thompson*, 510 U.S. 722, 750 (1991), and "prejudice" essentially requires a merits analysis, the Court

14  will proceed to the merits of Claim 18 prior to determining whether the state procedural default is

15  adequate and independent to bar relief in federal court.   *See id., quoting Coleman* at 510 U.S. 732.   The

16  Warden's objection to this manner of case management is overruled in advance.   A district court may

17  exercise discretion to proceed to the merits in advance of litigation of procedural default.   *Franklin v.*

18  *Johnson*, 290 F.3d 1223 (9th Cir. 2002).   The Warden may rest assured that no relief on Claim 18 will

19  be granted unless and until the Court finds that the state procedural bar was not adequate and

20  independent or that cause and prejudice are found.

21      On the merits, the Court directs the Warden to address whether Judge Stone's directive for the

22  jury not to consider guilt phase evidence during sanity phase deliberations was required (or

23  discretionary) under California law.[132]   The brief should be addressed *only* to this narrow point in

24  Claim 18.   Following the Court's review of this response, further briefing may or may not be ordered

25  on this specific aspect of Claim 18, including providing Weaver the opportunity to file response to the

26

27      [132]   Arguing that Claim 18 is procedurally defaulted, the Warden did not provide any merits

28  briefing.

117

Warden's brief.  Once the Court reviews the Warden's brief on this narrow issue, the Court will consider the fact that Weaver's testimony about not intending to kill either victim, not realizing he killed Mr. Radford, blacking out when Ms. Levoy bit him, and having been bit by his mother as punishment when he was youngster, was presented during the guilt phase.  Along with this fact, the Court also will consider Mrs. Huffman's declaration that she didn't know why Mr. Huffman wanted to have the jury instructed not to consider guilt phase evidence at the sanity phase, since that was the phase where Weaver discussed his hallucinations and being bitten as punishment by his mother growing up.  Exhibit 34 to First State Petition, ¶ 32.

## VIII.   Order

Claims 1 and 2 are not substantiated and denied on the merits.  No further evidentiary development of these claims is authorized.  With respect to the various examples of deficient performance by the Huffmans mentioned in Part VII.A.4., *supra*,  the Warden is directed to file points and authorities controverting the Court's impression of deficient performance.  These points and authorities shall be limited to the issue of deficient performance.  The Warden also is directed to file points and authorities consistent with the Court's discussion of Weaver's juror misconduct claim discussed in Part VII.B., *supra*.  These combined briefs shall be filed no later than six calendar weeks from the filing of this Memorandum Order.  As for the showing of factual foundation and prejudice requested from Weaver, the Court directs Weaver's counsel to submit a status report regarding his representation, in the event new counsel needs to be appointed, in order to complete the requested briefing.  That status report shall be filed within two calendar weeks from the filing of this order.

IT IS SO ORDERED.

Dated: <u>March 24, 2014</u>

<u>/s/ Anthony W. Ishii</u>
Anthony W. Ishii
United States District Judge

118