1

2

3

4

5

6

7 # UNITED STATES DISTRICT COURT

8

9 ## EASTERN DISTRICT OF CALIFORNIA

10 WARD FRANCIS WEAVER, JR.,                      Case No. 1:02-cv-05583-AWI-SAB

11              Petitioner,                       **DEATH PENALTY CASE**

12        v.                                      MEMORANDUM AND ORDER:

13 KEVIN CHAPPELL, Warden of San Quentin          (1) DENYING CLAIMS 8 AND 9 (Doc. No.
   State Prison,                                   107); and (2) DENYING MOTION TO
14                                                 EXPAND THE RECORD AND FOR
                 Respondent.[1]                    EVIDENTIARY HEARING REGARDING
15                                                 CLAIMS 8 AND 9 (Doc. No. 197)

16                                                 CASE TO REMAIN OPEN

17

18

19        Petitioner is a state prisoner, sentenced to death, proceeding with a petition for writ of

20 habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by appointed CJA

21 counsel Karen Schryver and Timothy Foley.

22        Respondent Kevin Chappell is named as Warden of San Quentin State Prison.  He is

23 represented in this action by Ryan McCarroll and Amanda Cary of the Office of the California

24 Attorney General.

25        Before the court for a decision are (1) claim 8 (alleging ineffective assistance of counsel

26

27 ───────────────
   [1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, Warden of San Quentin State Prison, shall be substituted as
   respondent in place of his predecessor wardens.

28

at the sanity phase) and claim 9 (alleging ineffective assistance of counsel at the penalty phase) of the amended petition (Doc. No. 107), and (2)  petitioner's motion for expansion of the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 7"), and for evidentiary hearing pursuant to Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rule 8"), in relation to these claims.

Having carefully reviewed the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that claims 8 and 9 shall be denied on the merits and the related evidentiary development motion shall be denied.

## I. BACKGROUND

On April 4, 1985, petitioner was sentenced to death following a jury trial in which he was convicted of two counts of murder and one count of kidnapping, with kidnapping and multiple murder special circumstances found true.  (CT 1355-57, 1482-90, 1640.)[2]  Petitioner was found sane in a separate subsequent hearing prior to the penalty phase.  (CT 1577-78.)  The California Supreme Court affirmed petitioner's conviction on direct appeal on August 20, 2001.  (Lod. Doc. No. 4, *People v. Weaver*, 26 Cal. 4th 876 (2001) (S004665).)  That court denied his petition for rehearing on October 24, 2001.  (Lod. Doc. No. 6.)  Petitioner filed a petition for writ of certiorari in the United States Supreme Court on January 17, 2002, which was denied on May 13, 2002.  (Lod.  Doc. Nos. 27, 29.)

Petitioner, through appellate counsel, filed a petition for writ of habeas corpus in the California Supreme Court on September 28, 1998, seeking to set aside the judgments of conviction and sentence of death.  (Lod. Doc. No. 7, *In re Ward Francis Weaver, Jr.*, California Supreme Court Number S073709.)  On November 14, 2001, the California Supreme Court denied the petition on the merits and also denied some claims as procedurally barred.  (Lod. Doc. No. 8.)

---

[2] Unless otherwise indicated, throughout this order, "CT" refers to the Clerk's Transcript on Appeal, "RT" to the Reporter's Transcript on Appeal, "Supp. CT" refers to the Supplemental Clerk'sTranscript on Appeal, "SHCP" refers to a state habeas corpus petition, and SHCP Ex. refers to an exhibit lodged with a state habeas corpus petition. Other transcripts are referenced by date.  References to page numbering are to the ECF system pagination except Bates numbering is used for the CT and internal pagination is used for the RT.  Any reference to state law is to California law unless otherwise noted.

On May 17, 2002, petitioner commenced this proceeding under 28 U.S.C. § 2254 by filing a combined request for appointment of counsel and temporary stay of execution.  He filed a petition for writ of habeas corpus in this federal proceeding on May 5, 2003.  (Doc. No. 32.)

Petitioner filed a second petition for writ of habeas corpus in the California Supreme Court on May 6, 2003, again seeking to set aside the judgments of conviction and sentence of death.  (Lod. Doc. No. 23, *In re Ward Francis Weaver, Jr.*, California Supreme Court Number S115638.)

On March 16, 2004, this court held the federal petition in abeyance pending the conclusion of state court exhaustion proceedings.  (Doc. No. 56.)

On August 26, 2009, the California Supreme Court denied the second petition on the merits and also denied some claims as procedurally barred.  (Lod. Doc. No. 24, *Weaver*, No. S115638.)

On September 1, 2009, petitioner filed the operative first amended petition in these proceedings.  (Doc. No. 107.)

Respondent filed his answer on March 30, 2010, admitting the jurisdictional allegations, asserting procedural defenses, and denying all claims 1 through 34.  (Doc. No. 116.)

On June 2, 2010, the court found all the claims in the amended petition to be exhausted (except for a subclaim of claim 7 as to which the Warden waived exhaustion) and the amended petition timely filed.[3]  (Doc. No.  121.)

On March 24, 2014, the court denied claim 1 (alleging deprivation of counsel due to impairment and incompetence) and claim 2 (alleging counsel's conflicts of interest), and ordered merits briefing of claims 8 and 9 as well as claim 18 (alleging juror misconduct).  (Doc. No. 162.)  Therein the court also granted petitioner's motion to expand the record in relation to claim 8 with proffered expert declarations of Dr. Donaldson (Exhibit B), Dr. Chappell (Exhibit C), and Dr. Sanders (Exhibit E), stating that:

---

[3] Respondent's subsequent exhaustion objections to certain of the points discussed in the court's March 24, 2014 order (see Doc. No. 174 at 5, 7, 9, 11, 13) are overruled.  *See* Doc. No. 121; *Kyzar v. Ryan*, 780 F.3d 940, 946-47 (9th Cir. 2015).

1    In reference to sanity phase ineffective assistance of counsel, [petitioner's] offer
     of proof as to Exhibits B, C, and E is granted, with the qualification that the bases
2    for Dr. Donaldson's present opinion (found in paragraphs 11 through 19 of
     Exhibit B) and Dr. Chappell's opinion (found in the exhibit to Exhibit C) are *not*
3    admitted for the truth of the matter stated, but rather, as the basis of the doctors'
     respective opinions. Fed. R. Evid. 703.

4    (Doc. No. 162 at 113:20-24.)

5        On July 29, 2015, the court ordered further briefing of record claims 3-7 and 10-34.

6    (Doc. No. 196.)

7        On July 31, 2015, petitioner filed his brief in support of claims 8 and 9 (Doc. No. 204)

8    along with the instant motion to expand the record and for evidentiary hearing (Doc. No. 197).

9        On October 28, 2015, respondent filed his brief in response to petitioner's brief (Doc. No.

10   205) and motion (Doc. No. 206).

11       On December 18, 2015, petitioner filed his brief in reply to respondent's brief (Doc. No.

12   207) and motion (Doc. No. 208).

13                              **II. STATEMENT OF FACTS**

14       The following factual summary is taken from the California Supreme Court's opinion in

15   *People v. Weaver* (2001) 26 Cal. 4th 876, and is presumed correct.  28 U.S.C. § 2254(d)(2),

16   (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the court

17   adopts the factual recitations set forth by the state appellate court.  *See Vasquez v. Kirkland*, 572

18   F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our

19   summary of the facts of the crime.").

20                                    I. Guilt Phase

21                                      A. *Facts*

22   Robert Radford, 18 years old, was assigned to basic training for the United States
     Air Force in Colorado. While there, he met 23-year-old Barbara Levoy. When
23   Radford completed his training, he traveled to his home in Edmonds, Washington,
     and Levoy accompanied him to meet his parents. The couple then drove south to
24   Pinedale, California (near Fresno) to meet Radford's grandmother. The couple's
     ultimate destination was Las Vegas, Nevada, where Radford would begin his first
25   tour of duty at Nellis Air Force Base. Levoy planned to fly home to Colorado
     from Las Vegas.  Radford and Levoy arrived in Pinedale on the afternoon of
26   February 5, 1981, and visited with Radford's grandmother. They left Pinedale
     around 7:00 p.m. the same day, anxious to get to Las Vegas. Unfortunately, their
27   car broke down one mile east of Tehachapi. James Powell was coming home from
     work around 11:00 p.m. and encountered Radford, his disabled car on the side of
28   the road with its emergency lights flashing. Powell saw a young woman in the car.

                                          4

He offered the couple a ride back to Tehachapi, but Radford declined because it was in the opposite direction from which he was traveling. Powell left.

Our knowledge of what happened next derives from defendant's admissions to a cellmate, Ricky Gibson, defendant's tape-recorded interviews with police, and defendant's testimony at trial. Around 10:00 p.m., defendant, who was working as a long-haul trucker, saw Radford's car on the side of the road as he drove by in the opposite direction. Defendant exited the highway and circled back to offer his assistance. Radford and Levoy accepted his offer to drive them to Mojave. After driving about five miles, defendant pulled over and asked Radford to help him shift the load on the flatbed of his truck. Levoy stayed in the cab. While Radford was bent over with his back turned, defendant struck him on the back of the head with a "cheater pipe," a three to four-foot length of metal pipe truckers use to gain leverage when tightening the bindings that restrain a load on the truck. A later autopsy revealed 11 separate lacerations to Radford's head.

Defendant rejoined Levoy in the truck cab, displayed a knife, and had her sit with her head between her legs and her hands behind her, a technique defendant had learned when transporting prisoners during his military service in Vietnam. Defendant reversed direction and drove to Bakersfield; near Kettleman City, he stopped and raped Levoy. He then drove towards San Francisco, pulled off the highway once more and again raped Levoy.

Meanwhile, a citizen reported having seen Radford on the side of the road where defendant had left him. Police responded to the scene and attempted to keep Radford alive, but he died on the way to the hospital. Police found a large amount of blood at the crime scene. At the hospital, Radford's wallet, with his Washington State driver's license, was found, allowing police to link Radford to the disabled car a few miles away. The car contained a woman's purse and several pieces of luggage. Correctly surmising that Radford had been traveling with a woman, police forced open the car and discovered identification belonging to Levoy. Police then issued a missing person report and organized a search effort to find her. Their efforts came too late to save Levoy.

After he deposited his cargo in San Francisco, defendant drove towards his home in Oroville. At a secluded spot outside that town, he stopped and asked Levoy to get out of the truck. He tied her hands and feet with electrician's tape, but when he attempted to gag her, Levoy struggled and bit defendant severely on the thumb. He then strangled her. He dug a grave and buried Levoy's body there before driving into town to meet his wife, who was working a late shift in a local restaurant. It was suggested defendant move the body, so defendant took his wife's car and returned to the grave, exhumed the body, put it in the trunk of the car and drove home. When he arrived, defendant's three children were awake and asked him about his bloody thumb. He told them he had gotten in a fight and that they should stay in the house because his assailant might come looking for him. With the children in the house, defendant moved Levoy's body from the car to a shallow grave dug in his backyard. Defendant previously had begun digging trenches in his yard for a sewer line and had instructed his 10-year-old son and another boy to keep working on the digging project while he was away driving his truck. Some weeks later, defendant exhumed Levoy's body again and moved it to a deeper grave elsewhere in his yard. He then built a wooden platform over the grave so his wife could stand on it and hang out the laundry without getting her feet wet in the grass.

5

Police were stymied in their attempt to solve Radford's murder and Levoy's disappearance. Then, 17 months after the crimes, prison inmate Ricky Gibson contacted authorities and reported that defendant, who was serving time in prison for subsequent unrelated (but similar) crimes, had told him the story of how he killed Radford and raped and killed Levoy. Police went to defendant's home in Oroville, interviewed defendant's wife and son, and obtained consent to search the yard. Defendant's son directed police to the platform, which they removed and discovered Levoy's badly decomposed body. She was identified through her dental records. In addition, the body bore the same clothes Levoy had been wearing when she disappeared, with the exception that her panties were missing. An autopsy of Levoy's body yielded no clues about the cause of her death, due to the advanced state of decomposition. Some electrician's tape, however, was found stuck to the collar of her shirt.

Police proceeded to interview defendant at San Quentin State Prison. He agreed to waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) if he could first speak to his mother. Police agreed. After speaking with his mother, he agreed to talk to police. In two tape-recorded interviews, defendant admitted he had killed Radford and Levoy, and that he had raped Levoy. He drew a map of the place in rural Oroville where he had first buried Levoy. Following the map, police found an indentation in the ground where defendant said he had dug the first grave; police also found some black electrician's tape on the ground nearby.

Defendant testified at trial. He claimed he had heard the voice of a female named Ladell in his head since he was 17 years old. He first heard a competing unnamed male voice when he served in Vietnam in 1968 and 1969. He trusted the male voice because it had warned him of danger in Vietnam and saved his life. Defendant explained that he often used amphetamines to stay awake while driving his truck, had taken amphetamines the day of the crimes and, at the time he killed Radford, had not slept in a week and a half.

When he picked up Radford and Levoy, he noticed how attractive Levoy was and became sexually aroused. The male voice started saying he should have sex with Levoy. Ladell told him to leave Levoy alone. The male voice assured him he would not get in trouble if he raped Levoy. Defendant testified, "I just couldn't go against him. I just couldn't help it. Had to go along with what sounded like the most logical thing to do." The male voice said to knock Radford out so he could be alone with Levoy. Defendant decided to follow the male voice, but did not think Radford would die because defendant had assaulted someone with the "cheater pipe" in 1977 and the victim did not suffer serious injury. Defendant said that if he had wanted to kill Radford, he would have used the knife he kept in the truck or used some other, more silent means of killing that he had learned in the military.

Defendant testified that when he hit Radford, the young man fell off the truck screaming. Defendant told him to "shut up" and when he did not, defendant struck him "a couple" of times with the pipe, taking full swings with both hands on the pipe. He did not check to see if Radford was alive or dead; he just assumed Radford was "out." He then rejoined Levoy in the truck, displayed his knife, and started driving. The voice named Ladell was chastising him while the male voice was telling him to ignore Ladell. When they approached Kettleman City, the male voice reminded defendant to have sex with Levoy. He pulled over around 4:00 a.m., displayed his knife again, and then raped Levoy. He then drove north

6

towards San Francisco. About an hour later, he pulled over and raped Levoy again.

Defendant claimed he did not intend to kill Levoy and, after the second rape, was looking all along the route for a safe yet deserted place to drop her off. As it began to get light, he abandoned this plan and took her to the Bay Area with him. He instructed Levoy to sit on the floor of his truck while he delivered his load. She obeyed, sitting quietly in the truck for 45 minutes. He then drove to Oakland to pick up another load for a local delivery. Defendant was stopped on the way to Oakland by a California Highway Patrol officer, but Levoy complied with defendant's instructions and did not call out to the officer or try to escape. After stopping in Oakland, defendant drove home to Oroville, taking a long and winding route.

Defendant stopped four miles outside of Oroville. By now it was about 11:00 p.m. on February 6, 1981. Defendant told Levoy he would tie her up and leave her under a bridge, coming back the next day when he was scheduled to drive to Southern California. He would then release her in Los Angeles in a warehouse district. He bound her with electrician's tape, but when he tried to gag her with some fabric diapers, she struggled and bit him on the thumb and would not let go. Defendant testified he twice hit her with his fist and then he blacked out and began jerking the diaper around Levoy's neck. He stopped when he realized she was no longer biting him. She slumped over; defendant at first thought she was unconscious but then determined she was dead. He cried and asserted he had never intended to kill her, even when she bit him. The male voice told him to get rid of the evidence. As indicated, he buried her where he killed her, then exhumed her body twice before finally burying her in his yard.

The next morning, on February 7, 1981, Thomas Jenkins, an insurance adjuster, met with defendant and noticed facial abrasions and scratches, as well as a white bandage on his hand. Defendant said his thumb had been almost bitten off by another trucker.

Defendant's first wife, Patricia Budrow, testified that defendant hates to be bitten. She testified she once bit his hand when they were wrestling in the car and he became very angry and began choking her. Another time, she bit his hand when they were wrestling on the floor. He grabbed her by the neck and looked dazed and glassy-eyed. He later told her he did not know why he choked her, but that he hated being bitten, and that when he was a child his mother would bite him until he bled as a means of disciplining him. Budrow also testified that defendant's mother confirmed the story and suggested Budrow use the same method to train her children.

*Weaver*, 26 Cal.4th at 898-903.

## II. Sanity Phase

### A. *Facts*

1. *Evidence of Defendant's Family and Childhood*

Dr. Albert Raitt, Jr., staff psychiatrist and director of the Butte County Mental Health Program, testified defendant's maternal aunt, Kathryn Bernardo, was schizophrenic. Dr. Raitt also concluded from medical records that Bernardo's daughter (and defendant's cousin) Lucia Bernardo, was schizophrenic. Dr. Raitt

7

explained that experts believe there is a genetic component to schizophrenia, hence the chance defendant would be schizophrenic was enhanced by the fact that his aunt and cousin were so afflicted.

Katie S. testified she is defendant's sister. She is 15 months younger than defendant and thus was 39 years old at the time of trial. When she was six years old, defendant cut off one of her fingers while playing with a hatchet. She later came to believe this act was intentional. About a year later, defendant tied her to a tree, saying he was going to hang her. She did not believe him until he began tying a noose. When he began to place the noose around her neck, she began screaming hysterically. Defendant left her tied to the tree for a long time before returning and releasing her. When she said she would tell their mother what he had done, he threatened to beat her up.

Other incidents occurred in the next three years. Once, when defendant's sister was in a field, he stampeded a herd of cattle into the field, later telling her he had done it on purpose. He also locked her in a tool shed and then set it on fire. He finally let her out when she screamed and pounded on the door; the fire got out of control and started a forest fire. Defendant's mother punished both of them for this incident.

When Katie S. was nine years old, defendant tied her up and inserted sticks into her vagina. When she was 12, defendant raped her and later told her she was pregnant. She did not tell anyone about the rape because his threats frightened her. Around that same time, she saw defendant and another boy torture a cat by rubbing sandpaper on its bottom and then pouring turpentine on it. She would sometimes get her friends to beat defendant up, although her parents punished her with a whipping when they found out. When defendant was in high school, he dated girls named Ladell and Sharon. He married his first wife, Patricia Budrow, when he was 18 years old, but continued to live with his parents. Katie S. admitted she was seeing a psychiatrist to help her deal with her childhood experiences with defendant.

2. *Lay Evidence of Mental Illness*

Defendant's cousin, Russell Mathiasch, testified that in the mid-1970's he lived in Texas. Around that time, he helped take defendant to a Veterans Administration hospital in Dallas for treatment for his mental illness, but defendant was turned away for lack of space; later that day, defendant was denied admission at another Veterans Administration hospital in Waco. Defendant then returned home to California.

Del Roy Barnett was a coworker and friend of defendant. They often hunted and fished together. When defendant went to Vietnam, he gave Barnett some fishing equipment because he did not expect to return. When defendant returned from Southeast Asia, he was more aggressive and outgoing. He seemed more prone to violence; he was irritable and anxious, and he drank more. He was depressed and had trouble keeping a steady job. Sometimes defendant did not appear to know Barnett was with him; defendant would talk to himself or to unseen people. Barnett thought defendant probably took drugs to stay awake when he drove his truck, but he was not sure.

Carl Hogan and Richard Archuleta testified they had been incarcerated with defendant in the Kern County jail, and they saw him talking to himself or to unseen people.

8

Cecil Sneed, another Kern County jail inmate, testified defendant asked him to testify that he had seen defendant talking to imaginary people. However, Sneed had never seen defendant engage in such behavior. Sometime after the encounter, he received a letter from defendant reading: "Anyone who hurt my case I would do my best to do them in." Sneed was impeached by evidence that after his testimony he was to be released from jail and given a bus ticket, and by evidence from two other jail inmates, Charles Shannon and Christopher Flores, who testified Sneed was laughing and saying defendant was his "meal ticket out of here" or words to that effect. Both Shannon and Flores reported seeing defendant awake late at night, pacing and talking to himself.

3. *Expert Witnesses Called by the Defense*

Dr. Robert Gardner conducted a presentence diagnostic evaluation of defendant for Humboldt County in 1977 following defendant's conviction of assault for hitting a woman on the head with a baseball bat. Dr. Gardner testified defendant was obviously depressed. Defendant said he had assaulted his wife several times and had volunteered for the Army in order to be killed. Dr. Gardner concluded defendant had suffered a "psychotic depressive reaction" and probably had an "underlying psychiatric disorder" of an unspecified type and "might be on the verge of becoming psychotic." Dr. Gardner stated in his report that defendant was at that time a "danger to others." Although he did not find defendant was suffering from schizophrenia, he did not rule it out.

Dr. Alfred Owre, Jr., was the chief psychiatrist for the Department of Corrections, California Men's Colony in San Luis Obispo in 1977 and evaluated defendant for parole suitability. While incarcerated at the Men's Colony, defendant was not taking any prescribed medications, such as antipsychotic medication. Dr. Owre noted defendant was in school while in prison and received satisfactory work reports. He concluded defendant was a "person without psychiatric symptomology except in his distorted relationships with women." Quoting from his 1977 report, Dr. Owre noted that, regarding relationships with women, defendant "derives pleasure from suffering at their hands," but "[w]hen stressed he derives an emotional relief from inflicting pain upon them. This is sexualized." His 1977 diagnosis was that defendant suffered from a "passive aggressive personality with depressive and then sadomasochistic features." A secondary diagnosis was that he bore "[a]ggressive sexuality towards adult women, manifested by attempted rape." Defendant presented no signs of schizophrenia to Dr. Owre. Dr. Owre found defendant was not depressed or suicidal, and he testified defendant did not complain of hallucinations or delusions.

On redirect, Dr. Owre opined that defendant was "definitely out of reality contact" and that, as he was observing him in the courtroom, Dr. Owre believed defendant was "suffering from a chronic [u]ndifferentiated schizophrenic condition. He is responding to internal messages. He shows a dearth of body sensing movements. He appears to me to have deteriorated markedly since we last had him [at the Men's Colony]."

A year after Dr. Owre's evaluation, in 1978, Dr. Jack Tolchin also conducted a periodic mental health evaluation of defendant at the California Men's Colony for the Community Release Board. He agreed with Dr. Owre's previous diagnosis of a "passive aggressive personality with sadomasochistic features or depressive features or both." This condition was not a mental disease or defect but was instead a personality disorder. He did not find defendant to be schizophrenic, but

admitted defendant's personality disorder was "very severe." Dr. Tolchin recommended defendant continue in therapy and be monitored on parole by a psychiatrist.

Dr. George Chappell, a psychiatrist, was appointed by the court to examine defendant to determine his sanity in connection with his 1981 crimes in Ventura County against David Galbraith and Michelle D. Dr. Chappell testified defendant told him he was taking 600 milligrams of Mellaril, an antipsychotic medication. Defendant told him he could not shave with a mirror because when he looked at his own face, he heard voices telling him to cut his own throat. Defendant reported to Dr. Chappell hearing two voices, one male and one female; defendant claimed he had heard the voices "over a period of years and months." Dr. Chappell "had serious questions as to whether [defendant] heard voices" because there was no direct evidence of his having heard such voices and it was unusual that defendant had not complained to people close to him (like his wife) about the voices.

Defendant told Dr. Chappell that he had been taking amphetamines for the previous 18 months to stay awake while driving. Amphetamines would probably aggravate an already existing psychosis, but Dr. Chappell did not believe defendant suffered from schizophrenia or any other psychosis. Dr. Chappell believed defendant "was malingering or faking some of his symptoms." He found defendant was legally sane at the time of the Ventura County crimes.

Dr. Theodore Donaldson, a clinical psychologist, also examined defendant for insanity in connection with the Ventura County crimes. In addition to interviewing him, Dr. Donaldson gave defendant the Minnesota Multiphasic Personality Inventory and the Rorschach Projective Personality Test. Defendant told him the voices in his head argued over whether to rape Michelle D., the victim in the Ventura County case, and "the bad voice" won. Defendant knew the rape was wrong but did it anyway. Dr. Donaldson thought defendant might be fabricating the auditory hallucinations; he concluded defendant suffered from a "mixed personality disorder, depressive neurosis, and a long history of amphetamine abuse." Persons suffering from a personality disorder such as defendant's usually had a very small "built-in set of morals and values" and a "lack of impulse control." He did not think defendant was schizophrenic. Like Dr. Chappell, Dr. Donaldson concluded defendant was not suffering from a mental disease or defect and was not insane in connection with the Ventura County case.

Dr. Rolland Rose, a psychologist, conducted a diagnostic placement evaluation of defendant in 1981 at the California Institute for Men in Chino, a state prison. Dr. Rose had no personal recollection of defendant, but testified from his 1981 report. He found defendant exhibited an "intense hostility toward women" and diagnosed him as suffering from a "passive aggressive personality with schizoid features and sexual sadism," which he explained was a character disorder and not a mental disease or defect. He admitted that one bearing such symptoms could be suffering from schizophrenia in remission and that the character disorder Dr. Rose diagnosed could be superimposed on a psychotic disorder.

Dr. Jack Shonkwiler, a psychiatrist, testified he was presently working under a restricted license and was being supervised at a clinic by two other doctors. He testified he had examined defendant in connection with the team of defense experts, including Drs. Lundgren, Dietiker, and Cholet and Mr. Powers. He interviewed defendant and defendant's mother and sister, and he viewed videotapes of defendant answering questions pursuant to the Vietnam Era Stress

Inventory. He also examined reports from prior mental health evaluations of defendant and his medical and military records.

Dr. Shonkwiler found defendant was "flooded with fantasies, images, visions of [a] sadistic sexual and aggressive nature and he has essentially no control." He noted that the fact defendant had close blood relatives who were schizophrenic gave him a "marked predisposition" to have schizophrenia. Dr. Shonkwiler's final diagnosis of defendant was "paranoid schizophrenia and post-traumatic stress [disorder]" (PTSD). He explained that the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III) required evidence of the presence of at least one of six diagnostic criteria under subdivision A for a diagnosis of schizophrenia, and defendant fit all six categories. He had bizarre delusions (he thought he could communicate with his mother telepathically); he had grandiose delusions (he believed he could hold off police with explosives made from household objects like bicycle tires and detergent); he had auditory hallucinations involving two or more voices; and he had markedly illogical thinking. Defendant fell "somewhat" into subdivision B, and there was evidence of subdivision C although such evidence was not "dramatic." For this latter criterion, Dr. Shonkwiler noted defendant's social isolation, his blunt or flat affect, and his belief in telepathy. Defendant did not suffer from manic depression so subdivision D did not apply. Dr. Shonkwiler examined defendant when he was 38, so onset of symptoms occurred before age 45, fulfilling subdivision E. Defendant did not suffer from an organic mental disorder or retardation (subd. F).

Dr. Shonkwiler also opined that, in addition to schizophrenia, defendant suffered from "full-blown post-traumatic stress [disorder]." The witness explained that defendant's emotional detachment from his wife and children and his generally constricted affect were both indicative of PTSD. Defendant's memory impairment, difficulty concentrating and expressions of survivor guilt, apparent from the videotapes of defendant taking the Vietnam Era Stress Inventory test, were likewise consistent with PTSD. Dr. Shonkwiler testified that defendant's chosen profession as a long-haul trucker could be viewed as a means to avoid intimate relationships, which was consistent with the PTSD characteristic of avoiding activities that arouse recollection of the traumatic event. Dr. Shonkwiler surmised that defendant's amphetamine abuse may be related to a sleep disturbance, a common feature of PTSD. The witness admitted there was no evidence defendant displayed hypervigilance, or an exaggerated startle response, or that his symptoms intensified when exposed to events that symbolized or resembled the war experience, three additional symptoms of PTSD. He testified that defendant's abusive childhood predisposed him to have PTSD.

Dr. Shonkwiler also found defendant's amphetamine abuse was a factor in the crimes: "My understanding was that [defendant] would have a quart jar with amphetamines, ephedrine, maybe some valium, some elevil [*sic*], and would go 20 hours without sleep, driving a long range truck. He would just grab a fistful and stuff it [in his mouth]. He didn't even know what he was taking. I am saying that what he did may have been 30 percent schizophrenia, 30 percent post-traumatic stress, 30 percent child abuse and the rest amphetamines and sleep deprivation. But who knows what was happening back there in '81, like a half-hour, hour before he murdered Radford or kidnapped Levoy. Maybe he shoved some amphetamines in him, which would make amphetamines 90 percent of what he did."

Dr. Shonkwiler opined that if defendant were taking antipsychotic medication during prior mental health evaluations, his symptoms would have been masked.

11

Dr. Shonkwiler concluded that although defendant knew right from wrong, he was unable to conform his conduct to the law. As a result of his abusive childhood, schizophrenia, PTSD, and amphetamine abuse, defendant had "[v]ery poor impulse control. He is functioning at the level, the earliest level of a child wanting something and reaching for it. No gratification delay, very poor impulse control." The witness concluded defendant was legally insane.

Dr. Kathe Lundgren, a clinical psychologist, interviewed defendant and administered a series of psychological tests to him at the request of defense counsel. She concluded defendant had "one of the most severe personality disorders" and that "[a] perceived threat to his source of affection or love," even "a slight frustration could set him into a violent act or a socially unacceptable act. Remember, that this is perceived stress, and besides his personality disorder is the psychosis, which twists reality, so even though you and I might not see something as being threatening or frustrating, in his twisted perception of it, it could be that it is frustrating to him." She concluded defendant suffered from chronic undifferentiated schizophrenia with a sociopathic, antisocial personality.

Dr. Lundgren opined that defendant attempted to fake being sicker than he was, but she determined this was just an aspect of his mental illness. She was not prepared to give a professional opinion whether defendant was legally insane.

Dr. K. Edward Dietiker, a psychologist, testified he was a member of the defense team of experts that examined defendant. He also administered some psychological tests to defendant. He concluded defendant suffered from paranoid schizophrenia. He opined that "under certain circumstances [it would be] very difficult for [defendant] to hold his behavior in conformity to the law. I think that may [vary] from one situation to another, but certain situations that involve him in the sexual sadistic controlling kinds of relationships, it may be virtually impossible." Dr. Dietiker did not express an opinion about whether defendant was insane at the time of the crimes.

Dr. Byron Wittlin, a psychiatrist, testified he worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients and Vietnam War veterans. He examined defendant and read several reports and previous mental health evaluations of defendant. He believed that when defendant entered the military, he was already suffering from a psychotic illness and explained that the stress of combat could aggravate a preexisting psychotic condition. He concluded defendant suffered from schizophrenia, paranoid type, as well as PTSD, but he could not determine whether defendant was legally insane.

Dr. Clyde Donahoe, a psychologist, testified he also worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients. He examined defendant, administered psychological tests and reviewed his military records. In addition, Dr. Donahoe administered psychophysiological tests, measuring defendant's heart rate and respiration while he was shown a series of pictures, some of which portrayed scenes from the Vietnam War. Defendant self-reported on the "Traumatic Violence Scale" to Dr. Donahoe that he had "either participated in or witnessed these items: Killing of women or children, mutilation of dead bodies, mutilation of live people, inadvertent air strikes or ambushes on own or friendly troops, use of white phosphorous or napalm, torture of prisoners, mercy killing, watching a buddy die in a gruesome manner, leaving one of the civilians to die, taking human body parts as trophies, bagging dead bodies,

deliberate killing of old women, men or children ... and the routine killing of prisoners."

Dr. Donahoe concluded to a reasonable medical certainty that defendant suffered from delayed PTSD. He did not know whether defendant suffered from PTSD in 1981 when the crimes occurred, but admitted that he could "very well" have had the disorder then.

Dr. John Wilson, a clinical psychologist, works with veterans and is an expert on PTSD. He developed the Vietnam Era Stress Inventory (VESI), a diagnostic tool consisting of several hundred questions to help determine if a person suffers from PTSD as a result of service in the Vietnam War. He interviewed defendant and examined police reports and the numerous previous psychological evaluations of defendant. Defendant reported to him that he had served as a combat engineer, stood perimeter guard duty and encountered incoming mortar and "sapper" fire, participated in unit patrols that "encountered anti-personnel weapons," engaged the enemy in a fire fight, was a tunnel rat (i.e., he entered underground tunnels constructed by the Viet Cong) and checked enemy base camps, and was a demolitions expert. Dr. Wilson opined that these experiences were consistent with the dates of service in defendant's military record.

Dr. Wilson testified defendant has "paranoid schizophrenia in addition to posttraumatic stress disorder and a mixed personality disorder. All three coexist." He opined that defendant was "absolutely not" faking the symptom of "thought broadcasting," that is, the belief that people know his thoughts. Dr. Wilson explained: "[Defendant's] affect was so intense that when individuals try to make [sic; mask?] their emotions, their affect [does not] quite correspond to the content of what you are saying and his was so spontaneous and his speech so pressured that that's very characteristic of someone who is suffering from this disorder."

Dr. Wilson opined that defendant's schizophrenia began developing "very early in childhood" as a result of sexual and physical abuse by his parents, especially his mother. In response to this upbringing, he began to express his sexual and aggressive feelings by engaging in antisocial behavior, as that was more comfortable than dealing with the "deeper level of his personality, where he is terribly confused and loses touch with reality, and then begins to hear voices and other things." His war experiences fed into his underlying psychosis in two ways. First, they gave sanction to his violent impulses. Second, the stress of war removed "whatever remaining controls he had over his impulses. What we now have is an individual with pre-existing psychotic tendencies, learned psychopathic antisocial personality disorder kinds of traits, but with no means to modulate them, because the effect of the war stress was to pull away those tenuous controls, ego controls, ego defenses, so that in one sense what we have is now this interplay. The post-traumatic stress disorder causes him to feel vulnerable. He re-experiences images, nightmares, feelings connected to Vietnam. Those make him feel vulnerable. That then feeds back into the psychosis, so he begins to have hallucinations and hear voices. To cope with that, he behaves in an antisocial way. So the three [psychological conditions, namely schizophrenia, PTSD, and personality disorder,] literally feed into each other."

Dr. Wilson concluded defendant was legally insane because, although he could distinguish right from wrong, he "could not conform his conduct to the requirements of the law." He had read the reports of the four experts later called by the prosecution, Drs. Cutting, Criswell, Burdick and Matychowiak, and

13

concluded they were incorrect in concluding defendant was sane, and that all four experts overlooked defendant's PTSD.

Defendant's final sanity phase witness was Dr. Harry Kormos, a psychiatrist. He is an expert on PTSD and the psychological problems of veterans, and had worked with hundreds of veterans. He reviewed 10 to 12 inches of documents relevant to defendant, including defendant's past mental health evaluations, the police reports of the crimes, defendant's military record, and videotapes of defendant answering the VESI questions. He also interviewed defendant for two hours. He found defendant's responses on the VESI videotapes to be sincere and consistent with those of other PTSD sufferers. He concluded defendant suffered from paranoid schizophrenia and chronic PTSD.

Dr. Kormos explained that only a minority of psychologists and psychiatrists at the time (1985) were "well versed" in PTSD and that it was a common error among psychiatrists to focus on a patient's childhood and ignore the psychological problems stemming from combat service in Vietnam. In addition, if defendant was taking an antipsychotic drug like Mellaril, the drug could have masked the symptoms of schizophrenia by reducing the intensity of symptoms.

Dr. Kormos concluded: "I consider [defendant] to have been, at the time that [the crimes] took place, to have been aware of the requirements of the law but unable to conform to those requirements."

4. *Expert Witnesses Called by the People*

Dr. Paul Cutting, a psychiatrist, examined defendant at the pretrial stage to determine whether defendant was competent to stand trial; at that time Dr. Cutting also examined defendant for sanity. He interviewed defendant for a little over one hour and examined about 200 pages of documents supplied to him by the district attorney's office. He did not administer any psychological tests. Defendant told him about the voices he heard in his head, and Dr. Cutting thought defendant did actually experience such voices.

Dr. Cutting concluded defendant suffered from a schizoid personality disorder but not schizophrenia, because he did not satisfy enough of the criteria of schizophrenia listed in the DSM-III. When asked, "What criteria in DSM-III ruled out schizophrenia?" he replied: "It is a degeneration from our previous level, previous level of behavior, and he didn't have any particular regression from [a] previous high level of behavior or adaptation, his lifelong poor adaptation, and there wasn't any skid downhill in this case, he just never rose [above] a very low level of adaptation." Dr. Cutting also found defendant did not suffer from PTSD.

Dr. Cutting concluded defendant was not insane: "I felt he knew what he was doing. I felt that he could listen to one voice or the other, obey whichever voice he wanted to obey. [¶] He didn't always obey the man's voice, incidentally, because the man's voice would frequently tell him to kill himself, and, obviously, he didn't act on that man['s voice]."

Dr. Francis Matychowiak, a psychiatrist, was appointed by the superior court to examine defendant to determine if he was insane at the time of the crimes. Dr. Matychowiak examined prior medical reports, law enforcement investigative reports, and a transcript of defendant's court testimony. He also examined defendant in jail. He concluded defendant suffered from a "personality disorder, showing a mixture of paranoid and antisocial traits." He concluded defendant was

sane. He rejected a diagnosis of PTSD, finding defendant's talking to imaginary persons was a "survival technique" but that it was not a posttraumatic reaction to his war experiences.

Dr. Richard Burdick, a psychiatrist, was also appointed by the court to examine defendant for sanity. Dr. Burdick concluded defendant demonstrated an antisocial personality disorder, meaning he was "responsive to inner urges and needs without particular conscience for what effect their behavior will have on another person.... They tend to get into difficulties with people and are either on the fringe or breaking the law, getting arrested. They do not seem to be responsive to correction by being incarcerated or having other forms of limits put on them." He thought defendant's report of hearing voices could be fabricated but, in any event, the voices did not play a role in the crimes. He admitted that if someone suffered from both schizophrenia and a personality disorder, it was sometimes difficult to perceive the underlying schizophrenia.

Dr. Burdick admitted he was not an expert in PTSD but found no indication of that condition. He testified that although he frequently examined criminal defendants at the superior court's request, he did not frequently find them insane. He concluded defendant was not legally insane.

Dr. Francis Criswell, a psychiatrist, was, like Dr. Cutting, appointed during the pretrial period to examine defendant both for competence and sanity. Dr. Criswell testified that defendant had suffered an abusive childhood from an "extremely pathological family," but he agreed with other prosecution witnesses that, although defendant suffered from a personality disorder, he was not psychotic, schizophrenic, or otherwise suffering from a mental disease or defect. Because defendant appreciated the criminality of his conduct and could conform his actions to the law, Dr. Criswell concluded defendant was not legally insane.

Dr. Mary Cholet testified for the People. She worked on the defense team of Dr. Lundgren, Dr. Dietiker and Mr. Powers, was a psychological assistant at the time of her examination of defendant, but was a psychologist at the time of trial. She administered psychological tests to defendant and interviewed him. She disagreed with the other members of her team, concluding defendant was not schizophrenic but merely suffered from a personality disorder. She found no evidence of organic brain damage and saw no evidence of hallucinations when she was with defendant. She also concluded defendant did not suffer from PTSD, although she admitted she was not familiar with the various diagnostic tools used by experts in the area of PTSD. She concluded defendant knew the difference between right and wrong, admitted she was only "fairly familiar" with the legal definition for insanity, and admitted this case was the first one in which she had tested someone to determine their sanity.

*Weaver*, 26 Cal. 4th at 934-46.

### III. Penalty Phase

#### A. *Facts*

Bonnie Brown testified that on September 22, 1976, she was working as a waitress in Eureka, California. At midnight, as she left work after her shift, a man she later identified as defendant pulled up in a pickup truck and asked her for directions. He then asked her to have a drink or some coffee with him. She agreed, and they went to a Denny's restaurant. He convinced her to go see his big

15

rig truck at a nearby truck stop; they drove their own vehicles there. After seeing the truck, they walked back to their cars. When her back was turned, defendant hit her on the back of the head with a club. Brown fell and blacked out. When she came to, defendant had his hand over her mouth and told her not to scream or he would kill her. He led her to his pickup truck, still holding what looked like a two to three-foot-long wooden baseball bat. He forced her into the passenger side of his truck, but she escaped as he walked around to get in the driver's side. She ran to the truck stop and screamed. Defendant was identified and arrested, eventually pleading guilty to assault with a deadly weapon. He served a prison term as a result.

In April 1981, just two months after defendant's crimes against Radford and Levoy, defendant picked up two hitchhikers: David Galbraith, 18 years old, and Michelle D., 15 years old. Both testified against defendant. Galbraith and Michelle D. were from Burlington, Washington, and were running away after Galbraith burglarized a sporting goods store to obtain supplies for their trip. They were headed for Yreka, California, where Michelle D. had an uncle. Defendant agreed to take them there. Defendant's 10-year-old son was riding with defendant that day.

When they arrived in Yreka, Michelle D.'s uncle was not home and not expected back for two weeks. Defendant suggested the couple come with him to his home in Oroville, and they accepted. The young couple stayed with defendant's family for two or three days. They accepted defendant's offer to take them to Ventura on his next trucking run. During the trip, defendant offered to help Galbraith find work. When they arrived in Ventura, defendant and Galbraith unloaded the truck, and then they met someone named Jerry, who defendant said would take Galbraith somewhere where he could get a job. Defendant went on a short delivery run with Michelle D.; they all agreed to meet in a few hours. Before they left, Galbraith saw defendant give Jerry a gun.

After Jerry and Galbraith had been driving about an hour, Jerry stopped the car and called Galbraith to come look at some deer on the side of the road. Jerry then shot Galbraith in the back of the head. After Galbraith fell, Jerry shot him again in the back of the head and then in the face. Jerry kicked him over an embankment and left, without saying anything. Galbraith was conscious throughout the attack and managed to crawl back to the roadway, where he was found by a forest ranger.

After defendant and Michelle D. had driven around for awhile, he stopped and raped her at gunpoint. Keeping her in the truck, he drove around again before forcing her to orally copulate him a few hours later. He told her Galbraith would be killed if she did not cooperate. He eventually returned with Michelle D. to his home in Oroville. The victim did not try to escape because she feared for Galbraith's life. Defendant released her in Marysville around 5:00 p.m., saying he would return for her at 9:00 p.m. She did not go for help because she was in a state of shock. When defendant did not return at 9:00 p.m., she went to the police.

Defendant testified at the penalty phase and explained that he took his family to Idaho after his assault on Bonnie Brown in 1976, but returned and voluntarily turned himself in when he learned police were looking for him. After his arrest, he sought admission into two Veterans Administration hospitals in Texas but was refused for lack of space.

*Weaver*, 26 Cal.4th at 974-76.

# III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated after April 24, 1996.  Therefore the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, 110 Stat. 1214, apply.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

# IV. STANDARDS OF REVIEW

## A.    Legal Standard - Habeas Corpus

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer*, 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

As a threshold matter, this court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer*, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.*  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case'; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009), *quoting Wright v. Van Patten*, 552 U.S. 120, 125 (2008); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

If no clearly established Federal law exists, the inquiry is at an end and the court must defer to the state court's decision.  *Carey*, 549 U.S. 70; *Wright*, 552 U.S. at 126; *Moses*, 555 F.3d at 760.  In addition, the Supreme Court has recently clarified that habeas relief is unavailable in instances where a state court arguably refuses to extend a governing legal principle to a context in which the principle should have controlled.  *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1706 (2014).  The Supreme Court stated: "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *Id., quoting Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004).

If the court determines there is governing clearly established Federal law, the court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at 72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

18

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, *citing Yarborough*, 541 U.S. at 664. The Supreme Court stated:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 101-05. In other words, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. *Id.* at 98-99. In applying this standard, "a habeas court must determine what arguments or theories supported . . . or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 101-03. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

19

states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

state court decision is objectively unreasonable.  *See LaJoie v. Thompson*, 217 F.3d 663, 669 n.6

(9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

  The AEDPA requires considerable deference to the state courts.  "[R]eview under §

2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "evidence introduced in federal

court has no bearing on 2254(d)(1) review."  *Id.* at 185.  "Factual determinations by state courts

are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1).  However, a state court

factual finding is not entitled to deference if the relevant state court record is unavailable for the

federal court to review.  *Townsend v. Sain*, 372 U.S. 293, 319 (1963), *overruled by Keeney v.

Tamayo-Reyes*, 504 U.S. 1 (1992).

  If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal

court considers that claim de novo.  *See Panetti*, 551 U.S. at 953 (when section 2254(d) is

satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise

requires."); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008).

  In this case, many of the allegations in petitioner's claims 8 and 9 were raised and

rejected by the California Supreme Court on direct appeal.  However, some of the claims were

raised in his state habeas petitions to the California Supreme Court, and summarily denied on the

merits.  In such a case where the state court decision is unaccompanied by an explanation, "the

habeas petitioner's burden still must be met by showing there was no reasonable basis for the

state court to deny relief."  *Richter*, 562 U.S. at 98.  The Supreme Court stated that "a habeas

court must determine what arguments or theories supported or . . . *could have supported*, the

state court's decision; and then it must ask whether it is possible fair-minded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior decision of

this Court."  *Id.* at 101-03 (emphasis added).  Petitioner bears "the burden to demonstrate that

'there was no reasonable basis for the state court to deny relief.'"  *Walker v. Martel*, 709 F.3d

925, 939 (9th Cir. 2013), *quoting Richter*, 562 U.S. at 98.  "Crucially, this is not a de novo

review of the constitutional question," *id.*, as "even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable." *Id., quoting Richter,* 562 U.S. at 102; *see*

*also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014).

When reviewing the California Supreme Court's summary denial of a petition, this court

must consider that the California Supreme Court's summary denial of a habeas petition on the

merits reflects that court's determination that:

> [T]he claims made in th[e] petition do not state a prima facie case entitling the
> petitioner to relief. It appears that the court generally assumes the allegations in
> the petition to be true, but does not accept wholly conclusory allegations, and will
> also review the record of the trial ... to assess the merits of the petitioner's claims.

*Pinholster*, 563 U.S. 181 n.12, *quoting In re Clark*, 5 Cal. 4th 750, 770 (1993); *see also Johnson*

*v. Williams*, 133 S. Ct. 1088, 1094-96 (2013) (holding that even where the state court does not

separately discuss a federal claim there is a presumption that that state court adjudicated the

federal claim on the merits).  Accordingly, if this court finds petitioner has unarguably presented

a prima facie case for relief on a claim, the state court's summary rejection of that claim would

be unreasonable.  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *Nunes v. Mueller*, 350

F.3d 1045, 1054-55 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the

federal court reviews the claim de novo without the deference usually accorded state courts

under 28 U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v.*

*Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  In such instances, however, the provisions of 28

U.S.C. § 2254(e) still apply.  *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have

force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167–68

(stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal

review is de novo).

///

# V. PROCEDURAL BARS

Some of petitioner's allegations in claims 8 and 9 were denied as procedurally barred.  As to those allegations, respondent has argued independent state grounds that bar federal habeas review.

Since "cause and prejudice" can excuse a procedurally defaulted claim, *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007), *quoting Coleman v. Thompson*, 501 U.S. 722, 750 (1991), and "prejudice" essentially requires a merits analysis, the court will proceed to the merits of claims found to be procedurally defaulted without determining whether the state procedural default is adequate and independent to bar relief in federal court.  *See id.*, *quoting Coleman* at 510 U.S. 732-35).  A district court may exercise discretion to proceed to the merits in advance of litigation of procedural default.  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011).

# VI. REVIEW OF CLAIMS

## A.     Previous Section 2254(d) Review of Claims 8 and 9

Petitioner argues this court, in its March 24, 2014 order denying claims 1 and 2 and directing briefing of instant claims 8 and 9, also found claims 8 and 9 satisfied the § 2254(d) gateway.  Respondent disagrees, pointing out these claims were then unbriefed and that the court specifically made no finding of *Strickland* prejudice.

The March 24, 2014 order states that:

> [T]he failure of the California Supreme Court to permit further evidentiary development of [petitioner's] ineffective assistance of counsel claims was unreasonable within the meaning of 28 U.S.C. § 2254(d) and the fairminded jurist standard of *Richter*, 131 S.Ct. 786.

(Doc. No. 204 at 15:23-16:3, *citing* Doc. Nos. 162 at 113:11-14.)  The court went on to observe:

> [Petitioner] has made a strong showing that his representation by Mr. and Mrs. Huffman was deficient, even though, at this point, he must still establish prejudice for that deficient performance.

22

1  (Doc. No. 162 at 111:4-6.)  Finally, the court stated that:

3  > While this Court is inclined to accept the notion that [petitioner] has established the Huffmans' deficient performance, the [respondent] will be directed to provide his views on this issue as well. In addition to deficient performance, [petitioner] bears a "heavy burden of establishing actual prejudice." *(Terry) Williams v. Taylor*, 529 U.S. 362, 394 (2000)).

6  (Id., at 113:25-28.)

7  It follows that, even if deficient performance had been determined, the March 24, 2014

8  order did not resolve *Strickland's* prejudice prong (*see* Doc. No. 205 at 12:25-13:19) and thus

9  did not conclude that claims 8 and 9 were sufficient to satisfy § 2254(d).

10  **B.   Review of Claim 8**

11  Claim 8 alleges that trial counsel were constitutionally ineffective in investigating,

12  preparing for, and presenting the sanity phase of petitioner's trial, violating petitioner's rights

13  under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (*See* Doc. No. 107 at 99:8-144:15.)

14  Petitioner states that claim 8 incorporates facts set out in claims 1-7, 9, 11 and 19 and the

15  evidence in the state record.  (Id.)

16  The California Supreme Court denied this claim and all subclaims on the merits.  *See*

17  *Weaver*, 26 Cal.4th at 946-74.  A subclaim of this claim was also raised in petitioner's first state

18  habeas petition and summarily denied on the merits by the California Supreme Court.  (*See* Lod.

19  Doc. No. 8.)

20  1.   <u>Clearly Established Law</u>

21  The Sixth Amendment right to effective assistance of counsel, applicable to the states

22  through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing

23  phase of a trial.  *See Murray*, 745 F.3d at 1010-11: U.S. Const. amend. VI; U.S. Const. amend.

24  XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 343–45 (1963); *Silva v. Woodford*, 279 F.3d 825,

25  836 (9th Cir. 2002).

26  The clearly established federal law for ineffective assistance of counsel claims is

27  *Strickland v. Washington*, 466 U.S. 668 (1984).  In a petition for writ of habeas corpus alleging

28

ineffective assistance of counsel, the court must consider two factors.  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.  The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. *Richter*, 562 U.S. at 104, *citing Strickland*, 466 U.S. at 688. Petitioner must show that counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable.  *Strickland*, 466 U.S. at 688.  Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689.  Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.; see also Richter*, 562 U.S. at 106-08.   A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104, *quoting Strickland*, 466 U.S. at 687; *see also Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 196.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), *quoting Strickland*, 466 U.S. at 688).   However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." *Summerlin v. Schriro*, 427 F.3d 623, 629 (2005).  "[S]trategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. It follows that:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

*Wiggins*, 539 U.S. at 521, *quoting Strickland*, 466 U.S. at 690–91; *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104, *quoting Strickland*, 466 U.S. at 693. "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 U.S. at 104, *quoting Strickland*, 466 U.S. at 687. Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 112, *quoting Strickland*, 466 U.S. at 696.

That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," *id*., has the defendant met *Strickland's* demand that defense errors were "so serious as to deprive the defendant of a fair trial." *Id.*, at 103-105, *quoting Strickland*, 466 U.S. at 687. A court need not determine whether counsel's performance was deficient before examining the

prejudice suffered by the petitioner as a result of the alleged deficiencies. *Strickland,* 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under AEDPA, the court does not apply *Strickland* de novo. Rather, the court must determine whether the state court's application of *Strickland* was unreasonable. *Richter*, 562 U.S. at 100-101. Establishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d) is very difficult. *See Richter*, 562 U.S. at 102, (on deferential (2254(d)) review relief is granted only for "extreme malfunctions" in the state criminal justice system, not for ordinary errors that can be corrected on appeal).

Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly so." *Id., quoting Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Further, because the *Strickland* rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." *Id.* at 101; *see also Premo v. Moore*, 562 U.S. 115, 122-23 (2011).

2.    Analysis

Petitioner claims that appointed lead counsel, David Huffman, and appointed co-counsel, Donnalee Huffman (lead counsel's wife), were prejudicially deficient in investigating, preparing and presenting the sanity phase. The subclaims comprising this claim are addressed separately below.

**a.    Absence of Lead Counsel**

Petitioner claims counsel was ineffective by failing to seek appointment of second counsel when Mr. Huffman became incapacitated by his alcoholism and PTSD (from Korean war experiences) several days into the sanity trial which began on January 14, 1985 and ended with the jury's verdict on February 28, 1985. For the balance of the sanity phase and all of the subsequent penalty phase, Mr. Huffman was unavailable and did not materially participate. Mrs. Huffman continued on, representing petitioner as sole counsel.

Petitioner claims Mrs. Huffman was ineffective due to her exhaustion from caring for her husband, lack of legal knowledge and experience and familiarity with the sanity defense that until his incapacitation had been the responsibility of her husband.  In particular, petitioner claims that Mrs. Huffman did not assist in preparation of the sanity defense and did not communicate with sanity phase experts prior to trial.  *See e.g.,* SHCP Ex. 34 at ¶¶ 10, 14, 15, 16, 18-20, 23, 24, 28-32.

The state supreme court denied this subclaim on procedural grounds, finding any objection to proceeding without Mr. Huffman was waived at trial.  *See Weaver*, 26 Cal.4th at 948.   That court also denied the subclaim on the merits, finding that "[petitioner] adequately waived the presence of lead counsel until Mr. Huffman was well enough to return to court."  *Id.* at 951; *see* CT 1508, 1511.

The state supreme court could reasonably have found Mrs. Huffman did not lack the ability, experience and knowledge to act as sole defense counsel.  *See Weaver*, 26 Cal.4th at 952.  Moreover, as respondent argues, there is no constitutional entitlement to the appointment of second counsel in a capital case, rather the matter is entirely discretionary in the trial court.  *See Gideon*, 372 U.S. at 344 (1963); *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 (1982); Cal. Pen. Code. § 987, subd. (d)); *Weaver*, 26 Cal.4th at 950.  Petitioner does not demonstrate an abuse of discretion in this case.  Neither petitioner nor Mrs. Huffman requested *Keenan* counsel, even when offered by the trial court.

Additionally, Mrs. Huffman had significant involvement in, and experience with petitioner's case years before it went to trial.  She was appointed to this case on June 8, 1983. (SHCP Ex. 34 at ¶ 3; CT 228-42.)  When it became apparent during the first week of the sanity trial that Mr. Huffman was having health issues and unable to participate, (CT 1508, 1511), Mrs. Huffman reasonably requested and was granted a two week continuance.  (S*ee* SHCP Ex. 34 at ¶¶ 9, 22; SHCP Ex. 148 at 8-30; *Weaver*, 26 Cal.4th at 949; CT 1511.)   Following the continuance, on February 1, 1985, Mrs. Huffman advised the court that Mr. Huffman would likely be absent for the remainder of the trial.  (CT 1522.)   Petitioner again waived Mr.

1   Huffman's participation and agreed in open court to continue with only Mrs. Huffman, declining

2   the court's offer to delay proceedings and appoint a second counsel.  (CT 1522; *See Weaver*, 26

3   Cal.4th at 949; RT 4986-88.)   Petitioner reiterated his decision to go forward with only Mrs.

4   Huffman when questioned by the prosecution.  *See Weaver,* 26 Cal.4th at 949-50; RT 4987-88.)

5          Petitioner makes much of Mrs. Huffman's lack of involvement in the investigation and

6   preparation of the sanity defense prior to Mr. Huffman's incapacitation.  (SHCP Ex. 34 at ¶¶ 22-

7   23.)   But that alone does not demonstrate a second attorney was necessary for effective

8   representation.  To the contrary, Mrs. Huffman appears to have stepped into her husband's shoes

9   and presented the work he had completed prior to his indisposition.  (*See id.* at ¶¶ 24, 26.)  Mrs.

10  Huffman was comfortable enough acting as lead counsel to suggest to the court that if Mr.

11  Huffman were to return he might serve as second counsel to her.  *See Weaver*, 26 Cal.4th at 952.

12  Moreover, the trial judge felt Mrs. Huffman was competent to represent petitioner alone.  (RT

13  4988.)

14         The trial record fairly suggests that Mrs. Huffman overcame any initial lack of familiarity

15  with sanity defense theory and evidence.  (*See e.g.*, RT 5422-23, 6608-99.)   Even though she

16  may not have been privy to formulation of the sanity defense (SHCP Ex. 34 at ¶¶ 10, 22), she felt

17  no need to request a further continuance.

18         This court previously determined as follows:

19

20         Mrs. Huffman's representation generally was cogent, in spite of her lack of
           personal preparation, co-dependence, financial concerns, and exhaustion. During
21         the defense case in chief, she questioned one mental health expert about
           schizophrenia in Weaver's family (Dr. Raitt), three mental health experts who
22         evaluated Weaver in connection to the Humboldt County conviction (Drs.
           Gardner, Owre, and Tolchin), three mental state experts relative to the Ventura
23         crimes (Drs. Chappell and Donaldson, plus Mr. Rose), three doctors comprising a
           defense team hired defense to evaluate Weaver for the sanity proceedings (Drs.
24         Shonkwiler, Dietiker, and Lundgren), four PTSD experts (Drs. Wittlin, Donahoe,
           Wilson, and Kormos), three lay witnesses (Weaver's sister, Ms. Smith, and two
25         friends, Messrs. Barnett and Mooreland), and two inmate witnesses (Messrs.
           Hogan and Archuleta). She conducted cross examination of five mental health
26         experts put on by the prosecution (Drs. Cutting, Matychowiak, Burdick, Criswell,
           and Cholet), and an inmate witness (Mr. Sneed). She also conducted the rebuttal
27         case by examining two additional inmate witnesses (Messrs. Shannon and Flores).
           Except for the opening argument on January 14, 1985 and the February 8, 1985
28         conference outside the presence of the jury about admission of the VESPI AV,

1
Mrs. Huffman conducted all aspects of the sanity phase. It was a substantial, complex presentation of evidence and summation.

2 (Doc. No. 162 at 96:13-27.)

3 Petitioner's habeas proffer suggests subsequent employers rated Mrs. Huffman's legal

4 skills as poor. (SHCP Ex. 26.) However, petitioner has not demonstrated how, if at all, such

5 testimony relates to Mrs. Huffman's performed during petitioner's trial. The state supreme court

6 could reasonably have discounted this proffer.

7 Moreover, this court noted in its March 24, 2014 order that Mrs. Huffman had effectively

8 represented a capital defendant prior to petitioner's proceeding

9
10
Mrs. Huffman (then, Ms. Mendez) represented capitally charged defendant Constantino Carrera before the Kern County Superior Court from April 27, 1982
11 through October 7, 1983, when Mr. Carrera's motion to set aside the death sentence was denied. The *Carrera* case has been before this Court and the Ninth
12 Circuit on a petition for writ of habeas corpus. While the Court did find prosecutorial misconduct, and granted relief on the death eligibility special
13 circumstance, the Court did not find ineffective assistance of counsel. *See Carrera v. Warden*, Case No. 1:90-cv-478 doc. 287, filed March 13, 2008. The
14 Ninth Circuit affirmed. *Carrera v. Ayers*, 699 F.3d 1104 (9th Cir. 2012).

15 (Doc. No. 162 at 99:13-20.)

16 The state supreme court could reasonably have concluded that petitioner was not entitled

17 to second (Keenan) counsel and that sole representation by Mrs. Huffman was not prejudicial.

18 **b.    Exclusion of Guilt Phase Evidence from Sanity Phase**

19 Petitioner claims counsel was ineffective by failing to reintroduce pertinent evidence

20 from the guilt phase during the sanity phase.

21 Petitioner claims that counsel errantly requested and received a sanity phase instruction

22 that the jury not consider guilt phase evidence at the sanity phase. (RT 6774-78; CT 1593.) He

23 claims this instruction violated California Penal Code § 190.4(d) (which provided that "evidence

24 presented at any prior phase of the trial . . . shall be considered at any subsequent phase of the

25 trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase").

26 Petitioner claims the jury was prevented from considering mental state evidence admitted at the

27 guilt phase that would have supported the insanity defense.

28

The state supreme court rejected this subclaim on the merits. That court found the instruction to be contrary to California Penal Code § 190.4, and that counsel invited the error by requesting the instruction. *See Weaver*, 26 Cal.4th at 970. However, that court denied the subclaim on grounds counsel presented a detailed sanity phase defense, and there was no prejudice given that petitioner was free to reintroduce guilt phase evidence at the sanity phase and that the evidence admitted at the guilt phase was "overwhelmingly negative. . . (and the details) gruesome." *Weaver* at 26 Cal.4th at 970-71; Lod. Doc. No. 8.

Petitioner claims the instruction prevented the sanity jury from considering mental state evidence admitted at the guilt phase that would have supported the insanity defense. (*See e.g.,* RT 3916-4073.) In particular, he claims this prevented the jury from considering guilt phase evidence that he "blanked out" when Ms. Levoy bit him and that he strangled her while allegedly dissociated (RT 3996-97); that when he was young his mother would discipline him by biting him (RT 3890-94, 3996-97, 4026); that since the age of 17 he has heard voices in his head (RT 3916-55); that he abused amphetamines to stay awake while driving including around the time of the capital murders (RT 4072-73); and that he had not slept in 10 days when he came upon Radford and Levoy on the highway. *See Weaver*, 26 Cal.4th at 970-71; *see also* RT 3923, 4072-73.

However, as discussed *post*, the sanity phase included significant testimony relating to these matters, including petitioner's alleged dissociation while he strangled Levoy; the impact of amphetamine use and sleep deprivation; and the voices he hears in his head. (*See e.g.*, RT 3916-4029.) Petitioner acknowledges that "several of the experts made reference to and relied upon petitioner's abusive childhood and the biting incidents in forming their opinions." (*See* Doc. No. 107 at 139:20-21.) But he complains this information was not substantively available because it was admitted only as the basis for expert opinion. (*See* Doc. No. 107 at 139:22-24; CALJIC No. 2.10; CT 1590-91; RT 6777-78.) Nevertheless, the state supreme court could reasonably have found that this evidence was before the jury in their consideration of expert opinion regarding petitioner's defense of insanity. For example, Dr. Donaldson concluded, as did Dr. Shonkwiler,

1  that petitioner's statement he blanked out after Levoy bit him to be "some evidence that he is

2  disassociated, which is part of an insane condition."  (RT 4961.)

3      Additionally, the state supreme court could reasonably have found counsel was tactically

4  motivated in excluding guilt phase evidence at the sanity phase.  The guilt phase theory, that

5  petitioner lacked the intent to kill when he planned to knock out Mr. Radford and kidnap and

6  rape Ms. Levoy (RT 4371-76, 4381-85, 4388, 4392, 4397, 4499-4503), differed considerably

7  from the sanity phase theory that petitioner suffered lifelong, progressively worsening mental

8  illness which prevented him from conforming his conduct to legal requirements.  (*See e.g.*, RT

9  4500-07.)

10      This court previously noted as much:

11

12      [Petitioner] testified during the guilt proceedings describing the crime, his
        motivations, his thought patterns, his hallucinations, and his blacking out. RT-15:

13      3906, RT-16: 4141, and RT-16: 4273-85. One concept he clarified was that he did
        not intend to kill Mr. Radford when he hit the young man with the cheater pipe.

14      He testified that if he had wanted to kill Mr. Radford, he had a knife between his
        seat and the driver's door and would have slit Mr. Radford's throat or stabbed him

15      in the lungs, as he learned in combat training. RT-15: 3940-41. The cheater pipe
        was in the back of the cab. It never crossed Weaver's mind to kill Mr. Radford

16      when they got out of the truck. He added, "If I would have wanted him to be dead,
        he would have been dead." *Id*.: 3941-42.

17

18  (*See* Doc. No. 162 at 110:15-23.)

19      Though Mrs. Huffman stated in her 1998 habeas declaration that she was uncertain why

20  this instruction was given, (SHCP Ex. 34 at ¶ 32), this alone does not preclude the state supreme

21  court from determining a reasonable tactical underpinning.  *Richter*, 562 U.S. at 101-03.  Nor

22  does it relieve petitioner from his burden of demonstrating the state supreme court acted

23  unreasonably, *Richter*, 562 U.S. at 98, or relieve this court of its responsibility to determine

24  arguments and theories that could have supported the state supreme court's denial of the

25  subclaim. *Id.*

26      This court previously noted concerns regarding the exclusion of guilt phase evidence.

27  (*See* Doc. No. 162 at 123:4-8.)   However, upon consideration of the fully briefed claim,

28

1    petitioner has not demonstrated the state supreme court's rejection of this subclaim as non-

2    prejudicial was unreasonable.  The factual details of the offenses related at the guilt phase were

3    indeed graphic and gruesome.  Mr. Radford was bludgeoned; Ms. Levoy was strangled following

4    a multi-day kidnap and rape and ultimately buried by petitioner in his backyard.  *See Weaver*, 26

5    Cal.4th at 898-903.  Objectively reasonable counsel could have determined that consideration of

6    guilt phase evidence of the crimes and their circumstances, including the apparent goal oriented

7    planning, extended duration and petitioner's attempts at concealment might have undermined the

8    insanity defense.

9         **c.    Inconsistent Defenses**

10        Petitioner claims counsel was ineffective by failing to prepare a unified guilt phase and

11   penalty phase defense.  He claims this resulted in prejudicially inconsistent defenses.

12        The sanity phase followed the guilty verdict and was tried to the same jury.  Petitioner

13   contends the guilt phase defense (that did not intend to kill his victims) conceded that he had the

14   mental capacity to plan to disable Mr. Radford and kidnap and rape Ms. Levoy.  (*See e.g.,* RT

15   4371, 4372, 4376, 4381-85, 4388, 4392, 4397, 4503.)   He argues the sanity defense (that

16   petitioner suffered mental illness preventing him from conforming his conduct to legal

17   requirements) was a prejudicially inconsistent theory.  He argues counsel's motion for a separate

18   sanity phase jury, which was denied by the trial court, admits as much.  (*See* RT 4507.)

19        The state supreme court denied this subclaim on direct appeal, *Weaver*, 26 Cal.4th at

20   947-48, noting that California law allows use of the same jury where, as here, the trial judge

21   found no good cause to discharge the initial jury.  *Id.* at 947, citing Cal. Pen. Code § 190.4.  That

22   court also found the speed by which the jury reached a sanity phase verdict (42 minutes) did not

23   necessarily show jury bias such as from the alleged inconsistent defenses.  *Id.*

24        The state supreme court also rejected petitioner's subclaim that the guilt phase jury could

25   not appropriately hear the alternative diminished or absent mental capacity defense that was

26   advanced in the sanity phase.  *Weaver*, 26 Cal.4th at 925-29; *see also* Lod. Doc. No. 8.

27        That California Supreme Court noted:

28

In this case, however, counsel set forth on the record specific reasons for deciding to forgo a diminished capacity defense. "[T]here are many tactical considerations that the defense has to review prior to commenting on evidence and taking a basic theory of defense when arguing the case at the conclusion of the evidence. We made a determination that we didn't want to attack diminished capacity or use diminished capacity as an argument, although we felt it was necessary as a jury instruction because of some of the evidence brought up; however, if we had argued the fact that there was diminished capacity, we would have not had proceeded [*sic*] on argument that we did, which is [defendant] looked at the possibility of personally attempting to kill someone, reflected [on] that [possibility] and ma[d]e the decision, a thinking decision of only attempting to knock the man out. We couldn't have faithfully argued that to the jury if we had the counter argument that he didn't have the ability to deliberate and premeditate so we decided to go with the strongest evidence we had, which was no intent to kill. [¶] ... [¶] Further, we decided not to submit any evidence of diminished capacity by way of medical testimony, reserving that defense for the insanity [*sic*] phase rather than coming in and destroying whatever evidence we were presenting relative to his ability to decide and make a logical conclusion as to his actions. We felt that there would be an inconsistent argument which would water down our credibility with the jury if we were to go both ways, so we decided to go and approach it one way."

"Those were tactical decisions and I am not saying that what we did was right, looking at the results, but it was a decision that we had to make and we believe that they were considered opinions predicated upon the evidence, [and the] state of the law as we knew it to be."

*Weaver*, 26 Cal.4th at 926-27.

The state supreme court also denied on direct appeal petitioner's related subclaim that counsel were ineffective for not presenting the defense of diminished capacity at the guilt phase, finding that:

[T]he record does not demonstrate that counsel were constitutionally ineffective under either the state or federal Constitution because they chose to withhold the evidence of defendant's alleged diminished capacity until the sanity phase of the trial.

*Weaver*, 26 Cal.4th 876, 925-29.  The same subclaim was summarily rejected on state habeas. (*See* Lod. Doc. No. 8.)

The state supreme court could reasonably have reached these decisions for the reasons it articulated, *ante*.  The record reflects that counsel explained on the record why the diminished

capacity defense was not asserted at the guilt phase, i.e., that the defense of diminished capacity was inconsistent with the defense position that petitioner had made a thinking decision that he would not kill Radford but only knock him unconscious. (*See* RT 4499-4500.) Counsel were aware that they were presenting inconsistent defenses, (*see* RT 4502-03), but chose to do so based on their not unreasonable assessment of the available evidence.

Petitioner claims that counsel's noted motion for separate juries implies a lack of tactics. But here again, the state supreme court could have given weight to counsel's statement of the reasons for his defense theories. If so, counsel's motion for separate juries might be seen as a response to the guilt phase verdict rather than a lack of trial tactics.

Additionally, petitioner has not demonstrated on the record that the sanity phase defense theory was itself unreasonable. As this court previous found:

> [Counsel's] sanity phase strategy of showing that Weaver suffered from schizophrenia was not a far-fetched idea even if he believed the jury would only find Weaver to be "schizotypal psychotic" and "dangerous." Besides the six defense experts who found Weaver was suffering from paranoid or undifferentiated schizophrenia (that is, Drs. Shonkwiler, Dietiker, Lundren, Wittlin, Wilson and Kormos), Mr. Huffman garnered plenty of support for this diagnosis among the other experts as well. Men's Colony evaluator regarding the Humboldt crime, Dr. Owre, testified from the witness stand that Weaver was, during trial proceedings, suffering from a chronic undifferentiated schizophrenic condition. Ventura County sanity evaluator, Dr. Donaldson, noted that Weaver demonstrated "a very schizoid adjustment" and that his lack of impulse control was consistent with ASPD as well as with schizophrenia. Mr. Rose, the Chino Prison intake evaluator for the Ventura crime, found passive-aggressive personality with schizoid features, and prosecution expert, Dr. Cutting, found atypical psychosis and "schizoidal personality disorder." In addition, Mrs. Huffman was said to have believed that both Weaver and his mother suffered from schizophrenia and that Weaver's illness worsened during his service in Vietnam as a demolitions expert.

(Doc. No. 162 at 98:26-99:11.)

Even if petitioner had demonstrated counsel argued inconsistent theories, he has not demonstrated prejudice on the facts of this case. Petitioner's actions over the extended period comprising the capital murders, goal oriented planning and attempts at concealment could all be seen as not reasonably suggestive of diminished capacity. *See Weaver*, 26 Cal.4th at 898-903.

1    Petitioner's further argument that counsel had no tactical basis for the defense theories

2    fails. Mrs. Huffman stated in her state habeas declaration that she did not know why Mr.

3    Huffman decided not to put on a diminished capacity defense, other than he was "obsessed with

4    the schizophrenia and PTSD defenses for the insanity phase." (*See* SHCP Ex. 34 at ¶ 28, 32.)

5    Even so, petitioner does not demonstrate that counsel was unreasonable in the selection of guilt

6    and penalty phase defenses, for the reasons noted, *ante*. Mrs. Huffman does not offer facts

7    undermining the sanity defense, only speculation.

8        **d.    Social and Mental Health History**

9    Petitioner faults counsel for failing to investigate, develop and present evidence of

10   serious mental illness, developmental trauma, combat trauma, organic brain damage, the multi-

11   generational history of major mental illness in petitioner's family, and his prolonged use of

12   amphetamines, and significant sleep deprivation.

13       *i.    Family History*

14   Petitioner complains counsel did not inadequately investigate and present evidence that

15   he was abused and suffered various illnesses during his childhood; that his family members

16   suffered multi-generational mental illness; that he performed poorly in school and failed to

17   complete high school; and that he suffered head injuries including a serious trucking accident in

18   1975 that left him hospitalized for a week.

19   The trial record reflects basically uncontradicted evidence that petitioner's relationship

20   with his family was aberrant, sexually charged and perverted, and physically and emotionally

21   abusive. (*See e.g.*, Lod. Doc. No. 7 at 223-25; *see* RT 3895-99, 4641-99, 4728, 5300-10.) That

22   record includes evidence of petitioner's abused home life, mentally disturbed relatives, and

23   unusually close and potentially abusive relationship with his mother (*see e.g.,* RT 4641-99, 4552-

24   94, 4605-07); his mental health history; and his disturbed behavior (*see e.g.,* RT 3895-99, 4662-

25   95, 4728, 5050-51, 5054, 5062-64, 5076-78, 5089, 5102, 5123, 5300-10, 5506, 6098.) That

26   record fairly suggests that as a result petitioner suffered behavioral and psychological issues.

27   (*See e.g.,* RT 5050-89, 5102, 5123, 5506, 6098.)

28

Counsel reasonably laid the foundation for the sanity defense by calling Dr. Albert Raitt, a psychiatrist with the Butte County Mental Health Program, who testified that petitioner was at increased risk of schizophrenia because it runs in his family.  (*See* RT 4572.)  Dr. Raitt testified that petitioner's aunt and cousin, Kathryn and Lucia Bernardo, were schizophrenic, (s*ee* RT 4552-77), and unable to work or to live independently.  (*See* RT 4569-70, 4584-85, 4594.)

Additionally, to corroborate Dr. Raitt's testimony, counsel called Butte County Sheriff's Deputy Roger Levey to testify that in 1978 he responded to a call from petitioner's mother seeking assistance with Kathryn Bernardo, who was incoherent and rambling about killing people.  (*See* RT 4605-07.)

Counsel also presented evidence of petitioner's academic performance including his low-normal IQ and his poor academic performance which led to his dropping out of high school.  (*See* RT 4641-99, 4733, 5496, 5891.)

The state supreme court could reasonably have found the state habeas proffer, declarations of family and friends and school and other public records, to add only minimally to the trial record.  For example, the habeas declaration of petitioner's mother, Dorothy Weaver, supports deprivation and abuse in her childhood and in petitioner's childhood.  (*See* SHCP Ex. 1. Therein Dorothy Weaver appears to substantiate her controlling, interfering and odd nature, her family mental health history, and events in petitioner's life, including health, academic, marriage and military that were already in the trial record.  *Id.*

Similarly, Patricia Weaver, petitioner's first wife, stated in her habeas declaration that she found petitioner to be caring and sensitive at times and an excellent father with a strong work ethic.  (*See* SHCP Ex. 2 at ¶¶ 24-26.)  Patricia Weaver also noted Dorothy Weaver's intrusive and domineering ways.  (Id.)  Petitioner's daughter, Tammi Weaver and his step-daughter Leslie Johansen, provided similar declarations in support of state habeas relief, although the latter noted some instances of possible abuse at the hands of petitioner's parents.  (*See* SHCP Ex.'s 3, 4.)

Likewise, habeas declarations provided by other family members and acquaintances could reasonably be seen as adding little to facts before the court at trial apart from isolated

1  instance of mental illness in the extended family.  (*See* SHCP Ex.'s 5-8.)  "[A] lawyer may make

2  reasonable decisions that render particular investigations unnecessary." *Frye v. Warden, San*

3  *Quentin State Prison*, No. 2:99-CV-0628 KJM CKD, 2015 WL 300755, at *18 (E.D. Cal. Jan.

4  22, 2015).

5          ii.      *Defense Lay Testimony - Mental Illness*

6          *Katie Smith*

7          Petitioner faults counsel for presenting allegedly uncorroborated and damaging testimony

8  that petitioner subjected his sister Katie to childhood physical and sexual abuse.  (Lod. Doc. No.

9  7 at 184-85; RT 4612-68, 5296-5315.)  This court previously observed the apparent failure of

10 counsel to factually substantiate Ms. Smith's declaration regarding petitioner's childhood

11 sexually sadistic behavior.  (*See* Doc. No. 162 at 116:2-5.)

12         However, the claims as briefed suggest the state supreme court could reasonably have

13 found that Ms. Smith's direct testimony did not require corroboration and that it was not

14 inconsistent with or damaging to his sanity phase defense of lifelong, progressively worsening

15 mental illness.  Mrs. Huffman's statement that there was no corroboration for Katie Smith's

16 testimony does not alone demonstrate the need for corroboration, or the absence of trial tactics

17 relating to presentation of this testimony.  (*See* SHCP Ex. 34 at ¶¶ 13-14.)

18         Based on the record, the state supreme court could reasonably have found Katie Smith's

19 direct testimony to support the sanity phase defense.  Her testimony supported abusive and

20 perverse family relationships and petitioner incipient mental health issues as a youth that

21 progressively got worse into adulthood.  (*See* RT 6612-84.)  Even the prosecution's expert

22 opined that petitioner grew up in a "pathological" family.  *Weaver*, 26 Cal.4th at 957-63.

23         Furthermore, Mrs. Huffman apparently confirmed a tactical underpinning for presenting

24 this testimony.  Mrs. Huffman, in her state habeas declaration, states her belief that Mr. Huffman

25 intended to show that "[petitioner] was a schizophrenic loner since childhood."  (*See* SHCP Ex.

26 34 at ¶ 14.)

27         Even if counsel were deficient as alleged, the state supreme court reasonably could have

28

found the alleged deficiencies to be harmless.   Petitioner points to his mother's habeas declaration which states that she was unaware of the abuse alleged by Katie Smith and that Ms. Smith later recanted these statements following a premonition of impending death.  (SHCP Ex. 1 at ¶ 81.)  Petitioner also points to the habeas declaration from Katie Smith husband which states that Ms. Smith never mentioned such abuse by petitioner.  *(See* SHCP Ex 7 at ¶ 4.)  However, the state supreme court might have accorded scant weight to these habeas declarations because the statements rely upon inference not clearly supported by admissible facts.  These statements could reasonably be seen as speculative.

### *Del Roy Barnett, Petitioner's Hometown Friend*

Petitioner faults counsel for failing to adequately interview and prepare petitioner's friend, Mr. Del Roy Barnett.  He claims Mr. Barnett "would have provided a wealth of information including information about petitioner's dysfunctional family dynamics, the changes and symptoms he observed in petitioner upon the latter's return from Vietnam, petitioner's abuse of amphetamines while long-haul truck driving to allow him to drive eighteen to twenty hours a day, and petitioner's virtues as a father."  (*See* Doc. No. 107 at 111:9-12; RT 3923, 4072-73.)

However, the trial record reflects that Mr. Barnett testified at trial about petitioner's "strange" family life prior to his Vietnam service (RT 5296-5310); how petitioner had changed upon his return from Vietnam; and petitioner's subsequent depression, difficulty holding a job, lack of self-control and substance abuse.  (*See* RT 5311-15.)

The state supreme court could reasonably have denied this subclaim by finding petitioner failed to demonstrate counsel acted deficiently.

Even if counsel was deficient as alleged, the state supreme court reasonably could have found no prejudice.  Mr. Barnett's statements regarding petitioner's overly protective, intrusive and odd mother, changes in petitioner upon his return from Vietnam, and petitioner being a good friend and father appear to be duplicative of noted evidence otherwise in the trial record.  The state supreme court could have ascribed little evidentiary value to such additional evidence.

///

*Cecil Sneed, Petitioner's Cellmate*

Petitioner faults counsel for failing to investigate and impeach Mr. Sneed, who testified that petitioner had asked him to testify that petitioner would stay awake at night in their jail cell talking to imaginary people (*see* RT 6526); and that petitioner threatened him should he testify otherwise. (*See* RT 6528-36.)

Petitioner asserts that Mr. Sneed could have been impeached by showing his felony Oklahoma felony conviction, his violation of probation, concessions received from the prosecution in exchange for his testimony (*see* Lod. Doc. No. 25*, In re Weaver*, Cal. Supreme Court, No. S115638, Ex. 14 at Bates No. 302, Criminal Court Records, *State of Oklahoma v. Sneed*, Case No. CRF-81-389); and his history of alcohol abuse and possible mental impairment as evidenced by Mr. Sneed's apparent inability to read or write. (*See* Doc. No. 107 at 111:20-26; Lod. Doc. No. 25*, In re Weaver*, Cal. Supreme Court, No. S115638, Ex. 15 at Bates No. 319, Criminal Court Records, *State of Oklahoma v. Sneed*, Case No. CRF-81-389.)

However, counsel could have found such investigation and impeachment to be unnecessary. Mr. Sneed admitted at trial that in exchange for his testimony, he would be released from jail and given a bus ticket. (RT 6531.) Mr. Sneed also appears to have impugned his own credibility. He admitted at trial that he told counsel he saw petitioner talking to himself late at night when everyone else was asleep, (*see* RT 6533), but then acknowledged that he was unaware of what petitioner did during the night. (*See* RT 6533, 6537-38.)

Counsel also could have taken note of the testimony of other inmates that was supportive of the insanity defense. Inmates Shannon and Flores each testified that petitioner paced and talked to himself in their jail cell late at night. (*See* RT 6573, 6580-83.) Inmate Hogan, who shared a cell with petitioner for one night approximately one year prior to his testimony, (*See* RT 5716-17), stated that petitioner talked to himself during the night. (*See* RT 5717-18.) Inmate Archuleta, who shared a cell with petitioner for a couple months in the fall of 1984 (*see* RT 5723), similarly testified that petitioner talked to himself. (*See* RT 5724-25.)

Even if counsel were deficient as alleged, the state supreme court reasonably could have

1   found the alleged deficiencies harmless on grounds there was no reasonable probability of a

2   different result had further impeachment been offered.  Inmate Sneed was impeached and his

3   credibility impugned to a significant degree on the trial record.  Other inmates gave testimony

4   favorable to petitioner.  The state supreme court could reasonably have ascribed little evidentiary

5   value to additional evidence impeaching inmate Sneed.

6           *iii.    Defense Expert Testimony - Mental Illness*

7           *Drs. Gardner, Owre, Tolchin, Chappel, Donaldson and Rose*

8       Petitioner complains that the initial six defense mental health experts, Drs. Gardner,

9   Owre, Tolchin, Chappel, Donaldson and Rose, who had examined petitioner in relation to other

10  criminal proceedings, harmed the defense by testifying that petitioner would be dangerous in the

11  future, (*see e.g.*, RT 4741, 4745, 4766-4896, 4943-77; 7031-32), and by failing to opine that

12  petitioner was insane at the time of the alleged offenses.  (*See Weaver*, 26 Cal.4th at 954; RT

13  4707-70 (Dr. Gardner); RT 4774-4822 (Dr. Owre); RT 4822-58 (Dr. Tolchin); RT 4858-4910

14  (Dr. Chappell); RT 4914-62 (Dr. Donaldson); RT 4963-79 (Dr. Rose).  He points out that in their

15  noted testimony two of these experts, Drs. Chappell and Donaldson, found petitioner sane at the

16  time he committed his crimes.  (*See* RT 4858-4962.)

17      Respondent suggests counsel may have acted tactically and in order to blunt the more

18  significant impact this aggravating evidence would have had if first presented by respondent.

19  (*See* RT 6613-30.)

20      The California Supreme Court rejected this subclaim on the merits, stating that:

21

22      The sanity phase was long and complicated. Evidence both for and against
        defendant was adduced. Respondent suggests many possible reasons why defense
23      counsel acted as she did. We need not resolve those issues, however, for it is
        sufficient for our purposes to conclude that defendant has not carried his burden
24      "to show that counsel's conduct falls outside the wide range of competent
        representation." (*People v. Ray*, *supra*, 13 Cal.4th at p. 349.) In none of the
25      identified instances of alleged ineffectiveness was counsel asked to state on the
        record the reasons for her actions. Moreover, none of the identified instances are
26      situations in which "there simply could be no satisfactory explanation" for
        counsel's actions or omissions. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1069.)

27

28

*Weaver*, 26 Cal.4th at 955.  Such a determination was not unreasonable on the facts of this case.  Furthermore, these experts had examined petitioner's mental state relating to other crimes committed before and after the capital murders.  The prosecution was presumptively aware of these experts and may well have called them had counsel not done so.

Counsel appears to have elicited some information favorable to the defense.  Counsel was able to challenge the harmful findings of Drs. Donaldson and Chappell, who evaluated petitioner shortly after the capital murders for sanity in relation to the Ventura County offenses discussed below.  Counsel elicited testimony suggesting petitioner was taking the antipsychotic Mellaril at the time of these evaluations (*see* Doc. No. 149, Ex. B at ¶¶ 2-11; id., Ex. C at ¶¶ 2-11;  SHCP Ex's 60, 61; RT 4868-69), and that this medication could have masked petitioner's mental illness or defect.  (*See e.g.*, RT 4868-70, 6630.)  Such testimony could have explained statements from Dr. Tolchin, that petitioner's passive aggressive personality and sadomasochism were in remission as a result of treatment (*see* RT 4832), without detracting from the overall insanity defense of a progressively worsening underlying mental illness.

Petitioner also complains these experts were not adequately prepared with updated mental health information available from petitioner's defense team and that this prevented more favorable testimony.  (*See* SHCP Ex.'s 37, 105 at 3; RT 5232-42; 5241-67, 5409, 6749, 6754, 6710.)  This court previously noted counsel's apparent failure to provide defense experts Drs. Gardner, Owre, and Tolchin, with petitioner's updated medical information, and counsel's apparent failure to prepare Ventura sanity examiners, Drs. Chappell and Donaldson, and Humboldt parole assessment examiner, Dr. Sanders.  (Doc. No. 162 at 111:6-22.)

Petitioner correctly notes that counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health.  *See Caro v. Woodford*, 280 F.3d 1254, 1254 (9th Cir. 2002).  However, the defense team experts, Drs. Lundgren, Deitiker and Shonkwiler, presented their individual assessments of petitioner's mental state at the times of the crimes based on tests they conducted.  Dr. Shonkwiler found petitioner to be insane at the time of the crimes.  Counsel might reasonably have found additional

review of defense team assessments by the non-defense team experts to be unnecessary and harmful should adverse opinion be elicited.  Especially so, in that the non-defense team experts examined petitioner in relating to other criminal proceedings, and given possible juror tedium from duplicative expert testimony.  (*See e.g.*, SHCP Ex. 18.)

The state supreme court also could reasonably have found such pre-testimony preparation unnecessary to support the progressing schizophrenia that was the linchpin of the sanity phase defense.   Petitioner has not shown on the facts of this case that testimony of future dangerousness or even periods of seemingly sane conduct was inconsistent with the sanity phase defense.

Petitioner complains counsel was ineffective by failing to seek a second competency determination when defense expert Dr. Owre testified at petitioner's capital trial that petitioner appeared schizophrenic and seemed to be hallucinating.  Dr. Owre, who examined petitioner for parole suitability in 1977 and found no schizophrenia at that time, based his subsequent testimony in petitioner's instant proceeding solely upon observations in the court.  The trial court found mere in court observation insufficient as a basis for diagnosis.

The state supreme court was not unreasonable in according deference to the trial court in this regard.  *Weaver*, 26 Cal.4th at 953-54.  Counsel could reasonably have determined any request for competency stay would have been overruled, especially as petitioner had been evaluated and found competent at the time of his arraignment.  Additionally, Dr. Owre cited to no change in circumstances or new evidence, casting serious doubt on the need for a second competency finding.  *See Id.* at 954.

*Drs.  Lundgren, Deitiker and Shonkwiler*

Petitioner complains that these experts, who along with psychological assistants Mary Cholet and Will Powers comprised the defense mental health team, provided equivocal and sometimes damaging testimony.

Psychologists Drs. Lundgren and Deitiker, and defense psychological assistants, non-expert team members Ms. Cholet and Mr. Powers, each independently evaluated petitioner.  (*See*

42

*e.g.,* RT 5256-57, 5331-33, 6414-15.)

Dr. Kathe Lundgren, a clinical psychologist, examined petitioner and concluded he suffered from chronic undifferentiated schizophrenia with a sociopathic, antisocial personality, but declined to express an opinion whether petitioner was insane at the time of the crimes. *See Weaver*, 26 Cal.4th at 941; RT 5326-62.

Dr. K. Edward Dietiker, a psychologist, examined petitioner and concluded he suffered from paranoid schizophrenia and that in some situations had difficulty behaving in conformity with the law. *See Id.*; RT 5254-95. Dr. Dietiker also declined to express an opinion whether petitioner was insane at the time of the crimes. *Id.*

Dr. Jack Shonkwiler, a psychiatrist, examined petitioner, interviewed petitioner's mother and sister, viewed the VESI videotapes and reviewed the work of the other defense mental health team members. (*See* RT 5021-27, 5062, 5331.) He rendered his opinion that petitioner suffered from schizophrenia and PTSD, essentially had no control of his sexually sadistic and aggressive behavior, was essentially unable to comport himself within legal requirements and was insane at the time of the crimes. *See Weaver*, 26 Cal.4th at 938-41; RT 5192-93. Dr. Shonkwiler also noted amphetamine use as a contributing factor. (RT 5192.)

The state supreme court rejected this subclaim on the merits, finding counsel could have been motivated by trial tactics regarding these witnesses. *See Weaver*, 26 Cal.4th at 955. That court was not unreasonable in doing so. Their noted testimony provided the noted significant support for the sanity phase defense of progressing schizophrenia and PTSD aggravated by amphetamine use.

Petitioner also faults counsel for calling Dr. Shonkwiler, claiming his credibility was compromised by a prior felony conviction (*see* RT 5001-02), as the prosecution noted in closing argument. (*See* RT 6733-34.) However, the trial court issued a limiting instruction regarding the prior conviction. (*See* RT 4999-5000.) The state supreme court could reasonably have concluded that given the trial court's instruction limiting impeachment by the prior convictions and consequent license impairment, counsel did not act unreasonably in calling Dr. Shonkwiler.

1  Especially so, as Dr. Shonkwiler's opinion that petitioner was insane at the time of the capital

2  crimes was very important to the sanity phase defense.   The state supreme court was not

3  unreasonable in concluding that petitioner did not carry his burden "to show that counsel's

4  conduct falls outside the wide range of competent representation."  *Weaver*, 26 Cal.4th at 955.

5  *No Prejudice From Defense Expert Testimony*

6  Petitioner has not demonstrated prejudice in relation to the testimony of these his defense

7  experts.  The defense presented nine experts and one psychological assistant.[4]  For the reasons

8  stated, the testimony of the defense experts could be seen to support the insanity defense.

9  Petitioner's state habeas proffer does not suggest a reasonable probability of a more

10  favorable result.   Petitioner complains that "[a] competent psychiatric evaluation includes a

11  mental status examination, a structured psychiatric diagnostic interview; a screening test for

12  possible neurological impairments, if indicated; an open-ended interview designed to elicit a

13  medical and psychiatric history as well as any evidence of malingering; and must be based on

14  comprehensive historical documentation." (*See* Doc. No. 107 at 115:8-12.)  However, the noted

15  expert testimony suggests petitioner was evaluated by the defense experts in essentially that

16  manner.

17  Minimal weight could be given to the opinions of defense habeas experts, Drs. Watson

18  and Foster.  Dr. Watson detected a strong possibility of anxiety disorder such as PTSD, but

19  offered no opinion on petitioner's sanity at the time of the crimes.  (*See* Lod. Doc. No. 7 at 282-

20  85; SHCP Ex. 36 at 15-16).  He noted apparent learning, attention, and memory deficits, but did

21  not opine expressly as to origin, or how these deficits might have related to petitioner's legal

22  sanity at the time he committed his capital crimes.  (*See* Lod. Doc. No. 7 at 282, 284.)  Dr.

23  Watson apparently did not review all of the information that was available to the trial experts.

24  (*See* SHCP, Ex. 36 at ¶ 9, Appx. A.)

25  Dr. Foster opined that petitioner was legally insane at the time of the crimes.  (*See* SHCP,

26  Ex. 37 at 14-15.)  However, the state supreme court could reasonably have noted that he relied

27

28  [4] Ms. Mary Cholet, defense team psychological assistant, declined to testify for the defense; she was called by the prosecution.  *See post*.

44

upon basically the same mental health factors and problems that were considered and opined upon by the trial experts.  (*See e.g.,* SHCP Ex. 37 at 8-15; RT 4718-20, 4740, 4765, 4789, 4884, 4931, 5059, 5148, 5313, 5791, 5795, 5820.)  As was the case with Dr. Watson, it also appears that Dr. Foster did not have the benefit of all the family history information reviewed by the trial defense experts.  (*See* SHCP Ex. 37, Appx. A.)

Furthermore, it appears that symptoms of organic brain damage noted by Dr. Foster, (*see* Lod. Doc. No. 7 at 269-70, 274), were investigated by Dr. Cholet 15 years earlier and determined not to be supported.  (*See* SHCP Ex. 37 at 12, 14; RT 6414, 6419-21.)  Petitioner's other habeas expert, Dr. Watson, noted that an April 1991 MRI of petitioner's brain was "essentially normal." (SHCP Ex. 36 at 7.)

Petitioner's statement to Dr. Foster suggesting that, during incarceration prior to trial, he may have been medicated with large doses of the antipsychotic Mellaril, could reasonably be discounted.  The trial record suggests instead that only small doses of Mellaril were administered early in petitioner's incarceration.  (*See* SHCP Ex. 36 at 6; SHCP Ex. 37 at 12-13; SHCP Ex. 60; Lod. Doc. No. 7 at 268-69, 271-72; RT 4868-69, 5051, 5055, 5059, 5070, 5077, 5099, 5102, 5109, 5519, 5529, 5533, 5538, 5791, 5799, 5800, 5807-10.)  That record also suggests uncertainty whether the drug was given for treatment of psychosis, or for some other reason. (*See* Id.)  For example, there was testimony at trial that jail staff might have prescribed Mellaril as a tranquilizer.  (*See* RT 6373.)

As noted, the possibility that schizophrenia could be masked by Mellaril, a consideration urged by petitioner on habeas review, was discussed by the trial experts(*see* RT 4868-69, 4887-88, 5070, 5958, 6373), reasonably providing a basis to discount the negative (for schizophrenia) diagnoses of those experts who examined petitioner at times he may have been taking Mellaril.

Petitioner's complaint that counsel elicited evidence of his future dangerousness from defense experts, (*see e.g.,* RT 4741, 4745, 4766-67, 4770, 4789, 4849, 4976-77, 5806-07, 6402-03, 6460-61) need not suggest prejudice.  Such evidence was not necessarily inconsistent with the sanity phase theory of progressively worsening mental illness whose symptomology included

attenuating self-control implying increased dangerousness.

Petitioner's complaint that Dr. Shonkwiler's impaired license lessened the force of his favorable testimony could reasonably suggest only harmless error. The trial court delivered the noted limiting instruction. Petitioner's further complains that the impairment tainted the opinions of Drs. Wilson and Kormos who, like Dr. Shonkwiler, found petitioner insane at the time of the offenses, (*see* Doc. No. 107 at 127:5-8), appears merely speculative. Petitioner seems not to make a factual proffer that the testimony of Drs. Wilson and Kormos was discounted for this reason.

The 2011 declarations of Drs. Donaldson and Chappell, added to the record pursuant to the court's March 24, 2014 order, appear merely to reference noted evidence that was in the trial record and considered by other defense experts. (See Doc. No. 149, Ex.'s B.) Petitioner does not demonstrate that if further prepared at trial, these experts could have provided material evidence suggesting a reasonable probability of a difference outcome. Instead it appears likely the suggested additional evidence would have been cumulative.

Similarly, the 2011 declaration of Dr. Sanders, also added to the record pursuant to the court's March 24, 2014 order, does not suggest a reasonable probability of a difference outcome. (See Doc. No. 149, Ex. C.) Dr. Sanders suggests that trial counsel should have subpoenaed a fellow member of the CDC psychiatric council more knowledge about petitioner. But Dr. Sanders gives rise only to speculation as to what, if any helpful testimony might have resulted had trial council done so. Especially so given that Dr. Sanders read the council's conclusions regarding petitioner into the trial record.

Petitioner also claims "[c]ounsel's failure to understand and explain the synergistic effects of [his] PTSD, psychotic symptoms, substance abuse, and neuropsychological deficits on his behavior at the time of the crime and relate it to [his] criminal conduct . . . was prejudicial in that it is reasonably probable the jury would not have returned a verdict that he was sane." (*See* Doc. No. 107 at 119:8-12.) However, as discussed above, counsel called nine experts and elicited testimony as to these factors. The same kind of evidence relied upon by petitioner's own

1    habeas experts.  Petitioner has not demonstrated prejudice in these regards.

2           iv.      *Prosecution Expert Testimony – Mental Illness*

3           *Drs. Cutting, Criswell, Burdick and Matychowiak; Psychological Assistant Ms. Cholet*

4           *Dual Appointment of Drs. Cutting and Criswell*

5           Petitioner complains that counsel was ineffective by failing to object, at his 1982

6    arraignment, to the appointment of Drs. Cutting and Criswell to examine him both for

7    competency (pursuant to Cal. Pen. Code § 1367) and for sanity (pursuant to Cal. Pen. Code §

8    1026).  Dr. Criswell and Dr. Cutting each concluded that petitioner was competent, did not suffer

9    from a mental disease or defect or PTSD and was not insane.  *See Weaver*, 26 Cal.4th at 945; RT

10   6040-88, 6344-6403.   However, each found petitioner suffered from personality disorder(s).

11   (*Id*.)

12          Petitioner claims the trial court lacked jurisdiction to make such a dual purpose

13   appointment.  He points out that a "not guilty by reason of insanity" plea had not been entered at

14   that time.  He claims the dual appointment of these experts denied him a fair trial, freedom from

15   compelled self-incrimination, and to a reliable penalty verdict.

16          The California Supreme Court rejected this subclaim on the merits.  That court agreed

17   with petitioner that the dual purpose appointments were in error, *Weaver*, 26 Cal.4th at 957, and

18   that statements by an accused at a custodial mental competency examination could not be

19   introduced at the sanity phase or penalty phase of a capital case unless the accused has been

20   informed of, and has waived his *Miranda* rights.  *Weaver*, 26 Cal.4th at 960, *citing Estelle v.*

21   *Smith*, 451 U.S. 454, 466-69 (1981).

22          Nonetheless, the state supreme court went on to reject the subclaim, finding the error was

23   waived on appeal and in any event was harmless, as follows:

24
25          Numerous expert witnesses testified at the sanity phase of trial and several of
             them (other than Dr. Cutting and Dr. Criswell) expressed the opinion that
             defendant was not insane or did not suffer from a mental disease or defect.
26          Neither Dr. Cutting nor Dr. Criswell learned information from defendant during
             their competency examinations that was not available to the other expert
27          witnesses in their respective examinations of defendant. Although defendant
             argues "it is easy to see how [the] corroborating testimony [of Drs. Cutting and
28

                                                       47

Criswell] tipped the scales and hurt [defendant] irreparably" at the sanity phase, the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes. The further revelation from Dr. Criswell that defendant posed a danger in the future was no doubt unsurprising to the jury given the facts of the case and was not the "highly inflammatory" information defendant claims it to be.

Moreover, the testimony of Drs. Cutting and Criswell was not uniformly negative. Although Dr. Cutting concluded defendant was not insane, he testified defendant suffered from a schizoid personality disorder and that defendant probably did experience hearing voices in his head. Dr. Criswell testified defendant endured an "extremely pathological family," which could have formed the basis of his developing a mental condition as an adult.

We thus conclude that while permitting Dr. Cutting and Dr. Criswell to testify at the sanity phase was error, the error was not preserved for appeal, nor was counsel constitutionally ineffective for failing to object. (See *People v. Williams*, *supra*, 44 Cal. 3d at p. 934 [finding the same error harmless]; *Williams v. Vasquez* (E.D. Cal. 1993) 817 F. Supp. 1443, 1466 [same].)

*Weaver*, 26 Cal.4th at 957-63.

That court also noted:

[T]o the extent defendant contends the erroneous dual appointment and testimony of Drs. Cutting and Criswell deprived him of a fair and reliable penalty phase verdict, we reject that claim as well because it is not reasonably possible that, in the absence of the jury's consideration of their testimony at the penalty phase, the jury would have reached a different verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

*Id. at* 962-63.

The state supreme court was not unreasonable in these regards given the record and for the reasons noted by that court. The trial experts who found petitioner sane relied upon essentially the same three primary factors considered by Drs. Cutting and Criswell, i.e., childhood trauma, Vietnam experience, and substance abuse. (*See e.g.,* Lod. Doc. No. 7 at 268-69, 271-72; RT 4718-20, 4740, 4765, 4789, 4884, 4931, 5059, 5148, 5313, 5791, 5795, 5800-20.) These same three factors also were considered by petitioner's habeas expert, Dr. Foster, to support his conclusion petitioner suffered from psychosis. (*See* Lod. Doc. No. 7 at 266; SHCP

Ex. 37 at 8-15.)   He has not shown the errant dual appointment allowed Drs. Cutting and Criswell to provide sanity phase testimony based on evidence not generally in the trial record, or that it was otherwise more than harmless.

Petitioner also complains that counsel elicited damaging testimony from Dr. Criswell that petitioner would remain "a dangerous individual and a menace to society for many years." (*See* RT 6402-03.)   However, for the same reasons discussed above, these extreme statements could reasonably suggest mental illness and thereby support the sanity phase theory.   Moreover, Ms. Cholet, a member of the defense team, gave similar testimony, discussed below.

*Validity of Insanity Plea*

Petitioner complains that appointment of prosecution experts Drs. Cutting, Criswell, Burdick and Matychowiak to examine him for sanity (pursuant to Cal. Pen. Code § 1026) was improper because he never personally plead guilty by reason of insanity and he was never advised of the rights he was waiving by entering that plea.

The state supreme court found that petitioner did personally enter a valid plea of not guilty by reason of insanity.   That court pointed out that on April 13, 1984, counsel advised the trial court that petitioner wished to enter the additional plea, initiating the following colloquy:

> "By the Court: Q Mr. Weaver, the second count of Information No. 24387 charges you with the crime of a violation of Section 187 of the Penal Code which is murder. How do you plead to that charge?
> "The Court: Do you want to add an additional plea?
> "Mr. Huffman: Add an additional plea of not guilty and not guilty by reason of insanity.
> "By the Court: Q *Is that correct, Mr. Weaver*?
> "A *Yes*." (Italics added.)

*Weaver*, 26 Cal.4th at 963-64.   That court also rejected petitioner's contention that he was deprived of *Boykin-Tahl* rights when he entered his plea of not guilty by reason of insanity.   That court determined petitioner had concurrently plead not guilty to the murders, such that he had not admitted the charges and was not entitled to the *Boykin-Tahl* advisements.   *See Id.* at 964. Petitioner has not demonstrated that the state supreme court ruling in these regards was

1   unreasonable.  The trial record reasonably reflects petitioner's knowing and intentional entry of

2   the additional plea of not guilty by reason of insanity.  (*See* April 13, 1984 RT 4-6.)

3       Moreover, the testimony of these experts was somewhat helpful to the defense.  All four

4   of these prosecution experts agreed that petitioner suffered an abusive childhood based on the

5   information before them.  (*See* RT 6040-6174; 6233-6343; 6344-6405; 6179-6232.)

6       The California Supreme Court also noted that Dr. Criswell provided evidence,

7   petitioner's statements to him, corroborating the sanity phase theory that petitioner's progressing

8   mental illness impacted his ability to hold a job.  (*See* SHCP Ex. 113.)  Dr. Matychowiak

9   concluded petitioner suffered from a "personality disorder, showing a mixture of paranoid and

10  antisocial traits", *Weaver*, 26 Cal.4th at 944; RT 6183.  Dr. Burdick concluded petitioner

11  demonstrated an "antisocial personality disorder." *Id.* at 945; RT 6244.

12      Petitioner complains that absent the testimony of Drs. Criswell and Cutting, who received

13  improper dual appointments, and absent the testimony of Dr. Richard Burdick who relied in part

14  for his diagnosis upon the report prepared by Dr. Criswell, there is a reasonable probability of a

15  more favorable result.  However, these experts relied upon essentially the same evidence and

16  considered essentially the same factors as the other prosecution and defense experts, some of

17  whom reached conclusions similar to Drs. Criswell and Cutting.  Also, Dr. Criswell found

18  petitioner suffered from a personality disorder, a finding that supports the sanity phase defense.

19  *See Weaver*, 26 Cal.4th at 945.  Even Dr. Criswell's finding of future dangerousness could be

20  seen as supporting the defense for the reasons stated, *ante*.

21      *Psychological Assistant Ms. Mary Cholet*

22      Petitioner faults counsel for failing to object to testimony of Ms. Cholet, a defense

23  psychological assistant who declined to testify for the defense, but was called by the prosecution.

24  (*See* RT 6413-76, 5026, 5149-50, 5256-67, 5326, 5330-33.)  Petitioner claims Ms. Cholet's

25  testimony was damaging.  He claims that she was not qualified as an expert.  He claims her

26  testimony was inadmissible attorney-client and work product information.

27      The California Supreme Court rejected this subclaim on direct appeal, finding that

28

50

1  counsel's failure to object could have been tactically motivated given that the trial court had

2  considered whether Ms. Cholet's testimony was admissible and determined that;

> [The] psychotherapist-patient privilege did not apply to her because she was
> neither a psychiatrist nor a licensed psychologist. In addition, the trial court ruled
> that because [Ms.] Cholet was part of a team with Drs. Lundgren and Dietiker,
> and defendant waived the privilege by having those doctors testify, any privilege
> over information held by Dr. Cholet was also waived.

7  *Weaver*, 26 Cal.4th at 956-57; *see also* RT 6024-37.   Based thereon the state supreme court

8  reasonably could have determined that any objection would have been futile and the failure to

9  object thus not deficient.  *See Weaver*, 26 Cal.4th at 957; *Rupe v. Wood*, 93 F.3d at 1445 ("[T]he

10  failure to take a futile action can never be deficient performance").   Additionally, Ms. Cholet

11  worked under the licensed members of the defense mental health team and her work was

12  reviewed by defense psychiatrist, Dr. Shonkwiler.

13      Petitioner complains that Ms. Cholet did not find organic brain damage.  He makes much

14  of Ms. Cholet alleged lacked the experience and qualifications to test petitioner for organic brain

15  damage, arguing her results included errors and speculation.  (*See e.g.*, RT 6460-85.)  He claims

16  his habeas expert, Dr. Foster, found symptoms of organic brain damage based solely on

17  neuropsychological screening.  (*See* SHCP Ex. 37 at ¶ 36.)

18      The record reflects that Ms. Cholet performed a neuropsychological evaluation of

19  petitioner and concluded he had no organic brain damage.  (*See* RT 6421, 6430.)  This even

20  though defense psychological assistant, Will Powers, had suggested further testing for organicity

21  after seeing indications that petitioner might suffer from organic brain damage.  (*See* Doc. No.

22  107 at 113:6-9.)  But the state supreme court could have taken note that defense experts Drs.

23  Shonkwiler and Donaldson did not find organic brain damage.  *See Weaver*, 26 Cal.4th at 940;

24  RT 4914-63, 5021-81.)   Defense expert, Dr. Rose, also found petitioner not to exhibit any

25  evidence of organic brain damage.  (*See* RT 4963-79.)

26      Such a finding that petitioner did not suffer organic brain damage also could have

27  obviated petitioner claim that trial counsel was deficient by not presenting further details of

28

petitioner's alleged severe head injury and skull fracture from his noted 1975 trucking accident, as well as anecdotal information about his numerous car accidents and events of blacking-out.

Petitioner also complains that Ms. Cholet gave damaging testimony of his statements that he had committed more than the two capitals murders; that he did not suffer from PTSD; and that he was sexually attracted to Dr. Cholet and suggested she might be one of his victims if he were not in prison.   However, the state supreme court reasonably could have found counsel not ineffective to the extent Ms. Cholet's cross-examination called into question her  qualifications and conclusions, and to the extent the statements she elicited were so extreme as to support the sanity defense theory (*see* RT 6432-61) and Dr. Shonkwiler's opinion that petitioner was insane at the time of the crimes.

v.       *Amphetamine Abuse – Mental Illness*

Petitioner claims counsel was ineffective by failing to develop and present available evidence that amphetamine abuse contributed significantly to his mental illness.

However, it appears that counsel did elicit testimony from both defense and prosecution experts supportive of the defense theory that amphetamine use may have diminished petitioner's ability to control his behavior, (*see e.g., RT* 4884, 5059, 5770, 5964, 6257, 6356, 6400), and compounded the effects of alleged schizophrenia, PTSD and sleep deprivation.   (*See e.g.*, RT 5059, 5964.)   Notably Dr. Shonkwiler, who concluded petitioner was insane at the time of the capital crimes, found that amphetamine abuse was factor in those crimes.   (Id., *see also Weaver*, 26 Cal.4th at 940.)   Such testimony could reasonably be seen as consistent with, corroborative of, and contributing to the sanity defense.

Petitioner argues that counsel erred by not investigating and presenting a defense that amphetamine abuse led to a psychosis, a "speed psychosis" theory.   Petitioner's habeas expert, Dr. Foster, noted "ongoing psychotic symptoms" when he examined petitioner in 1998, (SHCP Ex. 37 at ¶18), exacerbated by the ingestion of amphetamine and alcohol before the capital crimes.   (Id. at ¶ 37.)   But neither of petitioner's habeas experts appear to reference "speed psychosis" or that amphetamine ingestion did anything more than exacerbate petitioner's already

extant mental illness.  (*See* SHCP Ex.'s 36, 37.)   As noted *ante*, trial and habeas experts apparently considered the same essential mental and emotional factors relating to petitioner's schizophrenic and/or psychotic symptoms and PTSD and amphetamine abuse.  (*See* Id.)

It would not have been unreasonable for the state supreme court to conclude that counsel made a tactical decision to argue amphetamine use as exacerbating petitioner's alleged schizophrenia and PTSD, rather than arguing amphetamine use alone caused a psychosis, as petitioner now contends.  Clearly, evidence was presented at trial of petitioner's history of using amphetamines to stay awake during his work as a long haul trucker, up to and including two days prior to the capital murders.  *Weaver*, 26 Cal.4th at 937-38; RT 5059, 5961-65, 6256-59, 6356, 6400.

Petitioner's habeas expert, Dr. Foster, identified amphetamine use as a subset of his psychosis diagnosis.  (*See* SHCP 37 at ¶ 26, 37.)   Similarly, the trial experts factored amphetamine use into their conclusions.  (*See e.g.,* RT 4884, 5059, 5770, 5964, 6257, 6356, 6400)  For example, Dr. Shonkwiler testified that drug abuse by a schizophrenic individual could result in paranoid, delusional, hallucinatory or other disorganized behavior.  (*See* RT 5058-59.) Dr. Shonkwiler also stated that abuse of amphetamines could have resulted in a psychotic reaction.  (*See* RT 5064-65.)  This information was before the jury.

Even if counsel was deficient relating to the effect of amphetamine ingestion, petitioner seems not to demonstrate more than harmless error, for the reasons stated.   He does not factually support an amphetamine induced psychosis at the time of the capital crimes.  Even if he had, the state supreme court could reasonably have rejected the argument that petitioner was psychotic during the capital crimes, which occurred over a period of days and during which petitioner seemed to be oriented and interacted purposefully and normally with others.

### vi.     PTSD – Service in Vietnam

### Combat Experience

Petitioner faults counsel for failing to investigate and corroborate combat related Post Traumatic Stress Disorder ("PTSD") from his service in Vietnam.

The state supreme court reviewed this subclaim on direct appeal and found that ample evidence of petitioner's PTSD was presented to the jury at the sanity phase.  *See Weaver*, 26 Cal.4th at 969.  Petitioner's own statements to experts suggest that he served in combat areas and that he was traumatized by combat.  (*See e.g.,* RT 4944, 5152, 5707, 5854, 6045, 6742, 6750. 6778.)  As respondent notes, counsel contacted the U.S. Army in an attempt to locate veterans familiar with and who could corroborate petitioner's service in Vietnam.  But the Army refused to provide any information, citing privacy grounds.  (*See e.g.,* RT 5850.)  Mrs. Huffman's statement in her habeas declaration suggests counsel missed someone, that "there was a veteran living in Sacramento who entered and left the service with [petitioner] and was available to testify to [petitioner's] experiences in Vietnam." (*See* SHCP Ex. 34 at ¶ 24.)  But Mrs. Huffman does not demonstrate this was information available to counsel and how counsel should have been reasonably aware of it.

Petitioner told defense PTSD expert, Dr. Wilson, that he "stood perimeter guard duty and encountered incoming mortar and 'sapper' fire, participated in unit patrols that 'encountered anti-personnel weapons,' engaged the enemy in a fire fight, was a tunnel rat (i.e., he entered underground tunnels constructed by the Viet Cong) and checked enemy base camps, and was a demolitions expert." *Weaver*, 26 Cal.4th at 942; RT 5783, 5812-17, 5848-54.  Dr. Wilson noted a letter from the United States Army to counsel to the effect that petitioner's unit was, in fact, involved in combat and with enemy activity.  (*See* RT 5849-50.)  Petitioner concedes that Dr. Wilson's testimony included "independent factual evidence before the jury regarding [his] service in Vietnam."  (*See* Doc. No. 204 at 84:21-22.)

Five experts in Vietnam era PTSD testified at trial and referenced petitioner's military records in opining that he did suffer PTSD.  (*See* RT 5073-85, 5102, 5126, 5135-39, 5150, 5302-03, 5312-13, 5373, 5494, 5534, 5603, 5606-07, 5610, 5638, 5677, 5679. 5683, 5685, 5700-01, 5754, 5772, 5774, 5778-79, 5780, 5809-17, 5920-47.)  This was consistent with the noted lay testimony relating to personality changes upon his return from service.  (*See e.g*., RT 5315.)  A reasonable attorney could have felt the trial evidence relating to combat history was sufficient to

support the defense theory of PTSD and related mental defenses.

Moreover, petitioner's habeas proffer of declarations from Vietnam veterans, (*see* SHCP Ex.'s 12-15), does not appear to include evidence of observation of petitioner serving in combat. (*See* SHCP Ex.'s 12-15.)   Only one of these veterans, Denotaine Sanchez, knew and was stationed with petitioner. (*See* SHCP Ex. 12.)   Yet even Mr. Sanchez did not see petitioner perform in combat, though he stated the army company they were assigned to saw combat and took incoming missile fire. (Id. at 4-5.)   The others veterans appear only to attest to their own combat experiences in Vietnam, not petitioner's experiences.  (*See* SHCP Ex. 13-15.)

Petitioner's habeas proffer includes a declaration from one of his jurors suggesting deliberations might have been affected "if evidence had been introduced proving that [petitioner] had been in combat in Vietnam." (SHCP Ex. 16.)   But even if this juror declaration could be admissible evidence, the state supreme court could discount it given the evidence that was presented at trial of petitioner's exposure to combat.

*PTSD*

Counsel had petitioner evaluated for PTSD and psycho-physiological implications by Veterans Administration (VA) experts. VA psychiatrist Dr. Byron Wittlin, whose practice included PTSD patients and Vietnam veterans, examined petitioner and concluded he suffered from schizophrenia, paranoid type, as well as PTSD, but he could not determine whether petitioner was legally insane.  *See Weaver*, 26 Cal.4th at 941.   VA psychologist, Dr. Clyde Donahoe, who also treated PTSD patients, examined petitioner and concluded that he suffered from delayed PTSD, but was unsure whether PTSD was present at the times of the capital crimes.  (*See* RT 5672-73, 5677, 5753-54, 5772-74.)   Dr. Donahoe also testified at trial that petitioner's military records reflected combat service in Vietnam.  (*See* RT 5683.)

Defense clinical psychologist and Vietnam PTSD expert Dr. John Wilson, who developed the VESI, reviewed petitioner's records and the VESI videotapes and administered PTSD testing.   Regarding combat exposure, Dr. Wilson, in his trial testimony, referenced petitioner's Vietnam military records and service as a "combat engineer" responsible for "route

1  reconnaissance, mine sweeps, land clearing operations, and sitting as an infantry man as

2  required." *Weaver*, 26 Cal.4th at 942; *see also* RT 5849.

3       Dr. Wilson concluded that petitioner suffered from paranoid schizophrenia, which started

4  to develop early in childhood, in addition to posttraumatic stress disorder and a mixed

5  personality disorder.  Dr. Wilson found petitioner legally insane because he felt petitioner could

6  not conform his conduct to legal requirements.  *See Weaver*, 26 Cal.4th at 943-44.  Significantly,

7  Dr. Wilson read the reports of the four experts later called by the prosecution, Drs. Cutting,

8  Criswell, Burdick and Matychowiak, and concluded they were incorrect in finding petitioner

9  sane.  He believed that each had overlooked petitioner's PTSD.  (RT 5782-5821.)

10       Petitioner nonetheless complains that counsel elicited from Dr. Wilson damaging

11  statements of future dangerousness.  Statements that if petitioner was ever released, he would kill

12  the people responsible for his incarceration.  (*See e.g.,* 22 RT 5806-07.)  However, the state

13  supreme court reasonably may have viewed these statements as so bizarre that counsel intended

14  them to support petitioner's claimed mental illness.  Furthermore, these statements were admitted

15  solely as to the basis for Dr. Wilson's opinion, not for their truth.  (CT 1591; *See e.g.,* Doc. No.

16  204 at 131.)  These statements then could reasonably be harmless.

17       Petitioner complains counsel erred by calling the final defense expert, Navy psychiatrist

18  Dr. Kormos, during petitioner's sanity phase case-in-chief, rather than as a rebuttal witness.  Dr.

19  Kormos provided testimony discounting the reports prepared by prosecution experts.  According

20  to petitioner, calling Dr. Kormos before the prosecution had presented its case served to lessen

21  the persuasive effect of Dr. Kormos's otherwise compelling testimony.

22       It appears that Dr. Kormos's testimony strongly supported the insanity defense.  Dr.

23  Kormos evaluated petitioner based upon material supplied by counsel, including the VESI

24  interview (*see* RT 5914, 5920-29, 5924-25), and statements that petitioner went to Vietnam to be

25  killed.  (*See* RT 5930, 5939.)  Dr. Kormos opined that petitioner lacked impulse control (*see* RT

26  5926-27, 5931, 5957), and that he was a paranoid schizophrenic with PTSD, *see Weaver*, 26

27  Cal.4th at 943; RT 5947, 6002, exacerbated by amphetamine use and lack of sleep (*see* RT

28

5964).  Dr. Kormos felt petitioner was aware of right and wrong at the time of the crimes, but lacked the ability to conform his conduct to the law.  (*See* RT 5959.)  Dr. Kormos opined that petitioner was legally insane at the time of the crimes.  *See Weaver*, 26 Cal.4th at 943-44; RT 5993-6003.

As to his critique of the prosecution experts, Dr. Kormos testified that their findings, though superficial, were not necessarily inconsistent with his diagnosis.  (*See* RT 5947-57.)  Dr. Kormos also supported the insanity defense by testifying that a person with schizophrenia and PTSD could maintain relatively stable employment, (RT 5975-76), arguably like petitioner.

The state supreme court could reasonably have determined that additional evidence in these regards would have offered little if any support for the sanity defense.  Petitioner has not demonstrated that counsel's decision to use Dr. Kormos in the case in chief was unreasonable or prejudicial.

*VESI Videotapes*

Petitioner claims counsel was ineffective by showing the jury two improperly administered and unredacted (for damaging and incriminating responses by petitioner) Vietnam Era Stress Inventory ("VESI") videotapes created by counsel.  (CT 1559; *see also* SHCP Ex. 34 ¶ 16; RT 5753-72, 5772-74.)  As noted, VESI is a diagnostic tool which can assist in determining if a person suffers from PTSD as a result of service in the Vietnam War.

Petitioner also claims he had to leave the courtroom after becoming distraught during playing of the first VESI videotape, violating his right to due process, confrontation, an impartial jury, and a reliable determination of his guilt and penalty.  (*See* CT 1559; RT 5821-26.)

The California Supreme Court rejected petitioner's VESI subclaims on direct appeal (*see Weaver*, 26 Cal.4th at 956) and on state habeas review (*see* Lod. Doc. No. 8).

Petitioner claims the VESI interview should have been administered by Dr. Wilson or some other professional, (*see* Doc. No. 204 at 150:1-24) and that administration by Mr. Huffman gave the appearance of "evidence staged by an advocate."  (*See* Id. at 151:3-4.)  But apart from Mr. Huffman eliciting the noted unredacted information, petitioner supports this contention only

57

1   with surmise.

2        The record noted, *ante*, reflects that significant evidence was presented at trial relating to

3   the nature and extent of petitioner's Vietnam service and its effect upon him.  This included

4   petitioner's descriptions of his Vietnam experiences in the VESI tapes; expert discussion of

5   petitioner's military records while testifying to petitioner's PTSD; and similar testimony by

6   petitioner's friends following his return from Vietnam.  (*See e.g.*, RT 5051, 5068, 5076, 5102,

7   5126, 5135-39, 5150, 5302-03, 5312-15, 5373, 5494, 5534, 5603, 5606-07, 5610, 5638, 5677,

8   5679, 5683, 5685, 5700, 5754, 5772, 5774, 5778-79, 5780, 5809-17, 5920, 5924-25, 5929, 5936-

9   37, 5945, 5947.)

10        Counsel might reasonably have concluded all the VESI responses, including the

11   unredacted responses to questions not contained in the VESI, were consistent with the sanity

12   phase defense of lifelong, progressively worsening mental illness that became so severe it

13   prevented petitioner from conforming his conduct to the law.  The state supreme court could

14   have found the failure to redact was reasonable on this basis.  (*See* SHCP Ex. 34 at ¶ 16.)  If so,

15   under doubly deferential review, "[c]ounsel's tactical decisions are virtually unchallengeable,"

16   *Furman v. Wood*, 190 F.3d 1002, 1007 (9th Cir. 1999), and under § 2254(d), habeas review is

17   "doubly deferential." *Yarborough*, 540 U.S. at 5.

18        The California Supreme Court found petitioner's absence during playing of a portion of

19   the videotapes was pursuant to an oral waiver on the record.  *See Weaver*, 26 Cal.4th at 967.

20   That court nonetheless found petitioner's absence violated California Penal Code §§ 977 and

21   1043.  *See Weaver*, 26 Cal.4th at 965-68.)  However, it found the state statutory error to be

22   harmless.  Petitioner's waiver and the reasons for it are expressly reflected in the trial record, as

23   follows:

24

25        "The Court: The record should note that approximately five minutes prior to the
        recess just taken and during the playing of a portion of the video tape the
26        defendant requested that the guards accompany him out of the courtroom; the
        defendant appear[ed] to become emotional[ly] disturbed or distraught in someway
27        [*sic*] and so-I understand at this time he wants to waive his appearance during that
        approximate[ly] five minute time and also waive his presence for the balance of
28        the playing of the tape[s].

"Mrs. Huffman: That's correct, your Honor.

"The Court: Okay. That includes this afternoon and also tomorrow morning, if necessary.

"Mrs. Huffman: Until the tapes are finished Mr. Weaver wishes to have his presence-wants to waive his presence.

"The Court: Okay.

"Mrs. Huffman: He didn't want to lose control and he wants to apologize to the court for that, but he can't handle it.

"The Court: All right. First of all, do you join in that request, Mrs. Huffman?

"Mrs. Huffman: Yes, I do, your Honor.

"The Court: Mr. Weaver, I discussed this with you last week when I was starting to view the films preliminarily, so I have explained to you your right to be present at all phases of the case; okay?

"The Defendant: Yes, sir.

"The Court: Okay. You understand that by law or by Constitution you have the right to be present during all proceedings in this case. Nevertheless, you may waive that right and consent that we proceed in your absence, which is, as I understand, what you wish to do and you wish to have us complete the showing of these tapes without your presence, after which time you will be brought back in and be here for the balance of the trial. [¶] Is that correct?

"The Defendant: Yes, your Honor. I am sorry about what happened.

"The Court: You need not apologize and I will then take that as a waiver of your personal presence for the balance of the time it takes us to play the tapes.

"The Defendant: Thank you."

*Weaver*, 26 Cal.4th at 965-66.

Based thereon, the state supreme court was not unreasonable in finding the waiver knowing and voluntary. Petitioner has not shown otherwise. He claims that counsel should have explained the pros and cons of leaving the courtroom, (*see* Lod. Doc. No. 7 at 285-87), but he provides no authority for that argument. It could reasonably be found that the waiver on the record was not constitutionally infirm, for the reasons stated.

Petitioner claims that had he been present, the jury might have seen evidence of remorse helpful to the defense. He points to a habeas declaration from a juror suggesting counsel made no effort to show remorse. (*See* SHCP Ex. 17.) But this claim appears to be speculative, as the state supreme court found. *See Weaver*, 26 Cal.4th at 968. Petitioner was present in court for showing of half of the videotaped interview. During the time he was present, the jury was presumptively aware he became "disturbed or distraught" and that was why he left the courtroom. *Weaver*, 26 Cal.4th at 965.

Petitioner does not demonstrate on the state record how any additional evidence of remorse might have been apparent had he remained in the courtroom; and how that evidence

might have made a difference in the sanity phase verdict.  The state supreme court could reasonably have found additional viewing of petitioner in his disturbed and distraught would not have created a reasonable probability of a more favorable result.  Especially so if the jury suspected petitioner's performance was staged or created for the jury's benefit, as petitioner seems to suggest.

Finally, petitioner faults counsel for failing to object to the trial court's instruction that his statements on the VESI tapes could not be considered for their truth, but only as the basis for expert opinion.  The state supreme court found that petitioner's statements on the VESI tapes were hearsay and not particularly reliable when considered for their truth, even in this capital proceeding, such that objection would have been futile.  *See Weaver*, 26 Cal.4th at 980-82.  That court found that even if the instruction was in error, the error was harmless because the videotapes included the statements petitioner wanted redacted, i.e., potentially aggravating evidence damaging to the penalty phase defense if taken as true.  The state supreme court also found that, even if the instruction erroneously precluded the jury from considering petitioner's demeanor in the videotapes, there was no possibility of a more favorable result on the record before it.  *Id.*

Petitioner has not demonstrated by proffer how or why the state court was unreasonable in these regards.  This court agrees any error in this regard was harmless for the reasons articulated by the state supreme court.  Significantly, the instruction did not prevent petitioner's experts from considering statements in the VESI tapes in reaching their opinions favorable to the defense.

> vii.     The "Mad Man" Defense

Petitioner complains that counsel had him appear before the jury as a "mad man", unkempt with a beard and long hair, (*see* Doc. No. 204 at 152:27-155:13), seemingly predisposed to being a killer.  (*See* Id. at 144:9-10; SHCP Ex.'s 24 at ¶ 17, Ex. 34 at ¶ 11.)  He claims the jurors picked up on this ill-conceived tactic because counsel presented petitioner as clean-cut at the penalty phase, (*see* SHCP Ex. 17 at ¶¶ 4-5; Ex. 18 at 1), which family members

1   confirm was petitioner's customary appearance.  (*See* Lod. Doc. No. 7 at 359, 361.)

2        However, Mrs. Huffman confirmed that petitioner's unkempt appearance was part of Mr.

3   Huffman's sanity-phase strategy to make petitioner look like he was indeed insane.  (*See* SHCP

4   Ex. 34 at 4-5.)   The state supreme court could reasonably have concluded that petitioner's

5   appearance was a strategy employed during the sanity phase and that reasonable counsel might

6   employ such a strategy.  Its denial of this subclaim was not objectively unreasonable.

7        Additionally, petitioner has not demonstrated that his unkempt appearance during the

8   sanity phase detracted from the sanity phase defense of progressive and worsening mental

9   illness.  True the habeas proffer includes juror statements that they felt defense tactics may have

10  been in play because petitioner subsequently was clean cut during the penalty phase.  (*See e.g.*,

11  SHCP Ex.'s 17-18.)   Yet these juror statements, even if admissible, are not supported by further

12  proffer that petitioner's appearance so impacted the sanity phase defense that had petitioner's

13  appearance been different a more favorable sanity phase verdict was reasonably probable.

14       *viii.    Sanity Phase Closing Argument*

15       Petitioner faults counsel for what he characterizes as an incoherent and rambling closing

16  argument; one that deprived him of effective assistance of counsel, a fair trial, a fair and reliable

17  sanity and penalty determination, and due process under the Fifth, Sixth, Eighth, and Fourteenth

18  Amendments.

19       The California Supreme Court denied this subclaim on direct appeal.  *See Weaver*, 26

20  Cal.4th at 971-73.  The same subclaim was also summarily denied as stated in petitioner's first

21  habeas petition.  (*See* Lod. Doc. No. 8.)   The state supreme court, in its reasoned decision

22  denying the subclaim, found no less than twenty-one cogent points summarizing the sanity phase

23  evidence in support of the defense theory.  *See Weaver*, 26 Cal.4th at 971-72.

24       Petitioner complains that counsel's argument failed to relate complex and technical

25  evidence to the controlling law in a way that supported the sanity phase defense.  For example,

26  he points out that counsel did not discuss the testimony of inmates Carl Hogan or Richard

27  Archuleta, which corroborated the defense contention that petitioner talked to himself in jail.

28

1   Petitioner notes this court raised similar concerns in its March 24, 2014 order.  (*See* Doc. No.
2   162 at 110, 116.)

3          The state supreme court's rejection of this subclaim was not unreasonable.  The trial
4   record shows counsel argued the sanity phase evidence fairly within the defense theory of a
5   lifelong and progressively worsening mental illness.  (*See* RT 4500; 6607-6704.)  Counsel urged
6   the jury to return an insanity verdict on this basis.   Counsel also noted where the parties' experts
7   agreed; urged the jury to give weight to the corroborating evidence; suggested the jury discount
8   unfavorable evidence; and argued the cumulative effect of evidence suggesting defendant's
9   schizophrenia, personality disorder, amphetamine abuse and posttraumatic stress disorder.  (Id.)
10  The state supreme court could reasonably have found counsel reviewed the sanity phase
11  evidence in the context of the controlling law and argued it in favor of the defense theory, as
12  would competent counsel.

13         To the extent counsel's closing did not reference the testimony of inmates Hogan and
14  Archuleta, that testimony added only minimally to the arguably more complete and credible
15  corroborating testimony of Dr. Raitt and Deputy Levey, noted *ante*.

16         At bottom, petitioner has not demonstrated that counsel's summation failed to argue the
17  sanity phase defense based on the cogent evidence and the controlling law.  Petitioner points to
18  isolated minor ambiguity and omissions, as well as extensive summation and rebuttal, some
19  previously noted by this court. (*See e.g.,* Doc. No. 204 at 162:10-19.)   However, for the reasons
20  stated, the state supreme court could reasonably have found the closing summation adequate.
21  That court could have found incrementally more clarity and detail would not have created a
22  reasonable probability of a more favorable result.   Especially so given the large amount of
23  complex evidence presented at the sanity phase.

24         *ix.    Special Instruction on "Mental Disease or Defect"*

25         Petitioner faults counsel for "failing to object to the trial court's modification of the
26  standard instructions defining "mental defect" or "mental disease" by adding a special instruction
27  that was confusing, misleading and taken from a non-retroactive California Supreme Court

28

opinion decided after the date of the offense in [petitioner's] case." (Doc. No. 107 at 143:5-8.)

The California Supreme Court summarily rejected this subclaim as asserted in petitioner's first habeas corpus petition.  (*See* Lod. Doc. No. 8.)  That court also rejected the same subclaim on direct appeal finding no prejudice as the instruction was clear on its face; allowed the jury to consider the noted evidence of petitioner's mental health issues; and the burden of proving insanity remained with petitioner.  *See Weaver*, 26 Cal.4th at 969.

The record reflects that the prosecutor requested a special instruction that:

> The term mental disease or mental defect does not include an abnormality manifested only by repeated criminal or otherwise antisocial acts.

(Doc. No. 204 at 163:14-19; *see* CT 1608.)  Petitioner states this instruction, taken from *People v. Fields* 35 Cal.3d 329 (1983), needed clarification because it used terms not commonly understood by lay persons.

Thus petitioner claims counsel erred by failing request clarifying language from *Fields,* that:

> [i]f that illness manifests itself in some other way as well, then it can be considered as a 'mental disease' ... and instances of criminal or antisocial conduct can be ascribed to that disease or cited as evidence of its severity.

(Doc. No. 204 at 164:5-7, *citing Fields*, 35 Cal.3d at 369.)  He also points to Mrs. Huffman's later statement that:

> I do not remember why I did not object to the incomplete special instruction requested by the prosecution under People v. Fields (1983) 35 Cal.3d. 329 in the sanity phase, or ask that the explanatory language contained in Fields be added to the instruction.

(SHCP Ex. 34 at ¶ 31.)

Petitioner claims this instructional error "prejudicially misdirected the jury's attention away from the determination of whether petitioner's illness manifested itself in ways other than

1  antisocial or criminal conduct and, if so, whether the illness should be considered as a mental

2  disease and the instances of antisocial or criminal conduct considered evidence of its severity."

3  (*See* Doc. No. 107 at 10-13.)

4        The state supreme court reasonably rejected this subclaim.  The trial record shows that

5  counsel objected to the special instruction on grounds *Fields* should not be retroactively applied

6  to petitioner's offense and on grounds the instruction was misleading.  (*See* RT 6603-06.)   The

7  trial court overruled counsel's objection.  *See Weaver,* 26 Cal.4th at 968.

8        Reasonable counsel might have determined to move on, given counsel's unsuccessful

9  objection, the common terms used in the instruction, and the noted significant evidence of

10  psychological problems (such as PTSD symptoms for which he sought treatment, hearing voices

11  and going off to war so that he could be killed), i.e., problems that were other than criminal or

12  antisocial.  The state supreme court could have found it reasonable that counsel did not move to

13  clarify the special instruction.

14        Additionally, petitioner does not show prejudice by counsel's failure to seek clarification.

15  The instruction was not misleading.  Clarification was not reasonably required.  *See Rupe*, 93

16  F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance").

17  Petitioner cannot show prejudice by counsel's failure to clarify an unambiguous instruction –

18  counsel is not required to undertake a futile action.

19        3.    <u>Claim 8 Denied on the Merits</u>

20        A fair-minded jurist could find that petitioner failed to establish counsel's investigation,

21  preparation and presentation of the insanity defense fell below an objective standard of

22  reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding

23  would have been different.  *Strickland*, 466 U.S., at 687-94.

24        It does not appear that the California Supreme Court's rejection of claim 8 and all its

25  subclaims was contrary to, or an unreasonable application of, clearly established federal law, as

26  determined by the Supreme Court, or that the state court's ruling was based on an unreasonable

27  determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28

28

U.S.C. § 2254(d).

**C.     Review of Claim 9**

Claim 9 alleges that trial counsel was constitutionally ineffective in investigating, preparing for, and presenting the penalty phase of petitioner's trial, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.   (*See* Doc. No. 107 at 144:16-232:3.) Petitioner states that this claim incorporates facts set out in claims 1, 2, 3, 4, 5, 6, 7, 8 and 11, and the evidence in the state record.

The California Supreme Court denied this claim on the merits on direct appeal.  *See Weaver*, 26 Cal.4th at 976-91.  That court also summarily denied the claim on the merits in petitioner's first state habeas petition.  (*See* Lod. Doc. No. 8).

1.     Clearly Established Law

The standard for ineffective assistance of counsel is set out in section B.1., *ante*.

2.     Analysis

Petitioner claims that lead counsel, David Huffman, and co-counsel, Mrs. Donnalee Huffman, were ineffective by inadequately investigating, preparing and presenting the penalty phase defense, minimizing petitioner's serious mental illness, brain damage, military service, self-medicating drug use, trauma and abuse.

Petitioner was represented only by co-counsel, Mrs. Huffman, during the penalty phase. The penalty phase followed the sanity verdict and was tried to the same jury.

The subclaims comprising this claim are addressed separately, below.

**a.     Proceeding to Penalty Phase without Co-Counsel**

Petitioner again claims that Mrs. Huffman should have sought the assistance of second counsel.  He claims inexperience, exhaustion, and depression following the sanity phase verdict left Mrs. Huffman unable to adequately present a penalty phase defense.  He claims counsel did not plan for the possibility that petitioner would be found sane.  (*See e.g.*, SHCP Ex.'s 24-25 and 27-28.)  He claims Mrs. Huffman, who did not participate in her husband's preparation of the penalty defense, (*see* SHCP Ex. 34 at ¶ 26), was unable to effectively represent petitioner at the

1   penalty phase.

2          The California Supreme Court denied this subclaim for the same reasons stated in claim

3   8, *ante*, i.e., that "we find no constitutional violation flowing from defendant's decision to

4   proceed with the sanity and penalty phases of the trial represented by Mrs. Huffman only."

5   *Weaver*, 26 Cal.4th at 952.   That court concluded petitioner made no showing that available

6   mitigation evidence was not presented because of the absence of second counsel.  *See Weaver*,

7   26 Cal.4th at 978.

8          Petitioner claims his penalty defense was a severely abbreviated version of the originally

9   planned penalty defense.  Prior to trial, Mr. Huffman estimated fifteen witnesses would be called

10  during the penalty phase and that the penalty phase defense would require three weeks to present.

11  (*See* CT 1046.)   As it turned out, Mrs. Huffman called only petitioner, who give a brief

12  discussion of his 1976 assault on Ms. Bonnie Brown, his voluntarily surrender to police, and

13  subsequent unsuccessful efforts for treatment at two Veterans Administration mental hospitals in

14  Texas.   (*See* RT 6977-79, 6781).  Mrs. Huffman followed petitioner's testimony with a closing

15  summation that essentially re-argued sanity phase evidence.

16         Petitioner claims Mrs. Huffman's own statements demonstrate the ill-prepared penalty

17  defense:

18

19         David [Huffman] handled the preparation of the penalty phase of [petitioner's]
           trial. I was not involved in investigating or preparing for it. David was not
20         interested in humanizing [petitioner]. He wanted to keep [petitioner] looking
           insane. I am not aware of any particular interviews or investigation that focused
21         on the penalty phase. The quick verdict at the sanity phase really got to me.

22  (SHCP Ex. 34 at ¶ 26.)   Petitioner suggests Mrs. Huffman did nothing to develop the penalty

23  phase defense. (*See* Id. at ¶¶ 26-27; see also SHCP Ex.'s 24, 25, 27, 28.)

24         This court finds the state supreme court reasonably rejected this subclaim.   Petitioner

25  does not point to facts in the state record showing the need for second counsel at the penalty

26  phase.  Instead he re-argues the failure to appoint second counsel at the sanity phase.  The re-

27  argued subclaim fails for reasons stated in claim 8, *ante*.

28

1    Additionally, petitioner does not demonstrate on the facts of this case that had second

2  counsel been appointed, additional mitigating evidence would have been presented at the penalty

3  phase creating a reasonable probability that at least one juror would have struck a different

4  balance between life and death.  *See Wiggins*, 539 U.S. at 537.   Petitioner does not point to facts

5  in his proffer supporting this subclaim.

6          **b.    Failure to Present Available Mitigating Evidence**

7          Petitioner claims counsel failed to investigate and present significant mitigating evidence

8  from his family, friends, and acquaintances from the military and prison.  He claims such

9  evidence could have mitigated the prosecution's aggravating evidence of his prior convictions

10 relating to Bonnie Brown in Humboldt County and David Galbraith and Michelle DeLong in

11 Ventura County, mitigated the circumstances of the capital offenses and shown his good side and

12 that he was a good husband and father.

13         The state supreme court denied this subclaim on direct appeal, noting that counsel did

14 present mitigating evidence at the penalty phase, both as noted above and in the form of evidence

15 with mitigating value presented in the sanity phase.  *See Weaver*, 26 Cal.4th at 974-77.   That

16 court found the penalty phase jury could have considered such mitigating evidence under

17 California Penal Code § 190.3, s*ee Weaver*, 26 Cal.4th at 977, and that Mrs. Huffman argued as

18 much during her closing, *id*.  That court concluded that:

19

20         In light of the amount of mitigating evidence available to the jury, it is not
           reasonably probable additional mitigating evidence would have altered the
21         outcome at the penalty phase of the trial.

22 *Id.*  This court agrees, as to each asserted category of mitigating evidence, for the reasons that

23 follow.

24         i.    *Mental Health History*

25         Petitioner complains of counsel's failure to investigate and present mitigating evidence of

26 his background of extreme domestic violence, physical and sexual abuse, delusional thinking,

27 irrational behavior, prolonged poverty, and diagnosed psychiatric disease.  (*See* Doc. No. 107 at

28

1   ¶¶ 6-19.)

2          *Multigenerational Mental Illness*

3          Petitioner complains evidence of mental illness in previous generations of his family was

4   not adduced.   However, arguments in this regard could reasonably be seen as speculative.

5   Petitioner does not point to evidence in his habeas proffer suggesting any diagnosed mental

6   illness in his grandparents.  (*See* Lod. Doc. No, 7 at 326-27; SHCP Ex.'s 1, 5, 8, 10, 11.)  Nor

7   does he demonstrate that his father or mother was diagnosed with a mental illness.

8          Evidence was presented at trial that his maternal aunt and cousin were schizophrenic.

9   This was helpful to the defense, as various experts opined petitioner suffered from schizophrenia

10  to some extent.   (*See e.g.,* RT 4552-72, 5064, 5092-5311.)

11         There was also substantial testimony at trial relating to the non-diagnosed behavioral and

12  psychological issues presented by petitioner's father and mother and extended relatives on his

13  mother's side of the family.  (*See e.g.,* RT 4728, 5059, 5063-64, 5078, 5088, 5092, 5300, 5818,

14  5925-27.)

15         The state supreme court could reasonably have found significant evidence in the record

16  of petitioner's family history of schizophrenia and psychological issues and aberrant behavior

17  (*see e.g.*, RT 4552-4669; 5059-5106; 5300-11; 5497-5526; 5818-5932; 6087-6153; 6293); his

18  personal history of social, mental, and physical issues (*see e.g.,* RT 4868-4978; 5517-19; 5798-

19  5895; his seeking and receiving psychiatric treatment (*see e.g.*, RT 4702-03); his possible mental

20  illness at the times of the 1976 and 1982 crimes (*see e.g.,* RT 4724-41); and his treatment with

21  Mellaril, an antipsychotic drug, while incarcerated in state prison and in the Ventura County jail

22  (*see e.g.,* RT 5070, 5117; 6373).   Furthermore, petitioner's mother was interviewed by counsel

23  and provided information about petitioner's childhood.  (*See* SHCP Ex. 1 at ¶ ¶ 74-75.)

24         As to petitioner's mother, there was substantial testimony to the effect that she was

25  obsessed with and controlling of petitioner (*see e.g.,* RT 4615, 4621, 4645, 4662, 4718, 4728,

26  4978, 5300, 5497, 5509, 5514); that she claimed petitioner suffered from non-existent health

27  conditions to keep him close to her (*see e.g.,* RT 4669, 5300, 5497, 5509, 5514, 5526, 5932,

28

1   6293); and that she may have physically and sexually abused petitioner (*see e.g.,* RT `4728,

2   4784, 4812, 5175, 5501, 5999, 6073, 6373).

3          The habeas proffer as to petitioner's extended family and friends appears lacking in

4   additional mitigating value.  Declarations from petitioner's uncle Wayne Groce, petitioner's

5   childhood friend Earnestine Smith, and petitioner's first wife Patricia Budrow, essentially echo

6   the noted trial testimony relating to petitioner's strange relationship with his mother and the part

7   she played in his social problems and failed marriages.  (*See e.g.,* SHCP Ex.'s 2, 5 and 10.)

8   Petitioner's hometown friend, Del Roy Barnett, confirmed petitioner's odd mother-son

9   relationship.  (*See* RT 5298, 5300-01, 5308, 5310-11.)

10          The habeas declaration of petitioner's mother fairly supports her odd behavior and mental

11   state but otherwise could be seen as having little if any mitigating value.  (*See* SHCP Ex. 1.)

12   Furthermore, as respondent suggests, petitioner was so close to his mother that he may have

13   confessed aggravating details of the capital crimes to her.  (*See e.g*, RT 3914.)  This in turn could

14   suggest a further tactical reason for counsel not to pursue petitioner's mother as a potential

15   source of mitigating evidence.

16          The expert witness habeas proffer relating to petitioner's alleged childhood illnesses

17   appears to have minimal mitigation value over and above the testimony at trial.  (*See e.g*., SHCP

18   Ex. 1.)  This is so as to petitioner's often mentioned, but not substantiated, childhood cardiac

19   ailment.  The evidence at trial suggests the cardiac condition did not exist, but was created by

20   petitioner's mother as a means of keeping petitioner under her control.  (*See e.g*., RT 5497-

21   5526.)

22          Similarly, the state habeas proffer relating to mental health expert testimony does not

23   reasonably suggest additional material mitigating information.  The suggestion that petitioner

24   suffered "severe attentional and memory deficits as well as impairment related to temporal lobe

25   functioning" (*see* SHCP Ex. 36 at  ¶ 44) and that "[petitioner's mental]  impairments . . . greatly

26   exacerbated by the effects of his ingestion of amphetamines and alcohol before the crimes . . .

27   would have all combined to induce a dissociative dream-like . . . state . . . not conscious of what

28

he is doing and not able to control his actions" (*see* SHCP Ex. 37 at ¶ 37), could reasonably be seen as cumulative of sanity phase evidence noted, *ante*.  Similarly, his suggestion on habeas review that substance abuse was not investigated and developed as evidence in mitigation, (*see* SHCP Ex. 37 at ¶¶ 25, 26), seems to ignore that the jury presumably was well aware of petitioner's apparently voluntary amphetamine use during his work as a truck driver, given the noted sanity phase testimony.

The penalty jury, having sat through the sanity phase, was presumptively aware of the factors in petitioner's life upon which the sanity experts based their opinions.  Mrs. Huffman argued the cogent mitigating impact of these expert opinions at her penalty phase summation. (*See* RT 6607-6704.)

Petitioner complains of counsel's failure to investigate and present potentially mitigating independent evidence from Vietnam veterans about his wartime experiences.  However, evidence in the trial record of petitioners Vietnam experiences and changes in him upon his arrival home, adduced during the sanity phase, is significant.  (*See e.g.,* RT 5051, 5068, 5076, 5102, 5126, 5135-39, 5150, 5302-03, 5312-13, 5373, 5494, 5534, 5603, 5606-07, 5610, 5638, 5677, 5679, 5683, 5685, 5700, 5754, 5772, 5774, 5778-79, 5780, 5809-17, 5920, 5924-25, 5929, 5936-37, 5945, 5947.)  For example, petitioner's friend, Mr. Barnett, testified at the sanity phase to specific changes in noted in petitioner upon return from Vietnam, including aggression and growing depression and anger, difficulties at work, and increasing alcohol consumption.  (*See e.g.,* RT 5303-15.)

Petitioner complains that counsel did not corroborate his combat experience with evidence from other Vietnam veterans.  However, petitioner appears to discount trial counsel's efforts to locate such veterans, (*see* RT 5850.), and to exaggerate the mitigating effect of the habeas declarations provided by Vietnam veterans.  As noted, these habeas declarations do not seem to include evidence from Vietnam veterans about petitioner's wartime experiences.  (*See* SHCP Ex. 12-15.)  Reasonable counsel could have determined further evidence of this type would have been of minor mitigating value.

Petitioner's suggestion that counsel missed opportunities to counter evidence of future dangerousness essentially re-argues subclaims denied in claim 8, *ante*. The record reflects that the jury was free to consider at the penalty phase evidence adduced at all phases of trial. (See CT 1651.)

At bottom, the trial record includes substantial potentially mitigating evidence of petitioner's deprivations, academic problems and social and mental health problems as a child and youth (*see e.g.,* RT 4978, 5106, 5300-01, 5497, 5798); that he wanted to join the Army in order to go to Vietnam and die there (*see e.g*., RT 4735, 5300, 5383, 5534); that he heard and responded to voices in his head (*see e.g.,* RT 4868, 4923, 5101-02, 5517, 5519, 5804, 5808, 5820, 5895, 6047, 6242); that he sought and at times received psychiatric treatment (*see e.g,,* RT 4702-03, 6979, 4792, 4795, 4810, 4822); that he had been diagnosed in the 1970's as paranoid (*see e.g.,* RT 4709-10; 4738); and that he was taking the antipsychotic medication Mellaril while incarcerated in state prison and in the Ventura County jail (*see e.g,,* RT 5070, 5117, 6373). Further, petitioner's criminal history as presented at trial could be seen as mitigating mental state evidence. (*See e.g.,* RT 4724, 4740-41.)

The court does not find this to be a case where penalty phase counsel failed to investigate and present significant potentially mitigating evidence. *Cf., Doe v. Ayers*, 782 F.3d 425, 457-58 (9th Cir. 2015) (penalty counsel deficient for failing to present mitigating evidence of PTSD exacerbated by sexual assaults in prison).

*ii.    Social History*

Petitioner claims that counsel did not interview his children, who were then available and willing to testify that petitioner was a good father and that they did not want him to die. (*See e.g.*, Lod. Doc. No. 7 at 359-60; SHCP Ex.'s. 3, 4, 34.) This evidence, which is included with his state habeas proffer, could reasonably be seen to have only minor mitigating effect. Petitioner does not demonstrate this evidence is inconsistent with trial testimony. Its mitigating impact seems slight relative to the aggravating evidence presented by the prosecution of the Humboldt and Ventura crimes and the circumstances of the capital murders.

Petitioner claims his ex-wives, Patricia Budrow and Barbara Weaver, provided similar statements in support of state habeas relief. However, these women testified adversely to petitioner at trial. (*See* RT 3677-3689, 3889-3901.) The habeas declaration of his first wife, Ms. Budrow, describes petitioner as a person who was kind, at least to some extent. But the state supreme court would have noted Ms. Budrow's trial testimony that petitioner choked and beat her on multiple occasions including when she was pregnant, causing her to miscarry; and that she divorced him because of his violence toward her. (*See* Lod. Doc. No. 7 at 359; SHCP Ex. 2; RT 3891-3903.) Notably, petitioner's state habeas proffer does not include a declaration from his second wife, Barbara Weaver, who was his spouse during the capital crimes. Apparently, Barbara Weaver attempted to divorce petitioner following his arrest in 1981 for Ventura County crimes. (*See* CT 394, 414-15; RT 5806.) Counsel could reasonably have concluded that Barbara Weaver would not have provided more than minor mitigating evidence.

This court previously expressed concern with counsel's failure to present evidence that petitioner had raped, but not killed, multiple women in the past, to support his claim that he did not intend to kill Barbara Levoy. (*See* Doc. No. 162 at 115.) However, considering the parties briefing of the claims and the facts of this case, such evidence that petitioner had a history of raping but not killing hitchhikers likely would not be material and would not necessarily mitigate the instant capital murders. Such testimony could easily be seen as potentially aggravating evidence of callous and remorseless behavior bolstering sanity phase testimony of future dangerousness. A defense decision not to introduce additional evidence regarding other rapes by petitioner could be seen as objectively reasonable.

Petitioner also argues counsel could have presented additional evidence showing his positive adjustment to institutional life. (*See e.g.*, RT 4779-82; SHCP Ex. 117.) The jury was already aware that petitioner had been incarcerated and successfully paroled in the 1970's following his conviction for assaulting Ms. Brown in Humboldt County. Moreover, the noted substantial aggravating evidence of prior convictions and the circumstances of the capital murders could reasonably suggest additional evidence of positive institutional adjustment would

72

1   have had little mitigating value.

2       *iii.      Ventura County Offenses*

3       Petitioner claims counsel failed to investigate, develop and present evidence mitigating

4   the aggravating Ventura County conviction for attempted murder, kidnapping and rape.

5       The facts and circumstances of the Ventura convictions were introduced at the penalty

6   phase through the testimony of the victims, prosecution witnesses David Galbraith and Michelle

7   DeLong.  The prosecution also presented penalty phase testimony from Ventura County Sheriff

8   Sergeant Rudd, who took petitioner's statement after those crimes.  (*See e.g.,* RT 6943-73.)

9       Petitioner faults counsel for not discovering and presenting evidence showing that Jerrold

10  Daniels, co-defendant in the Ventura County offenses, stated he was solely responsible for

11  shooting Mr. Galbraith.  (*see* e.g., SHCP Ex. 34 at 11; SHCP Ex. 128, *People v. Daniels*,

12  Ventura County case #16564, testimony of J. Daniels, RT 687-718.)   Petitioner points to

13  counsel's later statement that:

14

15      I do not recall what investigation was done into the Ventura County case in which
        [petitioner] was convicted of conspiracy to commit murder and other crimes,
        which was used as evidence in aggravation against [petitioner]. I was unaware
16      that David Galbraith, one of the victims in that case, had been hypnotized before
        he testified at [petitioner's] trial in Ventura. Galbraith also testified [for the
17      prosecution] at the penalty phase of [petitioner's] trial in Bakersfield. I was also
        unaware that [petitioner's]  co-defendant in the Ventura case, Jerrold Daniels,
18      who had shot Galbraith, had testified in his own trial that [petitioner] did not
        know that Daniels was going to shoot Galbraith and had not expressed any
19      intention for Galbraith to be harmed.

20

21  (*See* SHCP Ex. 34 at ¶ 27.)

22      The record shows that petitioner was tried separately from Mr. Daniels.  (*See* SHCP Ex.'s

23  127A-D, *People v. Daniels and Weaver*, Ventura County Superior Court, Case No. 16564.)  Mr.

24  Daniels was convicted of conspiracy to commit murder with a firearm enhancement.  (*See* id.)

25      Petitioner does not deny that, in his separate proceeding for the Ventura County crimes,

26  he was convicted of conspiracy to commit murder and rape with a firearm enhancement.  (*See*

27  SHCP Ex. 127D.)   The penalty phase testimony of Mr. Galbraith and Ms. DeLong in this

28

proceeding (*see e.g.*, RT 6870-71, 6888, 6899, 6901-06) could reasonably have been seen to substantially outweigh any mitigating value evident from Mr. Daniel's statements purporting to exculpate petitioner; statements which might have been motivated by Mr. Daniel's interest in avoiding the conspiracy conviction and sentence.  Moreover, the state supreme court could reasonably presume petitioner's counsel in the Ventura County proceeding raised meritorious challenges in that proceeding.

Petitioner faults counsel for allowing Ventura County Sheriff Sergeant Rudd to testify as to petitioner's un*Mirandized* statements.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  However, the trial court raised this issue sua sponte and excluded the un*Mirandized* statements of petitioner to Sergeant Rudd.  (*See* RT 6949-74.)  Any error could reasonably be seen as harmless.

Petitioner claims that counsel failed to present evidence that he was kind to Mr. Galbraith.  Petitioner also claims that had counsel investigated Mr. Galbraith's mental health and criminal history, she would have discovered impeachment evidence and excluded Mr. Galbraith's hypnotically-induced testimony.  However, the mitigating value of the state habeas proffer in this regard seems minimal.  Mr. Galbraith testified as an eye witness. (*See e.g.*, RT 6870-71, 6888, 6899, 6901-06.)  His testimony was corroborated by Ms. DeLong.  (Id.)

As to issue of hypnosis, it appears Mr. Galbraith gave a statement to Ventura County authorities under hypnosis relating only to the accuracy of a police artist drawing of the perpetrator.  (*See* RT 6861-91.)  It appears the hypnotic testimony of Mr. Galbraith, even if errantly admitted at trial, closely tracked the substance of his non-hypnotic statements and testimony relating to the Ventura County crimes (*see* SHCP Ex. 129 at 22-25), and at best represented only minor  mitigating value.

*iv.     Failure to Reintroduce Sanity Phase Evidence*

Petitioner claims that counsel failed to reintroduce mitigating sanity phase evidence at the penalty phase.

However, the trial court instructed the jurors that they could consider evidence from any phase of the trial in determining and weighing aggravation and mitigation and reaching their

penalty decision.  (*See* CT 1651.)  This would include the potentially mitigating mental health evidence presented at the sanity phase.  *Cf.*, Ayers, 782 F.3d at 457-58 (failure to present significant mitigating mental health information can alone establish *Strickland* prejudice).

This then is not a case where counsel acts unreasonably by presenting only argument, as opposed to evidence.  *See Wiggins*, 539 U.S. at 526.  Moreover, during her summation, Mrs. Huffman focused the jury's attention on noted mitigating aspects of the sanity phase record.  (*See* RT 7028-39.)

The state supreme court could reasonably have found that mitigating sanity phase evidence was available to the jury during penalty phase deliberations.

v.    *Penalty Phase Closing Argument*

Petitioner claims that counsel made only a minimal closing argument that failed to summarize the available social and mental health evidence and failed to humanize petitioner before the jury.  He contends defense trial experts, Drs. Donaldson, Chappell and Wilson were available to testify at the penalty phase and most likely could have provided mitigating penalty phase testimony.  (*See* Doc. No. 149 Ex. B at ¶ 24; id. at Ex. C. at ¶ 8.)

Petitioner claims counsel failed to sufficiently explain the different analysis of mental disease or defect applicable at sanity and penalty phases.  (*See e.g.,* RT 7034-35.)

Petitioner claims counsel's statement during closing that "each one of these doctors that looked at Mr. Weaver said that he had – he was a danger to himself and to others", was aggravating.  (*See* RT 7032.)

As noted in the discussion of claim 8, *ante*, the California Supreme Court rejected this same subclaim on direct appeal, stating that:

> To the extent defendant argues counsel presented an inadequate, "minimalist" closing argument in which she "dehumanized" him rather than portraying him as a person with love for his mother and as a person who had endured a "life … marked by intense pain and suffering," we reject the claim. Defense counsel's description of defendant as a "madman" lacking all "impulse controls" was clearly an attempt to convince the jury to consider expert evidence presented at the sanity phase as mitigating under section 190.3, factors (d) and (h).

As we explained in *People v. Cudjo* (1993) 6 Cal. 4th 585, 634-635 [25 Cal. Rptr.

2d 390, 863 P.2d 635]: "The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality. Although defense counsel's argument in this case appears to have been somewhat lacking in clarity, not to mention eloquence, we are not persuaded that it fell below the standard of reasonably competent representation or that there is a reasonable probability that a better presentation would have resulted in a more favorable penalty verdict." Here also we find counsel's closing argument, though brief, did not fall below the standard of reasonably competent representation, and we find no reasonable probability exists that a better argument would have convinced the jury to vote for life over death.

*Weaver*, 26 Cal.4th at 978-79.   That court also summarily rejected this same subclaim as presented in petitioner's first habeas corpus petition.  (*See* Lod. Doc. No. 8.)

The state supreme court's rejection of this subclaim was not unreasonable.  The jury heard counsel's twenty-one point closing summary of the sanity phase evidence.  Mrs. Huffman, during her penalty closing, asked the jury to consider the entire case as a whole.  She pointed out to the jury evidence that could be mitigating.  (*See e.g.,* RT 7028-39.)  Evidence which could show that petitioner lacked criminal intent.   (Id.)   Evidence which could show that the aggravating convictions did not involve "exceptional violence."  (Id.)  Evidence which could show that petitioner acted under the influence of extreme mental and emotional disturbance, such as his belief he needed to follow the dominant male voice in his head.  (Id.)

Significantly, counsel reminded the jury that the mental state evidence presented at the sanity phase, including military service in Vietnam, could be considered as mitigating at the penalty phase, (s*ee* RT 7034-39), and evoke sympathy or pity for petitioner.  (*See* CT 1644; RT 7036-38.)

Petitioner claims that the "mad man" defense at the sanity phase was aggravating at the penalty phase because it de-humanized him and showed he lacked impulse control.  (*See e.g.,* RT 7031, 7039.)  But for reasons discussed in claim 8, counsel's decision to portray petitioner as disheveled during the sanity phase and neat in appearance at the penalty phase could reasonably be seen a matter of tactics (*see e.g.,* SHCP Ex. 34 at 4-5), and might have evoked sympathy and pity.

Petitioner's habeas proffer includes comments from a couple jurors who noted

petitioner's change in appearance from the sanity phase to the penalty phase.  (*See* SHCP Ex.'s 17, 18.)  But even if admissible evidence, the fact counsel's defense tactic ultimately was not successful would not alone show counsel was unreasonable in choosing the tactic.  *See Strickland*, 466 U.S. 668 at 699 (an unsuccessful defense may be the result of reasonable professional judgment).

### vi.    *Clarifying Jury Instructions*

Petitioner claims counsel failed to seek clarification of the potentially misleading effect of instructions given in the sanity and penalty phases.  He argues that the jury may have erroneously applied the more onerous "legal insanity" standard when considering whether petitioner's mental state was mitigating for purposes of California Penal Code § 190.3.

The California Supreme Court found "potentially misleading" the trial court's failure to specify which of the prior instructions applied at the penalty phase, especially as to the difference in the standard of proof between legal insanity ("substantial capacity"), and factor (h) of § 190.3 ("impaired.")  *See Weaver*, 26 Cal.4th at 982-83.  Even so, that court found no reasonable likelihood the jury misunderstood the instructions:

> [T]he prosecutor reminded the jury that, during voir dire, the jurors affirmed that they "could consider [mental disease or defect as a mitigating factor] even though the defendant might be sane.

*Weaver*, 26 Cal.4th at 983.  The state supreme court went on to find that penalty phase counsel:

> [A]ccurately quoted the statutory language for the jury (was defendant's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law ... impaired as a result of a mental disease or defect ...."?) and then reminded the jury that, during voir dire, the jurors all affirmed they could consider evidence of mental disease or defect as a mitigating circumstance even if they had already found defendant was legally sane. She then asked: "Did he have a mental defect? Did he have a mental illness? Did he have an emotional problem that caused some of these factors to happen? I say he did and I think those are very important factors and should be weighed very heavily." This is not an argument to apply the sanity phase instructions to the penalty phase.

*Weaver*, 26 Cal.4th at 984.  Based thereon, the state supreme court also found the failure of trial

1  counsel to object was not prejudicial.  *See Id.*

2      This court finds that the state supreme court did not act unreasonably.  The jurors were

3  instructed at the penalty phase that "all other instructions previously read to you which you find

4  to be applicable to this part of the trial should be considered by you in reaching a decision as to

5  the penalty to be imposed."  (CT 1644.)  Petitioner does not demonstrate evidence in the state

6  record suggesting the jury failed to consider mitigating mental state evidence because of

7  confusion over the (Cal. Pen. Code § 190.3(h)) standard applicable at the penalty phase.

8  Moreover, as the state supreme court noted, the prosecutor reminded the jury that "they could

9  consider [mental disease or defect as a mitigating factor] even though the defendant might be

10  sane."  *Weaver,* 26 Cal.4th at 983.

11      The jurors are presumed to have followed the penalty phase instructions including as to

12  mitigation.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Aguilar v. Alexander*, 125 F.3d

13  815, 820 (9th Cir. 1997).  The asserted instructional error could reasonably be seen as not more

14  than harmless.

15      3.   <u>Claim 9 Denied on the Merits</u>

16      A fair-minded jurist could have found that petitioner failed to establish that counsel's

17  investigation, preparation and presentation of the penalty defense fell below an objective

18  standard of reasonableness and that, but for counsel's unprofessional errors, the result of the

19  jury's sentence determination would have been more favorable.  *Strickland*, 466 U.S., at 687-94.

20      It does not appear that the California Supreme Court's rejection of claim 9 and all its

21  subclaims was contrary to, or an unreasonable application of, clearly established federal law, as

22  determined by the Supreme Court, or that the state court's ruling was based on an unreasonable

23  determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28

24  U.S.C. § 2254(d).

25      **VII. RECORD EXPANSION AND EVIDENTIARY HEARING**

26      On July 31, 2015, petitioner filed a motion for expansion of the record and evidentiary

27

28

hearing in conjunction with his merits briefing of claims 8 and 9.[5]   Petitioner seeks to expand the record that was before the state court with the following documents:

> Exhibit A (Declaration of David Foy, Ph.d) (Doc. No. 149-1)
> Exhibit D (Declaration of Byron J. Wittlin, MD) (Doc. No. 149-4)
> Exhibit F (Declaration of Robert Wilson Gardner, MD) (Doc. No. 149-6)
> Exhibit G (Declaration of Rollin G. Rose, Ph.d) (Doc. No. 149-7)
> Exhibit H (Declaration of Michael Lukehart) (Doc. No. 149-8)
> Exhibit N (Declaration of Dr. James Hopper) (Doc. No. 198)
> Exhibits N4-6, N11-N15, N24, N26-N27, N29, N36-N93, N95-N98, N100, N102-N108, N111-N126, N128, N130, N132-N134, N136-N160, N162-N172, N176, N179-N182, N187-N188, N192, N196-N197, N199-N200, N202-N213, N215, N218-N317 (Social History Items Reviewed by Dr. Hopper) (Doc. No. 198-203)
> Exhibit O (Supplemental Declaration of Dr. James Hopper, July 7 2015 and Index of Material Reviewed by Dr. Hopper) (Doc. No. 203)
> Exhibit P (Declaration of Dr. John Wilson, Ph.d) (Doc. No. 203)
> Exhibit Q (Ventura County Sheriff's Dept. Booking of Weaver, 5-7-81) (Doc. No. 203)
> Exhibit R (Ventura County Sheriff's Dept. Notice of No Records, 2014) (Doc. No. 203)
> Exhibit S (Declaration of Barry Smith, 2015) (Doc. No. 203)
> Exhibit T (Declaration of Wade Smith, 2015) (Doc. No. 203)
> Exhibit U (Declaration of Wayne Smith, 2015) (Doc. No. 203)
> Exhibit V (Declaration of Virginia Ledell Houston Johnson, 2015) (Doc. No. 203)
> Exhibit W (Declaration of Patricia Weaver, 2015) (Doc. No. 203)
> Exhibit X (Declaration of John Gorsage, 2015) (Doc. No. 203)
> Exhibit Y (Declaration of Tom Brizendine, 2015) (Doc. No. 203)
> Exhibit Z (Declaration of Donald Hamilton, 2015) (Doc. No. 203)
> Exhibit AA (Declaration of Jerry Tegtmeier, 2015) (Doc. No. 203)
> Exhibit BB (Declaration of Marvin Moore, 2015) (Doc. No. 203)
> Exhibit CC (Declaration of Randall Holden, 2015) (Doc. No. 203)
> Exhibit DD (Declaration of Danny Sands, 2015) (Doc. No. 203).

As noted in section VI A, *ante*, petitioner claims this court's March 24, 2014 order determined that the state court denial of claims 8 and 9 was unreasonable under § 2254(d). Petitioner further argues that he sought to diligently develop the factual basis for claims 8 and 9, s*ee Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005), citing to his state habeas requests for discovery and evidentiary hearing, *see In re Weaver*, California Supreme Court No. S073709, which requests were summarily denied without an evidentiary hearing, discovery, or factual findings.   (*See* Lod. Doc. 8; Lod. Doc. 24.)   Petitioner argues that evidentiary development and hearing in this proceeding is appropriate because claims 8 and 9 are colorable and if proved would entitle him to relief. *Hurles v. Ryan*, 752 F.3d 768, 791-792 (9th Cir. 2014);

---

[5] The court notes that the state habeas exhibits which petitioner seeks to re-present in this motion, (see Doc. No. 197 at 4, n.4; *In re Weaver*, S073709) were lodged in this proceeding on March 30, 2010.  (*See* Doc. No. 117.)

*Insyxiengmay*, 403 F.3d at 670.

Respondent counters as he did on the merits, by arguing that claims 8 and 9 do not pass through the §2254(d) gateway and that nothing in the court's March 24, 2014 order provides otherwise.  Respondent points out that these claims had not been briefed when this court issued its March 24, 2014 order and that *Strickland* prejudice was not considered in that order. Respondent argues that *Pinholster* precludes record expansion unless and until §2254(d) is satisfied.

### A.    Legal Standard

As noted, § 2254(d), as amended by the AEDPA, provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Pinholster*, 563 U.S. at 181, 185.  Although the central holding of *Pinholster* pertained to § 2254(d)(1), the Supreme Court observed that "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" providing "additional clarity" that review under § 2254(d)(2) is also limited to the record before the state court.  *Id.* at 185 n.7.  Therefore, for claims that were adjudicated on the merits in state court, a petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d).  *See Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).

A petitioner who seeks to expand the record without a hearing must meet the same

1   requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. §

2   2254(e)(2). *See Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (finding that the restrictions

3   of § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an

4   evidentiary hearing") (emphasis in original). *Colegrove v. Hoshino*, No. 13-CV-00096-BLF,

5   2014 WL 4421393, at *2 (N.D. Cal. Sept. 5, 2014). That is, where a state court denies the claim

6   on the merits, an expanded record cannot be considered in determining whether the state court's

7   decision was objectively unreasonable. *Rogovich v. Ryan*, 694 F.3d 1094, 1096-97 (9th Cir.

8   2012), citing *See Pinholster,* 563 U.S. at 180.

9           **B.    Analysis**

10          Petitioner seeks evidentiary development and an evidentiary hearing on claims 8 and 9.

11  These claims were adjudicated on the merits in the state court. *See Richter*, 562 U.S. at 99

12  ("[w]hen a federal claim has been presented to a state court and the state court has denied relief,

13  it may be presumed that the state court adjudicated the claim on the merits in the absence of any

14  indication or state-law procedural principles to the contrary). For the reasons discussed above,

15  petitioner fails to demonstrate that claim 8 and claim 9 overcome the limitation of § 2254(d).

16  Thus, *Pinholster* effectively bars a habeas court from any further factual development on these

17  claims. *Id.* at 203 n.20.

18          The Ninth Circuit has also followed this principle. In *Stokely v. Ryan*, 659 F.3d 802, 809

19  (9th Cir. 2011), the Ninth Circuit acknowledged *Pinholster's* mandate that habeas review is

20  "confined to the record before the state courts." It explained that the limitation on consideration

21  of new evidence in federal habeas proceedings "also forecloses the possibility of a federal

22  evidentiary hearing." *Id.*

23          Petitioner may claim that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2).

24  However, *Pinholster* suggests otherwise. "Section 2254(e)(2) continues to have force where §

25  2254(d)(1) does not bar federal habeas relief." *Id.* at 185. Analysis of the claims under §

26  2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2). *Id.* Thus, only

27  if a petitioner overcomes § 2254(d) can the court consider a hearing under § 2254(e)(2). As

28

1    Justice Breyer stated: "If the federal habeas court finds that the state-court decision fails [§

2    2254](d)'s test (or if [§ 2254](d) does not apply), then an [§ 2254](e) hearing may be needed."

3    *Id.* at 1412 (Breyer, J., concurring in part and dissenting in part).

4         As discussed above, § 2254(d) applies to claim 8 and claim 9 since they were adjudicated

5    on the merits.  Petitioner has not overcome § 2254(d) with respect to claims 8 and 9.

6         For the reasons stated, petitioner's motion for evidentiary development and hearing on

7    claims 8 and 9 shall be denied.

8                                    **VIII. ORDER**

9         Accordingly, for the reasons stated, it is HEREBY ORDERED that:

10   1.    Claims 8 and 9 (Doc. No. 107) are DENIED,

11   2.    Petitioner's motion to expand the record and for evidentiary hearing filed in

12         conjunction with claims 8 and 9 (Doc. No. 197) is DENIED, and

13   3.    All previously scheduled dates remain in effect.

14

15   IT IS SO ORDERED.

16   Dated:   March 31, 2016     _____

17                                SENIOR  DISTRICT  JUDGE

18

19

20

21

22

23

24

25

26

27

28