1
2
3
4
5
6
7                    # UNITED STATES DISTRICT COURT

8                      EASTERN DISTRICT OF CALIFORNIA
9

10  | WARD FRANCIS WEAVER, JR., | Case No. 1:02-cv-05583-AWI-SAB |
|---|---|
| Petitioner, | **DEATH PENALTY CASE** |
| v. | MEMORANDUM AND ORDER: |
| KEVIN CHAPPELL, Warden of San Quentin State Prison, | (1) DENYING CLAIMS 3-7, 10-34; (2) DENYING PETITIONER'S MOTION FOR RECORD EXPANSION AND EVIDENTIARY HEARING (3) DENYING PETITION FOR WRIT OF HABEAS CORPUS, and (4) ISSUING CERTIFICATE OF APPEALABILITY FOR CLAIMS 3, 7, 8, AND 9 |
| Respondent.[1] | (ECF Nos. 107, 216) |
|  | CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND SUBSTITUTE RON BROOMFIELD AS RESPONDENT WARDEN AND ENTER JUDGMENT |

Petitioner Ward Francis Weaver, Jr. (hereinafter "Petitioner") is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. §

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ron Broomfield, Acting Warden of San Quentin State Prison, shall be substituted as Respondent in place of his predecessor wardens.

2254.  He is represented in this action by attorneys Karen Schryver and Timothy Foley, each appointed pursuant to the Criminal Justice Act, 18 U.S.C. § 3599(a) (hereinafter "CJA").

Respondent Kevin Chappell is named as Warden of San Quentin State Prison.  He is represented in this action by Amanda Cary of the Office of the California Attorney General.

Before the Court for a decision are (1) the amended petition for writ of habeas corpus filed in this proceeding on September 1, 2009 (hereinafter the "Amended Petition") (ECF No. 107), (2) Amended Petition Claims 3-7 and 10-34 including subclaims (hereinafter "Claim" or "Claims"), and (3) Petitioner's motion for expansion of the record and evidentiary hearing relating to certain of the Claims (see ECF No. 216).

Having previously denied Claims 1, 2 (ECF No. 162) and Claims 8 and 9 (ECF No. 209), and upon careful review of the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that (1) Claims 3-7, 10-30, and 32-34 shall be denied with prejudice and Claim 31 shall be denied without prejudice as moot, (2) Petitioner's motion for record expansion and evidentiary hearing shall be denied, (3) the Amended Petition shall be denied, and (4) a Certificate of Appealability shall issue only for Claims 3, 7, 8, and 9.

## I. BACKGROUND

On August 10, 1982, the Kern County Sheriff's Department filed a Felony Criminal Complaint in the Kern County Municipal Court, charging Petitioner with the 1981 murders of Robert Radford and Barbara Levoy, the kidnapping of Levoy, and unlawful sexual intercourse, sodomy, and oral copulation by force upon Levoy.  (CT 131-132.)

On August 19, 1982, attorney David Huffman was appointed to represent Petitioner. (August 19, 1982 RT at 3.)

On September 22, 1982, Petitioner was charged by Information in the Kern County Superior Court with the murders of Robert Radford and Barbara Levoy with special circumstances of murder during the commission of kidnap, rape, sodomy, and multiple murder, and the kidnap of Levoy.[2]  (CT 203-205.)

---

[2] The Information was amended on June 7, 1984.  (CT 987-990.)  On November 14, 1984, the court struck the special circumstances based on rape and sodomy.  (RT 3136-38; CT 1256.)

On June 8, 1983, Donnalee Mendez, soon to be David Huffman's wife Donnalee Mendez Huffman, was appointed to represent Petitioner as co-counsel (hereinafter "Counsel" refers to either or both Mr. and Mrs. Huffman, "Lead Counsel" refers to Mr. Huffman, and "Second Counsel" refers to Mrs. Huffman).  (CT 242.)

During the arraignment hearing, on October 27, 1982, Counsel raised a doubt as to Petitioner's competence to stand trial.  Counsel pointed to reports by jailers and/or prisoners that Petitioner was acting abnormally and hearing voices, and to Petitioner's appearance.  (September 29, 1982 RT at 2-3; CT 206.)  The arraignment court agreed with Counsel, and with the concurrence of the parties appointed two experts to evaluate Petitioner pursuant to Penal Code section 1368 (competence to stand trial) and section 1026 (sanity).  (CT 207-208).  The parties submitted the matter of trial competence on the experts' reports.  (CT 209.)  The arraignment court reviewed the reports and found that Petitioner to be "presently sane" and "sane for purposes of standing trial, "and proceedings were reinstated.  (Id.)  Thereupon, Petitioner entered a plea of not guilty to all Counts and denied all allegations.  (Id.)  Subsequently, Petitioner additionally plead not guilty by reason of insanity (hereinafter "NGI") to all Counts.  (See April 13, 1984 RT at 4-5; CT 639, 673, 917-20, 934, 982-89.)

Petitioner's trial began on September 26, 1984.  (CT 1159.)  The trial court denied pretrial motions to exclude Petitioner's taped confession and admissions to law enforcement.  (CT 1258-1259.)

On December 19, 1984, the jury found Petitioner guilty of two Counts of murder and one Count of kidnapping with special circumstances of murder during the commission of kidnap and multiple murder.  (CT 1355-1357, 1482-1490.)

The sanity phase began on January 14, 1985.  (CT 1497-1498.)  On February 28, 1985, following proceedings during which Lead Counsel largely was absent due to alleged health problems, and following Petitioner's waiver of the presence of Lead Counsel, the jury deliberated 42 minutes and found Petitioner sane at the time of the crimes.  (CT 1577-1578, 1627-1629.)

On March 5, 1985, the penalty phase began.  (CT 1630-1631.)  On March 6, 1985,

1  Petitioner testified for fifteen minutes and Second Counsel presented argument in mitigation.

2  (RT 6976-82, 7027-7039; CT 1632-1633.)  On March 7, 1985, after less than one full day of

3  deliberations, the jury returned a death verdict.  (RT 7064-65; CT 1636-1637, 1708-1709.)

4       On April 4, 1985, the trial court entered judgment of death.  (RT 7104-7111; CT 1759-

5  1763.)[3]

6       The California Supreme Court affirmed Petitioner's conviction on direct appeal on

7  August 20, 2001.  (Lod. Doc. No. 4, People v. Weaver, 26 Cal. 4th 876 (2001), California

8  Supreme Court Number S004665.)  That court denied his petition for rehearing on October 24,

9  2001.  (Lod. Doc. No. 6.)  Petitioner filed a petition for writ of certiorari in the United States

10  Supreme Court on January 17, 2002, which was denied on May 13, 2002.  (Lod. Doc. Nos. 27,

11  29.)

12       Petitioner, through appellate counsel, filed a petition for writ of habeas corpus in the

13  California Supreme Court on September 28, 1998, seeking to set aside the judgments of

14  conviction and sentence of death.  (Lod. Doc. No. 7, In re Ward Francis Weaver, Jr., California

15  Supreme Court Number S073709.)  On November 14, 2001, the California Supreme Court

16  denied the petition on the merits and also denied some claims as procedurally barred.  (Lod. Doc.

17  No. 8.)

18       On May 17, 2002, Petitioner commenced this proceeding under 28 U.S.C. § 2254 by

19  filing a combined request for appointment of counsel and temporary stay of execution.  (ECF

20  Nos. 1, 2.)  On May 30, 2002, Petitioner filed a separate request to proceed in forma pauperis.

21  (ECF No. 3.)  The Court granted requests for appointment of counsel and in forma pauperis

22  status and denied as moot the stay of execution, on May 31, 2002.  (ECF No. 4.)

23       On May 5, 2003, Petitioner filed in this proceeding a petition for writ of habeas corpus

24  pursuant to 28 U.S.C § 2254.  (ECF No. 32.)

25  _____

[3] Unless otherwise indicated, throughout this order, "1SHCP" refers to the first state habeas corpus petition;

26  "2SHCP" refers to the second state habeas corpus petition; "CT" refers to the clerk's transcript on appeal, "RT" to
the reporter's transcript on appeal, "SCT" to the supplemental clerk's transcript on appeal.  Other transcripts are

27  referenced by date.  Reference to page numbering is to: ECF page numbering for documents filed electronically in
CM/ECF, Bates numbering for CT documents and where otherwise expressly noted, and internal pagination for all

28  other documents.  Reference to state law is to California law unless otherwise noted.

Petitioner filed a second petition for writ of habeas corpus in the California Supreme Court on May 6, 2003, again seeking to set aside the judgments of conviction and sentence of death. (Lod. Doc. No. 23, In re Ward Francis Weaver, Jr., California Supreme Court Number S115638.)

On March 16, 2004, this Court held the federal proceeding in abeyance pending the conclusion of state court exhaustion proceedings. (ECF No. 56.)

On August 26, 2009, the California Supreme Court denied the second petition on the merits and also denied some claims as procedurally barred. (Lod. Doc. No. 24.)

On September 1, 2009, Petitioner filed the operative Amended Petition in these proceedings. (ECF No. 107.)

Respondent filed his answer on March 30, 2010, admitting the jurisdictional allegations, asserting procedural defenses, and denying that Petitioner is entitled to federal habeas relief on Claims 1 through 34. (ECF No. 116.)

On June 2, 2010, the Court found all the Claims in the Amended Petition to be exhausted (except for a subclaim of Claim 7 as to which the Warden waived exhaustion); and found the Amended Petition timely filed. (ECF No. 121.)

On March 24, 2014, the Court denied on the merits Claim 1 (alleging deprivation of trial counsel due to impairment and incompetence), and Claim 2 (alleging deprivation of counsel and a fair trial due to counsel's conflicts of interest). (ECF No. 162.)

On March 31, 2016, the Court denied on the merits Claim 8 (alleging ineffective assistance of counsel at the sanity phase), and Claim 9 (alleging ineffective assistance of counsel at the penalty phase). (ECF No. 209.)

On November 10, 2016, Petitioner filed his brief in support of Claims 3-7 and 10-34. (ECF No. 210.)

On May 12, 2017, Respondent filed his brief in opposition to Claims 3-4 and 10-34. (ECF No. 211.)

On September 15, 2017, Petitioner filed his brief and a supporting exhibit in reply to Respondent's opposition brief. (ECF Nos. 214 & 215, respectively.)

On December 13, 2017, Petitioner moved for: (i) evidentiary hearing on Claims 3, 4, 6, 7, 11 and certain procedural default allegations relating to Claims 11, 12 and 18, and (ii) expansion of the record with additional documentation relating to Claims 3, 4, 6, 7 and 11. (ECF Nos. 216, 217.)  Respondent filed his opposition to the motion on February 13, 2018.  (ECF No. 218.) Petitioner filed his reply to the opposition on April 13, 2018.  (ECF No. 219.)

## II. STATEMENT OF FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its August 20, 2001 opinion.  People v. Weaver, 26 Cal. 4th 876 (2001).  Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the state supreme court's summary of facts is presumed correct. See Kirkpatrick v. Chappell, 950 F.3d 1118, 1131 (9th Cir. 2020), cert. denied, 141 S. Ct. 561 (2020) ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits.  Rather, it appears to apply to all factual determinations made by state courts."). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state supreme court.  Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

## I. Guilt Phase

### A. *Facts*

Robert Radford, 18 years old, was assigned to basic training for the United States Air Force in Colorado. While there, he met 23-year-old Barbara Levoy. When Radford completed his training, he traveled to his home in Edmonds, Washington, and Levoy accompanied him to meet his parents. The couple then drove south to Pinedale, California (near Fresno) to meet Radford's grandmother. The couple's ultimate destination was Las Vegas, Nevada, where Radford would begin his first tour of duty at Nellis Air Force Base. Levoy planned to fly home to Colorado from Las Vegas.

Radford and Levoy arrived in Pinedale on the afternoon of February 5, 1981, and visited with Radford's grandmother. They left Pinedale around 7:00 p.m. the same day, anxious to get to Las Vegas. Unfortunately, their car broke down one mile east of Tehachapi. James Powell was coming home from work around 11:00 p.m. and encountered Radford, his disabled car on the side of the road with its emergency lights flashing. Powell saw a young woman in the car. He offered the couple a ride back to Tehachapi, but Radford declined because it was in the opposite direction from which he was traveling. Powell left.

Our knowledge of what happened next derives from defendant's admissions to a cellmate, Ricky Gibson, defendant's tape-recorded interviews with police, and defendant's testimony at trial. Around 10:00 p.m., defendant, who was working as a long-haul trucker, saw Radford's car on the side of the road as he drove by in the opposite direction. n.1  Defendant exited the highway and circled back to offer his assistance. Radford and Levoy accepted his offer to drive them to Mojave. After driving about five miles, defendant pulled over and asked Radford to help him shift the load on the flatbed of his truck. Levoy stayed in the cab. While Radford was bent over with his back turned, defendant struck him on the back of the head with a "cheater pipe," a three to four-foot length of metal pipe truckers use to gain leverage when tightening the bindings that restrain a load on the truck. A later autopsy revealed 11 separate lacerations to Radford's head.

-FOOTNOTE-

n.1 Asked why he stopped to help, defendant explained that he had plenty of time because he did not have to be in San Francisco to deliver his load until 8:00 a.m. the next morning. The way defendant expressed it, however, proved prophetic and chilling: he said he stopped to help because "I had some time to kill."

-END FOOTNOTE-

Defendant rejoined Levoy in the truck cab, displayed a knife, and had her sit with her head between her legs and her hands behind her, a technique defendant had learned when transporting prisoners during his military service in Vietnam. Defendant reversed direction and drove to Bakersfield; near Kettleman City, he stopped and raped Levoy. He then drove towards San Francisco, pulled off the highway once more and again raped Levoy.

Meanwhile, a citizen reported having seen Radford on the side of the road where defendant had left him. Police responded to the scene and attempted to keep Radford alive, but he died on the way to the hospital. Police found a large amount of blood at the crime scene. At the hospital, Radford's wallet, with his Washington State driver's license, was found, allowing police to link Radford to the disabled car a few miles away. The car contained a woman's purse and several pieces of luggage. Correctly surmising that Radford had been traveling with a woman, police forced open the car and discovered identification belonging to Levoy. Police then issued a missing person report and organized a search effort to find her. Their efforts came too late to save Levoy.

After he deposited his cargo in San Francisco, defendant drove towards his home in Oroville. At a secluded spot outside that town, he stopped and asked Levoy to get out of the truck. He tied her hands and feet with electrician's tape, but when he attempted to gag her, Levoy struggled and bit defendant severely on the thumb. He then strangled her. He dug a grave and buried Levoy's body there before driving into town to meet his wife, who was working a late shift in a local restaurant. It was suggested defendant move the body, so defendant took his wife's car and returned to the grave, exhumed the body, put it in the trunk of the car and drove home. When he arrived, defendant's three children were awake and asked him about his bloody thumb. He told them he had gotten in a fight and that they should stay in the house because his assailant might come looking for him.

With the children in the house, defendant moved Levoy's body from the car to a shallow grave dug in his backyard. Defendant previously had begun digging trenches in his yard for a sewer line and had instructed his 10-year-old son and another boy to keep working on the digging project while he was away driving his truck. Some weeks later, defendant exhumed Levoy's body again and moved it to a deeper grave elsewhere in his yard. He then built a wooden platform over the grave so his wife could stand on it and hang out the laundry without getting her feet wet in the grass.

Police were stymied in their attempt to solve Radford's murder and Levoy's disappearance. Then, 17 months after the crimes, prison inmate Ricky Gibson contacted authorities and reported that defendant, who was serving time in prison for subsequent unrelated (but similar) crimes, had told him the story of how he killed Radford and raped and killed Levoy.

Police went to defendant's home in Oroville, interviewed defendant's wife and son, and obtained consent to search the yard. Defendant's son directed police to the platform, which they removed and discovered Levoy's badly decomposed body. She was identified through her dental records. In addition, the body bore the same clothes Levoy had been wearing when she disappeared, with the exception that her panties were missing.

An autopsy of Levoy's body yielded no clues about the cause of her death, due to the advanced state of decomposition. Some electrician's tape, however, was found stuck to the collar of her shirt.

Police proceeded to interview defendant at San Quentin State Prison. He agreed to waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S. Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) if he could first speak to his mother. Police agreed. After speaking with his mother, he agreed to talk to police. In two tape-recorded interviews, defendant admitted he had killed Radford and Levoy, and that he had raped Levoy. He drew a map of the place in rural Oroville where he had first buried Levoy. Following the map, police found an indentation in the ground where defendant said he had dug the first grave; police also found some black electrician's tape on the ground nearby.

Defendant testified at trial. He claimed he had heard the voice of a female named Ladell in his head since he was 17 years old. He first heard a competing unnamed male voice when he served in Vietnam in 1968 and 1969. He trusted the male voice because it had warned him of danger in Vietnam and saved his life. Defendant explained that he often used amphetamines to stay awake while driving his truck, had taken amphetamines the day of the crimes and, at the time he killed Radford, had not slept in a week and a half.

When he picked up Radford and Levoy, he noticed how attractive Levoy was and became sexually aroused. The male voice started saying he should have sex with Levoy. Ladell told him to leave Levoy alone. The male voice assured him he would not get in trouble if he raped Levoy. Defendant testified, "I just couldn't go against him. I just couldn't help it. Had to go along with what sounded like the most logical thing to do." The male voice said to knock Radford out so he could be alone with Levoy. Defendant decided to follow the male voice, but did not think Radford would die because defendant had assaulted someone with the "cheater pipe" in 1977 and the victim did not suffer serious injury. Defendant said that if he had wanted to kill Radford, he would have used the knife he kept in the

1   truck or used some other, more silent means of killing that he had learned in the military.

2   Defendant testified that when he hit Radford, the young man fell off the truck
3   screaming. Defendant told him to "shut up" and when he did not, defendant struck him "a couple" of times with the pipe, taking full swings with both hands on the
4   pipe. He did not check to see if Radford was alive or dead; he just assumed Radford was "out." He then rejoined Levoy in the truck, displayed his knife, and
5   started driving. The voice named Ladell was chastising him while the male voice was telling him to ignore Ladell. When they approached Kettleman City, the male
6   voice reminded defendant to have sex with Levoy. He pulled over around 4:00 a.m., displayed his knife again, and then raped Levoy. He then drove north
7   towards San Francisco. About an hour later, he pulled over and raped Levoy again.

8   Defendant claimed he did not intend to kill Levoy and, after the second rape, was
9   looking all along the route for a safe yet deserted place to drop her off. As it began to get light, he abandoned this plan and took her to the Bay Area with him.
10  He instructed Levoy to sit on the floor of his truck while he delivered his load. She obeyed, sitting quietly in the truck for 45 minutes. He then drove to Oakland
11  to pick up another load for a local delivery. Defendant was stopped on the way to Oakland by a California Highway Patrol officer, but Levoy complied with
12  defendant's instructions and did not call out to the officer or try to escape. After stopping in Oakland, defendant drove home to Oroville, taking a long and
13  winding route.

14  Defendant stopped four miles outside of Oroville. By now it was about 11:00 p.m. on February 6, 1981. Defendant told Levoy he would tie her up and leave her
15  under a bridge, coming back the next day when he was scheduled to drive to Southern California. He would then release her in Los Angeles in a warehouse
16  district. He bound her with electrician's tape, but when he tried to gag her with some fabric diapers, she struggled and bit him on the thumb and would not let go.
17  Defendant testified he twice hit her with his fist and then he blacked out and began jerking the diaper around Levoy's neck. He stopped when he realized she
18  was no longer biting him. She slumped over; defendant at first thought she was unconscious but then determined she was dead. He cried and asserted he had
19  never intended to kill her, even when she bit him. The male voice told him to get rid of the evidence. As indicated, he buried her where he killed her, then exhumed
20  her body twice before finally burying her in his yard.

21  The next morning, on February 7, 1981, Thomas Jenkins, an insurance adjuster, met with defendant and noticed facial abrasions and scratches, as well as a white
22  bandage on his hand. Defendant said his thumb had been almost bitten off by another trucker.

23  Defendant's first wife, Patricia Budrow, testified that defendant hates to be bitten.
24  She testified she once bit his hand when they were wrestling in the car and he became very angry and began choking her. Another time, she bit his hand when
25  they were wrestling on the floor. He grabbed her by the neck and looked dazed and glassy-eyed. He later told her he did not know why he choked her, but that he
26  hated being bitten, and that when he was a child his mother would bite him until he bled as a means of disciplining him. Budrow also testified that defendant's
27  mother confirmed the story and suggested Budrow use the same method to train her children.

28  Weaver, 26 Cal.4th at 898-903.

## II. Sanity Phase

### A. *Facts*

#### 1. *Evidence of Defendant's Family and Childhood*

Dr. Albert Raitt, Jr., staff psychiatrist and director of the Butte County Mental Health Program, testified defendant's maternal aunt, Kathryn Bernardo, was schizophrenic. Dr. Raitt also concluded from medical records that Bernardo's daughter (and defendant's cousin) Lucia Bernardo, was schizophrenic. Dr. Raitt explained that experts believe there is a genetic component to schizophrenia, hence the chance defendant would be schizophrenic was enhanced by the fact that his aunt and cousin were so afflicted.

Katie S. testified she is defendant's sister. She is 15 months younger than defendant and thus was 39 years old at the time of trial. When she was six years old, defendant cut off one of her fingers while playing with a hatchet. She later came to believe this act was intentional. About a year later, defendant tied her to a tree, saying he was going to hang her. She did not believe him until he began tying a noose. When he began to place the noose around her neck, she began screaming hysterically. Defendant left her tied to the tree for a long time before returning and releasing her. When she said she would tell their mother what he had done, he threatened to beat her up.

Other incidents occurred in the next three years. Once, when defendant's sister was in a field, he stampeded a herd of cattle into the field, later telling her he had done it on purpose. He also locked her in a tool shed and then set it on fire. He finally let her out when she screamed and pounded on the door; the fire got out of control and started a forest fire. Defendant's mother punished both of them for this incident.

When Katie S. was nine years old, defendant tied her up and inserted sticks into her vagina. When she was 12, defendant raped her and later told her she was pregnant. She did not tell anyone about the rape because his threats frightened her. Around that same time, she saw defendant and another boy torture a cat by rubbing sandpaper on its bottom and then pouring turpentine on it. She would sometimes get her friends to beat defendant up, although her parents punished her with a whipping when they found out. When defendant was in high school, he dated girls named Ladell and Sharon. He married his first wife, Patricia Budrow, when he was 18 years old, but continued to live with his parents. Katie S. admitted she was seeing a psychiatrist to help her deal with her childhood experiences with defendant.

#### 2. *Lay Evidence of Mental Illness*

Defendant's cousin, Russell Mathiasch, testified that in the mid-1970's he lived in Texas. Around that time, he helped take defendant to a Veterans Administration hospital in Dallas for treatment for his mental illness, but defendant was turned away for lack of space; later that day, defendant was denied admission at another Veterans Administration hospital in Waco. Defendant then returned home to California.

Del Roy Barnett was a coworker and friend of defendant. They often hunted and fished together. When defendant went to Vietnam, he gave Barnett some fishing equipment because he did not expect to return. When defendant returned from Southeast Asia, he was more aggressive and outgoing. He seemed more prone to

10

violence; he was irritable and anxious, and he drank more. He was depressed and had trouble keeping a steady job. Sometimes defendant did not appear to know Barnett was with him; defendant would talk to himself or to unseen people. Barnett thought defendant probably took drugs to stay awake when he drove his truck, but he was not sure.

Carl Hogan and Richard Archuleta testified they had been incarcerated with defendant in the Kern County jail, and they saw him talking to himself or to unseen people.

Cecil Sneed, another Kern County jail inmate, testified defendant asked him to testify that he had seen defendant talking to imaginary people. However, Sneed had never seen defendant engage in such behavior. Sometime after the encounter, he received a letter from defendant reading: "Anyone who hurt my case I would do my best to do them in." Sneed was impeached by evidence that after his testimony he was to be released from jail and given a bus ticket, and by evidence from two other jail inmates, Charles Shannon and Christopher Flores, who testified Sneed was laughing and saying defendant was his "meal ticket out of here" or words to that effect. Both Shannon and Flores reported seeing defendant awake late at night, pacing and talking to himself.

3. *Expert Witnesses Called by the Defense*

Dr. Robert Gardner conducted a presentence diagnostic evaluation of defendant for Humboldt County in 1977 following defendant's conviction of assault for hitting a woman on the head with a baseball bat. Dr. Gardner testified defendant was obviously depressed. Defendant said he had assaulted his wife several times and had volunteered for the Army in order to be killed. Dr. Gardner concluded defendant had suffered a "psychotic depressive reaction" and probably had an "underlying psychiatric disorder" of an unspecified type and "might be on the verge of becoming psychotic." Dr. Gardner stated in his report that defendant was at that time a "danger to others." Although he did not find defendant was suffering from schizophrenia, he did not rule it out.

Dr. Alfred Owre, Jr., was the chief psychiatrist for the Department of Corrections, California Men's Colony in San Luis Obispo in 1977 and evaluated defendant for parole suitability. While incarcerated at the Men's Colony, defendant was not taking any prescribed medications, such as antipsychotic medication. Dr. Owre noted defendant was in school while in prison and received satisfactory work reports. He concluded defendant was a "person without psychiatric symptomology except in his distorted relationships with women." Quoting from his 1977 report, Dr. Owre noted that, regarding relationships with women, defendant "derives pleasure from suffering at their hands," but "[w]hen stressed he derives an emotional relief from inflicting pain upon them. This is sexualized." His 1977 diagnosis was that defendant suffered from a "passive aggressive personality with depressive and then sadomasochistic features." A secondary diagnosis was that he bore "[a]ggressive sexuality towards adult women, manifested by attempted rape." Defendant presented no signs of schizophrenia to Dr. Owre. Dr. Owre found defendant was not depressed or suicidal, and he testified defendant did not complain of hallucinations or delusions.

On redirect, Dr. Owre opined that defendant was "definitely out of reality contact" and that, as he was observing him in the courtroom, Dr. Owre believed defendant was "suffering from a chronic [u]ndifferentiated schizophrenic condition. He is responding to internal messages. He shows a dearth of body

11

sensing movements. He appears to me to have deteriorated markedly since we last had him [at the Men's Colony]."

A year after Dr. Owre's evaluation, in 1978, Dr. Jack Tolchin also conducted a periodic mental health evaluation of defendant at the California Men's Colony for the Community Release Board. He agreed with Dr. Owre's previous diagnosis of a "passive aggressive personality with sadomasochistic features or depressive features or both." This condition was not a mental disease or defect but was instead a personality disorder. He did not find defendant to be schizophrenic, but admitted defendant's personality disorder was "very severe." Dr. Tolchin recommended defendant continue in therapy and be monitored on parole by a psychiatrist.

Dr. George Chappell, a psychiatrist, was appointed by the court to examine defendant to determine his sanity in connection with his 1981 crimes in Ventura County against David Galbraith and Michelle D. n.12 Dr. Chappell testified defendant told him he was taking 600 milligrams of Mellaril, an antipsychotic medication. Defendant told him he could not shave with a mirror because when he looked at his own face, he heard voices telling him to cut his own throat. Defendant reported to Dr. Chappell hearing two voices, one male and one female; defendant claimed he had heard the voices "over a period of years and months." Dr. Chappell "had serious questions as to whether [defendant] heard voices" because there was no direct evidence of his having heard such voices and it was unusual that defendant had not complained to people close to him (like his wife) about the voices.

-FOOTNOTE-

n.12 Evidence of these crimes, which occurred shortly after the crimes against Radford and Levoy, was admitted at the penalty phase. (See discussion, *post*, pt. III.A.)

-END FOOTNOTE-

Defendant told Dr. Chappell that he had been taking amphetamines for the previous 18 months to stay awake while driving. Amphetamines would probably aggravate an already existing psychosis, but Dr. Chappell did not believe defendant suffered from schizophrenia or any other psychosis. Dr. Chappell believed defendant "was malingering or faking some of his symptoms." He found defendant was legally sane at the time of the Ventura County crimes.

Dr. Theodore Donaldson, a clinical psychologist, also examined defendant for insanity in connection with the Ventura County crimes. In addition to interviewing him, Dr. Donaldson gave defendant the Minnesota Multiphasic Personality Inventory and the Rorschach Projective Personality Test. Defendant told him the voices in his head argued over whether to rape Michelle D., the victim in the Ventura County case, and "the bad voice" won. Defendant knew the rape was wrong but did it anyway. Dr. Donaldson thought defendant might be fabricating the auditory hallucinations; he concluded defendant suffered from a "mixed personality disorder, depressive neurosis, and a long history of amphetamine abuse." Persons suffering from a personality disorder such as defendant's usually had a very small "built-in set of morals and values" and a "lack of impulse control." He did not think defendant was schizophrenic. Like Dr. Chappell, Dr. Donaldson concluded defendant was not suffering from a mental disease or defect and was not insane in connection with the Ventura County case.

Dr. Rolland Rose, a psychologist, conducted a diagnostic placement evaluation of defendant in 1981 at the California Institute for Men in Chino, a state prison. Dr. Rose had no personal recollection of defendant, but testified from his 1981 report. He found defendant exhibited an "intense hostility toward women" and diagnosed him as suffering from a "passive aggressive personality with schizoid features and sexual sadism," which he explained was a character disorder and not a mental disease or defect. He admitted that one bearing such symptoms could be suffering from schizophrenia in remission and that the character disorder Dr. Rose diagnosed could be superimposed on a psychotic disorder.

Dr. Jack Shonkwiler, a psychiatrist, testified he was presently working under a restricted license and was being supervised at a clinic by two other doctors. He testified he had examined defendant in connection with the team of defense experts, including Drs. Lundgren, Dietiker, and Cholet and Mr. Powers. He interviewed defendant and defendant's mother and sister, and he viewed videotapes of defendant answering questions pursuant to the Vietnam Era Stress Inventory. He also examined reports from prior mental health evaluations of defendant and his medical and military records.

Dr. Shonkwiler found defendant was "flooded with fantasies, images, visions of [a] sadistic sexual and aggressive nature and he has essentially no control." He noted that the fact defendant had close blood relatives who were schizophrenic gave him a "marked predisposition" to have schizophrenia. Dr. Shonkwiler's final diagnosis of defendant was "paranoid schizophrenia and post-traumatic stress [disorder]" (PTSD). He explained that the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III) n.13 required evidence of the presence of at least one of six diagnostic criteria under subdivision A for a diagnosis of schizophrenia, and defendant fit all six categories. n.14 He had bizarre delusions (he thought he could communicate with his mother telepathically); he had grandiose delusions (he believed he could hold off police with explosives made from household objects like bicycle tires and detergent); he had auditory hallucinations involving two or more voices; and he had markedly illogical thinking. Defendant fell "somewhat" into subdivision B, and there was evidence of subdivision C although such evidence was not "dramatic." For this latter criterion, Dr. Shonkwiler noted defendant's social isolation, his blunt or flat affect, and his belief in telepathy. Defendant did not suffer from manic depression so subdivision D did not apply. Dr. Shonkwiler examined defendant when he was 38, so onset of symptoms occurred before age 45, fulfilling subdivision E. Defendant did not suffer from an organic mental disorder or retardation (subd. F).

-FOOTNOTE-

n.13 DSM-III was the then accepted diagnostic tool in the mental health profession. (See now Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV).)

n.14 DSM-III contains the following diagnostic criteria for schizophrenic disorder:
"A. At least one of the following during a phase of the illness:
"(1) bizarre delusions (content is patently absurd and has *no* possible basis in fact), such as delusions of being controlled, thought broadcasting, thought insertion, or thought withdrawal
"(2) somatic, grandiose, religious, nihilistic, or other delusions without persecutory or jealous content
"(3) delusions with persecutory or jealous content if accompanied by hallucinations of any type

"(4) auditory hallucinations in which either a voice keeps up a running commentary on the individual's behavior or thoughts, or two or more voices converse with each other

"(5) auditory hallucinations on several occasions with content of more than one or two words, having no apparent relation to depression or elation

"(6) incoherence, marked loosening of associations, markedly illogical thinking, or marked poverty of content of speech if associated with at least one of the following: [¶] (a) blunted, flat, or inappropriate affect [¶] (b) delusions or hallucinations [¶] (c) catatonic or other grossly disorganized behavior

"B. Deterioration from a previous level of functioning in such areas as work, social relations, and self-care.

"C. Duration: Continuous signs of the illness for at least six months at some time during the person's life, with some signs of the illness at present. The six-month period must include an active phase during which there were symptoms from [criterion] A, with or without a prodromal or residual phase, as defined below.

"*Prodromal phase*: A clear deterioration in functioning before the active phase of the illness not due to a disturbance in mood or to a Substance Use Disorder and involving at least *two* of the symptoms noted below.

"*Residual phase*: Persistence, following the active phase of the illness, of at least *two* of the symptoms noted below, not due to a disturbance in mood or to a Substance Use Disorder.

"*Prodromal or Residual Symptoms*

"(1) social isolation or withdrawal

"(2) marked impairment in role functioning as wage-earner, student, or homemaker

"(3) markedly peculiar behavior (e.g., collecting garbage, talking to self in public, or hoarding food)

"(4) marked impairment in personal hygiene and grooming

"(5) blunted, flat, or inappropriate affect

"(6) digressive, vague, overelaborate, circumstantial, or metaphorical speech

"(7) odd or bizarre ideation, or magical thinking, e.g., superstitiousness, clairvoyance, telepathy, 'sixth sense,' 'others can feel my feelings,' overvalued ideas, ideas of reference

"(8) unusual perceptual experiences, e.g., recurrent illusions, sensing the presence of a force or person not actually present [¶] ... [¶]

"D. The full depressive or manic syndrome (criteria A and B of major depressive or manic episode), if present, developed after any psychotic symptoms, or was brief in duration relative to the duration of the psychotic symptoms in [criterion] A.

"E. Onset of prodromal or active phase of the illness before age 45.

"F. Not due to any Organic Mental Disorder or Mental Retardation." (DSM-III, *supra*, pp. 188-190, italics in original.)

-END FOOTNOTE-

Dr. Shonkwiler also opined that, in addition to schizophrenia, defendant suffered from "full-blown post-traumatic stress [disorder]." The witness explained that defendant's emotional detachment from his wife and children and his generally constricted affect were both indicative of PTSD. Defendant's memory impairment, difficulty concentrating and expressions of survivor guilt, apparent from the videotapes of defendant taking the Vietnam Era Stress Inventory test, were likewise consistent with PTSD. Dr. Shonkwiler testified that defendant's chosen profession as a long-haul trucker could be viewed as a means to avoid intimate relationships, which was consistent with the PTSD characteristic of avoiding activities that arouse recollection of the traumatic event. Dr. Shonkwiler surmised that defendant's amphetamine abuse may be related to a sleep

14

disturbance, a common feature of PTSD. The witness admitted there was no evidence defendant displayed hypervigilance, or an exaggerated startle response, or that his symptoms intensified when exposed to events that symbolized or resembled the war experience, three additional symptoms of PTSD. He testified that defendant's abusive childhood predisposed him to have PTSD.

Dr. Shonkwiler also found defendant's amphetamine abuse was a factor in the crimes: "My understanding was that [defendant] would have a quart jar with amphetamines, ephedrine, maybe some valium, some elevil [*sic*], and would go 20 hours without sleep, driving a long range truck. He would just grab a fistful and stuff it [in his mouth]. He didn't even know what he was taking. I am saying that what he did may have been 30 percent schizophrenia, 30 percent post-traumatic stress, 30 percent child abuse and the rest amphetamines and sleep deprivation. But who knows what was happening back there in '81, like a half-hour, hour before he murdered Radford or kidnapped Levoy. Maybe he shoved some amphetamines in him, which would make amphetamines 90 percent of what he did."

Dr. Shonkwiler opined that if defendant were taking antipsychotic medication during prior mental health evaluations, his symptoms would have been masked.

Dr. Shonkwiler concluded that although defendant knew right from wrong, he was unable to conform his conduct to the law. As a result of his abusive childhood, schizophrenia, PTSD, and amphetamine abuse, defendant had "[v]ery poor impulse control. He is functioning at the level, the earliest level of a child wanting something and reaching for it. No gratification delay, very poor impulse control." The witness concluded defendant was legally insane.

Dr. Kathe Lundgren, a clinical psychologist, interviewed defendant and administered a series of psychological tests to him at the request of defense counsel. She concluded defendant had "one of the most severe personality disorders" and that "[a] perceived threat to his source of affection or love," even "a slight frustration could set him into a violent act or a socially unacceptable act. Remember, that this is perceived stress, and besides his personality disorder is the psychosis, which twists reality, so even though you and I might not see something as being threatening or frustrating, in his twisted perception of it, it could be that it is frustrating to him." She concluded defendant suffered from chronic undifferentiated schizophrenia with a sociopathic, antisocial personality.

Dr. Lundgren opined that defendant attempted to fake being sicker than he was, but she determined this was just an aspect of his mental illness. She was not prepared to give a professional opinion whether defendant was legally insane.

Dr. K. Edward Dietiker, a psychologist, testified he was a member of the defense team of experts that examined defendant. He also administered some psychological tests to defendant. He concluded defendant suffered from paranoid schizophrenia. He opined that "under certain circumstances [it would be] very difficult for [defendant] to hold his behavior in conformity to the law. I think that may [vary] from one situation to another, but certain situations that involve him in the sexual sadistic controlling kinds of relationships, it may be virtually impossible." Dr. Dietiker did not express an opinion about whether defendant was insane at the time of the crimes.

Dr. Byron Wittlin, a psychiatrist, testified he worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients and Vietnam War veterans. He examined defendant and read several reports and previous mental

health evaluations of defendant. He believed that when defendant entered the military, he was already suffering from a psychotic illness and explained that the stress of combat could aggravate a preexisting psychotic condition. He concluded defendant suffered from schizophrenia, paranoid type, as well as PTSD, but he could not determine whether defendant was legally insane.

Dr. Clyde Donahoe, a psychologist, testified he also worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients. He examined defendant, administered psychological tests and reviewed his military records. In addition, Dr. Donahoe administered psychophysiological tests, measuring defendant's heart rate and respiration while he was shown a series of pictures, some of which portrayed scenes from the Vietnam War. Defendant self-reported on the "Traumatic Violence Scale" to Dr. Donahoe that he had "either participated in or witnessed these items: Killing of women or children, mutilation of dead bodies, mutilation of live people, inadvertent air strikes or ambushes on own or friendly troops, use of white phosphorous or napalm, torture of prisoners, mercy killing, watching a buddy die in a gruesome manner, leaving one of the civilians to die, taking human body parts as trophies, bagging dead bodies, deliberate killing of old women, men or children ... and the routine killing of prisoners."

Dr. Donahoe concluded to a reasonable medical certainty that defendant suffered from delayed PTSD. He did not know whether defendant suffered from PTSD in 1981 when the crimes occurred, but admitted that he could "very well" have had the disorder then.

Dr. John Wilson, a clinical psychologist, works with veterans and is an expert on PTSD. He developed the Vietnam Era Stress Inventory (VESI), a diagnostic tool consisting of several hundred questions to help determine if a person suffers from PTSD as a result of service in the Vietnam War. He interviewed defendant and examined police reports and the numerous previous psychological evaluations of defendant. Defendant reported to him that he had served as a combat engineer, stood perimeter guard duty and encountered incoming mortar and "sapper" fire, n.15 participated in unit patrols that "encountered anti-personnel weapons," engaged the enemy in a fire fight, was a tunnel rat (i.e., he entered underground tunnels constructed by the Viet Cong) and checked enemy base camps, and was a demolitions expert. Dr. Wilson opined that these experiences were consistent with the dates of service in defendant's military record.

-FOOTNOTE-

n.15 A "sapper" is a "member of a military engineer unit organized, trained, and equipped primarily to execute ... field fortification work" or "an engineer that lays, detects, and disarms mines." (Webster's 3d New Internat. Dict. (1961) p. 2013, col. 3.)

-END FOOTNOTE-

Dr. Wilson testified defendant has "paranoid schizophrenia in addition to post-traumatic stress disorder and a mixed personality disorder. All three coexist." He opined that defendant was "absolutely not" faking the symptom of "thought broadcasting," that is, the belief that people know his thoughts. Dr. Wilson explained: "[Defendant's] affect was so intense that when individuals try to make [*sic*; mask?] their emotions, their affect [does not] quite correspond to the content of what you are saying and his was so spontaneous and his speech so pressured that that's very characteristic of someone who is suffering from this disorder."

16

Dr. Wilson opined that defendant's schizophrenia began developing "very early in childhood" as a result of sexual and physical abuse by his parents, especially his mother. In response to this upbringing, he began to express his sexual and aggressive feelings by engaging in antisocial behavior, as that was more comfortable than dealing with the "deeper level of his personality, where he is terribly confused and loses touch with reality, and then begins to hear voices and other things." His war experiences fed into his underlying psychosis in two ways. First, they gave sanction to his violent impulses. Second, the stress of war removed "whatever remaining controls he had over his impulses. What we now have is an individual with pre-existing psychotic tendencies, learned psychopathic antisocial personality disorder kinds of traits, but with no means to modulate them, because the effect of the war stress was to pull away those tenuous controls, ego controls, ego defenses, so that in one sense what we have is now this interplay. The post-traumatic stress disorder causes him to feel vulnerable. He re-experiences images, nightmares, feelings connected to Vietnam. Those make him feel vulnerable. That then feeds back into the psychosis, so he begins to have hallucinations and hear voices. To cope with that, he behaves in an antisocial way. So the three [psychological conditions, namely schizophrenia, PTSD, and personality disorder,] literally feed into each other."

Dr. Wilson concluded defendant was legally insane because, although he could distinguish right from wrong, he "could not conform his conduct to the requirements of the law." He had read the reports of the four experts later called by the prosecution, Drs. Cutting, Criswell, Burdick and Matychowiak, and concluded they were incorrect in concluding defendant was sane, and that all four experts overlooked defendant's PTSD.

Defendant's final sanity phase witness was Dr. Harry Kormos, a psychiatrist. He is an expert on PTSD and the psychological problems of veterans, and had worked with hundreds of veterans. He reviewed 10 to 12 inches of documents relevant to defendant, including defendant's past mental health evaluations, the police reports of the crimes, defendant's military record, and videotapes of defendant answering the VESI questions. He also interviewed defendant for two hours. He found defendant's responses on the VESI videotapes to be sincere and consistent with those of other PTSD sufferers. He concluded defendant suffered from paranoid schizophrenia and chronic PTSD.

Dr. Kormos explained that only a minority of psychologists and psychiatrists at the time (1985) were "well versed" in PTSD and that it was a common error among psychiatrists to focus on a patient's childhood and ignore the psychological problems stemming from combat service in Vietnam. In addition, if defendant was taking an antipsychotic drug like Mellaril, the drug could have masked the symptoms of schizophrenia by reducing the intensity of symptoms.

Dr. Kormos concluded: "I consider [defendant] to have been, at the time that [the crimes] took place, to have been aware of the requirements of the law but unable to conform to those requirements."

4. *Expert Witnesses Called by the People*

Dr. Paul Cutting, a psychiatrist, examined defendant at the pretrial stage to determine whether defendant was competent to stand trial; at that time Dr. Cutting also examined defendant for sanity. He interviewed defendant for a little over one hour and examined about 200 pages of documents supplied to him by the district attorney's office. He did not administer any psychological tests. Defendant told

him about the voices he heard in his head, and Dr. Cutting thought defendant did actually experience such voices.

Dr. Cutting concluded defendant suffered from a schizoid personality disorder but not schizophrenia, because he did not satisfy enough of the criteria of schizophrenia listed in the DSM-III. When asked, "What criteria in DSM-III ruled out schizophrenia?" he replied: "It is a degeneration from our previous level, previous level of behavior, and he didn't have any particular regression from [a] previous high level of behavior or adaptation, his lifelong poor adaptation, and there wasn't any skid downhill in this case, he just never rose [above] a very low level of adaptation." Dr. Cutting also found defendant did not suffer from PTSD.

Dr. Cutting concluded defendant was not insane: "I felt he knew what he was doing. I felt that he could listen to one voice or the other, obey whichever voice he wanted to obey. [¶] He didn't always obey the man's voice, incidentally, because the man's voice would frequently tell him to kill himself, and, obviously, he didn't act on that man['s voice]."

Dr. Francis Matychowiak, a psychiatrist, was appointed by the superior court to examine defendant to determine if he was insane at the time of the crimes. Dr. Matychowiak examined prior medical reports, law enforcement investigative reports, and a transcript of defendant's court testimony. He also examined defendant in jail. He concluded defendant suffered from a "personality disorder, showing a mixture of paranoid and antisocial traits." He concluded defendant was sane. He rejected a diagnosis of PTSD, finding defendant's talking to imaginary persons was a "survival technique" but that it was not a post-traumatic reaction to his war experiences.

Dr. Richard Burdick, a psychiatrist, was also appointed by the court to examine defendant for sanity. Dr. Burdick concluded defendant demonstrated an antisocial personality disorder, meaning he was "responsive to inner urges and needs without particular conscience for what effect their behavior will have on another person.... They tend to get into difficulties with people and are either on the fringe or breaking the law, getting arrested. They do not seem to be responsive to correction by being incarcerated or having other forms of limits put on them." He thought defendant's report of hearing voices could be fabricated but, in any event, the voices did not play a role in the crimes. He admitted that if someone suffered from both schizophrenia and a personality disorder, it was sometimes difficult to perceive the underlying schizophrenia.

Dr. Burdick admitted he was not an expert in PTSD but found no indication of that condition. He testified that although he frequently examined criminal defendants at the superior court's request, he did not frequently find them insane. He concluded defendant was not legally insane.

Dr. Francis Criswell, a psychiatrist, was, like Dr. Cutting, appointed during the pretrial period to examine defendant both for competence and sanity. Dr. Criswell testified that defendant had suffered an abusive childhood from an "extremely pathological family," but he agreed with other prosecution witnesses that, although defendant suffered from a personality disorder, he was not psychotic, schizophrenic, or otherwise suffering from a mental disease or defect. Because defendant appreciated the criminality of his conduct and could conform his actions to the law, Dr. Criswell concluded defendant was not legally insane.

Dr. Mary Cholet testified for the People. She worked on the defense team of Dr. Lundgren, Dr. Dietiker and Mr. Powers, was a psychological assistant at the time

of her examination of defendant, but was a psychologist at the time of trial. She administered psychological tests to defendant and interviewed him. She disagreed with the other members of her team, concluding defendant was not schizophrenic but merely suffered from a personality disorder. She found no evidence of organic brain damage and saw no evidence of hallucinations when she was with defendant. She also concluded defendant did not suffer from PTSD, although she admitted she was not familiar with the various diagnostic tools used by experts in the area of PTSD. She concluded defendant knew the difference between right and wrong, admitted she was only "fairly familiar" with the legal definition for insanity, and admitted this case was the first one in which she had tested someone to determine their sanity.

Weaver, 26 Cal. 4th at 934-45.

### III. Penalty Phase

### A. *Facts*

Bonnie Brown testified that on September 22, 1976, she was working as a waitress in Eureka, California. At midnight, as she left work after her shift, a man she later identified as defendant pulled up in a pickup truck and asked her for directions. He then asked her to have a drink or some coffee with him. She agreed, and they went to a Denny's restaurant. He convinced her to go see his big rig truck at a nearby truck stop; they drove their own vehicles there. After seeing the truck, they walked back to their cars. When her back was turned, defendant hit her on the back of the head with a club. Brown fell and blacked out. When she came to, defendant had his hand over her mouth and told her not to scream or he would kill her. He led her to his pickup truck, still holding what looked like a two to three-foot-long wooden baseball bat. He forced her into the passenger side of his truck, but she escaped as he walked around to get in the driver's side. She ran to the truck stop and screamed. Defendant was identified and arrested, eventually pleading guilty to assault with a deadly weapon. He served a prison term as a result.

In April 1981, just two months after defendant's crimes against Radford and Levoy, defendant picked up two hitchhikers: David Galbraith, 18 years old, and Michelle D., 15 years old. Both testified against defendant. Galbraith and Michelle D. were from Burlington, Washington, and were running away after Galbraith burglarized a sporting goods store to obtain supplies for their trip. They were headed for Yreka, California, where Michelle D. had an uncle. Defendant agreed to take them there. Defendant's 10-year-old son was riding with defendant that day.

When they arrived in Yreka, Michelle D.'s uncle was not home and not expected back for two weeks. Defendant suggested the couple come with him to his home in Oroville, and they accepted. The young couple stayed with defendant's family for two or three days. They accepted defendant's offer to take them to Ventura on his next trucking run. During the trip, defendant offered to help Galbraith find work. When they arrived in Ventura, defendant and Galbraith unloaded the truck, and then they met someone named Jerry, who defendant said would take Galbraith somewhere where he could get a job. Defendant went on a short delivery run with Michelle D.; they all agreed to meet in a few hours. Before they left, Galbraith saw defendant give Jerry a gun.

After Jerry and Galbraith had been driving about an hour, Jerry stopped the car and called Galbraith to come look at some deer on the side of the road. Jerry then

shot Galbraith in the back of the head. After Galbraith fell, Jerry shot him again in the back of the head and then in the face. Jerry kicked him over an embankment and left, without saying anything. Galbraith was conscious throughout the attack and managed to crawl back to the roadway, where he was found by a forest ranger.

After defendant and Michelle D. had driven around for awhile, he stopped and raped her at gunpoint. Keeping her in the truck, he drove around again before forcing her to orally copulate him a few hours later. He told her Galbraith would be killed if she did not cooperate. He eventually returned with Michelle D. to his home in Oroville. The victim did not try to escape because she feared for Galbraith's life. Defendant released her in Marysville around 5:00 p.m., saying he would return for her at 9:00 p.m. She did not go for help because she was in a state of shock. When defendant did not return at 9:00 p.m., she went to the police.

Defendant testified at the penalty phase and explained that he took his family to Idaho after his assault on Bonnie Brown in 1976, but returned and voluntarily turned himself in when he learned police were looking for him. After his arrest, he sought admission into two Veterans Administration hospitals in Texas but was refused for lack of space.

Weaver, 26 Cal.4th at 974-76.

## III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated after April 24, 1996. Therefore, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214 (hereinafter the "AEDPA"), apply. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Van Tran v. Lindsey, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63, 71 (2003).

## IV. STANDARDS OF REVIEW

### A.    Legal Standard - Habeas Corpus

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Harrington v. Richter, 562 U.S. 86, 98 (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

"[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." Brown v. Walker, Case No. C 09-04663 JSW, 2014 WL 4757804 at *5 (N.D. Cal. Sept. 24, 2014) (citing Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004)).

As a threshold matter, this Court must "first decide what constitutes clearly established Federal law, as determined by the Supreme Court of the United States." Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "squarely address [] the issue in th[e] case; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); see also Panetti v. Quarterman, 551 U.S. 930, 949 (2007); Carey v. Musladin, 549 U.S. 70, 74 (2006).

If no clearly established Federal law exists, the inquiry is at an end and the court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760. In addition, the Supreme Court has clarified that habeas relief is unavailable in instances where a state court arguably refuses to extend a governing legal principle to a context in which

21

1   the principle should have controlled.  White v. Woodall, 572 U.S. 415, 425-26 (2014).  The

2   Supreme Court stated: "[I]f a habeas court must extend a rationale before it can apply to the facts

3   at hand, then by definition the rationale was not clearly established at the time of the state-court

4   decision."  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

5        If the court determines there is governing clearly established Federal law, the court must

6   then consider whether the state court's decision was "contrary to, or involved an unreasonable

7   application of, [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28

8   U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

9   if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

10  question of law or if the state court decides a case differently than [the] Court has on a set of

11  materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

12  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

13  in character or nature,' or 'mutually opposed.' "  Williams, 529 U.S. at 405 (quoting Webster's

14  Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

15  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

16  contradicts the governing law set forth in [Supreme Court] cases."  Id.

17       "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

18  the state court identifies the correct governing legal principle from [the] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at

20  413.  "[A] federal court may not issue the writ simply because the court concludes in its

21  independent judgment that the relevant state court decision applied clearly established federal

22  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;

23  see also Lockyer, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit

24  precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of

25  the state court's decision."  Richter, 562 U.S. at 101 (citing Yarborough, 541 U.S. at 664).

26  Therein the Supreme Court stated that:

27          As a condition for obtaining habeas corpus from a federal court, a state prisoner
            must show that the state court's ruling on the claim being presented in federal
28          court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fair-minded disagreement.

Id. at 101-05.  In other words, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable.  Id. at 98-99.  In applying this standard, "a habeas court must determine what arguments or theories supported . . . or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Id. at 101-03.  This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012).  If the court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

The AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," Cullen v. Pinholster, 563 U.S. 170, 181 (2011), and "evidence introduced in federal court has no bearing on 2254(d)(1) review."  Id. at 185.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992), superseded by status as stated in Williams v. Taylor, 529 U.S. 420 (2000).

1    If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal

2    court considers that claim *de novo*.  See Panetti, 551 U.S. at 953 (when § 2254(d) is satisfied,

3    "[a] federal court must then resolve the claim without the deference AEDPA otherwise

4    requires.");  accord Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

5    In this case, some of Petitioner's claims and allegations were raised and rejected by the

6    California Supreme Court on direct appeal while others were raised in his state habeas petitions

7    to that court and summarily denied.  In the case of summary denial, where the state court

8    decision is unaccompanied by an explanation, "[t]he habeas petitioner's burden still must be met

9    by showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at

10   98.  The Supreme Court stated that "a habeas court must determine what arguments or theories

11   supported or ... *could have supported*, the state court's decision; and then it must ask whether it

12   is possible fair-minded jurists could disagree that those arguments or theories are inconsistent

13   with the holding in a prior decision of this Court."  Id. at 101-03 (emphasis added).  Petitioner

14   bears "the burden to demonstrate that there was no reasonable basis for the state court to deny

15   relief."  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

16   "Crucially, this is not a *de novo* review of the constitutional question," id., as "even a strong case

17   for relief does not mean the state court's contrary conclusion was unreasonable."  Id. *(*quoting

18   Richter, 562 U.S. at 102); see also Murray v. Schriro, 745 F.3d 984, 996-97 (9th Cir. 2014).

19   When reviewing the California Supreme Court's summary denial of a petition, this Court

20   must consider that the California Supreme Court's summary denial of a habeas petition on the

21   merits reflects that court's determination that:

> [T]he claims made in th[e] petition do not state a prima facie case entitling the
> petitioner to relief. It appears that the court generally assumes the allegations in
> the petition to be true, but does not accept wholly conclusory allegations, and will
> also review the record of the trial ... to assess the merits of the petitioner's claims.

26   Pinholster, 563 U.S. 181 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993)), superseded by

27   statute as stated in Briggs v. Brown, 3 Cal. 5 th 808 (2017); see also Johnson v. Williams, 568

28   U.S. 289, 300–01 (2013) (holding that even where the state court does not separately discuss a

24

federal claim there is a presumption that that state court adjudicated the federal claim on the merits); see also Richter, 562 U.S. at 99–100 (holding that "[§] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits.").

Accordingly, if this Court finds Petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999-1000 (9th Cir. 2014), as recognized by Velasquez v. Ndoh, 824 Fed. Appx. 498 (9th Cir. 2020); see also Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1).   Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir. 2005); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  For example, claims denied solely on procedural grounds are reviewed *de novo*.  Vang v. Nevada, 329 F.3d 1069, 1072 (9th Cir. 2003).  In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  Pinholster, 563 U.S. 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); Pirtle, 313 F.3d at 1167–68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

According to the Ninth Circuit:

> In a habeas corpus proceeding, we do not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991). This doctrine "applies to bar federal habeas review when the state court has declined to address the petitioner's federal claims because he failed to meet state procedural requirements." *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir.1995). If a petitioner has procedurally defaulted, we do not review the claim unless the petitioner "can establish cause and prejudice or that a miscarriage of justice would result in the absence of our review." *Moran v. McDaniel,* 80 F.3d 1261, 1270 (9th Cir.1996).

Vang, 329 F.3d at 1072.

> Procedural default is an affirmative defense. *Bennett v. Mueller,* 322 F.3d 573, 585 (9th Cir.2003). Generally, the state must assert the procedural default as a

defense to the petition before the district court; otherwise the defense is waived. *Franklin v. Johnson,* 290 F.3d 1223, 1229 (9th Cir.2002). However, the district court retains discretion to consider the issue *sua sponte* if the circumstances warrant. *Boyd v. Thompson,* 147 F.3d 1124, 1128 (9th Cir.1998).

In *Boyd,* we recognized that the district court may, *sua sponte*, raise the issue of procedural default when the default is obvious from the face of the petition and when recognizing the default would "further the interests of comity, federalism, and judicial efficiency." *Id.*

Id., at 1073.

A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." Id. (citing Calderon v. United States Dist. Court, 96 F.3d 1126, 1129 (9th Cir.1996)).

A state procedural bar is "independent" if the state court explicitly invokes the procedural rule as a separate basis for its decision. McKenna v. McDaniel, 65 F.3d 1483, 1488 (9th Cir. 1995). For a state law ground to be "independent," it must not be interwoven with federal law. See La Cross v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001). A state court's decision is not "independent" if the application of a state's default rule depends on a consideration of federal law. Park v. California, 202 F.3d 1146, 1152 (9th Cir.2000). If the state court's decision fails "to specify which claims were barred for which reasons," we have held that the ambiguity serves to defeat the independence of the state procedural bar. Valerio v. Crawford, 306 F.3d 742, 775 (9th Cir. 2002).

## V. PROCEDURAL BARS

As noted, certain of Petitioner's claims or aspects thereof were denied by the California Supreme Court as procedurally barred. As to those claims, Respondent has invoked the noted independent state ground doctrine, pursuant to which a federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Vang, 329 F.3d at 1069 (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).

Since "cause and prejudice" can excuse a procedurally defaulted claim, Smith v. Baldwin, 510 F.3d 1127, 1139 (9th Cir. 2007) (citing Coleman, 501 U.S. at 750), and "prejudice" essentially requires a merits analysis, the Court will proceed to the merits of claims

1   found to be procedurally defaulted, and review them *de novo* if denied solely on procedural

2   grounds, without determining whether the state procedural default is adequate and independent

3   to bar relief in federal court.  Id. (citing Coleman, 501 U.S. at 732-35); see also Franklin v.

4   Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their

5   face clearly not meritorious despite asserted procedural bar); Bell v. Cone, 543 U.S. 447, 451 n.3

6   (2005) (an application for habeas corpus may be denied on the merits even if unexhausted in

7   state court); Loggins v. Thomas, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief may be denied on

8   the merits where petition is clearly not meritorious despite asserted procedural bar).

9        Under Martinez v. Ryan, 566 U.S. 1, (2012), the procedural default of a substantial claim

10  of ineffective assistance of trial counsel is excused where state law requires that all claims be

11  brought in the initial collateral review proceeding and counsel in that proceeding was ineffective.

12  See Ramirez v. Ryan, 937 F.3d 1230, 1241 (9th Cir. 2019).   A substantial claim of ineffective

13  assistance of trial counsel is one which has "some merit."  Id. (citing Martinez, 566 U.S. at 14-

14  16).  Conversely, an insubstantial claim of ineffective assistance of trial counsel "does not have

15  any merit or [ ] is wholly without factual support."  Id.

16       "Thus, to establish cause and prejudice in order to excuse the procedural default of his

17  ineffective assistance of trial counsel claim, Ramirez must demonstrate the following: (1) post-

18  conviction counsel performed deficiently; (2) there was a reasonable probability that, absent the

19  deficient performance, the result of the post-conviction proceedings would have been different,

20  Id.; and (3) the underlying ineffective-assistance-of-trial-counsel claim is a substantial one,

21  which is to say that the prisoner must demonstrate that the claim has some merit.*"* Ramirez, 937

22  F.3d at 1242.

23       To the extent claims already adjudicated were later denied on procedural grounds, the

24  Court finds these claims remain ripe for federal adjudication.  See e.g., Cone, 556 U.S. 449, 466-

25  67 (2009); see also Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996) (applying look through

26  doctrine to Waltreus bars); Kim v. Villalobos, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986) (applying

27  look through doctrine to Miller bars).

28

# VI. PRELIMINARY MATTERS

The Court takes judicial notice of the certified record on appeal to the California Supreme Court, all documents on file in the California Supreme Court in the case of <u>People v. Ward Francis Weaver, Jr.</u>, California Supreme Court Case No. S004665 as lodged with this Court, and all declarations, witness statements, and records filed on Petitioner's behalf in his first state habeas corpus proceeding before the California Supreme Court, <u>In re Ward Francis Weaver, Jr.</u>, Case No. S073709, and in his second state habeas corpus proceeding before the California Supreme Court, <u>In re Ward Francis Weaver, Jr.</u>, Case No. S115638 (<u>see</u> Lod. Doc. Nos. 7 & 23, respectively).

# VII. REVIEW OF CLAIMS

## A.   Claims Alleging Trial and Execution Incompetence

**1**.   Claim 3

Petitioner alleges that he was incompetent to stand trial due to mental and intellectual impairments and/or disabilities that left him unable to understand the proceedings and assist counsel in the defense, and to make valid waivers, violating his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.[4]  (ECF No. 107 at 50-61.)

### a.   State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 224-51), and denied on the merits, as follows:

> On September 29, 1982, before defendant was arraigned, his defense counsel expressed a doubt as to defendant's present competence. The trial court agreed and appointed two psychiatrists, Dr. Paul Cutting and Dr. Francis Criswell, to examine defendant. The proceedings were suspended until the two doctors could examine defendant and file their reports with the court. On October 27, 1982, the court was in possession of the reports of both doctors. Both found defendant was legally competent. Defense counsel and the prosecutor submitted the question of defendant's competence on these two psychiatric reports, and the trial court found defendant competent. The proceedings then resumed.
>
> Defendant contends the failure to hold a full-blown adversarial hearing on the question of his competence deprived him of due process and requires that we vacate his convictions. Essentially, defendant claims counsel could not waive a

---

[4] Petitioner states that he incorporate the factual allegations and evidentiary support set out in Claims 2, 4, 5, 6, 7, 8, 9 and 11. (ECF No. 107 at 50-51; <u>cf.</u> Rule 2, Rules Following 28 U.S.C. § 2254.)

full jury trial with live witnesses. We rejected this precise claim in *People v. McPeters* (1992) 2 Cal.4th 1148, 1169 [9 Cal.Rptr.2d 834, 832 P.2d 146]: "Section 1368 entitles defendant to a 'hearing' on the issue of competence and he received one. Although defendant's counsel, for understandable reasons, elected to waive certain available incidents of the hearing procedure, i.e., the right to jury trial and the rights to present oral testimony and to confront and cross-examine witnesses, defendant presented evidence and received an independent judicial determination of his competence to stand trial based on the stipulated record. [Citation.] [¶] Defendant cites no authority holding that submission to the court of the issue of competence to stand trial based on psychiatric reports is per se unconstitutional or a violation of statute."

Weaver, 26 Cal. 4th at 903.

The Claim was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 407-21) as ineffective assistance of counsel, and summarily denied on the merits (Lod. Doc. 8).

### b.   Legal Standard

#### (i)   Trial Incompetence – Substantive Due Process

A criminal defendant has a constitutional due process right not to be tried or convicted while incompetent to stand trial. Pate v. Robinson, 383 U.S. 375, 378 (1966); accord Medina v. California, 505 U.S. 437, 439 (1992). He may not waive his right to counsel or plead guilty unless he does so "competently and intelligently[.]" Johnson v. Zerbst, 304 U.S. 458, 468 (1938); accord Godinez v. Moran, 509 U.S. 389, 396 (1993). This right assures that a defendant has: (1) a rational, as well as a factual, understanding of the nature of the proceedings against him; and (2) the present ability to consult with his lawyer with a reasonable degree of rational understanding and to assist with the preparation and presentation of his defense. See Drope v. Missouri, 420 U.S. 162, 171–72 (1975) (quoting Dusky v. United States, 362 U.S. 402 (1960)). Protecting this right is "fundamental to an adversary system of justice." Id. at 172.

The trial or conviction of a person who is legally incompetent is a substantive due process violation. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); see also Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010) ("It is undisputed that the conviction of an accused person while he is legally incompetent violates due process.") (quoting Robinson, 383 U.S. at 378).

"[T]he standard for competence to stand trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and

has a rational as well as factual understanding of the proceedings against him." Moran, 509 U.S. at 396 (citing Dusky, 362 U.S. at 402); see also Clark v. Arnold, 769 F.3d 711, 729 (9th Cir. 2014). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Anderson v. Gipson, 902 F.3d 1126, 1133 (2018) (citing Drope, 420 U.S. at 171).

A "substantive" competency claim focuses on whether the defendant was actually incompetent at trial. Boyde v. Brown, 404 F.3d 1159, 1165 (9th Cir. 2005). "Even where the evidence before the trial judge was insufficient to raise a good faith doubt with respect to Steinsvik's competency, he would still be entitled to relief if it now appears that he was in fact incompetent." Steinsvik v. Vinzant, 640 F.2d 949, 954 (9th Cir. 1981) (citing Zapata v. Estelle, 588 F.2d 1017, 1021 (5th Cir. 1979)).

Petitioner bears the burden of proof by a preponderance of the evidence. Hayes v. Woodford, 301 F.3d 1054, 1078 n.28 (9th Cir. 2002) (citing Simmon v. Blodgett, 110 F.3d 39, 41 (9th Cir. 1997)) (rehearing en banc Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005)) (panel decision reversed on other grounds).

Trial incompetency, if demonstrated, is structural error not amenable to harmless error analysis under Brecht, but rather necessitating automatic reversal. See United States v. Walters, 309 F.3d 589, 593 (9th Cir. 2002) (quoting Neder v. United States, 527 U.S. 1, 7 (1999)).

c.   Analysis

Petitioner argues that during his trial from September 1984 to April 1985, he suffered major mental illnesses or vulnerabilities and brain dysfunction, and their attendant physical and mental symptoms, leaving him incompetent for trial.  (ECF No. 107 at 51; ECF No. 210 at 51); see also Penal Code § 1367; Boag v. Raines, 769 F.2d 1341, 1343 (9th Cir. 1985) (habeas court may consider facts creating a real and substantial doubt as to petitioner's competency, even if those facts were not presented to the trial court); Chavez v. United States, 656 F.2d 512, 518 (9th Cir. 1981) ("Trial courts must assess a defendant's competence with specific reference to the gravity of the decisions the defendant faces.") (citing de Kaplany v. Enomoto, 540 F.2d 975, 985

1   (9th Cir. 1976)).  He argues that numerous mental impairments detrimentally affected his ability

2   to rationally understand the proceedings against him or rationally aid and assist counsel at trial

3   because he could not: (1) understand the true nature of the charges brought against him; (2) assist

4   counsel in the preparation of his defense; (3) understand the nature and object of the legal

5   proceedings; (4) understand the nature and impact of the testimony and evidence brought against

6   him; (5) make knowing and intelligent waivers of his constitutional rights; and (6) exercise his

7   constitutional rights, including his right to effective assistance of counsel and right to cross

8   examine witnesses." (ECF No. 210 at 47.)

9        However, the state supreme court reasonably could find Petitioner failed to demonstrate

10  by a preponderance of the evidence that he was incompetent to stand trial, as discussed below.

11            (i)    Competency Determination at Arraignment

12       Petitioner discounts the competency determination made at the time of his arraignment.

13  He argues the court appointed experts, Drs. Paul Cutting and Francis Criswell, in their October

14  1982 reports, did not consider evidence of his psychosocial history, and that his psychotic

15  symptoms were then masked by the antidepressant Mellaril.  (See CT, Confidential Records, at

16  8-12, 13-20; ECF No. 202-1 at 227-35.)   He also argues the state law requirement that a

17  defendant's incompetency result from "mental disorder or developmental disability" conflicts

18  with the clearly established federal law.  (See e.g., ECF No. 211 at 27); Penal Code § 1367.

19       A state court's determination of a defendant's competence is entitled to a presumption of

20  correctness on habeas corpus review, Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (per

21  curiam); Vargas v. Lambert, 159 F.3d 1161, 1168 (9th Cir.1998), and petitioner has the burden

22  of presenting clear and convincing evidence rebutting this presumption.  28 U.S.C. § 2254(e)(1).

23       The record reflects that during arraignment, on September 29, 1982, the Kern County

24  Superior Court, based on its observation of Petitioner's appearance and information provided by

25  Lead Counsel, declared a doubt as to Petitioner's competence for trial.  (RT Sept. 29, 1982, at 2-

26  4; CT 206-208.)  The court then suspended proceedings and at the suggestion of and with the

27  agreement of Counsel, appointed two experts, Drs. Paul Cutting and Francis Criswell, to

28  examine Petitioner, and opine upon not only his competency, but his sanity.  (See CT 206-208;

1 CT, Confidential Records, at 8-12, 13-20.)  On October 27, 1982, upon reviewing the reports of

2 these experts opining competency for trial, the trial court declared that Weaver was competent to

3 stand trial and reinstated the criminal proceedings.  (RT Oct. 27, 1982, at 3; see also CT 209.)

4      Here, the state supreme court reasonably could find Petitioner failed to impeach or

5 demonstrate a basis for discounting the pretrial competency reports and determination.

6      (A)    Failure to Hold a Formal Competency Hearing

7      Petitioner argues the trial court erred by failing to hold a formal pretrial competency

8 hearing.  (ECF No. 107 at 53, 60-61; ECF No. 210 at 48.)

9      However, the state supreme court reasonably could find Petitioner did not show real and

10 substantial evidence that a formal competency hearing at arraignment was required or necessary.

11      Petitioner does not provide state or federal authority that submission on the experts'

12 reports was improper, or that an evidentiary hearing was required.  See Penal Code § 1367;

13 Dusky, 362 U.S. 402.

14      Counsel submitted the issue of competence to stand trial on court-ordered psychiatric

15 reports of Drs. Paul Cutting and Francis Criswell, who found him competent for trial.[5]  (See CT,

16 Confidential Records, at 8-12, 13-20); see also Weaver, 26 Cal. 4th at 903.)  Petitioner did not

17 challenge the qualifications or credibility of these experts.  Both experts based their findings and

18 opinions on professional standards, their review of the noted psychosocial records and materials,

19 and their respective examinations of Petitioner.  (See CT, Confidential Records, at 8-12, 13-20;

20 see Baal, 495 U.S. at 735 (state court's determination petitioner was competent was supported by

21 record, including opinions of three psychiatrists); Williams v. Woodford, 384 F.3d 567, 608-09

22 (9th Cir. 2004) ("We accord substantial weight to Dr. Siegel's contemporaneous opinion that

23 [petitioner] did not suffer from a mental defect, and to the other evidence before the state trial

24 court that suggested that [petitioner] was competent to stand trial.").

25      Petitioner's suggestion Drs. Cutting and Criswell were uninformed or incorrectly

26

27     [5] Respondent contends this Claim is not cognizable because it creates and retroactively applies a "new rule" of constitutional law under Teague v. Lane, 489 U.S. 288 (1989).  Respondent advances this argument as to other

28 Claims as well. Unless otherwise noted, the Court declines to address Respondent's Teague arguments where the Claim lacks merit.

1  informed as to his use of Mellaril belies the noted record, as discussed herein.  Cf. Moran v.

2  Godinez, 57 F.3d 690, 695 (9th Cir. 1994), superseded by statute as stated in In re Gonzales, 623

3  F.3d 1242 (9th Cir. 2010), reversed on other grounds by Ryan v. Gonzales, 568 U.S. 57 (2013) (a

4  reasonable jurist should have entertained a competency doubt where defendant was taking

5  multiple medications including as anti-anxiety and sedative, stated his desire to plead guilty and

6  die, and had recently attempted suicide).

7       Petitioner's further argument that a hearing was necessary to develop facts surrounding

8  Second Counsel's statement and the finding of Drs. Cutting and Criswell that Petitioner was

9  competent for trial only if assisted by counsel reasonably could be seen as unpersuasive.

10  Particularly, Petitioner has not pointed to clearly established Supreme Court authority supporting

11  the argument.  Nor has he demonstrated how and why development of such matters at a formal

12  hearing would provide a basis to question or discount the findings and opinions of Drs. Cutting

13  and Criswell.  See Williams, 529 U.S. at 386 (habeas relief is available when a state-court

14  decision "was based on an unreasonable determination of the facts in light of the evidence

15  presented in the State court proceeding.").

16       As Respondent observes, "[a] state court's decision not to hold an evidentiary hearing

17  does not render its fact-finding process unreasonable so long as the state court could have

18  reasonably concluded that the evidence already adduced was sufficient to resolve the factual

19  question."  (Id., citing Hibbler, 693 F.3d at 1147; Ayala v. Chappell, 829 F.3d 1081, 1105 (9th

20  Cir. 2016) (a state court's decision may be based on an "unreasonable determination of the facts,"

21  28 U.S.C. § 2254(d)(2), if "the [fact-finding] process employed by the state court [was]

22  defective,").

23       Notably, at arraignment, Counsel did not argue in support of incompetence.  See Medina

24  v. California, 505 U.S. 437, 450 (1992) ("[D]efense counsel will often have the best-informed

25  view of the defendant's ability to participate in his defense."); Williams, 384 F.3d at 608 ("We

26  find especially relevant defense counsel's opinion that [petitioner] was competent to stand

27  trial."); Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir.1991) ( "While the opinion of [defense]

28  counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a

1  client's comprehension of the proceedings.").

2         (B)    Failure to Consider Psychosocial History Evidence

3         Petitioner argues that had Drs. Cutting and Criswell considered his habeas proffered

4  family and personal psychosocial history, they might have concluded differently.  (See Claims 4,

5  5, 8, herein.)

6         The record reflects that Dr. Cutting reviewed 270 pages of reports and documents and

7  examined Petitioner on October 15, 1982.  (See CT, Confidential Records, at 8.)  Petitioner

8  provided Dr. Cutting with certain psychosocial background information regarding his family,

9  educational, and military history relating to abuse, poor academic performance, auditory

10 hallucinations of a male voice and female voice, regular employment including the use of drugs

11 and "speed" while working as a truck driver prior to and at the time of the capital crimes,

12 various traumatic injuries including his serious logging truck accident, and prior psychiatric

13 assessment.  (Id. at 9.)  Also, Petitioner told Dr. Cutting his mother meted out discipline by biting

14 him, the trauma of which played a role in his abusing his first and second wives.  (Id. at 10.)

15        Dr. Cutting was aware Petitioner had a history of taking Mellaril and was then taking

16 Mellaril to prevent pacing and help him sleep.  (Id.; see also ECF No. 209 at 45.)

17        Dr. Cutting diagnosed Petitioner with atypical psychosis and personality disorder and

18 found him competent for trial with the assistance of counsel, and sane at the time of the capital

19 crimes.  (Id. at 11-12.)

20        The record reflects that Dr. Criswell reviewed 276 pages of records relating to the instant

21 crime and the separate Ventura County case including psychiatric evaluation and conviction

22 therein, and he examined Petitioner on October 18, 1982.  (See CT Confidential Records, at 13.)

23 Dr. Criswell observed Petitioner was then mildly sedated with and had a history of taking

24 Mellaril, in doses as high as 600 mg. per day, while incarcerated.  (Id. at 13, 18; see also ECF

25 No. 209 at 45.)  Dr. Criswell observed no evidence of thought disorder or delusional thinking.

26 (Id. at 13-14.)

27        Petitioner also provided Dr. Criswell with psychosocial background information

28 consistent with that he provided to Dr. Cutting.  (Id.)

1    Dr. Criswell found Petitioner was not then or ever psychotic or insane, and diagnosed

2    him with a pathological personality and sexual sadism.  (Id. at 19.)  Particularly, Dr. Criswell

3    found Petitioner's alleged auditory hallucinations to be unconvincing.  (Id. at 19-20.)  Dr.

4    Criswell found Petitioner competent to stand trial with the assistance of counsel.  (Id.)

5    The state supreme court reasonably could find Petitioner's proffered psychosocial

6    history, to the extent available in 1982 and not provided to Drs. Cutting and Criswell, was not a

7    basis to discount the findings and opinions of these arraignment experts, for the reasons

8    discussed in Claims 4, 5, and 8, post, and summarized here.  (See also ECF No. 209 at 36, 41,

9    42, 46, 48.)

10    Petitioner's proffer includes evidence of multi-generational and extended family mental

11    illness and neuropsychological impairment, schizophrenia, psychotic disorders, and seizure

12    disorders.  (See e.g., ECF No. 210 at 51, citing 1SHCP Ex.'s 5-8, 54, 55, 154; see also RT 4552-

13    94, 4605-07; 5050-5123, 5310-11, 5497-5506.)  However, neither Drs. Cutting and Criswell, nor

14    thirteen of the twenty-one other mental health experts testifying at trial found Petitioner to be

15    schizophrenic, psychotic, or suffering seizures, and none of the trial experts found Petitioner

16    incompetent for trial.  (See e.g.,  CT, Confidential Records, at 8-12, 13-20.)  Notably, neither Dr.

17    Cutting nor Dr. Criswell testified that they lacked information needed to opine on competency.

18    To the contrary, Dr. Cutting testified that he reviewed all the reports and information he needed

19    to inform his 1982 findings and opinion.  (RT 6091; see also RT 6114-15.)  Moreover, this Court

20    previously found Drs. Cutting and Criswell considered the same social history factors, i.e., child

21    abuse, wartime service in Vietnam, as other testifying trial experts.  (ECF No. 209 at 48.)

22    Petitioner proffers evidence that he experienced direct and indirect physical, emotional,

23    and possibly sexual abuse at the hands of his parents, particularly his mother who facilitated his

24    co-dependent behavior, leaving him mentally ill.  (See e.g., ECF No. 210 at 51 citing 1SHCP

25    Ex.'s 1, 2, 4, 8, 9, 11, 37 at ¶ 22, 142; RT 3895-99, 4695-97, 4728-29, 4784, 4812, 5050--5123,

26    5175, 5310-11 5300, 5497, 5509-14, 5526-99; 5818, 5925-33, 5995-97, 6087-6119, 6293, 6373-

27    76.)  However, Drs. Cutting and Criswell generally were aware of Petitioner's allegedly abusive

28    upbringing, and his alleged oral and visual hallucinations relating to a male and female voice,

1    and considered such in rendering their opinions.  (See CT, Confidential Records, at 8-12, 13-20.)

2          Petitioner proffers evidence of alcohol and drug abuse during his military deployment to

3    Vietnam and related Post Traumatic Stress Disorder ("PTSD") allegedly leaving him with mental

4    and behavioral problems including episodes of schizophrenia, psychotic and personality

5    disorders, attention deficits and impaired abstract thinking.  (See e.g., ECF No. 210 at 52-53

6    citing the testimony of Dr. J. Shonkwiler (RT 5126-49); Dr. B. Wittlin (RT 5596-5610); Dr. C.

7    Donahoe (RT 5673-5702); Dr. J. Wilson (RT 5814-5881, 5882-5911); .Dr. H. Kormos (RT

8    5929-45); see also 1SHCP Ex.'s. 36 (declaration of state habeas defense expert Watson), 37

9    (declaration of state habeas defense expert Foster); non-expert mental state evidence (1SHCP

10   Ex.'s 1, 11, 12, 13, 14, 15, 102, 124, 126, 143, 155, 157, 165); and additional mental state

11   evidence (RT 3922-23, 3955, 4072-73, 5296-5315, 5818-5881.)  Even so, Drs. Cutting and

12   Criswell considered the extent, ebb, and flow of Petitioner's then apparent mental and behavioral

13   problems, including his level of functioning including that after his return from Vietnam, he was

14   mostly employed, at one point owning his own trucking business.  (Id.; RT 4073.)

15         Petitioner proffers evidence that he suffered organic brain injury, impairment and

16   neurocognitive deficits including evidence of a low-normal IQ, long-standing hearing loss,

17   problems processing verbal information and remembering things, possible partial complex

18   seizure disorder; he points in support to his poor academic performance and dropping out of high

19   school.  (See e.g., ECF No. 210 at 52, citing 1SHCP Ex. 36 at ¶¶ 32, 36 [reflecting Petitioner's

20   overall IQ of 95 and verbal IQ score of 85]; see also 1SHCP Ex.'s 1, 2, 46, 51, 51A, 57, 104,

21   110, 155; RT 4665-77, 4733, 5496, 5891.)  Still, Drs. Cutting and Criswell considered

22   Petitioner's mental capacity.  Dr. Cutting found Petitioner to be of low average Intelligence

23   Quotient.  (RT 6072.)  Dr. Criswell found that Petitioner was of average intelligence.  (RT 6365.)

24   Moreover, not all defense experts questioned Petitioner's mental capacity.  Dr. Chappell, a year

25   prior to Petitioner's arraignment on the capital crimes, found him of average intelligence.  (RT

26   4908.)  Dr. Rose, a corrections department psychologist who examined Petitioner shortly after

27   the Ventura conviction, also found him of average intelligence.  (RT 4972.)

28         Petitioner proffers evidence that he was addicted to amphetamines during his

1    employment as a truck driver.  (See e.g., ECF No. 210 at 54, citing 1SHCP Ex. 37 at ¶ 26; see

2    also 1SHCP Ex.'s 4, 11 at ¶ 11; RT 3923, 4072-74.)  He proffers evidence that amphetamine

3    abuse can cause at least temporary psychosis.  (RT 4907.)  Even so, the state supreme court

4    reasonably could find Petitioner's history of amphetamine abuse as a truck driver was not a basis

5    to discount the arraignment competency opinions of Drs. Cutting and Criswell.  Notably, neither

6    Dr. Cutting nor Dr. Criswell found Petitioner to be actively psychotic at the time of arraignment.

7    Moreover, the proffer appears to concede that amphetamine remains in the system no longer than

8    72 hours.  (RT 4876.)

9          Petitioner proffers evidence that he sought and received treatment for mental illness (see

10   e.g., RT 4702-03, 4724-41, 5517-5610; 5798-5800), including treatment with varying doses of

11   the antipsychotic Mellaril during the period 1981-1983 while incarcerated in state prison and

12   county jail prior to the capital trial (1SHCP Ex. 37 at ¶ 31; see also, RT 4863-82, 5070-71, 5117;

13   6372-73); when interviewed at San Quentin by the Kern County Sheriff's Department (see e.g.,

14   ECF No. 210 at 56 citing RT 122-25, 144-46; RT 202-203, 211-12, 215-17); and while arraigned

15   on the capital charges (August 18, 1992 RT at 1-4; September 29, 1982 RT at 1-4), and evaluated

16   for competency by Drs. Cutting and Criswell during arraignment (see CT, Confidential Records,

17   at 8-12, 13-20; see also ECF No. 210 at 55-57; RT  6042-43, 6351-52; 1SHCP Ex.'s 60-61).

18   Still, the state supreme court reasonably could find the proffer not a basis upon which to discount

19   the arraignment competency opinions of Drs. Cutting and Criswell.

20        As to Mellaril, the record reflects that while at San Quentin in 1982, Petitioner was

21   prescribed 100 mg. of Mellaril daily as an antidepressant.  (RT 1541-44; see also ECF No. 209 at

22   45.)  Drs. Cutting and Criswell knew that Petitioner was taking Mellaril at the time of their

23   competency evaluations and discounted its effect other than mild sedation.  (See CT,

24   Confidential Records, at 8-12, 13-20.)  Notably, the record reflects Petitioner's Mellaril was

25   discontinued by Kern County jail medical staff in 1983 upon their determination Petitioner no

26   longer needed it.  (See CT Confidential Records at 58; see also RT 200, 3500-01; 1SHCP Ex. 37,

27   at ¶ 31; ECF No. 209 at 45.)

28        As to any pre-existing mental illness at the time of arraignment, Drs. Cutting and

1  Criswell considered Petitioner's prior psychological history including as related to the Ventura
2  proceeding.  (See CT, Confidential Records, at 8-13.)  For example, Dr. Chappell, who along
3  with Dr. Donaldson was appointed by the court in the Ventura proceeding to opine on
4  Petitioner's sanity at the time of the Ventura crimes, examined him in August 1981 and found
5  him sane at the time of the May 1981 Ventura crimes.  (RT 4894-98.)  Dr. Donaldson likewise
6  found Petitioner sane at the time of the Ventura crimes.  (RT 4926, 4942.)  These Ventura
7  experts suspected Petitioner was malingering or faking some symptoms.  (RT 4884, RT 4926.)
8  Particularly, Dr. Chappell observed that Petitioner was oriented and that his memory and
9  judgment were intact.  (RT 4906).

10     At bottom, the state supreme court reasonably could find Petitioner has not shown any
11  failure by Drs. Cutting and Criswell to consider proffered evidence, to the extent available in
12  1982, as a basis to discount their findings and opinions.  Especially so, as Drs. Cutting and
13  Criswell during their sanity phase testimony, did not suggest whether and how evidence
14  proffered after their 1982 opinions would have impacted those opinions, if at all.

15          (ii)     Competency Following Arraignment and During Trial

16          (A)     Petitioner's Conduct and Demeanor

17     Petitioner argues his conduct and demeanor following arraignment and throughout trial
18  demonstrated trial incompetence.  He argues the arraignment competency determinations of Drs.
19  Cutting and Criswell were over two years old by the time of trial and conflicted with Dr. Owre's
20  noted courtroom observation during the sanity phase that Petitioner had decompensated.  (See
21  e.g., RT 4808-16.)   He argues that he began decompensating in the year prior to trial when Kern
22  County Jail personnel discontinued his Mellaril prescription and then placed him in a darkened
23  isolation cell.  (See  1SHCP Ex. 37 at ¶ 31; RT 3499-3501, 3549-51; see also ECF No. 210 at 57;
24  ECF No. 214 at 24-26.)  For example, he points to evidence that he became floridly delusional
25  while in the Kern County jail, including that: cellmates observed him talking to himself, crying,
26  and relieving himself in bed (RT 5716-21, 5723-27.)  He points to evidence that during this time,
27  the male voice in his head directed that he kill himself.  (See ECF No. 210 at 52-53; RT 5805-06,
28  6572-73, 6577-84.)  Petitioner points to evidence that his guilt phase testimony, however lucid

1   on its face, preceded by five weeks the noted decompensation into schizophrenia and psychosis
2   allegedly observed by Dr. Owre during the latter's sanity phase testimony. (See ECF No. 214 at
3   23-24; RT 4815-22.)

4         But the state supreme court reasonably was unpersuaded that Petitioner's mental state and
5   circumstances changed substantially following arraignment, preponderating to prima facie
6   incompetence by the time of trial.

7         The state supreme court reasonably could discount evidence Petitioner decompensated
8   while in the Kern County Jail prior to and during trial.  Inmate testimony of isolated alleged
9   instances of odd behavior was subject to impeached during the sanity phase. (See Claims 4, 5,
10  8; see also ECF No. 209 at 39.)  That court reasonably could find evidence that Petitioner was
11  only mildly sedated with Mellaril at the time of arraignment, and that continued administration
12  of the antipsychotic for that purpose ended at least a year before trial, insufficient evidence of
13  decompensation at trial.  That court reasonably could find discontinuance of Mellaril by medical
14  staff at the Kern County jail, on ground Petitioner did not need the medication, militated against
15  decompensation during trial.  (Id.)  Petitioner himself told examining mental health experts that
16  apart from helping him sleep, Mellaril had no effect on him.  (See e.g., RT 6151-52, 6284.)  That
17  court reasonably could discount Dr. Owre's sanity phase testimony of decompensation, for the
18  reasons discussed below.  (See Claim 8, herein; ECF No. 209 at 42.)

19        Significantly, Petitioner's guilt and penalty phase testimony was grounded in the factual
20  record, and appeared coherent, rational, oriented, responsive, appropriate relative to the questions
21  asked, and demonstrative of an ability to recall and recite events as they occurred.  (See e.g., RT
22  3906-4141, 6977-81.)  Petitioner apparently did not have problems understanding the
23  proceedings and his defense, as his noted testimony in aid of his defense suggests.  While his
24  guilt phase persona contrasted markedly with the "madman" defense tactic in play during the
25  sanity phase, the state supreme court reasonably could find a tactical underpinning.  (See e.g.,
26  ECF No. 209 at 61.)

27        Petitioner's suggestion that his noted lucid and lengthy testimony at the guilt phase be
28  discounted because it occurred five weeks prior to Dr. Owre's sanity phase observation of

1  decompensation reasonably could be rejected.  Petitioner fails to show changed circumstances

2  relevant to competency during the intervening five weeks, and Dr. Owre's testimony itself was

3  reasonably discounted by the state court.  (See Claims 4, 5, 8; ECF No. 209 at 42.)    Moreover,

4  his sanity phase waivers of presence (during playing of a portion of the VESI videotapes) and

5  representation (by Lead Counsel in favor of representation by Second Counsel) reasonably could

6  be seen as voluntary, knowing, and intelligent upon consultation with Counsel and colloquy with

7  the trial court, and not otherwise suggestive of trial incompetence, for the discussed below.  (See

8  Claims 4, 5, 8, 19; see also ECF No. 209 at 59; Weaver, 26 Cal. 4 th at 948-52, 965-67; RT

9  4986-88, 5822-24).[6]

10  Neither the trial court nor Counsel raised a doubt as to Petitioner's competence to stand

11  trial.  See Baal, 495 U.S. at 735; see also Sturgis v. Goldsmith, 796 F.2d 1103, 1109 (9th

12  Cir.1986) ("The defendant's demeanor and behavior in the courtroom can often be as probative

13  on the issue of his competence as the testimony of expert witnesses.").    Contrary to the

14  suggestion of defense state habeas expert, Dr. Foster, that the cessation of Mellaril well before

15  trial left Petitioner at high risk for becoming psychotic again (see 1SHCP Ex. 37 at ¶ 31),

16  Counsel found Petitioner cooperative and able to understand the proceedings with Counsel's

17  assistance (RT 4854-58).  Counsel believed Petitioner to be competent for trial.  (See 1SHCP Ex.

18  34 at ¶ 30; see also Williams, 384 F.3d at 608 (defense counsel's opinion is particularly relevant

19  to the determination of competency).

20  None of the trial experts opined that the cessation of Mellaril more than a year before trial

21  alone suggested a doubt as to, or manifested in trial competency.  (See Claims 4, 5, 8; see also

22  ECF No. 209 at 78-82.)    Although Petitioner suggested he was glad when Mellaril was

23  discontinued because "when he talks, he knows that it is him talking and not the medication"

24  (CT Confidential Records at 58), he told Dr. Matychowiak that Mellaril helped him sleep, but

25  had no effect on him otherwise (RT 6151-52).

26

27

28

---

[6] In this Claim and others asserted herein, Petitioner seeks relief in relation to a Claim or allegation previously denied by the Court.  (See ECF Nos. 162 & 209.)  To the extent construed as a request for reconsideration, the request is denied for lack of support in the record, for the reasons stated.  See Fed. R. Civ. P. 60(b); Harvest v. Castro, 531 F.3d 737, 749 (9th Cir. 2008); Local Rule 230(j).

Petitioner also points to evidence that at least two jurors at this trial noted his unkempt appearance and suggested concern for their safety.  (See ECF No. 210 at 61 citing 1SHCP Ex.'s 17 & 18 [Decl.'s of Jurors Rice and Haney, respectively].)  However, the jurors' suspicions that during the sanity phase, Counsel made Petitioner look dirty and wild (id.), to the extent admissible, reasonably could be seen by the state supreme court to acknowledge Counsel's express trial tactic of presenting a madman defense (see 1SHCP Ex. 34 at ¶ 11; ECF No. 209 at 61), rather than evidence of Petitioner's trial incompetence.

At bottom, the noted record of Petitioner's post-arraignment conduct and demeanor reasonably suggested that he remained competent for trial, that: he understood and did not disrupt courtroom proceedings, responded appropriately during testimony and colloquy with the trial court, and rationally conferred with Counsel and participated in his defense.  To the extent Second Counsel observed any problems with Petitioner's comprehension of what was going on in the proceeding, her explanations ultimately appeared to resolve the matter.  (See RT 4857-58.)

(B)    Findings and Opinions of Mental Health Experts at Trial

Petitioner argues mental health expert findings and opinions presented at trial demonstrated trial incompetence.

However, the state supreme court reasonably could find the weight of the expert opinion not to preponderate to prima facie trial incompetence.  While all eighteen experts who examined Petitioner prior to and during trial found him to present personality disorder, and six of those experts also found him to present more severe symptoms of PTSD, psychosis, and schizophrenia, none of the trial experts opined that Petitioner was incompetent to stand trial, as discussed below.

(1)    Petitioner's Mental Health History

The seven mental health experts who testified to Petitioner's family and personal mental health history found that he was predisposed to mental illness, and presented with mental illness that fell short of psychosis, schizophrenia, and PTSD.  None opined incompetence.

Dr. Albert Raitt, a staff psychiatrist and director of the Butte County Mental Health Program, testified that Petitioner's family history included schizophrenia, predisposing Petitioner to schizophrenia.  (RT 4552-72.)  Dr. Raitt noted that schizophrenia can be episodic. (RT 4600-

01.)

Dr. Robert Gardner, along with Drs. Alfred Owre, and Jack Tolchin testified as to their evaluation of Petitioner in connection with his May 2, 1977 Humboldt County felony conviction for assault with a deadly weapon against Bonnie Brown, an enhancing conviction admitted by Petitioner at the capital trial. (CT 1630.).  Dr. Gardner, a psychiatrist, evaluated Petitioner in 1977, found him of average to low average intelligence (RT 4737), depressed (RT 4720) and possibly homicidal (RT 4723, 4745), and opined that Petitioner presented a probable psychotic depressive reaction relating to an underlying psychiatric disorder (RT 4746).  Significantly, Dr. Gardner did not find hallucinations or delusions or PTSD or schizophrenia.  (RT 4753, 4770-71.)

Dr. Alfred Owre, a psychiatrist, opined that when he examined Petitioner in 1977-1978, he presented without psychiatric symptoms apart from distorted relationships with women.  (RT 4788.)  Dr. Owre, at that time, diagnosed Petitioner with passive aggressive personality with depressive and sadomasochistic features, with aggressive sexuality toward adult women.  (RT 4789.)  Dr, Owre then found Petitioner of high normal intelligence (RT 4813), and free of hallucinations or delusions or mental disorders (RT 4814).  Although Dr. Owre, during his 1985 sanity phase testimony, observed Petitioner to present a chronic undifferentiated schizophrenic condition, possibly due to discontinuance of antipsychotic medication (RT 4815-20), (RT 4817-20), the trial court and state supreme court reasonably found his mere in-court observations an insufficient basis upon which to raise a doubt about competency.  (See Claims 4, 5, 8; ECF No 209 at 42); see also Weaver, 26 Cal. 4th at 953-54.

Particularly, as the trial court noted, Dr. Owre had not personally examined Weaver since 1977, and his professional observations of Petitioner's mental state were limited to ninety minutes in the courtroom.  (RT 4854-55.)  The record shows that Counsel and the prosecutor stipulated to the trial court's discounting of Dr. Owre's volunteered opinion that Petitioner was then suffering symptoms of schizophrenia.  (CT 1510.)   Relatedly, this Court, in its prior order denying Claims 8 and 9, found that the state supreme court was not unreasonable in denying relief on Petitioner's allegation that counsel provided ineffective assistance by failing to request a second competency hearing mid-trial after Dr. Owre's testimony.  (ECF No. 214 at 26 n.3,

citing ECF No. 209 at 42.)

Dr. Jack Tolchin, a psychologist, examined Petitioner in 1978, and opined that Petitioner presented a passive aggressive personality with sadomasochistic features or depressive features or both, and a personality disorder which was then in remission. (RT 4825, 4832, 4849.) Dr. Tolchin did not find Petitioner psychotic (RT 4850).

Dr. George Chappell, a psychiatrist, along with psychologist Dr. Theodore Donaldson, was appointed by the court in the Ventura County proceeding to opine on Petitioner's sanity at the time of those crimes. (RT 4859-63.) Dr. Chappell examined Petitioner in August 1981. (RT 4859-63.) Dr. Chappell noted that Petitioner claimed he was then daily taking 600 mg of Mellaril, but showed no effects thereof. (RT 4863-64.) Petitioner also claimed a history of amphetamine use. (RT 4876.) Dr. Chappell found Petitioner of average intelligence (RT 4908), depressed, and possibly malingering or faking some symptoms (RT 4884). Dr. Chappell diagnosed Petitioner with adjustment disorder with depression. (RT 4886.) Dr. Chappell concluded that Petitioner was sane at the time of the May 1981 Ventura County crimes. (RT 4894.)

Dr. Donaldson examined Petitioner in July 1981. (RT 4915.). Dr. Donaldson noted Petitioner might be fabricating his alleged auditory hallucinations and exaggerating other symptoms. (RT 4924-26.) He observed that Petitioner was "very clear and articulate" during conversation. (RT 4941.) Dr. Donaldson opined that Petitioner was sane at the time of the Ventura crimes. (RT 4925.) Dr. Donaldson diagnosed Petitioner with mixed personality disorder and depressive neurosis with a history of amphetamine abuse. (RT 4926.) Dr. Donaldson did not find Petitioner to be schizophrenic. (RT 4926.) Dr. Donaldson found Petitioner's 1982 interview with detectives Johnson and Davis regarding the capital crimes, unavailable to him at the time of his 1981 opinion, was nonetheless consistent therewith. (RT 4948-49.)

Dr. Rolland Rose, a corrections department psychologist, evaluated Petitioner in late 1981, shortly after his conviction on the Ventura County crimes, found him of average intelligence (RT 4963-72), and diagnosed him with a personality disorder, passive-aggressive

1    personality with schizoid feature and sexual sadism (RT 4974) and intense hostility toward

2    women (RT 4976).  Dr. Rose found no evidence of organic brain damage.  (RT 4976.)

3         *(2)    Petitioner's Trial Defense Experts*

4         The seven mental health experts retained for Petitioner's sanity phase defense, all found

5    him to present with personality disorder or PTSD, six found evidence of schizophrenia, and three

6    found Petitioner insane at the time of the capital crimes.  Still, none of these experts found

7    Petitioner incompetent, as discussed below.

8         Dr. Jack Shonkwiler, a psychiatrist then on probation with the California Board of

9    Medical Quality Assurance and practicing under a restricted license following a felony

10   conviction (RT 5021, 5156-57), examined Petitioner for sanity in August 1983 (RT 5026).  Dr.

11   Shonkwiler noted Petitioner's predisposition  to schizophrenia based on his family history (RT

12   5092), and that Petitioner claimed he was then taking 25mg of Mellaril three times a day (RT

13   5070).  Dr. Shonkwiler diagnosed Petitioner with a psychopathic personality disorder (RT 5169),

14   paranoid schizophrenia and PTSD (RT 5067, 5148).  Dr. Shonkwiler found Petitioner insane at

15   the time of the capital crimes (RT 5148, 5192, 5232), manifesting an irresistible impulse and

16   diminished capacity (RT 5192, 5232).  However, Dr. Shonkwiler conceded that his expert report

17   and addendum thereto did not consider Petitioner's noted guilt phase testimony.  (RT 5153.)

18        Dr. K. Edward Dietiker, a psychologist, examined Petitioner for sanity in September

19   1983.  (RT 5437.)  Dr. Dietiker observed that Petitioner exaggerated his fears and anxieties.  (RT

20   5287.)    Dr. Dietiker diagnosed Petitioner with a psychosis (RT 5290), and paranoid

21   schizophrenia (RT 5293, 5427).    Dr. Dietiker suggested that under certain circumstances,

22   Petitioner would have difficulty conforming with the law.  (RT 5429.)

23        Dr. Kathe Lundgren, a clinical psychologist, examined Petitioner for sanity in August

24   1983.  Dr. Lundgren suggested that Petitioner may be faking some of his symptoms.  (RT 5895-

25   96.)  Dr. Lundgren found Petitioner to present a severe personality disorder (RT 5356), with

26   symptoms of chronic undifferentiated schizophrenia (RT 5357).    Dr. Lundgren diagnosed

27   Petitioner with chronic undifferentiated psychosis and psychopathic personality.  (RT 5896.) Dr.

28   Lundgren, who suggested Petitioner was a danger to the public (RT 5361-62), had no opinion

whether Petitioner was sane or insane at the time of the capital crimes (RT 5898-99).

Dr. Byron Wittlin, a psychiatrist, evaluated Petitioner for PTSD in August 1984. Dr. Wittlin observed that Petitioner presented with insane and paranoid delusions (RT 5226-32), insane thinking (RT 5537), and psychotic behavior (RT 5541). Dr. Wittlin suggested that Petitioner was schizophrenic as early as the time he entered the Army in 1967. (RT 5598-99.) Dr. Wittlin diagnosed Petitioner with PTSD. (RT 5610.)

Dr. Clyde Donahoe, a psychologist, evaluated Petitioner for PTSD in August 1984. He testified, based upon his interview with Petitioner and his review of Petitioner's military records, that Petitioner saw combat in Vietnam (RT 5683), and suffered PTSD as a result (RT 5677-81, 5701, 5713).

Dr. Harry Kormos, a psychiatrist, examined Petitioner for PTSD during the sanity phase in February 1985, and found him mentally ill (RT 5947). Dr. Kormos diagnosed Petitioner with schizophrenia of the paranoid type and chronic PTSD. (Id.) Dr. Kormos testified that schizophrenics can be functional at times, showing no signs of mental illness (RT 5948, 5954), and that stress can cause the schizophrenia to become more apparent (5949). Dr. Kormos concluded that Petitioner was insane at the time of the capital crimes. (RT 5959.)

Dr. John Wilson, a psychologist, evaluated Petitioner for PTSD in February 1985, during the sanity phase. (RT 5798-5800.) Dr. Wilson observed Petitioner's long standing history of mental illness. (Id.) Dr. Wilson found Petitioner to present with paranoid schizophrenia, PTSD, and mixed personality disorder. (RT 5800-01.) Dr. Wilson opined that Petitioner was insane at the time of the capital crimes. (RT 5820.)

(3)     Other Experts

The five non-defense team experts who testified at trial all found Petitioner to present with personality disorder. Yet none of these experts found Petitioner insane or incompetent, as discussed below.

As noted, psychiatrists Dr. Paul Cutting, and Dr. Francis Criswell evaluated Petitioner in October 1982 for trial competence and sanity pursuant to appointment by the arraignment court. Dr. Cutting testified at the sanity phase that Petitioner, in 1982, was fully oriented and responded

appropriately, showing no memory difficulties. (RT 6046, 6062, 6351.) Dr. Cutting found Petitioner to be of low-average intelligence. (RT 6072.) Dr. Cutting found Petitioner to present with mental and emotional problems including atypical psychosis and schizoid personality disorder. (RT 6047.) Dr. Cutting found Petitioner competent to stand trial (CT, Confidential Records, at 11-12), and sane at the time of the capital crimes (RT 6048). Dr. Cutting testified that his 1982 arraignment opinion was fully informed by the information then provided to and considered by him. (RT 6090-91.)

Dr. Criswell testified at the sanity phase that Petitioner, in 1982, was oriented, responded appropriately, and that notwithstanding claimed auditory and visual hallucinations, he did not present any thought or psychic disorder or evidence of delusional thought. (RT 6353-54.) Dr. Criswell stated that Petitioner indicated a history of psychiatric treatment (RT 6394) and claimed he was then medicated, possibly with Mellaril (RT 6394-95). Dr. Criswell observed that while Petitioner appeared mildly sedated, such sedation was not any "great handicap." (Id.; see also RT 6361.) Dr. Criswell found that Petitioner was of average intelligence. (RT 6365.) Dr. Criswell found Petitioner's claimed hallucinations to be unconvincing. (RT 6357, 6361; see also RT 6395.) Dr. Criswell found no evidence of psychosis. (RT 6357, 6361.) Dr. Criswell concluded Petitioner suffered from a personality disorder (id.), was competent to stand trial (CT, Confidential Records, at 20), and was sane at the time of the capital crimes (RT 6357-58).

Psychiatrists Drs. Francis Matychowiak and Richard Burdick evaluated Petitioner for sanity in April 1984, pursuant to appointment by the court following entry of Petitioner's NGI plea. (RT 6127-28, 6239-41.) Dr. Matychowiak reviewed background information including copies of medical reports by Drs. Criswell, Cutting, Donaldson, Chappell, Lundgren, and Shonkwiler, as well as Kern County Sheriff's reports and Superior Court testimony. (CT Confidential Reports at 21.) Petitioner stated at that time he was no longer taking Mellaril and that he used to take 600 mg. daily. (Id. at 23.) Dr. Matychowiak found Petitioner to be oriented and responsive (RT 6132), and of low-average intelligence (RT 6133). Dr. Matychowiak found Petitioner to present a personality disorder with a mixture of paranoid and antisocial traits. (RT 6134; see also CT Confidential Reports at 26.) Dr. Matychowiak opined that Petitioner was sane

46

1   at the time of the capital crimes.  (Id.)  Dr. Matychowiak did not find Petitioner to be suffering

2   PTSD.  (RT 6209.)

3          Dr. Burdick reviewed the same materials as Dr. Matychowiak as well as psychological

4   evaluations by Mary Cholet M.S. and Will Powers, Jr., M.S. and K. Edward Dietiker, Ph.D.;

5   psychiatrist Dr. Gardner who evaluated Petitioner in relation to the Humboldt County

6   proceeding; Kern County Sheriff's reports, and information on the capital crimes and Petitioner's

7   prior offenses.  (CT Confidential Reports at 28.)  Petitioner told Dr. Burdick that he had taken

8   Mellaril in the past.  (Id. at 33.)  Dr. Burdick observed Petitioner's statements that he was not

9   then taking Mellaril; that Mellaril did not help him other than assisting with sleep; and that he

10  did not desire to take Mellaril.  (RT 6284.)   Dr. Burdick found Petitioner to be of low-average

11  intelligence (RT 6241), with no problems concentrating.  (RT 6303.)  Dr. Burdick found that

12  Petitioner's complaints of auditory hallucinations were not consistent with mental illness.  (RT

13  4262-63.)  Dr. Burdick found that Petitioner presented with antisocial personality disorder.  (RT

14  6243; see also CT Confidential Reports at 37.)   Dr. Burdick found unpersuasive Petitioner's

15  contention that he blacked out during the killing of Levoy.  (RT 6266.)  Dr. Burdick found

16  Petitioner sane at the time of the capital crimes.  (RT 6244; see also CT Confidential Reports at

17  37.)

18         Dr. Mary Cholet, a psychologist who was a registered psychological assistant at the time

19  she evaluated Petitioner for the defense in August 1983, testified for the People at trial.  Dr.

20  Cholet found Petitioner possibly learning impaired.  (RT 6507.)  Dr. Cholet found no evidence of

21  brain damage (RT 6417-21, 6430), schizophrenia (RT 6430), or thought disorder (RT 6507).  Dr.

22  Cholet found Petitioner to present an antisocial personality disorder with characteristics of

23  borderline personality disorder.  (RT 6431.)  Dr. Cholet discounted Petitioner's claimed auditory

24  hallucinations, finding no evidence of hallucinations.  (Id.)  Dr. Cholet discounted the possibility

25  Petitioner suffered PTSD.  (RT 6476.)

26         (C)     Findings and Opinions of Mental Health Experts on State Habeas

27         Petitioner argues the findings and opinions proffered by his two state habeas experts, Dr.

28  Dale Watson and Dr. David Foster, preponderate to trial incompetence.  Particularly, he points to

1   the state habeas declaration of Dr. Foster, who examined Petitioner in September 1998, some

2   thirteen years after trial, and found Petitioner to be incompetent at the time of trial.  (See 1SHCP

3   Ex. 37 at ¶¶ 7, 38; see also ECF No. 215 at 27, citing Taylor v. Davis, 164 F. Supp. 3d 1147,

4   1155 (N.D. Cal. 2016) (a diagnosis of paranoid schizophrenia coupled with suicide attempt and

5   institutionalization clearly raises a bona fide doubt that a defendant is competent for trial).)

6          Still, this Court previously observed the state supreme court reasonably could give

7   minimal weight to the habeas proffer opining trial incompetence.  (ECF No. 209 at 44.)  The

8   state supreme court reasonably could find Dr. Foster's opinion of trial incompetence, the only

9   such opinion in the record, rendered nearly one and one-half decades after trial, not to be

10  preponderate evidence of prima facie trial incompetence given the weight of the undiscounted

11  opinions of the trial experts who contemporaneously examined Petitioner and did not find him

12  incompetent for trial.  See Sully v. Ayers, 725 F.3d 1057, 1071 (9th Cir. 2013) (retroactive

13  determinations of incompetence generally are disfavored); Williams, 384 F.3d at 608; cf.

14  Sherwood v. Sherman, 734 F. App'x 471, 474 (9th Cir. 2018) (holding that district court erred in

15  rejecting psychologist's retrospective report regarding petitioner's competency to plead guilty

16  because report "was based wholly on evidence that was readily available to [counsel] at the time

17  of trial").  Notably, Dr. Chappell observed that one's mental state is best evaluated when

18  proximal to the interview.  (RT 4904-05.)  .

19         Furthermore, Dr. Foster did not review trial transcripts (see 1SHCP Ex. 37, Appx. A),

20  and thus failed to reconcile his conclusions with Petitioner's lucid and lengthy trial testimony,

21  and unremarkable courtroom demeanor, or otherwise point to manifestations of incompetence in

22  the trial court record.  Significantly, state habeas expert Dr. Watson examined Petitioner in 1997

23  and did not opine trial incompetence (1SHCP Ex. 36 at ¶¶ 42-45).  Moreover, not every person

24  diagnosed with schizophrenia is incompetent to stand trial.  Taylor, 164 F. Supp. 3d at 1156; cf.

25  People v. Pennington, 66 Cal.2d 508, 519 (1967) (concluding that substantial evidence of

26  incompetence to stand trial existed whenever a mental health professional "who has had

27  sufficient opportunity to examine the accused, states under oath with particularity that in his

28  professional opinion the accused is, because of mental illness, incapable of understanding the

purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel[.]").

The Ninth Circuit Court of Appeals has stated that:

> We also accord little weight to the competency assessments of [petitioner's] habeas corpus experts because they are based not upon medical reports contemporaneous to the time of the preliminary hearings or trial, but upon declarations submitted by [petitioner's] friends and family and neuropsychological testing conducted […] years after trial. We have previously held that retrospective competency determinations, although disfavored, are permissible when it is possible to make an accurate retrospective evaluation, for example, by consulting contemporaneous medical reports. *See Moran,* 57 F.3d at 696. Without the benefit of such contemporaneous reports, the passage of time and the difficulties inherent in evaluating the defendant's competence from a written record reduce the likelihood of an accurate retrospective determination. *See Pate,* 383 U.S. at 387, 86 S. Ct. 836 (concluding that no meaningful retrospective competency determination could be made six years after trial).
>
> […]
>
> Given the significant contemporaneous evidence of [petitioner's] competence at trial, supported by defense counsel's firm belief that [petitioner] was competent, and the absence of persuasive evidence to the contrary, [petitioner] fails to establish a violation of his right not to be tried and convicted while incompetent.

Williams, 384 F.3d at 609–10.  The state supreme court reasonably could find the opinions of experts rendered proximal to the capital crimes, could be weighted more heavily than opinions provided more distal to the crimes.  (See e.g., RT 4904-05.)

Additionally, the state supreme court reasonably could reject Petitioner's suggestion the state supreme court discounted Dr. Foster's credibility based upon its unreasonable determination of facts relating to the duration and extent of Petitioner's treatment with Mellaril. (See ECF No. 210 at 81-83, citing Earp v. Ornoski, 431 F.3d 1158, 1167, 1169-70 (9th Cir. 2005) (petitioner must have an opportunity to present live testimony so that the trier of fact can judge credibility).  The noted evidentiary record includes facts supporting Petitioner's use of Mellaril during the period 1981-1983, as stated by Dr. Foster.  Petitioner's suggestion the state supreme court must have determined a shorter duration of medication with Mellaril and thereupon discounted Dr. Foster's credibility (see 1SHCP Ex. 37 at ¶ 31; ECF No. 214 at 20, citing 1SHCP Ex. 36 at ¶¶ 7, 20; RT 5070, 6373),  is at best only supposition.

49

It follows that, "[g]iven the significant contemporaneous evidence of [Petitioner's] competence at trial, supported by [Counsel's] belief that [Petitioner] was competent, and the absence of persuasive evidence to the contrary, [Petitioner] fails to establish a violation of his right not to be tried and convicted while incompetent." Williams, 384 F.3d at 610; Baal, 495 U.S. at 735; see also Vargas, 159 F.3d at 1168-69 (next friend failed to rebut state court's finding petitioner was competent, which was "extremely well supported by expert opinions, psychological testing, and [petitioner's] courtroom demeanor").

(iii)    Unconstitutionality of State Standard for Trial Competence

Petitioner argues that Penal Code section 1367, by requiring that a defendant's incompetence be attributable to "a diagnosed mental illness[,]" runs contrary to Dusky, Drope, and Godinez, which do not require a diagnosed mental illness or disorder. (ECF No. 210 at 77-81 and state cases cited therein; see also Penal Code §1367(a); see also Benn v. Lambert, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002) ("The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the "contrary to" clause of AEDPA."); see also Drope, 420 U.S. at 171-72. Petitioner argues "it is reasonable to assume" the state supreme court rejected Claim 3 based upon application of the noted heightened standard set out in Penal Code section 1367.

However, the state supreme court reasonably could find Petitioner failed to provide legal authority supporting the argument section 1367 is contrary to clearly established federal law. (See ECF No. 214 at 18-20, citing Hardy v. Chappell, 832 F.3d 1128, 1137 (9th Cir. 2016), amended and superseded upon denial of rehearing by Hardy v. Chappell, 849 F.3d 803 (9th Cir. 2016) (California supreme court erred by employing a standard of review harsher than Strickland).) Petitioner has not pointed to clearly established federal law precluding consideration of whether trial incompetency resulted from a mental disorder or developmental disability.[7] As noted, the clearly established federal law requires that a person whose mental

---

[7] At the time of Petitioner's trial, Penal Code section 1367(a) provided that "A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

1   condition is such that he lacks the capacity rationally to understand the nature and object of the

2   proceedings against him, to consult with counsel, and to assist in preparing his defense, may not

3   be subjected to a trial.  Anderson v. Gipson, 902 F.3d 1126, 1133 (2018) (citing Drope, 420 U.S.

4   at 171).

5           Petitioner has not proffered evidence that the state supreme court's application of Penal

6   Code section 1367(a), to the facts and circumstances of his case, was contrary to or an

7   unreasonable application of the noted clearly established federal law.  See Williams, 529 U.S. at

8   405, 413 (under § 2254(d)(1), the writ may issue only if the state-court adjudication resulted in a

9   decision that (1) arrives at a conclusion opposite to that reached by the Supreme Court on a

10  question of law or if the state court decides a case differently than this Court has on a set of

11  materially indistinguishable facts, or (2) identifies the correct governing legal principle from this

12  Court's decisions but unreasonably applies that principle to the facts of the prisoner's case).

13  Moreover, as Respondent observes, "the Missouri statute at issue in Drope required that a

14  defendant's incompetence be the result of a "mental disease or defect."  (ECF No. 211 at 27,

15  citing Drope,  420 U.S. at 173.)

16          Particularly, Petitioner fails to demonstrate legally and factually why and how section

17  1367 limits the mental condition for trial incompetence under the clearly established federal

18  standard.  See Moran, 509 U.S. at 396; Dusky, 362 U.S. at 402; Drope, 420 U.S. at 171.

19  Notably, the Ninth Circuit has repeatedly reviewed state court application of section 1367

20  without finding constitutional error.  See e.g., Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir.

21  2011); Huu Thanh Nguyen v. Garcia, 477 F.3d 716, 724-25 (9th Cir. 2007); Deere v. Cullen, 718

22  F.3d 1124, 1126 (9th Cir. 2013) (citing Dennis, v. Budge, 378 F.3d 880, 890 (9th Cir. 2004)

23  ("The question . . . is not whether mental illness substantially affects a *decision,* but whether a

24  mental disease, disorder or defect substantially affects the prisoner's *capacity* to appreciate his

25  options and make a rational choice.").

26          d.     Conclusions

27          A fair-minded jurist could find the state supreme court's denial of the Claim was not

28  contrary to, or an unreasonable application of, clearly established federal law, as determined by

51

the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Petitioner has not rebutted, by clear and convincing evidence, the presumption that the state supreme court's finding of competence was correct.  28 U.S.C. § 2254(e)(1).

Claim 3 shall be denied.

### 2.      Claim 28

Petitioner alleges that his serious mental illness renders him ineligible for execution, such that his capital sentence violates his rights under the Eighth and Fourteenth Amendments.[8]  (ECF No. 107 at 392-408.)

#### a.      State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 88-107), and summarily denied on the merits (Lod. Doc. 24).

#### b.      Legal Standard

##### (i)      Execution Incompetence

Execution of the mentally impaired fails to further any interest in retribution or deterrence, and leads to unacceptable risk of wrongful execution, such that it violates the Eighth Amendment.  Atkins v. Virginia, 536 U.S. 304, (2002); Ford v. Wainwright, 477 U.S. 399, (1986) (the federal Constitution "places a substantive restriction on the State's power to take the life of a mentally retarded offender"),

Execution of sixteen and seventeen-year-old offenders violates the [Eighth Amendment. Roper v. Simmons, 543 U.S. 551 (2005).

#### c.      Analysis

Petitioner argues that he is ineligible for execution, re-arguing his noted alleged serious mental illness and relating impairments.  He relies by analogy on clearly established federal law prohibiting on Eighth Amendment grounds execution of the intellectually disabled (formerly referred to as the mentally retarded).  (See ECF No. 107 at 392-408 citing Atkins, Ford, and Roper.)  Based thereon, he argues that his mental impairments and mental illness are similar to

---

[8] Petitioner states that he incorporates the factual basis of Claims 3, 4, 5, 6, 7, 8, and 9.  (ECF No. 107 at 393.)

1   the mentally retarded persons and children protected from execution by Atkins, 536 U.S. at 320–

2   21, and Roper, 543 U.S. at 568–69.

3        (i)     Petitioner's Indicia of Intellectual Disability

4        Petitioner argues that his noted mental illness leaves him intellectually disabled and

5   exempt from execution on that basis. He argues that, at the time of the capital crimes, his serious

6   mental illness and functional impairments left him intellectually disabled and volitionally

7   incapacitated and unable to control his behavior, and to reason, exercise judgment, plan, or

8   remember and accurately account for his behavior. (ECF No. 107 at 392-93, 405-06, citing

9   1SHCP Ex. 37 at ¶¶ 12, 14-15, 30, and 37; see also 1SHCP Ex. 36 at ¶ 44; Claims 3, 4, 5, 8,

10  herein.) He argues that, at the time of trial, his mental illness and impairments left him unable to

11  follow and participate in the proceedings, waive rights, assist counsel, testify accurately, and

12  display appropriate demeanor. (Id.; see also ECF No. 210 at 237-51.) Especially so, he

13  suggests, given his alleged symptoms of withdrawal from the antipsychotic Mellaril during trial.

14  (ECF No. 210 at 247-48, citing Lockett v. Ohio, 438 U.S. 586, 605 (1978) (plurality opn.)

15  (requiring an individualized sentence where sentencer is not precluded from considering

16  mitigating evidence).

17       Petitioner argues that his alleged serious mental illness and impairments render his death

18  sentence unreliable and his execution without penological purpose. (ECF No. 210 at 237-51,

19  citing e.g., 1SHCP Ex.'s 17 & 18 (Decl. Jurors Rice and Haney, respectively.) Particularly, he

20  suggests that his death sentence is "grossly disproportionate to his personal moral culpability and

21  lacks penological justification." (ECF No. 107 at 404, citing Gregg v. Georgia, 428 U.S. 153,

22  173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).) He suggests that given his

23  volitional incapacity, his death sentence lacks penological justification because neither

24  retribution nor deterrence would be served by his execution (ECF No. 107 at 406, citing Gregg,

25  428 U.S. at 183), such that "[his execution] fails to serve a legitimate penological purpose, [and]

26  is nothing more than the purposeless and needless imposition of pain and suffering, and hence an

27  unconstitutional punishment." (ECF No. 210 at 251, citing Atkins, 536 U.S. at 319 (quoting

28  Enmund v. Florida, 458 U.S. 782, 798 (1982).)

1    To support his claim of extending a ban on capital punishment to those with mental

2    illness, Petitioner argues that national public consensus generally opposes use of the death

3    penalty against defendants suffering from severe mental illness.  (ECF No. 107 at 408.)

4    Petitioner argues in these regards that he is similarly situated to mentally disabled

5    murderers and murders under 18 years of age, who are categorically exempt from execution.

6    (ECF No. 107 at 405); see also ECF No. 210 at 228 citing Atkins, Roper.  He observes that

7    "[n]ineteen of twenty states whose laws explicitly address the question of whether conduct the

8    defendant was powerless to avoid may serve as the basis for a death sentence have concluded

9    that it may not.  In seventeen states, the trial court's fact finding concerning the petitioner's

10   volitional capacity would have shielded the applicant from all criminal responsibility and all

11   punishment."  (ECF No. 107 at 396-97 and state statutes cited therein; see also ECF No. 214 at

12   64-65, citing Clark v. Arizona, 548 U.S. 735, 749-51 (2006).)  He argues that "no state has by

13   express legislative enactment rendered offenders who lacked sufficient capacity to conform their

14   conduct to the requirements of law eligible for capital punishment, [and] no court has ever so

15   construed the laws of any American state to permit such a result."  (ECF No. 107 at 402.)

16        (ii)    Preponderance of the Evidence

17   The state supreme court reasonably could find Petitioner fails to demonstrate by a

18   preponderance of the evidence that he is intellectually disabled and exempt from execution on

19   that basis.

20   Atkins establishes that "the Eighth and Fourteenth Amendments to the Constitution

21   forbid the execution of persons with intellectual disability."  Hall v. Florida, 572 U.S. 701, 704

22   (2014).  In so holding, the Supreme Court recognized that "[n]ot all people who claim to be

23   [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled]

24   offenders." Atkins, 536 U.S. at 317.  Importantly, "Atkins did not provide definitive procedural

25   or substantive guides for determining when a person who claims [intellectual disability] falls

26   within the protection of the Eighth Amendment."  Hall, 572 U.S. at 718.  Rather, the Supreme

27   Court left to the states "the task of developing appropriate ways to enforce the constitutional

28   restriction upon [their] execution of sentences."  Id. at 719, quoting Atkins, 536 U.S. at 317.

In response to the U.S. Supreme Court's decision in <u>Atkins</u>, California enacted Penal Code section 1376, defining intellectual disability as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age." Penal Code § 1376(a); <u>see In re Hawthorne</u>, 35 Cal.4th 40, 44 (2005). The California legislature derived this standard from clinical definitions cited in the <u>Atkins</u> decision. <u>See Atkins</u>, 536 U.S. at 308 n.3; <u>Hawthorne</u>, 35 Cal.4th at 47 (noting that California's definition of intellectual disability generally conforms to "the clinical definitions referenced in <u>Atkins</u>."). Intellectual disability is a question of fact based on state law, measured by an assessment of the individual's overall capacity, and based on consideration of all relevant evidence. <u>Hawthorne</u>, 35 Cal.4th at 49–50. A court "shall not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and consider all evidence bearing on the issue of [intellectual disability]." <u>Id.</u> at 50.

Although the Constitution prohibits the execution of children and persons whose mental illness renders them insane or intellectually disabled, it does not prohibit the execution of the mentally ill. <u>See Roper</u>, 543 U.S. at 568–69; <u>Atkins</u>, 536 U.S. at 320–21; <u>Ford</u>, 477 U.S. at 410. Nonetheless, Petitioner requests that this Court extend the clearly established federal law to prohibit the execution of the mentally ill.

However, to extend the clearly established federal law to prohibit the execution of the merely mentally ill would constitute a new rule of constitutional law. <u>See Woodall</u>, 572 U.S. at 426 ("AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." Under AEDPA, however, this Court cannot create new rules of constitutional law within the context of a habeas petition by a state prisoner. <u>See</u> 28 U.S.C. § 2254(d)(1) (stating a federal court may not grant habeas relief to a state prisoner unless the adjudication of his claim in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"); <u>see also Cornwell v. Warden, San Quentin State Prison</u>, No. 206CV00705TLNKJN, 2018 WL 934542 at *129 (E.D. Cal. Feb. 15, 2018) (same). Absent a decision from the Supreme Court barring the execution of

1  mentally ill prisoners, the Court rejects Petitioner's Claim that he is exempt from execution
2  because he is mentally ill.

3      Petitioner concedes that "there is no Supreme Court case addressing the exact factual
4  issue here, (i.e., whether the Eighth Amendment permits the execution of severely mentally ill
5  offenders). (ECF No. 214 at 63.) Still, he argues that the Supreme Court's jurisprudential
6  methodology for determining whether, under the "evolving standards of decency," a punishment
7  violates the constitutional prohibition of cruel and unusual punishments is well established. (Id.)
8  But he fails to point to clearly established federal law applicable to the facts and circumstances
9  of this case.

10     The Court finds Petitioner's related argument, that a general constitutional standard may
11  be applied to differing fact patterns, falls short. (See ECF No. 214 at 63, citing Panetti, 551 U.S.
12  at 953 (Kennedy, J., concurring in judgment).) Especially so, as Petitioner acknowledges
13  California allows mitigation upon evidence of impaired mental capacity. (See ECF No. 107 at
14  402 citing Penal Code § 190.3; see also Claims 26, 31, herein.)

15     In any event, Petitioner's Claim to execution ineligibility is premature. In Ford, the
16  Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual
17  punishment prevents the execution "of one whose mental illness prevents him from
18  comprehending the reasons for the penalty or its implications." 477 U.S. at 416-18. The
19  Supreme Court has since held that a Ford claim does not become ripe until execution is
20  imminent. See Burton v. Stewart, 549 U.S. 147, 154–55 (2007) (stating that "the claim of a
21  capital prisoner that he was insane and therefore could not be put to death was necessarily unripe
22  until the State issued a warrant for his execution"). As a result, while the Supreme Court has
23  assumed that Ford claims are habeas claims that ought to be included in a petition for writ of
24  habeas corpus, Ford claims are not required to be included in initial habeas petitions. See
25  Panetti, 551 U.S. at 943, 946–47 (holding that Ford claims raised after rejection of initial habeas
26  petitions do not constitute second or successive petitions); Stewart v. Martinez–Villareal, 523
27  U.S. 637, 645–46 (1998) (same).

28     District courts in the Ninth Circuit have dismissed Ford claims as premature when they

are brought up prior to setting of an execution date.  See Stanley v. Davis, No. C-07-4727 EMC, 2015 WL 435077 at *5 (N.D. Cal. Feb. 2, 2015) (district courts in the Ninth Circuit have dismissed Ford claims as premature when they are brought up prior to an execution date.).

        d.     Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 28 shall be denied.

    B.     Claims Alleging Trial Court Error

    1.     Claim 5

Petitioner alleges the trial court erred by failing *sua sponte* to declare a doubt about and redetermine Petitioner's competency during trial, violating his rights under the Fourth, Sixth, Eighth and Fourteenth Amendments.[9]  (ECF No. 107 at 65.)

        a.     State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 224-31), and denied on the merits, as follows:

> During presentation of the defense case at the sanity phase, Dr. Alfred Owre, Jr., a psychiatrist, testified that he had examined defendant briefly in 1977 in prison to determine defendant's parole suitability and had observed no evidence of schizophrenia at that time. Dr. Owre then testified that seeing defendant across the courtroom, it appeared defendant was out of touch with reality, that he was suffering from chronic undifferentiated schizophrenia, and that he appeared to be hallucinating. Defendant claims the trial court, after hearing this testimony, should have halted the sanity hearing and initiated competency proceedings. The court's failure to do so, defendant argues, violated several of his rights guaranteed by the federal Constitution. In addition, defendant contends his defense counsel's opposition to a competency hearing constituted ineffective assistance under the state and federal Constitutions. We disagree.
>
> The law in this area is settled. As noted, *ante*, trial of an incompetent criminal defendant violates his or her right to due process. (*Medina v. California*, *supra*, 505 U.S. at p. 448 [112 S.Ct. at pp. 2578-2579]; *People v. Hale*, *supra*, 44 Cal.3d

_____

[9] Petitioner states that he incorporates the factual allegations set out in Claims 3, 4, 7, 8, and 11. (ECF No. 107 at 65-66.)

at p. 539.) Section 1367, subdivision (a) states that a "defendant is mentally incompetent ... if, as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." " 'When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' " (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].) "The trial judge's ruling regarding whether a competency hearing is required should be given great deference. 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " (*Id.* at p. 727, quoting *People v. Merkouris* (1959) 52 Cal.2d 672, 679 [344 P.2d 1].)

The evidence in this case of defendant's alleged incompetence falls far short of being substantial. Dr. Owre admitted his statements indicating his present belief defendant was incompetent came from his observations of defendant's in-court demeanor and not from any actual examination or testing of defendant. Dr. Owre also admitted he had not seen defendant in the hallway before the court session, smoking and conversing with his defense counsel, or seen defendant previously testifying for more than a day, coherently and responsively answering questions. The trial court concluded it had no doubt as to defendant's competency, stating: "I just quite frankly don't believe that a doctor can from the witness stand, when he is not examining a patient or not even observing a person except secondarily to his testimony, can render an opinion like that on the witnesses stand...." Defense counsel seemed to agree, noting for the court that defendant had been examined by two psychiatrists and found competent.

On this record, we find the trial court's conclusion that Dr. Owre's testimony was not substantial evidence establishing a doubt of defendant's competence is entitled to deference on appeal. (See *People v. Rodrigues, supra,* 8 Cal.4th at p. 1111 [it was significant the expert witness had not actually examined the defendant].) Moreover, defendant fails to mention an important fact critically undermining his claim: the trial court had already declared a doubt as to defendant's competence at the time of the arraignment, had suspended proceedings, and had defendant examined by two psychiatrists. The parties submitted the matter, and the trial court found defendant legally competent. "Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence. [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 734 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Dr. Owre's brief observation regarding defendant's competence does not address whether there had been a substantial change in circumstances. Accordingly, we agree with the trial court that Dr. Owre's testimony did not raise a reasonable doubt as to defendant's competence, and his testimony thus did not comprise substantial evidence of incompetence necessitating a hearing.

Weaver, 26 Cal. 4th at 952–54.

b.      Legal Standard

(i)      Trial Court Error

Trial court error violates due process where it renders the resulting criminal trial

1    fundamentally unfair.  Chambers v. Mississippi, 410 U.S. 284, 294, 303 (1973).

2         "Federal habeas petitioners are not entitled to habeas relief based on trial error unless

3    they can establish that it resulted in actual prejudice."  Davis v. Ayala, 576 U.S. 257, 267 (2015)

4    (quoting Brecht, 507 U.S. at 637).  "Under this test, relief is proper only if the federal court has

5    grave doubt about whether a trial error of federal law had substantial and injurious effect or

6    influence in determining the jury's verdict."  Id. at 267–68 (quoting O'Neal v. McAninch, 513

7    U.S. 432, 436 (1995)); see also Beardslee v. Brown, 393 F.3d 1032, 1041–44 (9th Cir. 2004)

8    (applying Brecht's harmless error test to an Eighth Amendment error based on the improper

9    consideration of invalid aggravating factors).

10        (ii)    Trial Incompetence – Procedural Due Process

11        The conviction of a legally incompetent defendant violates the Due Process Clause of the

12   Fourteenth Amendment.  Cooper, 517 U.S. at 354; Cacoperdo v. Demosthenes, 37 F.3d 504, 510

13   (9th Cir. 1994).  A defendant is incompetent to stand trial if he lacks sufficient present ability to

14   consult with his lawyer with a reasonable degree of rational understanding, or lacks a rational as

15   well as factual understanding of the proceedings against him.  Indiana v. Edwards, 554 U.S. 164,

16   170 (2008) (quoting Dusky, 362 U.S. 402); see also Moran, 509 U.S. at 396; McMurtrey v.

17   Ryan, 539 F.3d 1112, 1118 (9th Cir. 2008); Douglas v. Woodford, 316 F.3d 1079, 1094 (2003).

18        Furthermore, if at any time during the trial, the trial court becomes aware of

19   circumstances that would lead a reasonable person to have a "bona fide doubt" as to the

20   defendant's competence, the trial court must suspend the proceedings and conduct a hearing to

21   determine the defendant's competency.  Pate, 383 U.S. at 385; accord Maxwell, 606 F.3d at 568.

22   In Drope, moreover, the U.S. Supreme Court held that "[e]ven when a defendant is competent at

23   the commencement of his trial, a trial court must always be alert to circumstances suggesting a

24   change that would render the accused unable to meet the standards of competence to stand trial."

25   420 U.S. at 181; accord Maxwell, 606 F.3d at 574.

26        A state court's determination that the evidence was insufficient to require a competency

27   hearing is a finding of fact that entitled to deference.  Davis v. Woodford, 384 F.3d at 644; §

28   2254(d)(2).  In reviewing whether a state trial judge should have *sua sponte* conducted a

1    competency hearing, a federal court may consider only the evidence that was before the trial

2    judge. United States v. Lewis, 991 F.2d 524, 527 (9th Cir. 1993); see also McMurtrey, 539 F.3d

3    at 1119; Davis, 384 F.3d at 645.

4          Trial incompetency, if demonstrated, is structural error not amenable to harmless error

5    analysis under Brecht, 507 U.S. at 619, but rather necessitating automatic reversal. See Walters,

6    309 F.3d at 593 (quoting Neder, 527 U.S. at 7).

7          c.    Analysis

8          Petitioner argues the evidence before the trial court was sufficient to raise a bona fide

9    doubt about his competence to stand trial, and trigger an evidentiary hearing thereon. (ECF No.

10   107 at 66; ECF No. 210 at 83, citing Penal Code §§ 1367-70; Odle v. Woodford, 238 F.3d 1084,

11   1087 (9th Cir. 2001) ("[A] trial judge must conduct a competency hearing whenever the

12   evidence before him raised a bona fide doubt about the defendant's competence to stand trial,

13   even if defense counsel does not ask for one."); see also ECF No. 210 at 84 citing de Kaplany,

14   540 F.2d at 983) (the test for a bona fide doubt is "whether a reasonable judge, situated as was

15   the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should

16   have experienced doubt with respect to competency to stand trial.")

17         As noted, under state law, "[a] defendant is mentally incompetent ... [if] the defendant is

18   unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of

19   a defense in a rational manner." Penal Code § 1367. Also, when a competency hearing has

20   already been held and defendant has been found competent to stand trial, however, a trial court

21   need not suspend proceedings to conduct a second competency hearing unless it is presented

22   with a substantial change of circumstances or with new evidence casting a serious doubt on the

23   validity of that finding. People v. Lawley, 27 Cal. 4th 102, 136 (2002) (quoting People v. Kelly,

24   1 Cal. 4th 495, 542 (1992)).

25         (i)    Competence Redetermination

26         Petitioner argues the state supreme court's denial of the Claim on direct appeal on

27   grounds "the evidence did not disclose a substantial change of circumstances or new evidence

28   casting serious doubt on the validity of the prior [competency] finding" (see ECF No. 210 at 94

1  (citing <u>Weaver</u>, 26 Cal. 4th at 952-55) ignores crucial facts in the record and misapprehends and

2  is contrary to clearly established federal law that a competency hearing is required if a

3  reasonable judge would have found a bona fide doubt of competence (see <u>Torres v. Prunt</u>, 223

4  F.3d 1103, 1108 (9th Cir. 2000); see also <u>de Kaplany</u>, 540 F.2d at 979-80 (citing <u>Pate</u>, 383 U.S.

5  at 385-86) (courtroom demeanor, indicating alertness and understanding, alone could not be

6  relied upon to establish competency and justify "ignoring the uncontradicted testimony of

7  Robinson's history of pronounced irrational behavior.").

8      Particularly, Petitioner argues the state supreme court's denial of the Claim was an

9  unreasonable determination of the facts.  He argues that court ignored or failed to give proper

10  weight to evidence supporting a doubt as to trial competence based upon new facts and changed

11  circumstances apparent in the wake of the prior finding of competence by Drs. Cutting and

12  Criswell.  (ECF No. 210 at 95-96 citing <u>Drope</u>, 420 U.S. at 179.)  He points to evidence that:

14  - The 1983 discontinuance of his anti-psychotic medication, Mellaril, which
   he had been taking for approximately two years, led to the mental
15  decompensation he experienced in the middle of trial, as evidenced by Dr.
   Owre's testimony.  (ECF No. 210 at 96, citing <u>Weaver</u>, 26 Cal. 4th at
   954.)

17  - His 1982 confession to Kern County Sheriff's Sergeants Gary Davis and
   Glen Johnson was made while he was under the influence of Mellaril.
18  (ECF No. 210 at 84 citing RT 122-23, 144-45.)

19  - His 1982 arraignment competency evaluations took place while he was
   sedated with Mellaril, was delusional and hearing voices, was depressed,
20  and had the affect of a subdued child." (ECF No. 107 at 67;  CT
   Confidential Records at 8-12, 13-20.)

21  - The judge assigned the trial in 1984 knew or should have known that the
   1982 arraignment judge and defense counsel expressed doubt as to
22  Petitioner's competency for trial.  (ECF No. 210 at 84 citing RT Sept. 29,
   1982 at 2-4; CT 206-208.)

24  - The trial court knew Petitioner had been taking anti-psychotic medication
   (i.e., Mellaril) since 1981 and that against Petitioner's wishes the drug had
25  been discontinued by the time of trial  and Petitioner had been moved
   from his regular housing to a dark isolation cell, whereupon Petitioner
26  showed signs of confusion, delusion, and suicidal thought process. (ECF
   No. 210 at 84-85 citing RT 199-217; see also RT 233-34; 246-80; RT
   1541-42, 3499-3501, 3549-51, 3826, 4857-58.)

28  - His deteriorating appearance and demeanor was apparent during trial and
   affected the jury's ability to deliberate fairly.  (ECF No. 107 at 68;  see also

ECF No. 210 at 86 citing RT 3951; 1SHCP Ex.'s 17 & 18 [Decl. Jurors Rice and Haney, respectively]; RT 4815-21 [testimony of Dr. Owre].)

- His sanity phase testimony described his ongoing hallucinations and suicidal ideations. (See Claims 3, 4, herein; see also ECF No. 210 at 86 citing RT 4512-13; RT 5822-24.)

- Sanity phase experts Drs. Shonkwiler, Wilson, and Kormos, opined that Petitioner suffered PTSD and was schizophrenic and insane at the time of the capital crimes. (See e.g., ECF No. 210 at 87-88 citing RT 5067, 5148, 5232, 5800-02, 5820, 5947, 5959.)

- Kern County jail inmates observed Petitioner talking to himself, crying, and wetting his bed around the time of trial. (ECF No. 210 at 89 citing RT 5716-21, 5723-27.)

The question is whether a reasonable judge, "situated as was the trial court judge," should have experienced a "good faith" or "substantial doubt" regarding the defendant's competence. Stanley, 633 F.3d at 860 (quoting deKaplany, 540 F.2d at 983). A "good faith" or "substantial doubt" exists "when there is substantial evidence of incompetence." Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003), as amended on denial of reh'g (Oct. 2, 2003) (citing Cuffle v. Goldsmith, 906 F.2d 385, 392 (9th Cir.1990)). Whether a defendant is capable of understanding the proceedings and assisting counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on competence to stand trial." Drope, 420 U.S. at 180. None of these factors is determinative, but any one of them may be sufficient to raise a reasonable doubt regarding competence. Id.

Here, the state supreme court reasonably could defer to the trial court's implicit determination that Petitioner's behavior, demeanor and testimony, and the medical opinion before and during trial, did not demonstrate a substantial change of circumstances or new evidence casting a serious doubt on the validity of the prior competency determination during arraignment. Lawley, 27 Cal. 4th at 136; see also People v. Medina, 11 Cal.4th 694, 734 (1995) (citing People v. Jones, 53 Cal. 3d 1115, 1153-54 (1991)) (general assertion of defendant's worsening condition and inability to cooperate with counsel inadequate to justify second hearing).

The trial court personally observed and interacted with Petitioner throughout the course

of the trial including the taking of pleas and rights waivers.  See People v. Lawley, 27 Cal. 4th 102, 136 (2002) (citing People v. Jones, 53 Cal.3d 1115, 1153 (1991)) (a trial court may appropriately take into account its own observations in determining whether the defendant's mental state has significantly changed during the course of trial).

Drs. Cutting and Criswell, at the time they examined Petitioner in October of 1982, considered his noted alleged psychotic symptoms.  They were aware he was taking Mellaril and observed at most his mild sedation as a result of the medication.  To the extent Petitioner argues discontinuation of Mellaril as a changed circumstance impacting competence, it appears that none of the trial experts tethered discontinuance of Mellaril to Petitioner's competence for trial, or found him incompetent for trial.  Petitioner himself downplayed Mellaril's effect on him, suggesting at most that it made him sleepy

Notwithstanding Petitioner's claims of confusion, delusion, and suicidal ideations, neither the trial court and Counsel observed change in Petitioner's cognition or irrational behavior after Mellaril was discontinued.  At no time did Counsel or the prosecutor find reason to request re-determination of trial competence.  See, e.g., Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991) ("We deem significant the fact that the trial judge, government counsel, and [the petitioner's] own attorney did not perceive a reasonable cause to believe [the petitioner] was incompetent."); United States v. Clark, 617 F.2d 180, 186 (9th Cir. 1980) (fact that the defendant's attorney considered the defendant competent to stand trial was significant evidence that defendant was competent); Cornwell, 2018 WL 934542 at **124–25.

Dr. Owre's noted testimony regarding his courtroom observation of decompensation reasonably could be discounted by the trial court, for the reasons stated.  (ECF No. 209 at 42; Weaver, 26 Cal.4th at 953-54.)  As discussed above, the state supreme court reasonably could have attributed Petitioner's apparently deteriorating appearance and demeanor to trial tactics, rather than trial competence.  (See ECF No. 209 at 61.)

Furthermore, the state supreme court reasonably could find the opinions of the noted three defense trial experts, that Petitioner was schizophrenic, suffered PTSD, and was insane at the time of the crimes, not a new circumstance or evidence as to trial competence.  None of these

1  three experts opined Petitioner was incompetent for trial, or explained how their diagnosis

2  affected, if at all, Petitioner's ability rationally to understand his capital proceeding and assist

3  counsel in his defense.  Notably, Petitioner's claimed auditory hallucinations were longstanding

4  and unchanging prior to and after arraignment and continuing to trial.

5       Significantly, Dr. Matychowiak, who evaluated Petitioner in 1984 in conjunction with his

6  plead of NGI, stated that based upon his review of Petitioner's prior mental health evaluations

7  and his examination of Petitioner in 1984, Petitioner's condition looked much the same, without

8  any change or evidence of deterioration.  (RT 6170.)

9       As discussed above, the state supreme court reasonably could find that the weight of the

10  undiscounted expert findings and opinions at trial did not raise a doubt as to Petitioner's

11  competency to stand trial.  See de Kaplan, 540 F.2d at 583-84 ("We are not prepared to assert

12  that in every trial in which the sanity of the defendant is contested there must exist a good faith

13  doubt which requires a hearing on competency.").

14       To the extent Petitioner's incompetency allegations raise only state law error, such error

15  is unsupported, and not alone a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62,

16  67-68 (1991);  see also Claims 3, 4, 8, herein.

17       (ii)    Actual Prejudice

18       Petitioner argues that "[h]ad the trial court fulfilled its *sua sponte* duty by suspending

19  criminal proceedings, appointing separate and independent mental health experts to evaluate

20  petitioner, and holding an inquiry into petitioner's competence, it would have found petitioner

21  incompetent to stand trial."  (ECF No. 107 at 70.)

22       Assuming arguendo the trial court erred by failing *sua sponte* to declare a doubt about

23  and redetermine Petitioner's competency during trial, the state supreme court reasonably could

24  find no actual prejudice arising therefrom.  That court reasonably could find on the evidence

25  before it, that Petitioner was not incompetent at trial and there was no structural error in this

26  regard, for the reasons stated.  (See Claims 3, 4, 8, herein; see also Brecht, 507 U.S. at 619;

27  Walters, 309 F.3d at 593.

28       d.    Conclusions

64

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 5 shall be denied.

## 2.    Claims 10 and 12

Petitioner alleges that the trial court erred by denying his motions for change of venue (Claim 10) and jury sequestration (Claim 12), violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (ECF No. 107 at 232, 265-70.)

### a.    State Court Direct and Collateral Review

Claim 10 was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 79-83), and that court denied it on the merits, stating that:

> Citing prejudicial pretrial coverage of his trial in the local media, defendant moved for a change of venue from Kern County. In support, he submitted to the trial court a survey of public opinion about the case and 12 articles from the Bakersfield Californian, the area's major newspaper. After a hearing, the trial court denied the motion. Defendant now claims the trial court erred.
>
> The applicable principles are settled. A trial court should grant a change of venue when the defendant demonstrates a reasonable likelihood that in the absence of such relief, he cannot obtain a fair trial. (*People v. Jennings* (1991) 53 Cal.3d 334, 359 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People v. Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146].) On appeal, "we make an independent determination of whether a fair trial was obtainable." (*Jennings*, *supra*, at p. 360; *People v. Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) To make that decision, we examine five factors: the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People v. Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640].)
>
> Because this is a capital case and a double murder, the nature and gravity of the offense tilts strongly in favor of granting a change of venue, although this factor is not dispositive. (*People v. Jennings*, *supra*, 53 Cal.3d at p. 360.) The size of the community is relatively neutral; as defendant asserts, Kern County is "neither large nor small." At the time of trial, the county had a population exceeding 450,000 and Bakersfield, where the trial was held, had a population of 200,000. The key consideration is "whether it can be shown that the population is of such a size that it 'neutralizes or dilutes the impact of adverse publicity.' " (*Jennings*, *supra*, at p. 363, quoting *Lansdown v. Superior Court* (1970) 10 Cal.App.3d 604, 609 [89 Cal.Rptr. 154].) As explained, *post*, the adverse publicity in this case was neither relentless nor virulent. The moderate size of Kern County thus does not

undermine the trial court's decision to deny the change of venue motion.

Both defendant and the victims were strangers to the community, and neither held any position of prominence or popularity. Although defendant argues the fact that the victims were a young couple starting their life together and were "religious, church-going people" necessarily enhanced their status in the community, nothing in the record suggests these factors had any effect on the jury pool.

The nature, extent, and penetration of the news coverage, especially from the Bakersfield Californian, was the most heavily litigated of the five factors. Defendant contends the press coverage "flowed evenly for months, was vituperative in nature, pandered to base instincts, and referred to innuendoes that never proved true but which severely prejudiced [defendant]." By contrast, respondent argues "[t]he coverage of the murders in the newspaper in question was factual, not sensational." The truth lies somewhere between these two characterizations.

Defendant submitted 12 articles from the Bakersfield Californian. They ranged from a short mention on February 7, 1981, of Radford's murder and Levoy's disappearance (*Man Found Beaten To Death On Desert Highway*), to an article on July 28, 1982, reporting that defendant had been linked to the crimes (*San Quentin Inmate Linked To Kern Homicide Victim*), to a June 7, 1983, article describing defense attorney's request for a pretrial gag order (*Gag Order Asked In Murder Trial*). The period of time in which the 12 articles were published was 29 months, hardly a flood of information. Jury selection began on October 9, 1984, 16 months after publication of the last article submitted by defendant. This interval suggests that any possible prejudice flowing from the press coverage was blunted by the passage of time.

With two significant exceptions, the 12 articles are largely factual and not sensational, although the reader is naturally swayed by reports of the anguish of the victims' friends and relatives. Two articles went beyond mere factual reporting. On August 12, 1982, the Bakersfield Californian published an article bearing the headline *Suspect Expresses Regret At Raping Virgin*. The article noted Levoy was "good-looking," a Mormon, and a virgin. Defendant was reported as regretting raping her because "he thought that meant she wouldn't go to heaven." The same article noted that in addition to the two murders and kidnapping, defendant was charged with rape, sodomy, and oral copulation, charges that were later dropped.

Then, on Sunday, May 29, 1983, the main headline on the front page of the Bakersfield Californian stated, *Man Boasts About His Killings*; the subheading read, *Trucker Suspected In Rapes, Murders Of Two Dozen Hitchhikers*. The article reported on revelations from "court documents" that defendant had told cellmate Ricky Gibson that "although it takes a long time to strangle someone, it's exciting, very exciting, to watch a woman turn blue after she has taken her last breath." (Defendant later testified at trial he generally exaggerated his crimes to Gibson to appear more dangerous and intimidating, and that he did not realize he was strangling Levoy, but blacked out when she bit him. He specifically denied telling Gibson that he liked to watch women turn blue when they were dying.) The article continued, reporting that "law enforcement officers in seven states suspect [defendant] may be involved in as many as two dozen hitchhiker homicides," including "numerous rapes." Defendant has not, however, been charged with or convicted of any other hitchhiker-related crimes, with the exception of his crimes against David Galbraith and Michelle D., discussed *post*, which occurred after Radford's and Levoy's murders.

66

The same article reported that in one incident, when defendant drove off with Michelle D. and raped her, he "kept her for several days, raping and sodomizing her in the sleeper compartment of his truck-trailer rig as he drove to his home in Oroville. [¶] He locked her in the closet in Oroville, taking her out only for sex." This lurid tale proved largely untrue, as the victim's own testimony at the penalty phase shows.

In short, neither defendant's nor respondent's characterization of the publicity leading up to the trial is accurate. Two newspaper articles that went well beyond mere factual reporting created a potential for prejudice. These articles emphasized the more sensational aspects of the case, aspects that the evidence presented at trial showed were either not true or not proved. Did publication of these two articles tip the balance, requiring the trial court to grant defendant's motion for a change of venue?

We conclude they did not. Although the potential for prejudice was certainly present, almost 17 months had elapsed from the time of the most inflammatory article to the commencement of jury selection. More importantly, the evidence of public opinion presented by defendant's own expert demonstrated that the effect of the two sensationalistic articles was minimal. Defendant employed Terry Newell, Ph.D., a licensed psychologist, to conduct a poll of public opinion. Of 377 persons contacted at random, only 187, or 53 percent, had even heard of the case. Of those 187 persons, only 18 percent recalled defendant was suspected of crimes in other states, 14 percent thought their knowledge of the case would affect their verdict if they were to serve on defendant's jury, and 17 percent already thought he was guilty. The survey, moreover, was conducted on July 22-24, 1983, more than a year before jury selection began. Because the record does not indicate additional articles were published, we assume the public's recollection of the case diminished over time.

Examination of the voir dire proceedings also supports the conclusion that pretrial publicity failed to penetrate the public's consciousness to such an extent as to compromise defendant's ability to obtain a fair trial. Although many prospective jurors averred they recalled something about the case, the vast majority assured the court they could set aside their impressions and judge the case fairly. Although defendant emphasizes the number of prospective jurors who recalled something about the case, jurors need not be wholly ignorant of the facts of a case. It is sufficient if the jurors can, as here, assure the court they can set aside their prior impressions and render a decision based solely on the evidence presented in court. (*People v. Bean* (1988) 46 Cal.3d 919, 941 [251 Cal.Rptr. 467, 760 P.2d 996].)

In sum, although the gravity and nature of the crime support a change of venue, the size of the community is a neutral factor, and the status of both defendant and his victims in the community supports a denial of a change of venue. The critical factor, the extent and nature of the pretrial publicity, was-considering the totality of the evidence-mildly supportive of a denial of a change of venue despite the publication of two potentially prejudicial articles. Weighing all these factors, we conclude the trial court correctly denied the motion.[3]


-------------------FOOTNOTE-------------------

n.3  We reject defendant's further contention that the short amount of time the jury deliberated before reaching a guilt verdict (195 minutes), a sanity verdict (42

1

2

minutes), and a penalty verdict (150 minutes) demonstrates "more than a reasonable likelihood that the prejudicial pretrial publicity deprived [him] of his due process right to a fair trial." This was a case, after all, in which defendant essentially confessed to the crimes and committed an equally reprehensible set of crimes against similarly vulnerable victims (David Galbraith and Michelle D.) just months after his attacks on Radford and Levoy. Hence, even in the absence of any publicity, a relatively short deliberation time, based on the evidence presented, would not have been unexpected.

3

4

5

-------------------END FOOTNOTE-------------------

6

7

Weaver, 26 Cal. 4th at 905–08.

8

Claim 12 was presented to the California Supreme Court in Petitioner's second state

9

habeas petition (Lod. Doc. 23 at 38-60), and summarily denied on the merits and on procedural

10

grounds, (Lod. Doc. 24).

11

    b.    Legal Standard

12

    (i)    Trial Court Error

13

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

14

    (ii)    Trial by a fair and Impartial Jury

15

The Sixth Amendment secures to criminal defendants the right to trial by a fair and

16

impartial jury. Skilling v. United States, 561 U.S. 358, 377-78 (2010); Irvin v. Dowd, 366 U.S.

17

717, 722 (1961). The Constitution further provides that the trial shall occur "in the State where

18

the . . . Crimes . . . have been committed." Art. III, § 2, cl. 3; see also U.S. Const., Amend. 6

19

(right to trial by "jury of the State and district wherein the crime shall have been committed"").

20

"The Constitution's place-of-trial prescriptions, however, do not impede transfer of the

21

proceeding to a different district at the defendant's request if extraordinary local prejudice will

22

prevent a fair trial—a 'basic requirement of due process.' " Skilling, 561 U.S. at 378.

23

Nevertheless, "juror impartiality, we have reiterated, does not require ignorance."

24

Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (jurors are not required to be "totally

25

ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors

26

will not have formed some impression or opinion as to the merits of the case."); Reynolds v.

27

United States, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a

28

matter of necessity, brought to the attention of all the intelligent people in the vicinity, and

1  scarcely any one can be found among those best fitted for jurors who has not read or heard of it,
2  and who has not some impression or some opinion in respect to its merits.").

3      To merit relief for violation of his due process rights due to pretrial publicity, petitioner
4  must demonstrate that the case is one in which prejudice is presumed, or he must demonstrate
5  actual prejudice.  Skilling, 561 U.S. at 379, 385.

6      When pretrial publicity is at issue, "primary reliance on the judgment of the trial court
7  makes [especially] good sense" because the judge "sits in the locale where the publicity is said to
8  have had its effect" and may base her evaluation on her "own perception of the depth and extent
9  of news stories that might influence a juror."  Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

10      (A)    Presumed Prejudice

11      A presumption of prejudice is "rarely invoked and only in extreme situations."  United
12  States v. McVeigh, 153 F.3d 1166, 1181 (10th Cir. 1998) (partially overruled on other grounds
13  by Hooks v. Ward, 184 F.3d 1206, 1227 (10th Cir. 1999)).  The Supreme Court has determined
14  that pretrial publicity so manifestly tainted a criminal prosecution that prejudice must be
15  presumed in only three cases:  Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381
16  U.S. 532 (1965); and Sheppard v. Maxwell, 384 U.S. 333 (1966).

17      "The foundation precedent is Rideau."  Skilling, 561 U.S. at 379.  In Rideau, the case
18  turned on an actual filmed confession broadcast to the entire community.  373 U.S. at 724.
19  "What the people [in the community] saw on their television sets," the Supreme Court observed,
20  "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the
21  commission of the robbery, kidnapping, and murder."  Id. at 725.  "[T]o the tens of thousands of
22  people who saw and heard it," the Supreme Court explained, the interrogation "in a very real
23  sense was Rideau's trial—at which he pleaded guilty."  Id. at 726.  The Supreme Court therefore
24  "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir
25  dire," that "[t]he kangaroo court proceedings" trailing the televised confession violated due
26  process.  Id. at 726–727.

27      In the two cases to follow Rideau, the analyses and holdings turned on the massive media
28  interference with court proceedings and the constant and pervasive media coverage during trial.

69

1  See Skilling, 561 U.S. at 379-80.  In Estes, "extensive publicity before trial swelled into

2  excessive exposure during preliminary court proceedings as reporters and television crews

3  overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of the

4  pretrial hearing.  The media's overzealous reporting efforts, we observed, 'led to considerable

5  disruption' and denied the 'judicial serenity and calm to which petitioner was entitled.'" Id.

6  (quoting Estes, 381 U.S. at 536).  In Sheppard, the Supreme Court noted that "bedlam reigned at

7  the courthouse during the trial and newsmen took over practically the entire courtroom,"

8  thrusting jurors "into the role of celebrities." 384 U.S. at 353, 355. Pretrial publicity consisted

9  of "months [of] virulent publicity about [the defendant] and the murder." Id. at 354.  Ultimately,

10  the Supreme Court "upset the murder conviction because a 'carnival atmosphere' pervaded the

11  trial." Skilling, 561 U.S. at 380 (quoting Sheppard, 384 U.S. at 358).   This result follows from

12  "[t]he theory of our system [that] conclusions to be reached in a case will be induced only by

13  evidence and argument in open court, and not by any outside influence, whether of private talk or

14  public print." Patterson v. Colorado, 205 U.S. 454, 462 (1907); see also Doe v. Rose, No. CV-

15  15-07503-MWF-JCX, 2016 WL 9107137 at *2 (C.D. Cal. Sept. 30, 2016).

16         (B)     Actual Prejudice

17         The standard of "actual prejudice" examines the jury voir dire to determine if,

18  notwithstanding jurors' assurances of impartiality, the record compels an inference that jurors

19  were not impartial.  Murphy v. Florida, 421 U.S. 794, 799-803 (1975).

20         A court must determine from the record of voir dire if the jurors demonstrated actual

21  partiality or hostility which could not be set aside.  See e.g., Fetterly v. Paskett, 163 F.3d 1144,

22  1147 (9th Cir. 1998) (examining jurors' responses during voir dire and finding no substantial

23  evidence of actual prejudice).

24         c.     Analysis

25         (i)     Change of Venue

26         Petitioner argues the state supreme court unreasonably denied Claim 10, applying state

27  law which, he argues, was insufficient to vindicate his rights under the noted clearly established

28  federal law.  (ECF No. 210 at 148 citing Weaver, 26 Cal. 4th at 905-08.)  He argues a reasonable

1  likelihood the trial court erred in denying his motion for change of venue, and that the error had a
2  substantial and injurious effect on the jury's deliberations.  (ECF No. 107 at 237.)

3       California law provides that, "[a] motion for change of venue or continuance shall be
4  granted whenever it is determined that because of the dissemination of potentially prejudicial
5  material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be
6  had." Maine v. Superior Court, 68 Cal. 2d 375, 383 (1968).  The factors to be considered in
7  granting or denying a motion for change of venue are: "1) the nature and gravity of the offense,
8  2) the size and nature of the community, 3) the status of the victim, 4) the status of the defendant,
9  5) the nature and extent of the publicity." Martinez v. Superior Court, 29 Cal. 3d 574, 578
10 (1981).

11      The record reflects that on August 31, 1983, Counsel filed a motion to change venue that
12 argued and appended: the July 1983 Public Opinion Survey prepared by psychologist Terry
13 Newell; and twelve (12) articles from the major local newspaper, the Bakersfield Californian,
14 spanning the period February 7, 1981 to June 7, 1983.  On September 6, 1983, Second Counsel
15 argued the motion, asserting that highly prejudicial newspaper, television, and radio coverage,
16 including false information and information that would be inadmissible during trial, made a fair
17 and impartial trial impossible.   (September 6, 1983 RT at 2-16; see also ECF No. 107 at 233; CT
18 312-340.)  The trial court denied the motion on September 21, 1983.  (CT 376-377.)

19      Petitioner, in this Claim, argues extensive and ongoing adverse and prejudicial pretrial
20 publicity including false and inadmissible information fed to the media by law enforcement
21 tainted the residents of Kern County such that they could not be fair and impartial.[10]   (ECF No.
22 107 at 232; ECF No. 210 at 146; see also CT 219-20, 256-57, 312-42.)   He argues some of this
23 publicity was viewed by certain of the jurors close in time to the beginning of the jury selection
24 process in October 1984.   (ECF No 107 at 233.)

25      Petitioner acknowledges that the factors for "status of the defendant" and "size of the
26 community" neither militated for or against a venue change.  Petitioner, a long haul truck driver,

_____

[10] Petitioner states that he incorporates the factual allegations of Claims 6, 9 and 15 into Claim 10.  (ECF No. 107 at
232.)   Petitioner states that the factual allegations in Claims 1,2, 6, 7, 8, 9, 10, 11, 15, 17 and 18 are incorporated
into Claim 12.

1  was from Northern California with no ties to Kern County.  (ECF No. 107 at 235.)  Bakersfield
2  and the surrounding county was "neither large nor small" with "approximately 200,000 people
3  living in Bakersfield, with a county population of 450,000."  (ECF No. 107 at 235.)

4      Petitioner argues the balance of the factors required a venue change.  He points to the
5  extreme gravity of the charged capital multiple murders and special circumstances.   (ECF No.
6  107 at 235; see People v. Farley, 46 Cal.4th 1053, 1083 (2009) (a trial for multiple special
7  circumstance murders weighs in favor of a change of venue, but the fact that a defendant is
8  charged with multiple murders is not alone dispositive).

9      Petitioner points to evidence that: a pretrial survey conducted between July 22 and July
10  24, 1983, showed that over half of those eligible for jury service knew about the case and that
11  81.3% of those people had read about it in the Bakersfield Californian; of those who had heard of
12  the case, over one-third believed Petitioner was possibly an interstate rapist and killer;  over one-
13  quarter believed the pretrial publicity would influence their deliberations and 69% believed
14  Petitioner should receive the death penalty if convicted; that despite the required presumption of
15  innocence, 31.5% of those asked believed Petitioner was guilty, 66.3% had no opinion, 1.1%
16  believed he was not guilty and 1.1% refused to provide their opinion.  (ECF No. 107 at 236; ECF
17  No. 210 at 147 citing CT 319-340.)  Predictably, he argues, half of the potential jurors who were
18  passed for cause, recalled the case.  (ECF No. 107 at 235-37; ECF No. 210 at 148 citing Lod.
19  Doc. 3 at 2, n.1.)

20      Petitioner points to the sympathetic status of the victims who, while not residents of Kern
21  County, were portrayed in pre-trial articles in the Bakersfield Californian as young, lonely,
22  devoted to the Mormon church, engaged to be married and overcoming personal and family
23  problems.  (ECF No. 107 at 234; CT 319-40.)  He alleges the contents of an unopened and
24  undelivered Valentine's card from victim Radford to victim Levoy, which was provided to the
25  public.  (ECF No. 107 at 234.)

26      Petitioner points to allegedly pervasive publicity surrounding him and the crimes and
27  trial, exacerbated by evidence that residents of Bakersfield and the surrounding county were
28  "predisposed to the imposition of the death penalty."  (ECF No. 107 at 235; CT 319-40.)  He

1    suggests the noted pre-trial articles in the Bakersfield Californian included other inaccurate,

2    speculative and/or inadmissible information that: he had boasted about the killings and confessed

3    to the charges; he was a multi-state serial rapist and killer with at least twenty-four hitchhiker

4    victims; he had served in Vietnam where he blew up villages and loved that part of his service;

5    he, in a separate 1981 offense, shot a male hitchhiker in the head three times; and defense

6    counsel was "scrambling to make a deal" while the District Attorney promised to get a death

7    verdict. (ECF No. 107 at 233-35; ECF No. 210 at 146.)

8         Petitioner argues that as a result of such pervasive and prejudicial publicity, the jury was

9    against him. (ECF No. 107 at 237.) Particularly, he points out that: following the three week

10   guilt phase, the jury reached their verdict in 3 hours and 15 minutes; following the 6 week sanity

11   phase, the jury reached a verdict in 42 minutes; and following the two-day penalty phase, the

12   jury reached a verdict in 90 minutes. (ECF No. 107 at 235-37.)

13        However, the state supreme court reasonably denied the Claim. It is settled that "[t]he

14   [above noted Martinez] five factors, while useful for analytical purposes, should not be

15   considered exclusively . . . the United States Supreme Court has adopted a "totality of the

16   circumstances" approach, which we deem to be the correct standard for federal constitutional

17   purposes." Mackey v. Asuncion, No. 15-CV-03165-HSG, 2018 WL 4680190 at *28 (N.D. Cal.

18   Sept. 28, 2018) (citing Murphy, 421 U.S. at 799); see also Patton v. Yount, 467 U.S. 1025, 1031

19   (1984) (same); Sheppard, 384 U.S. at 352-53 (same)

20        Mindful of the federal standard, the Court considers Petitioner's claim that here, as in

21   Sheppard and Irvin, the extent and nature of the publicity surrounding the case created an

22   atmosphere that prevented a fair trial. (ECF No. 210 at 149.)

23        (A)    Presumed Prejudice

24        The state supreme court reasonably could reject claimed presumed prejudice. The media

25   coverage in this case was neither persistent nor pervasive. As that court noted, the twelve

26   articles appended to Counsel's venue motion were "largely factual and not sensational" and

27   published over a period of twenty-nine months with the last article published sixteen months

28   prior to jury selection. Weaver, 26 Cal. 4th at 906-07. The state supreme court reasonably could

1   find the potential for prejudice attenuated with the passage of time.  See Skilling, 561 U.S. at 383

2   ("[U]nlike cases in which trial swiftly followed a widely reported crime . . . over four years

3   elapsed between Enron's bankruptcy and Skilling's trial."); Yount, 467 U.S. at 1032-34 (passage

4   of time weakened or eliminated impact of publicity).

5       Petitioner concedes he and the victims were strangers to Kern County; there was no

6   apparent sympathy or outrage in these regards.  Kern County was neither small nor large, with an

7   urban population of approximately 200,000 and a county-wide population exceeding 450,000.

8   (See CT 367, 376.)  Moreover, the fiscal impact of the capital trial was not a matter of discussion

9   in Kern County.

10      Counsel's own pretrial public opinion poll of [eligible Kern County jurors] fourteen

11  months before trial showed that only slightly more than half (i.e., 53%) of the 377 randomly

12  contacted persons knew of the case.  (CT 319-40.)  Of that 53%, only 14.2% thought their

13  knowledge of the case would impact their ability to be an impartial juror, and a mere 16.7%

14  thought Petitioner was guilty.  (Id.)

15      Moreover, even if "heavy media coverage may have weighed in favor of a change of

16  venue, [it] did not necessarily require a change of venue . . . the risks created by the pretrial

17  publicity were significantly reduced, if not entirely eliminated, by the court's summoning of a

18  large venire and employment of a targeted and particularly careful jury selection process."

19  Mackey v. Asuncion, No. 15-CV-03165-HSG, 2018 WL 4680190 at *30 (N.D. Cal. Sept. 28,

20  2018).  The record reflects the trial court summoned over 250 prospective jurors, and vetted

21  them through use of a standardized set of voir dire questions included whether and the extent to

22  which potential jurors had heard of the case outside the courtroom.  (See RT 304-3123.)

23      Finally, the duration of jury deliberation, on the facts and circumstances of this case, is

24  not alone a basis to find juror partiality, for the reasons stated.  (See Claims 16, 17, 18, herein.)

25

26      (B)     Actual Prejudice

27      Furthermore, the state supreme court reasonably could find no actual prejudice.

28  Petitioner does not cite to facts in the record showing juror partiality or hostility that could not be

74

1   set aside.  (See ECF No. 107 at 232-37; ECF No. 210 at 146-50; ECF No. 214 at 38-39.)

2   Similarly,  the record on voir dire of the empaneled and alternate jurors is not suggestive of actual

3   prejudice.  (See RT 462-89, 592-615, 625-47, 779-801, 972-91, 992-1015, 1021-34, 1116-40,

4   1278-1301, 1405-28, 1743-65, 1889-1909, 2131-50, 2471-89, 2489-2505); see also Fetterly, 163

5   F.3d at 1147 (examining jurors' responses during voir dire and finding no substantial evidence of

6   actual prejudice).  As in Fetterly, the empaneled and alternate jurors in this case were not tainted

7   by publicity or opinion as to guilt.  The state supreme court reasonably could find these jurors,

8   while not totally ignorant of the case and its facts, nonetheless based their verdict on the

9   evidence developed at trial and not the noted media coverage.  See Irvin, 366 U.S. at 722.

10          (ii)     Jury Sequestration

11          Petitioner argues the state supreme court unreasonably denied Claim 12, revisiting his

12   above argument in support of change of venue.  He argues a reasonable likelihood the trial court

13   erred by denying guilt phase jury sequestration on grounds the substance of prosecutor's

14   allegedly prejudicial statements to the media were already in the public record.  (ECF No. 107 at

15   269; see also RT 4326-27.)

16          But as Respondent observes (ECF No. 116 at 48 n.7), Petitioner's Claim 12 asserts trial

17   court error that is unsupported in the factual record.  Even considering the facts purportedly

18   incorporated in Claim 12, the state supreme court could reasonably deny the Claim, for the

19   reasons stated above and those that follow.

20          The trial court, in June 1983, more than a year prior to voir dire, twice imposed gag

21   orders.  On June 8, 1983,  the trial court ordered that the Kern County District Attorney's office

22   including the District Attorney, all deputies, employees, and investigators, and defense counsel

23   including all employees and investigators, not discuss the merits of the case or any evidentiary

24   matters  with any media.  (June 8, 1983 RT at 7-8; see also CT 213-227, 243-246.)

25    On June 27, 1983, the trial court issued a second gag order that specified policing agencies not

26   talk to the media about the merits and the evidence of the case.  (See June 27, 1983 RT at 2-5;

27   September 6, 1983 RT at 4, respectively; see also CT 266, 268.)  Petitioner has not shown his

28   trial jury was prejudiced against him by virtue of media coverage of his case.  (See Claim 10,

herein.)

The state supreme court has stated that:

[Penal Code] Section 1121 provides, in relevant part, that "[t]he jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer." It is well settled that under this statute and prior case law, "sequestration is discretionary with the trial court even in capital cases." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1218, 249 Cal.Rptr. 71, 756 P.2d 795, accord *People v. Gallego* (1990) 52 Cal.3d 115, 169, 276 Cal.Rptr. 679, 802 P.2d 169; *People v. Ruiz* (1988) 44 Cal.3d 589, 616, 244 Cal.Rptr. 200, 749 P.2d 854.) "The trial court stands in the best position to evaluate the necessity of sequestration in a particular case." (*Ruiz*, at p. 616, 244 Cal.Rptr. 200, 749 P.2d 854.) " '[I]n reviewing a trial court's denial of a defendant's motion for individual sequestered jury selection, we apply the "abuse of discretion standard," under which the pertinent inquiry is whether the court's ruling "falls outside the bounds of reason." ' [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 443, 229 Cal.Rptr.3d 303, 411 P.3d 490, quoting *People v. Famalaro* (2011) 52 Cal.4th 1, 34, 127 Cal.Rptr.3d 40, 253 P.3d 1185.)

Defendant argues, however, that in this case due process requires a higher standard of review, principally relying on some general language found in *Sheppard v. Maxwell* (1966) 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (*Sheppard*), regarding the increasing prevalence of unfair and prejudicial media coverage of pending trials that may impact a defendant's constitutional right to "receive a trial by an impartial **jury** free from outside influences." (*Id.* at p. 362, 86 S.Ct. 1507.) The high court stated that "trial courts must take strong measures to ensure that the balance is never weighed against the accused" and "appellate tribunals have the duty to make an independent evaluation of the circumstances." (*Id.*, at pp. 362-363, 86 S.Ct. 1507.)

But this language from *Sheppard* was not directed at the standard of review of a trial court's choice of method for ensuring the jury is not subject to any such prejudicial influences from the media. Instead, the high court's observations were made in the context of the defendant's failed attempt to obtain a change of venue and the subsequent effect of the intense media presence and coverage on the jury and the defendant's verdict. (*Sheppard*, *supra*, 384 U.S. at pp. 345-349, 86 S.Ct. 1507.) The high court was critical of the fact that the trial court in the *Sheppard* case had allowed a table "within a few feet of the jury box and counsel" where "sat some 20 reporters staring at Sheppard and taking notes" and that "[p]articipants in the trial, including the jury, were forced to run a gantlet of reporters and photographers each time they entered or left the courtroom." (*Id.* at p. 355, 86 S.Ct. 1507.) The court also pointed out that two of the sitting jurors admitted to learning, during the trial, of "the highly inflammatory charge that a prison inmate claimed Sheppard as the father of her illegitimate child." (*Id.* at p. 357, 86 S.Ct. 1507.)

It was the extraordinary circumstances involved in the *Sheppard* case, where "bedlam reigned at the courthouse," because of the oppressive nature of the media's presence both inside and outside the courtroom, resulting in a "carnival atmosphere," that triggered the finding of a constitutional violation. (*Sheppard*, *supra*, at pp. 355, 358, 86 S.Ct. 1507.) Those circumstances do not exist here. We conclude, therefore, in accordance with our prior case law, that a trial court's decision whether to sequester a jury is subject to an abuse of discretion standard

76

1    of review.

2    People v. Westerfield, 6 Cal. 5th 632, 682-83 (2019).

3          The Ninth Circuit has recognized that sequestration is a particularly dramatic remedy.

4    Levine v. U.S. Dist. Court for Cent. Dist. Of California, 764 F.2d 590, 600 (9th Cir. 1985).  The

5    court in that case was particularly loath to require jurors, "especially in long trials" to "bear the

6    brunt of counsels' transgressions."   Id.

7          Here, the state supreme court reasonably could find the media coverage of the case was

8    not substantial or intrusive, for the reasons stated.  Press coverage largely ebbed more than a year

9    prior to trial; gag orders had issued; Counsel was able to voir dire prospective jurors regarding

10   knowledge of the case; and the jury repeatedly was admonished and instructed regarding its duty

11   to decide the case solely based on the evidence presented.  (See e.g., RT 3057, 3278-79, 3356,

12   3413, 3452, 3495-96; 3545-46, 3671, 3701, 3797-98; 3807, 3902, 3950, 3982-3983, 4058 4141,

13   4323, 4435, 4458, 4493, 4629, 4699, 4706, 4742, 4773, 4853, 4913-4914, 4982, 5081, 5158,

14   5201, 5362, 5626, 5733, 5882, 6007, 6174, 6310, 6406, 6462, 6541, 6563, 6585-86, 6699, 6755,

15   6854, 6922, 6949, 6982, 7056, 7062.)   That court reasonably could find the trial court did not

16   abuse its discretion in denying sequestration.

17         Moreover, any state law error is not alone a basis for federal habeas relief.  See McGuire,

18   502 U.S. at 67-68; Park, 202 F.3d at 1149.  The state supreme court reasonably could find federal

19   law error, if any there was, to be no more than harmless.  That court reasonably found the jury

20   did not engage in misconduct by considering matters outside the trial record.  (See Claims 16,

21   17, 18, herein.)

22         d.   Conclusions

23         A fair-minded jurist could find the state supreme court's denial of the Claims as trial

24   court error was not contrary to, or an unreasonable application of, clearly established federal law,

25   as determined by the Supreme Court, or based on an unreasonable determination of the facts in

26   light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

27         Claims 10 and 12 as trial court error shall be denied.

28

1

### 3.    Claim 13

2

Petitioner alleges the trial court erred by admitting evidence from the backyard of his

3    home that was seized without warrant or voluntary consent, in violation of rights under the

4    Fourth Amendment, in turn violating his rights under the Fifth, Sixth, Eighth, and Fourteenth

5    Amendments.[11]  (ECF No. 107 at 282-85.)

6

### a.    State Court Direct and Collateral Review

7

The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 133-

8    37), and denied it on the merits and in part on procedural grounds, as follows:

9

10    Defendant moved to suppress the body of Barbara Levoy and other evidence
flowing from the discovery of her body, such as clothing, autopsy reports and
dental comparison evidence, claiming the search police conducted exceeded the
11    scope of the consent given by defendant's ex-wife, Barbara Weaver.[7] A hearing
on the suppression motion was held on September 1, 1983. Sergeant Glen
12    Johnson testified that he and Sergeant Gary Davis traveled to defendant's Oroville
home after learning from inmate Ricky Gibson that defendant had told Gibson he
13    was guilty of a double murder and that one of the victims was buried in his yard.
They contacted Barbara Weaver at her home, explained the purpose of their visit,
14    and asked whether defendant had done any digging in the yard early in 1981. She
replied in the affirmative. Davis told defendant's ex-wife that police proposed to
15    dig in her yard to attempt to find the victim's body, and she consented orally. She
then signed the standard sheriff's office consent form, which states: "I consent that
16    Officer -- of the Kern County Sheriff's Department and deputies under his control
enter my residence and/or my motor vehicle(s) to search for evidence pertinent to
17    his investigation. [¶] I am giving this written permission to these officers freely
and voluntarily, without any threats or promises having been made, and after
18    having been informed by said officer that I have a right to refuse this search
and/or seizure." The form is signed by Barbara Weaver; the names of Sergeants
19    Davis and Johnson are inscribed in the blank space.

20

21    --------------------FOOTNOTE--------------------

22    n.7  By the time of the search some 18 months after the crime, defendant was in
prison for other crimes and his wife was in the process of divorcing him.

23    --------------------END  FOOTNOTE--------------------

24

25    On cross-examination, Sergeant Johnson testified he had, on a few previous
occasions, added handwritten modifications to the standard consent form and had
26    the consenting person initial the changes. No particular reason existed why he
failed to modify the form in this case to specify he intended to dig up the yard.

27

28

---

[11] Petitioner states that he incorporates the factual basis set forth in Claim 6.  (ECF No. 107 at 283.)

Barbara Weaver, defendant's ex-wife, also testified. She stated she signed the consent form, and that some discussion took place about digging in the yard, but "[i]t was just talk." She understood her consent to include searching her residence only. On cross-examination, she admitted the officers had told her they suspected a body was buried in her yard and that they wished to search her yard, but she did not remember telling the officers they could dig up her yard. Once the officers began digging, she was afraid to ask them to stop.

The trial court denied the suppression motion, saying: "I find the testimony of [Barbara] Weaver to be incredible in certain aspects about the officers asking to search the house for a body and she thought well, maybe there could possibly be a body in the house but not in the yard when there was evidence that the defendant had done some digging in the yard and she knew about the digging and even pointed it out to the officers and cooperated with the officers in showing them places where he had done some digging. Then her answers to some of the specific questions as to what she said specifically, she would tense up each time and then take quite a bit of time to answer those questions. [¶] I do not feel that she was being truthful in answers to many of those specific questions as to what she said. [¶] ... [¶] I believe the officer's testimony. I don't believe her testimony in certain particulars when she indicates that she does not remember telling the officer specific things and that she did not consent to the search of the yard, orally at least, and so the motion to suppress is denied."

Defendant contends the trial court erred, and that the search exceeded the scope of Barbara Weaver's consent. He also contends her consent was involuntary. We disagree.

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

As with the *Miranda* issue discussed above, this issue turns on a credibility determination made by the trial court. Sergeant Johnson testified Barbara Weaver gave her consent to search the yard; she testified she gave no such consent. After hearing both witnesses testify, the trial court specifically credited Sergeant Johnson, noting Barbara Weaver tensed up and then took a long time to answer certain questions. Evaluating such nonverbal factors in determining the credibility of witnesses is a task uniquely for the trial court, as such factors are not apparent from the face of the record. We thus defer to the trial court's decision in this matter and find substantial evidence supports the court's decision that Barbara Weaver consented to a search of her yard.

Defendant further contends his suppression motion should have been granted because Barbara Weaver's consent to the search was involuntary. We agree with respondent that defendant did not preserve this issue for appeal. A claim based on the voluntariness of Barbara Weaver's consent appears nowhere in defendant's moving papers, defense counsel's oral argument at the suppression hearing, or in the trial court's oral decision. The issue is thus not properly before us. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1038.)

Assuming the issue was preserved, we reject it on the merits. Six or seven officers presented themselves at Barbara Weaver's home (Sergeants Davis and Johnson, as well as four or five other officers who were there to dig), and defendant suggests

79

they were an intimidating force. Although the state has the burden of proving that Barbara Weaver's "consent was ... freely and voluntarily given," and the "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority" (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548-549 [88 S.Ct. 1788, 1792, 20 L.Ed.2d 797]), the prosecution satisfied this burden with evidence of Barbara Weaver's signed consent form and her testimony that she freely consented to a search of her house. Nothing in this record suggests Barbara Weaver's free will was overborne by the searching officers. We thus reject defendant's claim that her consent to search the yard was involuntary.

Weaver, 26 Cal. 4th at 922–25.

### b.   Legal Standard

(i)   Trial Court Error

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

(ii)   Fourth Amendment

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial". Stone v. Powell, 428 U.S. 465, 481-82 (1976); see also Newman v. Wengler, 790 F.3d 876, 878-80 (9th Cir. 2015) (per curiam) ("Stone is still good law"); Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005) ("If the state has provided a state prisoner the opportunity for full and fair litigation of his Fourth Amendment claim, we cannot grant federal habeas relief on the Fourth Amendment issue.")

### c.   Analysis

Petitioner argues the trial court erred by denying his motion to "suppress evidence seized from the backyard of his home by law enforcement officers acting without benefit of a warrant and while acting outside the scope of a narrowly drawn consent." (ECF No. 107 at 282.)   He argues consent to the search was not voluntary.  (Id.)

The record reflects Counsel's August 18, 1983 motion to suppress evidence seized from Petitioner's backyard.  (CT 296-301.)  The trial court, following suppression hearing, denied the motion.  (CT 420.)

Petitioner points to the [suppression hearing] testimony of his wife Barbara Weaver and the written consent to search she gave authorities in 1982, that the search was to be limited to the

1  house and did not extend to the backyard.  (ECF No. 107 at 283; CT 401-415; see also CT 126,

2  301.)  He argues Barbara Weaver was too intimidated to tell searching officers that she had not

3  consented to a backyard search, and that any consent to a backyard search was involuntary.

4       However, the state supreme court reasonably could deny the Claim.

5            (i)    Admitting Evidence from the Backyard Search

6       Petitioner argues that Kern County Sheriff Glen Johnson testified falsely that Mrs.

7  Weaver orally gave permission to dig in the yard before signing the consent form.  He points in

8  support to Johnson's concession that on previous occasions he had modified the form consent by

9  writing in additional terms that were initialed by the person from whom consent was sought, but

10  did not do so on this occasion.  (ECF No. 107 at 283; see also CT 395-98.)

11      Petitioner argues that at the suppression hearing, the trial court "erroneously failed to

12  adhere to the controlling terms as specified in the written consent form and erroneously

13  expanded the area of the consent to include the backyard, resulting in a misapplication of federal

14  law concerning the protections against unreasonable searches and seizures guaranteed by the

15  Fourth Amendment[,]" denying him a full and fair hearing on the suppression motion.  (ECF No.

16  107 at 285.)

17      However, the state supreme court reasonably could find the trial court did not err in

18  denying the suppression motion.  The suppression hearing record reflects the trial court's

19  consideration of Barbara Weaver's apparent nervousness and evasion in responding to questions

20  regarding the scope of her consent to the search.  That court observed Barbara Weaver's

21  responses reasonably suggested that she was aware the officers wanted to search for a body in

22  the backyard and would dismantle a wooden platform over the site and dig where the body

23  ultimately was found.  That court observed Barbara Weaver showed the officers areas in the

24  backyard where Petitioner had been digging, and did not refuse consent to the backyard search,

25  and subsequently signed the consent form.  (See CT 403-412; see also CT 101-102, 180.)  Her

26  testimony that she believed the search would involve only the house because the attic was the

27  most likely place to conceal a body (CT 413), was based upon her surmise alone, and ran

28  contrary to the unimpeached testimony of law enforcement that she was informed the search

1  would involve the backyard (see CT 401-421).

2      The state supreme court reasonably accorded deference to the trial court's discounting of

3  Barbara's Weaver's credibility, apparent in the record, given her responses and demeanor during

4  the hearing, and the trial court's finding that the police did not coerce Barbara Weaver's consent

5  to the backyard search. (CT 407-420; see also Weaver, 26 Cal. 4th at 924.) That court

6  reasonably found "substantial evidence support[ing] the court's decision that Barbara Weaver

7  consented to a search of her yard." (Weaver, 26 Cal. 4th at 924; see also CT 101-102, 180.)

8      Additionally, while Barbara Weaver testified to the alleged limited scope of her consent

9  to the search, she never testified that her consent to the officer's search request was involuntary.

10  (See CT 401-420.)  The state supreme court reasonably found that on the totality of the

11  circumstances before it, Barbara Weaver freely consented to the backyard search and that her

12  free will was not overborne by the searching officers.  See Weaver, 26 Cal. 4th at 922–25.

13      When the subject of a search is not in custody, the state must show voluntary consent;

14  voluntariness being a question of fact to be determined from all the circumstances. Schneckloth

15  v. Bustamonte, 412 U.S. 218 (1973); see also United States v. Escobar, 309 F. Supp. 3d 778, 784

16  (N.D. Cal. 2018) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)) (the standard for

17  measuring the scope of consent under the Fourth Amendment is that of objective

18  reasonableness).

19      The determination whether consent to search is voluntary considers the need for the

20  search and the requirement there be no express or implied coercion.  Schneckloth, 412 U.S. at

21  227.  In determining whether consent is "free and voluntary" rather than the result of coercion or

22  duress, the Ninth Circuit considers factors such as whether compliance was sought versus

23  ordered; any efforts to mislead; number of officers present; day search versus night search; and

24  the maturity and emotional condition of the person giving consent. United States v. Alexander,

25  No. 12-CR-00118-YGR, 2013 WL 1821101 at *6 (N.D. Cal. Apr. 30, 2013) (citing United States

26  v. Brown, 563 F.3d 410, 415 (9th Cir.2010)); see also United States v. Sierra–Hernandez, 581

27  F.2d 760, 764 (9th Cir.1978) (the number of officers present is an element contributing to the

28  totality of circumstances reviewed to determine whether consent was freely and voluntarily

1   given).

2   Here, the state supreme court reasonably could find Barbara's Weaver's consent was not

3   coerced by any implied threat or covert force. Schneckloth, 412 U.S. at 228.  Nothing in the

4   record suggests the officers required compliance, misled Barbara Weaver in order to gain her

5   consent, conducted a nighttime search, or that her maturity and emotional state played a role in

6   the consent given.  While Petitioner suggests Barbara Weaver was intimidated by the number of

7   searching officers, she expressed intimidation only in the context of her alleged belief they were

8   exceeding the limited scope of her consent; scope limitations the state supreme court reasonably

9   rejected on credibility grounds, for the reasons stated. (See CT 101-102, 180, 403-421; Claim 6,

10  herein; see also United States v. Yerger, 12 F.3d 1110 at *3 (9th Cir. 1993) (the objectively

11  reasonable standard includes an analysis of whether the suspect reasonably understood [her]

12  consent to extend to the search conducted.).

13  Notably, Barbara Weaver did not raise intimidation as to the voluntariness of her consent

14  *ab initio*.  Barbara Weaver never testified that she consented to the search because she was

15  coerced by the searching officers to do so. (See CT 401-420.)  Nor are there facts in the record

16  reasonably suggesting such coercion, or even that at the time of oral and written consent, Barbara

17  Weaver was aware of and considered the total number of searching officers.

18          (ii)      Harmless Error

19  The state supreme court reasonably could find Petitioner failed to demonstrate that the

20  alleged trial court error was more than harmless.  He argues that had "the physical evidence

21  found in [his] backyard and all of its fruits, including but not limited to his confession" been

22  suppressed, he would not have been convicted and sentenced to death.  (CT 107 at 282.)

23  However, the state supreme court reasonably could have observed the substantial weight of the

24  guilt phase evidence offered by the prosecution including Petitioner's confession to Gibson and

25  guilt phase testimony, and reasonably concluded otherwise.  (See Claims 6, 7, 23, herein.)

26          Additionally, that court reasonably could find that Petitioner fully and fairly litigated the

27  alleged illegal seizure at the suppression hearing pursuant to Penal Code section 1538.5. (See

28  CT 296-301, 378-422.)  He is not entitled to federal habeas relief on this ground.  See Stone, 428

U.S. at 481-82; see also Moormann, 426 F.3d at 1053 ("If the state has provided a state prisoner the opportunity for full and fair litigation of his Fourth Amendment claim, we cannot grant federal habeas relief on the Fourth Amendment issue.")  Petitioner's suggestion that he was denied a full and fair suppression hearing because Counsel was ineffective at the hearing (see ECF No. 107 at 284-85) lacks merit for the reasons stated.  (See Claims 6, 7, 23, herein.)

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 13 shall be denied.

### 4.    Claims 14, 25

Petitioner alleges the trial court erred by admitting his custodial statements to authorities confessing to the murders  [Claim 14], and by using these statements to establish first degree felony murder and in aggravation at the penalty phase notwithstanding lack of corpus delicti [Claim 25], violating his right under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[12] (ECF No. 107 at 285-91, 363-68.)

### a.    State Court Direct and Collateral Review

Claim 14 was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 111-32), and denied on the merits and in part on procedural grounds, as follows:

> The information Ricky Gibson provided police regarding defendant's inculpatory statements about the murders of Radford and Levoy led to the discovery that Levoy's body was buried in defendant's backyard. This in turn led police to defendant, who was at that time serving a sentence for unrelated crimes in San Quentin State Prison. Police spoke to defendant on July 27 and 28, 1982, and on August 2, 1982. The interviews on the latter two dates were tape-recorded. In those interviews, defendant essentially confessed to the crimes of which he now stands convicted. He claims on appeal that admission at trial of his statements to police on those dates violated his rights under the state and federal Constitutions. His primary claim is that police violated his rights as set forth in *Miranda v.*

---

[12] Petitioner states that he incorporates into Claim 14 the factual basis for Claims 1, 2, 3, 4, 6, 7, 8, and 9.  (ECF No. 107 at 285.)  Petitioner states that he incorporates into Claim 25 the factual basis for Claims 1, 2, 3, 4, 6, 7, 8, 9, 11, 14, and 33.  (ECF No. 107 at 364.)

*Arizona*, *supra*, 384 U.S. 436 (*Miranda*). As we explain, he is mistaken.

a. *The facts*

Sergeants Gary Davis and Glen Johnson of the Kern County Sheriff's Department testified they went to San Quentin State Prison on July 27, 1982, to speak to defendant about a double homicide. Prison officials placed the two officers alone with defendant in the security squad office. Sergeant Davis testified that at the beginning of the 30-minute interview, he advised defendant of his *Miranda* rights, reading from a preprinted form from the sheriff's office. Defendant replied verbally that he understood his rights and would speak with the officers.

In this first interview, defendant stated he was not involved in the homicides. Sergeant Davis advised defendant that this was his chance to talk to them, but that they would be filing a report with the district attorney's office for a possible complaint against defendant charging him with the murders. Davis also told defendant he already had spoken with defendant's wife, son, mother, and father about the crimes. Defendant then told Davis he wished to speak with his mother and that, after doing so, he would advise Davis whether he wished to continue their conversation. Defendant then requested that the interview cease, and the officers withdrew. According to Sergeant Davis, defendant appeared alert and coherent, and his answers were responsive to Davis's questions. At no time did he indicate a desire to have an attorney present. Following this first interview, Davis called defendant's parents' home and informed his father that defendant wished to speak to his mother.

Sergeant Davis did not tape-record this first interview because he was not allowed to enter the prison with his recording equipment, as the prison was in full lockdown due to an in-prison disturbance. At the end of the interview, he spoke with prison officials about his inability to record the interview with defendant. The prison offered Davis the use of its own recording equipment should he return for future meetings with defendant.

The next day, July 28, 1982, Davis and Johnson returned to the prison in the morning but were unable to see defendant because he was meeting with his mother. The officers eventually met with defendant in the afternoon, again in a security squad office. This second interview was tape-recorded using the prison's recording equipment. Davis testified that he again read defendant his *Miranda* rights and defendant again stated he understood his rights and wished to speak to the officers. He told the officers that he wanted to make a statement and would do so whether an attorney was present or not, and that he later wanted to testify in court about how he had committed the homicides. Sergeant Davis denied threatening defendant or promising him any benefits should he decide to speak with them. The officers promised only to listen to defendant's entire story. During this second interview, defendant admitted his involvement in the Radford and Levoy murders. Defendant did not appear drowsy or sleepy, and his answers were responsive to the officers' questions.

On cross-examination, Sergeant Davis specifically denied threatening to arrest defendant's son if defendant refused to talk to them, denied threatening to arrest someone close to defendant's family, and denied saying that he would not have defendant's mother come to see him if defendant would not, afterwards, agree to talk to police. Davis stated he advised defendant of his rights on the second day while the tape recorder was running and did not advise him of his rights before the tape recorder began. He repeated that defendant did not appear drowsy, and that defendant's speech was not slurred or slow.

Sergeant Glen Johnson essentially confirmed Sergeant Davis's testimony. Johnson specifically corroborated Davis's testimony that Davis had read defendant his *Miranda* rights before the interviews on July 27 and 28, 1982, and that defendant did not appear sleepy or otherwise under the influence of drugs, although Johnson recalled defendant had said he was "sedated."

Sergeant Johnson further testified that he alone conducted a third interview with defendant on August 2, 1982. The interview occurred in the same place as the first two interviews. Johnson read defendant his *Miranda* rights from a card and obtained defendant's agreement to talk. During this third interview, defendant appeared fully aware of his surroundings and did not exhibit any excessive movements or unusual perspiration. He was alert and responsive. Sergeant Johnson testified he did not threaten to arrest defendant's son or other family members. He did not recall hearing defendant say anything about wanting an attorney present.

The defense called defendant's mother, Dorothy Weaver, to the stand. She testified she had just visited her son in late July when police visited her and informed her of defendant's possible involvement in the Radford and Levoy murders. She decided to visit him again to hear the truth; she denied police contacted her by telephone. She drove to San Quentin the next day with defendant's sister, Katie S. When Mrs. Weaver spoke to defendant, he told her police had informed him that if he did not cooperate, they would arrest his son as well as another close loved one. His sister told defendant he should consult an attorney before speaking with the police, but Mrs. Weaver simply urged defendant to tell the truth.

The defense then called Katie S. to the stand. She confirmed her mother's testimony regarding their visit with defendant, including Mrs. Weaver's testimony that defendant said police had threatened to arrest defendant's son and a close loved one unless he cooperated. In addition, she testified that when her mother left to use the restroom, defendant told her the close loved one police had threatened to arrest was his mother. Defendant seemed very agitated, and his body was shaking. She told defendant not to talk to anyone until he conferred with a lawyer. He replied that he had "no choice" and repeated that police would arrest his son and mother. Defendant's son was 12 years old at the time.

Defendant then testified. He asserted that when the police first came to talk to him at the prison, he was taking 600 milligrams of Mellaril a day to calm himself down. The officers did not inform him of his *Miranda* rights at any time during that first interview. When defendant denied having anything to do with the crimes, the officers told him they did not have "time to mess around" and that they would go to Oroville and arrest his son and another member of his family. Not wishing to have his son arrested, defendant told them he wanted to speak with his mother. If the police would arrange it, he agreed to speak to the officers after speaking to his mother. He acknowledged the police officers did not tape-record that first interview.

His mother and sister visited him the next day. While his mother was away from the table, defendant told his sister that he believed police intended to arrest his mother. After their visit, he met with the two officers. Before the tape recorder was turned on, they read him his *Miranda* rights and he indicated he would like to have an attorney present. He also said he wanted his invocation of his right to counsel on the tape. Sergeant Johnson told him it was not necessary to put that information on the tape because "everybody knows that you want an attorney

86

present." Defendant then went ahead without an attorney and gave a statement because he did not want police to arrest his son or other family member.

On cross-examination, defendant confirmed he never put his invocation of his right to counsel on the tape. He believed that had he done so, police would have terminated the interview and arrested his son. He did not know of any reason why police would arrest his son. He believed the threat to arrest a close family member referred to his mother because "she is the only one that I am real close to." He did not know of any reason why police would arrest his mother.

Defendant testified that on the second day of interviews, police advised him of his rights twice, once before the tape recorder was running and once after. Before the tape was turned on, the police officers told him what to say in response to each *Miranda* advisement. After the tape was turned on, defendant testified, he repeated each response as instructed. Defendant admitted he knew he had the right to an attorney and that one would be provided him should he so desire.

Defendant admitted the third interview was "somewhat" his idea and that he did not invoke his right to counsel. Defendant did not remember whether the officer had advised him of his rights, but he "knew better than to ask [for an attorney] on tape." He stated: "I wanted to make sure that they had everything they wanted so they wouldn't arrest my son and other members of my family."

On redirect, defendant stated that his son had helped him dig the hole in which Levoy was buried and that was the reason he believed police might arrest him. He averred the "main reason" he gave a statement to police was to protect his family.

The prosecutor then recalled Sergeant Davis, who reaffirmed that defendant had never asked for an attorney and that he had never threatened defendant by saying he would arrest his son. Sergeant Johnson, also recalled, similarly denied threatening defendant with the arrest of his son.

After listening to the tapes and considering the briefing, the trial court ruled that defendant had been properly advised of and waived his *Miranda* rights; that despite his ingestion of prescribed drugs, his mental state was such that he could, and did, give his statement intelligently, freely, and voluntarily; and that such statement was not the product of any coercion stemming from a threat to arrest defendant's family members. The court stated it was convinced of the voluntariness of defendant's statement beyond a reasonable doubt.

### b. *The applicable law*

The law is well settled. When reviewing a trial court's decision on a motion that a statement was collected in violation of the defendant's rights under *Miranda*, *supra*, 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules (*Bradford*, *supra*, at p. 1033), that is, whether (assuming the defendant was in custody) the statement was preceded by the now-famous admonition of *Miranda* rights: the defendant has the right to remain silent, any statement he might make can be used against him, he has the right to the presence of an attorney, and an attorney will be provided at state expense if he cannot afford one. (*Dickerson v. United States* (2000) 530 U.S. 428, 435 [120 S.Ct. 2326, 2331-2332, 147 L.Ed.2d 405].)

If a custodial defendant requests counsel, all questioning must cease. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [101 S.Ct. 1880, 1883-1884, 68 L.Ed.2d 378].) Statements made by a custodial defendant in the absence of *Miranda* warnings are inadmissible in the prosecution's case-in-chief. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1033.) (7b) There is no dispute in this case that police were interrogating defendant (see, e.g., *Rhode Island v. Innis* (1980) 446 U.S. 291 [100 S.Ct. 1682, 64 L.Ed.2d 297]) or that defendant was in custody. The only issues are whether defendant was given *Miranda* warnings before giving his statements on July 28 and August 2, 1982, whether he invoked his right to counsel, and whether he was coerced into waiving his rights by threats to arrest his son and another family member. We turn to those issues now.

c. *Analysis*

The difference in the testimony regarding whether Sergeants Davis and Johnson read defendant his *Miranda* warnings was striking. The officers testified they read defendant the *Miranda* warnings from a preprinted card. Defendant testified they either did not read him his rights, or they suggested to him (while the tape recorder was off) that should he invoke his rights, they would arrest his son. Defendant's story was supported by the testimony of his mother and his sister. The officers expressly denied such threats. We assume the trial court considered the demeanor of the witnesses, as well as the interest each party had to tell the truth. We also assume the trial court considered such factors as the likelihood that police would threaten to arrest a 12-year-old boy for a double murder, the likelihood they would threaten to arrest defendant's mother in the absence of any evidence she was at all involved in the crimes, the inability of defendant to explain why he believed the officers' alleged threat to arrest a close family member was a threat to arrest his mother, the fact defendant waived his *Miranda* rights on the tape recording, the tone of his voice on the tape, the evidence of his medication, and the testimony describing his behavior, mood, and emotional state during the interviews.

All things considered, we conclude substantial evidence supports the trial court's decision to credit the testimony of Sergeants Davis and Johnson that, before interrogating defendant, they properly "*Mirandized*" him and obtained a waiver of his rights. Substantial evidence also supports the trial court's decision to disbelieve defendant, his sister, and his mother that police coerced defendant into waiving his rights. This was a simple credibility determination for which we defer to the trial courts.

Defendant raises a number of counterarguments, but all are speculative and do not undermine the substantial nature of the evidentiary support for the trial court's decision. He suggests the short duration of the first interview on July 27, 1982, was somehow suspicious. Not at all: police testified that, on that day, defendant denied involvement but agreed to speak with them again if he could first talk to his mother. Defendant also argues the fact the first interview was not tape-recorded is also suspicious. But Davis and Johnson explained the problem they had bringing their own recording equipment into the prison, a problem that was solved by the next day when they were able to use the prison's own recording equipment.

Nor is it suspicious that Sergeant Davis states at the beginning of the tape of the July 28 interview that "one of the things we talked about was advising you of your rights and *at this time* I'm gonna advise you of your rights." (Italics added.) By saying "at this time" Davis did not, as defendant argues, necessarily mean that

88

he had failed to read defendant his *Miranda* rights on the previous day.

Defendant further argues that the interviews on July 28 and August 2 were "inextricably connected" with the interview on July 27 and, because police did not read him his *Miranda* warnings on July 27, the subsequent interviews were tainted by that illegality. The trial court found, however, that the officers had read defendant his *Miranda* warnings on July 27, and substantial evidence supports that decision, namely, the testimony of Sergeants Davis and Johnson. This argument thus fails.

Defendant also contends that because he invoked his right to counsel on July 27, subsequent interrogations without counsel were prohibited even if he was re-*Mirandized*. But implicit in the trial court's ruling that defendant executed a sufficient waiver of his rights on July 27 is the conclusion that defendant did not invoke his right to counsel at that time. Subsequent interrogations, therefore, were permissible, provided defendant was re-*Mirandized*. That he was readmonished before each interview with police is supported by substantial evidence. Accordingly, the rule against interrogations following an invocation of counsel is inapplicable.

### d. *Voluntariness*

*Miranda* aside, defendant also contends admission at trial of the statements he made to police on July 28 and August 2, 1982, violated his constitutional rights because they were involuntarily made. An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution (*Jackson v. Denno* (1964) 378 U.S. 368, 385-386 [84 S.Ct. 1774, 1785-1786, 12 L.Ed.2d 908, 1 A.L.R.3d 1205]) as well as article I, sections 7 and 15 of the California Constitution (*People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]). Threats to arrest family members, as defendant claims occurred here, can render a subsequent confession involuntary. (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [83 S.Ct. 917, 920-921, 9 L.Ed.2d 922]; *People v. Matlock* (1959) 51 Cal.2d 682, 697 [336 P.2d 505, 71 A.L.R.2d 605].) "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. (*Withrow v. Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1753-1755, 123 L.Ed.2d 407].)" (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].) Defendant raised the voluntariness issue below, and the trial court denied his motion to suppress on this ground.

Although at present the state's burden is to prove the voluntariness of a confession by a preponderance of the evidence, defendant's crimes occurred before the enactment of article I, section 28, subdivision (d) of the state Constitution, the so-called Truth in Evidence provision that was added to the state charter by passage of Proposition 8 in 1982. Accordingly, at defendant's trial the state was required to show the confession was voluntary beyond a reasonable doubt. (*People v. Benson*, *supra*, 52 Cal.3d at p. 770 & fn. 1; *People v. Markham* (1989) 49 Cal.3d 63, 65 [260 Cal.Rptr. 273, 775 P.2d 1042].)[5]

--------------------FOOTNOTE--------------------

n.5 We reject respondent's argument that "since the appropriate standard of proof to be applied is a procedural question, the preponderance test applies to all statements taken after June 8, 1982, regardless of when the crimes occurred." We held in *People v. Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149], that "Proposition 8 applies only to prosecutions for crimes committed on or

after its effective date." We have also expressed a view on the precise question of the proper burden of proof, explaining that the date of the crime, and not the date of the confession, is the controlling benchmark. (*People v. Benson*, *supra*, 52 Cal.3d at p. 770, fn. 1.)

-------------------END  FOOTNOTE-------------------

On appeal, our role when reviewing the trial court's determination that a confession was voluntary is similar to the standard applied in the *Miranda* context: we independently examine the record, but, to the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence. (*People v. Howard* (1988) 44 Cal.3d 375, 394 [243 Cal.Rptr. 842, 749 P.2d 279].)

Defendant's argument that his statements to police on July 28 and August 2, 1982, were involuntary is brief and no more persuasive than his *Miranda*-related claims. He contends the threats to arrest his son as well as a close family member (that he took to be a threat to arrest his mother) overcame his free will, causing him to confess his crimes. In denying the motion to suppress, however, the trial court implicitly disbelieved the testimony of defendant, his mother and his sister and instead credited that of Sergeants Davis and Johnson that no such threats were made. There is substantial evidence supporting this implied finding: both officers directly and strongly denied issuing such threats, no such threats appear on the tape recording of the interrogations, and the implausibility that police would arrest a 12-year-old boy or Dorothy Weaver in the absence of any evidence of their complicity in the crimes all support the trial court's decision.

Although defendant does not expressly make the argument here, to the extent he suggests his statements were involuntary because at the time of the interviews with police he was under the influence of medication, we reject that claim as well. The due process inquiry focuses on the alleged wrongful and coercive actions of the state, here Sergeants Davis and Johnson, and not the mental state of defendant. (*Colorado v. Connelly* (1986) 479 U.S. 157, 165 [107 S.Ct. 515, 520-521, 93 L.Ed.2d 473].) Because the trial court determined that neither officer engaged in wrongful conduct, the mere fact defendant was taking medication prescribed by the prison medical staff is insufficient to establish a claim of involuntariness. (See *Clabourne v. Lewis* (9th Cir. 1995) 64 F.3d 1373, 1379 [defendant's confession not involuntary despite being under the influence of prison-prescribed Thorazine]; see also *People v. Hendricks* (1987) 43 Cal.3d 584, 591 [238 Cal.Rptr. 66, 737 P.2d 1350] [consumption of alcoholic beverages during interrogation did not render confession involuntary].)

Weaver, 26 Cal. 4th 914–22.

The California Supreme Court considered Claim 25 on direct appeal (Lod. Doc. 1 at 171-82, 185-87), and denied it on the merits and in part on procedural grounds, as follows:

Based on his statements to police, defendant originally was charged with felony-murder special-circumstance allegations based on kidnapping, rape, and sodomy. Because the decomposition of Levoy's body was too advanced to confirm that she had been sexually assaulted, the only evidence of these sexual assaults came from

defendant himself. Defendant moved to strike the two sex-crime-based special-circumstance allegations, citing the corpus delicti rule, and the trial court granted the motion.

As to the charged murder of Levoy, however, the prosecution proceeded on the dual theories that defendant killed her after premeditating the crime and killed her during the commission of a rape, i.e., on a felony-murder theory. Defendant now contends the corpus delicti rule should prohibit permitting the jury to rely on a felony-murder theory to elevate the degree of a homicide to the first degree, when the only evidence of the sole qualifying felony (in this case, rape) comes from the defendant's own statements. In the alternative, he claims that using his uncorroborated admission he raped Levoy to establish the degree of the homicide violates his rights under the Eighth and Fourteenth Amendments to the federal Constitution.

"The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. [Citations.] 'The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause.' [Citation.] Such proof, however, may be circumstantial and need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' [Citation.]" (*People v. Jennings, supra,* 53 Cal.3d at p. 364.) When the People have established the corpus delicti of murder, a defendant's extrajudicial statements may be admitted to prove an underlying felony for felony-murder purposes even if the felony cannot be proved by evidence other than such statements. (*People v. Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on another ground by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 160 Cal.Rptr. 84, 603 P.2d 1].)[11]

-------------------------FOOTNOTE--------------------

n.11  Although not at issue here, at the time of defendant's trial, the corpus delicti rule applied to felony-based special-circumstance allegations (*People v. Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887]), a rule later abrogated by statute (§ 190.41, enacted by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990)). The new rule is not retroactive. (*People v. Ray* (1996) 13 Cal.4th 313, 341, fn. 13 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

-------------------END  FOOTNOTE--------------------

Defendant concedes a long line of decisions has found the corpus delicti rule inapplicable to felonies used to establish the degree of a homicide (*People v. Cooper* (1960) 53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d 964]; *People v. Miller* (1951) 37 Cal.2d 801, 806 [236 P.2d 137] ["The corpus delicti of the crime of murder having been established by independent evidence, ... extrajudicial statements of the accused ... may be used to establish the degree of the crime committed"]), but he contends the need for heightened reliability in capital cases demands that we extend the protection of the rule to cases such as his. He also argues the rule established by these decisions permitted the prosecution in his case "to circumvent the stated policy [of the corpus delicti rule] of protecting an accused from possibly fabricated testimony." (See *People v. Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1].)

Defendant's contentions are unpersuasive. The United States Supreme Court's well-known admonition, on which defendant relies, about the need for heightened reliability in capital cases, refers to the determination of penalty, not the degree of the homicide. (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944] (lead opn. of Powell, J.) ["Because of that qualitative difference [between a sentence of life and death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"].) We are unaware of any holding by the high court, and defendant cites none, requiring this court to modify its long-standing state-law-based rules governing the admissibility of evidence at the guilt phase merely because in a particular case the death penalty is a possible outcome.

The motivating idea of the corpus delicti rule-to protect an accused from his or her own fabricated statements-has little application in this situation, where the corpus delicti of murder is established by ample evidence of a homicide committed by a criminal agency. Defendant is sufficiently protected from the possibility of his own folly, his possible mental impairment, or police overreaching by the rule rendering his statements inadmissible to prove the substantive sex crimes that he admitted having committed. Application of the corpus delicti rule to the charge that he committed murder also protects him. He finally is protected by his ability, should he so desire, to attempt to exclude his statements by proving they were the product of his mental impairment or of police misconduct. (See *Colorado v. Connelly*, *supra*, 479 U.S. at p. 167 [107 S.Ct. at p. 522] ["coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"].)

Once the criminal agency has been established by prima facie evidence that a murder was committed, permitting a defendant's own statements to help establish the degree of the crime does not violate his rights to due process, a fair trial, or to be free from cruel and unusual punishment, or other constitutional guarantee. Although it is unclear whether defendant is relying on any asserted state constitutional basis for his claim, we reject such claim as well, finding no reason to interpret the state Constitution differently in this context.

[…]

Prior to trial, defendant moved on corpus delicti grounds to dismiss the charge he murdered Levoy, contending the prosecution had not demonstrated a prima facie case that Levoy had been murdered. The trial court denied the motion. Defense counsel renewed the issue at trial, claiming defendant's extrajudicial statements should be excluded on corpus delicti grounds. When the trial court overruled the objection, defendant testified and explained that he killed Levoy, but the killing was not intentional. Defendant now claims the trial court erred in overruling his motion to exclude his statements and that this error induced him to testify at trial.

Respondent argues that defendant did not adequately preserve the issue for appeal, having raised a slightly different claim below. We do not resolve that question, however, because even assuming the issue was preserved, we find the corpus delicti for Levoy's murder was more than adequately established by the evidence independent of defendant's statements. The fact of the injury is obvious: Levoy's lifeless body, unearthed in defendant's yard, is proof of that. The

existence of a criminal agency as the cause of her death is reasonably inferable from the suspicious circumstances of her disappearance, including the fact Radford was killed at the same time she disappeared, as well as from the fact her body was buried in the same clothes she had been wearing when she disappeared, suggesting her death was not from natural causes.

The trial court held as much: "[T]he fact that Barbara Levoy disappeared abruptly after her companion had been killed by homicide, and that she stayed disappeared [*sic*] until she was discovered some eighteen months later, that she was discovered in a grave four feet approximately underground, [there is] just ... a great deal of circumstantial evidence that she died by means of homicide .... [¶] ... [¶] ... It is obvious that it was not an accidental death, there was not a suicide, but in any event, I am amply convinced that the death has been proved and it has been proved to have been committed by criminal means."

We agree and conclude the trial court correctly denied defendant's motion, based on the corpus delicti rule, to exclude his statements implicating him in Levoy's murder. Accordingly, defendant could not have been improperly induced to testify as a result of the trial court's decision denying his motion. To the extent defendant claims that admission of his statements to prove he murdered Levoy violated his rights to a fair trial, due process, and a fair and reliable penalty verdict under the federal Constitution, we deny those claims as well.

Weaver, 26 Cal. 4th at 929–32.

### b.    Legal Standard

### (i)    Trial Court Error

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

### (ii)    Custodial Statements

Miranda safeguards in the context of custodial interrogation a defendant's Fifth Amendment privilege that "[n]o person . shall be compelled in any criminal case to be a witness against himself." Miranda v. Arizona, 384 U.S. 436, 461 (1966). Miranda rights may be waived provided the waiver is made "voluntarily, knowingly and intelligently." Id. at 444.

"It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will, Blackburn v. Alabama, 361 U.S. 199, 206-207 [(1960)], and because of the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from

93

1  the actual criminals themselves. Spano v. New York, 360 U.S. 315, 320-321 [(1959).]" Jackson

2  v. Denno, 378 U.S. 368, 385–86 (1964); see also Colorado v. Connelly, 479 U.S. 157, 167

3  (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not

4  'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment[.]").

5      Federal courts apply a totality of circumstances test to determine the voluntariness of a

6  confession. Withrow v. Williams, 507 U.S. 680, 693-694 (1993); see also Donnelly v.

7  DeChristoforo, 416 U.S. 637, 643 (1974) (the relevant inquiry is whether the error at trial "so

8  infected the trial with unfairness as to make the resulting conviction a denial of due process.").

9          c.      Analysis

10     Petitioner argues that state supreme court, in denying these Claims, failed to apply, or

11 unreasonably applied clearly established federal law. He argues the trial court erred on

12 November 16, 1984, by denying, after a hearing, his motion to exclude his July 27-28 and

13 August 2, 1982 statements to Kern County Sheriff Sergeants Gary Davis and Glen Johnson,

14 given at San Quentin where he was serving time for the Ventura County convictions, confessing

15 to the crimes against Radford and Levoy. (See RT 93-240; CT 106-114, 472-79, 1259-60.)

16 Particularly, he argues his statements were inadmissible because they were un-Mirandized,

17 involuntary, unreliable, and admitted in violation of the corpus delicti rule. (See ECF No. 107 at

18 285-91, ECF No. 210 at 163-67, 218; see also Claims 6, 7, 23, herein.) However, the state

19 supreme court reasonably denied the Claims, as discussed below.

20          (i)      Admission of Custodial Statements

21          (A)      Miranda Advisement and Waiver

22     Petitioner argues that sergeants Davis and Johnson did not Mirandize him for the

23 unrecorded first interview on July 27, 1982 (see RT 206, 218), rendering ineffective the Miranda

24 advisements given for the recorded second and third interviews which he argues were part of "a

25 continuous interview process." (ECF No. 107 at 290; ECF No. 210 at 165 citing Miranda, 384

26 U.S. at 469; Smith v. Illinois, 469 U.S. 91, 92 (1984); see also RT 93-240.) He argues the

27 sergeants testified falsely that he was advised of and waived rights under Miranda before the

28 brief July 27, 1982 unrecorded interview began. (RT 96-99, 132; see also CT 160.)

Petitioner argues the sergeants refused his unrecorded request for counsel (something Davis and Johnson deny), violating his rights under the Fifth Amendment. (ECF No. 107 at 287-89; ECF No. 210 at 166 citing Sessoms v. Grounds, 776 F.3d 615, 626 (9th Cir. 2014) (en banc); see also RT 122, 143, 206-32.)  In this regard, Petitioner testified that, at the time of the interviews, he knew he had a right to an attorney, but "said exactly what [he] was told to say" when he agreed to a Miranda waiver (RT 220-22), such that his purported Miranda waiver was not valid (ECF No. 210 at 163).

Petitioner argues his statements were coerced by the sergeants' threats to arrest his mother and twelve-year-old son, and thus not "voluntary beyond a reasonable doubt" as required by then prevailing state law.  (ECF No. 107 at 286 citing In re Lance W., 37 Cal. 3d 873, 881-90 (1985); People v. Smith, 34 Cal. 3d 251, 257-63 (1983).)  He argues that he confessed only after Davis and Johnson (i) threatened to arrest members of his family (something Davis and Johnson deny), and (ii) refused Petitioner access to counsel (something Davis and Johnson deny).  (ECF No. 107 at 287-89; see also RT 206-31.)

Petitioner argues his noted mental disabilities (see Claims 3, 4, 6, and 8) and medication with the prescription drug Mellaril, a tranquilizer and anti-depressant, rendered his waivers and statements involuntary, unknowing, and unreliable (RT 122-23, 144-45, 203, 212, 215-16, 1541-44), and that Counsel was ineffective for failing to develop and present the argument.    (See Claims 3, 4, 67, 8, herein.)

The record reflects that during the first interview, Petitioner was told a body had been recovered from the back yard where he had lived with his family and that the detectives had interviewed his wife, son, father, and mother.  (See ECF No. 210 at 164 citing RT 99-100.)  Petitioner denied involvement and refused to make a statement until he had spoken with his mother.  (Id., citing RT 99-100, 115, 204-207; see also RT 4042-43.)  The following day, July 28th, after Petitioner met with his mother and his sister (RT 162, 171, 178-81), the sergeants met with Petitioner a second time (RT 130-06).  Petitioner, in this tape recorded interview during which he was Mirandized and waived rights thereunder (CT 162), made a statement admitting his involvement in the Radford and Levoy homicides (RT 105-108, 121, 132-33, 149, 155). The

1  transcript of the tape recorded third interview on August 2, 1982, includes sergeant Johnson

2  reading Petitioner his Miranda rights at the beginning of the interview, (RT 135-36), something

3  Petitioner could not recall (RT 224).  Petitioner then made further statements about the killing.

4  (See e.g., RT 135-38.)

5        The record further reflects the trial court found Petitioner was given, and waived Miranda

6  rights, and that his statements to the sergeants were given "intelligently, freely, and voluntarily."

7  (RT 3141.)  The trial court then denied the suppression motion.  (CT 1259-60.)

8        As to Petitioner's medication with Mellaril, the sergeants testified they were aware

9  Petitioner was then medicated, and that at times his mood and emotional state varied widely; still

10  they found Petitioner to be responsive, coherent, and that he appeared to understand the

11  interview proceedings.  (See RT 122-28, 144-46.)

12        The state supreme court, on the noted facts and circumstances before it, was not

13  unreasonable in accepting the trial court's findings and underlying credibility determinations, for

14  the reasons stated by that court.  Particularly, the trial court was in the best position to judge

15  credibility.  See People v. Westerfield, 6 Cal. 5th 632, 682-83 (2019).

16        (B)      Corpus Delicti

17        Petitioner argues the statements should have been excluded because the corpus delicti of

18  Levoy's murder-rape was not independently proved, and such statements were unreliable at the

19  penalty phase.  (ECF No. 107 at 363; ECF No. 210 at 216-17 citing Caldwell v. Mississippi, 472

20  U.S. 320 (1985) (stating need for greater reliability in capital sentencing proceedings)); People v.

21  Hamilton, 60 Cal.2d 105, 129 (1963), overruled in part by People v. Morse, 60 Cal. 2d 631

22  (1964) (during the guilt phase of a criminal trial an extrajudicial admission is inadmissible in the

23  absence of independent proof of the corpus delicti).)

24        The record reflects the trial court denied Counsel's objection and motion to dismiss

25  Count 2 (i.e., murder of Levoy) and exclude his extrajudicial statements, on corpus delicti

26  grounds.  (See CT 480-503, 1278-79, 1351; RT 3704-08, 4324; see also CT 168.)

27        The principal purpose of the state corpus delicti rule is to ensure that the accused does not

28  admit to a crime that never occurred.  People v. Carpenter (1997) 15 Cal.4th 312, 394 (1997),

1  abrogated on other grounds by People v. Diaz, 60 Cal. 4th 1176 (2015); People v. Alvarez, 27
2  Cal.4th 1161, 1169 (2002) ("rule is intended to ensure that one will not be falsely convicted, by
3  his or her untested words alone, of a crime that never happened").   Although the prosecution
4  must establish a corpus delicti independent of the defendant's extrajudicial admissions or
5  confession, proof of the corpus delicti may be entirely circumstantial.   People v. Jones, 17
6  Cal.4th 279, 301 (1998).  The prosecution's burden consists only of making prima facie showing
7  "permitting the reasonable inference that a crime was committed."  People v. Jennings 53 Cal.3d
8  334, 364 (1991).

9       When a defendant's extrajudicial statements form part of the prosecution's evidence, the
10  trial court must instruct *sua sponte* that "a finding of guilt cannot be predicated on the statements
11  alone."  Alvarez, 27 Cal.4th at 1170.   The trial court's failure to so instruct is harmless error if "it
12  does not appear reasonably probable that a result more favorable to defendant would have been
13  reached in the absence of the error."  People v. Beagle, (1972) 6 Cal.3d 441, 455–456, abrogated
14  on other grounds by People v. Diaz, 60 Cal. 4th 1176 (2015).   When "the corpus delicti is
15  convincingly established independently of admissions[,] the error of the omission of that
16  instruction cannot be deemed as reversible."  Beagle, 6 Cal.3d 455.

17       Federal courts have viewed the corpus delicti rule solely a matter of state law.  See e.g.,
18  Evans v. Luebbers, 371 F.3d 438, 442–43 (8th Cir. 2004) (claim concerning a similar corpus
19  delicti rule that required some slight proof of human agency before admission of a confession did
20  not involve federal constitutional rights); Jacobs v. Horn, 395 F.3d 92, 112–13 (3d Cir. 2005)
21  (failure to instruct on the corpus delicti in violation of state law did not violate federal due
22  process of law); West v. Johnson, 92 F.3d 1385, 1393–94 (5th Cir. 1996) (noting that petitioner
23  cited no authority for the proposition that application of a state corpus delicti rule is
24  constitutionally mandated); see also Gerlaugh v. Lewis, 898 F. Supp. 1388, 1410 (D. Ariz.
25  1995), aff'd. by Gerlaugh v. Stewart, 129 F.3d 1027 (9th Cir.1997) (claimed violation of the
26  corpus delicti rule presented only a state law question and thus did not warrant habeas relief);
27  Baltazar–Monterrosa v. Palmer, No. 3:10–cv–00002–RCJ–WGC, 2013 WL 944799, **13–14
28  (D. Nev. March 7, 2013) (unpublished) (where there was independent evidence of guilt and no

1  showing of a violation of any federal constitutional right, a claim concerning application of a

2  state corpus delicti rule did not result in a decision that was contrary to, or an unreasonable

3  application of clearly established federal law or an unreasonable determination of fact in light of

4  the evidence presented to the state court, and was only a matter of state law).

5      Here, Petitioner argues particularly that "the prosecution failed to demonstrate a prima

6  facie case that [Levoy] was murdered, and that the prosecution failed to prove the underlying

7  felony [of rape] independent of the statements for first-degree felony murder."  (ECF No. 107 at

8  364; see also ECF No. 107 at 364-65 citing CT 480-504, 535-79, 644-45; 1256, 1351; RT 3135-

9  38; [regarding the trial court's refusal to dismiss, on such grounds, the Levoy murder Count and

10  conviction], CT 1278-79 [regarding the trial court's overruling defense objection to the felony

11  murder theory of the killings of Levoy and Radford as first-degree murders]); cf. People v.

12  Mattson, 37 Cal. 3d. 85, 93-94 (1984), superseded by statute as stated in People v. Jablonski, 37

13  Cal. 4th 774 (the corpus delicti of felony-based special circumstances must be established

14  independently of an accused's extrajudicial statements).

15      Petitioner argues the only evidence of what occurred between him and Levoy was his

16  allegedly unreliable confession.  (ECF No. 107 at 365; ECF No. 210 at 217.)  He observes that

17  prior to trial, the substantive rape, forcible sodomy, and forcible oral copulation Counts, and the

18  rape and sodomy special circumstance were stricken for lack of independent evidence. (ECF No.

19  107 at 364-65; ECF No. 210 at 217 citing CT 131-133, 1256; RT 199-201, 3135-38.)  He

20  suggests that, just as the "underlying felony" of a felony-based special circumstance and the

21  same felony, when charged as a substantive crime, are subject to the corpus delicti rule in

22  California courts, so too should the underlying felony of first-degree felony murder; especially so

23  in a capital case where the need for reliability is at its greatest.  (ECF No. 107 at 366.)

24      However, the state supreme court reasonably rejected Petitioner's assertion of the corpus

25  delicti rule, for the reasons it stated.  That court, in the course thereof, observed the noted

26  independent proof of the corpus delicti of Levoy's murder in the trial record, the inapplicability

27  of the rule in establishing the degree of murder and the admissibility of evidence in aggravation,

28  and the consequent absence of legal and factual constitutional error.  Particularly, the jury was

1  instructed on the corpus delicti rule, i.e., that the charged crimes must be proved independent of

2  any admission or confession (CT 1383); the presumption of innocence (CT 1388); the

3  requirement of proof beyond a reasonable doubt (id.); and the substantive elements of the

4  charged offenses and the special allegations including as to felony murder-rape and degree of

5  murder (CT 1392-1443).

6      To the extent Petitioner argues penalty phase use of his extrajudicial admission custodial

7  statements, as unadjudicated acts of violence, denied him the heightened reliability required in

8  capital cases, (see ECF No. 210 at 217-18), he concedes that "California statute and case law

9  allow the presentation of unadjudicated criminal acts as aggravating evidence in a capital penalty

10 trial." (ECF No. 210 at 217 citing Penal Code § 190.3 (b).)  Here again, he does not point to

11 clearly established federal law to the contrary.  As noted, California's death penalty process and

12 pattern instructions repeatedly have been upheld by the Supreme Court.  (See Claims 26, 27, 33,

13 herein.)

14      (ii)     Harmless Error

15      Petitioner argues the foregoing alleged constitutional infirmities constitute more than

16 harmless error.  (ECF No. 210 at 167 citing Brecht, 507 U.S. at 637.)  He argues that "[h]ad the

17 trial court not erroneously admitted the extrajudicial statement[s] [he] would not have been

18 convicted, found sane, or sentenced to death." (ECF No. 107 at 285; see also id. at 364; ECF

19 No. 210 at 166.)  He argues that "[b]ecause the prosecution's felony-murder theory was

20 predicated entirely on petitioner's extrajudicial statements, the convictions for first-degree

21 murder and the subsequent verdicts at the sanity and penalty phases must be reversed . . . [and]

22 the jury's use of guilt phase evidence of rape as a factor in aggravation rendered the death verdict

23 unreliable and unconstitutional." (ECF No. 107 at 368.)

24      But that state supreme court reasonably could find the alleged errors, individually and

25 cumulatively, no more than harmless.  Petitioner concedes that "California statute and case law

26 allow the presentation of unadjudicated criminal acts as aggravating evidence in a capital penalty

27 trial." (ECF No. 210 at 217 citing Penal Code § 190.3 (b); People v. Balderas, 41 Cal.3d 144,

28 204-205 (1985).)  He has not demonstrated clearly established federal law to the contrary.

Rather, the Supreme Court has upheld California's death penalty statute. Notably, the jury otherwise was aware of evidence Petitioner premeditated the murders and committed the acts alleged in the multiple murder and kidnapping special circumstances found true. (See Claims 6, 7, 9, 23, 33, herein.)

Additionally, a federal writ is not available for alleged error in the interpretation or application of only state law. See McGuire, 502 U.S. at 67-68; Park, 202 F.3d at 1149. Federal habeas relief is not available to retry a state issue that does not rise to the level of a federal constitutional violation. Id. Alleged errors in the application of state law are not cognizable in federal habeas corpus. Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002). The Court accepts a state court's interpretation of state law. Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.1996).

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claims was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claims 14, 25 shall be denied.

### 5.    Claim 15

Petitioner alleges the trial court erred by failing to admonish the jury, during voir dire, not to form or express an opinion on or investigate the case, violating his rights under the Sixth, Eighth, and Fourteenth Amendments.[13]  (ECF No. 107 at 292-96.)

### a.    State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 84-93), and denied on the merits, and in part on procedural grounds, as follows:

> In preliminary proceedings, the court organized the jury pool into groups, telling certain prospective jurors to return for voir dire after lunch, while assigning others future times and days in which they were to return to court for voir dire. Before the latter jurors left the courtroom, the trial court did not admonish them against discussing the case, reading, or listening to media accounts, or visiting the scene

---

[13] Petitioner states that he incorporates the factual basis of Claims 1, 2, 6, and 10 (ECF No. 107 at 292), and the instructional errors alleged in Claim 20 (ECF No. 107 at 294).

of the crimes. Defendant acknowledges that the statutory requirement that jurors be admonished (§ 1122) applies only after a jury is sworn and thus does not expressly apply to this preliminary period in the jury selection process. (*People v. Horton* (1995) 11 Cal.4th 1068, 1094 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Nevertheless, he contends the trial court's failure to admonish the jury violated his federal constitutional rights to a fair trial, an impartial jury, and a reliable guilt and penalty verdict, as well as his analogous rights under the state Constitution.

We have explained that "the giving of the admonition to prospective jurors during the voir dire process constitutes a sound judicial practice" (*People v. Horton*, *supra*, 11 Cal.4th at p. 1094), but that failure to do so does not constitute error. Because our *Horton* opinion makes no mention of whether we considered all the constitutional bases defendant now asserts, *Horton* does not fully dispose of defendant's claim. We nevertheless find three reasons why the claim is meritless.

First, defendant failed to object or call the trial court's attention to the lack of an admonishment. The issue is thus forfeited on appeal. (Cf. *People v. Heishman* (1988) 45 Cal.3d 147, 175 [246 Cal.Rptr. 673, 753 P.2d 629] [where § 1122 applies, a timely objection is necessary].) Second, even assuming the issue were preserved for appeal, we are unaware of any constitutional requirement that our trial courts admonish prospective jurors so far in advance of a trial. Certainly, defendant does not cite any authority to that effect.

Third, any prospective jurors who discuss the case, form opinions, view the crime scene, or do legal research can be discovered during the voir dire process and be either excused or rehabilitated at that time. Although defendant directs our attention to a few jurors who may have acquainted themselves with the law after being notified they might be chosen for the jury, he fails to explain why his right to a fair trial and an impartial jury could not be protected by rehabilitating those jurors or excusing them for cause or peremptorily if they could not be rehabilitated. He thus fails to show prejudice. (*People v. Heishman*, *supra*, 45 Cal.3d at p. 175.) Defendant's ability to strike such jurors also protects his rights under both the state and federal Constitutions to a reliable verdict.

Defendant also contends his trial attorney provided ineffective assistance of counsel by failing to ask the court to admonish the prospective jurors. He claims his counsel could have had no conceivable tactical reason for the omission. Even assuming that to be true, defendant fails to demonstrate how he was prejudiced. Accordingly, he does not show his trial attorney was constitutionally ineffective under either the state or federal Constitution. (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [104 S.Ct. 2052, 2066-2067, 80 L.Ed.2d 674].)

Weaver, 26 Cal. 4th at 908–09.

The Claim also was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 456-58), and summarily denied on the merits, and in part on procedural grounds (Lod. Doc. 8).

      b.        Legal Standard

      (i)      Trial Court Error

1    The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

2    (ii)    Trial by a Fair and Impartial Jury

3    The standard for trial by a fair and impartial jury is set out in section VII, B, 2, b, (ii),

4    herein.

5    c.    Analysis

6    Petitioner argues the trial court erred by failing to admonish the jury, during individual

7    voir dire, not to form an opinion or express any opinion about the case and not to investigate the

8    facts of the case or the applicable law.  He argues that as a result, at least two jurors who voted to

9    find him sane and sentenced him to death "acquainted themselves during the jury selection

10   process with legal principles applicable to the definition of sanity" (ECF No. 107 at 292; see

11   also ECF No. 210 at 168.)

12   (i)    Proceedings at Voir Dire

13   Petitioner argues that certain prospective jurors independently researched case-related

14   matters and/or consulted with others in such regards.  Particularly, he argues that:

15

16   •    Prospective juror Jake Amick, who served on the sanity and penalty phase
         jury, responded to voir dire in a manner that inferentially suggested
17       atypical familiarity with the discredited M'Naghten test for sanity.  (ECF
         No. 107 at 294.)

18   •    Prospective juror Laura Wilkerson, who served on the sanity and penalty
         phase jury, responded to voir dire in a manner that inferentially suggested
19       atypical familiarity with applicable legal principles including mitigation.
         (ECF No. 107 at 294-95.)
20
     •    Prospective juror Nora Armstrong responded to voir dire in a manner that
21       inferentially suggested atypical familiarity with the insanity defense.
         (ECF No. 107 at 295.)
22
     •    Prospective juror Darlene Dugger responded to voir dire in a manner that
23       inferentially suggested she had discussed Petitioner's case with her sister.
         (ECF No. 107 at 295.)
24
     •    Prospective juror Christine White responded to voir dire by admitting she
25       had discussed the nature of charges against Petitioner, with her husband.
         (ECF No. 107 at 295.)
26

27   Even so, Petitioner has not identified legal authority that a trial court must admonish

28   jurors before they are sworn.  As the state supreme court observed, Petitioner does not show trial

102

1  counsel was denied or constrained in the opportunity to voir dire and as appropriate challenge

2  these and the other prospective jurors.  Weaver, 26 Cal. 4th at 909.  Particularly, as to the five

3  prospective jurors in issue, the state supreme court reasonably could find Petitioner argues

4  inference insubstantially supported by facts in the record.

5        While prospective juror Amick responded during voir dire that whether a sane person

6  could commit a bizarre murder related to whether the person "knows what he is doing and …

7  knows that it is wrong[,]" (RT 1139), he nonetheless stated he could apply law to facts at the

8  sanity phase and was not predisposed one way or the other on the matter of sanity (RT 1130-31).

9  Nothing tethered this response to M'Naghten, or suggested he would not follow the trial court's

10  instruction.  (Id.)

11       While prospective juror Wilkerson responded during voir dire that she would weigh the

12  evidence and apply a balancing approach at the penalty phase (RT 2494-95), she nonetheless

13  stated that she could apply law to facts at the penalty phase (RT 2504).

14       While prospective juror Armstrong responded during voir dire that whether a person

15  could claim he was crazy at the time of the crime related to whether "they know what they are

16  doing[,]" (RT 1963), she nonetheless stated she could apply law to facts at the sanity phase (RT

17  1951), adding that she that had never studied psychology or psychiatry or dealt with those issues

18  (RT 1962).

19       While prospective juror Dugger mentioned discussing her sister during voir dire, she

20  nonetheless stated that she could apply law to facts at trial  (RT 2080).

21       While prospective juror White stated on voir dire that she mentioned to her husband that

22  she had a murder case with a plea of insanity (RT 2416), she nonetheless stated that "[she] didn't

23  really go into it" and could apply law to facts at trial with an open mind (RT 2399-2400).

24            (ii)    Harmless Error

25       Petitioner argues these prospective jurors freely investigated law and facts outside the

26  trial record, such that the conviction and death sentence rendered were arbitrary and unreliable.

27  (ECF No. 107 at 295-96.)

28       However, the state supreme court reasonably could find the noted record on voir dire

1  does not suggest more than harmless error.  That court could find Petitioner's allegations to be

2  only speculation and surmise insubstantially supported in the trial record, for the reasons stated.

3  Particularly, Petitioner has not demonstrated the jury considered extrinsic evidence, failed to

4  deliberate consistent with their instructions, or otherwise engaged in misconduct.  (See Claims

5  17, 18, herein; see also Weeks v. Angelone, 528 U.S. 225, 234 (2000) (federal courts presume

6  jurors understand and follow instructions).

7      Furthermore, Petitioner has not shown Counsel was denied the opportunity to examine

8  and challenge prospective jurors during voir dire.  See e.g., Weaver, 26 Cal. 4th at 909.  Rather,

9  the voir dire record suggests that, with the exception of prospective juror Dugger who was

10  excused for cause, Counsel engaged in substantial questioning of these prospective jurors.  (See

11  e.g., RT 1171-40, 2489-2505, 1947-64, 2079-2085, 2396-2422.)

12      Accordingly, that court reasonably could find no "substantial and injurious effect or

13  influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

14      d.      Conclusions

15      A fair-minded jurist could find the state supreme court's denial of the Claim was not

16  contrary to, or an unreasonable application of, clearly established federal law, as determined by

17  the Supreme Court, or based on an unreasonable determination of the facts in light of the

18  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

19      Claim 15 shall be denied.

20      6.      Claims 20, 21, 22

21      Petitioner alleges the trial court gave erroneous instructions at the guilt, sanity, and

22  penalty phases (i.e., Claim 20), including as to the prosecution's burden of proof generally (i.e.,

23  Claim 22), and the prosecution's burden of proof specifically as to essential elements of the

24  charged offenses (i.e., Claim 21), violating his rights under the Fifth, Sixth, Eighth, and

25  Fourteenth Amendments.[14]  (ECF No. 107 at 325-58.)

26      a.      State Court Direct and Collateral Review

27
---
[14] Petitioner states that he incorporates the factual basis of Claims 1, 2, 6, 7, 8, and 9, into Claim 20.  (ECF No. 107
28  at 326.)  Petitioner states that he incorporates the factual basis of Claims 7, 20, and 22, into Claim 21.  (Id. at 351.)
Petitioner states that he incorporates the factual basis of Claims 7, 20, and 21, into Claim 22.  (Id. at 355.)

(i)     Claim 20

Claim 20 was presented to the state supreme court on direct appeal (Lod. Doc. 1 at 290-95, 334-41, 346-84, 388-99, 411-31, 442-44), and denied on the merits, as follows:

### Special Jury Instruction Concerning Mental Disease or Defect

The prosecution proposed a special jury instruction for the sanity phase: "The terms 'mental disease' or 'mental defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." The instruction was taken from our opinion in *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], which in turn adopted it from subdivision (2) of the American Law Institute test for insanity. (*Fields*, *supra*, at pp. 368-369.) Defense counsel objected on the ground that *Fields* was not the applicable law at the time of the offense, and could not be applied retroactively to defendant's case. Although she asserted the instruction was "misleading," she did not explain why. The trial court overruled the defense objection and delivered the instruction.

Defendant now contends the trial court erred by failing to also deliver, sua sponte, another instruction further explaining the prosecution's special instruction using additional language from our *Fields* opinion. Thus, defendant argues the trial court erred by failing to have instructed the jury that "[i]f that illness manifests itself in some other way as well, then it can be considered as a 'mental disease' ... and instances of criminal or antisocial conduct can be ascribed to that disease or cited as evidence of its severity." (*People v. Fields*, *supra*, 35 Cal.3d at p. 369.)

We disagree. As defendant admits, "when terms have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required." (*People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) In this case, the language of the special instruction ("does not include an abnormality manifested *only by* repeated criminal [conduct]" (italics added)) clearly implies that where evidence of *more than* mere criminal conduct is present, such evidence can be considered as proof of a mental disease or defect. Here there was ample evidence presented to the jury at the sanity phase of the voices defendant said he heard in his head, his post-traumatic stress as a result of service in Vietnam, and other psychological problems. The jury would reasonably have understood that such evidence, if credited, coupled with the evidence of repeated antisocial behavior, could comprise evidence of insanity. Because the meaning of the prosecution's special instruction was clear, the trial court bore no sua sponte duty to give an additional instruction further explaining it.

Defendant also contends counsel was ineffective for failing to request an explanatory instruction. Because the prosecution's special instruction was sufficiently clear, however, counsel's failure to seek an additional explanatory instruction could not have been prejudicial. Hence, counsel was not ineffective for failing to request more. (*People v. Kirkpatrick*, *supra*, 7 Cal.4th at p. 1008.) Moreover, because we find the prosecution's special instruction was not misleading, we reject defendant's further argument that his sanity and penalty phase verdicts were rendered unreliable in violation of the state and federal Constitutions.

Finally, we also reject defendant's additional apparent contention, raised with no

105

supporting argument, that the instruction impermissibly lightened the prosecution's burden. It was defendant who bore the burden of proving his insanity. (*People v. Coddington*, *supra*, 23 Cal.4th at p. 608; see also *People v. Earp*, *supra*, 20 Cal.4th at p. 884 ["we need not consider on appeal mere contentions of error unaccompanied by legal argument"].)

*Consideration of Guilt Phase Evidence at the Sanity Phase*

At the close of the sanity phase of the trial, the trial court instructed the jury as follows: "In your consideration of the issue of legal insanity or legal sanity, you are limited to the evidence produced in this phase of the trial. [¶] You may not consider the evidence produced in the guilt phase of the trial." The trial court gave this instruction at defense counsel's request.

Defendant contends the instruction was erroneous and deprived him of his federal constitutional due process right to present a defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636] ["the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' "].) He is correct to the extent that he claims the instruction is contrary to law: section 190.4, subdivision (d) provides: "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026[,] shall be considered a[t] any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase."

Although the instruction was erroneous under section 190.4, subdivision (d), the record reveals counsel made a deliberate choice to request the instruction; hence, the error was invited. Consequently, we need not decide whether the instruction deprived defendant of his constitutional right to present a defense: "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248], quoting *People v. Wader* (1993) 5 Cal.4th 610, 658 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

Even were we to assume the error was not invited, defendant's due process right to present a defense was not infringed. Defendant presented a thorough and detailed defense at the sanity phase and was not prevented from reintroducing those portions of the guilt phase evidence he believed could be beneficial to his case at the sanity phase. Accordingly, he was not denied a meaningful opportunity to present a defense.

Defendant argues that, to the extent Mrs. Huffman's decision to request the instruction bars consideration of the issue, she was ineffective under the state and federal Constitutions. Counsel's deficient performance was exacerbated, defendant claims, by her failure to reintroduce critical guilt phase evidence at the sanity phase to permit the jury to consider it as a factual basis for the opinions of the various expert witnesses who testified. In particular, he directs our attention to guilt phase evidence that he "blanked out" when Levoy bit him, that when he was young his mother would discipline him by biting him, that he hears voices in his head, that he abused amphetamines to stay awake while driving, and that he had not slept in 10 days when he came upon Radford and Levoy on the highway.

We reject the claim defense counsel was ineffective, because defendant suffered no possible prejudice from counsel's choice to request a jury instruction limiting

the jury's consideration to evidence presented in the sanity phase only. In light of the overwhelming negative evidence against defendant presented in the People's case-in-chief at the guilt phase, including gruesome details of the actual crimes, we conclude defendant could not have been prejudiced by counsel's decision.

To the extent defendant's appellate counsel argues the instruction limiting consideration of evidence to that presented at the sanity phase, combined with the instruction requested by the prosecution that evidence of antisocial acts alone cannot comprise evidence of insanity (*ante*, pt. II.B.10.), deprived defendant of a viable defense at the sanity phase, we reject that claim as well because there was ample evidence of defendant's alleged insanity apart from his antisocial acts from which the jury could have concluded he was legally insane.

Weaver, 26 Cal. 4th at 968–71.

*Jury Instruction Precluding Jury from Considering Defendant's Statements on a VESI Videotape for Their Truth*

As noted, *ante* (pts. II.B.5. & 9.), two videotapes of defendant answering questions from the VESI were played for the jury at the sanity phase. For that phase of trial, the jury was instructed that defendant's answers were not to be considered for their truth but only as demonstrating the basis for some of the medical experts' opinions.[27] That instruction was imported into the penalty phase when the trial court instructed the jury that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed."

------------------------FOOTNOTE--------------------

n.27  The jury was instructed: "There has been admitted in evidence the testimony of medical experts of statements made to them by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. The testimony of such statements may be considered by you only for the limited purpose of showing the information upon which the medical experts based their opinion. Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

--------------------END  FOOTNOTE--------------------

After retiring to deliberate, the jury sent out a note, asking about the permissible way it could consider the VESI videotapes. The trial court instructed the jury: "I will simply repeat the instruction that I gave you several times during the course of the trial and the video tape was played in the second phase of the trial. It is received and it may be considered by you only as supplying a part of a basis of this particular doctor's opinion. It may not be used for the truth of anything stated on the video tape, and to the extent that the doctor's opinion as reflected by the video tape played a part in this decision, yes, it can be used in that manner. But as I say, it is not to be used as the establishing of any fact, the truth of any fact that may have been stated on the tape. Just as when a doctor examines a patient in

person and that patient made certain statements to the doctor about his condition, those statements may not be used for the truth of what was told the doctor but simply may be considered as a basis or part of a basis of the doctor's subsequent opinions."

Although defendant did not object to the trial court's initial instruction or its reinstruction, he now complains that both were erroneous, and that defense counsel was constitutionally ineffective for failing to object. We disagree. Defendant's statements on the VESI videotapes were hearsay insofar as they might be considered for their truth, and we have implicitly concluded that, with some exceptions, the hearsay rule applies at the penalty phase of a capital trial. (See *People v. Harris* (1984) 36 Cal.3d 36, 68-71 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn. of Broussard, J.); *id.* at p. 75 (dis. opn. of Kaus, J.); *People v. Ray*, *supra*, 13 Cal.4th at p. 371 (conc. opn. of Mosk, J.); see *People v. Nye* (1969) 71 Cal.2d 356, 372 [78 Cal.Rptr. 467, 455 P.2d 395] [under the then applicable death penalty law, "[o]bjectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase"].)

Defendant argues the jury should have been permitted to consider the nonhearsay elements of the videotapes, such as defendant's demeanor, physical reaction to questions, and remorse. We do not read the trial court's instruction as precluding consideration of defendant's demeanor or physical reactions. In any event, even assuming the court erroneously deprived the jury of this "evidence," there is no reasonable possibility the jury would have reached a different verdict in the absence of the alleged error.

Defendant also contends that, given the finality of the death penalty, penalty phase juries should not be "precluded from considering, as a mitigating factor, any aspect of the accused's character that would permit the jury to return a sentence less than death," citing *Lockett v. Ohio* (1978) 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973]. Stated differently, defendant would have us conclude that, because the death penalty is involved, we should dispense with traditional state-law-based rules of evidence. He cites *Green v. Georgia* (1979) 442 U.S. 95 [99 S.Ct. 2150, 60 L.Ed.2d 738] in support.

We previously addressed and rejected this broad reading of *Green v. Georgia*, *supra*, 442 U.S. 95, in *People v. Stanley* (1995) 10 Cal.4th 764 [42 Cal.Rptr.2d 543, 897 P.2d 481]. In that case, the defendant claimed the trial court erred by refusing to modify an instruction so as to permit the jury to consider for their truth certain videotapes defendant had made while under the influence of sodium amytal. (*Id.* at p. 833.) We considered the rule of *Green v. Georgia*, in which the high court held that due process concerns could override state evidentiary rules at the penalty phase of a capital trial in circumstances where the evidence in question was highly relevant and reliable. (*Stanley*, *supra*, at pp. 838-839.) We concluded the videotapes bore no special indicia of reliability, so the rule did not require the trial court to dispense with the hearsay rule.

Although we have recognized the potential importance of *Green v. Georgia*, *supra*, 442 U.S. 95, explaining that "[e]xclusion of hearsay testimony at a penalty phase may violate a defendant's due process rights if the excluded testimony is highly relevant to an issue critical to punishment *and* substantial reasons exist to assume the evidence is reliable" (*People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145]), the rule is not implicated in this case. The VESI videotapes were made by defendant to support his claim of insanity, and we cannot conclude they were particularly reliable as a result. Although defendant claims their reliability was shown by the testimony of other witnesses confirming

that he had served in Vietnam and came home a changed person, we agree with respondent that such evidence shows only that defendant's assertions on the videotapes that he had served in Vietnam were not lies. The testimony of other witnesses cannot confirm the substance of defendant's war experiences, which is the aspect of his VESI responses that he claims is mitigating.

In any event, even assuming for argument that the trial court should not have instructed the jury that it could consider the VESI videotapes only for a limited purpose, we agree with respondent that any error was harmless because the videotapes included potentially aggravating evidence. As defendant argued earlier when he claimed counsel was ineffective for eliciting damaging evidence on the videotapes and then failing to seek a redaction before they were played for the jury, the videotapes included such information as defendant's saying women existed for his sexual satisfaction, that he hated all women except his mother, and that he had raped other women. These statements, if made available to the jury for their truth, could only have emboldened the jury to impose the death penalty.

We conclude the trial court did not err in limiting the jury's consideration of the VESI videotapes to using them as a basis for the expert psychiatric testimony. "Any contrary ruling would have permitted defendant to give self-serving testimony free from cross-examination as to its validity." (*People v. Stanley*, *supra*, 10 Cal.4th at p. 839.) Even assuming the instruction was erroneous, defendant was not prejudiced thereby. It follows that counsel was not ineffective for failing to object to the instruction.

Weaver, 26 Cal. 4th at 979–82.

## Failure to Give Clarifying Jury Instructions

As noted above, the trial court instructed the jury that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed." Defendant contends the trial court's failure to enumerate specifically which of the sanity phase jury instructions applied at the penalty phase was reversible error. In particular, he claims that by leaving the jury to decide which of the sanity phase instructions applied, the jury may have erroneously applied the definition for legal insanity to the penalty phase. This error, defendant claims, would have required him to prove by a higher quantum of evidence that his mental condition deserved consideration as a mitigating circumstance, because former CALJIC No. 4.00 (1978 rev.) asks the jury to determine if the defendant "as a result of mental disease or defect ... *lacks substantial capacity* either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Italics added.) By contrast, section 190.3, factor (h) permits the jury to consider as a mitigating circumstance "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law *was impaired* as a result of mental disease or defect, or the [e]ffects of intoxication." (Italics added.)

Defendant is correct that the trial court's failure to specify which of the previously delivered instructions continued to apply at the penalty phase was potentially misleading. We admonished the trial courts in *People v. Babbitt* (1988) 45 Cal.3d 660 [248 Cal.Rptr. 69, 755 P.2d 253] that, "[t]o avoid any possible confusion in

future cases, trial courts should expressly inform the jury at the penalty phase which of the instructions previously given continue to apply." (*Id.* at p. 718, fn. 26.) The current applicable pattern instruction, CALJIC No. 8.84.1 (6th ed. 1996), provides that the jury at the penalty phase should "[d]isregard all other instructions given to you in other phases of this trial." In the Use Note to CALJIC No. 8.84.1, the authors explain that the instruction "should be followed by all appropriate instructions beginning with CALJIC 1.01, concluding with CALJIC 8.88. [¶] Our recommended procedure may be more cumbersome than the suggestion advanced in footnote number 26 [of *Babbitt*, *supra*, at p. 718], but the Committee believes it is less likely to result in confusion to the jury."

Defendant's trial occurred before we decided *People v. Babbitt*, *supra*, 45 Cal.3d 660, so the trial court did not have the benefit of our admonition. In any event, regarding the possibility of confusion between the definition for insanity and the mitigating circumstance set forth in section 190.3, factor (h), we rejected the same claim in *People v. Babbitt*, at pages 720-721: "Nor do we agree with defendant that factor (h) suggested to the jury that, having found defendant sane, it could not consider his asserted mental defects or disease in mitigation. Whereas the insanity instruction requires that a defendant lack 'substantial capacity' to appreciate the criminality of his conduct or to conform his conduct to the law, factor (h) requires only that his capacity to do so be 'impaired.' The difference between the two standards is readily apparent." (See *People v. Marshall* (1996) 13 Cal.4th 799, 857 [55 Cal.Rptr.2d 347, 919 P.2d 1280] ["For a particular sentencing factor, such as section 190.3, factor (h), to apply on the record of the case, the evidence supporting it need not suffice to establish a complete defense to the crime; rather, there need be in the record only some evidence relevant to the factor"].)

Defendant argues *People v. Babbitt*, *supra*, 45 Cal.3d 660 is distinguishable because we there emphasized that "both the prosecutor and defense counsel informed the jury that defendant's mental condition could properly be considered even though the jury had found him to be legally sane." (*Id.* at p. 721, fn. omitted.) By contrast, he claims, "the record reflects that the jury was urged by both parties in closing argument to apply the sanity phase instructions to the penalty phase." For example, he notes the prosecutor "urged the jury to apply the same reasoning it had employed in the sanity phase to its assessment of mitigating factors in the penalty phase."

Defendant exaggerates the record. When the prosecutor asserted in closing argument that the section 190.3, factor (h) analysis was "[b]asically ... a review of the sanity phase in the case," he was likely not urging the jury to apply the same *level of proof*. Instead, he appeared to be urging the jury to find there was *insufficient persuasive evidence* showing defendant suffered a mental disease or defect. "The only thing I am going to say with regard to that is I don't think there is evidence to support it. There was an attempt made to present evidence showing that. I think that evidence failed in that regard for the reasons that I have stated earlier in my argument." The prosecutor reminded the jury that, during voir dire, the jurors affirmed that they "could consider [mental disease or defect as a mitigating factor] even though the defendant might be sane." Although the prosecutor could have more clearly explained the difference in the standard of proof between legal insanity ("substantial capacity") and factor (h) ("impaired"), we conclude the prosecutor did not mislead the jury.

Defense counsel also could have clarified the differences between insanity and section 190.3, factor (h) but, like the prosecutor, she did not. Contrary to defendant's claim, however, neither did she affirmatively mislead the jury. She accurately quoted the statutory language for the jury (was defendant's "capacity ...

to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law ... impaired as a result of a mental disease or defect ....") and then reminded the jury that, during voir dire, the jurors all affirmed they could consider evidence of mental disease or defect as a mitigating circumstance even if they had already found defendant was legally sane. She then asked: "Did he have a mental defect? Did he have a mental illness? Did he have an emotional problem that caused some of these factors to happen? I say he did, and I think those are very important factors and should be weighed very heavily." This is not an argument to apply the sanity phase instructions to the penalty phase.

Because there was no "reasonable likelihood" (*People v. Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *Boyde v. California* (1990) 494 U.S. 370, 380-381 [110 S.Ct. 1190, 1197-1199, 108 L.Ed.2d 316]) the jury misunderstood the instructions-because the difference between the standard for insanity and for consideration of evidence under section 190.3, factor (h) was "readily apparent" (*People v. Babbitt*, *supra*, 45 Cal.3d at p. 721)-we conclude the trial court did not err in failing to specify which of the earlier instructions applied at the penalty phase. Accordingly, defendant's further arguments that the allegedly ambiguous instruction prevented the jury from giving effect to mitigating evidence in violation of his rights under the Eighth Amendment to the federal Constitution, as well as his rights under article I, section 17 of the state Constitution, must fail. We likewise reject his final argument that defense counsel was ineffective for failing to object to the instruction; because we conclude there was no reasonable likelihood the jury was misled, there was no prejudice flowing from the failure to object.

Weaver, 26 Cal. 4th at 982–84.

### Alleged Brown Error

The trial court instructed the jury in the language of former CALJIC No. 8.84.2 (1979 rev.): "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors or aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose the sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

This was the "standard pre-*Brown* mandatory weighing instruction, which quoted the language of the statute." (*People v. Avena*, *supra*, 13 Cal.4th at p. 440; see *People v. Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], revd. on another issue *sub nom*. *California v. Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934].) "We acknowledged in *Brown*, *supra*, 40 Cal.3d at page 544, footnote 17, that the instruction might in some cases confuse the jury about its role; specifically, the use of the word 'shall' in the standard instructions raised concerns the jury might feel legally obligated to impose the death penalty, rather than appreciating it was to undertake a normative decision to determine whether the death penalty was appropriate. Thus, the jury might improperly view the weighing process as prohibiting an individual juror from assigning 'whatever moral or sympathetic value he deems appropriate' to the mitigating evidence. (*Brown*, *supra*, at pp. 538-541.) We said we would examine the record in each case to determine whether prejudicial confusion existed." (*People v. Avena*,

*supra*, at pp. 440-441.)

Defendant relies on the prosecutor's use and emphasis in closing argument of the word "shall" and contends such argument, coupled with the potentially misleading pattern instruction, misled the jury into believing it had no choice of penalty once it concluded the aggravating circumstances outweighed the mitigating ones. We disagree. Although the prosecutor used the word "shall," "[n]owhere did the prosecutor urge the jury to merely count the number of aggravating and mitigating factors and mechanically or arithmetically impose the death penalty." (*People v. Sanders* (1990) 51 Cal.3d 471, 522 [273 Cal.Rptr. 537, 797 P.2d 561].) Moreover, the prosecutor informed the jury "[t]hat in the end [the decision] is a moral judgment that each of you will have to make as to the appropriate weight to be ascribed to each of these factors," that "[t]here is no numerical figure that you can place on these [factors]," "[w]hat you have to do is balance, weigh those factors that you determine to be in mitigation, and I submit that there are very few in this case, they are entitled to minimal weight in this case, against the factors in aggravation," and "[t]here are no numbers. You can't go through and say we have put one here, two there. You evaluate it. It is a moral judgment. You have to decide what weight each of these factors is entitled to. Having done that, you weigh them and determine what the appropriate penalty is."

Defense counsel's argument did not contradict the prosecutor's argument on these points, other than to disagree that the aggravating circumstances outweighed the mitigating ones, and that death was the appropriate penalty.

There was no *Brown* error.

Defendant makes a number of subsidiary claims under the general category of misleading the jury as to its proper role. As we explain below, we reject them:

(a) Defendant argues that former CALJIC No. 8.84.2 (1979 rev.), coupled with the prosecutor's argument, might have resulted in the jury's failing to understand "the law does not require a verdict of death unless *each juror* [individually] finds that verdict appropriate under all the circumstances." (Italics added.) We disagree; we assume the jury followed the instruction that it was "the duty of *each of you* to consider the evidence for the purpose of arriving at a verdict if you can do so. *Each of you* must decide the case for yourself...." (Italics added.)

(b) Defendant argues some parts of the prosecutor's argument encouraged the jury to treat factors in isolation rather than collectively. In making this argument, defendant extracts the statements from their context. The prosecutor clearly told the jury to weigh all the applicable factors together and then make a "moral" decision.

(c) To the extent defendant claims the prosecutor's emphasis on the absence of "excuse" or "license" encouraged the jury to apply an incorrect standard of proof to the penalty phase, defendant again views the statements in isolation. In any event, we assume the jury followed the instruction on section 190.3, factor (k):[28] the jury should consider "[a]ny other circumstance which extenuates the gravity of the crime *even though it is not a legal excuse for the crime*...." (Italics added.)

------------------------FOOTNOTE-------------------

n.28   This factor was labelled "(j)" in the instructions due to the deletion of

statutory factor (j): "Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor."

-------------------END  FOOTNOTE-------------------

(d) To the extent defendant argues the instruction permitting the jury to consider "sympathy or pity for defendant or his family as a circumstance in mitigation" "tended to reduce any impact [of sympathy] by separating it from the factors which aroused it," causing a "compartmentalization of sympathy," and fostered in the jury a misunderstanding of its role (or that the sympathy instruction failed to negate a budding misunderstanding of the jury's role), we note defense counsel passionately asked the jury to consider sympathy as a factor in defendant's favor; to the extent defendant believed the standard sympathy instruction, which was otherwise a correct statement of law, was somehow misleading because it caused a "compartmentalization of sympathy," he should have sought a clarifying instruction. His failure to do so waived that claim. (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

(e) To the extent defendant claims the challenged instruction violated his federal right to due process of law under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175], we reject that as well. (*People v. Earp*, *supra*, 20 Cal.4th at p. 884 ["we need not consider on appeal mere contentions of error unaccompanied by legal argument"].)

Weaver, 26 Cal. 4th at 984–87.

### Failure to Instruct on Elements of Assault

As a factor in aggravation, the prosecution introduced evidence of defendant's conviction for assault with a deadly weapon stemming from his attack on Bonnie Brown in 1976. Defendant now claims the trial court erred by failing to instruct the jury, sua sponte, on the elements of assault, which he contends "has a technical meaning peculiar to the law ... not commonly understood by persons familiar with the English language." "We have explained, however, that such an instruction is not required because 'a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die.' " (*People v. Avena*, *supra*, 13 Cal.4th at p. 435, quoting *People v. Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

In any event, the evidence shows defendant struck Brown on the back of the head with a wooden baseball bat, rendering her momentarily unconscious. This is thus not a case in which the "technical" definition of the crime of assault was at all relevant, and there is no possibility the jury misunderstood the nature of defendant's crime against Brown. We reject the claim.

Weaver, 26 Cal. 4th at 987.

*Alleged Ineffective Assistance of Counsel: Failure to Clarify the Relationship Between Factors (d) and (k)*

Defendant contends defense counsel was ineffective for failing to clarify for the jury in closing argument that evidence of defendant's mental disturbance that could be characterized as less than "extreme" (see § 190.3, factor (d)) could still be considered mitigating under section 190.3, factor (k) (which the jury was told was factor "(j)"; see fn. 28, *ante*). Factor (k) provides that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

Counsel discussed the fact of defendant's mental problems at length during her closing argument and, although she did not specifically refer to section 190.3, factor (k), we assume the jury followed the instructions permitting it to consider defendant's mental problems under factor (k). (See *People v. Williams*, *supra*, 16 Cal.4th at p. 256.) In any event, it does not appear reasonably probable the result of the penalty phase would have been different had defense counsel, during her discussion of defendant's mental problems, referenced factor (k) specifically in addition to arguing such evidence was mitigating under section 190.3, factors (d) and (h).

Weaver, 26 Cal. 4th at 987-88.

*Jury Was Misled into Believing It Must Be Unanimous Before It Could Consider a Mitigating Factor*

Defendant argues the interplay between the sanity phase instruction that "[i]n order to reach *a finding* all twelve jurors must agree to the decision" (italics added), the nearly identical penalty phase instruction requiring unanimity for a penalty verdict, and the penalty phase instruction that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed," led the jury reasonably to believe that no juror could consider a mitigating circumstance unless all 12 jurors agreed the factor was established by the evidence. We disagree, finding it was not reasonably likely the jury understood the instructions in this manner.

"It is settled that a requirement of unanimity improperly limits consideration of mitigating evidence. (*McKoy v. North Carolina* (1990) 494 U.S. 433 [108 L.Ed.2d 369, 110 S.Ct. 1227].)" (*People v. Breaux* (1991) 1 Cal.4th 281, 314 [3 Cal.Rptr.2d 81, 821 P.2d 585], italics omitted; see also *Mills v. Maryland* (1988) 486 U.S. 367 [108 S.Ct. 1860, 100 L.Ed.2d 384].) As in *Breaux*, however, "there is no indication that the jury was misled in any respect. There was nothing in the instructions to limit the consideration of mitigating evidence and nothing to suggest that any particular number of jurors was required to find a mitigating circumstance. The only requirement of unanimity was for the verdict itself." (*People v. Breaux*, *supra*, at p. 315; see also *People v. Coddington*, *supra*, 23 Cal.4th at p. 641 ["CALJIC No. 8.84.2 ... was not misleading" on this point].) We note the jury was specifically instructed that each juror must decide the question

of penalty individually: "Both the People and the defendant are entitled to the individual opinion of each juror."

We conclude it is not reasonably likely the instructions misled the jury into believing it must find the existence of mitigating factors unanimously before such factors could be considered. We also conclude counsel was not ineffective for failing to object to the penalty phase instructions on this ground.

Weaver, 26 Cal. 4th at 988–89.

## Constitutional Challenges to the Death Penalty Law

Defendant next raises several arguments that the state's death penalty law is unconstitutional under the state and federal Constitutions. As outlined below, we have addressed and rejected these claims in previous opinions, and defendant does not convince us we should revisit those decisions. Thus, defendant claims various of his constitutional rights were violated because the death penalty law, and the jury instructions implementing that law:

Permitted the jury to hear the underlying facts of a prior felony conviction (his conviction for the 1976 assault of Bonnie Brown) admitted as aggravating evidence. (*People v. Ray*, *supra*, 13 Cal.4th at p. 350; *People v. Stanley*, *supra*, 10 Cal.4th at pp. 818-819.)

Failed to inform the jury that the state bears the burden of persuasion at the penalty phase. (*People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Jackson*, *supra*, 13 Cal.4th at p. 1239.)

Failed to inform the jury it must unanimously find an aggravating factor exists before that factor may be considered. (*People v. Kipp*, *supra*, 18 Cal.4th at p. 381.)

Failed to inform the jury it must find aggravating circumstances outweigh mitigating circumstances and that death is an appropriate penalty beyond a reasonable doubt. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Counsel was not ineffective for failing to request a reasonable doubt instruction at the penalty phase.

Failed to impose on the jury a standard of proof for the penalty phase. *People v. Carpenter* (1997) 15 Cal.4th 312, 417-418 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Counsel was not ineffective for failing to request that the jury be instructed on some standard of proof at the penalty phase.

Failed to require the jury provide written findings. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at pp. 276-277.) Counsel was not ineffective for failing to request that the jury be required to return written findings at the penalty phase.

Failed to provide for intercase proportionality review. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at pp. 278-279.)

Prohibited consideration of mental or emotional disturbances as a mitigating factor unless such disturbances are "extreme." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at pp. 276-277.)

Failed to define the term "extreme" as used in section 190.3, factor (d). (*People v. Arias*, *supra*, 13 Cal.4th at pp. 188-189.)

Failed to clarify that "extreme mental disturbance" as used in section 190.3, factor (d) can be a mitigating circumstance only. (*People v. Ray*, *supra*, 13 Cal.4th at p. 359.)

Granted prosecutors "unbounded" discretion in deciding when to seek the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at p. 278.)

Failed adequately to narrow eligibility for the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Permitted the jury's consideration of nonstatutory aggravating circumstances. (*People v. Earp*, *supra*, 20 Cal.4th at p. 899; *People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Counsel was not ineffective for failing to object to the jury instructions on this ground.

Permitted the jury to believe the absence of mental or emotional disturbance could be an aggravating factor. (*People v. Coddington*, *supra*, 23 Cal.4th at pp. 638-639; *People v. Scott*, *supra*, 15 Cal.4th at p. 1220 ["Although the absence of mitigation is not itself aggravating, the prosecutor may argue the evidence of mental state does not in fact mitigate"].)

Permitted the jury generally to believe that the absence of a mitigating factor could be an aggravating factor. (*People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]; see *People v. Coddington*, *supra*, 23 Cal.4th at p. 639 ["the court is not required to instruct that the absence of a mitigating factor is not itself aggravating"].) Counsel was not ineffective for failing to object to the jury instructions on this ground.

Permitted the jury to believe defendant's future dangerousness could be an aggravating factor. (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1242; *People v. Ray*, *supra*, 13 Cal.4th at p. 353.)

Prevented the jury from considering all relevant mitigating evidence because of the use of limiting modifiers such as "extreme" and "substantial."[29] (*People v. Box*, *supra*, 23 Cal.4th at p. 1217; *People v. Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

-------------------------FOOTNOTE-------------------

n.29  For example, section 190.3, factor (g) asks "[w]hether or not the defendant acted under *extreme* duress or under the *substantial* domination of another person." (Italics added.)

-------------------END  FOOTNOTE-------------------

Weaver, 26 Cal. 4th at 991–93.

### (ii)     Claim 21

The Claim was presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 78-83), and summarily denied on the merits, and in part on procedural grounds (Lod. Doc. 24).

### (iii)    Claim 22

The Claim was presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 84-87), and summarily denied on the merits (Lod. Doc. 24).

### b.      Legal Standard

### (i)     Trial Court Error

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

### (ii)    Instructional Error

To obtain federal habeas relief for instructional errors, a petitioner must show that the instructions given the jury so infected the entire trial that the resulting conviction violates due process. McGuire, 502 U.S. at 72 (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. Spivey v. Rocha, 194 F.3d 971, 976 (1999). "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. Boyde v. California, 494 U.S. 370, 380 (1990). Additionally, a reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." Johnson v. Texas, 509 U.S. 350, 368 (1993). Lastly, federal courts presume that juries follow instructions, including cautionary instructions. Weeks, 528 U.S. at 234; see also Boyde, 494 U.S. at 381-85; Tan v. Runnels, 413 F.3d 1101, 1115 (2005).

Any error in the state court's determination of whether state law supported an instruction in the case cannot form the basis for federal habeas relief. See McGuire, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

In determining whether a petitioner pursuant to § 2254 suffered prejudice from an instructional error, a federal court must determine whether such petitioner suffered actual prejudice by assessing whether, in light of the record as a whole, the error had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 62 (2008); see also Brecht, 507 U.S. at 637-38. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. Clark v. Brown, 450 F.3d 898, 916 (9th Cir. 2006).

The harmless error analysis applies to instructional errors as long as the error at issue does not categorically vitiate all the jury's findings. Pulido, 555 U.S. at 61 (citing Neder, 527 U.S. at 11) (quoting Sullivan v. Louisiana, 508 U.S. 275 (1993)) (concerning erroneous reasonable doubt instructions as constituting structural error). In Hedgpeth, the Court cited its previous decisions that various forms of instructional error were trial errors subject to harmless error analysis, including errors of omitting or misstating an element of the offense or erroneously shifting the burden as to an element. 555 U.S. at 60–61.

### c. Analysis

### (i) Guilt Phase

### (A) Instructional Error

Petitioner argues the following instructions to the jury provided insufficient guidance as to the prosecution's burden of proving the essential elements of the charged offenses beyond a reasonable doubt (see ECF No. 107 at 351-58):

CALJIC 2.90 [Presumption of Innocence-Reasonable Doubt-Burden of Proof]

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

(RT 4446-47; see also CT 1388.)

CALJIC 2.02 [Sufficiency of Circumstantial Evidence to Prove Specific Intent][15]

The [specific intent] [or] [mental state] with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offense charged [in Count(s) 1 and 2], unless the proved circumstances not only are consistent with the theory that he had the required [specific intent] [or] [mental state] but cannot be reconciled with any other rational conclusion.

Also, if the evidence as to any such specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of a specific intent or mental state and the other to the absence of the specific intent or mental state, it is ~~your duty~~ fair to adopt that interpretation which points to the absence of the specific intent or mental state. If, on the other hand, one interpretation of the evidence as to such [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.

(RT 4447-48, cf. CT 1391.)

CALJIC 2.01 [Sufficiency of Circumstantial Evidence-Generally]

[E]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.

(RT 4440; CT 1371)

CALJIC 8.83.1 [Special Circumstances-Sufficiency of Circumstantial Evidence to Prove Required Intent]

[I]f the evidence as to the required intent is susceptible of two reasonable interpretations, one of which points to the existence thereof and the other to the

---

[15] The trial court, when orally instructing the jury, omitted the strikeout language and added the underlined language.

absence thereof, you must adopt that interpretation which points to its absence. If, on the other hand, one interpretation of the evidence as to the required intent appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.

(RT 4465; CT 1441-1442)

CALJIC 2.22 [Weighing Conflicting Testimony]

You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force. This does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convicting force of the evidence.

(RT 4442-43; CT 1378.)

However, the state supreme court reasonably could reject these allegations of instructional error. Due process requires that the government prove every element of a charged offense beyond a reasonable doubt. Victor v. Nebraska, 511 U.S. 1, 5 (1994) (citing In re Winship, 397 U.S. 358 (1970)). "The Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Id. (citing Hopt v. People, 120 U.S. 430, 440-41 (1887)). A court must instruct the jury "on the necessity that the defendant's guilt be proven beyond a reasonable doubt," but "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Jackson v. Virginia, 443 U.S. 307, 320, n.14 (1979). CALJIC 2.90, instructing on proof beyond a reasonable doubt of the essential elements of the charged offenses, has been upheld by the Supreme Court. Drayden v. White, 232 F.3d 704, 715 (9th Cir. 2000); see also Victor, 511 U.S. at 5 (no particular words to inform the jury of the burden of proof beyond a reasonable doubt).

The state supreme court reasonably could find Petitioner failed to demonstrate clearly established federal law that CALJIC 2.90 was constitutionally deficient, or rendered so by the noted instructions on circumstantial evidence, considered in their entirety. See Holland v. U.S.,

120

1   348 U.S. 121, 140 (1954) (circumstantial evidence is no different from testimonial evidence – if

2   the jury is convinced beyond a reasonable doubt, no more is required); see also Claims 26, 31,

3   33, herein; see Victor, 511 U.S. at 5 (taken as a whole, the instructions must correctly convey the

4   concept of reasonable doubt to the jury).

5          (B)    Harmless Error

6           Petitioner argues these instructional errors rendered the instructions unconstitutionally

7   vague.  He argues these errors individually and cumulatively lessened the prosecution's burden

8   of proving beyond a reasonable doubt the specific intent and mental state required for its theories

9   of first-degree premeditated murder and felony murder, from mandatory to discretionary.  (ECF

10  No. 107 at 353-54, citing RT 4483-85; see also ECF No. 210 at 206-10, citing People v. Bloyd,

11  43 Cal. 3d 333, 377-78 (1987) (court not obligated to give CALJIC 2.02 where CALJIC 2.01 is

12  given).

13         However, as noted, a petitioner can only obtain federal habeas relief if the

14  unconstitutional instructions had a substantial influence on the conviction that resulted in actual

15  prejudice under Brecht.  Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  "[T]he proper

16  inquiry is not whether the instruction "could have" been applied in an unconstitutional manner,

17  but whether there is a reasonable likelihood that the jury did so apply it."  McGuire, 502 U.S.

18  62, 72, and n.4.

19         Here, the state supreme court, on the facts and circumstances before it, reasonably could

20  find the alleged instructional error to be harmless under Brecht.  That court could find no

21  reasonable likelihood that the jury understood the instructions, taken in their entirety, to allow

22  conviction based on proof insufficient to meet the Winship standard.  Petitioner's suggestion that

23  the noted instruction on consideration of circumstantial evidence rendered ambiguous and

24  lessened the prosecution's burden of proof beyond a reasonable doubt, reasonably could be seen

25  as no more than an exercise in semantic supposition.  See Holland, 348 U.S. at 140

26  (circumstantial evidence is no different from testimonial evidence – if the jury is convinced

27  beyond a reasonable doubt, no more is required).  Petitioner fails to persuade that a reasonable

28  juror would understand  CALJIC 2.01, 2.02, and 8.83.1, to alter the CALJIC 2.90 standard.  See

1  Boyde, 494 U.S. at 380–81 (jurors do not parse instructions for subtle shades of meaning, but

2  rather deliberate with a commonsense understanding of the instructions in the light of all that has

3  taken place at the trial).  Moreover, the state supreme court reasonably could find Petitioner

4  failed to demonstrate clearly established federal law that instructing the jury with CALJIC 2.01,

5  2.02 and 8.83.1 was constitutional error.

6      The fact the trial court misread CALJIC 2.02 when instructing the jury orally is not alone

7  a basis to find error as alleged.  (See Claims 7, 20; see also CT 1365, 1615 (the error was

8  corrected in the written version of instructions provided to the jury room).)  Any error of only

9  state law is not a basis for federal habeas relief.  McGuire, 502 U.S. at 71-72.

10     Additionally, the state supreme court reasonably could find the guilt phase record not

11 suggestive of multiple reasonable interpretations of evidence relating to Petitioner's specific

12 intent or mental state, for the reasons stated.  (See Claims 7, 23, 25, herein.)

13     (ii).    Sanity Phase

14     (A)    Instructional Error

15     Petitioner argues the jury was inadequately instructed on the law and the evidence it was

16 to consider in its sanity determination.  (ECF No. 107 at 325-30.)

17     First, Petitioner argues the trial court erred by agreeing to counsel's request to instruct the

18 jury that guilt phase evidence not be considered at the sanity phase.  (ECF No. 107 at 346; see

19 also RT 6774-78; CT 1593.)  He observes state law mandating consideration of evidence

20 presented in a prior phase of trial.  (See Penal Code 190.4(d).)

21     The state supreme court agreed there was state law statutory error, but reasonably found

22 the error harmless under the facts and circumstances of the case.  (See Claim 8, 23, 24.)  That

23 court could find Counsel was motivated by reasonable trial tactics given the inconsistent guilt

24 phase and penalty phases defenses, the graphic, violent and sociopathic nature of the guilt phase

25 evidence, and the sanity phase expert testimony which touched upon aspects of Petitioner's

26 psychosocial history raised during the guilt phase, as a basis for the expert opinion.  See Weaver,

27 26 Cal. 4 th at 968–71.)  Relatedly, as this Court previously observed, Petitioner's statements and

28 testimony that he lacked the intent to kill when he planned to knock out Radford and kidnap and

1  rape Levoy (see RT 4371-76, 4381-85, 4388, 4392, 4397, 4499-4503), differed considerably

2  from the sanity phase defense theory that Petitioner suffered lifelong, progressively worsening

3  mental illness which prevented him from conforming his conduct to legal requirements.   (ECF

4  No. 209 at 62; see also  RT 4500-07.)  Also, the guilt phase included particularly harmful

5  testimony by Petitioner's sister Katie, that he physically and sexually abused her as a child.  (See

6  RT 4612-68, 5296-5315; see also Lod. Doc. No. 7 at 184-85.)

7      Next, Petitioner argues the trial court erred by acceding to the prosecutor's request to

8  modify the insanity defense instructions with a special pinpoint instruction regarding only

9  criminal or antisocial conduct.   The record reflects the jury was instructed on the defense of

10  insanity, including that "A person is legally insane if, as a result of mental disease or mental

11  defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to

12  conform his conduct to the requirements of law."  (CT 1603, CALJIC 4.00 (1978 Revision)  The

13  jury also was given the special pinpoint instruction that "[t]he terms mental disease or mental

14  defect do not include an abnormality manifested only by repeated criminal or otherwise

15  antisocial conduct." (CT 1608; see also ECF No. 107 at 326.)

16      Petitioner argues the special pinpoint instruction was confusing and misleading,

17  unwarranted on the facts of his case, and in inaccurate statement of the law as applied to his case.

18  (ECF No. 107 at 327.)  He argues the special instruction errantly failed to inform the jury that "if

19  that illness manifests itself in some other way as well, then it can be considered as a mental

20  disease . . . and instances of criminal or antisocial conduct can be ascribed to that disease or cited

21  as evidence of its severity."  (ECF No. 107 at 326; see also id. at 327 citing People v. Fields, 35

22  Cal. 3d. 329, 369 (1983).)  He argues that the Fields discussion of insanity in the context of

23  commission of continuous criminal conduct was not meant to eliminate the insanity defense for

24  persons with "legitimate major mental illnesses."  (ECF No. 107 at 327-28.)

25      But the state supreme court reasonably could find Petitioner has not demonstrated the

26  special pinpoint instruction was constitutional error.  As that court observed, a reasonable juror

27  would view the special instruction as implying that where, as here, evidence of more than

28  criminal conduct is present, such evidence could be considered proof of mental disease or defect.

See Weaver, 26 Cal.4th at 968.  This Court, in its prior order denying Claims 8 and 9, found the state supreme court reasonable in this regard, observing the commonly used terms and the noted significant evidence of Petitioner's mental illness and impairments that manifested in conduct other than criminal or antisocial.  (See ECF No. 209 at 62-65; see also Claims 3 and 4, herein.)

### (B)   Harmless Error

Petitioner argues these instructional errors had a substantial and injurious influence or effect on the sanity phase verdict.  (See e.g., CT 1577-1580.)  He argues the exclusion of guilt phase evidence, and the modified special instruction defining mental disease or defect, kept the jury from considering facts of unconsciousness and diminished capacity (see ECF No. 107 at 346), and of his non-criminal behavior and conduct, in determining whether he suffered from a mental illness or defect that would have rendered him insane at the time the crimes were committed (ECF No. 107 at 326-29).

However, a petitioner can only obtain federal habeas relief if the unconstitutional instructions had a substantial influence on the conviction that resulted in actual prejudice under Brecht.  See Hanna, 87 F.3d at 1039.  Here, the sanity phase jury was properly instructed that Petitioner had the burden of proving by a preponderance of the evidence that he was legally insane at the time of the crime, even where the record might suggest his periods of lucidity.  (CT 1606.)

Additionally, this Court previously found Petitioner did not demonstrate prejudice arising from Counsel's failure to seek clarification regarding the special instruction defining mental disease or defect.  The Court found the instruction not to be misleading, and that clarification was not reasonably required.  (ECF No. 209 at 64.)  The Court then observed the sanity phase included significant testimony of matters underlying the guilt phase defense, including that Petitioner suffered the effects of amphetamine use and sleep deprivation, heard voices, and dissociated while he strangled Levoy.  (See ECF No. 209 at 61-65; see also ECF No. 107 at 139.)

### (iii)   Penalty Phase

### (A)   Instructional Error

Petitioner argues the jury was inadequately instructed on the law and the evidence it was

1    to consider in its sentencing determination.  (ECF No. 107 at 330-51.)  He argues the instruction

2    on the Penal Code section 190.3 weighing factors was inadequate, that the trial court erred by

3    failing to provide the jurors with guidance in the event they found the aggravating and mitigating

4    evidence to be in equipoise.  (ECF No. 107 at 335; ECF No. 210 at 194-95 citing CT 1651-52,

5    1677-78.)

6          Petitioner also argues the trial court's instruction on the scope of the jury's sentencing

7    discretion was inadequate.  He argues he trial court's instruction, with language disapproved and

8    modified in People v. Brown, 40 Cal. 3d 512, 538-41 (1985), judgment reversed by California v.

9    Brown, 479 U.S. 538 (1987), that the jury "shall" impose a sentence of death if aggravating

10   circumstances outweighed mitigating circumstances, misled the jury about the scope of its

11   sentencing discretion by suggesting it cannot give full effect to the mitigating evidence presented

12   at trial.  (ECF No. 210 at 195.)   He argues the error denied him due process in the event the jury

13   voted for a sentence of death where the aggravation did not outweigh the mitigation.  (ECF No.

14   107 at 335 citing to then applicable CALJIC 8.84.2.)

15         Particularly, he argues the instruction "failed to inform the jury that California's statutory

16   scheme does not require any juror to vote for the death penalty unless, as a result of the weighing

17   process, the juror personally determines that death is the appropriate penalty under all the

18   circumstances."  (ECF No. 107 at 336.)  He argues the instruction "permitted the prosecutor to

19   unconstitutionally argue that individual jurors should employ a mechanistic counting of factors

20   that required a vote for death if the aggravating circumstances outweighed the mitigating

21   circumstances regardless of the juror's personal assessment of the appropriateness of the

22   penalty."  (ECF No. 107 at 336; see also ECF No. 210 at 195-96 citing RT 7026; Mills v.

23   Maryland, 486 U.S. 367, 374-76 (1988).)  He argues the instruction permitted the prosecutor to

24   "undermine[] petitioner's right to have the jury consider any other circumstance that extenuated

25   the gravity of the offense even though not a legal "excuse" for the crime as allowed for by then

26   applicable CALJIC No.8.84.1 (k)."  (ECF No. 107 at 337.)

27         However, the state supreme court reasonably could reject these allegations.  The record

28   reflects the jury was instructed on the CALJIC 8.84.1 (Penal Code section 190.3) sentencing

1  factors (see CT 1651-1652); consideration of the sentencing factors (CT 1677);  the necessity of

2  proof beyond a reasonable doubt as to facts supporting aggravating criminal activity and prior

3  felony convictions (CT 1651-1655); consideration of sympathy or pity for the defendant (CT

4  1644);  and consideration of the penalty phase instructions in their entirety (CT 1645).

5        Particularly, the jury was instructed pursuant to CALJIC 8.84.2 "[i]f you conclude that

6  the aggravating circumstances outweigh the mitigating circumstances, you shall impose a

7  sentence of death.  However, if you determine that the mitigating circumstances outweigh the

8  aggravating circumstances, you shall impose a sentence of confinement in the state prison for life

9  without the possibility of parole."  (CT 1677.)  The United States Supreme Court has found the

10  "shall impose" language of CALJIC 8.84.2 does not unconstitutionally prevent an individualized

11  sentencing assessment.  Boyde, 494 U.S. at 377.  Moreover, the instructions otherwise,

12  considered in their entirety were constitutionally sufficient, for the reasons stated.  (See Claims

13  9,  26, 31, 33, herein; ECF No. 209 at 77-78.)  Notably, Petitioner concedes the jury was

14  instructed with catchall instruction CALJIC 8.84.1(j), [regarding Penal Code section 190.3(k)].

15  (ECF No. 107 at 341-43, incorporating [previously denied] Claim 9.)

16        Petitioner argues the trial court erred by failing to specifically define "assault," for

17  purposes of aggravating factor (b) prior criminal activity, assault with a deadly weapon.  He

18  argues the instruction read the elements of assault with a deadly weapon or by means of force

19  likely to produce great bodily injury, but failed to define assault for the jury, leaving the jurors

20  without guidance of what is necessary to a proper consideration of the evidence.  (ECF No. 107

21  at 337.)  However, as noted by the supreme court in its direct appeal order, the allegation fails

22  given a common sense reading of the instructions upon the facts and circumstances of this case.

23  (See Weaver, 26 Cal. 4th at 987.)  Notably, the jury was instructed on assault with a deadly

24  weapon or by means of force likely to produce great bodily injury, including elements of assault

25  and use of a deadly weapon (CT 1656-1657), and battery (CT 1664-1666).

26        Petitioner argues the trial court erred by failing to clarify that sanity phase instruction

27  CALJIC 4.00 (that a person is legally insane "if, as a result of mental disease or defect, he lacks

28  substantial capacity either to appreciate the criminality of his conduct or to conform his conduct

to the requirements of the law") did not apply to penalty phase consideration of mitigation under: CALJIC 8.84.1(d) [Penal Code section 190.3 (d)] ("[w]hether or not the offense was committed while the defendant as under the influence of extreme mental or emotional disturbance[,]) and CALJIC 8.84.1(h) [Penal Code section 190.3(h)] ("[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication."). (See ECF No. 107 at 332-41.)

However, the state supreme court could find no reasonable likelihood the jury misunderstood these "readily apparent" differing standards. See Weaver, 26 Cal. 4th at 980-84; Boyde, (1990) 494 U.S. at 380-381 ("We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."); (see also Claims 9, 26, 31, 33, herein). Although the jury was instructed at the penalty phase to consider "all other instructions previously read to you which you find to be applicable to this part of the trial[,]" (CT 1644), the jury was specifically instructed with the Penal Code section 190.3 sentencing factors including the noted subfactors (d) and (h), as well as the catchall subfactor (k) [modified by the trial court to be read as subfactor (j)] ("[a]ny other circumstances which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less then death].") (See CT 1651-1652.) To the extent Petitioner supports alleged instructional error by pointing to the argument of Counsel at the penalty phase, the jury was instructed such argument was not evidence. (See CT 1646.)

Petitioner argues the instructions otherwise were constitutionally infirm and resulted in an unreliable verdict on other grounds that have been consistently rejected by the state supreme court. (ECF No. 107 at 337-43.) He argues the jurors should have been instructed that: aggravating factors be found unanimously and beyond a reasonable doubt; aggravating factors must outweigh mitigating factors beyond a reasonable doubt; and death be found the appropriate penalty beyond a reasonable doubt. (Id., incorporating the allegations of Claim 33, arguing

1  ambiguity in CALJIC 8.84.2 [CT 1677] (that "[i]n order to make a determination as to the

2  penalty, all twelve jurors must agree"); see also ECF No. 210 at 197-98.)

3      Petitioner argues the jurors should have been required to make written findings on

4  aggravating and mitigating factors. (ECF No. 107 at 341; ECF No. 210 at 197-98.) He argues

5  that he was denied equal protection, an individualized sentence, and meaningful sentence

6  review, to the extent written findings are required in non-capital cases. (Id., citing to Penal Code

7  § 1170(c); Myers v. Ylst, 897 F.2d 417, 421 (9th Cir. 1990); Ring v. Arizona, 536 U.S. 584, 605-

8  606 (2002). He argues the trial court erred by instructing the jury that "[it] could only consider

9  evidence of petitioner's mental or emotional disturbance at the time of the offenses as mitigating

10 if it was "extreme" or "substantial." (ECF No. 107 at 341, citing CALJIC 8.84.1(d).)

11     Petitioner argues the instructions impermissibly allowed the jury to consider nonstatutory

12 aggravating evidence of Petitioner's character, personality, mental state evidence, and in-prison

13 therapy. (ECF No. 107 at 344-45 citing CALJIC 8.84.1 [which provides that "[I]n determining

14 which penalty is to be imposed on defendant, you shall consider all of the evidence which has

15 been received during any part of the trial of this case. You shall consider, take into account and

16 be guided by the following factors, if relevant . . . ."]; see also ECF No. 107 at 344-45.) He

17 argues CALJIC 8.84.1 impermissibly suggested that the absence of mitigation evidence under

18 Penal Code section 190.3 factors (b)(d) and (h) could be treated as aggravating evidence. (ECF

19 No. 107 at 349-50.)

20     However, the California Supreme Court reasonably could reject these allegations.

21 Petitioner failed to proffer clearly established federal authority supporting his position. (See

22 Claims 9, 26, 31, 33, herein); see also Williams v. Calderon, 52 F. 3d 1465, 1484-85 (9th Cir.

23 1995) (California's death penalty statute "ensures meaningful appellate review, and need not

24 require written jury findings in order to be constitutional"); Harris v. Pulley, 692 F.2d 1189,

25 1195-96 (1982), judgment reversed by Pulley v. Harris, 465 U.S. 37, 53-54 (1984) (upholding

26 California's death penalty process).

27     Finally, Petitioner argues the trial court erred by instructing the jury, at the sanity phase

28 and by implication at the penalty phase, that it was precluded from "considering the truth of

Petitioner's statements on the Vietnam Era Stress Inventory (VESI) videotape during penalty phase deliberations." (ECF No. 107 at 348-49 citing CALJIC 2.10 [that Petitioner's statements to medical experts could be considered only for the limited purpose of showing the information upon which the medical experts based their opinion and not as evidence of the truth of the facts disclosed by defendant's statements]; see CT 1591, 1614; see also ECF No. 210 at 199-204.) He argues the California Supreme Court erred as well, misinterpreting the Eighth Amendment by finding on direct appeal that state evidentiary (hearsay) rules prevented consideration of Petitioner's VESI statements as substantive evidence in mitigation. (ECF No. 210 at 202 citing Weaver, 26 Cal. 4th at 980; Green v. Georgia, 442 U.S. 95 (1979)) (the hearsay rule may not be applied mechanistically to defeat the ends of justice); McKinney v. Ryan, 813 F.3d 798, 819 (9th Cir. 2015) (en banc) (rejecting Arizona's "causal nexus" restriction on mitigating evidence); see also Hedlund v. Ryan, 854 F.3d 557, 583-87 (9th Cir. 2017) (sentencer in a death penalty proceeding to fully consider all the mitigating evidence presented in the weighing process).

However, the state supreme court reasonably could find the VESI tape evidence was not admissible as substantive evidence, for the reasons stated by that court. See Weaver, 26 Cal. 4th at 979-82. Moreover, state court rulings on admissibility of evidence are not a basis for federal habeas relief unless Petitioner was denied a fundamentally fair trial. McGuire, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."); Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (same). The Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability - even if the defendant would prefer to see that evidence admitted." Crane v. Kentucky, 476 U.S. 683, 690 (1986). Particularly, the state supreme court reasonably could find, contrary to Petitioner's argument, that the VESI statements were not the kind of "highly reliable and relevant" extrinsic evidence admitted in Green. 442 U.S. at 97. For instance, Petitioner's statements were made by him in preparation of his insanity defense, whereas in Green the statements were made by and against the penal interests of a co-perpetrator and otherwise corroborated.

(B)   Harmless Error

Petitioner argues the alleged penalty phase instructional errors had a substantial and injurious influence or effect on the penalty verdict. (ECF No. 107 at 351.) He suggests the state supreme court applied the wrong standard, considered whether the allegedly deficient instructions created "prejudicial confusion," when it should have considered whether there was a "reasonable likelihood" that the jury applied the instruction to restrict the full use of the mitigating evidence. (ECF No. 210 at 196 citing Weaver, 26 Cal. 4th at 985; People v. Avena, 13 Cal. 4th 394, 440-41 (1996).) However, the state supreme court's reference to the possibility the allegedly errant instruction resulted in "prejudicial confusion" was in the context of that court's express application of the noted Boyde standard for instructional error. See Weaver, 26 Cal. 4th at 984–87; see also Brecht, 507 U.S. at 637-38 (a "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given); Clark, 450 F.3d at 916 (same).

Petitioner argues the above alleged errors were prejudicial at the penalty phase because the jury considered non-statutory aggravating evidence and was prevented from giving mitigating effect to evidence of his mental impairments. (ECF No. 107 at 330-33.) Particularly, he argues jurors were left "without guidance in a case in which one or more of the jurors might have believed that the evidence in aggravation was counterbalanced by the evidence about Petitioner's long history of mental illness." (ECF No. 107 at 335.) Relatedly, he points to the trial court's failure to specifically instruct the jury which, if any guilt and sanity phase instructions applied at the penalty phase.[16] (Id.) He points to the prosecutor's argument that "the consideration and role of Petitioner's mental state evidence during the penalty phase was simply a sanity phase re-run." (ECF No. 107 at 334 citing RT 7016, 7022-7023.) He points to the prosecutor's argument that "the substantial aggravating evidence introduced in the trial compelled a death sentence" and that "you as jurors have taken an oath to follow the law." (Id. at 197 citing RT 7026.)

---

[16] As noted, the trial court instructed the penalty phase jury that "all other instructions previously read to you [the jurors] which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed." (ECF No. 107 at 331; see also RT 7040; CT 1644.)

1   However, here again the state supreme court could find no reasonable possibility the jury
2   was misled about its sentencing responsibility and discretion under Boyde.  See Brecht, 507 U.S.
3   at 637-38 (a "substantial and injurious effect" means a "reasonable probability" that the jury
4   would have arrived at a different verdict had the instruction been given).  Although the jury was
5   instructed at the penalty phase to consider "all other instructions previously read to you which
6   you find to be applicable to this part of the trial[,]" (CT 1644) it also was specifically instructed
7   with the Penal Code section 190.3 sentencing factors including the noted subfactors (d) and (h),
8   as well as the noted catchall subfactor (k) [modified by the trial court to be read as subfactor (j)]
9   (see CT 1651-1652).  To the extent Petitioner relies upon the argument of Counsel at the penalty
10  phase, the jury was instructed such argument was not evidence.  (See CT 1646.)

11  Petitioner further argues the noted lack of explicit findings on aggravating and mitigating
12  factors precludes meaningful appellate and post-conviction review and represents a structural
13  defect that renders the capital sentence invalid.  (ECF No. 210 at 198.)

14  But as noted, the Supreme Court has upheld California's death penalty process.  (See
15  Harris, 465 U.S. at 53-54; see also Claims 23, 26, 31, 33.)  Also, Petitioner does not point to
16  facts in the record that the jury improperly considered evidence in aggravating or failed to
17  consider evidence in mitigation.

18  ### d.   Conclusions

19  A fair-minded jurist could find the state supreme court's denial of Claims 20, 21, and 22
20  as alleged trial court error was not contrary to, or an unreasonable application of, clearly
21  established federal law, as determined by the Supreme Court, or based on an unreasonable
22  determination of the facts in light of the evidence presented in the state court proceeding.  28
23  U.S.C. § 2254(d).

24  Claims 20, 21 and 22 as alleged trial court error shall be denied.

25  ### 7.   Claim 16

26  Petitioner alleges that the trial court erred by refusing to excuse jurors "for cause" during
27  voir dire, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[17]

28

---

[17] Petitioner states that he incorporates the factual basis of Claims 1, 2, 6, and 15.  (ECF No. 107 at 297.)

(ECF No. 107 at 296-300.)

a.   State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 94-110), and denied on the merits and in-part on procedural grounds, as follows:

During voir dire, two venirepersons questioned by defense counsel expressed the general belief that the death penalty was the appropriate penalty for all murders. Defendant challenged the prospective jurors for cause. In each instance, the prosecutor questioned the prospective juror and rehabilitated him somewhat. The trial court denied defendant's challenges for cause, leading defendant to excuse each venireperson by exercising a peremptory challenge. Defendant now contends the trial court's failure to excuse the two prospective jurors for cause violated his rights under the state and federal Constitutions. We disagree.

The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120-121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "[A] juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*Id.* at p. 121, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) If the death penalty is imposed by a jury containing even one juror who would vote automatically for the death penalty without considering the mitigating evidence, "the State is disentitled to execute the sentence." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729 [112 S.Ct. 2222, 2230, 119 L.Ed.2d 492].)

Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." (*Id.* at p. 1147.) A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. (*Ibid.*) "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Applying these rules to this case, we conclude the trial court did not abuse its discretion in denying defendant's two challenges for cause. At the threshold, we note that a defendant challenging on appeal the denial of a challenge for cause must fulfill a trio of procedural requirements: (1) the defense must exercise a peremptory challenge to remove the juror in question; (2) the defense must exhaust all available peremptory challenges; and (3) the defense must express dissatisfaction with the jury as finally constituted. (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 121.) In this case, defense counsel moved to excuse Prospective

Jurors B.M. and F.M. for cause, each challenge was denied, and counsel exercised a peremptory challenge to remove each juror. Counsel subsequently exhausted the 26 peremptory challenges then granted by statute. (Pen. Code, former § 1070, subd. (a), repealed by Stats. 1988, ch. 1245, § 30, p. 4155; see now Code Civ. Proc., § 231, subd. (a), added by Stats. 1988, ch. 1245, § 2, p. 4152 [granting each side 20 peremptory challenges in a capital case].)

Defense counsel failed, however, to express on the record his dissatisfaction with the jury. Defendant concedes as much. Accordingly, the issue was not preserved for appeal, as it is possible that counsel, despite initial misgivings, was ultimately satisfied with the overall composition of the jury. Also possible is that, had counsel expressed dissatisfaction, the trial court would have allowed him to exercise additional peremptory challenges. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].)

Although a procedural obstacle thus exists to reaching this issue on appeal, we do not, for several reasons, rest our decision solely on this procedural lacuna. First, language in past cases suggested that counsel's expression of dissatisfaction with the jury was not always a necessary prerequisite to challenging on appeal a trial court's decision denying a challenge for cause. (E.g., *People v. Crittenden*, *supra*, 9 Cal.4th at p. 121, fn. 4.) Second, defendant argues it is "inconceivable" that counsel was satisfied with the jury, as it contained one juror with strong ties to the law enforcement community who stated on voir dire that he believed the death penalty was warranted for any premeditated murder. Third, because the presence of even a single juror compromising the impartiality of the jury requires reversal, counsel would be constitutionally ineffective if he had failed to voice dissatisfaction with the jury as constituted, all the while knowing a biased juror was sitting among the 12 seated jurors. We thus turn to the merits.

a. *Juror B.M.*

Juror B.M., a refinery worker, professed knowing almost nothing about the case. He informed the court that he could impose either the death penalty or a life sentence without the possibility of parole, depending on all the evidence he heard. But when defense counsel Donnalee Huffman asked him his views concerning the death penalty, Mr. B.M. stated that, "as a taxpayer, I am personally in favor of it." He admitted he was more apt to impose a sentence of death over life imprisonment and, when asked whether there was "any other way that you could vote," he replied, "I don't believe so."

The prosecutor, Ronald Shumaker, then explained to the juror the penalty phase process, with the People presenting aggravating evidence and the defense presenting mitigating evidence. He further explained that the trial court would instruct the jury to weigh the two sides before coming to a decision on the appropriate penalty. The following then occurred:

"Q [Mr. Shumaker] Could you, if the Court instructs you in that regard, follow those instructions and make a decision on that kind of a standard?

"A [Juror B.M.] Yes, on that standard, yes.

"Q Even though you may feel that the life without parole is an expensive process, you could still render that decision if in fact you felt that the factors favoring [a life term] outweighed those favoring the death penalty?

"A Yes, I could."

133

This record indicates that although Juror B.M. initially expressed the view he would automatically vote for the death penalty, when informed of the penalty phase process he retracted that rigid position and professed a willingness and ability to follow the trial court's instructions to weigh all the evidence before coming to a penalty decision. The trial court obviously credited this latter testimony in denying the challenge for cause. Substantial evidence supports the trial court's factual determination. We thus find no abuse of discretion in the court's denial of the challenge to Juror B.M. for cause.

b. *Juror F.M.*

When questioned by the trial court, Juror F.M. affirmed his ability to vote for life imprisonment without the possibility of parole if, based on all the facts, it was the appropriate penalty. He could also vote for the death penalty. When questioned by co-counsel for the defense, Donnalee Huffman, however, Juror F.M. stated that "if a person's life is taken and he is found guilty, then he should be sentenced to death." When asked whether "every murder conviction should be given the death penalty," Juror F.M. replied, "Well, I think so, yes, murder conviction, yes." He admitted he was "death penalty prone" and that he believed the death penalty was the proper punishment "in almost every situation." He also stated, however, that he could consider sympathy and mercy and that to vote for a life sentence, he would look for mitigating factors such as medical and psychiatric testimony. He several times averred he would have to hear the evidence from the entire case before making up his mind.

Mr. Shumaker explained to the juror the penalty phase process, including the necessity of weighing the aggravating and mitigating evidence, and asked him whether, "[i]f the Court tells you that that's the law and the instruction you are to follow in this case, do you feel that you could do that?" He replied, "Yes, life without parole, yes." He also affirmed that he could judge both sides of the issue by "the same standard."

As with Juror B.M., the record indicates that although Juror F.M. initially asserted that he would automatically vote for the death penalty, he modified his view when informed by the prosecutor of the penalty phase process. He then affirmed his willingness and ability to follow the trial court's instructions to weigh all the evidence before coming to a penalty decision. We cannot say the trial court's decision to credit these statements was made in the absence of substantial evidence, or that its decision to deny the challenge for cause was an abuse of discretion.

In the alternative, defendant argues the trial court's erroneous denial of his two challenges for cause forced him to excuse Jurors B.M. and F.M. by exercising two of his peremptory challenges, thereby infringing on his federal constitutional right to a state-created liberty interest in his full statutory complement of peremptory challenges. He claims he should not be forced to surrender one constitutional right (his asserted state-created liberty interest in a full complement of peremptory challenges) to vindicate another constitutional right (his right to a jury free from biased jurors). We rejected this argument in *People v. Gordon* (1990) 50 Cal.3d 1223, 1248, footnote 4,4 [270 Cal.Rptr. 451, 792 P.2d 251],[4] and defendant does not convince us we should reconsider that decision.

-------------------FOOTNOTE-------------------

n.4 *People v. Gordon*, *supra*, 50 Cal.3d 1223, was overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].

--------------------END  FOOTNOTE--------------------

We conclude defendant failed to preserve this issue for appeal, and that even if the issue were properly before us, he does not demonstrate the trial court abused its wide discretion when it denied his challenge to Jurors B.M. and F.M. for cause. Moreover, because neither prospective juror actually sat on defendant's jury, he was not deprived of his constitutional right to an impartial jury. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 86 [108 S.Ct. 2273, 2277, 101 L.Ed.2d 80].)

Weaver, 26 Cal. 4th at 909–14.

   b.     Legal Standard

   (i)     Trial Court Error

   The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

   (ii)     Trial by a Fair and Impartial Jury

   The standard for trial by a fair and impartial jury is set out in section VII, B, 2, b, (ii), herein.

   c.     Analysis

   Petitioner argues the trial court erred by failing to excuse jurors who clearly expressed during voir dire they could not be fair and impartial in deciding whether to impose the death penalty, impairing and limiting defense exercise of peremptory challenges, and resulting in a jury predisposed to verdicts of guilt, death eligibility, sanity, and death.

   (i)     Proceedings at Voir Dire

   Petitioner faults the trial court for denying Counsel's "for cause" challenge of prospective juror Brian Morrell.  Petitioner argues Morrell's voir dire responses clearly favored the death penalty (RT 1912-13) and showed a clear inability to fully consider a mitigation defense (RT 1916), notwithstanding Morrell's subsequent responses that he could follow the trial court's instructions (RT 1914-15).

   Petitioner also faults the trial court for denying Counsel's "for cause" challenge of prospective juror Fred Moore.  Petitioner argues Moore's voir dire responses revealed an unequivocal predisposition towards the death penalty generally (RT 2229-31), and in this case to

1   the extent of what he then knew of the case (id.), notwithstanding subsequent responses that he

2   could consider sympathy or mercy and follow the court's instructions and weigh penalty phase

3   evidence and vote for either life without parole (hereinafter "LWOP"), or death, depending upon

4   the facts and overwhelming evidence in support (RT 2232-34).  Petitioner suggests Moore's voir

5   dire responses also clearly showed his personal belief that California would never execute

6   anyone, making it easier for him to vote for the death penalty.  (RT 2235.)

7        Petitioner observes Counsel had to remove by peremptory challenge both Moore (RT

8   2824) and Morrell (RT 2950), and that Counsel ultimately used all 26 available peremptory

9   challenges.  (See ECF No. 107 at 299 citing RT 2675, 2695, 2715, 2728, 2730, 2747, 2778,

10  2797, 2807, 2824, 2833, 2846, 2868, 2884, 2902, 2918, 2928, 2934, 2936,  2950, 2953, 2956,

11  2969, 2989, 3008, 3045.)  The Supreme Court has held that a prospective juror in a capital case

12  may be dismissed for cause if the juror's views on the death penalty "would prevent or

13  substantially impair the performance of his duties as a juror in accordance with his instructions

14  and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985).  "[I]n applying this standard,

15  reviewing courts are to accord deference to the trial court."  Uttecht v. Brown, 551 U.S. 1, 7

16  (2007).  "[W]hen there is ambiguity in the prospective juror's statements, the trial court, aided as

17  it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in

18  favor of the State."  Id.  Moreover, the state court's findings on factual issues are entitled to a

19  presumption of correctness on federal habeas review.  Witt, 469 U.S. at 426; see also 28 U.S.C. §

20  2254(e)(1).

21       Here, the state supreme court was not unreasonable in rejecting these allegations for the

22  reasons stated by that court.  That court reasonably could find both prospective jurors were

23  adequately rehabilitated on the record, stating their ability to follow penalty phase instructions

24  relative to the facts before them and following a weighing process select either LWOP or death.

25  That court reasonably could have found the trial court's discretionary denial of  the "for cause"

26  challenges of such rehabilitated prospective jurors was not an abuse of discretion.

27       (ii)    Harmless Error

28

136

Petitioner argues that as a result of the trial court's error, he was forced to accept two jurors who were predisposed to favor the prosecution, knew, or were related to law enforcement members or prosecution witnesses, or who had committed misconduct. (ECF No. 107 at 299-300.)

However, even if the trial court erred as alleged, any such error was harmless. Both of the noted prospective jurors were removed by peremptory challenge prior to empanelment. Petitioner has not provided authority that expenditure of peremptory challenge in this circumstance violated his federal rights. See e.g., United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000) (the right to peremptory challenges is not guaranteed by the United States Constitution). The Supreme Court has found that a defendant's Sixth Amendment rights are not violated where he had to use a peremptory challenge to remove a juror who should have been removed for cause. Ross v. Oklahoma, 487 U.S. 81, 86-89 (1988). Here, the jury that was ultimately empaneled on November 26, 1984 reasonably could be seen as impartial. (Martinez-Salazar, 528 U.S. at 313-17; see also CT 1279.)

Here again, any error of state law is not alone a basis for federal habeas relief. (Coleman, 501 U.S. at 729.)

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 16 shall be denied.

### 8.    Claim 18

Petitioner alleges the trial court erred by failing *sua sponte* to conduct an examination of jurors who allegedly slept during sanity phase testimony, to determine if they had, if fact, been inattentive. (ECF No. 107 at 312-13.)

### a.    State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court in Petitioner's second state

1   habeas petition (Lod. Doc. 23 at 61-77), and summarily denied on the merits, and in part on

2   procedural grounds (Lod. Doc. 24).

3        b.       Legal Standard

4        (i)      Trial Court Error

5        The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

6        (ii)     Trial by a Fair and Impartial Jury

7        The standard for trial by a fair and impartial jury is set out in section VII, B, 2, b, (ii),

8   herein.

9        c.       Analysis

10       Petitioner argues that, after Second Counsel raised juror inattentiveness to evidence

11  presented during the sanity phase as a basis for her unsuccessful oral and written motion for new

12  trial pursuant to Penal Code section 1181.4, that the verdict was by lot or by any means other

13  than a fair expression of opinion by all the jurors (see RT 5422-23, 6800-01, 7070-92; CT 1711-

14  1722), and the trial court erred "in failing to *sua sponte* conduct an examination of [certain]

15  jurors to determine if they had, in fact, been inattentive during the sanity phase testimony" (Lod.

16  Doc. 23 at 69).  See also ECF No. 210 at 312-13).

17       (i)      Juror Inattention

18       Petitioner argues the trial court erred in failing to hold a hearing to determine whether

19  jurors had been asleep and, if so, whether the juror had missed essential portions of the trial; and

20  whether the jurors' conduct had resulted in substantial prejudice to the accused, meaning

21  deprivation of the continued, objective, and disinterested judgment of the juror, thereby

22  foreclosing the Petitioner's right to a fair trial."  (Lod Doc. 23 at 67-71.)

23       California provides for dismissal of a sworn juror upon a showing of good cause when

24  facts are discovered from which it can reasonably be concluded that the juror, originally thought

25  to be unbiased, actually cannot be fair and impartial.  See People v. Diaz, 105 Cal.App.2d. 690.

26  697 (Ct. App. 1951); Penal Code §§ 1089, 1120, and 1123 (repealed by Stats.1988, c. 1245, §

27  42.).  The trial court must make at least a preliminary inquiry into the facts of impartiality,

28  provided a formal hearing is required where personal knowledge of facts in issue is alleged.  See

138

1  People v. Burgener, 41 Cal.3d 505, 518-19 (1986), disapproved of on other grounds by People v.

2  Reyes, 19 Cal. 4th 743, 968 P.2d 445 (1998) (citing People v. McNeal, 90 Cal. App. 3d 830, 837

3  (Ct. App. 1979); see also People v. Davis (1995) 10 Cal.4th 463, 547 (1995) (a trial judge "must

4  conduct a sufficient inquiry to determine facts alleged as juror misconduct whenever the court is

5  put on notice that good cause to discharge a juror may exist.").

6      The determination of "good cause" rests in the sound discretion of the court.  People v.

7  Abbott, 47 Cal.2d 362, 371 (1956); see also Burgener 41 Cal.3d at 520 (1986) (the trial court's

8  good cause finding will be upheld if substantial evidence supports it).  However, a juror's

9  inability to perform as a juror must "appear in the record as a demonstrable reality."  People v.

10  Compton, 6 Cal. 3d 55, 60 (1971), abrogation on other grounds recognized by People v. Fuiava,

11  53 Cal. 4th 622, 712 (2012) (a trial court has broad discretion to investigate and remove a juror

12  in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to

13  serve); see also People v. Williams, 16 Cal. 4th 153, 231 (1997).  Both the decision to investigate

14  and the decision as to whether there was misconduct justifying discharge rest in the trial court's

15  sound discretion.  People v. Bradford, 15 Cal. 4th 1229, 1348 (1997).  The state supreme court

16  has observed that "[t]here is no statutory provision regarding the procedure to be followed in

17  applying [Penal Code] section 1089, but it seems clear that the taking of sworn testimony under

18  the usual rules of evidence is not necessary where the facts upon which action is taken are

19  uncontroverted.  Abbott, 47 Cal. 2d at 371.

20      Here, the state supreme court reasonably could find Petitioner presented no evidence,

21  other than counsel's surmise, that any juror was sleeping.   (See e.g., RT 5422); see also 28

22  U.S.C. § 2254(e)(1); James v. Borg, 24 F.3d 20, 26 (9th Cir. 2004) ("Conclusory allegations

23  which are not supported by a statement of specific facts do not warrant habeas relief.").  At most,

24  Petitioner proffered Second Counsel's observation that "at least four or five people on the jury

25  are falling asleep, they are not grasping what we are doing."  (RT 5422.)  Moreover, Second

26  Counsel's habeas declaration that after trial, four jurors stated that "[a]fter the guilt phase, it

27  would be hard to convince any jury of insanity[,]" is not admissible evidence that any juror slept

28  during the sanity phase evidence.  (See CT 1722.)  Notably, neither the trial court nor the

1   prosecutor observed or suggested any juror was sleeping during the sanity phase.  See Bradford,

2   15 Cal.4 th at 1348 (defense counsel's speculation that a juror might have been sleeping was

3   insufficient to apprise the trial court that good cause might exist to discharge the juror, and

4   therefore did not obligate the court to conduct any further inquiry).

5        In any event, the presence of a sleeping juror during trial does not *per se* deprive a

6   defendant of the right to due process, a fair trial, or an impartial jury.  See Tanner v. United

7   States, 483 U.S. 107, 126–27 (1987) (juror who falls asleep during testimony is not *per se*

8   incompetent); United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987), abrogated on other

9   grounds by United States v. Benally, 843 F.3d 350, 353–54 (9th Cir. 2016), as recognized by

10  United States v. Morgenstern, 725 Fed. Appx. 546, 550 (9th Cir. 2018) (no violation of due

11  process or the right to a fair trial and impartial jury when juror napped through part of

12  testimony); see also United States v. Olano, 62 F.3d 1180, 1189 (9th Cir.1995) ("[T]he presence

13  of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's

14  ability to reliably serve its function as a vehicle for determination of guilt or innocence.  A single

15  juror's slumber thus is not per se plain error.")

16       (ii)    Harmless Error

17       Even assuming a juror was sleeping during trial, and that the trial court erred in failing to

18  inquire further when counsel raised the matter, Petitioner cannot obtain habeas corpus on this

19  ground unless he demonstrates that he suffered prejudice as a result, i.e. . that the error had a

20  "substantial and injurious effect" on the verdict.  Fields v. Brown, 503 F.3d 755, 781 n.19 (9th

21  Cir. 2007) (citing Brecht, 507 U.S. at 623); see also Stringer v. Harrison, 2009 WL 20951, *2

22  (9th Cir. Jan. 5, 2009) (no prejudice under Brecht arising from claim jurors were biased as a

23  result of defendant's inappropriate eye contact with them).

24       A trial judge has wide discretion in deciding how to deal with a sleeping juror.

25  Springfield, 829 F.2d at 864 (deferring to trial court determination that portions of trial testimony

26  missed by sleeping juror were insubstantial).  Where a juror has been found to be sleeping, a new

27  trial may not be required if the court determines the juror "did not miss essential portions of the

28  trial and was able fairly to consider the evidence."  United States v. Barrett, 703 F.2d 1076, 1083

1  n.13 (9th Cir.1983) (citing United States v. Hendrix, 549 F.2d 1225, 1229 (9th Cir. 1977)).

2      In this case, the state supreme court reasonably could find the alleged trial court error not

3  to be prejudicial under Brecht.  Petitioner alleges certain jurors fell asleep during the February 6,

4  1985 sanity phase testimony of Dr. Dietiker, which suggested that Petitioner's Rorschach

5  responses demonstrated "a though disorder, fluid or psychotic thinking . . . consistent with a

6  diagnosis of paranoid schizophrenia."  (Lod. Doc. 23 at 68, citing RT 5387-5423.)  Petitioner

7  argues Dr. Dietiker's testimony was a "crucial element" of the sanity phase defense.  (Lod. Doc.

8  23 at 68.)  However, Petitioner concedes that at least one other sanity phase expert found

9  Petitioner to be suffering from paranoid schizophrenia.  (Id.)  Petitioner does not suggest at any

10  level of specificity how the alleged juror inattentiveness may have affected the verdict.  There is

11  no evidence suggesting the jury was unable to deliberate.  Moreover, the state supreme court

12  reasonably could find Petitioner's suggestion the jurors slept because they had prejudged the

13  case, to be no more than speculation.

14      Finally, even if the trial court erred in its application of the noted state law, federal habeas

15  relief is unavailable for merely state law error.  See McGuire, 502 U.S. at 67-68; Park, 202 F.3d

16  at 1149.  Federal habeas relief is not available to retry a state issue that does not rise to the level

17  of a federal constitutional violation.  McGuire, 502 U.S. at 67–68.  Alleged errors in the

18  application of state law are not cognizable in federal habeas corpus.  Souch, 289 F.3d at 623.

19          d.      Conclusions

20      A fair-minded jurist could find the state supreme court's denial of Claim 18 as trial court

21  error was not contrary to, or an unreasonable application of, clearly established federal law, as

22  determined by the Supreme Court, or based on an unreasonable determination of the facts in light

23  of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

24      Claim 18 allegations of trial court error shall be denied.

25      9.    Claim 19

26      Petitioner alleges the trial court erred by taking evidence during the sanity phase while he

27  was absent from the courtroom, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth

28

Amendments.[18]  (ECF No. 107 at 318-25.)

### a.    State Court Direct and Collateral Review

The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 87 [Supplemental Opening Brief filed October 3, 1996] at 2-11), and denied it on the merits, stating that:

> Defendant next contends his sanity and penalty phase verdicts must be reversed because he was absent from court during the sanity phase when the two videotapes of defendant answering the VESI were played for the jury. He claims his absence violated his state and federal constitutional rights to due process, confrontation, an impartial jury, and a reliable determination of his guilt and penalty. In addition, he contends his personal waiver of his presence was invalid for a variety of reasons, discussed below. He also claims his absence violated sections 977 and 1043. Finally, he argues these errors deprived the jury of meaningful evidence that it could have considered in his favor at the penalty phase, requiring we reverse the penalty judgment as well as the sanity judgment. As we explain, we reject all of these claims.

> a. *The facts*

> Two videotapes showing defendant's responses to the VESI were played for the jury at the sanity phase. After the first tape was played and the jury left the courtroom for a scheduled recess, the following occurred:

> "The Court: The record should note that approximately five minutes prior to the recess just taken and during the playing of a portion of the video tape the defendant requested that the guards accompany him out of the courtroom; the defendant appear[ed] to become emotional[ly] disturbed or distraught in some way [*sic*] and so-I understand at this time he wants to waive his appearance during that approximate[ly] five minute time and also waive his presence for the balance of the playing of the tape[s].

> "Mrs. Huffman: That's correct, your Honor.

> "The Court: Okay. That includes this afternoon and also tomorrow morning, if necessary.

> "Mrs. Huffman: Until the tapes are finished Mr. Weaver wishes to have his presence-wants to waive his presence.

> "The Court: Okay.

> "Mrs. Huffman: He didn't want to lose control and he wants to apologize to the court for that, but he can't handle it.

> "The Court: All right. First of all, do you join in that request, Mrs. Huffman?

> "Mrs. Huffman: Yes, I do, your Honor.

---

[18] Petitioner states that he incorporates the factual basis of Claims 1, 2, 3, 4, 6, 7, 8, and 9.  (ECF No. 107 at 319.)

"The Court: Mr. Weaver, I discussed this with you last week when I was starting to view the films preliminarily,  so I have explained to you your right to be present at all phases of the case; okay?

"The Defendant: Yes, sir.

"The Court: Okay. You understand that by law or by Constitution you have the right to be present during all proceedings in this case. Nevertheless, you may waive that right and consent that we proceed in your absence, which is, as I understand, what you wish to do and you wish to have us complete the showing of these tapes without your presence, after which time you will be brought back in and be here for the balance of the trial. [¶] Is that correct?

"The Defendant: Yes, your Honor. I am sorry about what happened.

"The Court: You need not apologize, and I will then take that as a waiver of your personal presence for the balance of the time it takes us to play the tapes.

"The Defendant: Thank you."

b. *Discussion*

"A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. [Citations.] Nonetheless, ... 'as a matter of both federal and state constitutional law, ... a capital defendant may validly waive presence at critical stages of the trial.' [Citation.]" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1209-1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Because the record demonstrates defendant waived his constitutional right to be present, we reject his claim to the contrary under both the state and federal Constitutions.

Defendant contends his waiver was it was neither knowingly nor intelligently given, in that he was not advised of the importance of his personal presence before he waived it. He argues "he was not admonished by the court or counsel as to the significant impact his presence and [ ]demeanor would have on the jury which was looking for signs of humanity and remorse in [defendant]." Moreover, given his history of mental problems, defendant contends the court was obligated to conduct "an extensive inquiry to determine whether [defendant] actually understood the significance and consequences of his decision."

Defendant cites no authority for his argument that we must apply a heightened waiver standard under the circumstances, or that the trial court had a sua sponte duty to admonish him of the importance of his decision to absent himself from the courtroom. Defendant was represented by counsel, and he himself chose, for his own reasons, to leave the courtroom. We find nothing improper about the procedure used, and we conclude defendant's waiver of his state and federal constitutional right to be present at this phase of his capital trial was both voluntary, knowing and intelligent.

Defendant is on firmer ground in arguing his absence violated sections 977 and 1043. Section 977, subdivision (b)(1) states: "In all cases in which a felony is charged, the accused shall be present ... during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present *at all other proceedings* unless he or she shall, with leave of court, execute in open court, a written waiver of his

143

or her right to be personally present." (Italics added.) Section 1043, subdivision (b) states: "The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom. [¶] (2) Any prosecution for an offense *which is not punishable by death* in which the defendant is voluntarily absent." (Italics added.)

We have explained that "when read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants be present at trial does not apply to capital defendants. Thus, the trial court, by permitting a nondisruptive capital defendant to be absent during the taking of evidence, committed error under sections 977 and 1043." (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1210.) "The Legislature evidently intended that a capital defendant's right to voluntarily waive his right to be present be severely restricted." (*Id.* at p. 1211.)

The error being merely statutory, however, we will reverse the judgment only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson*[, *supra*] 46 Cal.2d 818, 836 ....)" (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1211.) In this case, no live witnesses testified in defendant's absence, reducing the potential value of any assistance defendant could have given to defense counsel. Although the jury was deprived of its ability to observe defendant's demeanor during the playing of the videotapes, it is unclear which way this factor cuts, as defendant apparently was afraid he would become overly emotional before the jury, harming his case. His absence, and the concomitant inability of the jury to observe him, may actually have helped him. In any event, such speculation does not support a finding that it was reasonably probable defendant would have achieved a more favorable sanity or penalty phase verdict had he been forced to appear before the jury against his will. Any state law error was thus harmless under *People v. Watson*, *supra*, 46 Cal.2d at page 836. The speculative nature of any possible harm defendant suffered by his absence also precludes a finding the error affected the penalty phase verdict in any way.

Weaver, 26 Cal. 4th at 965-68.

The Claim, characterized as ineffective assistance of counsel, also was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 285-87), and summarily denied on the merits (Lod. Doc. 8).

1

### b.     Legal Standard

2

### (i)     Trial Court Error

3

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

4

### (i)     Physical Presence during Trial

5

The Constitution guarantees a criminal defendant the right to presence at all critical

6 stages of the trial.  Illinois v. Allen, 397 U.S. 337, 338 (1970); see also United States v. Gagnon,

7 470 U.S. 522, 526 (1985).

8

A defendant has a right to be present "whenever his presence has a relation, reasonably

9 substantial, to the fullness of his opportunity to defend against the charge. . . .  [T]he presence of

10 a defendant is a condition of due process to the extent that a fair and just hearing would be

11 thwarted by his absence, and to that extent only."  Kentucky v. Stincer, 482 U.S. 730, 745

12 (1987), (quoting Snyder v. Massachusetts, 291 U.S. 97, 105–06  (1934)), overruled in part on

13 other grounds by Malloy v. Hogan, 378 U.S. 1 (1964).  But he need not be present "when

14 presence would be useless, or the benefit but a shadow."  Id. (quoting Snyder, 291 U.S. at 106–

15 07); see Rice v. Wood, 77 F.3d 1138, 1140 n.2 (listing cases finding right to presence not

16 violated).

17

### c.     Analysis

18

### (i)     Presence during the VESI Videotape

19

Petitioner argues his absence from court on February 13-14, 1985, when the VESI

20 videotape and related evidence was presented, violated his noted federal rights as well as state

21 law that required his presence during the taking of evidence.  (ECF No. 107 at 319 citing Penal

22 Code  §§ 977, 1043; ECF No. 210 at 188-93.)

23

The record reflects that during sanity phase testimony of Dr. John Wilson, the VESI

24 videotape was presented to the jury.  (See e.g., ECF No. 210 at 189 citing RT 5773, 5995; see

25 also RT 5821-26.)   As noted above, soon after the videotape began, Petitioner showed signs of

26 emotional distress and asked guarded to escort him from the courtroom.  (RT 5822-24.)  Second

27 Counsel advised the trial court that "[P]etitioner wished to waive his appearance until the playing

28 of the [VESI] tapes was concluded because Petitioner "didn't want to lose control and wants to

145

1  apologize to the court for it." (ECF No. 107 at 320.)  The trial court advised Petitioner of his

2  right to be present and took his oral waiver of that right on the record.  (See ECF No. 107 at 320;

3  ECF No. 210 at 190-91 citing RT 5823-24.)  Petitioner was absent from the courtroom while the

4  remainder of the videotape was played.  (RT 5824-26.)

5      Petitioner suggests his emotional upset during playing of the VESI tapes was not alone a

6  basis for his removal from court, and that he did not knowingly, intelligently, and voluntarily

7  waive his right to presence in the courtroom.  (ECF No. 107 at 320-21; ECF No. 210 at 191-92.)

8  Petitioner argues his mental state was such that he was not competent to waive his right to be

9  present in court, especially so here as the waiver was partially retroactive.  (Id.; see also Claims

10  3, 4, herein.)

11      Here, the state supreme court reasonably could find no violation of Petitioner's federal

12  rights.  Nowhere in the decisions of the Supreme Court is there a ruling that "the Fourteenth

13  Amendment assures the privilege of presence when presence would be useless, or the benefit but

14  a shadow." Snyder, 291 U.S. at 106–107.  The exclusion of a defendant from a trial proceeding

15  should be considered in light of the whole record.  Id. at 115.  In Faretta v. California, 422 U.S.

16  806, 819 n.15 (1975), the United States Supreme Court reaffirmed the holding of Snyder, and

17  observed that "an accused has a right to be present at all stages of the trial where his absence

18  might frustrate the fairness of the proceedings."

19      The state supreme court reasonably could find Petitioner's presence during playing of the

20  balance of the VESI videotape would not have benefitted his defense.  He, of course, participated

21  in the VESI interview and knew what the jury would see and hear.  Significantly, Petitioner was

22  present in court with Counsel when the video tape was previewed outside the presence of the

23  jury.  He had the opportunity to discuss the matter with Counsel and provide any desired input,

24  and waived presence during preview of the videotapes, outside the presence of the jury, upon

25  colloquy with the trial court and Counsel.  (RT 5634-35.)

26      Later, when the tapes were admitted at trial, the jury was able to view Petitioner's

27  reaction to the videotape during that portion played while he was present in the courtroom, which

28  constituted most of the first videotape.  Moreover, Counsel offered the videotapes as an

146

1  alternative to Petitioner's testimony at the sanity phase, suggesting Counsel and Petitioner, as a

2  matter of trial tactics, relied upon demeaner evidence apparent in the videotapes.  (RT 5638.)

3  Petitioner has not demonstrated beyond the level of speculation how his absence deprived the

4  jury of otherwise unavailable demeanor and remorse evidence benefitting the defense.

5      The Constitution is not implicated every time a defendant is excluded from a trial stage,

6  United States v. Reyes, 764 F.3d 1184, 1193 (9th Cir.2014); see also Moore v. Campbell, 344

7  F.3d 1313, 1323 (11th Cir. 2003) ("the issue of whether a defendant must be present at all times

8  in a capital trial has not yet been settled by the Supreme Court"); Allen, 397 U.S. 337, 338

9  (1970) (a criminal defendant can lose the right to presence at trial by consent or misconduct).

10     Given the foregoing, this Court previously found that the state supreme court was not

11 unreasonable in finding the waiver of presence to be knowing and voluntary.  (ECF No. 209 at

12 59; see also Campbell v. Wood, 18 F.3d 662, 672 (9th Cir. 1994) (en banc) (holding "[t]here is

13 no principled basis for limiting to noncapital offenses a defendant's ability knowingly,

14 voluntarily, and intelligently to waive the right of presence"); United States v. Mitchell, 502 F.3d

15 931, 987 (9th Cir. 2007) (same); United States v. Berger, 473 F.3d 1080, 1095 (9th Cir. 2007)

16 (defendant may waive his or her constitutional right to be present at all critical stages of the

17 proceedings "provided such waiver is voluntary, knowing, and intelligent).   The Court further

18 found speculative Petitioner's claim his denied the jury evidence of remorse.  (ECF No. 209 at

19 68, 69, 71); see also Weaver, 26 Cal.4th at 968.

20     As to Petitioner's allegation his state law rights were violated, the state supreme court

21 reasonably agreed.  Penal Code section 977 in effect at the time of Petitioner's trial provided in

22 pertinent part that:

23

24      (b)(1) In all cases in which a felony is charged, the accused shall be present at the
       arraignment, at the time of plea, during the preliminary hearing, during those
25      portions of the trial when evidence is taken before the trier of fact, and at the time
       of the imposition of sentence. The accused shall be personally present at all other
26      proceedings unless he or she shall, with leave of court, execute in open court, a
       written waiver of his or her right to be personally present, as provided by
27      paragraph (2).

28      (2) The accused may execute a written waiver of his or her right to be personally
       present, approved by his or her counsel, and the waiver shall be filed with the

147

court. However, the court may specifically direct the defendant to be personally present at any particular proceeding or portion thereof. The waiver shall be substantially in the following form:

"Waiver of Defendant's Personal Presence"

"The undersigned defendant, having been advised of his or her right to be present at all stages of the proceedings, including, but not limited to, presentation of and arguments on questions of fact and law, and to be confronted by and cross-examine all witnesses, hereby waives the right to be present at the hearing of any motion or other proceeding in this cause. The undersigned defendant hereby requests the court to proceed during every absence of the defendant that the court may permit pursuant to this waiver, and hereby agrees that his or her interest is represented at all times by the presence of his or her attorney the same as if the defendant were personally present in court, and further agrees that notice to his or her attorney that his or her presence in court on a particular day at a particular time is required is notice to the defendant of the requirement of his or her appearance at that time and place."

(c) The court may permit the initial court appearance and arraignment in municipal or superior court of defendants held in any state, county, or local facility within the county on felony or misdemeanor charges, except for those defendants who were indicted by a grand jury, to be conducted by two-way electronic audio video communication between the defendant and the courtroom in lieu of the physical presence of the defendant in the courtroom. If the defendant is represented by counsel, the attorney shall be present with the defendant at the initial court appearance and arraignment, and may enter a plea during the arraignment. However, if the defendant is represented by counsel at an initial hearing in superior court in a felony case, and if the defendant does not plead guilty or nolo contendere to any charge, the attorney shall be present with the defendant or if the attorney is not present with the defendant, the attorney shall be present in court during the hearing. The defendant shall have the right to make his or her plea while physically present in the courtroom if he or she so requests. If the defendant decides not to exercise the right to be physically present in the courtroom, he or she shall execute a written waiver of that right. A judge may order a defendant's personal appearance in court for the initial court appearance and arraignment. In a misdemeanor case, a judge may, pursuant to this subdivision, accept a plea of guilty or no contest from a defendant who is not physically in the courtroom. In a felony case, a judge may, pursuant to this subdivision, accept a plea of guilty or no contest from a defendant who is not physically in the courtroom if the parties stipulate thereto.

(d) Notwithstanding subdivision (c), if the defendant is represented by counsel, the attorney shall be present with the defendant in any county exceeding 4,000,000 persons in population.

Penal Code section 1043 in effect at the time of Petitioner's trial provided in pertinent part that:

(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.

(b) The absence of the defendent[1] in a felony case after the trial has commenced

in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:

------------FOOTNOTE------------

n.1      So in original.

--------END FOOTNOTE---------

(1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

(2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent.

(c) Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim his right to be present at the trial as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.

(d) Subdivisions (a) and (b) shall not limit the right of a defendant to waive his right to be present in accordance with Section 977.

[¶]

(e) If the defendant in a misdemeanor case fails to appear in person at the time set for trial or during the course of trial, the court shall proceed with the trial, unless good cause for a continuance exists, if the defendant has authorized his counsel to proceed in his absence pursuant to subdivision (a) of Section 977.

If there is no authorization pursuant to subdivision (a) of Section 977 and if the defendant fails to appear in person at the time set for trial or during the course of trial, the court, in its discretion, may do one or more of the following, as it deems appropriate:

(1) Continue the matter.
(2) Order bail forfeited or revoke release on the defendant's own recognizance.

(3) Issue a bench warrant.

(4) Proceed with the trial if the court finds the defendant has absented himself voluntarily with full knowledge that the trial is to be held or is being held.

Nothing herein shall limit the right of the court to order the defendant to be personally present at the trial for purposes of identification unless counsel stipulate to the issue of identity.

Upon consideration of this state law authority, the state supreme court reasonably found the trial court committed statutory error.  <u>Weaver</u>, 26 Cal. 4th at 965-68.

1      (ii)    Harmless Error

2          Petitioner argues the trial court's alleged error was more than harmless under Brecht.

3  (ECF No. 210 at 192-93 citing Bustamante v. Eyman, 456 F.2d 269, 274-75 (9th Cir. 1972) ("the

4  presence of counsel is no substitute for the presence of the defendant himself…").)  He argues

5  that he was unaware state law prohibited his being absent during the taking of evidence.  (ECF

6  No. 107 at 320-21; ECF No. 210 at 191-92; see also Penal Code §§ 977, 1043.)  He argues that

7  he was unaware his absence from court could deny the jury evidence helpful to his defense (id.),

8  including his demeanor and signs of his humanity, redeeming qualities, trauma, and remorse

9  (ECF No. 107 at 320-24).  Especially so, he argues, given trial court's erroneous refusal to allow

10 the jury's consideration of the VESI tape for the truth of facts therein.  (See ECF No. 107 at 324;

11 see also Claims 8, 20,  23; ECF No. 209 at 59-60.)

12         But as noted, a defendant's "absence from various court proceedings, even without

13 waiver, may be declared non-prejudicial in situations where his presence does not bear a

14 reasonably substantial relation to the fullness of his opportunity to defend against the charge."

15 People v. Johnson, 6 Cal.4th 1, 18  (1993), abrogated on other grounds by People v. Rogers, 39

16 Cal.4th 826, 879 (2006) (citing People v. Garrison, 47 Cal.3d 746, 782 (1989)) (quoting Bloyd,

17 43 Cal.3d at 359–60)).  For the reasons stated, the state supreme court could reasonably have

18 found this to be such a case.  As noted by the state supreme court, Petitioner was present in court

19 for showing of half of the videotaped interview.  During the time he was present, the jury was

20 presumptively aware he became "disturbed or distraught" and that was why he left the

21 courtroom.  Weaver, 26 Cal.4th at 965.

22         Also, Petitioner was represented by Counsel during his absence from court.  "It has long

23 and clearly been held that criminal defendants are entitled to effective assistance of counsel

24 during all critical stages of the criminal process."  Nunes, 350 F.3d at 1052.  "[I]t is counsel's

25 dut[y] to consult with the defendant on important decisions and to keep the defendant informed

26 of important developments in the course of the prosecution."  Id. at 1053.  For the reasons

27 stated, the state supreme court reasonably could find Petitioner's presence in the courtroom

28 during the balance of the VESI videotapes would not have benefited his defense.

1   Petitioner also argues that he was denied the opportunity to "advise and consult with

2   counsel regarding appropriate areas to question witnesses or to point out areas that needed to be

3   clarified for the jury." (ECF No. 107 at 324.)  He observes that "[a]t least one juror, Emery

4   Hubbard, has declared that presentation of combat-related evidence would have caused him to

5   vote for life." (ECF No. 107 at 324; see also 1SHCP Ex. 16 at 1.)  However, the sanity phase

6   testimony apparently established Petitioner's involvement in combat including during the 1969

7   Tet Offensive, as a basis for the defense expert opinion.  (See e.g., RT 5778-83, 5929.)

8   Additionally, Petitioner acknowledges this Court, in its previous denial of Claim 8

9   allegations of ineffective assistance of counsel at the sanity phase, found the state supreme court

10  reasonably determined any such error was harmless under Strickland.  (ECF No. 210 at 192 n.38

11  citing ECF No. 209 at 58-60.)  Petitioner fares no better under the Brecht standard, for the

12  reasons stated.

13      d.      Conclusions

14  A fair-minded jurist could find the state supreme court's denial of Claim 19 allegations of

15  trial court error was not contrary to, or an unreasonable application of, clearly established federal

16  law, as determined by the Supreme Court, or based on an unreasonable determination of the facts

17  in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

18  Claim 19 allegations of trial court error shall be denied.

19      10.     Claim 23

20  Petitioner alleges that the trial court erred during his automatic motion to modify the

21  verdict, violating his rights Fourth, Sixth, Eighth, and Fourteenth Amendments.[19]  (ECF No. 107

22  at 358-60.)

23      a.      State Court Direct and Collateral Review

24  The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1

25  at 432-41, and denied on the merits, as follow:

26

27          Defendant contends the trial court violated state law and the federal Constitution
            by denying his automatic motion for modification of the penalty verdict pursuant

28  _____
    [19] Petitioner states that he incorporates the factual basis of Claims 7, 8, 9, and 17. (ECF No. 107 at 358.)

to section 190.4, subdivision (e). "In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to 'make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' [Citations.] That is to say, [the trial judge] must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And [the trial judge] must make that determination independently, i.e., in accordance with the weight he [or she] believes the evidence deserves. [Citation.]" (*People v. Marshall* (1990) 50 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].) "[T]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict. [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], italics omitted.)

Defendant first claims the trial court failed to consider the mitigating evidence of his impaired mental condition, falling into the error of assuming that section 190.3, factor (h) (whether his mental capacity was "impaired as a result of mental disease or defect") required the same level of proof as a verdict of legal insanity. (See discussion of this issue in pt. III.B.3., *ante*.) Not so. The trial court merely explained that it had already taken into account under section 190.3, factor (d) the evidence of defendant's mental problems (whether "defendant was under the influence of extreme mental or emotional disturbance") and had found such mental problems mitigating. The court previously had explained that it was "clear from all of the witnesses ... that the defendant did suffer and does suffer from a mental disease or defect, and I do consider that to be in mitigation."

It is true the trial court stated section 190.3, factor (h) had not been "satisfied." Defendant strongly argues this conclusion necessarily reveals the trial court misunderstood the difference between the standard of proof at the sanity phase and that for section 190.3, factor (h). We disagree. Instead, it appears the trial court meant that it found the expert psychiatric evidence established defendant suffered from an "extreme mental ... disturbance" (§ 190.3, factor (d)) but did not establish that defendant's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect" (*id.*, factor (h)). That was not an unreasonable conclusion; despite the ample evidence of defendant's mental problems, he seemed to understand that what he did to Radford and Levoy was wrong.

Defendant next claims the trial court improperly failed to consider non-statutory mitigating evidence under section 190.3, factor (k). Regarding factor (k), the court stated: "I don't think that there [is] any other [] [mitigating evidence] that I have not already considered in my previous discussion." The court later concluded: "the Court has considered *all of the evidence* and has taken into account and been guided by these factors, having heard, considered the arguments of counsel, and independently conclude and find that the aggravating circumstances do outweigh the mitigating circumstances, and it therefore is the Court's conclusion that the jury's findings and verdicts are not only supported by the weight of the evidence, but the Court in its own independent review *of all the evidence* finds the jury's verdicts and findings are consistent with the law and evidence." (Italics added.)

Defendant argues the trial court should have considered as mitigating his service in Vietnam, for which he received several commendations and awards, the abusive childhood he endured, his record of good behavior in prison, the fact he cooperated with police, and the evidence he financially supported his family. He

claims the court's failure to mention this evidence when addressing section 190.3, factor (k) indicated the court had failed to consider the evidence.

We denied essentially the identical claim in *People v. Arias*, *supra*, 13 Cal.4th 92. In that case, we explained the trial court, when ruling on a section 190.4, subdivision (e) motion, "was obliged only to provide a ruling adequate ' "to assure thoughtful and effective appellate review." ' [Citation.] Thus, it was not required to recount every detail of matters ... it already deemed mitigating. Moreover, the court's ruling indicates its clear understanding of its duty to weigh all the aggravating and mitigating evidence. The court carefully set forth the evidence to which it assigned significant aggravating or mitigating weight. Under these circumstances, the failure to mention other specific matters in mitigation implies, not that they were overlooked or deemed legally irrelevant, but simply that the court found them insubstantial and unpersuasive." (*People v. Arias*, *supra*, at pp. 191-192.)

Accordingly, we find the trial court, in denying defendant's motion for modification of penalty under section 190.4, subdivision (e), did not breach any of his rights under the federal Constitution. We also conclude the trial court did not violate any statutory rights defendant may have under section 190.4. Finally, in light of these conclusions, we find defendant was not deprived of the effective assistance of counsel by defense counsel's failure to object or otherwise call the trial court's attention to the alleged error.

Weaver, 26 Cal. 4th at 989–91.

      b.    Legal Standard

      (i)    Trial Court Error

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

      (ii)    Fair and Reliable Verdict

A defendant is entitled to a fair and reliable verdict based upon an individualized determination of the appropriate sentence given his record and character. Harris, 465 U.S. at 52.

The Eighth Amendment requires full consideration of "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604; see also Eddings v. Oklahoma, 455 U.S. 104, 113-114 (1982) (sentencer must consider any relevant mitigating evidence).

      c.    Analysis

Petitioner argues the state supreme court unreasonably denied the Claim because that court and the trial court failed to identify and correctly apply the clearly established federal law, as follows. (See ECF No. 210 at 214 citing Williams, 529 U.S. at 405-406; Jeffries v. Wood, 114 F.3d 1484, 1500-1501 (9th Cir. 1997) (*en banc*), overruled on other grounds by Gonzalez v.

1   Arizona, 677 F.3d 383 (2012) (discussing AEDPA standard of review).

2         (i)      Motion to Modify the Verdict

3         Petitioner argues the trial court made numerous errors during the hearing on the motion to

4   modify the verdict.  He argues the trial court impermissibly applied the sanity phase standard

5   when considering the Penal Code section 190.3(h) factor relating to whether a defendant's

6   capacity to appreciate the criminality of his conduct or conform his conduct to the requirement of

7   the law was impaired as a result of mental disease or defect, or intoxication.  He argues the trial

8   court otherwise failed to consider mitigating evidence under factors (h) and (k), thereby

9   depriving Petitioner of his right to an individualized determination of the appropriate sentence

10  based on his record and character.

11        At the time of Petitioner's trial, state law provided that:

12

13  In every case in which the trier of fact has returned a verdict or finding imposing
    the death penalty, the defendant shall be deemed to have made an application for
    modification of such verdict or finding pursuant to Subdivision 7 of Section 11.[2]

14  In ruling on the application, the judge shall review the evidence, consider, take
    into account, and be guided by the aggravating and mitigating circumstances

15  referred to in Section 190.3, and shall make a determination as to whether the
    jury's findings and verdicts that the aggravating circumstances outweigh the

16  mitigating circumstances are contrary to law or the evidence presented. The judge
    shall state on the record the reasons for his findings.

17

18

19             ------------------------FOOTNOTE-------------------

20  n.2  Probably should read "Section 1181".

21            -------------------END FOOTNOTE-------------------

22

23  Penal Code § 190.4(e ); see also People v. Lang, 49 Cal. 3d 991, 1045 (1989), abrogated on other

24  grounds by People v. Diaz, 60 Cal. 4th 1176 (2015) (in ruling on the automatic motion to modify

25  a death verdict, the trial judge's function is to independently reweigh the evidence of aggravating

26  and mitigating circumstances and then to determine whether, in the judge's independent

27  judgment, the weight of the evidence supports the jury verdict; the weighing of aggravating and

28  mitigating circumstances is the method by which the jury determines which penalty is

1  appropriate)

2       Here, the state supreme court reasonably could reject the allegations of trial court error.

3  The trial court, in ruling on the motion, specifically found three factors in aggravation (i.e., the

4  circumstances of the crime; the presence of other violent criminal activity; and a prior

5  conviction), and one factor in mitigation (i.e., the offense was committed under circumstances

6  involving the influence of extreme mental or emotional disturbance).  (See ECF No. 210 at 212

7  citing RT 7105-108.)  The trial court then denied the motion for modification, concluding that

8  "the aggravating circumstances do outweigh the mitigating circumstances."  (Id., citing RT

9  7108-09; see also CT 1733-1734.)

10      Petitioner fails to identify clearly established federal law requiring the trial court exercise

11  independent review and judgment upon a motion to modify the verdict.  See Webster v.

12  Chappell, No. CIV S-93-306 LKK DAD, 2014 WL 2526857 at *74 (E.D. Cal. June 4, 2014),

13  report and recommendation adopted sub nom. Webster v. Warden, San Quentin State Prison, No.

14  CIV. S-93-0306 LKK D, 2014 WL 4211115 (E.D. Cal. Aug. 26, 2014) (citing

15  Turner v. Calderon, 281 F.3d 851, 871 (2002)); Pulley, 465 U.S. at 41) ("[The] Ninth Circuit has

16  stated that "at most the [trial court's] error [in ruling on the section 190.4(e) motion] would be

17  one of state law" and thus not one cognizable as a habeas claim.").

18      Petitioner suggests Ninth Circuit cases "implicitly recogniz[e] that an error [at a sentence

19  modification hearing] could rise to the level of a cognizable Eighth Amendment claim."  (ECF

20  No. 210 at 211 citing Allen v. Woodford, 395 F.3d 979, 1018 (9th Cir. 2005) ("Although the trial

21  court erred as a matter of state law by considering in its review of the jury's verdict presentence

22  reports that had not been considered by the jury, that error neither prejudiced Allen nor denied

23  him his Eighth Amendment or due process rights."); Babbitt v. Calderon, 151 F.3d 1170, 1179

24  (9th Cir. 1998) (the judge's section 190.4(e) review should be guided by the aggravating and

25  mitigating circumstances in Cal. Penal Code § 190.3); Williams, 52 F.3d at 1483 (the 1977 death

26  penalty statute allows consideration of non-statutory factors).)  However, Petitioner fails to

27  demonstrate these circuit cases rise to the level of clearly established federal law that trial court

28  error at a section 190.4(e) sentence modification hearing could rise to the level of a cognizable

1  Eighth Amendment claim.  Additionally, <u>Williams</u> was sentenced under California's prior (1977)

2  death penalty statute.

3     Petitioner's related argument, that "[t]he automatic modification motion procedure is

4  important to the overall proceeding, and part of the manner by which California fulfills its

5  constitutional duty to tailor and apply its death sentencing scheme in a rational manner" is

6  similarly insufficient to support the Claim.  (ECF No. 210 at 212 citing <u>Harris</u> , 465 U.S. at 52;

7  <u>Godfrey v. Georgia</u>, 446 U.S. 420, 428 (1980)).  The Court in <u>Pully</u> does not hold that a

8  challenge to the section 190.4(e) sentence modification hearing can provide a basis for federal

9  constitutional error.  This Court has recognized as much, as Petitioner concedes.  (See ECF No.

10  210 at 211 citing <u>Vieira v. Chappell</u>, No. 1:05-cv-1492 AWI, 2015 WL 641433 (E.D. Cal. Feb.

11  5, 2015) at **170-71; <u>Webster</u>, 2014 WL 2526857 at **73-75; <u>cf. Ross v. Davis</u>, 2017 WL

12  2374101 (C.D. 2017) at **45-46 (acknowledging that a state law error by the trial court in its

13  section 190.4(e) review, given the particular facts and circumstances, also may violate federal

14  rights).

15     Additionally, Petitioner does not point to facts in the record that the trial court

16  unreasonably denied Petitioner's motion after consideration of the aggravating and mitigating

17  circumstances, or that the state supreme court was unreasonable in deferring to the trial court's

18  independent determination that the jury's findings and verdict that the aggravating circumstances

19  outweigh the mitigating circumstances were not contrary to law or the evidence presented for the

20  reasons stated by that court.  <u>See e.g., Weaver</u>, 26 Cal. 4th at 990-91.  As the state supreme court

21  stated, "the failure to mention other specific matters in mitigation implies, not that they were

22  overlooked or deemed legally irrelevant, but simply that the court found them insubstantial and

23  unpersuasive." <u>Id.</u> at 991 (quoting <u>People v. Arias</u>, 13 Cal. 4th 92, 191-92 (1996)).

24     Particularly, the state supreme court reasonably could find the trial court did not fail to

25  consider and give effect to the mitigating evidence in the record.  <u>See Eddings</u>, 455 U.S. at 113-

26  14; <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4-5 (1986); (see also ECF No. 210 at 211-12, citing

27  <u>Lockett</u>, 438 U.S. at 604; RT 7108; ECF No. 209 at 68-69, 71).  Petitioner's primary argument,

28  that the jury's finding Petitioner was sane at the time of the crime caused the trial court to limit

1 | its Penal Code section 190.4(e) consideration of the mitigating effect of impaired mental capacity

2 | (Penal Code § 190.3(h)) and related extenuating circumstances (Penal Code § 190.3(k)), relies on

3 | inference thinly supported in the record, for the reasons stated.  (See ECF No. 107 at 358-60;

4 | ECF No. 210 at 212-13 citing RT 7016, 7108; Tennard v. Dretke, 542 U.S. 274, 285 (2004);

5 | Eddings, 455 U.S. at 113-114; see also Claim 20, herein.)

6 |      Petitioner points to the trial courts summary findings under Penal Code section 190.3(h),

7 | that:

8 |

9 |      The next [factor] is whether or not at the time of the offense the  capacity of the
     defendant to appreciate the criminality of his conduct or conform his conduct to

10 |      the requirement of the law was impaired as a result of mental disease or defect, or
     the effects of intoxication. That of course was the entire substance of the insanity

11 |      phase of the trial, the second phase, and the mental defect or mental incapacity
     suffered by the defendant that all of the medical experts indicated does exist, they

12 |      just disagree as to the degree and the effect on the defendant, I have taken into
     consideration under the fourth consideration, that is, the defendant's extreme

13 |      mental or emotional disturbance. I do not think that this eighth criterion has been
     satisfied and I do not think it is a factor one way or another in this matter.

14 |

15 | (ECF No. 210 at 212-13 citing RT 7108; CT 1750.)  However, the state supreme court

16 | reasonably observed on direct appeal that the trial court's finding of mitigation evidence of

17 | Petitioner's extreme mental or emotional disturbance (under Penal Code § 190.3(d)) does not

18 | necessarily raise an inference that the trial court unreasonably failed to consider and find

19 | mitigating impaired mental capacity (under Penal Code § 190.3(h)) and related extenuating

20 | circumstances (under Penal Code § 190.3(k)).  Petitioner has not persuasively argued facts or

21 | authority otherwise.

22 |      Petitioner also points to the trial court's summary findings under Penal Code section

23 | 190.3(k), that:

24 |

25 |      The last [penalty phase factor] is whether or not there are any other extenuating
     circumstances which mitigate or excuse the crime even though it did not amount

26 |      to a legal excuse, and I don't think that there are any others that I have not already
     considered in my previous discussion.

27 |

28 | (ECF No. 210 at 213 citing RT 7108); see also Eddings, 455 U.S. at 113-114 (the sentencing

authority may not refuse to consider relevant mitigating evidence in a capital sentencing proceeding).  But here again, the trial court need not refer to every piece of mitigating evidence that it considered and found insubstantial and unpersuasive.  See Weaver, 26 Cal. 4 th at 991; see also Arias, 13 Cal. 4th at 191-92.  The state supreme court reasonably could find the trial court's failure specifically to mention each piece of allegedly mitigating evidence not indicative of a failure to consider such evidence for purposes of the motion to modify the verdict.

### (ii)    Harmless Error

Petitioner argues the alleged constitutional errors were harmful and prejudicial because the errors denied him a fair and reliable verdict based upon an individualized determination of the appropriate sentence given his record and character.  (ECF No. 107 at 360; ECF No. 210 at 213-14 citing Harris, 465 U.S. at 52, Lockett, 438 U.S. at 604.)

But "[federal] habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice."  Ayala, 576 U.S. at 267 (quoting Brecht, 507 U.S. at 637).  "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  Id. at 267–68 (quoting O'Neal, 513 U.S. at 436); see also Beardslee, 393 F.3d at 1041–44 (applying Brecht's harmless error test to an Eighth Amendment error based on the improper consideration of invalid aggravating factors).

Here, for the reasons stated, the state supreme court reasonably could find no prejudice under the Brecht standard because Petitioner failed to show the trial court did not consider mitigating evidence in the record.

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 23 shall be denied.

1

11.   Claim 24

2   Petitioner alleges that the trial court erred by denying his motions for a separate sanity

3   phase jury and a new sanity phase trial, violating his rights under the Fourth, Sixth, Eighth, and

4   Fourteenth Amendments.[20]  (ECF No. 107 at 360-63.)

5   a.   State Court Direct and Collateral Review

6   The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 203-

7   06, 311-15), and denied it on the merits, stating that:

8
> Following completion of the guilt phase, defendant renewed his claim for a
> separate jury to decide his claim of insanity. Counsel argued that the defense
9   > argument at the sanity phase would be that defendant, due to mental impairments,
> was unable to conform his conduct to the law, a defense at odds with their guilt
10  > phase argument that defendant made a conscious decision to knock out Radford
> but not to kill him, and that he killed Levoy when he fell into a blind rage when
11  > she bit his thumb. The trial court denied the motion for a separate jury, noting that
> mental health experts testifying at the sanity phase would be subject to cross-
12  > examination based on defendant's testimony at the earlier guilt phase, and the
> jury's knowledge of that prior testimony would be important.
13
> Defendant now claims the trial court abused its discretion when it denied his
14  > motion for a separate sanity phase jury. He argues that because the guilt phase
> jury had just found him guilty, use of that same jury at the sanity phase forced
15  > him to be tried by a jury predisposed to find him sane. As evidence of that claim,
> he points to the fact the jury deliberated just 42 minutes before finding him sane,
16  > and that three jurors were laughing and talking during the reading of the sanity
> phase jury instructions.
17
> Section 190.4, subdivision (c), added to the Penal Code by initiative in 1978 and
18  > unchanged since that time, provides the applicable law. It states in pertinent part:
> "If the trier of fact which convicted the defendant of a crime for which he may be
19  > subject to the death penalty was a jury, *the same jury shall consider any plea of*
> *not guilty by reason of insanity* pursuant to Section 1026, ... unless for good cause
20  > shown the court discharges that jury in which case a new jury shall be drawn."
> (*Ibid.*, italics added.) The appropriate standard of review when considering a trial
21  > court's denial of a separate jury under section 190.4 is the abuse of discretion
> standard. (*People v. Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841
22  > P.2d 897].)

23  > In this case, the trial court concluded the anticipated testimony from mental health
> experts would be difficult to understand unless the jury was aware of defendant's
24  > previous testimony at the guilt phase. That decision was well within the court's
> discretion and consistent with the Legislature's expressed preference for a single
25  > jury in capital cases. To sustain his claim that the trial court abused its discretion,
> defendant must at the very least show good cause existed for a separate sanity
26  > phase jury. He fails to do so. Although he argues his defenses at the guilt and
> sanity phases were conflicting, "more than speculation or the desire of counsel is
27  > necessary [to demonstrate good cause]. [Citations.] A new jury is not required, for

28  _____
[20] Petitioner states that he incorporates that factual basis of Claims 6, 7, 8, 9, and 16.

example, simply because there is a deviation between defense strategy at the guilt trial and at the penalty trial." (*People v. Lucas*, *supra*, 12 Cal.4th at p. 483 [defendant sought separate penalty phase jury].)

Contrary to defendant's claim, the speed with which the jury reached a sanity phase verdict does not necessarily show the jury was biased. (See also the discussion in pt. II.B.13., *post.*) It is sheer speculation whether the rapidity of the jury's decision was the result of bias, inattention, weakness of defendant's case or strength of the state's case. We also find the alleged laughter and inattention of some jurors an insufficient basis on which to conclude the trial court abused its discretion in denying a separate sanity jury. Evidently, no contemporaneous objection was made to the behavior (defense counsel brought it up later in a motion for new trial), and we assume the trial court was aware of what happened in open court and would have admonished the jury if some jurors' actions were inappropriate.

We conclude the trial court did not abuse its discretion in denying the motion for a separate jury, there was no constitutional error, and the sanity and penalty phase verdicts need not be reversed due to the use of the same jury throughout the trial.

[…]

Defendant contends he was denied his right to due process, a fair trial, and to be free of cruel and unusual punishment under the state and federal Constitutions by the short duration of the jury's deliberations following the sanity phase of the trial. After presentation of numerous witnesses, expert and lay, over six weeks, raising issues of insanity, mental illness, irresistible impulse, amphetamine abuse, PTSD and child abuse, the jury returned a verdict finding defendant sane after only 42 minutes. Because the jury deliberated for so short a time, defendant claims, we can and should infer the jury failed to fairly and seriously consider the evidence before reaching a verdict, requiring we reverse both the sanity and penalty phase judgments.

The trial court addressed this issue in denying the motion for a new trial.[25] The court opined: "First of all, it has been contended that the trial took six weeks. Well, in fact it did, spread out over about six weeks, but in my reviewing my trial notes, there were 16 days of testimony, and some of those were partial days because of the unavailability of witnesses at various times. Much of the testimony that was given by some of the witnesses was, shall we say, foundational or background material, really did not ... bear directly on the specific issue to be decided by the jury, that is, whether or not the defendant was insane when he committed the three offenses for which he was found guilty. And as pointed out by both counsel, it is abundantly clear by the evidence, and indeed admitted by both sides, that the defendant did in fact know right from wrong, or, that is, appreciate the criminality of his conduct at the time it was committed, the first prong of the test to be applied, the second prong being whether or not he could conform his conduct to the law. It seems to me that first of all in 43 minutes the jury did have time to discuss certain matters, 42 minutes, whatever it was. Granted, that is not the most lengthy period of deliberation that the Court has observed, but in light of the fact that all of the witnesses were testifying on basically the same issue, and if the jury went into the jury room, and after discussing what the issues were, determined there really was nothing further to discuss because they were all in agreement, it seems to me that the verdict reached in that length of time is a proper verdict [and it] must be sustained."

160

--------------------FOOTNOTE--------------------

n.25    Following this verdict, defendant moved for a new trial pursuant to Penal Code section 1181, claiming the sanity verdict had been "decided by lot, or by means other than a fair expression of opinion on the part of all the jurors." The motion was denied without prejudice and then later denied when counsel renewed it. To the extent defendant contends there was evidence some of the jurors did not take the sanity phase seriously after considering the guilt phase evidence, or applied an incorrect standard of proof at the sanity phase, that evidence was not properly placed before the trial court and was inadmissible in any event (Evid. Code, § 1150), as even defendant seems to admit.

--------------------END  FOOTNOTE--------------------

We agree. As we explained in response to a similar claim that a jury arrived too quickly at a guilty verdict, which the defendant contended indicated the jury improperly considered the possibility of the death penalty at the guilt phase, "[i]t appears much more likely ... the relatively short duration of the jury's deliberations simply reflected the strength of the prosecution's case." (*People v. Robertson* (1982) 33 Cal.3d 21, 36 [188 Cal.Rptr. 77, 655 P.2d 279]; cf. *People v. Williams*, *supra*, 16 Cal.4th at p. 229 ["Defendant's mere speculation that his jury cut short its [guilt] deliberations out of prejudice [based solely on the fact that they deliberated for less than two hours] does not establish 'good cause' " to reopen voir dire prior to the penalty phase].) We find defendant was not denied any state or federal constitutional rights by the jury's short sanity phase deliberations.

Weaver, 26 Cal. 4th at 946-48, 973–74.

b.    Legal Standard

(i)    Trial Court Error

The standard for trial court error is set out in section VII, B, 1, b, (i), herein.

(ii)    Fair and Impartial Jury

The standard for trial by a fair and impartial jury is set out in section VII, B, 2, b, (ii), herein.

c.    Analysis

Petitioner argues the trial court erred when it denied his Penal Code section 190.4(c) motion for a different sanity phase jury (ECF No. 107 at 360; ECF No. 210 at 215; RT 4502-07; CT 1159-61, 1358), and his Penal Code section 1181 motion for a new sanity trial based in part on the denial of a separate sanity phase jury (ECF No. 107 at 361; ECF No. 210 at 215; RT 6800-01, 7070-92; CT 1711-1722).

(i)    Separate Sanity Phase Jury

161

1    Petitioner argues the trial court was presented with good cause for a new sanity phase

2    jury because "this jury has been predisposed after hearing the first phase of this case not to listen

3    to anything in the second phase."  (ECF No. 107 at 362 citing RT 6801; CT 1722.)  He argues

4    the jury, having rejected his guilt phase defense that he did not intend to kill Radford and Levoy,

5    would not be susceptible to an inconsistent defense that he was insane at the time of the crimes.

6    He points to habeas proffered post-trial interviews with four jurors that suggested it was hard to

7    convince them of insanity after the guilt phase.  (ECF No 107 at 363; CT 1722.)  He points to

8    habeas proffered evidence that "two jurors later stated their belief that Petitioner's counsel

9    disingenuously tried to manipulate them."  (ECF No. 107 at 363; see also 1SHCP Ex.'s 17, 18

10    At the time of Petitioner's trial, state law provided that:

11

12    If the trier of fact which convicted the defendant of a crime for which he may be
      subject to the death penalty was a jury, the same jury shall consider any plea of

13    not guilty by reason of insanity pursuant to Section 1026, the truth of any special
      circumstances which may be alleged, and the penalty to be applied, unless for

14    good cause shown the court discharges that jury in which case a new jury shall be
      drawn. The court shall state facts in support of the finding of good cause upon the

15    record and cause them to be entered into the minutes.

16    Penal Code § 190.4(c).

17    Here, the state supreme court reasonably could find the trial court's denial of Petitioner's

18    request for a separate sanity phase jury was not constitutional error.  Petitioner has not pointed to

19    clearly established federal law that, on the facts and circumstances of this case, his disparate guilt

20    and sanity phase defenses (see e.g., RT 4371-76, 4381-85, 4388, 4392, 4397, 4499-4507),

21    required separate juries.  See Spencer v. Texas, 385 U.S. 554, 656 (1967) ("Two-part jury trials

22    are rare in our jurisprudence; they have never been compelled by this Court as a matter of

23    constitutional law, or even as a matter of federal procedure."); see also People v. Bennett, 45 Cal.

24    4th 577, 600 (2011) (capital defense counsel's tactical decision to present inconsistent defenses

25    does not, without more, constitute good cause to empanel a separate penalty phase jury).

26    Furthermore, Counsel's strategically reasonable presentation of alternative or even

27    inconsistent defenses is not alone violative of Petitioner's federal rights.  (See Claims 7, 8,

28    herein.)   Particularly so, to the extent the sanity phase expert testimony considered Petitioner's

162

1  testimony and certain evidence during the guilt phase.  See Weaver, 26 Cal. 4 th at 947; see also
2  ECF No. 209 at 36.)

3      Significantly, the empaneled jurors attested during voir dire that they could fairly
4  consider the insanity defense notwithstanding conviction at the guilt phase.  (See RT 474; 593-
5  94; 626; 781-82; 973-74; 992; 1021; 1117-18, 1130-39; 1279; 1406-07; 1744; 1889-90; 2132;
6  2471-72; 2490, 2501); see also People v. Grimes, 1 Cal. 5th 698, 733 (2016) (2016) (trial court
7  acted within its discretion in using the same jury to decide guilt and penalty in a capital
8  prosecution, where the trial court conducted individual sequestered voir dire, absent evidence of
9  any particular circumstances of the defendant's case establishing good cause for a separate
10 penalty jury); see also People v. Superior Court (Brim), 193 Cal. App. 4th 989, 992 (App. Ct.
11 2011) (good cause under section 190.4(c) has been construed to require facts in the record
12 showing that the jury is unable to perform its function).

13     Furthermore, any state court error in the application of Penal Code section 190.4(c) is not
14 alone a basis for federal habeas relief.  See McGuire, 502 U.S. at 68.

15     (ii)     New Sanity Phase Trial

16     Petitioner argues the trial court should have granted his motion for a new sanity trial
17 because through juror misconduct, "the sanity verdict had been decided by lot or by means other
18 than a fair expression of opinion on the part of all the jurors."  (ECF No. 107 at 361; see also
19 Claims 17, 18.)

20     At the time of Petitioner's trial, state law provided that:

21
22     When a verdict has been rendered or a finding made against the defendant, the
       court may, upon his application, grant a new trial, in the following cases only:

23     […]

24     4. When the verdict has been decided by lot, or by any means other than a fair
       expression of opinion on the part of all the jurors[.]
25

26 Penal Code § 1181.

27     Petitioner argues that some jurors were inattentive and slept during the sanity phase, and
28 improperly considered guilt phase evidence, such that insufficient evidence supported the sanity

1 | verdict. (ECF No. 107 at 361-62; see also Claims 17 & 18; RT 5422, 6801-02; 7 CT 1722.)  He

2 | argues the trial court's errors "resulted in a sentence that was arbitrary, capricious, and

3 | unreliable."  (ECF No. 107 at 360.)

4 |      Petitioner points to the alleged: frivolous attitude of Jurors Nine, Ten, and Eleven who

5 | laughed and talked during the reading of the sanity phase instructions, the sleeping of four or five

6 | jurors during presentation of sanity phase expert opinion, and the swift sanity phase verdict

7 | allegedly rendered without constitutionally adequate deliberation.  (ECF No 107 at 362-63; see

8 | also Claims 17 & 18; RT 5422, 6788, 6792; CT 1576-78.)

9 |      However, the state supreme court reasonably could reject these allegations, for the

10 | reasons stated by that court, and those discussed in Claims 17 and 18 herein, summarized here.

11 |      Petitioner fails to show on the evidentiary record that at the sanity phase, the jury was not

12 | properly instructed through inattentiveness or otherwise.  Notably, a copy of the jury instructions

13 | was available in the jury room.  (See CT 1615.)

14 |      Petitioner fails to show on the evidentiary record that at the sanity phase, one or more

15 | jurors slept through or otherwise missed essential portions of the trial and thereby could not

16 | fairly consider the evidence and deliberate upon it.

17 |      Petitioner fails to show on the evidentiary record that sanity phase deliberations, based

18 | upon duration or otherwise, were constitutionally inadequate.  Notably, of the sixteen defense

19 | experts testifying at the sanity phase, only three actually opined on sanity.  (See Claim 8, herein.)

20 | Two of the defense experts, Drs. Donaldson and Chappell, who examined Petitioner three

21 | months after the capital crimes, found him sane at that time.  (See RT 4925, 4894, respectively.)

22 |     (iii)    Harmless Error

23 |      Petitioner argues alleged errors were harmful and prejudicial, denying him a fair and

24 | reliable verdict based upon an individualized determination of the appropriate sentence given his

25 | record and character.  (ECF No. 107 at 360.)

26 |      Particularly, Petitioner argues the trial court failed to consider the relevant and material

27 | facts showing prejudice, including "the frivolous attitude of Jurors Nine, Ten, and Eleven who

28 | laughed and talked during the reading of the sanity phase instructions; the sleeping of four or five

1  jurors during presentation of the evidence; the swift sanity phase verdict rendered without

2  constitutionally adequate deliberation; … the post-trial interviews with [certain jurors] … that it

3  was hard to convince anyone of insanity after the guilt phase[;] [and that] … counsel

4  disingenuously tried to manipulate them."  (ECF No. 107 at 363.)

5      "[Federal] habeas petitioners are not entitled to habeas relief based on trial error unless

6  they can establish that it resulted in actual prejudice."  Ayala, 576 U.S. at 267 (quoting Brecht,

7  507 U.S. at 637).  "Under this test, relief is proper only if the federal court has grave doubt about

8  whether a trial error of federal law had substantial and injurious effect or influence in

9  determining the jury's verdict."  Id. at 267–68 (quoting O'Neal, 513 U.S. at 436); see also

10  Beardslee, 393 F.3d at 1041–44 (applying Brecht's harmless error test to an Eighth Amendment

11  error based on the improper consideration of invalid aggravating factors).

12      Here, the state supreme court reasonably could find no more than harmless error under

13  the Brecht standard.  The jury was properly instructed on Petitioner's burden at the sanity phase

14  and presumably applied those instructions to evidence in the sanity phase record.  Weeks, 528

15  U.S. at 234.  As noted by the state supreme court, the sanity phase expert testimony considered

16  Petitioner's guilt phase testimony.  See Weaver, 26 Cal. 4th at 947.  To the extent Petitioner

17  relies upon inference otherwise, arising from the noted juror habeas declarations, such evidence,

18  even if admissible, does not include facts that the defense presented at the guilt phase left the

19  jury actually partial toward finding him sane.  The state supreme court reasonably could find

20  Counsel to proffer no more that surmise unsupported by the evidentiary record.  See Murphy,

21  421 U.S. at 799-803.  As noted, the state supreme court reasonably could find the individual jury

22  voir dire not to compel an inference the jurors were partial.

23      Furthermore, the state supreme court reasonably found the brief duration of deliberations

24  not a basis to find more than harmless error, but rather mere speculation.  Weaver, 26 Cal. 4th at

25  973-74; see also Claims 17, 18, herein.)  That court reasonably could find Petitioner's argument

26  otherwise either unsupported in the evidentiary record, or inadmissible, as stated.

27      d.    Conclusions

28      A fair-minded jurist could find the state supreme court's denial of the Claim was not

contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 24 shall be denied.

### C.     Claims Alleging Prosecutorial Misconduct

#### 1.     Claim 11

Petitioner alleges the prosecutor withheld material evidence impeaching prosecution witnesses, presented false testimony, and failed to honor a plea agreement, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[21]  (ECF No. 107 at 238-64.)

##### a.     State Court Direct and Collateral Review

Claim 11 allegations that the prosecution withheld material exculpatory information relevant to impeachment of prosecution witnesses Gibson and Galbraith, and failed to honor a plea agreement with him at trial, were raised in the first state habeas petition (Lod. Doc. 7 at 446-55), and summarily denied on the merits (Lod. Doc. 8).

Claim 11 allegations that the prosecution withheld material exculpatory information relevant to impeachment of prosecution witnesses Gibson, Sneed, and Galbraith, and manufactured false testimony, were raised in the second state habeas petition (Lod. Doc. 23 at 22-37), and summarily denied on the merits (Lod. Doc. 24), and on procedural grounds (id.).

##### b.     Legal Standard

###### (i)     Prosecutorial Misconduct Generally

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see also Tan, 413 F.3d at 1112; Floyd v. Filson, 949 F.3d 1128, 1150 (9th Cir. 2020) (in making that determination, courts look to various Darden factors, i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to

---

[21] Petitione states that he incorporates factual allegations of Claims 1, 2, 3, 4, 5, 6, 7, 8, 9 and 12. (ECF No. 107 at 238.)

1  disregard the comment, whether the comment was invited by defense counsel in its summation

2  and whether defense counsel had an adequate opportunity to rebut the comment).

3        To constitute a due process violation, the prosecutorial misconduct must be "of sufficient

4  significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483

5  U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)); see also

6  United States v. Agurs, 427 U.S. 97, 98 (1976); Smith v. Phillips, 455 U.S. 209, 221 (ordinary

7  trial errors by a prosecutor do not suffice; the misconduct must be egregious enough to deny the

8  defendant a fair trial).

9        "Before a federal court may overturn a conviction resulting from a state trial . . . it must

10  be established not merely that the [State's action] is undesirable, erroneous, or even universally

11  condemned, but that it violated some right which was guaranteed to the defendant by the

12  Fourteenth Amendment." Phillips, 455 U.S. at 221 (quoting Cupp, 414 U.S. at 146).

13        If prosecutorial misconduct is established, and it was constitutional error, the error must

14  be evaluated pursuant to the harmless error test set forth in Brecht. See Thompson v. Borg, 74

15  F.3d 1571, 1577 (9th Cir. 1996") (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (1993)) ("Only

16  if the argument were constitutional error would we have to decide whether the constitutional

17  error was harmless. A petitioner is entitled to relief in this context only where the constitutional

18  violations exerted a "substantial and injurious" effect on the judgment. Brecht, 507 U.S. at 620;

19  Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002) (stating the Ninth Circuit applies

20  Brecht if misconduct of constitutional dimension is established) (amended 315 F.3d 1062 (9th

21  Cir. 2002)).

22        Any claim of prosecutorial misconduct must be reviewed within the context of the entire

23  trial. Greer, 483 U.S. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir.

24  1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of

25  alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"

26  and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but

27  avoidance of an unfair trial to the accused." Phillips, 455 U.S. at 219. "Improper argument does

28  not, *per se*, violate a defendant's constitutional rights." Thompson, 74 F.3d at 1576.

1          (ii)     Brady Error

2          In Brady v. Maryland, the Supreme Court held that the suppression by the prosecution of

3    evidence favorable to an accused violates due process where the evidence is material either to

4    guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  373 U.S.

5    83, 87 (1963).

6          Under Brady, there are three elements of a due process violation based on the suppression

7    of evidence: (1) the evidence at issue must be favorable to the accused either because it is

8    exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State

9    either willfully or inadvertently; and (3) the evidence is material, i.e., if there is a reasonable

10   probability that the evidence, considered cumulatively, would have produced a different result at

11   trial.   373 U.S. at 87; Kyles v. Whitley, 514 U.S. 419, 434 (1995) (same).  If a habeas petitioner

12   establishes the "reasonable probability" of a different result, the error cannot subsequently be

13   found harmless.  Id. at 436; see also Silva v. Brown, 416 F.3d 980, 986 (2005).

14         A 'reasonable probability' is a probability sufficient to undermine confidence in the

15   outcome."   Bagley, 473 U.S. at 682; see also Turner v. United States, 137 S. Ct. 1885, 1893

16   (2017) (We "must examine the trial record, evaluate the withheld evidence in the context of the

17   entire record, and determine in light of that examination whether there is a reasonable probability

18   that, had the evidence been disclosed, the result of the proceeding would have been different.");

19   Kyles, 514 U.S. at 435 (a Brady violation occurs when the undisclosed favorable evidence

20   "could reasonably be taken to put the whole case in such a different light as to undermine

21   confidence in the verdict.").

22         Once the materiality of the suppressed evidence is established, no further harmless error

23   analysis is required.  Kyles, 514 U.S. at 435-36; see also Silva, 416 F.3d at 986 ("When the

24   government has suppressed material evidence favorable to the defendant, the conviction must be

25   set aside.").

26         A Brady violation may also occur when the government fails to turn over evidence that is

27   "known only to police investigators and not to the prosecutor."   Youngblood v. West Virginia,

28   547 U.S. 867, 870 (2006) (quoting Kyles, 514 U.S. at 437, 438) ("The individual prosecutor has

1  a duty to learn of any favorable evidence known to the others acting on the government's behalf

2  in the case, including the police.").

3     The duty to disclose such evidence is applicable even though there has been no request

4  by the accused.  Agurs, 427 U.S. at 107; see also Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th

5  Cir. 2014) (quoting Bagley, 473 U.S. at 675) ("The prosecutor, although 'not required to deliver

6  his entire file to defense counsel,' is required to turn over evidence that is both favorable to the

7  defendant and material to the case.").

8        (iii)   Napue Error

9     In Napue v. People of the State of Illinois, the Supreme Court held that the knowing use

10  of false or perjured testimony to obtain a conviction violates due process regardless of whether

11  the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it

12  appeared.  360 U.S. 264, 269 (1959).  The Court explained that the principle that a state may not

13  knowingly use false testimony to obtain a conviction - even false testimony that goes only to the

14  credibility of the witness - is "implicit in any concept of ordered liberty."  Id.

15     While the Supreme Court has clearly established that the prosecution's Brady duty

16  encompasses evidence "known only to police investigators and not to the prosecutor," Kyles,

17  514 U.S. at 437–38, it is not clearly established that a police officer's knowledge of false

18  testimony may be attributed to the prosecution under Napue.  Briscoe v. LaHue, 460 U.S. 325,

19  326 n.1 (1983) (noting that while the Supreme Court had "held that the prosecutor's knowing use

20  of perjured testimony violates due process," the Court had "not held that the false testimony of a

21  police officer in itself violates constitutional rights"); accord Reis-Campos v. Biter, 832 F.3d

22  968, 977 (9th Cir. 2016), and Browning v. Baker, 875 F.3d 444, 459–60 (9th Cir. 2017).

23     A conviction obtained by the knowing use of perjured testimony "must be set aside if

24  there is any reasonable likelihood that the false testimony could have affected the judgment of

25  the jury."  Bagley, 473 U.S. at 678.]  Once a petitioner establishes this reasonable likelihood,  no

26  further harmless error analysis is required.  Id. at 478-79.

27        c.   Analysis

28     Petitioner argues that the prosecution: (i) withheld from trial counsel a wide range of

1  exculpatory evidence which was material to both the jury's guilt-innocence, sanity, and penalty

2  phase determinations, (ii) presented and failed to correct false testimony, and (iii)

3  unconstitutionally failed to honor a plea agreement that would have spared Petitioner from a

4  death sentence.  He argues that absent this alleged misconduct, the jury would have acquitted

5  him of first-degree murder, found the special circumstances untrue, or sentenced him only to life

6  without parole.

7       However, the state supreme court reasonably rejected these allegations, for the reasons

8  discussed below.

9       (i)     Jailhouse Informant Rickey Gibson

10      Petitioner argues the prosecution withheld impeaching information that it obtained

11  statements from its guilt phase jailhouse informant witness Gibson by promising benefits such as

12  monetary payments or freedom from prosecution.  (ECF No. 107 at 239.)  He argues the

13  prosecution withheld impeaching criminal history information.  (ECF No. 107 at 240-41.)  He

14  argues the prosecution enabled Petitioner's related false testimony in these regards.  He argues

15  the prosecution's misconduct denied him a fair trial and raised a reasonable probability the

16  judgment was affected and might have been different absent the misconduct.  (See ECF No. 107

17  at 251; see also Claim 7.)   Particularly, he argues this information would have undermined

18  Gibson's credibility and placed into question his statements that: (i) he was motivated to testify

19  as a "good samaritan" (RT 3745, 4349-50); see also CT 188, 191), (ii) he faced danger on

20  account of his testifying against Petitioner (RT 3764-69, 4339-50), and (iii) he did not receive

21  anything in exchange for his testimony (RT 4349-50).

22      The record reflects that in 1982, Gibson informed Kern County authorities that, when he

23  and Petitioner were inmates at the California Medical Facility in Vacaville, California, Petitioner

24  confessed to him that he had committed the instant capital crimes.  (ECF No. 107 at 240; see

25  also ECF No. 210 at 151 citing RT 3726-70.)  Gibson's testimony included Petitioner's alleged

26  inflammatory statement to him that while strangling Levoy, "[Petitioner] turned her around to

27  watch her turn blue and die and he said that excites him to a point where he actually got off [i.e.,

28  experienced sexual pleasure] watching her die."  (RT 3731-32.)

Particularly, Petitioner argues the prosecution withheld impeaching evidence, directly and through false testimony, that:

- Gibson had a history of mental disturbance and related treatment beginning in adolescence (ECF No. 107 at 241-42; ECF No. 210 at 151-52; see also 2SHCP, Ex. 2 at 2-4 [Bates], Ex. 3 at 5-7 [Bates], Ex. 4 at 8-10 [Bates]). Ex. 6 at 35-36 [Bates] & Ex. 7 at 38-40 [Bates]; and at the time of Petitioner's alleged confession to him, was experiencing severe psychiatric symptoms that would have seriously impaired his ability to fully and accurately remember the conversations (ECF No. 107 at 248), including that he was "hearing voices," was depressed, [and] phobic[.]" (ECF No. 107 at 248-49, citing RT 3758), had tried to kill himself (ECF No. 107 at 249) and was diagnosed with a "schizotypal personality" and "antisocial personality disorder" and displayed "ingratiating and seemingly manipulative" behavior. (ECF No. 107 at 249-50).

- Gibson was a life-long substance abuser, including marijuana, methamphetamine, and alcohol (see e.g., 2SHCP Ex. 8 at 44), and may have been medicated with the antipsychotic Mellaril at the time he interacted with Petitioner (id.).

- Gibson falsely testified about his motivation and prosecution provided incentives, that he informed on Petitioner, as a good samaritan (RT 3745); that he had not informed on other inmates when in fact he had done just that at Lerdo in a separate matter (ECF No. 107 at 243 citing RT 3737-38); that he did not expect anything in return for his testimony, (RT 3743-45) and was not on parole (ECF No. 107 at 244 citing RT 3762), when in fact his request for money in exchange for testimony was denied by the prosecution (see ECF No. 107 at 244-45 citing RT 3745, 3770), the prosecution was involved in placing him in a witness protection program that paid living expenses, and repeatedly interceded on his behalf, "helping him avoid criminal charges for violating his parole in California and preventing his extradition to Utah for criminal charges" (ECF No. 107 at 245-47), and he was discharged from parole 2 weeks after Petitioner's death verdict and 1 year earlier than his official discharge date.

- Gibson falsely testified about his criminal history, that he had only felony convictions for "accessory to a robbery," and making a "false report" in Massachusetts. (ECF No. 107 at 241, citing RT 3727, 3733-34; CT 187-88),when in fact he was convicted of the more serious crimes of robbery with enhancements (ECF No. 107 at 242-43; see also ECF No. 210 at 151-52 citing 2SHCP Ex. 7), and "making a knowing false report of a bomb (ECF No. 107 at 241; see also 2SHCP Ex. Exhibit 5 at 19), and did not disclose other criminal and institutional history relevant to truth and veracity, including: (i) a 1977 false bomb threat for which he spent 60 days in jail in Santa Barbara, (ii) a 1979 arrest for forgery for which he was sentenced to 9 months in the county jail, (iii) a 1980 guilty plea to receiving stolen property for which he was sentenced to 2 years' probation which he violated 6 months later, and (iv) a non-violent juvenile record.

However, the state supreme court reasonably could find Petitioner offered only his surmise that the prosecution was chargeable with and withheld material evidence and knowingly presented materially false testimony. (See generally discussion of Claims 6, 7, and 11, herein;

see also Barker v. Fleming, 423 F.3d 1085, 1099 (2005) (we first examine the "force and nature of the withheld evidence item by item," and then "we consider the cumulative effect of the suppressed evidence . . . [g]auging the collective impact of the withheld evidence requires us to step back and consider the strength of the prosecution's case . . . ."); Blumberg v. Garcia, 687 F. Supp. 2d 1074, 1115 (C.D. Cal. 2010) ("As Napue and its progeny make clear, whether the materiality standard is met depends on the intended and actual use of the false evidence, and whether that evidence was otherwise corroborated, or effectively impeached, by non-tainted evidence such that it is not reasonably likely that the false evidence could have affected the jury's judgment.").

Petitioner provides only scant support in the state record of material undisclosed evidence. The record reflects Counsel's multiple motions for pretrial discovery and disclosure by the prosecution and its agents, including law enforcement, seeking: (i) felony convictions of any trial witnesses (CT 258-267), and (ii) disclosure of facts, things, and information in the possession, control, or knowledge of the prosecution and law enforcement relating to exoneration and impeachment, including as to prosecution witnesses any felony criminal histories and background information, leniency grants, deals and inducements to testify, and probation status and records. (See CT 437-448.) The record reflects the trial court granted the requested disclosure. (See CT 471, 507-516.) Petitioner does not identify in the state record the undiscovered material facts of impeachment. His reliance upon the noted exhibits to the second state habeas petition is misplaced. Those exhibits do not specifically support the noted allegations of psychosocial impeachment.

The state supreme court reasonably could reject Petitioner's allegation the prosecution withheld evidence that materially would have impeached Gibson based upon: his criminal history (ECF No. 107 at 240-41), and that as a result Gibson testified falsely by understating the nature and extent of his prior felony convictions (see ECF No. 107 at 241-43, citing RT 3727, 3733; CT 187-88; ECF No. 210 at 151-52 citing 2SHCP Ex. 5 at 19, Ex. 6 at 35-36, Ex. 7 at 38-40); and his statement that he was then out of prison and not on parole (see RT 3762; ECF No. 107 at 244). That court reasonably could find impeaching criminal history information allegedly

1    withheld by the prosecution, considered cumulatively and in the context of the entire record, did

2    not raise a reasonable probability of a different outcome by placing the case in a different light,

3    undermining confidence in the verdict.   Notably, Gibson testified that he had been convicted of

4    multiple felonies (RT 3733-34), and that he elicited Petitioner's confession while both were

5    incarcerated in a correctional mental hospital.  (RT 3727, 3738, 3743-50.)

6         The state supreme court reasonably could reject Petitioner's allegations the prosecution

7    withheld impeaching evidence that Gibson had a history of informing on fellow inmates in order

8    to curry favor with authorities, and sought and received benefits from the prosecution in

9    exchange for testimony in Petitioner's proceeding, and falsely denied such during his testimony.

10   (See e.g., ECF No. 107 at 243 citing RT 3738.)   The record reflects Gibson testified for the

11   prosecution notwithstanding the latter's rejection of his demands for payment and other things

12   (RT 3745, 3770-71), a pending bench warrant, and his fear he might be harmed for testifying

13   should be again be incarcerated.   (See RT 3743-50, 3762-70, 4349-50; see also CT 1024, 1328.)

14        Petitioner does not point to facts in the state record that: (i) Gibson, after being shot at on

15   the street in Los Angeles, was ineligible for placement in a witness protection program or that

16   such placement was other than consistent with Gibson's testimony he was endangered by

17   assisting the prosecution's case against Petitioner, and (ii) Gibson's testimony was motivated by

18   relief from probation or parole.  (Cf. ECF No. 107 at 246-48.)

19        Petitioner does not point to facts in the state record that Gibson previously purposefully

20   elicited information from fellow inmates in order to turn that information over to authorities, as

21   he did in this case.  (See ECF No. 107 at 243.)   Petitioner's suggestion Gibson did so in

22   connection with a planned escape at the Lerdo jail appears unsupported in the factual record.

23   (Id.)

24        The state supreme court reasonably could reject Petitioner's allegation the prosecution

25   withheld impeaching evidence that Gibson experienced severe psychiatric symptoms impacting

26   his ability to accurately perceive and relate Petitioner's confession to him.  (ECF No. 107 at 241,

27   249; ECF No. 210 at 151-52.)  Support in the state evidentiary record is scant at best, suggesting

28   only Gibson had a history of mental disturbance and intravenous drug use and on occasion was

1    incarcerated at state mental hospitals in California and Massachusetts.  (2SHCP Ex.'s 2-8.)

2    Notably, Gibson testified he was not taking medication at Vacaville state hospital.  (RT 3758.)

3           Also, the state supreme court reasonably could find such impeaching information

4    allegedly withheld by the prosecution, considered cumulatively and in the context of the entire

5    record, did not raise a reasonable probability of a different outcome by placing the case in a

6    different light, undermining confidence in the verdict.   Particularly, Gibson's credibility, while

7    somewhat self-impeached, found support in the untainted evidentiary record.  Gibson testified to

8    statements about the capital crimes made to him by Petitioner more than two years before trial,

9    while he and Petitioner were incarcerated in the Vacaville California state mental facility.  (See

10   RT 3727-49, 3758.)  Gibson's testimony included facts known only to law enforcement and the

11   killer.  For example, Gibson testified in detail to: Petitioner's bludgeoning of a white male, with

12   a "cheater pipe," (RT 3728), during an attack that occurred near Mojave, California (RT 3727,

13   3735); Petitioner's taking the girl accompanying the male to his truck, and with her inside

14   driving off, turning around and heading toward Southern California, then unloading and loading

15   the truck with the girl inside, and heading with the girl to Petitioner's home in Oroville,

16   California (RT 3727-49, 3758); Petitioner's forceable rape of the girl (id.); Petitioner's wrapping

17   a cloth around the girl's throat, gaging and strangling her (id.); and Petitioner's enlisting of his

18   son in digging a hole that ultimately would serve as the girl's grave (id.).  Also,  Gibson

19   apparently went to authorities with these statements years prior to his learning anything about

20   this case from media sources.  (See RT 3750.)

21           (ii)    Prosecution Witness David Galbraith

22           Petitioner argues the prosecution withheld material evidence impeaching its penalty

23   phase witness David Galbraith, who testified about Petitioner's crimes resulting in Petitioner's

24   October 22, 1981 Ventura County conviction for conspiracy to commit first degree murder,

25   attempted murder, conspiracy to commit rape, kidnapping, oral copulation, and unlawful sexual

26   intercourse, with the use of a firearm.  (ECF No. 107 at 251-56; ECF No. 210 at 152-54; see also

27   2SHCP Ex. 10; CT 1015-1018.)   He argues the impeaching information allegedly withheld

28   denied him a fair trial and raises a reasonable probability the judgment was affected and might

have been different.  (See ECF No. 107 at 238, 251-56); see also Claim 7; Bagley, 473 U.S. at 682.  He also argues the prosecutor failed to correct Galbraith's false testimony regarding the withheld criminal history.  (ECF No. 107 at 241, 262-63; see also Claim 12, post.)

Particularly, Petitioner argues the prosecutor requested, obtained, and then withheld Galbraith's September 10, 1984 rap sheet out of Washington state which included information that:

- Galbraith had committed multiple burglaries and thefts and had been convicted of two counts of second-degree burglary.  (ECF No. 107 at 252-53; 2SHCP Ex.'s 10 & 11.)

- Galbraith had multiple juvenile cases relating to theft, drugs and running away from home; and was terminated from the Jobs Corps for rules violations including use of marijuana.  (2SHCP Ex. 10.)

- Galbraith committed sex offenses with underage co-victim in the Ventura County proceeding, Michelle DeLong, including indecent liberties with a child and communication with a minor for immoral purposes.  (Id.)

- Galbraith falsified a monthly probation report and repeatedly violated his probation.  (ECF No. 107 at 253-54; see also 2SHCP Ex. 10 at 96-98, 105-06.)

- Galbraith suffered mental impairments prior to the Ventura County crimes; that although his IQ was 120, he suffered "minimal brain damage" and was dyslexic, hyperactive, and medicated for that condition, impulsive, abused substances including alcohol, marijuana, and LSD, had been expelled from school, and had received professional counseling for these issues.  (See ECF No. 107 at 253-54; 2SHCP Ex. 10 at 82-84.)

- Galbraith, as a result of being shot by Petitioner's accomplice in the Ventura crimes, suffered hearing losses, memory lapses, and bad dreams.  (Id.)

The record reflects that out of the presence of the jury, the prosecutor told Counsel and the trial court that: Galbraith was in custody in Washington state on a parole violation and a pending burglary charge (RT 6858-60); the prosecutor did not have a rap sheet on Galbraith because it would be out of Washington state and he did not request one (id.); Galbraith had five or six impeachable felony convictions for burglary, theft or drug offenses, (id.); Washington state parole and prosecuting authorities would consider Galbraith's assistance in this case with a view toward possible concessions (id.); the Kern County District Attorney would reimburse Galbraith $120 for inmate work pay he would miss while in California waiting to testify in this case (id.);

1  and that the trial court would inform the Washington state parole board of Galbraith's testimony
2  in this case with a view toward protective custody (id.).

3          Here, the state supreme court reasonably could find Petitioner offered only his surmise
4  that the prosecution was chargeable with and withheld Galbraith's noted rap sheet.  (See the
5  discussion of Claims 6, 7, and 11, herein); see also Barker, 423 F.3d at 1099).  Notably, Counsel
6  conceded that at arraignment in Petitioner's capital proceeding, the prosecutor handed him a 2-
7  inch thick file from the Ventura proceeding.  (CT 382.)  Petitioner does not point to facts in the
8  state record supporting his allegation the prosecutor possessed a Galbraith rap sheet prior to trial.

9          Relatedly, the state supreme court reasonably could reject Petitioner's allegation the
10 prosecution withheld material evidence that would have impeached Galbraith based upon his
11 noted criminal history, and presented his related materially false testimony.  As noted, the
12 prosecutor, outside the presence of the jury, summarized for Counsel and the Court Galbraith's
13 criminal history and testimonial inducements.  Galbraith himself testified to his multiple felony
14 history including five or six burglary and narcotic offenses, and to his current incarceration.  (RT
15 6861-63, 6877, 6883.)  Given the foregoing, the state supreme court reasonably could find
16 Petitioner failed to point to undisclosed material impeachment evidence in Galbraith's rap sheet.
17 (See 2SHCP Ex.'s 10-11.)

18         Moreover, the states supreme court reasonably could find the impeaching criminal history
19 information allegedly withheld by the prosecution, considered cumulatively and in the context of
20 the entire record, did not raise a reasonable probability of a different outcome by placing the case
21 in a different light, undermining confidence in the verdict.  (See ECF No. 209 at 74.)  Galbraith
22 testified to his multiple felony background ((RT 6861-63, 6877, 6883), his sexual activity with
23 then sixteen-year-old DeLong (RT 6879; see also 6906), the prosecution's agreement to pay him
24 $120 in inmate wages lost due to his testimony in Petitioner's proceeding (RT 6875-76), and the
25 prosecution's agreement to apprise Washington state parole and prosecuting authorities of his
26 cooperation in Petitioner's proceeding (id.).  Any mere inconsistencies in such testimony are
27 insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.
28 United States v. Zuno–Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).  "Discrepancies in . . . testimony

1  . . . could as easily flow from errors in recollection as from lies." Id.

2  The state supreme court reasonably could reject Petitioner's allegation the prosecution

3  withheld material evidence that would have impeached Galbraith on his psychosocial history.

4  That court reasonably could find impeaching psychosocial history information allegedly

5  withheld by the prosecution, considered cumulatively and in the context of the entire record, did

6  not raise a reasonable probability of a different outcome by placing the case in a different light,

7  undermining confidence in the verdict.  For example, Petitioner suggests evidence was withheld

8  that: as a child, Galbraith was medicated for hyperactivity, dyslexic, had a short attention span,

9  and was impulsive; as a teenager, Galbraith was diagnosed as having minimal brain damage,

10  began using alcohol and marijuana at age 15, refused to follow rules and was expelled from high

11  school where his language disability problems had placed him in classes with mentally impaired

12  children (2SHCP Ex. 10 at 82-83); as an adult, Galbraith was terminated from the Job Corps for

13  smoking marijuana, sought psychiatric counseling following a bad experience with LSD, and

14  suffered headaches and memory lapses from being shot in the head during the Ventura crimes

15  (id.).  Still, the state record reflects Galbraith's above noted behavioral problems; multiple gun

16  shots to the head during the Ventura County crimes; that Galbraith tested to an IQ of 120 (see

17  2SHCP Ex. 10 at 82-84); and that his testimony in Petitioner's proceeding was coherent and

18  grounded in the factual record (RT 6861-92), and in the main corroborated by the testimony of

19  his co-victim in the Ventura crimes, DeLong (RT 6893-6921).

20  Furthermore, the state supreme court reasonably could reject Petitioner's allegation the

21  prosecution withheld evidence that would have impeached Galbraith's testimony against

22  Petitioner in the Ventura proceeding.  Petitioner suggests Galbraith colluded with James Prizzi, a

23  jailhouse informant in the Ventura County proceeding.  But Petitioner points only to the

24  unspecified contents of a confiscated letter allegedly passed between Galbraith and Prizzi. (ECF

25  No. 107 at 255-56, citing RT 6969.)  The state supreme court reasonably could be unpersuaded

26  in these regards.

27  Petitioner also suggests Galbraith was disqualified from testifying in the Ventura

28  proceeding to the extent he was hypnotized by the Ventura County Sheriff prior to his testimony.

(ECF No. 107 at 254-55 citing <u>People v. Shirley</u>, 31 Cal. 3d 18 (1982), <u>People v. Guerra</u>, 37 Cal.

3d 385 (1984); <u>see also</u> ECF No. 210 at 153 citing 1SHCP Ex.'s 34, 129.)   However, this Court,

in its prior order denying claimed ineffective assistance at the sanity and penalty phases (see

respectively Claims 8 and 9, herein), concluded the impeachment value of the hypnosis evidence

was minimal and non-prejudicial, stating that:

> Petitioner claims that counsel failed to present evidence that he was kind to Mr. Galbraith. Petitioner also claims that had counsel investigated Mr. Galbraith's mental health and criminal history, she would have discovered impeachment evidence and excluded Mr. Galbraith's hypnotically-induced testimony. However, the mitigating value of the state habeas proffer in this regard seems minimal. Mr. Galbraith testified as an eyewitness. (*See e.g.*, RT 6870-71, 6888, 6899, 6901-06.) His testimony was corroborated by Ms. DeLong. (Id.)

> As to issue of hypnosis, it appears Mr. Galbraith gave a statement to Ventura County authorities under hypnosis relating only to the accuracy of a police artist drawing of the perpetrator. (*See* RT 6861-91.) It appears the hypnotic testimony of Mr. Galbraith, even if errantly admitted at trial, closely tracked the substance of his non-hypnotic statements and testimony relating to the Ventura County crimes (*see* SHCP Ex. 129 at 22-25), and at best represented only minor mitigating value.

(ECF No. 209 at 74.)  As the Court then noted, the standard for determining materiality under

<u>Brady</u> is the same as the standard for determining prejudice under <u>Strickland</u>.  <u>See Kyles</u>, 514

U.S. at 434; <u>Bagley</u>, 473 U.S. at 682.

Finally, Galbraith's credibility found support in the untainted evidentiary record.

Galbraith testified as a victim, a percipient witness to Petitioner's crimes in the Ventura County

proceeding which included the attempted murder of Galbraith and the kidnap and rape of

Galbraith's girlfriend, Delong.  (<u>See</u> RT 6872-92; <u>see also</u> ECF No. 209 at 74.)  As noted,

Galbraith's testimony was corroborated by Delong's testimony in Petitioner's proceeding.  (<u>See</u>

RT 6893-6921.)

### (iii)   Prosecution Witness Cecil Sneed

Petitioner argues the prosecution withheld material exculpatory evidence about its sanity

phase witness Cecil Sneed, who discounted fellow-inmate testimony about alleged bizarre

behavior by Petitioner in the Lerdo Jail facility (ECF No. 107 at 256-57 citing RT 6521-27; <u>see</u>

<u>also</u> 2SHCP Ex.'s 12-13), and testified to Petitioner's threats should Sneed testify against him

1  (see RT 6528-31).

2      The record reflects Sneed testified that Petitioner asked him and other inmates to testify
3  Petitioner was up nights talking to imaginary people.  (ECF No. 107 at 256, citing RT 6524-26.)
4  Sneed testified Petitioner did not talk to imaginary people at night, but that Petitioner told him he
5  was staying up one or two days at a time in prelude to psychological or psychiatric tests that
6  were being conducted at the request of his trial defense counsel.  (ECF No. 107 at 256, citing RT
7  6527-28.)

8      Petitioner argues the prosecution withheld impeaching evidence of Sneed's criminal and
9  institutional mental health records, and of assistance provided by the prosecution in resolving
10  Sneed's pending criminal matters.  He points to evidence the prosecution failed to disclose
11  Sneed's 1983 grand larceny conviction in Oklahoma, and prosecution assistance in resolving
12  Sneed's related parole violation.  (ECF No. 107 at 256-57 citing 2SHCP Ex. 14 at 302; see also
13  ECF No. 210 at 154 citing 2SHCP Ex.'s 12-15.)  He points to evidence the prosecution failed to
14  disclose Sneed's allegedly poor mental health including Sneed's multiple arrests for alcohol-
15  related offenses and his apparent intellectual limitations including inability to read and write.
16  (ECF No. 107 at 257-58 citing 2SHCP Ex. 15 at 319.)

17      However, the state supreme court reasonably could find the state record belies
18  Petitioner's allegations.  Prior to Sneed's testimony, the prosecutor stated on the record that he
19  had provided "a rap sheet to the defense, which is taken from one of our files, also consistent
20  with the one on the probation report in that case" and which included felony convictions for
21  "auto theft[,]" and that Sneed was then in custody on a "escape" charge and due to be released in
22  August 1985.  (RT 6512-13.)  The prosecutor stated the rap sheet showed that Sneed had a
23  conviction in Oklahoma in the early 1960's, apparently for receiving stolen property, which
24  might be a felony.  (RT 6515.)  The prosecutor also stated that as a condition of his testimony,
25  the sentence Sneed was then serving would be modified to time served, and he would be given
26  up to $150 for transportation to leave the area.  (RT 6513.)

27      Counsel, for her part acknowledged on the record receipt of a rap sheet for Sneed which
28  showed an extensive criminal history going back over 25 years including charges of

1  embezzlement and a conviction for burglary, both out of Oklahoma, which were not mentioned

2  by the prosecutor.   (Id.).   Prior to Sneed's sanity phase testimony, Counsel was allowed to

3  question him about his rap sheet and criminal history outside the jury's presence, and ultimately

4  the parties agreed Sneed's 1974 burglary conviction and 1983 auto theft conviction and the

5  escape charge on which he was then in custody would be available for presentation to the jury.

6  (RT 6518.)   Petitioner's suggestion Sneed received assistance in resolving violation of parole on

7  his 1983 Oklahoma auto theft conviction apparently lacks support in the state record.   (See

8  2SHCP Ex. 14 at 302.)

9         Given the foregoing, the state supreme court reasonably could find the allegedly withheld

10  impeaching evidence, considered cumulatively and in the context of the entire record, did not

11  raise a reasonable probability of a different outcome by placing the case in a different light,

12  undermining confidence in the verdict.   Especially so, given that Sneed's testimony was to some

13  degree self-impeaching.   (See ECF No. 209 at 39.)   Sneed testified that he was then incarcerated

14  in the Lerdo Jail facility (RT 6522-23), and that he agreed to testify against Petitioner in

15  exchange for his release from custody for time served on his one year sentence (RT 6525), and a

16  bus ticket (RT 6531).   Sneed testified that he had convictions for burglary and grand theft auto.

17  (RT 6534.)   Sneed testified that he could not read.   (RT 6532; see also RT 6579.)   Petitioner does

18  not identify in the state record, with any sufficient degree of specificity, undisclosed mental state

19  evidence.   Sneed conceded during cross-examination that prior to trial he was interviewed by and

20  told Counsel he would testify that Petitioner talked to imaginary people.   (RT 6526-27, 6533.)

21         Also, Sneed's testimony was countered by that of fellow Lerdo jail inmates.   Charles

22  Shannon and Christopher Flores testified in support of Petitioner's insanity defense.   Shannon

23  and Flores testified that Petitioner paced and talked to himself in their jail cell late at night.   (RT

24  6573, 6580-83.)   Carl Hogan, who shared a cell with Petitioner for one night approximately one

25  year prior to his testimony, testified that Petitioner talked to himself during the night.   (RT 5716-

26  18.)   Richard Archuleta, who shared a cell with Petitioner for a couple months in the fall of

27  1984, similarly testified that Petitioner talked to himself.   (RT 5723-25.)

28         Furthermore, Petitioner concedes that the Court, in its previous denial of Claims 8 and 9,

180

1  concluded that Sneed's testimony was significantly impeached even without this additional

2  information, which the Court found of "little evidentiary value."  (See ECF No. 209 at 39-40.)

3       Particularly, the Court previously found that:

5       Even if counsel were deficient as alleged, the state supreme court reasonably
        could have found the alleged deficiencies harmless on grounds there was no
6       reasonable probability of a different result had further impeachment been offered.
        Inmate Sneed was impeached, and his credibility impugned to a significant degree
7       on the trial record. Other inmates gave testimony favorable to petitioner. The state
        supreme court could reasonably have ascribed little evidentiary value to additional
8       evidence impeaching inmate Sneed.

9  (ECF No. 209 at 39-40.)  The standard for determining materiality under Brady is the same as

10 the standard for determining prejudice under Strickland.  See Kyles, 514 U.S. at 434; Bagley,

11 473 U.S. at 682.  Moreover, the sanity phase was the scene of extensive expert testimony

12 presented by both parties.  Only when the government has suppressed material evidence

13 favorable to the defendant, must the conviction be set aside.  Silva, 416 F.3d at 986.

14       (iv)   Other Material Exculpatory Evidence

15       Petitioner argues the prosecution withheld certain other material exculpatory evidence.

16 However, the state supreme court reasonably could find the allegedly withheld evidence,

17 considered cumulatively and in the context of the entire record, did not raise a reasonable

18 probability of a different outcome by placing the case in a different light, undermining

19 confidence in the verdict.

20       Petitioner argues the prosecution failed to disclose material exculpatory evidence relating

21 to his competence to stand trial.  He argues the prosecution withheld evidence that during breaks

22 in the sanity phase, Petitioner told courtroom custodial staff he did not understand much of Dr.

23 Alfred Owre testimony and that he had to "ask the Huffmans what each doctor was actually

24 saying."  (ECF No. 107 at 258.)  He argues that after reading an article relating to the

25 confirmation hearings for Attorney General Edwin Meese, Petitioner stated to courtroom

26 custodial staff, "I don't know where he's a Senator from."  (Id.)  But Counsel was aware she

27 needed to assist Petitioner in his understanding of courtroom proceedings and stated as much on

28 the record.  (See Claims 3, 4, herein.)  Moreover, the issue of Petitioner's competence to stand

trial and expert opinion thereon was extensively litigated.  (See Claims 3, 4, 5, herein.)
Anecdotal evidence of Petitioner's comment to courtroom staff, even if admissible, reasonably
appears no more than innocuous.   (Id.).

Petitioner argues the prosecution withheld and failed to preserve evidence of his truck
driving records that showed his history of amphetamine use including at the time of the capital
crimes, evidence supporting a "speed psychosis" defense at the guilt phase.  (ECF No. 107 at
258-62)  Still, Petitioner himself testified during the guilt phase to his continuous use of "speed"
over his one and one-half years as a truck driver preceding the capital crimes, and that his
employer at the time of the capital crimes, Bellegante Trucking, was aware he used "speed."
(RT 4072-74.)  Furthermore, where a criminal defendant alleges failure to preserve potentially
useful evidence, there is no denial of due process absent a showing of bad faith on the part of the
authorities.  Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  Here, the state supreme court
reasonably could find Petitioner made no such showing on the state record.

Petitioner also argues the prosecution withheld evidence arising out of the Ventura
County proceeding, evidence that Jerrold Daniels, Petitioner's co-defendant therein, was
extremely mentally ill, addicted to pain killers and alcohol, had attempted suicide, suffered
multiple nervous breakdowns requiring in-patient psychiatric treatment and therapy, tended
toward violence, and had taken full responsibility for the attempted murder of Galbraith.  (ECF
No. 107 at 260-61.)   However, at the penalty phase, co-victims Galbraith and DeLong testified
in detail to the crimes against then as perpetrated by Petitioner and Daniels.  (See RT 6861-6921;
see also Barker, 423 F.3d at 1099.

(v)    Due Process – Plea Agreement

Petitioner argues the prosecutor abused his discretion and committed misconduct by
refusing to honor a plea agreement that would have resulted in a life sentence, denying Petitioner
a reliable sentence.  (ECF No. 107 at 263.)   He argues that a "proposed pre-trial agreement
permitting Petitioner to plead guilty for two sentences of life without parole" was withdrawn for
politically based reasons by then Kern County District Attorney, Ed Jagels (ECF No. 107 at 263-
64), an active proponent of the death penalty "[who had] announced that he personally would see

1    to it that Petitioner received the death penalty." (ECF No. 107 at 263.)

2       As noted, a petitioner is entitled to habeas corpus relief if the prosecutor's misconduct

3 "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

4 Darden, 477 U.S. at 181; see also Tan, 413 F.3d at 1112; Floyd, 949 F.3d at 1150. The court

5 must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial

6 misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due

7 process is not punishment of society for the misdeeds of the prosecutor but avoidance of an

8 unfair trial to the accused." Phillips, 455 U.S. at 219.

9       The State's breach of a plea agreement implicates the constitutional guarantee of due

10 process. Mabry v. Johnson, 467 U.S. 504, 509 (1984), disapproved on other grounds by Puckett

11 v. U.S., 556 U.S, 129 (2009); Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir.2003).

12

13       "Plea agreements are contractual in nature and measured by contract law
14 standards." *In re Ellis,* 356 F.3d 1198, 1207 (9th Cir.2004) (en banc); *Buckley v. Terhune,* 441 F.3d 688, 695 (9th Cir.2006) (en banc), *cert. denied,* 550 U.S. 913,
15 127 S.Ct. 2094, 167 L.Ed.2d 831 (2007); *Brown,* 337 F.3d at 1159. Under "clearly established federal law[,] ... the construction and interpretation of state
16 court plea agreements 'and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law.' " *Buckley,* 441 F.3d
17 at 694–95 (quoting *Ricketts v. Adamson,* 483 U.S. 1, 6 n. 3, 107 S.Ct. 2680, 2684 n. 3, 97 L.Ed.2d 1 (1987)). "Under California law, a contract must be interpreted
18 so as 'to give effect to the mutual intention of the parties as it existed at the time of contracting.' " *Davis,* 446 F.3d at 962 (quoting Cal. Civ. Code § 1636). In so
19 doing, "[a] court must first look to the plain meaning of the agreement's language." *Buckley,* 441 F.3d at 695 (citing Cal. Civ. Code §§ 1638, 1644). "If the
20 language in the contract is ambiguous, 'it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee
21 understood it[,]' " which means looking to the " 'objectively reasonable' expectation of the promisee." *Buckley,* 441 F.3d at 695 (citations omitted). "If
22 after this second inquiry the ambiguity remains, 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to
23 exist.' " *Id.* at 695–96 (citations omitted).

24 Orozco v. Clark, 705 F. Supp. 2d 1158, 1168 (C.D. Cal. 2010).

25

26       "[D]ue process rights conferred by the federal constitution allow [a defendant] to
enforce the terms of [his] plea agreement." *Brown v. Poole,* 337 F.3d 1155, 1159
27 (9th Cir.2003). It is axiomatic that when a plea agreement rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a
28 part of the inducement or consideration, such promise must be fulfilled. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971);

*Mabry v. Johnson,* 467 U.S. 504, 509–10, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (clarifying that a *Santobello* claim requires the plea to be induced by the prosecutor's promise); *see also Davis v. Woodford,* 446 F.3d 957, 961 (9th Cir.2006) (when a prosecutor adds a term to the agreement during the plea colloquy, that term becomes a part of the agreement regardless of the parties' prior understanding); *Brown,* 337 F.3d at 1159. The determination of the defendant's "rights and responsibilities under the plea agreement is controlled by the principles of *fundamental fairness* imposed by the Due Process Clause." *Santobello,* 404 U.S. 257 at 262–62, 92 S.Ct. 495 (emphasis added). "Where a plea agreement is breached, the purpose of the remedy is, to the extent possible, to 'repair the harm caused by the breach.' " *Buckley,* 441 F.3d at 699 (quoting *Toscano,* 124 Cal.App.4th at 345, 20 Cal.Rptr.3d 923) (citing *People v. Kaanehe,* 19 Cal.3d 1, 14, 136 Cal.Rptr. 409, 559 P.2d 1028 (1977))). *Santobello* provides that depending on the circumstances of the case, specific performance and withdrawal of the plea are both available remedies for breach. *Santobello,* 404 U.S. at 263, 92 S.Ct. 495.

Quintana v. Cate, 88 F. Supp. 3d 1102, 1112-13 (C.D. Cal. 2015).

A criminal defendant has a due process right to enforce the terms of a plea agreement into which he and the State entered. *See Santobello v. New York,* 92 S.Ct. 495, 498–99 (1971). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 499. "In construing an agreement, the court must determine what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty." *United States v. De La Fuente,* 8 F.3d 1333, 1337 (9th Cir.1993); *see also Gunn v. Ignacio,* 263 F.3d 965, 970 (9th Cir.2001). "[T]he construction of the plea agreement and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law." *Ricketts v. Adamson,* 107 S.Ct. 2680, 2683 n.3 (1987). Plea agreements are construed under ordinary rules of contract interpretation. *See, e.g., Brown v. Poole,* 337 F.3d 1155, 1159 (9th Cir. 2003).

Allen v. Dyer, No. CV 14-5492-R (GJS), 2015 WL 4776872 at *5 (C.D. Cal. June 23, 2015), report and recommendation adopted, No. 14-5492-R (GJS), 2015 WL 4757646 (C.D. Cal. Aug. 10, 2015).

Here, the state supreme court reasonably could reject the allegation because Petitioner fails to support it with facts in the record showing a plea agreement was reached, the terms and conditions thereof, and Petitioner's plea or change in position in reliance thereon.

Furthermore, Petitioner plea agreement argument, unsupported in the state record, raises no more than harmless error under Brecht.  Petitioner's suggestion that "[t]he political basis of the decision to seek the death penalty also denied [him] equal protection under the Fourteenth Amendment[,]"  (see ECF No. 107 at 264), fails, for the reasons stated.  (See Claims 12, 27,

1  herein.)

2        d.    Conclusions

3        A fair-minded jurist could find the state supreme court's denial of Claim 11 as

4  prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly

5  established federal law, as determined by the Supreme Court, or based on an unreasonable

6  determination of the facts in light of the evidence presented in the state court proceeding.  28

7  U.S.C. § 2254(d).

8        Claim 11 allegations of prosecutorial misconduct shall be denied.

9        2.    Claim 12

10       Petitioner alleges the prosecutor engaged in multiple instances of misconduct during pre-

11 trial and trial proceedings, violating his rights under the Fifth, Sixth, Eight and Fourteenth

12 Amendments.[22]  (ECF No. 107 at 265-82.)

13       a.    State Court Direct and Collateral Review

14       Claim 12 allegations that the prosecutor misled the jury and misstated the law regarding

15 mitigating evidence were raised and rejected on direct appeal on the merits, as follows:

16

17       When the prosecutor asserted in closing argument that the **section 190.3, factor**
      (h) analysis was "[b]asically ... a review of the sanity phase in the case," he was

18       likely not urging the jury to apply the same *level of proof.* Instead, he appeared to
      be urging the jury to find there was *insufficient persuasive evidence* showing

19       defendant suffered a mental disease or defect. "The only thing I am going to say
      with regard to that is I don't think there is evidence to support it. There was an

20       attempt made to present evidence showing that. I think that evidence failed in that
      regard for the reasons that I have stated earlier in my argument." The prosecutor

21       reminded the jury that, during voir dire, the jurors affirmed that they "could
      consider [mental disease or defect as a mitigating factor] even though the

22       defendant might be sane." Although the prosecutor could have more clearly
      explained the difference in the standard of proof between legal insanity

23       ("substantial capacity") and factor (h) ("impaired"), we conclude the prosecutor
      did not mislead the jury.

24

25 Weaver, 26 Cal. 4th at 983.

26       Claim 12 allegations that the prosecutor committed misconduct by releasing comments

27 and information to the media, peremptorily challenging Kern County Superior Court Judge

28 ------

[22] Petitioner states that the factual allegations in Claims 1, 2, 6, 7, 8, 9, 10, 11, 15, 17 and 18 are incorporated herein.

1  Robert Baca, arguing at the guilt phase closing Petitioner's assertion of his right to remain silent

2  during initial questioning by Kern County authorities, failing to provide timely notice of the

3  felony murder-rape theory as to victim Radford, and arguing at the penalty phase closing the law

4  and evidence to be considered in the sentence determination, were presented to the California

5  Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 38-60), and

6  summarily denied on the merits and on procedural grounds.  (Lod. Doc. 24.)

7       b.    Legal Standard

8       The standard for prosecutorial misconduct generally is set out in section VII, C, 1, b, (i),

9  herein.

10      c.    Analysis

11      Petitioner argues the prosecutor engaged in numerous acts of misconduct prior to and

12  during trial, which so infected the integrity of his trial that the error cannot be deemed harmless.

13  These arguments are discussed separately below.

14          (i)    Comments and Information Released to the Media

15      Petitioner argues the prosecutor committed misconduct "by releasing unethical and

16  severely prejudicial comments and confidential information about Petitioner's case to the

17  newspaper and television media prior to and during trial[,]" even after the trial court's issuance

18  of gag orders and Petitioner's related change of venue motion.  (ECF No. 107 at 265-66; see

19  also id. at 266, citing to the American Bar Association Code of Professional Responsibility and

20  related standards that such conduct is punishable as contempt.)

21      The record reflects that in June 1983, in response to Petitioner's Motion to Suppress

22  Pretrial Publicity and Issue a Gag Order following alleged prejudicial publicity, the trial court

23  issued a gag order that "the parties not directly or indirectly release to any news media

24  information or opinion concerning the trial or any issue likely to be involved therein, other than

25  the date and place of trial, the names of the parties and counsel, the contents of the complaint,

26  and the plea of the defendant[,]" and prohibiting "public statements or releases concerning the

27  merits of the complaint, the evidence or arguments to be adduced by either side, or trial tactics or

28  strategy."  (ECF No. 107 at 268 citing CT 243-44.)  The trial court shortly thereafter extended

1   the gag order to all participating law enforcement agencies.  (See CT 268-69.)

2          Petitioner argues the Kern County District Attorney, politically motivated to get a death

3   verdict, continued to release prejudicial comments and information published in the Bakersfield

4   Californian newspaper and/or included in local television coverage.  He points to media coverage

5   that he had confessed to the charged offenses, and falsely portraying him as a multi-state serial

6   rapist and killer.  (ECF No. 107 at 266-68.)  He points to media coverage "linking [his]

7   confession to defense counsel's 'scrambling to make a deal.' "  (Id.; see also 2SHCP Ex. 16 at

8   321.)  He points to the prosecutor's comments to the media regarding proposed guilt phase

9   rebuttal testimony by Petitioner's mother refuting aspects of the defense relating to whether she

10  bit Petitioner as a child, as a method of disciplining him.  (ECF No. 107 at 269-70 citing RT

11  4307, 4324-27; see also RT 4293-4300.)

12          Petitioner also argues the trial court's denial of his motion for jury sequestration

13  compounded the prejudice from the prosecutor's misconduct alleged above.  (ECF No. 107 at

14  269-70 citing RT 4326-27.)

15          However, the supreme court reasonably could reject the allegations as at most reflective

16  of ordinary trial errors.  (See Claim 12, herein, discussing the factual predicate in the context of

17  claimed trial court error); see also Phillips, 455 U.S. at 221.  Petitioner does not point to facts in

18  the record, on voir dire and otherwise, suggesting the jury was tainted by the media evidence and

19  that the media evidence was so significant as to deny him a fair trial.  (See Claim 10); see also

20  Greer, 483 U.S. at 765.  For example, the trial court observed the proffer regarding the mother's

21  proposed testimony was made outside the presence of the jury and thus could not be prejudicial.

22  (RT 4293.)  Relatedly, the trial court did not find the prosecutor in violation of the gag orders.

23          Petitioner goes on to argue that the conduct of the state in this case was deliberate and

24  egregious and part of a pattern of prosecutorial misconduct which so infected the integrity of the

25  proceeding against Petitioner that the error cannot be deemed harmless.  (ECF No 107 at 282.)

26  But even assuming arguendo the prosecutor's alleged misconduct, the state supreme court

27  reasonably could find it harmless, for the reasons stated.  Significantly, Petitioner does not point

28  to facts in the record that the seated jurors were aware of and considered the media evidence.

1          (ii)      Disqualification of Superior Court Judge Baca

2          Petitioner argues the prosecutor committed misconduct by peremptorily challenging Kern

3 County Superior Court Judge Robert T. Baca's assignment to his case.  (ECF No. 107 at 270-71

4 citing CT 1027-1028.)

5          Petitioner suggests that Judge Baca knew of Lead Counsel's alcohol problems and case-

6 related impacts, and argues the prosecutor sought to avoid removal of Lead Counsel on this

7 basis.  (Id.)  Relatedly, Petitioner argues the prosecutor engaged in misconduct by failing to

8 inform the trial court of Lead Counsel's alcoholism.  (ECF No. 107 at 271; see also  Claims 1, 2,

9 herein; ECF No. 162 at 98-100.)

10         However, the state supreme court reasonably could reject the allegations as mere surmise.

11 The state record reflects that the recusal motion was grounded in Judge Baca's alleged prejudice

12 against the Kern County District Attorney's Office.  (CT 1027-28.)   Petitioner's suggestion the

13 recusal motion was motivated by a desire to avoid removal of allegedly incompetent counsel is

14 unsupported factually.  Moreover, the Court previously found Petitioner was not denied counsel

15 on grounds of impaired and incompetent counsel.  (See ECF No. 162 at 98-100; Claim 1, herein.)

16         To the extent Petitioner revisits argument that the conduct of the prosecution in this case

17 was part of a pattern of harmful  misconduct (ECF No 107 at 282), the allegation fails, for the

18 reasons stated (see Claim 27, herein).  Petitioner does not provide legal or factual argument

19 suggesting removal of Judge Baca denied him a fair trial and was harmful error under Brecht.

20         (iii)      Guilt Phase Closing Argument

21         Petitioner argues the prosecutor committed misconduct by "improperly denigrat[ing]

22 [his] testimony and his defense, by accusing him of being a liar, and by declaring that his defense

23 was a sham, and the defense theory recently fabricated."  (ECF No. 107 at 274.)  He points to

24 prosecution argument that Petitioner's testimony was geared to avoid evidence of intent to kill

25 and killing in the perpetration of a felony, and alleged misstatement of the relevant law by telling

26 the jury that "[a] killing in the perpetration of a felony or the attempt to perpetrate a felony

27 extends to a point in time until the perpetrator has completed the act and reached a point of

28 temporary safety."  (Id. at 275-79, citing RT 4322-56, 4423-28.)  He points to prosecution

1    argument allegedly vouching for its witnesses (id. citing to RT 4349-50,  4422), and acting as a

2    spokesperson for the victims (ECF No. 210 at 160-61).  He points to prosecution argument

3    suggesting an unfavorable inference from Petitioner's alleged invocation of his right to remain

4    silent arising from what he characterizes as his initial refusal to speak with Kern County

5    authorities about the capital crimes.  (ECF No. 107 at 278 citing RT 4042, 4334, 4345; ECF No.

6    210 at 158 citing RT 4334-45; Doyle v. Ohio, 426 U.S. 610, 618 (1976) (silence at time of arrest

7    may not be used to impeach an exculpatory story proffered for the first time at trial).)

8         However, the state supreme court reasonably could reject these allegations.  The

9    prosecutor is accorded certain leeway in arguing the facts of the case.  Boyde, 494 U.S. at 384-85

10   (arguments of counsel, like the instructions of the court, must be judged in the context in which

11   they are made).  Additionally, the jury properly was instructed that attorney statements were not

12   evidence.  (CT 1368.)  Jurors are presumed to understand and follow instructions.  Weeks, 528

13   U.S. at 234.  Here, the state supreme court reasonably could find Petitioner failed to demonstrate

14   the prosecutor exceeded the bounds of fair argument or argued facts not in evidence infecting the

15   trial with unfairness, for the reasons discussed below.

16        The state supreme court reasonably could find the prosecutor's argument relating to the

17   law of premediated and felony murder was not premised in a misstatement of the applicable  law,

18   the evidence, or the instructions given by the trial court.  (See Claims 20, 21, 22, herein.)

19   Particularly, Petitioner suggests the prosecutor improperly argued evidence relating to

20   Petitioner's intent to kill Levoy.  (See RT 4345-49.)  Petitioner notes the prosecutor's argument

21   "[D]id she bite him? There was evidence he was bit. We don't know that it was her but let's

22   assume she did bite him, and it hurt, and it made him mad. Did he intend to kill her? If you are

23   angry enough, you intend to kill."  (RT 4348.)  But the state supreme court reasonably could find

24   only fair argument as to Petitioner's proffered testimony suggesting the killing of Levoy was an

25   unconscious act.  Moreover, the prosecutor informed the jury that the trial court would provide

26   instruction thereon.  (RT 4308.)  The trial court ultimately instructed the jurors on murder and

27   felony murder, the required mental states (see e.g., CT 1389-97, 1402 1430-33), and on

28   unconscious acts (CT  1445-1446).  Here again, the jury is presumed to understand and follow

1   their instructions.  <u>Weeks</u>, 528 U.S. at 234.

2         The state supreme court reasonably could find the prosecutor's argument allegedly

3   vouching for certain of its witnesses was merely fair argument.  Petitioner points prosecution

4   argument that:

5
6         One, as I indicated is you evaluate the evidence and ask yourself who has a reason
      to tell you something other than the truth. Do any of the People's witnesses have
      that reason? I submit that they don't. Most of them are simply people who became
7      involved either because they saw something and have no reason to change their
      story or to make up anything or to either aggravate it or minimize it." (RT 4349.)
8
      Does Ricky Gibson have any reason to come in here and make this up? He went
9      to law enforcement originally. He told them what he had. Following that, yes, he
      did. He wanted to be paid. I suppose it's human nature if you have something you
10     think is of value. He demanded payment. He was advised that he wouldn't get
      any. He testified before, he testified at the trial. He testified to receiving nothing,
11     nobody refuted that and there is no reason to think that he received anything.

12     [¶]

13     He, also, testified what would happen to him if being labeled a snitch he was
      returned to prison. If anything, he has reason to tell less than what he was told, to
14     minimize it, but he came forward and told the story he had told before."  (RT
      4349-50.)
15
      "So, it isn't Gibson who came here and lied to you and told you something other
16     than what happened." (RT 4422.)

17

18        Still, the prosecutor prefaced his remarks by explaining to the jury that he was going to

19  "go through some of the reasons" why "you should reject the defendant's version of what

20  happened in this case."  (RT 4349.)  He stated jurors should "evaluate the evidence and ask

21  yourself who has a reason to tell you something other than the truth."  (<u>Id</u>.).  The state supreme

22  court reasonably could find the prosecutor argued for the credibility of its witnesses and

23  Petitioner, based upon persuasive value of facts in the record.  <u>See Nichols v. Garcia</u>, No. C 98-

24  1301 CRB(PR), 1999 WL 459362 at *4 (N.D. Cal. June 28, 1999) (citing United States v.

25  Berger, 295 U.S. 78, 86–88 (1935)) (it is misconduct for the prosecutor to vouch for the

26  credibility of a witness by giving personal assurances of the witness's truthfulness or suggesting

27  that there is information not presented to the jury which supports the witness's testimony).  For

28  example, as to Gibson, the prosecutor's comment that it wasn't he who "came here and lied to

1 you[,]" related to portions of Petitioner's confession to Gibson which Petitioner later admitted he
2 made up.  (See RT 4422.)

3        Moreover, the jury was instructed on evaluating witness credibility and weighing
4 evidence (see CT 1374-79), and reasonably would have considered the prosecutor's argument in
5 the context of these instructions.  The state supreme court reasonably could find the concerns
6 espoused by the Supreme Court proscribing vouching, i.e., the danger of implying either that
7 there is unpresented evidence bolstering the witness's credibility, or that the witness's testimony
8 has the government's imprimatur (see United States v. Young, 470 U.S. 1, 18 (1985)),  not to be
9 present on the facts and circumstances of this case.

10       The state supreme court also reasonably could find the prosecutor's argument
11 commenting regarding Petitioner's temporary cessation of his initial interview with Kern County
12 authorities not improper as implicating his right to remain silent.  Petitioner observes the
13 prosecutor argued that:

14

15        [Petitioner] told [the officers] he didn't want to talk to them, but I questioned him
         about that; "did you tell them you didn't want to talk, or did you talk and deny
16       involvement?" He talked but denied involvement. He said "I don't know what
         you are talking about. Let me talk to my mother and maybe we will talk again."

17 (RT 4334; see also RT 4345.)

18       The Fifth Amendment privilege against self-incrimination  generally prohibits a
19 prosecutor from commenting on a defendant's decision not to testify.  Gwin v. Martel, No. CV
20 14-6083-MWF (GJS), 2016 WL 8223274 at *41–42 (C.D. Cal. June 21, 2016), report and
21 recommendation adopted, No. CV 14-6083-MWF (GJS), 2017 WL 517759 (C.D. Cal. Feb. 6,
22 2017) (citing Griffin v. California, 380 U.S. 609, 615 (1965)).  Particularly,  a "prosecutor may
23 not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of
24 guilt."  United States v. Robinson, 485 U.S. 25, 34 (1988).  The Ninth Circuit has stated that "a
25 direct comment about the defendant's failure to testify always violates Griffin, [but] a
26 prosecutor's indirect comment violates Griffin only if it is manifestly intended to call attention to
27 the defendant's failure to testify, or is of such a character that the jury would naturally and
28 necessarily take it to be a comment on the failure to testify."  Hovey v. Ayers, 458 F.3d 892, 912

1  (9th Cir. 2006).

2       Here, the state supreme court reasonably could find no <u>Griffin</u> error.  The prosecutor's

3  noted argument apparently related in the main to Petitioner's changing story rather than his

4  request, honored by authorities, that the San Quentin interview be suspended pending

5  Petitioner's discussion with his mother.  (<u>See</u> Claim 14, herein; <u>see also</u> CT 106-107.)  That

6  court reasonably could find the prosecutor's comment only to indirectly refer to Petitioner's

7  apparent temporary assertion of a right to remain silent, followed by Petitioner's continuance of

8  the interview and ultimately his testimony at trial wherein he confessed to the capital crimes.

9       Notably, Petitioner concedes the prosecutor properly could comment upon any

10  inconsistency between the trial defense and Petitioner's pretrial statements/lack thereof.  (ECF

11  No. 210 at 159 citing <u>Anderson v. Charles</u>, 447 U.S. 404, 408-409 (1980); <u>United States v.</u>

12  <u>Ochoa-Sanchez</u>, 676 F.2d 1283, 1286 (9th Cir. 1982).  Also, jurors were instructed on weighing

13  inconsistent evidence (CT 1374-1376) and presumably understood and followed their

14  instructions.  <u>Weeks</u>, 528 U.S. at 234.

15       Additionally, the state supreme court reasonably could find any <u>Griffin</u> error only

16  harmless.  <u>See Chapman v. California</u>, 386 U.S. 18, 22-26 (1967) (<u>Griffin</u> error is not structural

17  but, rather, is trial error subject to harmless error review).  The state supreme court reasonably

18  could find the prosecutor's comment did not have  a "substantial and injurious effect or influence

19  in determining the jury's verdict[,]" for the reasons stated.  <u>See Brecht</u>, 507 U.S. at 637-38.

20       (iv)    Notice of Felony Murder-Rape Theory

21       Petitioner argues the prosecutor committed misconduct by providing untimely notice that

22  the felony murder-rape theory applied to the Count 1 the killing of Radford.  (ECF No. 107 at

23  278 citing RT 3219.)  He points to Counsel's statement on the record that:

24

25       Being lulled into the belief that rape would only apply to Barbara Levoy, I
        haven't concentrated at all or spent very little time concentrating on Robert

26       Radford as that murder being applicable to the felony murder rule other than the
        kidnapping. The reason being is that the prosecutor at the preliminary hearing

27       stage never filed murder during the rape of Barbara Levoy as a special crime for
        Robert Radford, on the count relative to Robert Radford, on the count relative to

28       Robert Radford [sic] for special circumstance. That's never been a thought in my
        mind that would be attempted to be applied by the prosecutor. It is only his last

192

supplemental pleading that brought that forth. I have always concentrated on the death of Barbara Levoy as showing that the felony murder rule was applicable or inapplicable."

(RT 3219.)

The record reflects that the 1982 criminal complaint and information and the 1984 amended information charged only premeditated murder (Penal Code § 187) as to Radford.  (CT 131, 203, 983.)  Notably, as discussed above in Claim 25, the application of the felony murder-rape theory in issue was as to the first degree murder charge, not the special circumstance.

Here, the parties briefed and argued the application of the felony murder doctrine to Petitioner's admitted rape.  (See CT 1261-1277.)  The trial court ruled thereon at the start of the guilt phase, finding that the murder of Radford was part of the rape of Levoy, and that the felony murder rule was applicable.  (See CT 1278-1279.)

The state supreme court reasonably could find Petitioner failed to argue or demonstrate on the state record that he was improperly charged or that Counsel was denied timely notice thereof.  Particularly, Petitioner's argument of untimely notice of the prosecution's felony murder-rape theory of murder as to Radford is unsupported by legal authority and ignores the facts and circumstances of the crimes presented as early as the preliminary hearing.  (See e.g., CT 152-176, 183-191.)

To the extent Petitioner argues the alleged conduct of the prosecution was deliberate and egregious and part of a pattern of prosecutorial misconduct which was more than harmless error (ECF No 107 at 282), the state supreme court reasonably could find the alleged error harmless individually and cumulatively, for the reasons stated.  (See Claims 25, 27); see also Brecht, 507 U.S. at 637-38.  Significantly, Counsel was fully heard on the matter, stated his agreement with the trial court's position that felony murder-rape could apply to Radford (RT 3219), and ultimately failed to point to facts in the state record suggesting the trial court erred legally or factually in allowing the prosecution to apply this theory of murder to the Radford killing.  (Id.; see also Claim 25.)

(v)    Penalty Phase Closing Argument

Petitioner argues the prosecutor improperly argued at the penalty phase closing that "the

1  jury could consider as aggravation certain evidence that was not so statutorily eligible and

2  encouraging the jury to review all the evidence for additional aggravating factors."  (ECF No.

3  107 at 280.)   He points to the prosecutor's argument that "[t]he lack of application of the factors

4  in mitigation, only extenuate the validity of the death penalty in this case" (ECF No. 107 at 281,

5  citing RT 7026), as improperly suggesting there was no limit evidence to be aggravating,

6  including that evidence of Petitioner's character, mental state, and in-prison mental health

7  therapy (ECF No. 107 at 281-82 citing RT 7014-23).   But the state supreme court reasonably

8  could find the jury was properly instructed on the weighing of aggravating and mitigating

9  circumstances (see Claim 20), and that the prosecutor's noted argument went to the persuasive

10  weight of the evidence before the jury.   Those instructions, considered in the context of all the

11  trial court's instructions (see e.g., RT 7014-27), and did not preclude the jury from considering

12  any and all mitigating evidence.  See Lockett, 438 U.S. at 605.  For the same reasons,

13  Petitioner's argument the alleged federal errors, individually and cumulatively, denied him a fair

14  trial and were harmful, reasonably could be denied.  (See ECF No 107 at 282); see also Phillips,

15  455 U.S. at 221; Greer, 483 U.S. at 765.

16      Petitioner argues the prosecutor misled the jury into applying the more stringent sanity

17  phase standard during consideration of the evidence before the jury during the penalty

18  determination phase.  (ECF No. 107 at 279-80; ECF No. 210 at 159-60 citing RT 7014-22.)  He

19  suggests the prosecutor misstated the law by arguing that the sanity phase legal standard applied

20  to the penalty phase.  (Id.)  He suggests the prosecutor improperly argued that "certain mitigating

21  evidence [of impaired mental capacity to appreciate the criminality of his conduct or to conform

22  his conduct to the requirements of the law] could not be considered as (Penal Code § 190.3(h))

23  mental disturbance, disease, or defect[.]" (Id.)  He suggests the prosecutor improperly argued

24  that the jury could consider as aggravation certain evidence that it was not statutorily permitted

25  to consider.  (Id.)  He suggests the prosecutor improperly discounted the mitigating value of

26  sanity phase evidence, and misstated the relevant law by suggesting necessity of a nexus between

27  the crime and the mitigating evidence.  (Id.; see also Penry v. Lynaugh, 492 U.S. 302, 328

28  (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002)).

Particularly, Petitioner takes issue with prosecution argument that:

Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. I submit to you that there is no evidence in this case to indicate that that was the case. There was evidence geared in the sanity portion or insanity portion of the trial, but that I don't think is what we are dealing with. There is a separate category that covers that.

(RT 7014-15.)   He takes issue with prosecution argument that:

Subsection ["h"] is whether or not the defendant — or whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.  Basically, that is a review of the sanity phase in the case. I am not going to repeat the arguments that I made there as to why I felt it was not appropriate. It wasn't that long ago. I am confident that you can remember those arguments. You were questioned extensively in your selection concerning whether or not you could consider that even though the defendant might be sane. The only thing I am going to say with regard to that is I don't think there is evidence to support it. There was an attempt made to present evidence showing that. I think that evidence failed in that regard for the reasons that I have stated earlier in my argument.

(RT 7016.)   He takes issue with prosecution argument that:

[T]he other area that may be anticipated is the psychiatric defense, and included in that is what was described as the defendant's abusive childhood, mental health problems, the other things disclosed again in the sanity phase. It was not that long ago. It was argued extensively at that point. I indicated there why I felt it was not valid, and rather than reiterate that argument, I would simply say the same thing, the defendant undoubtedly has problems, those problems are in part mental or personality or emotional, but there was nothing in the evidence to indicate that it should be a basis or an excuse for these crimes. I submit that that same reasoning applies as to the penalty case, that it is not a basis to find less than the death penalty. The evidence simply did not come across as that persuasive.

(RT 7022.)

But here again, the state supreme court reasonably could find the jury was properly instructed on the weighing of aggravating and mitigating circumstances (see Claims 9, 20, herein), and that the prosecutor's noted argument went to the persuasive weight of the evidence before the jury, considered in the context of the trial court's instructions (see Weaver, 26 Cal. 4th at 983; see also RT 7014-27), and did not preclude the jury from considering any and all

mitigating evidence.  See Locket, 438 U.S. at 605.  Particularly, that court reasonably could find prosecution argument that sanity phase evidence was not sufficient to support (Penal Code § 190.3(h)) mitigating mental or emotional disturbance or defect, or (Penal Code § 190.3(k)) extenuating circumstance, was not improper given the factual record and the trial court's noted instructions.  The apparent thrust of the prosecutor's argument was that Petitioner's mental state proffer at trial "did not come across as that persuasive."  (RT 7022.)  Relatedly, the prosecutor reminded the jury that mental disease or defect could have mitigating value even though the defendant might be sane.  (RT 7016.)

For the same reasons, Petitioner's argument the alleged federal errors, individually and cumulatively, denied him a fair trial and were harmful, reasonably could be denied.  (See ECF No 107 at 282; See Phillips, 455 U.S. at 221; Greer, 483 U.S. at 765.

Petitioner argues the prosecutor improperly argued jurors should sympathize with "the victims in this case[,]" that on the facts of the case, the death penalty was required in order to provide justice for the absent victims who could no longer speak for themselves.  (RT at 7025-27; see also ECF No. 210 at 161.)  However, Counsel's objection to this argument was sustained.  (RT 7026.)  Moreover, the jury was properly instructed on the weighing of aggravating and mitigating circumstances (see Claim 20, herein; see also CT 1651-1652 [i.e., CALJIC 8.84.1 stating the Penal Code § 190.3 factors]), including that: "[jurors] must not allow prejudice or passion against [Petitioner] to influence [their] verdict as to the penalty imposed" (CT 1644).  The jurors were also instructed that the statements of counsel were not evidence.  (CT 1646.)  The state supreme court reasonably could view such argument as proper in context of the factual record, the jury instructions, and the state's role in seeking a just punishment for crime.  See e.g., Drayden, 232 F.3d at 713.

Significantly, the Supreme Court has noted that:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence ... and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that

196

1    prosecutorial misrepresentations may never have a decisive effect on the jury, but
2    only that they are not to be judged as having the same force as an instruction from
     the court. And the arguments of counsel, like the instructions of the court, must be
3    judged in the context in which they are made.

4    Boyde, 494 U.S. at 384-85.

5         Petitioner again argues that the conduct of the state in this case was deliberate and

6    egregious and part of a pattern of prosecutorial misconduct which so infected the integrity of the

7    proceeding against Petitioner that the error cannot be deemed harmless."   (ECF No 107 at 282.)

8    But even if the prosecutor did engage in improper argument as alleged, the state supreme court

9    reasonably could find only harmless trial error that individually and cumulatively did not deny

10   Petitioner a fair trial, for the reasons stated.  (See ECF No. 107 at 282); Phillips, 455 U.S. at 221;

11   Greer, 483 U.S. at 765.

12        d.    Conclusions

13        A fair-minded jurist could find the state supreme court's denial of Claim 12 as

14   prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly

15   established federal law, as determined by the Supreme Court, or based on an unreasonable

16   determination of the facts in light of the evidence presented in the state court proceeding.  28

17   U.S.C. § 2254(d).

18        Claim 12 allegations of prosecutorial misconduct shall be denied.

19        3.    Claim 27

20        Petitioner alleges the prosecutor engaged in misconduct by considering his race, class,

21   and gender in making the decision to charge capitally.  (ECF No. 107 at 388-91.)

22        a.    State Court Direct and Collateral Review

23        The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 400-

24   01), and denied it the merits, as follows:

25
26        Defendant next raises several arguments that the state's death penalty law is
          unconstitutional under the state and federal Constitutions. As outlined below, we
27        have addressed and rejected these claims in previous opinions, and defendant does
          not convince us we should revisit those decisions. Thus, defendant claims various
28        of his constitutional rights were violated because the death penalty law, and the
          jury instructions implementing that law:

Granted prosecutors "unbounded" discretion in deciding when to seek the death penalty.  (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at p. 278.)

Weaver, 26 Cal. 4 th at 991-92.

### b.   Legal Standard

### (i)   Prosecutorial Misconduct Generally

The standard for prosecutorial misconduct generally is set out in section VII, C, 1, b, (i), herein.

### (ii)   Prosecutorial Discretion

Prosecutorial discretion "is essential to the criminal justice process," McCleskey v. Kemp, 481 U.S. 279, 297 (1987), and does not violate the federal Constitution.  The Constitution forbids only "purposeful discrimination" in the exercise of that prosecutorial discretion, id. at 292-93, and in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused[,]" id. at 297.  It follows that the fact California's statutory scheme gives the prosecutor discretion does not violate the United States Constitution.  See 28 U.S.C. § 2254(a); Gregg, 428 U.S. at 225.

"A defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'[,]" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him.  McCleskey, 481 U.S. at 292 (quoting Whitus v. Georgia, 385 U.S. 545, 550 (1967)).  Therefore, to prevail on this claim, Petitioner "must prove that the decisionmakers in his case acted with discriminatory purpose."  Id.  It is not enough that other defendants who may be similarly situated did not receive the death penalty.  Id. at 306–07.

Prosecutorial charging decisions are "particularly ill-suited to judicial review."  Wayte v. United States, 470 U.S. 598, 607 (1985).

### c.   Analysis

Petitioner argues that the prosecutor based his charging decisions upon impermissible factors including race, economic class, and gender.  However, the state supreme court reasonably

198

could deny the claim.  As noted, the Supreme Court has held that local prosecutors have broad

charging discretion, provided purposeful discrimination is proscribed.

Petitioner argues only his conjecture in support of the alleged purposeful  discrimination.

Significantly, he does not point to facts in the record that the prosecutor considered improper

charging factors and based thereon intentionally discriminated against Petitioner in the charging

decision.  The state supreme court reasonably could find Petitioner's reliance upon empirical

studies, unrelated to the facts and circumstances of his case, not alone evidence otherwise.  See

Cornwell, 2018 WL 934542 at *122 (empirical  study factually insufficient to support prima facie

constitutional violation).

### d.   Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not

contrary to, or an unreasonable application of, clearly established federal law, as determined by

the Supreme Court, or based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 27 shall be denied.

### D.   Claims Alleging Juror Misconduct

### 1.   Claims 17, 18

Petitioner alleges jurors unconstitutionally and prejudicially  failed to deliberate during

the sanity phase (Claim 17) and engaged in other misconduct in the sanity and penalty phases

(Claim 18), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[23]

(ECF No. 107 at 300-18.)

### a.   State Court Direct and Collateral Review

The Claim 17 allegations were presented to the California Supreme Court on direct

appeal (Lod. Doc. 1 at 311-15), and denied on the merits, as follows:

> Defendant contends he was denied his right to due process, a fair trial, and to be
> free of cruel and unusual punishment under the state and federal Constitutions by
> the short duration of the jury's deliberations following the sanity phase of the trial.

---

[23] Petitioner states that he incorporates the factual basis of Claims 1, 2, 3, 4, 6, 7, 8, and 9 into Claim 17  (ECF No. 107 at 301), and the factual allegations of Claims 15 and 17 into Claim 18 (ECF No. 107 at 307).

After presentation of numerous witnesses, expert and lay, over six weeks, raising issues of insanity, mental illness, irresistible impulse, amphetamine abuse, PTSD and child abuse, the jury returned a verdict finding defendant sane after only 42 minutes. Because the jury deliberated for so short a time, defendant claims, we can and should infer the jury failed to fairly and seriously consider the evidence before reaching a verdict, requiring we reverse both the sanity and penalty phase judgments.

The trial court addressed this issue in denying the motion for a new trial.[25] The court opined: "First of all, it has been contended that the trial took six weeks. Well, in fact it did, spread out over about six weeks, but in my reviewing my trial notes, there were 16 days of testimony, and some of those were partial days because of the unavailability of witnesses at various times. Much of the testimony that was given by some of the witnesses was, shall we say, foundational or background material, really did not ... bear directly on the specific issue to be decided by the jury, that is, whether or not the defendant was insane when he committed the three offenses for which he was found guilty. And as pointed out by both counsel, it is abundantly clear by the evidence, and indeed admitted by both sides, that the defendant did in fact know right from wrong, or, that is, appreciate the criminality of his conduct at the time it was committed, the first prong of the test to be applied, the second prong being whether or not he could conform his conduct to the law. It seems to me that first of all in 43 minutes the jury did have time to discuss certain matters, 42 minutes, whatever it was. Granted, that is not the most lengthy period of deliberation that the Court has observed, but in light of the fact that all of the witnesses were testifying on basically the same issue, and if the jury went into the jury room, and after discussing what the issues were, determined there really was nothing further to discuss because they were all in agreement, it seems to me that the verdict reached in that length of time is a proper verdict [and it] must be sustained."

-------------------FOOTNOTE-------------------

n.25   Following this verdict, defendant moved for a new trial pursuant to Penal Code section 1181, claiming the sanity verdict had been "decided by lot, or by means other than a fair expression of opinion on the part of all the jurors." The motion was denied without prejudice and then later denied when counsel renewed it. To the extent defendant contends there was evidence some of the jurors did not take the sanity phase seriously after considering the guilt phase evidence, or applied an incorrect standard of proof at the sanity phase, that evidence was not properly placed before the trial court and was inadmissible in any event (Evid. Code, § 1150), as even defendant seems to admit.

-------------------END  FOOTNOTE-------------------

We agree. As we explained in response to a similar claim that a jury arrived too quickly at a guilty verdict, which the defendant contended indicated the jury improperly considered the possibility of the death penalty at the guilt phase, "[i]t appears much more likely ... the relatively short duration of the jury's deliberations simply reflected the strength of the prosecution's case." (*People v. Robertson* (1982) 33 Cal.3d 21, 36 [188 Cal.Rptr. 77, 655 P.2d 279]; cf. *People v. Williams*, *supra*, 16 Cal.4th at p. 229 ["Defendant's mere speculation that his jury cut short its [guilt] deliberations out of prejudice [based solely on the fact that they deliberated for less than two hours] does not establish 'good cause' " to

reopen voir dire prior to the penalty phase].) We find defendant was not denied any state or federal constitutional rights by the jury's short sanity phase deliberations.

Weaver, 26 Cal. 4th at 973–74.

The Claim 17 and 18 allegations were presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 61-77), and summarily denied on the merits, and in part on procedural grounds (Lod. Doc. 24).

b.    Legal Standard

(i)    Trial by a Fair and Impartial Jury

The standard for trial by a fair and impartial jury is set out in section VII, B, 2, b, (ii), herein.

(ii)    Juror Misconduct

The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. Parker v. Gladden, 385 U.S. 363, 364-65 (1966).

A jury's consideration of extraneous evidence violates a criminal defendant's right to trial by jury. Turner v. State of Louisiana, 379 U.S. 466. 471-73 (1965).

When a defendant alleges improper contact between a juror and an outside party, the court asks at step one whether the contact was "possibly prejudicial" Mattox v. U.S., 146 U.S. 140, 150 (1892), superseded by rule as stated in Pena-Rodriguez v. Colorado, 137 S.Ct. 885, (2017)), that is "sufficiently improper to raise a credible risk affecting the outcome." Godoy v. Spearman, 861 F.3d 956, 967-68 (2017).   If so, the contact is "deemed presumptively prejudicial" and the court moves to step two, where the "burden rests heavily upon the [state] to establish" the contact was actually "harmless" Remmer v. U.S., 347 U.S. 227, 229 (1954), that is whether "the sufficiently improper contact gives rise to a "credible risk" of affecting the outcome of the case. Godoy, 861 F.3d at 967. If the state does not prove harmlessness, the court sets aside the verdict." Id. at 962. Factors for consideration include: the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction. Id., (citing

1   Caliendo v. Warden of Cal. Men's Colony, 365 F.3d 691, 697–98 (9th Cir. 2004)).

2       (iii)    Harmless Error

3           On collateral review, juror misconduct claims "are generally subject to a 'harmless error'

4   analysis, namely, whether the error had 'substantial and injurious' effect or influence in

5   determining the jury's verdict." Brecht, 507 U.S. at 638; Fields, 503 F.3d at 781 n.19 (noting

6   that Brecht provides the standard of review for harmless error in cases involving unconstitutional

7   juror misconduct); Jeffries, 5 F.3d at 1190 (a habeas petitioner must show that the alleged error

8   "had substantial and injurious effect or influence in determining the jury's verdict.").

9       c.    Analysis

10           Petitioner argues multiple instances during the sanity and penalty phases, where the jury

11   did not fairly and impartially deliberate on the law and evidence placed before it. (ECF No. 107

12   at 300-318 citing RT 4816, 4848-50, 4905, 4926, 4974, 5148, 5234, 5356-59, 5427, 5481, 5603,

13   5610, 5701-03, 5896, 6607-99; see also ECF No. 107 at 315-16, ECF No. 210 at 171, 181-82,

14   citing United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000); Tinsley v. Borg, 895 F.2d

15   520, 527-29 (9th Cir. 1990).)  He suggests this was because the jury prejudged the case. (ECF

16   No. 107 at 311 citing 2SHCP Ex. 17 at 324.)   The instances of alleged misconduct are discussed

17   separately, below.

18       (i)    Failure to Meaningfully Deliberate at the Sanity Phase

19           Petitioner argues the complexity of the sanity phase evidence and law applicable thereto

20   "required a deliberative process lengthier than that in which the jury supposedly engaged." (ECF

21   No. 107 at 306.)   He points to evidence that following the approximately 6-week sanity trial

22   which included complex and sometimes contradictory testimony from no less than 19 experts

23   and numerous lay witnesses and closing arguments that consumed portions of two days (RT

24   6607-73), the jury "notified the court less than forty-five minutes after it entered the jury room it

25   had reached a verdict[.]" (ECF No. 107 at 302, 309 citing RT 6788, 6792; CT 1576-1578, 1712-

26   1722; see also ECF No. 210 at 170-78.)

27           Petitioner points to the testimony of defense experts Harry Kormos, M.D., Jack Deloss

28   Shonkwiler, M.D., and John P. Wilson, Ph.D., who opined that Petitioner was legally insane at

1    the time of the crimes as a result of Vietnam War-related PTSD, child abuse, and schizophrenia.

2    (ECF No. 107 at 302.)  He observes the further testimony of Dr. Shonkwiler, that Petitioner's

3    capacity then was diminished.  (Id.)

4         Petitioner points to the habeas declaration of juror Emery Hubbard, who stated that:

5

6         The deliberations for each phase were really short, particularly for the sanity
          phase. We had already made up our minds by the time we got into the
          deliberations room. At the start of the sanity phase deliberations, all the jurors

7         marked their ballots right away. We were all in agreement already, so we just sat
          and talked for an hour.

8

9    (2SHCP Ex. 17 at 324 [Bates].)

10        Petitioner points to the declaration of Second Counsel, who stated that jurors post-trial

11   comments suggested they made up their minds after the guilt phase, foreclosing meaningful

12   deliberations during the remainder of the trial.  (CT 1714, 1722.)

13        The Court observes that due process requires a defendant be tried by "a jury capable and

14   willing to decide the case solely on the evidence before it."  Phillips, 455 U.S. at 217; see also

15   U.S. v. Plache, 913 F.2d 1375, 1377-78 (1990) ("It is well-settled that a single partial juror

16   deprives a defendant of his Sixth Amendment right to a trial by an impartial jury.").

17        Here, the state supreme court reasonably could conclude the short duration of

18   deliberations was not alone a basis to find juror misconduct.  Petitioner has not provided clearly

19   established federal authority otherwise.  That court also reasonably could find the length of the

20   sanity phase deliberations was not disproportionate to the weight of the undiscounted sanity

21   phase evidence, for the reasons stated.  (See Claim 12, herein, discussing the factual predicate in

22   the context of claimed trial court error.)  Notably, prosecution psychiatrists Richard Burdick,

23   Francis Criswell, Paul Cutting, Francis Matychowiak, and then psychologist-in-training Mary

24   Cholet, all found Petitioner sane, presenting at most an anti-social personality.  Of the sixteen

25   defense experts who testified during the sanity phase, psychiatrists Drs. Albert Raitt, Robert

26   Gardner, Alfre Owre, George Chappell, Theodore Donaldson, and Byron Wittlin,  and

27   psychologists K. Edward Dietiker, Kathe Lundgren, and Clyde Donahoe had no opinion or a

28   merely equivocal opinion about Petitioner's sanity or lack thereof at the time of the capital

1  crimes.  (See Claims 3, 4, 5, 8 herein; see also ECF No. 107 at 302-04.)  Significantly, these

2  experts observed and considered Petitioner's predisposition to the mental illness that ran in his

3  family, his amphetamine abuse, and his presentation with various personality or psychiatric

4  disorders including schizophrenia and PTSD with psychotic symptoms.

5       Relatedly, the state supreme court reasonably could find the habeas declaration of juror

6  Hubbard to be inadmissible evidence of the juror mental processes.  See Tanner, 483 U.S. at 117;

7  see also Fed. R. Evid. 606(b) which provides that "[d]uring an inquiry into the validity of a

8  verdict or indictment, a juror may not testify about any statement made or incident that occurred

9  during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any

10  juror's mental processes concerning the verdict or indictment [and the] court may not receive a

11  juror's affidavit or evidence of a juror's statement on these matters [except that a] juror may

12  testify about whether (A) extraneous prejudicial information was improperly brought to the jury's

13  attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake

14  was made in entering the verdict on the verdict form."

15       Finally, the state supreme court reasonably could find the noted declaration of Second

16  Counsel, proffered in support of her motion for a new sanity phase trial, even if admissible, not

17  to be evidence of any actual statements by jurors, but rather Second Counsel's thinly supported

18  characterization of their statements.  (CT 1722.)

19       (ii)    Inattentiveness; Failure to Follow Instructions; Consideration of Specialized

20  Knowledge

21       (A)    Sanity Phase

22       Petitioner argues that some jurors were inattentive to evidence and instructions during the

23  sanity phase, failed to follow instructions, and failed to deliberate only on the sanity phase

24  evidence.

25       Petitioner points to Second Counsel's courtroom observation that certain jurors were

26  "constructively absent" by sleeping during testimony of defense expert Dr. Dietiker (ECF No.

27  107 at 311 citing RT 5422-23; ECF No. 210 at 311 citing RT 5387-5421); and that certain jurors

28  were not paying attention during the sanity phase instructions (ECF No. 107 at 309, 313-15,

1   citing RT 6800-01, 6929, 2SHCP Ex. 18 at 325; see also ECF No. 210 at 308).

2       Petitioner points to juror Hubbard's habeas declaration, that the jury prejudged their
3   sanity verdict based upon improper consideration of evidence presented during the guilt phase.
4   (ECF No. 107 at 311; ECF No. 210 at 308; see also CT 1711-22; RT 7070-92; 2SHCP Ex. 17 at
5   324 [Bates], Ex. 18 at 325 [Bates].)

6       Petitioner points to other habeas proffered juror declarations that the jury drew upon their
7   own specialized knowledge during sanity phase deliberations.  For example, he argues that:
8   jurors who were combat veterans considered and shared their own "expertise" in deliberating on
9   Petitioner's Vietnam PTSD defense.  (ECF No. 107 at 315-16 citing 2SHCP Ex. 18 at 325
10  [Bates]; ECF No. 210 at 176.)  He suggests that juror Laura Wilkerson must have prejudged
11  Petitioner's sanity because her education as a nurse included several months of studying
12  psychology.  (See ECF No. 107 at 315 n.15; see also Claim 6, 16, herein.)

13      However, the state supreme court reasonably could find Petitioner failed to demonstrate
14  clearly established legal authority and admissible evidence in the state record sufficiently
15  supporting the allegations.  As to alleged juror inattention during the sanity phase instructions,
16  the state supreme court reasonably could note Petitioner's failure to point to federal authority that
17  counsel's isolated observation of apparent juror inattentiveness, of unspecified duration, during
18  jury instructions alone establishes juror misconduct and constitutional harm under Brecht.  (See
19  Lod. Doc. No. 23 at 70;  RT 6801); see also Warger v. Shauers, 574 U.S. 40, 50-52 (2014)
20  (citing Tanner, 483 U.S. at 126; Federal Rule of Evidence 606(b)) (precluding a criminal
21  defendant from introducing evidence that multiple jurors had been intoxicated during trial).
22  Moreover, that court reasonably could find Counsel's statement that certain jurors were sleeping
23  and inattentive was otherwise unsupported in the factual record and alone unpersuasive of the
24  issue, for the reasons stated.

25      As to Petitioner's allegation of jurors sleeping during trial, the state supreme court
26  reasonably could find Petitioner failed to demonstrate clearly established federal authority that a
27  juror sleeping during a portion of trial denies a fundamentally fair trial or establishes juror
28  incompetence.  See Tanner, 483 U.S. at 125-27 ("[t]he presence of a sleeping juror during trial

1    does not, per se, deprive a defendant of a fair trial by an impartial jury.").  Nor has he shown on

2    the factual record in this case that a sleeping juror missed an essential portion of the sanity trial

3    and could not fairly consider the sanity phase evidence.  See Barrett, 703 F.2d at 1083 n.13 (new

4    trial on grounds of sleeping juror may not be required if the court determines the juror "did not

5    miss essential portions of the trial and was able fairly to consider the evidence"); Springfield,

6    829 F.2d at 864 (denying sleeping juror claim where trial court had found that juror missed only

7    "insubstantial" portions of the trial).  The record reflects that when counsel raised the sleeping

8    juror issue at sidebar, Dr. Dietiker was testifying about scoring Petitioner's responses to

9    Rorschach cards, data merely underlying Dr. Dietiker's subsequent testimony concluding

10   Petitioner was insane at the time of the crimes.  (See RT 5386-5430.)  Moreover, the next

11   morning when the jurors were presumably fresh, Dr. Dietiker's summed up his testimony and

12   conclusions from the day before, and diagnosed Petitioner with paranoid schizophrenia and low

13   impulse control.  (RT 5425-30.)

14         As to Petitioner's allegation that jurors improperly considered their own personal

15   knowledge, absent consideration of extrinsic evidence, a juror's personal knowledge and

16   experience comes into the jury room with them and is properly a part of the deliberations.  See

17   Ybarra v. Hedgpeth, No. 1:10-CV-571 AWI DLB, 2011 WL 2173706 at *10 (E.D. Cal. June 2,

18   2011) (jurors bring to their deliberations knowledge and beliefs about general matters of law and

19   fact that find their source in everyday life and experience).

20         Moreover, evidence that personal knowledge and experience was brought to bear during

21   deliberations is inadmissible because it is part of the jury's deliberative process.  Tanner, 483

22   U.S. at 117; see also Fed. R. Evid. 606(b); Grotemeyer v. Hickman, 393 F.3d 871, 877 (9th Cir.

23   2004) (no improper extrinsic evidence found were juror who was medical doctor shared his

24   opinion of defendant's mental condition); cf. United States v. Navarro-Garcia, 926 F.2d 818,

25   821-22 (9th Cir. 1991) (improper extrinsic evidence found where juror shared personal

26   experiences and had personal knowledge of the parties or the issues in the case).  Especially so

27   here, as the noted record reflects the jurors alleged to have specialized knowledge were fully voir

28   dired and neither the trial court nor Counsel raised the alleged personal knowledge at issue.  (See

Claims 6, 16.)

Additionally, the record reflects the sanity phase jury was instructed: to consider only the evidence received during the sanity phase and not from any other source, not to be swayed by mere sentiment or passion, and to consider the sanity phase evidence and discuss it and the instructions only with the other jurors during deliberations.  (CT 1584-85, 1593, 1613; see also ECF No. 107 at 308-10.)  The jury was repeatedly admonished in these regards.  (See e.g., RT 3057, 3278-79, 6774-87.)  Jurors are presumed to understand and follow their instructions. Weeks, 528 U.S. at 234.

(B)   Penalty Phase

Petitioner argues that at least one juror prejudged the petitioner's penalty well in advance of the close of the penalty phase (ECF No. 210 at 176-77), contrary to trial court's admonition and instruction (id. citing RT 7056, 7062; see also 2SHCP Ex. 18 at 325 [Bates]).  He points to the habeas declaration of juror Michael Smith, that "[t]he penalty phase was not long, but I had already made up my mind before going into deliberations that I was going to vote for the death penalty." (2SHCP Ex. 18 at 325 [Bates]; see also ECF No. 107 at 316-17.)

Petitioner points to evidence that jurors, contrary to their instructions (RT 7051-52), considered extraneous facts regarding the possibility of being a hung jury (ECF No. 107 at 316-18).  He again points to the habeas declaration of juror Smith, that:

> The initial discussion broke down along gender lines, with some of the female jurors having issues with giving Ward Weaver the death penalty. One juror in particular, and older woman, was holding out and clearly was not comfortable giving Ward Weaver the death penalty. We then discussed our concern that if we didn't reach a unanimous decision, everything we had gone through for the past several months would have been wasted.

(2SHCP Ex. 18 at 325 [Bates].)

However, the state supreme court reasonably could find juror habeas statements inadmissible evidence of jury deliberations.  See Tanner, 483 U.S. at 117; see also Fed. R. Evid. 606(b).  Again, Petitioner fails to proffer authority otherwise.

Even if the statements were admissible, the state supreme court reasonably could find that

1   Petitioner offered only supposition and surmise that the jury necessarily failed to deliberate on

2   the evidence as instructed.  Weeks, 528 U.S. at 234.

3          For the reasons stated and contrary to Petitioner's suggestion, he is not entitled to *de novo*

4   review and development of these allegations of juror misconduct, adjudicated on the merits

5   against him in state court, on grounds of insufficient factual development in state court.  (See

6   ECF No. 210 at 179-80; Pinholster, 63 U.S. at 181, 185; cf. Winston v. Kelly (Winston I), 592

7   F.3d 535, 555-56 (4th Cir. 2010) (judgment on a materially incomplete record is not an

8   adjudication on the merits for purposes of § 2254(d).).

9          (iii)    Harmless Error

10         Petitioner argues he was presumptively and actually prejudiced by his jury's noted

11  misconduct, and denied a fundamentally fair trial.  (ECF No. 107 at 313; ECF No. 210 at 170,

12  178.)  He argues that "[b]y failing to pay attention during the court's reading of the [sanity

13  phase] instructions, the jurors were unable to know the law as explained to them by the court and

14  therefore could not follow that law[,]" resulting in an unfair trial.  (ECF No. 107 at 313.)  He

15  argues "[t]he jury's unwillingness to engage in any deliberative process by failing to exercise its

16  duty to deliberate resulted in a constitutionally impermissible finding that Petitioner was sane

17  and in a death verdict that was arbitrary, capricious, and unreliable."  (ECF No. 107 at 301.)

18         However,  the state supreme court reasonably could find Petitioner has not demonstrated

19  extrinsic influence or more than harmless error, and that he was not denied a fundamentally fair

20  trial.  That court reasonably could find Petitioner has not demonstrated on the factual record that

21  jurors missed critical portions of the proceedings, failed to deliberate on the law and facts, or

22  considered extraneous contact or evidence, for the reasons stated.

23         d.    Conclusions

24         A fair-minded jurist could find the state supreme court's denial of these Claims as juror

25  misconduct was not contrary to, or an unreasonable application of, clearly established federal

26  law, as determined by the Supreme Court, or based on an unreasonable determination of the facts

27  in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

28         Claims 17 and 18 allegations of juror misconduct shall be denied.

1

2     E.     Claims Alleging Ineffective Assistance of Trial Counsel

3     1.     Claim 4

4     Petitioner alleges that Counsel was ineffective, prior to and during trial, by failing to

5 investigate and declare a doubt as to, and seek a hearing and re-determination of his competence

6 to stand trial and waive rights thereat, violating his rights under the Fourth, Sixth, Eighth, and

7 Fourteenth Amendments.[24]  (ECF. No. 107 at 61-64; ECF No. 210 at 62-83.)

8     a.     State Court Direct and Collateral Review

9     The Claim, to the extent it alleges Counsel was ineffective at the 1982 arraignment by

10 submitting the competency determination solely on the psychiatric reports of Drs. Cutting and

11 Criswell, was presented to the California Supreme Court on direct appeal and denied on the

12 merits, as follows:

13

14        On September 29, 1982, before defendant was arraigned, his defense counsel
          expressed a doubt as to defendant's present competence. The trial court agreed
15        and appointed two psychiatrists, Dr. Paul Cutting and Dr. Francis Criswell, to
          examine defendant. The proceedings were suspended until the two doctors could
16        examine defendant and file their reports with the court. On October 27, 1982, the
          court was in possession of the reports of both doctors. Both found defendant was
17        legally competent. Defense counsel and the prosecutor submitted the question of
          defendant's competence on these two psychiatric reports, and the trial court found
18        defendant competent. The proceedings then resumed.

19        Defendant contends the failure to hold a full-blown adversarial hearing on the
          question of his competence deprived him of due process and requires that we
20        vacate his convictions. Essentially, defendant claims counsel could not waive a
          full jury trial with live witnesses. We rejected this precise claim in *People v.
21        McPeters* (1992) 2 Cal.4th 1148, 1169 [9 Cal.Rptr.2d 834, 832 P.2d 146]:
          "Section 1368 entitles defendant to a 'hearing' on the issue of competence and he
22        received one. Although defendant's counsel, for understandable reasons, elected
          to waive certain available incidents of the hearing procedure, i.e., the right to jury
23        trial and the rights to present oral testimony and to confront and cross-examine
          witnesses, defendant presented evidence and received an independent judicial
24        determination of his competence to stand trial based on the stipulated record.
          [Citation.] [¶] Defendant cites no authority holding that submission to the court of
25        the issue of competence to stand trial based on psychiatric reports is per se
          unconstitutional or a violation of statute."

26        Of course, trial of an incompetent defendant violates an accused's right to due

27 ─────────────────────────
   [24] Petitioner states that he incorporates the factual allegations set out in Claims 1, 2, 3, 6, 7, 8, 9 and 11. (ECF No.
28 107 at 62.)

process. (*Medina v. California* (1992) 505 U.S. 437, 448 [112 S.Ct. 2572, 2578-2579, 120 L.Ed.2d 353]; *Pate v. Robinson* (1966) 383 U.S. 375, 378 [86 S.Ct. 836, 838, 15 L.Ed.2d 815]; *People v. Hale* (1988) 44 Cal.3d 531, 539 [244 Cal.Rptr. 114, 749 P.2d 769]; *People v. Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942].) But contrary to defendant's arguments, neither *Hale* nor any of our other precedents precludes a defense attorney from waiving a jury, forgoing the right to present live witnesses, and submitting the competency determination on the psychiatric reports filed with the court. The statutory references to a "hearing" (§ 1368, subd. (b)) or a "trial" (§ 1369) simply mean that a determination of competency must be made by the court (or a jury if one is not waived), not, as defendant contends, that there must be "a court or jury trial, at which the criminal defendant's rights of confrontation, cross examination, compulsory process and to present evidence are honored by the court and counsel." Unlike in *People v. Marks* (1988) 45 Cal.3d 1335, 1343 [248 Cal.Rptr. 874, 756 P.2d 260], defense counsel did not attempt to waive the competency issue; he merely submitted the matter on the psychiatric reports.

To the extent defendant attempts to impugn the validity of the appointed experts' conclusions on grounds they failed to consider the effect of defendant's medication on his competency, the time to raise such a challenge has long since passed. Having submitted the competency determination on the two psychiatric reports, defendant may not now relitigate that question with arguments he did not make below. We also reject the further claim that defense counsel was constitutionally ineffective under the state and federal Constitutions for waiving a jury trial and submitting the matter on the reports. We have examined the reports and conclude counsel's decision against challenging the conclusions therein was a reasonable one.[2]

--------------------FOOTNOTE--------------------

n.2   To the extent defendant contends that evidence of his mental condition, adduced at the time of the sanity phase of the trial, supports the conclusion he was incompetent at the time of arraignment, we note the sanity phase occurred years after the October 1982 competency hearing, and the record does not indicate that the evidence produced at the sanity hearing was available earlier.

--------------------END  FOOTNOTE--------------------

Defendant cites two appellate opinions in support, but neither assists him. To the extent defendant contends *Moore v. United States* (9th Cir. 1972) 464 F.2d 663, 666, indicates the Ninth Circuit Court of Appeals applies a per se reversal rule to a competency determination submitted on medical reports rather than pursuant to a full-blown jury trial, we agree with respondent that defendant misconstrues the federal appellate court's position on this issue. (*Greenfield v. Gunn* (9th Cir. 1977) 556 F.2d 935, 939 [submission of competency question on doctor's reports permissible].) Finally, *People v. Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], also cited in support, is manifestly distinguishable; *Ramirez* concerned the procedural due process that must be afforded before an inmate can be excluded from the California Rehabilitation Center. *Ramirez* sheds no light on whether a defense attorney validly may waive the trial authorized by section 1369 and submit the competency determination on the psychiatric reports.

In sum, we have already decided a defense attorney may validly submit a

competency determination on the available psychiatric reports (*People v. McPeters*, *supra*, 2 Cal.4th at p. 1169), and defendant fails to persuade us *McPeters* was decided incorrectly. We thus reject this claim, finding no error under section 1368, no violation of either the state or federal Constitution, and no showing counsel was constitutionally ineffective for deciding to submit the competency determination on the psychiatric reports.

Weaver, 26 Cal. 4th at 903–05.

The Claim, to the extent it alleges Counsel was ineffective by opposing a renewed competency hearing at the sanity phase, was presented to the California Supreme Court on direct appeal and denied on the merits, as follows:

During presentation of the defense case at the sanity phase, Dr. Alfred Owre, Jr., a psychiatrist, testified that he had examined defendant briefly in 1977 in prison to determine defendant's parole suitability and had observed no evidence of schizophrenia at that time. Dr. Owre then testified that seeing defendant across the courtroom, it appeared defendant was out of touch with reality, that he was suffering from chronic undifferentiated schizophrenia, and that he appeared to be hallucinating. Defendant claims the trial court, after hearing this testimony, should have halted the sanity hearing and initiated competency proceedings. The court's failure to do so, defendant argues, violated several of his rights guaranteed by the federal Constitution. In addition, defendant contends his defense counsel's opposition to a competency hearing constituted ineffective assistance under the state and federal Constitutions. We disagree.

The law in this area is settled. As noted, *ante*, trial of an incompetent criminal defendant violates his or her right to due process. (*Medina v. California*, *supra*, 505 U.S. at p. 448 [112 S.Ct. at pp. 2578-2579]; *People v. Hale*, *supra*, 44 Cal.3d at p. 539.) Section 1367, subdivision (a) states that a "defendant is mentally incompetent ... if, as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." " ' When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' " (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].) "The trial judge's ruling regarding whether a competency hearing is required should be given great deference. 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " (*Id.* at p. 727, quoting *People v. Merkouris* (1959) 52 Cal.2d 672, 679 [344 P.2d 1].)

The evidence in this case of defendant's alleged incompetence falls far short of being substantial. Dr. Owre admitted his statements indicating his present belief defendant was incompetent came from his observations of defendant's in-court demeanor and not from any actual examination or testing of defendant. Dr. Owre also admitted he had not seen defendant in the hallway before the court session, smoking and conversing with his defense counsel, or seen defendant previously testifying for more than a day, coherently and responsively answering questions. The trial court concluded it had no doubt as to defendant's competency, stating: "I just quite frankly don't believe that a doctor can from the witness stand, when he

211

is not examining a patient or not even observing a person except secondarily to his testimony, can render an opinion like that on the witnesses stand...." Defense counsel seemed to agree, noting for the court that defendant had been examined by two psychiatrists and found competent.

On this record, we find the trial court's conclusion that Dr. Owre's testimony was not substantial evidence establishing a doubt of defendant's competence is entitled to deference on appeal. (See *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1111 [it was significant the expert witness had not actually examined the defendant].) Moreover, defendant fails to mention an important fact critically undermining his claim: the trial court had already declared a doubt as to defendant's competence at the time of the arraignment, had suspended proceedings, and had defendant examined by two psychiatrists. The parties submitted the matter, and the trial court found defendant legally competent. "Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence. [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 734 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Dr. Owre's brief observation regarding defendant's competence does not address whether there had been a substantial change in circumstances. Accordingly, we agree with the trial court that Dr. Owre's testimony did not raise a reasonable doubt as to defendant's competence, and his testimony thus did not comprise substantial evidence of incompetence necessitating a hearing.

Weaver, 26 Cal. 4th at 952–54.

The Claim, to the extent it alleges Counsel was ineffective by failing to object to or otherwise exclude testimony from Drs. Cutting and Criswell opining on both competency and sanity, was presented to the California Supreme Court on direct appeal and denied on the merits, as follows:

Defendant contends the appointment of the same two psychiatrists to examine him to determine his competency to stand trial and, at the same time, to determine his sanity violated his federal constitutional right to a fair trial, to be free of compelled self-incrimination, and to a reliable penalty verdict. He also contends defense counsel's failure to object to (or otherwise attempt to exclude) testimony from these psychiatrists was constitutionally ineffective representation under both the state and federal Constitutions

[…]

In *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61], the Court of Appeal concluded a psychiatrist appointed to examine a defendant for competency could not testify later on the question of the defendant's sanity. The court reasoned that because a defendant may not invoke his right against compelled self-incrimination in an examination for competency, "neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470.) Such judicially declared immunity was "reasonably to be implied from the code provisions. The purpose of [an] inquiry [into

competency] is not to determine guilt or innocence. It has no relation to the plea of not guilty by reason of insanity. Rather, the sole purpose ... is the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a criminal charge. This purpose is entirely unrelated to any element of guilt, and there is no indication of any legislative intent that any result of this inquiry into a wholly collateral matter be used in determining the issue of guilt.... Both humanitarian and practical considerations call for a judicially declared immunity." (*Id.* at p. 469.)

We cited *Tarantino v. Superior Court*, *supra*, 48 Cal.App.3d 465, with approval in *Daly v. Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193], and then formally adopted its judicially declared rule of immunity in *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*).[19]

------------------------FOOTNOTE--------------------

n.19  Coincidentally, *Arcega* was filed one day after the hearing in this case in which the trial court declared a doubt as to defendant's competence and appointed Drs. Cutting and Criswell in an improper dual capacity.

--------------------END  FOOTNOTE--------------------

[…]  Our decision in *Arcega* also described the federal constitutional dimension to the rule prohibiting a psychiatrist from testifying to statements made in a custodial mental competency examination. "Not only was the admission of the testimony of [the examining psychiatrist] a violation of state law, but as a recent United States Supreme Court decision establishes, it violated the federal Constitution as well. (*Estelle v. Smith* [(1981)] 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359].) In that case, the high court ruled that the Fifth Amendment privilege against self-incrimination is generally applicable to custodial mental competency examinations, and specifically discussed the provision of immunity for statements made during such examinations. (*Estelle v. Smith*, *supra*, 451 U.S. at pp. 466-469 [68 L.Ed.2d at pp. 371-373].) The court ruled that a state may not introduce at the penalty phase of a capital case, evidence of statements made by an accused at a custodial mental competency examination unless the accused has been informed of and has waived his *Miranda*[20] rights. In the absence of a valid waiver, the statements could only be used at the hearing on competency." (*Arcega*, *supra*, 32 Cal.3d at p. 523, fns. omitted.)

------------------------FOOTNOTE--------------------

n.20 *Miranda*, *supra*, 384 U.S. 436.

--------------------END  FOOTNOTE--------------------

It is thus clear that the testimony of Dr. Cutting and Dr. Criswell was not admissible at the sanity phase of trial because defendant was not permitted to invoke his constitutional right against compelled self-incrimination before he spoke to the doctors. But because defense counsel did not object on this ground,[21] the question of the admissibility at the sanity phase of the two psychiatrists'

213

testimony was not properly preserved for appeal. (*People v. Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776] [failure to object waived evidentiary claim based on right against self-incrimination]; Evid. Code, § 353.)  Nevertheless, defendant's fallback position that his defense counsel was constitutionally ineffective for failing to object requires that we grapple with the issue. As we explain, the erroneous admission of the psychiatric testimony does not require reversal.

------------------------FOOTNOTE-------------------

n.21  Indeed, the record shows Mr. Huffman affirmatively asked that the psychiatrists appointed to examine defendant for competency also evaluate him for sanity.

-------------------END FOOTNOTE-------------------

As noted, *ante*, the question whether counsel is constitutionally ineffective comprises two inquiries: (1) Was counsel's performance deficient? and (2) was there prejudice? (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687 [104 S.Ct. at p. 2064]; *People v. Jennings*, *supra*, 53 Cal.3d at p. 357.) We explained in *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008 [30 Cal.Rptr.2d 818, 874 P.2d 248], however, that "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."

That rule is applicable here, for defendant fails to demonstrate prejudice. Numerous expert witnesses testified at the sanity phase of trial and several of them (other than Dr. Cutting and Dr. Criswell) expressed the opinion that defendant was not insane or did not suffer from a mental disease or defect. Neither Dr. Cutting nor Dr. Criswell learned information from defendant during their competency examinations that was not available to the other expert witnesses in their respective examinations of defendant. Although defendant argues "it is easy to see how [the] corroborating testimony [of Drs. Cutting and Criswell] tipped the scales and hurt [defendant] irreparably" at the sanity phase, the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes. The further revelation from Dr. Criswell that defendant posed a danger in the future was no doubt unsurprising to the jury given the facts of the case and was not the "highly inflammatory" information defendant claims it to be.

Moreover, the testimony of Drs. Cutting and Criswell was not uniformly negative. Although Dr. Cutting concluded defendant was not insane, he testified defendant suffered from a schizoid personality disorder and that defendant probably did experience hearing voices in his head. Dr. Criswell testified defendant endured an "extremely pathological family," which could have formed the basis of his developing a mental condition as an adult.

We thus conclude that while permitting Dr. Cutting and Dr. Criswell to testify at the sanity phase was error, the error was not preserved for appeal, nor was counsel constitutionally ineffective for failing to object. (See *People v. Williams*, *supra*, 44 Cal.3d at p. 934 [finding the same error harmless]; *Williams v. Vasquez* (E.D. Cal. 1993) 817 F. Supp. 1443, 1466 [same].)

[…]

Finally, to the extent defendant contends the erroneous dual appointment and testimony of Drs. Cutting and Criswell deprived him of a fair and reliable penalty phase verdict, we reject that claim as well because it is not reasonably possible that, in the absence of the jury's consideration of their testimony at the penalty phase, the jury would have reached a different verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Weaver, 26 Cal. 4th at 957, 959-63.

The Claim in its entirety was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 407-21), and summarily denied on the merits (Lod. Doc. 8).

b.   Legal Standard

(i)   Competency to Stand Trial

The standard for trial competency is set out in section VII, A, 1, b, (i), herein.

(ii)   Ineffective Assistance of Counsel

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial.  U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Gideon v. Wainwright, 372 U.S. 335, 343-45 (1963); see also Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002).

The Supreme Court explained the legal standard for assessing a claim of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 685-87 (1984).  Strickland propounded a two-prong test for analysis of claims of ineffective assistance of counsel.  The first prong focuses upon whether counsel performed deficiently.  The petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 688); see also United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

Petitioner must show that counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence."  Id. at 689.

The Supreme Court "[has] declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that [t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688).

A court indulges a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687); see also Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did."  Pinholster, 563 U.S. at 196.

The second prong focuses upon whether the petitioner suffered prejudice from counsel's deficient performance.  The petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different."  Strickland, 466 U.S. at 694.  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding."  Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 693).  The prejudice prong "looks to the weight of the available evidence and its effect on the case." Andrews v. Davis, 944 F.3d 1092, 1116 (9th Cir. 2019) (en banc) (citing Strickland, 466 U.S. at 693–95).

A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694.  To make this assessment, the court "compare[s] the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently."  Clark, 769 F.3d at 728 (quoting Murtishaw v. Woodford, 255 F.3d 926, 940 (9th Cir. 2001)); accord Hernandez v. Chappell, 923 F.3d 544, 551 (9th Cir. 2019).

That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met _Strickland's_ demand that defense errors were so serious as to deprive [him] of a fair trial. _Richter_, 562 U.S. at 104 (quoting _Strickland_, 466 U.S. at 693).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner because of the alleged deficiencies. _Strickland_, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

### c.   Analysis

Petitioner argues Counsel ineffectively failed to investigate and develop his trial incompetency, declare a doubt as to competence, request a competency hearing, and seek a re-determination of competency to stand trial. These arguments are discussed separately below.

#### (i)   Deficient Conduct

#### (A)   Trial Competence at Arraignment

Petitioner argues that Counsel, prior to trial, unreasonably failed to fully investigate, develop, and present the arraignment court and experts with then available evidence of and substantial doubt as to his incompetence to stand trial, and request a hearing thereon. (_See_ ECF No. 107 at 62-65; ECF No. 210 at 62-69, citing _American Bar Association Standards for Criminal Justice_ (hereinafter "ABA Standards"), Mental Health, §§ 4-3.6 and commentary, 7-4.2 ("Defense counsel should move for an evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

An attorney is required to investigate and develop relevant facts. _See e.g., Williams_, 529 U.S. at 398(citing the ABA Standards) (counsel obligated to conduct a thorough investigation of defendant's background). The _American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases_ (hereinafter "ABA Guidelines") are suggestive of "prevailing norms of practice." _Wiggins_, 539 U.S. at 522-24. ABA Guideline 10.7 provides that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guideline 10.7 (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1015 (2003); _see also Bobby v. Van Hook_,

1    558 U.S. 4, 7 (2009) (*per curiam*) (restatements of professional standards, such as the ABA

2    Guidelines, are useful "only to the extent they describe the professional norms prevailing when

3    the representation took place.").

4            "The Ninth Circuit has observed that "[u]nder the ABA Standards [in effect at the time of

5    Petitioner's trial and sentencing] defense counsel had a duty "to conduct a prompt investigation

6    of the circumstances of the case and to explore all avenues leading to facts relevant to the merits

7    of the case and the penalty in the event of conviction." Noguera v. Davis, No. 17-99010, 2021

8    WL 3043458 at *16 (9th Cir. July 20, 2021) (citing ABA Standards 4-4.1 [2d ed. 1980]).

9            Here, the record reflects that, at the September 1982 arraignment, Counsel raised a doubt

10   as to Petitioner's competence for trial based upon information from custodial staff and other

11   inmates; the trial court agreed, noting Petitioner's appearance, and appointed Drs. Cutting and

12   Criswell to examine Petitioner pursuant to Penal Code sections 1367-70. (See RT, September

13   29, 1982 at 2-3.) Dr. Criswell and Dr. Cutting each independently evaluated Petitioner. (RT

14   6040-88, 6347-6403.) These experts reviewed and considered documents provided by Counsel

15   relating to the capital crimes and prior charges out of Ventura and Humboldt Counties (see ECF

16   No. 107 at 72), and the mental evaluation reports provided in the Ventura County proceeding by

17   psychiatrist Dr. Chappell and psychologist Dr. Donaldson finding Petitioner sane at the time of

18   those crimes (see CT Confidential Records at 8-20; RT 6117, 6360; see also 1SHCP Ex.'s 58,

19   59.) Drs. Cutting and Criswell concluded that Petitioner presented with a personality disorder,

20   not mental disease, defect, or PTSD, and found him then competent for trial and sane at the time

21   of the crimes. (Id.); see also Weaver, 26 Cal.4th at 945. Notably, Counsel reviewed, considered,

22   and concurred in the reports of these experts in determining to submit the competency issue to

23   the arraignment court. (RT, October 27, 1982 at 2.)

24           Petitioner faults Counsel for not obtaining and providing Drs. Cutting and Criswell with

25   then available evidence detailing Petitioner's incompetency, including his alleged extensive

26   history of mental illness and use of anti-psychotic medication. (ECF No. 107 at 61-65; ECF No.

27   210 at 63-64, 70-72; see also Clabourne v. Lewis, 64 F.3d 1373, 1385 (9th Cir. 1995) (counsel

28   required to provide his experts with materials needed to develop an accurate profile of his mental

218

1    health).    Particularly, Petitioner suggests Counsel should have provided Drs. Cutting and
2    Criswell with information from his 1977-1978 mental health evaluations in relation to his
3    Humboldt County conviction for assault with a deadly weapon, conducted by psychiatrist Dr.
4    Robert Gardner (see RT 4707-73; 1SHCP Ex. 110), and psychologist Dr. Jack Tolchin (see RT
5    4822-53; 1SHCP Ex. 117).    He also suggests information gleaned from the 1981 mental health
6    evaluation by Chino State Prison psychologist Rolland Rose (see RT 4963-80) should have been
7    provided to Drs. Cutting and Criswell.

8        However, the state supreme court could find that Counsel reasonably raised a doubt as to
9    Petitioner's competence, citing the arraignment court to Petitioner's mental state evaluations in
10   the Ventura County proceeding and other reports (see RT, September 29, 1982 at 2-3), and
11   submitted the mater on the competency findings of Drs. Cutting and Criswell, for the noted
12   reasons stated by that court and those that follow.

13       The state supreme court reasonably could determine the findings and conclusions of Drs.
14   Donaldson and Chappell, considered by Drs. Cutting and Criswell, were largely corroborated by
15   the noted prior psychosocial history proffered by Petitioner in support of this Claim.    Drs.
16   Donaldson and Chappell considered psychosocial history information both provided to them by
17   Petitioner in 1981 in the Ventura County proceeding (see 1SHCP Ex.'s 58, 59), and information
18   related to Petitioner's 1977 Humboldt County conviction for assault with a deadly weapon (id.).

19       Drs. Donaldson and Chappell, aware Petitioner had seen psychiatrists in the past and had
20   a claimed history of amphetamine abuse, nonetheless observed no history of psychiatric
21   problems or treatment.  (See 1SHCP Ex.'s 58, 59; see also ECF No. 210 at 70; RT 4926, 6043,
22   6049, 6090, 6116-19, 6373.)  Particularly, Dr. Chappell testified to his review of Dr. Gardner's
23   1977 report and the psychosocial history information in it.  (RT 4862.)  He testified that while he
24   had no information on Petitioner's familial mental health history (RT 4887), Petitioner told him
25   that he had not received psychiatric treatment or drugs.  (RT 4878-79.)  Dr. Chappell, aware of
26   Petitioner's claimed auditory hallucinations (RT 4875) and history of amphetamine abuse as a
27   truck driver (RT 4876), diagnosed Petitioner only with an adjustment disorder with depression
28   (RT 4886).  Moreover, Dr. Donaldson testified that Petitioner's familial mental health history,

1    unavailable to him in 1981, would not have influenced his noted 1981 findings and conclusions.

2    (RT 4945.)

3         Regarding the proffer relating to the Humboldt County assault with a deadly weapon

4    conviction, Dr. Gardner concluded in his 1977 report that Petitioner presented only with "a

5    probable psychotic depressive reaction in an individual with underlying psychiatric disorder."

6    (1SHCP Ex. 110; see also RT 4740-41.)  Dr. Gardner observed that Petitioner: did not show

7    signs of hallucinations, schizophrenia, or PTSD (RT 4770-71); was possibly of below normal

8    intelligence (RT 4740); had been committed violent acts against family members and others;

9    (see e.g., RT 4734); and was not suicidal, but rather possibly was homicidal (RT 4723).  While

10   Dr. Gardner  recommended further psychiatric assistance and treatment (RT 4741), Petitioner has

11   not demonstrated that occurred.

12        Also, when Dr. Owre evaluated Petitioner in 1977 at the Men's Colony in San Luis

13   Obispo, he found Petitioner to be without psychiatric symptomology except in his distorted

14   relationships with women.  (RT 4788.)

15        Dr. Tolchin concluded in his 1978 report that Petitioner presented "a passive aggressive

16   personality with depressive and sado-masochistic features, in good remission at this time.")

17   (1SHCP Ex. 117; see also RT 4832.)  Dr. Tolchin, in his testimony, stated that to his knowledge

18   Petitioner was not then medicated.  (RT 4832-33.)  He found Petitioner to be a near model

19   prisoner (RT 4845-46.).    While Dr. Tolchin recommended continuing psychotherapy for

20   Petitioner along with his wife (RT 4846), Petitioner has not demonstrated that occurred.  Dr.

21   Tolchin stated that he did not find Petitioner to be psychotic or  schizophrenic.  (RT 4849-50.)

22        Similarly, Dr. Rose, in his 1981 custodial evaluation, tested Petitioner to an IQ of 96

23   suggesting average intelligence (RT 4972), and diagnosed him with a personality disorder,

24   passive-aggressive personality with schizoid features and sexual sadism (RT 4974).  Dr. Rose

25   found intense hostility toward women.  (RT 4976.)  Dr. Rose found no evidence of psychosis or

26   organic brain damage.  (RT 4976-77.)

27        Also, the state supreme court reasonably could discount Petitioner's suggestion that

28   Counsel failed to place before Drs. Cutting and Criswell Petitioner's use of the antipsychotic

1   Mellaril.  For example, Petitioner suggests Drs. Donaldson and Chappell  were unaware he was

2   taking Mellaril at the time they evaluated him in the Ventura County case.  But the report of Dr.

3   Chappell includes Petitioner's statements that he was then taking 600 milligrams of Mellaril to

4   calm his nerves.  (1SHCP Ex. 58 at 2; RT 4868.)  Even so, Dr. Chappell appeared skeptical,

5   testifying that Petitioner's statement was unverified, and that Petitioner did not appear to be

6   under the influence of medication during the interview.  (RT 4864, 4876.)  Relatedly, Dr.

7   Donaldson testified that Petitioner's court file, which he reviewed, did not indicate Petitioner's

8   then was taking medication.  (RT 4950.)

9        (B)    Dual Competency/Sanity Evaluation by Drs. Cutting and Criswell

10       Petitioner argues that during the 1982 arraignment, Counsel erred by requesting and

11   acquiescing in the appointment of Drs. Cutting and Criswell to examine Petitioner under both

12   Penal Code section 1367 (i.e., competency evaluation), and Penal Code section 1026 (i.e., sanity

13   evaluation).  (ECF No. 107 at 63.); ECF No. 210 at 70); see also Weaver, 26 Cal. 4th at 963.[25]

14   He argues Counsel should have evaluated Petitioner's sanity independently and confidentially.

15   He argues the trial court lacked jurisdiction to make such a dual purpose appointment, especially

16   so prior to entry of his "not guilty by reason of insanity" plea.  He argues the dual purpose

17   appointment denied him a fair trial, freedom from compelled self-incrimination, and a reliable

18   verdict.

19       The California Supreme Court agreed with Petitioner, that the dual purpose appointments

20   were erroneous.  Weaver, 26 Cal. 4th at 957-61.  That court observed that statements by an

21   accused at a custodial mental competency examination could not be introduced at the sanity

22   phase or penalty phase of a capital case unless the accused has been informed of, and has waived

23   his Miranda rights, which did not occur in this case.  Weaver, 26 Cal. 4th at 960, citing Estelle v.

24   Smith, 451 U.S. 454, 466-69 (1981).

25       Nonetheless, the state supreme court reasonably found the error non-prejudicial under

26   Strickland and harmless at the sanity phase, especially so given the persuasive weight of the

27   ───────────────

28   [25] As noted, the Court previously denied Petitioner's allegations that Counsel was ineffective in investigating,
     preparing for, and during the sanity phase (see ECF No. 209 at 1-2, rejecting Claim 8), and that Counsel was
     ineffective during the penalty phase (id. rejecting Claim 9).

1    balance of expert opinion that Petitioner as sane at the time of the crimes.  Weaver, 26 Cal. 4th at

2    957, 959-63.  That court reasonably also could find the erroneous dual purpose appointment

3    harmless at the penalty phase, as the noted findings of Drs. Cutting and Criswell and their sanity

4    phase testimony were cumulative of evidence otherwise before the penalty phase jury and only

5    insubstantially added to the persuasive weight of the mitigating evidence, for the reasons stated.

6    (See also ECF No. 209 at 48.)

7            (C)    Competency Re-Determination

8            Petitioner argues that Counsel, themselves incompetent and conflicted (see Claims 1 and

9    2, herein; see also ECF No. 210 at 72-75) erred by failing to investigate Petitioner's post-

10   arraignment competence and thereupon seek a renewed determination of Petitioner's mental state

11   or a suspension of proceedings for a formal competence inquiry pursuant to the procedures set

12   forth in Penal Code sections 1367-70 (regarding competency determination), with the result that

13   Petitioner proceeded with and completed trial in 1985 while mentally incompetent.  (ECF No.

14   107 at 61; ECF No. 210 at 62-68); see also Maxwell, 606 F.3d at 575 (a defendant found

15   competent before trial may suffer deteriorated mental condition over time and by changed

16   circumstances, requiring reassessment of competency at trial).

17          Petitioner argues that his mental condition deteriorated after arraignment, pointing to the

18   above noted evidence that discontinuance of Mellaril in the months before trial contributed to his

19   alleged decompensation into psychosis as observed by defense experts and commented on by Dr.

20   Owre from the stand

21          Relatedly, Petitioner argues that Counsel erred by failing to prepare Drs. Cutting and

22   Criswell for their sanity phase testimony by providing them with updated and additional

23   information relevant to the opinions they proffered at the arraignment.  For example, information

24   known to Counsel that:

25

26          1) During the time in county jail after arraignment and prior to trial, Petitioner
            was not able to sleep, and heard and responded to imaginary voices.  (See RT
27          3499-3501.)

28          2) Six of the mental health experts assessed Petitioner during the months before
            trial found his mental state to be profoundly compromised.  (See Claim 3, herein.)

3) Defense expert Dr. Owre testified at trial that Petitioner appeared to be psychotic in the courtroom.  (RT 4815-17, 4854-59.)

However, the state supreme court reasonably could find Counsel was not deficient by failure to seek a competency redetermination.  That court reasonably could find Petitioner failed to point to a "substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence."  Medina, 11 Cal.4th at 734.  Instead, that court reasonably could find the weight of the mental state evidence available to Counsel following arraignment was that although Petitioner suffered a progressive personality disorder, that did not leave him incompetent for trial.  (See Claim 3, herein.)  As noted, none of the experts who evaluated Petitioner prior to or during trial found him incompetent to stand trial.  (Id.)

Additionally, Second Counsel conceded Petitioner's competence on the record during the sanity phase, stating her belief that Petitioner was able to understand the capital proceedings and participate in his defense with the assistance of Counsel.  (See RT 4857-58.)

Finally, to the extent Petitioner revisits allegations that Counsel was conflicted and incompetent, this Court previously rejected these very allegations.  (ECF No. 162 at 100, 109-10, 123, denying Claims 1 and 2.)

(ii)   Prejudice

Petitioner argues that counsel's alleged deficient conduct was prejudicial because it resulted in an erroneous finding that Petitioner was competent for trial notwithstanding sufficient doubt as to competency.  (ECF No. 107 at 62-63; ECF No. 210 at 76 citing Strickland, 466 U.S. at 694 [even if Petitioner were to fail to prove his incompetency by a preponderance of the evidence, it is still possible that he raised sufficient doubt on that issue to satisfy the prejudice prong of his ineffective assistance of counsel claim].)

Under the clearly established federal law, a failure by counsel to seek a competency hearing is prejudicially deficient under the Strickland standard, when there are "sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency" and "a reasonable probability that the defendant would have been found

1  incompetent." Hibbler, 693 F.3d 1140, 1149–50 (9th Cir. 2012) (quoting Stanley, 633 F.3d at

2  862).

3      Here, assuming arguendo Counsel's allegedly deficient conduct, the state supreme court

4  reasonably could find Petitioner failed to raise sufficient doubt that his apparent personality

5  disorders and mental impairments  left him unable to understand his trial proceedings and assist

6  counsel therein, for the reasons stated.  (See e.g., Claim 3, herein.)  This Court, in denying

7  Claims 8 and 9, determined the state supreme court reasonably could find no organic brain injury

8  or psychosis at the time of the capital crimes, and gave minimal weight to the proffer of state

9  habeas experts Foster and Watson.  (ECF No. 209 at 44, 51-53.)  Particularly, this Court, in

10 rejecting Claim 8, found that Counsel was not ineffective by failing to request a competency stay

11 in the wake of Dr. Owre's sanity phase testimony that Petitioner appeared schizophrenic and

12 seemed to be hallucinating in court. (ECF No. 209 at 42.)

13     As to Counsel's choice of guilt phase defenses, the state supreme court  could find

14 omission of a competency defense was reasonably premised in an adequate investigation, and

15 tactically motivated.  (See Claims 6-7, herein.)  The guilt phase defense, that Petitioner lacked

16 the intent to kill, was premised in the factual record, including Petitioner's own statements and

17 testimony, and reasonably did not require further investigation and development of mental state

18 defenses. Petitioner does not point to substantial evidence of incompetence arising after

19 arraignment and continuing through trial.  As noted, none of the trial experts opined that he was

20 then incompetent for trial.  Petitioner's demeanor and interaction with the trial court and Counsel

21 did not raise reasonable doubt as to competency in the mind of either.

22     Finally, the state supreme court reasonably found the sanity phase testimony of Drs.

23 Cutting and Criswell, erroneously admitted, was not prejudicial under the Strickland standard,

24 observing that:

25

26     Numerous expert witnesses testified at the sanity phase of trial and several of
       them (other than Dr. Cutting and Dr. Criswell) expressed the opinion that
27     defendant was not insane or did not suffer from a mental disease or defect.
       Neither Dr. Cutting nor Dr. Criswell learned information from defendant during
       their competency examinations that was not available to the other expert
28     witnesses in their respective examinations of defendant. Although defendant

argues "it is easy to see how [the] corroborating testimony [of Drs. Cutting and Criswell] tipped the scales and hurt [defendant] irreparably" at the sanity phase, the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes. The further revelation from Dr. Criswell that defendant posed a danger in the future was no doubt unsurprising to the jury given the facts of the case and was not the "highly inflammatory" information defendant claims it to be.

Moreover, the testimony of Drs. Cutting and Criswell was not uniformly negative. Although Dr. Cutting concluded defendant was not insane, he testified defendant suffered from a schizoid personality disorder and that defendant probably did experience hearing voices in his head. Dr. Criswell testified defendant endured an "extremely pathological family," which could have formed the basis of his developing a mental condition as an adult.

[…]

Finally, to the extent defendant contends the erroneous dual appointment and testimony of Drs. Cutting and Criswell deprived him of a fair and reliable penalty phase verdict, we reject that claim as well because it is not reasonably possible that, in the absence of the jury's consideration of their testimony at the penalty phase, the jury would have reached a different verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Weaver, 26 Cal. 4th at 957-63.)

### d.   Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 4 shall be denied.

### 2.   Claims 6, 7

Petitioner alleges multiple instances of ineffective assistance during the pre-trial phase (i.e., Claim 6) and guilt phase (i.e., Claim 7), violating his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.[26]  (ECF No. 107 at 70-99.)

---

[26] Petitioner states that he incorporates the factual allegations set out in Claims 1, 2, 3, 4, 5, 8, 9 and 11. (ECF No. 107 at 71.)

a.     State Court Direct and Collateral Review

Claim 6 was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 422-36, 443-45), and summarily denied on the merits, (Lod. Doc. 8).

Claim 7 was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 138-70), and that court denied the allegations on the merits, stating that:

Guilt Phase Defense of Diminished Capacity

At the guilt phase of the trial, defense counsel defended the charge that defendant was guilty of murdering Radford in the first degree by attempting to persuade the jury that defendant did not intend to kill Radford, but only to knock him unconscious. As to Levoy, counsel argued both that the killing did not occur during the commission of the rapes because the sexual assaults had long since terminated by the time defendant killed her, and that defendant had strangled Levoy when she bit him on the thumb, enraging him and causing him to lose contact with reality. As to Levoy, then, counsel argued the criminal homicide was not elevated to first degree murder on either a felony-murder or a premeditation theory. Despite possession of a large amount of expert evidence related to defendant's mental condition, counsel chose not to present a defense of diminished capacity.[8] Defendant claims this decision demonstrates he was not afforded the effective assistance of counsel. We disagree.

--------------------FOOTNOTE--------------------

n.8  Because defendant's crimes occurred before the voters passed Proposition 8 in June 1982, the defense of diminished capacity was still available. (*In re Avena* (1996) 12 Cal.4th 694, 722-723 [49 Cal.Rptr.2d 413, 909 P.2d 1017]; *People v. Saille* (1991) 54 Cal.3d 1103, 1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

--------------------END FOOTNOTE--------------------

"'[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his " representation fell below an objective standard of reasonableness ... under prevailing professional norms." (*Strickland v. Washington*[, *supra*,] 466 U.S. 668, 687-688 ....) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland*, *supra*, at pp. 691-692 ....) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto*[, *supra*,] 48 Cal.3d 1247, 1257...; *Strickland*, *supra*, at p. 694 ....)' (*People v. Jennings*[, *supra*] 53 Cal.3d 334, 357....)" (*In re Avena*, supra, 12 Cal.4th at p. 721, first ellipsis in *Avena*.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People v. Wright* (1990) 52 Cal.3d 367, 412), and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 [48 Cal.Rptr.2d 525, 907 P.2d 373], quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) "[W]e accord great

deference to counsel's tactical decisions" (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183]), and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354]). "Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. (*People v. Earp* (1999) 20 Cal.4th 826, 896 [85 Cal.Rptr.2d 857, 978 P.2d 15]; see also *People v. Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144] [on appeal, a conviction will be reversed on the ground of ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission"].)

In this case, however, counsel set forth on the record specific reasons for deciding to forgo a diminished capacity defense. "[T]here are many tactical considerations that the defense has to review prior to commenting on evidence and taking a basic theory of defense when arguing the case at the conclusion of the evidence. We made a determination that we didn't want to attack diminished capacity or use diminished capacity as an argument, although we felt it was necessary as a jury instruction because of some of the evidence brought up; however, if we had argued the fact that there was diminished capacity, we would have not had proceeded [*sic*] on argument that we did, which is [defendant] looked at the possibility of personally attempting to kill someone, reflected [on] that [possibility] and ma[d]e the decision, a thinking decision of only attempting to knock the man out. We couldn't have faithfully argued that to the jury if we had the counter argument that he didn't have the ability to deliberate and premeditate so we decided to go with the strongest evidence we had, which was no intent to kill. [¶] ... [¶] Further, we decided not to submit any evidence of diminished capacity by way of medical testimony, reserving that defense for the insanity [*sic*] phase rather than coming in and destroying whatever evidence we were presenting relative to his ability to decide and make a logical conclusion as to his actions. We felt that there would be an inconsistent argument which would water down our credibility with the jury if we were to go both ways, so we decided to go and approach it one way."

"Those were tactical decisions, and I am not saying that what we did was right, looking at the results, but it was a decision that we had to make and we believe that they were considered opinions predicated upon the evidence, [and the] state of the law as we knew it to be."

As is clear, counsel had a reasoned explanation for their decision to forgo a diminished capacity defense at trial and to rely on what they considered their stronger arguments, namely, that defendant did not premeditate the killings and that Levoy's killing came after the rape had terminated. Defendant makes a number of arguments why he believes counsel's admittedly tactical decision was deficient, but none is availing. He claims counsel were mistaken in believing that a diminished capacity defense would have been inconsistent with the defense that defendant made a "thinking decision" to knock Radford out but not to kill him. Yet defendant admits that in his pretrial statement to police, he said he intended merely to knock Radford out. At trial, moreover, defendant testified he did not think Radford would suffer serious injury.

Defendant also contends trial counsel were mistaken in concluding a diminished capacity defense would have been inconsistent with their defense that Levoy's killing did not occur during the commission of the rapes. But in making the temporal argument that the rapes had terminated, defense counsel David Huffman may well have believed that reliance as well on a diminished capacity defense would have undercut the thrust of the main defense theory of the case. We take counsel's statement that he could not have "faithfully argued" his chosen defense theory if he also used a diminished capacity argument to mean as much.

We reach the same conclusion with respect to defendant's claim that the unconsciousness defense, that is, that defendant became enraged and lost consciousness when Levoy bit his thumb, was not inconsistent with a diminished capacity defense. That may be true, but counsel's decision to reserve the mental evidence for the sanity phase so as not to blunt its impact was not unreasonable. (See *People v. Miller* (1972) 7 Cal.3d 562, 572 [102 Cal.Rptr. 841, 498 P.2d 1089] [evidence of mental incapacity would lose much of its impact at the sanity phase if presented earlier].)

Although the case was governed by the pre-*Pope* legal standard for ineffective assistance of counsel,[9] *People v. Miller*, *supra*, 7 Cal.3d 562, posed the exact issue we confront in this case: was counsel ineffective for deciding to forgo presentation of mental incapacity evidence at the guilt phase and to reserve it instead for the sanity phase? We found counsel's tactical decision there was not unreasonable, explaining: "We touch here on a difficult tactical problem facing every defense counsel who possesses psychiatric evidence bearing on his client's condition at the time of the crime. Since the development of the *Wells-Gorshen* line of cases,[10] this evidence is usually admissible at both the guilt phase and the sanity phase. Counsel's dilemma is, therefore, at which phase should he introduce this evidence? In *People v. Coogler* (1969) ... 71 Cal.2d 153, 169 [77 Cal.Rptr. 790, 454 P.2d 686], we upheld the competency of counsel who chose to introduce such evidence at the guilt phase only: 'His decision not to enter an insanity plea may have been based upon a fear that such a plea would prejudice his client's claim of diminished capacity; if the jury knew that an insanity hearing would follow in the event of defendant's conviction, it might treat summarily the psychiatric testimony as to whether defendant could form the requisite intent to commit the crimes charged.' Even more certain than this conjecture, however, is that a trier of fact would tend to 'treat summarily' such evidence if it were introduced at the sanity phase after the same trier had already rejected it at the guilt phase. It follows that when, as here, counsel concludes his client has a valid defense of not guilty by reason of insanity, it might be unwise for him to prematurely expose that evidence to the scrutiny of the trier of fact at the guilt phase.

-------------------FOOTNOTES-------------------

n.9  Compare *People v. Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487] (whether trial was reduced to a farce or sham by counsel's actions or omissions) with *People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] (stating the modern standard).

n.10  *People v. Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People v. Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].

--------------------END  FOOTNOTES--------------------

"It is no solution to this dilemma for us to engage in the perilous process of second-guessing whichever of the alternatives counsel chooses....

"Nothing is seen more clearly than with hindsight. The most that can be fairly said on this record, however, is that counsel's decision to delay introducing his evidence of defendant's mental state until the sanity phase was a debatable trial tactic. Yet as we reminded the bench and bar not long ago, even 'debatable trial tactics' do not 'constitute a deprivation of the effective assistance of counsel.' (*People v. McGautha* (1969) 70 Cal.2d 770, 784 [76 Cal.Rptr. 434, 452 P.2d 650], affd. *sub nom. McGautha v. California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454].) When, as here, 'there is no showing that counsel did not research the facts or the law, or that he was ignorant of a crucial defense' (*In re Hawley* (1967) ... 67 Cal.2d 824, 829 [63 Cal.Rptr. 831, 433 P.2d 919]), and counsel makes a tactical choice to withhold certain evidence for a later stage of trial, sound policy reasons persuade us to defer to counsel's judgment in the matter." (*People v. Miller*, *supra*, 7 Cal.3d at pp. 572-574, fns. omitted.)

We agree and conclude the record does not demonstrate that counsel were constitutionally ineffective under either the state or federal Constitution because they chose to withhold the evidence of defendant's alleged diminished capacity until the sanity phase of the trial.

Weaver, 26 Cal. 4th at 925-29.

Application of Corpus Delicti Rule to Felony Murder

Based on his statements to police, defendant originally was charged with felony-murder special-circumstance allegations based on kidnapping, rape, and sodomy. Because the decomposition of Levoy's body was too advanced to confirm that she had been sexually assaulted, the only evidence of these sexual assaults came from defendant himself. Defendant moved to strike the two sex-crime-based special-circumstance allegations, citing the corpus delicti rule, and the trial court granted the motion.

As to the charged murder of Levoy, however, the prosecution proceeded on the dual theories that defendant killed her after premeditating the crime and killed her during the commission of a rape, i.e., on a felony-murder theory. Defendant now contends the corpus delicti rule should prohibit permitting the jury to rely on a felony-murder theory to elevate the degree of a homicide to the first degree, when the only evidence of the sole qualifying felony (in this case, rape) comes from the defendant's own statements. In the alternative, he claims that using his uncorroborated admission he raped Levoy to establish the degree of the homicide violates his rights under the Eighth and Fourteenth Amendments to the federal Constitution.

"The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. [Citations.] 'The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm,

229

and the existence of a criminal agency as its cause.' [Citation.] Such proof, however, may be circumstantial and need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' [Citation.]" (*People v. Jennings, supra,* 53 Cal.3d at p. 364.) When the People have established the corpus delicti of murder, a defendant's extrajudicial statements may be admitted to prove an underlying felony for felony-murder purposes even if the felony cannot be proved by evidence other than such statements. (*People v. Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on another ground by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)[11]

--------------------FOOTNOTE--------------------

n.11  Although not at issue here, at the time of defendant's trial, the corpus delicti rule applied to felony-based special-circumstance allegations (*People v. Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887]), a rule later abrogated by statute (§ 190.41, enacted by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990)). The new rule is not retroactive. (*People v. Ray* (1996) 13 Cal.4th 313, 341, fn. 13 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

--------------------END  FOOTNOTE--------------------

Defendant concedes a long line of decisions has found the corpus delicti rule inapplicable to felonies used to establish the degree of a homicide (*People v. Cooper* (1960) 53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d 964]; *People v. Miller* (1951) 37 Cal.2d 801, 806 [236 P.2d 137] ["The corpus delicti of the crime of murder having been established by independent evidence, ... extrajudicial statements of the accused ... may be used to establish the degree of the crime committed"]), but he contends the need for heightened reliability in capital cases demands that we extend the protection of the rule to cases such as his. He also argues the rule established by these decisions permitted the prosecution in his case "to circumvent the stated policy [of the corpus delicti rule] of protecting an accused from possibly fabricated testimony." (See *People v. Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1].)

Defendant's contentions are unpersuasive. The United States Supreme Court's well-known admonition, on which defendant relies, about the need for heightened reliability in capital cases, refers to the determination of penalty, not the degree of the homicide. (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944] (lead opn. of Powell, J.) ["Because of that qualitative difference [between a sentence of life and death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"].) We are unaware of any holding by the high court, and defendant cites none, requiring this court to modify its long-standing state-law-based rules governing the admissibility of evidence at the guilt phase merely because in a particular case the death penalty is a possible outcome.

The motivating idea of the corpus delicti rule-to protect an accused from his or her own fabricated statements-has little application in this situation, where the corpus delicti of murder is established by ample evidence of a homicide committed by a criminal agency. Defendant is sufficiently protected from the possibility of his own folly, his possible mental impairment, or police

overreaching by the rule rendering his statements inadmissible to prove the substantive sex crimes that he admitted having committed. Application of the corpus delicti rule to the charge that he committed murder also protects him. He finally is protected by his ability, should he so desire, to attempt to exclude his statements by proving they were the product of his mental impairment or of police misconduct. (See *Colorado v. Connelly*, *supra*, 479 U.S. at p. 167 [107 S.Ct. at p. 522] ["coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"].)

Once the criminal agency has been established by prima facie evidence that a murder was committed, permitting a defendant's own statements to help establish the degree of the crime does not violate his rights to due process, a fair trial, or to be free from cruel and unusual punishment, or other constitutional guarantee. Although it is unclear whether defendant is relying on any asserted state constitutional basis for his claim, we reject such claim as well, finding no reason to interpret the state Constitution differently in this context.

Failure to Raise the Corpus Delicti Rule in Connection with the Charged Kidnapping

Defendant next contends his defense counsel was ineffective for failing to move to exclude on corpus delicti grounds his extrajudicial statements that he kidnapped Levoy. We disagree. Counsel is not ineffective for failing to make a frivolous motion. We reiterate that the proof necessary to satisfy a corpus delicti challenge "need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' " (*People v. Jennings*, *supra*, 53 Cal.3d at p. 364.) Here, Levoy was known to be traveling with Radford, and witness James Powell saw the two stranded by car trouble on the side of the road. Shortly thereafter, Radford was found with grievous and ultimately fatal injuries, and Levoy had disappeared. A search failed to reveal her whereabouts. Her body was discovered 18 months later buried in defendant's yard, hundreds of miles from the scene of her disappearance, in the opposite direction from which she was known to have been traveling, and still clad in the clothes she had been wearing on the night she disappeared. Because this evidence permits the reasonable inference Levoy was taken from the crime scene against her will and moved a substantial distance, the evidence establishes prima facie showing that a kidnapping occurred. Any motion to exclude defendant's statements on the ground the corpus delicti for kidnapping had not been shown would have been denied. (See *People v. Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126] [finding corpus delicti of kidnapping on similar facts].) Counsel was thus not ineffective under either the state or federal Constitution for failing to make the motion.

Application of the Corpus Delicti Rule to Levoy's Murder

Prior to trial, defendant moved on corpus delicti grounds to dismiss the charge he murdered Levoy, contending the prosecution had not demonstrated a prima facie case that Levoy had been murdered. The trial court denied the motion. Defense counsel renewed the issue at trial, claiming defendant's extrajudicial statements should be excluded on corpus delicti grounds. When the trial court overruled the objection, defendant testified and explained that he killed Levoy, but the killing was not intentional. Defendant now claims the trial court erred in overruling his motion to exclude his statements and that this error induced him to testify at trial.

Respondent argues that defendant did not adequately preserve the issue for appeal, having raised a slightly different claim below. We do not resolve that

question, however, because even assuming the issue was preserved, we find the corpus delicti for Levoy's murder was more than adequately established by the evidence independent of defendant's statements. The fact of the injury is obvious: Levoy's lifeless body, unearthed in defendant's yard, is proof of that. The existence of a criminal agency as the cause of her death is reasonably inferable from the suspicious circumstances of her disappearance, including the fact Radford was killed at the same time she disappeared, as well as from the fact her body was buried in the same clothes she had been wearing when she disappeared, suggesting her death was not from natural causes.

The trial court held as much: "[T]he fact that Barbara Levoy disappeared abruptly after her companion had been killed by homicide, and that she stayed disappeared [*sic*] until she was discovered some eighteen months later, that she was discovered in a grave four feet approximately underground, [there is] just ... a great deal of circumstantial evidence that she died by means of homicide .... [¶] ... [¶] ... It is obvious that it was not an accidental death, there was not a suicide, but in any event, I am amply convinced that the death has been proved and it has been proved to have been committed by criminal means."

We agree and conclude the trial court correctly denied defendant's motion, based on the corpus delicti rule, to exclude his statements implicating him in Levoy's murder. Accordingly, defendant could not have been improperly induced to testify as a result of the trial court's decision denying his motion. To the extent defendant claims that admission of his statements to prove he murdered Levoy violated his rights to a fair trial, due process, and a fair and reliable penalty verdict under the federal Constitution, we deny those claims as well.

Weaver, 26 Cal. 4th at 925–32.

Claim 7 also was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 390-406), and summarily denied on the merits, (Lod. Doc. 8).[27]

### b.   Legal Standard

The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b, (ii), herein.

### c .   Analysis

Petitioner argues Counsel was ineffective by failing to investigate, develop, and defend the charges against him.  His multiple arguments are discussed separately, below.

#### (i)   Deficient Conduct

---

[27] Respondent waived exhaustion of alleged ineffective assistance of counsel for inadequate guilt phase closing argument.  (ECF No. 116 at 46 n.6 citing ECF No. 107 at 85-95.)

1

(A)     Conflicts and Impairments

2      Petitioner argues that, prior to and during trial, Lead Counsel was impaired by "a number

3  of serious illnesses, including chronic alcoholism and Post-Traumatic Stress Disorder (PTSD)

4  due to military service during the Korean War, and numerous attempts at rehabilitation failed."

5  (ECF No. 107 at 71.)  He argues Counsel did not disclose to Petitioner and the trial court the

6  nature and extent of these impairments which caused Lead Counsel to be absent for much of

7  Petitioner's trial.  (Id.; see also Claims 1, 2, herein.)

8      Petitioner points to evidence that Lead Counsel's chronic alcoholism and psychological

9  impairments resulted in his removal as counsel in separate prior criminal cases, and left him

10  unable to prepare and try Petitioner's case even after multiple in-patient alcohol rehabilitation

11  programs over a period of years, and multiple continuances of the start of Petitioner's trial.  (ECF

12  No. 107 at 77-79, citing Claims 1, 2, 4, 8 , 9; ECF No. 210 at 98 citing 1SHCP Ex.'s 22, 23, 34,

13  62, 67, 82)  He points to evidence that, after accepting appointment, Mr. Huffman was severely

14  ill and unable to: establish an effective attorney/client relationship; review, investigate and

15  develop evidence including as to Petitioner's psychosocial and criminal histories and reports of

16  abnormal behavior in the Kern County Jail, police and autopsy reports, forensic evidence,

17  interrogation transcripts relating to the capital crime, and criminal histories in Humboldt and

18  Ventura counties; and adequately prepare and present discovery, change of venue, exclusionary

19  and other pre-trial motions.  (ECF No. 107 at 72-73, 76-77 citing Claims 10, 13, herein.)   For

20  example, he argues Counsel's in limine motions were filed prematurely, giving the prosecution

21  "more time than necessary to develop a strategy to defeat the motions when they were properly

22  heard at the start of trial."  (ECF No. 107 at 79.)

23      Petitioner argues that during this time, Lead Counsel and Second Counsel each were

24  burdened by personal and professional conflicts.  He points to evidence that when Mr. Huffman

25  accepted appointment, he was burdened by a heavy caseload, lack of legal and office resources,

26  and suffered financial difficulties.  (ECF No. 107 at 73-74; see Claims 1, 2, herein.)   For

27  example, he observes Lead counsel then represented defendants in two other capital cases.  (Id.)

28      Petitioner points out that Second Counsel, who married Lead Counsel during the pretrial

phase, also was conflicted personally and financially. (ECF No. 107 at 76 citing Claims 1, 2, 4, herein.) For example, Counsel planned to create videotaped material from the sanity phase for use as teaching material at their proposed commercial venture, The Huffman School of Law. (ECF No. 107 at 91.)

However, the state supreme court reasonably could reject allegations Counsel was impaired and conflicted and thus ineffective. This Court previously found that Petitioner was not denied competent and conflict free counsel during the capital proceedings. (ECF No. 162 at 100, 109-10, 123.) This Court observed Second Counsel did not lack the ability, experience, and knowledge to represent Portioner in the absence of Lead Counsel (ECF No. 162 at 98-100, 123, citing Weaver, 26 Cal.4th at 952), stating that:

> Mrs. Huffman's representation generally was cogent, in spite of her lack of personal preparation, co-dependence, financial concerns, and exhaustion. During the defense case in chief, she questioned one mental health expert about schizophrenia in Weaver's family (Dr. Raitt), three mental health experts who evaluated Weaver in connection to the Humboldt County conviction (Drs. Gardner, Owre, and Tolchin), three mental state experts relative to the Ventura crimes (Drs. Chappell and Donaldson, plus Mr. Rose), three doctors comprising a defense team hired defense to evaluate Weaver for the sanity proceedings (Drs. Shonkwiler, Dietiker, and Lundgren), four PTSD experts (Drs. Wittlin, Donahoe, Wilson, and Kormos), three lay witnesses (Weaver's sister, Ms. Smith, and two friends, Messrs. Barnett and Mooreland), and two inmate witnesses (Messrs. Hogan and Archuleta). She conducted cross examination of five mental health experts put on by the prosecution (Drs. Cutting, Matychowiak, Burdick, Criswell, and Cholet), and an inmate witness (Mr. Sneed). She also conducted the rebuttal case by examining two additional inmate witnesses (Messrs. Shannon and Flores). Except for the opening argument on January 14, 1985 and the February 8, 1985 conference outside the presence of the jury about admission of the VESPI AV, Mrs. Huffman conducted all aspects of the sanity phase. It was a substantial, complex presentation of evidence and summation.

(ECF No. 162 at 96.)

(B)   Competency at Arraignment

Petitioner revisits his argument that Counsel, at the arraignment, unreasonably failed to obtain a confidential and independent mental health evaluation of Petitioner, and unreasonably stipulated to the non-confidential sanity evaluations by Drs. Cutting and Criswell, in the absence of an underlying NGI plea or advisement of Petitioner as to his rights in such regard. (See ECF No. 210 at 99 citing RT Sept. 29, 1982 at 2-4; CT 206-208.) He argues that Counsel misled the

234

trial court by suggesting he had been evaluated for trial competency in the separate prior Ventura County proceedings, when in fact that evaluation was only for sanity. (See ECF No. 107 at 74.)

Petitioner argues Counsel provided Drs. Criswell and Cutting with inaccurate and incomplete prior psychiatric evaluations from the Humboldt and Ventura County proceedings. He argues Counsel should have provided these experts with Petitioner's psychosocial history including jail and prison records verifying psychiatric treatment with Mellaril; his history of delusions and suicidal ideation, depression, migraine headaches, severe emotional trauma from a physically, psychologically, and sexually abusive childhood and combat duty in Vietnam; his history of a fractured skull and temporal lobe damage from a trucking accident that occurred one year before Petitioner's first conviction at age thirty-two; and his history of numerous other head injuries, clumsiness, and learning disabilities. (ECF No. 107 at 75; ECF No. 210 at 104 citing the factual basis for Claim 4, discussed ante.)

However, the state supreme court reasonably could reject these allegations. As discussed above, Counsel raised a doubt as to Petitioner's competency, advising the arraignment court that, while held in the Lerdo Jail facility "[Petitioner] has acted in a manner other than normal. He's been hearing voices and so on. This has been documented. I talked to those people personally." (RT September 29, 1982 at 2; see also CT 112.) The arraignment court stated that "[a]nd by personal appearance, by looking at him, I think we should suspend proceedings." (Id. at 3.)

Dr. Criswell examined Petitioner in the Kern County jail on October 18, 1982 and found him both competent for trial and sane. (1SHCP Ex. 113 at 1, 7-8.) Dr. Criswell examined "extensive records" including information relating to the capital offenses and charges, and the Ventura County case and offenses, and mental evaluations therein. (Id.) Dr. Criswell observed Petitioner was: "mildly sedated by his current medication" (id.); fully oriented with no evidence of any thought disorder or delusional thinking (id. at 1-6); able to relate his family, educational, military, employment, medical background, and lengthy criminal record (id.); and able to describe his chronic auditory and visual hallucinations, and amphetamine use while working as a truck driver (id.). As noted, Petitioner told Dr. Criswell that while incarcerated, he had and was then taking Mellaril, with dosages as high as 600 mg. (Id.)

1     Dr. Criswell found Petitioner to be an "extremely pathological individual[,]" free of

2  mental disease or defect and not or ever psychotic or legally insane.  (Id. at 7.)  Dr. Criswell

3  found unconvincing Petitioner's reported oral hallucinations.  (Id.)  Dr. Criswell found

4  Petitioner "presently able to understand the nature and purpose of the proceedings taken against

5  him [and] presently able to cooperate in a rational manner with counsel in presenting a defense."

6  (Id.)  As to prognosis, Dr. Criswell found "[Petitioner] is likely to remain a dangerous individual

7  and a menace to society for many years, i.e., until enfeebled by reason or age or health."  (Id.)

8  Dr. Criswell diagnosed Petitioner with "antisocial personality disorder; sexual sadism; and

9  adjustment disorder with depressed mood."  (Id.)

10     Dr. Cutting, for his part considered nearly three hundred pages of reports and documents,

11  Petitioner's narrative of his psychosocial history including use of Mellaril, and his examination

12  of Petitioner, and found Petitioner competent to stand trial with the assistance of counsel, and

13  sane at the time of the capital offenses.  (CT Confidential Records at 8-12.)

14     The state supreme court reasonably could find on the record before it, that at the time of

15  arraignment, Counsel had discovered, reviewed, and provided the arraignment experts with the

16  then developed indicia of Petitioner's incompetence, discussed above.  That court reasonably

17  could observe that Counsel, prior to arraignment, had a compressed timeline for investigation

18  and development of Petitioner's psychosocial background.  The record reflects that Counsel was

19  appointed on August 19, 1982.  (RT August 19, 1982 at 3.)  The preliminary examination was set

20  for September 15, 1982 (id. at 5-6.), and the arraignment held two weeks later (RT September

21  29, 1982 at 2).

22     Moreover, as Drs. Cutting and Criswell were not defense experts, the state supreme court

23  could find that Counsel reasonably determined not to provide these experts with any confidential

24  defense information.  Especially so, as Petitioner has not shown facts in the state record that he

25  had been found incompetent or insane, prior to his arraignment on the capital charges.

26     (C)     Investigation, Development, and Entry of Not Guilty by Reason of Insanity Plea

27     Petitioner argues his April 13, 1984 entry of an additional plea of not guilty by reason of

28  insanity was improper because Counsel failed reasonably to investigate and advise him on the

plea, and his mental state precluded consent to it.  (See CT 625-627, 639.)  He also argues

Counsel failed to develop and provide court appointed sanity experts Richard Burdick, M.D., and

Francis Matychowiak, M.D., with the noted psychosocial history information relating to his

predisposition for mental illness, his abused upbringing and substance abuse, and his PTSD,

organic brain impairments and mental impairments, necessary to perfect the insanity plea and

defense.  (See e.g., ECF No. 107 at 79-88; ECF No. 210 at 99 citing the noted expert opinion

from Petitioner's prior offenses; Claims 3, 4, herein; see also ECF No. 209 at 36.)

Petitioner argues that in the absence of such proffered evidence, his sanity plea focused

only on his schizophrenic disorder, rather than the constellation of his organic and mental

impairments.  He argues that as a result of such deficient conduct by Counsel, Drs. Burdick and

Matychowiak errantly found him sane.

Additionally, Petitioner argues the NGI  plea was unconstitutionally entered.  He argues

Counsel failed to fully advise him of the nature and consequences of the NGI plea and of his

right to refuse to talk with the court appointed sanity experts.  (ECF No. 107 at 80.)  He argues

that he wished to plead NGI only as to Count 2 (see CT 625-627), such that Counsel's

subsequently enter of the NGI plea to all Counts was unauthorized (id.).  He also argues that

Counsel did not allow him to personally enter the NGI plea.  (Id.)

However, the state supreme court reasonably rejected these allegations.  The record

reflects the April 13, 1984 entry of Petitioner's plea of NGI to the Count 2 murder of Levoy

based upon Counsel's psychiatric examination.  (RT April 13, 1984 at 4-5.)  The trial court then

examined Petitioner as to his NGI plea to Count 2, confirming during colloquy with Petitioner

his entry of the NGI plea and appointment of Drs. Burdick and Matychowiak to examine him.

(Id. at 5-6.)  The state supreme court observed that on that date, Counsel advised the trial court

that Petitioner wished to enter the additional plea, initiating the following colloquy:

"By the Court: Q Mr. Weaver, the second count of Information No. 24387
charges you with the crime of a violation of Section 187 of the Penal Code which
is murder. How do you plead to that charge?
"The Court: Do you want to add an additional plea?
"Mr. Huffman: Add an additional plea of not guilty and not guilty by reason of
insanity.

1
        "By the Court: Q *Is that correct, Mr. Weaver*?
        "A *Yes*." (Italics added.)

2

3 <u>Weaver</u>, 26 Cal.4th at 963-64.

4        Subsequently, during a pretrial hearing on Petitioner's motion to sever Counts 1 and 2,

5 with Petitioner present, Counsel moved, and the trial court accepted additional pleas of not guilty

6 by reason of insanity to Counts 1 and 3. (May 14, 1984 RT at 13-18.) The state supreme court

7 reasonably could find Petitioner failed to demonstrate he lacked competence to knowingly plead

8 NGI, for the reasons stated. (<u>See</u> Claim 3, 4, 8.) Furthermore, the state supreme court

9 reasonably rejected Petitioner's contention that he was deprived of <u>Boykin-Tahl</u> rights when he

10 entered his plea of not guilty by reason of insanity, observing that Petitioner had concurrently

11 plead not guilty to the murders, such that he had not admitted the charges and was not entitled to

12 the <u>Boykin-Tahl</u> advisements. <u>Weaver</u>, 26 Cal. 4th at 964.

13        This Court previously denied allegations that Petitioner did not personally plead guilty by

14 reason of insanity and he was not advised of the rights he was waiving by entering that plea.

15 (<u>See</u> ECF No. 209 at 50; <u>see also</u> RT April 13, 1984 at 4-6.) The Court also found the state

16 supreme court was reasonable in rejecting allegations that Counsel was ineffective in

17 investigating, preparing for, and during the sanity trial. (<u>See</u> ECF No. 209 at 50.) In any event,

18 there is no clearly established federal law requiring the defendant to consent on the record to an

19 insanity defense. <u>Rogovich v. Ryan</u>, 694 F.3d 1094, 1097 (9th Cir. 2012).

20        At bottom, the state supreme court reasonably could find Petitioner failed to point to

21 clearly established federal law demonstrating constitutional error in the entry of his NGI plea

22 amendments. State law error, if any there be, is not alone a basis for federal habeas relief.

23        (D)    The Guilt Phase Defenses

24        Petitioner argues Counsel unreasonably failed to fully to investigate the facts and

25 controlling law and thereupon develop and present at the guilt phase then available defenses of

26 trial incompetency, and impaired capacity to form the required mens rea. (ECF No. 107 at 88-

27 99; <u>see also</u> 1SHCP Ex.'s 36, 37.)

28        Particularly, Petitioner argues that Counsel, due to incompetence, conflict, and

1   insufficient investigation and development of facts and law, presented inferior defenses to the
2   prosecution's theory of first degree murder, that: (1) he did not intend to kill Radman, but meant
3   only to knock him out, precluding premeditated murder, (2) he did not intend to kill Levoy, but
4   did so accidentally and only after she bit him triggering a blackout and his unconscious act of
5   strangling her, precluding premeditated murder, and (3) the killings of Radman and Levoy were
6   not "immediately adjacent" in time to rape, precluding felony murder-rape. (See ECF No. 107 at
7   82-96, 236; see also ECF 210 at 124-131.)

8        However, the state supreme court reasonably could find that Counsel adequately
9   investigated and developed mental state evidence, and was motivated by reasonable trial tactics
10  in choosing the defense presented at the guilt phase, and reserving certain of the mental state
11  evidence for the sanity phase, for the reasons stated and those that follow. (See Claims 3, 4,
12  herein); see also Dunn v. Reeves, 141 S. Ct. 2405, 2410 (2021) (citing Burt v. Titlow, 571 U.S.
13  12, 23-24) (2013)) (even if there is reason to think that counsel's conduct "was far from
14  exemplary," a court still may not grant relief if "[t]he record does not reveal" that counsel took
15  an approach that no competent lawyer would have chosen.).

16       *(1)    Guilt Phase Investigation*

17       Petitioner argues that Counsel's investigation of guilt phase defense was inadequate to
18  support reasonable trial tactics. But the state supreme court reasonably found otherwise. See
19  Weaver, 26 Cal. 4th at 925-29.

20       The record reflects that Counsel investigated Petitioner's psychosocial background prior
21  to the guilt phase. Of the nineteen experts proffered at trial, seventeen examined Petitioner prior
22  to the sanity phase. (See section VII, A, 1, c, (ii) (B), herein.) Counsel's investigation included
23  expert derived information relating to: Petitioner's deprivations, academic problems and social
24  and mental health problems as a child and youth (section VII, A, 1, c, (ii) (B), herein; see also
25  RT 4978, 5106, 5300-01, 5497, 5798); his desire to join the Army in order to go to Vietnam and
26  die there (section VII, A, 1, c, (ii) (B), herein; see also RT 4735, 5300, 5383, 5534); his auditory
27  hallucinations (section VII, A, 1, c, (ii) (B), herein; see also RT 4868, 4923, 5101-02, 5517,
28  5519, 5804, 5808, 5820, 5895, 6047, 6242); and his prior psychiatric history including that he

1 had been diagnosed in the 1970's as paranoid and that he was taking the antipsychotic

2 medication Mellaril while incarcerated in state prison and the Ventura County jail (section VII,

3 A, 1, c, (ii) (B), herein; see also RT 4702-10, 4738, 6979, 4792, 4795, 4810, 4822, 5070, 5117,

4 and 6373).

5      Counsel also interacted with and observed Petitioner prior to and during the guilt phase

6 and discovered non-expert guilt phase evidence relating to Petitioner's conduct and demeanor,

7 including his ability to participate in his defense with the assistance of counsel.  (See RT 4857-

8 58; see also 1SHCP Ex. 34.)

9      As noted, Counsel investigated and presented at the guilt phase non-expert evidence

10 relating to Petitioner's personal background, service in Vietnam, the facts of the capital crimes,

11 his alleged loss of touch with reality upon being bitten, his hearing and responding to internal

12 voices, and the mistreatment he suffered growing up, perpetrated by his mother.  (See RT 3906-

13 3999; see also 1SHCP Ex. 34.)  Counsel requested and received prior to the guilt phase,

14 Petitioner's U.S. Army records.  (See RT 5849-55.)  Counsel also requested the Army provide

15 information about veterans familiar with and who could corroborate Petitioner's service in

16 Vietnam, but the Army refused, on privacy grounds.  (See RT 5850.)

17      *(2)    Choice of Guilt Phase Defenses*

18      Petitioner argues that then available but unpresented mental state defenses predicated on

19 evidence of his "major mental illnesses, organic brain impairments, substance abuse,

20 overwhelming developmental and combat trauma, and symptoms arising from that trauma" were

21 superior to the defenses presented at trial.  (ECF No. 107 at 88.)  Particularly, he argues his

22 mental incapacity to commit first degree murder, and relatedly his inability to voluntarily,

23 knowingly, and intentionally waive constitutional rights.  (ECF No. 107 at 83; see also ECF No.

24 210 at 99-104.)

25      Petitioner argues that, contrary to Counsel's belief, presentation of mental state defenses

26 at the guilt phase would not have been inconsistent with his insanity defense.  (ECF No. 210 at

27 126-30 citing Weaver, 26 Cal. 4th at 928; see also (RT 4507.)  He observes that even Second

28 Counsel second-guessed her husband's decision not to present a mental state defense at the guilt

phase.  (ECF No. 210 at 127 citing 1SHCP Ex. 34 at ¶ 28.)

However, as to alleged trial incompetence, the state supreme court could find that Counsel reasonably chose not to seek a redetermination of competency at the guilt phase, for the reasons stated.  (See Claim 4, herein.)

As to an alleged diminished capacity,  the state supreme court reasonably could find that contrary to Petitioner's assertion, Counsel was aware that diminished capacity was then an available defense at the guilt phase, but chose to reserve expert mental state evidence for the sanity phase, following an adequate investigation.  (See ECF No. 107 at 90, 92 citing RT 4499-4507, 7080; ECF No. 210 at 126; ECF No. 214 at 34); see also Weaver, 26 Cal. 4th at 925-29; Weeden v. Johnson, 854 F.3d 1063, 1070 (9th Cir. 2017) (citing Bemore v. Chappell, 788 F.3d 1151, 1166–67 (9th Cir. 2015) (counsel must make a reasonable decision that investigation of psychological evidence is unnecessary); Wiggins, 539 U.S. at 522 ("Under Strickland, counsel's investigation must determine trial strategy, not the other way around."); cf. Williams, 529 U.S. at 396 (counsel's failure to uncover and present mitigating evidence could not be justified as a tactical decision to focus on Williams' voluntary confessions where counsel did not thoroughly investigate defendant's background).

The defense of diminished (impaired) capacity, later abolished, see People v. Saille,  54 Cal.3d 1103) (1991), was extant when Petitioner committed his crimes.  See, e.g., People v. Mickey, 54 Cal.3d 612, 639, n.1 (1991) (diminished capacity defense available as to crimes committed before January 1, 1982; Penal Code § 25 (a)); People v. Wetmore, 22 Cal.3d 318, 331 (1978), superseded by statute as stared in People v. Elmore, 59 Cal. 4th 121 (2014) (allowing .presentation of duplicating mental state evidence at both the guilt and sanity phases at the time of Petitioner's trial).  It provided that "[a] person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter."  People v. Conley 64 Cal.2d 310, 318) (1966), disapproved on other grounds by People v. Ray, 14 Cal. 3d 20, 25 (1975), abrogated on other grounds by People v. Lasko, 23 Cal. 4 th 101, 110 (2000).

The Ninth Circuit has stated that "during the guilt phase, a defendant's mental state is

1   directly relevant for limited purposes - principally, ... legal insanity or actual failure to form the

2   requisite intent at the time of the offense." Noguera, 2021 WL 3043458 at *15) (citing Bemore,

3   788 F.3d at 1171).   The Ninth Circuit also has stated that "mental defenses to charges of

4   premeditated murder are rarely successful during the guilt phase." Id. at *22 (citing Mickey v.

5   Ayers, 606 F.3d 1223, 1239 (9th Cir. 2010)) (discussing the climate surrounding mental health

6   defenses and the death penalty in the early to mid-eighties).

7        The state supreme court reasonably could find unpersuasive Petitioner's argument that

8   Counsel failed adequately to investigate the availability and sufficiency of a diminished capacity

9   defense at the guilt phase.   The record demonstrates Counsel's understanding that diminished

10  capacity was an available defense to the charged murders.   For example, prior to voir dire, Lead

11  Counsel told the trial court he would present a diminished capacity defense overlapping the

12  insanity defense.  (See ECF No. 210 at 125 citing RT 298-99.)  Counsel filed a July 26, 1983

13  motion for ruling that the state's Proposition 8 did not retroactively bar a diminished capacity

14  defense on the facts and circumstance of Petitioner's case.  (See CT 271-279.)  The prosecutor

15  ultimately conceded the issue.  (CT 288, 1160.)  Moreover, Counsel requested and received

16  instruction on voluntary manslaughter due to diminished capacity (CT 1412, 1417, 1429-33), and

17  unconsciousness (CT 1445).

18        Furthermore, Counsel presented a guilt phase defense built around Petitioner's statements

19  and testimony that he expressly did not intend to kill Radman and blacked out during the killing

20  of Levoy.  (See RT 3942-48, 3957.)  Counsel supported the defense to Levoy's killing with non-

21  expert mental state evidence suggesting an unconsciousness defense, including that: Petitioner

22  loses control and blacks out when bitten, a disciplinary technique used against him by his mother

23  (see e.g., RT 3890-94); Petitioner regularly used amphetamines and did so on or about the date

24  of the capital crimes, and had not slept for about 10 days previous (see e.g., RT 3923, 4072-73);

25  Levoy bit him and the next thing he knew, she was dead (see e.g., RT 3996-97); and Petitioner

26  heard voices prior to and during the capital crimes telling him what to do (see e.g., RT 3916-19

27  3929-32, 3953-55, 3999).

28        Counsel explained this tactic was meant to avoid impeaching the credibility of Counsel,

and blunting the impact of evidence presented at the sanity phase.  (See e.g., ECF No. 210 at 134-35; RT 4499-4504; see also Weaver, 26 Cal. 4th at 927-28; People v. Miller, 7 Cal. 3d 562, 572 (1972) ("[T]rial counsel could well have believed that if he were to disclose his evidence of mental incapacity at the guilt phase, it would lose much of its impact on the [trier of fact] during the insanity phase.").  The fact that Second Counsel may not have understood fully Lead Counsel's tactics reasonably could suggest no more than the division of labor between Lead and Second Counsel.  (See e.g., 1SHCP Ex. 34 at ¶ 28.)

Notably, in the months before trial, Counsel moved to sever the Radford and Levoy murder Counts due to the "divergent defenses" Counsel intended to offer.  (RT May 11, 1984 at 4.)  Lead Counsel, in the course of explaining why he reserved certain mental state evidence for the sanity phase, noted his concern not with admissibility of a mental incapacity defense, but with how the jury might view divergent and disparate evidence of Petitioner's statements to authorities and the mental state opinion evidence from the noted experts.  (RT 4502-07.)  The state supreme court did not err in finding that explanation to be reasonable.  See Hernandez, 923 F.3d at 550–51 (citing Doe v. Ayers, 782 F.3d 425, 445 (9th Cir. 2015)) (generally, the court credits the statements of defense counsel as to whether their decisions at trial were—or were not—based on strategic judgments).

Significantly, Petitioner concedes that the tactically reasonable presentation of inconsistent defenses alone would not rise to the level of deficient conduct.  (ECF No. 210 at 142; see also ECF No. 214 at 36.)  "Counsel's tactical decisions are virtually unchallengeable," Furman v. Wood, 190 F.3d 1002, 1007 (9th Cir. 1999), and under § 2254(d), habeas review is "doubly deferential."  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

Also supporting Counsel's strategy was Petitioner's cogent and lucid guilt phase testimony suggesting goal oriented actions and a level of functionality during the capital crimes including attempts to avoid detection and apprehension over multiple days.  (RT 3906-4029, 4095); see also Williams, 384 F.3d at 609 (citing Williams v. Calderon, 41 F. Supp.2d 1043, 1059 (1998)) ("Petitioner's experts did not adequately explain the effect of his impairments on his thoughts or actions, and failed to adequately explain how he could appear lucid during the

1  crimes yet be unable to form the intent to kill").   Petitioner vividly testified at the guilt phase that

2  after Levoy bit him, he stopped jerking the diaper he had around her neck when he realized he

3  was hurting her; and tried to explain to her "what happens when somebody bites me."  (RT 3997;

4  see also RT 4015-16, 4026-29.)   That only then did he realize she was dead.  (RT 3998.)

5        Additionally, the state supreme court reasonably could find the weight of the expert

6  mental state opinion not supportive of Petitioner's impaired capacity for form mens rea at the

7  time of the capital crimes.  (See section VII, A, 1, c, (ii), (B), herein.)   Of the nineteen mental

8  health experts whose opinions were offered at trial, only Dr. Shonkwiler, without the benefit of

9  Petitioner's guilt phase testimony, opined diminished capacity and insanity.[28]  (Id.)  Of the two

10  other trial experts who opined insanity, Dr. Kormos found that Petitioner was aware of the

11  requirements of the law at the time of the capital crimes (RT 5959), and Dr. Wilson found that

12  Petitioner could distinguish right from wrong at the time of the capital crimes (RT 5820).  Also,

13  Petitioner's statements to the experts reasonably suggested his potential for violence, especially

14  against women, and that he might be a malingerer.  (See section VII, A, 1, c, (ii), (B), herein.)

15        Petitioner's state habeas proffer is not persuasive otherwise.  (See ECF NO. 209 at 36.)

16  The state habeas record reflects that in 1997, notwithstanding the noted evidence of progressive

17  mental impairment, habeas defense expert psychologist Dr. Dale Watson tested Petitioner to a

18  full-scale IQ of 93, with a verbal score of 85 and a performance score of 107.  (1SHCP Ex. 36 at

19  12-13.)  Dr. Watson detected a strong possibility of anxiety disorder such as PTSD, but offered

20  no opinion on Petitioner's sanity, or ability to form mens rea  at the time of the crimes.  (Id. at

21  15-16; see also Lod. Doc. No. 7 at 282-85).   Dr. Watson noted Petitioner's apparent learning,

22  attention, and memory deficits, but did not opine expressly as to origin, or how these deficits

23  might have related to Petitioner's mental state at the time he committed his capital crimes.  (Id.)

24  Also, Dr. Watson did not review all of the information that was available to the trial experts, a

25  basis reasonably to discount his testimony.  (See 1SHCP, Ex. 36 at 4, Appx. A.)

26

27  [28] The Court previously found Dr. Shonkwiler's impaired license, and the limiting instructions given by the trial court in relation thereto, did not materially lessen the force of his testimony and opinions favorable to the defense.

28  (ECF No. 209 at 43.)

State habeas defense expert psychiatrist Dr. David Foster opined in 1998 that Petitioner's mental capacity was seriously diminished by mental illness, substance abuse and brain damage. (1SHCP Ex. 37 at 14-15.)  Dr. Foster found Petitioner was legally insane at the time of the crimes. (1SHCP, Ex. 37 at 14-15.)  However, the state supreme court reasonably could observe that Dr. Foster relied upon basically the same mental health factors and problems that were considered and opined upon by the trial experts fourteen or more years before. (See e.g., 1SHCP Ex. 37 at 8-15; see also section VII, A, 1, c, (ii) (B).)

As was the case with Dr. Watson, it appears Dr. Foster did not have the benefit of all the psychosocial information reviewed by the trial defense experts. (1SHCP Ex. 37, Appx. A.) To the extent of the organic brain damage noted by Dr. Foster (1SHCP Ex. 37 at 14; see also Lod. Doc. No. 7 at 269-70, 274), Dr. Cholet's investigation in preparation for trial 15 years earlier, did not support organic brain injury. (RT 6419-21.)  Notably, Petitioner's other habeas expert, Dr. Watson, found that an April 1991 MRI of Petitioner's brain was "essentially normal." (1SHCP Ex. 36 at 7.)

Additionally, Petitioner's statement to Dr. Foster suggesting that during pretrial incarceration, he may have been medicated with large doses of the antipsychotic Mellaril (see 1SHCP Ex. 37 at 12) could reasonably be discounted by the state supreme court. The record reasonably suggests uncertainty as to duration and dosing of Mellaril for Petitioner, and whether the drug was given as an antipsychotic or a sedative  (See e.g., 1SHCP Ex. 36 at 6; 1SHCP Ex. 60; Lod. Doc. No. 7 at 268-69, 271-72; see also section VI, A, 1, (c), (ii), (B), herein; RT 4868-69, 5051, 5055, 5059, 5070, 5077, 5099, 5102, 5109, 5519, 5529, 5533, 5538, 5791, 5799, 5800, 5807-10.)  For example, there was testimony at trial that correctional staff might have prescribed Mellaril as a tranquilizer. (See RT 6373.)  In any event, the related possibility that schizophrenia could be masked by Mellaril, a consideration urged by Petitioner on habeas review, was considered by the trial experts in formulating their conclusions. (See section VI, A, 1, (c), (ii), (B), herein; see also e.g., RT 4868-69, 4887-88, 5070, 5958, 6373.)

It follows that, having reasonably selected a mens rea defense as the primary defense theory, Counsel no longer had a duty to investigate a conflicting mental state defense. See Bean

1   v. Calderon, 163 F.3d 1073, 1081–82 (9th Cir.1998) (counsel's reasonable choice of an alibi

2   defense ended counsel's duty to investigate a conflicting defense of diminished mental capacity);

3   Turk v. White, 116 F.3d 1264, 1266–67 (9th Cir.1997) (defense counsel's reasonable selection of

4   a self-defense theory obviated counsel's need to investigate a conflicting defense of

5   incompetency); Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir.1998) (defense counsel was not

6   ineffective for failing to present psychiatric evidence that would have contradicted the primary

7   defense theory of misidentification); Fritchie v. McCarthy, 664 F.2d 208, 215 (9th Cir.1981)

8   (same).

9       The state supreme court reasonably could find unpersuasive Petitioner's further argument

10  faulting Counsel for defensing felony murder-rape by arguing the rape was not proximate in time

11  to the murders.  (See ECF No. 210 at 107; see also People v. Hernandez, 47 Cal.3d 315, 348

12  (1988) ("[T]he focus is on the relationship between the underlying felony and the killing and

13  whether the felony is merely incidental to the killing, an afterthought.")

14      Here, Petitioner testified to his overarching desire to rape Levoy and that the killings

15  occurred in the furtherance and aftermath of rape.  (See RT 3929-4000.)   The state supreme

16  court reasonably could find unsupported in the state record any argument that rape was

17  secondary to murder.  Moreover, as Respondent observes, the latter argument likely would have

18  conceded an *ab initio* intent to kill Radford and Levoy (see ECF No. 211 at 39), an intent Gibson

19  had ascribed to Petitioner (see CT 185).

20      Accordingly, the state supreme court reasonably could find this is not a case where

21  counsel failed adequately to investigate, develop, and present the best possible guilt phase

22  defense.  See Hernandez, 923 F.3d at 550 (trial counsel was unreasonable by failing to

23  investigate and present a diminished capacity defense based on mental illness, the "best possible

24  defense" in that case and one available under then-existing California law); see also Furman, 190

25  F.3d at 1007 (under the Strickland standard, "[c]ounsel's tactical decisions are virtually

26  unchallengeable.").

27

28

1        (E)    Guilt Phase Opening and Closing Argument

2        Petitioner faults Counsel for waiving a guilt phase opening statement and delivering a

3   "rambling, confused, and repetitious guilt phase closing argument which required a recess to

4   reorganize."  (ECF No. 210 at 109-110 citing RT 3266, 3879, 4361-4421.)   He argues these

5   omissions and acts were not motivated by reasonable tactics.  He points to Counsel's initial

6   intent to present a diminished capacity defense (RT 298-99), only to later reserve mental state

7   evidence for the sanity phase (RT 4500, 4505).  He points to Counsel's confusion during sidebar

8   prior to the guilt phase closing, regarding the law of malice and felony murder (ECF No. 107 at

9   98-99 citing RT 4359-60), later necessitating correction in front of the jury following prosecution

10  objection (ECF No. 107 at 98, citing RT 4393-94, 4407-08).

11       The Court observes that generally, "[t]he timing of an opening statement, and even the

12  decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases

13  will not constitute the incompetence basis for a claim of ineffective assistance of counsel."

14  United States v. Rodriguez-Ramirez, 777 F.2d 454, 458 (9th Cir. 1985); see also United States v.

15  Murray, 751 F.2d 1528, 1535 (9th Cir. 1985) (rejecting claim of ineffectiveness where counsel,

16  motivated by reasonable tactics, failed to make an opening statement, failed to cross-examine

17  some witnesses, and failed to call any witnesses in defense); Gustave v. United States, 627 F.2d

18  901, 904 (9th Cir.1980) ("[m]ere criticism of a tactic or strategy is not in itself sufficient to

19  support a charge of inadequate representation").

20       Similarly, "[c]ounsel has wide latitude in deciding how best to represent a client, and

21  deference to counsel's tactical decisions in his closing presentation is particularly important

22  because of the broad range of legitimate defense strategy at that stage."  Gentry, 540 U.S. at 5-6.

23  Closing arguments "should 'sharpen and clarify the issues for the trier of fact,' but which issues

24  to sharpen and how best to clarify them are questions with many reasonable answers."  Id. at 6.

25  "Judicial review of a defense attorney's summation is therefore highly deferential . . . ."  Id.

26       Here, the state supreme court reasonably could reject the instant allegations.  Petitioner

27  has not rebutted on the factual record the strong presumption that counsel acted competently.

28  See Richter, 562 U.S. at 104.  Petitioner has not pointed to evidence suggesting Counsel's waiver

1   of the guilt phase opening was an unreasonable trial tactic.  Particularly, the fact Counsel

2   originally deferred and later waived opening statement, in response to the prosecution's position,

3   reasonably suggests a tactical underpinning rather than a lack of preparation.   (See RT 3266,

4   3879.)

5         Counsel's trial tactic regarding reservation of expert evidence of impaired capacity for

6   the sanity phase was reasonable, for the reasons discussed above.   (See ECF No. 209 at 36-37.)

7         Furthermore, Petitioner has not shown Counsel's sidebar at the guilt phase closing

8   regarding a potential misstatement during discussion of jury instructions, and Counsel's

9   allegedly muddled guilt phase closing argument, preponderates over the presumption of

10   diligence.  Petitioner argues that "[d]uring a sidebar conference just prior to closing argument,

11   counsel revealed their confusion and lack of knowledge about the intent requirements set forth in

12   <u>Carlos v. Superior Court</u>, 35 Cal. 3d 131 (1983), overruled by <u>People v. Anderson</u>, 43 Cal. 3d

13   1104 (1987)), superseded by statute as stated in <u>People v. Mil</u>, 53 Cal. 4th 400 (2012)), requiring

14   counsel to improvise and modify their closing argument accordingly." (ECF No. 107 at 98 citing

15   RT 4359-60.)  He argues Counsel's closing argument was unprepared, uninformed, and

16   misstated the law.  (ECF No. 107 at 98.)  But the state supreme court reasonably found Counsel

17   methodically and at length argued the facts and law, questioning the credibility of Gibson, the

18   prosecution's star witness, and whether the prosecution proved its case beyond a reasonable

19   doubt.  (See RT 4361-4421.)

20         In any event, such closing statements reasonably could be viewed as mere argument,

21   clarified, and corrected as necessary by the trial court's oral and written instructions.  <u>See</u>

22   <u>Rodriguez-Ramirez</u>, 777 F.2d at 458.

23         (F)    Other Guilt Phase Acts/Omissions

24         Petitioner argues or reargues multiple other guilt phase deficiencies, discussed separately

25   below.

26         *(1)    Corpus Delicti of Felony Murder-Rape*

27         Petitioner argues Counsel unreasonably failed to invoke the corpus delicti rule to exclude

28   his out-of-court statements to Kern County authorities that were used to establish felony murder,

1   and the felony murder special circumstance.  (See ECF No. 107 at 95-98; ECF No. 210 at 106-

2   08; see also Claim 25, herein); Mattson, 37 Cal.3d at 93-94 (the corpus delicti of felony-based

3   special circumstances must be established independently of an accused's extrajudicial

4   statements).

5        However, for the reasons stated, the state supreme court reasonably could find sufficient

6   evidence in the record, apart from Petitioner's noted statements, to establish the corpus delicti for

7   first degree felony murder and the felony murder-kidnap special circumstance, such that any

8   motion to exclude the statements on such grounds would have failed.  (See Claim 25, herein); see

9   also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (the failure to make a futile argument

10  does not constitute ineffective assistance of counsel); James, 24 F.3d at 27 (same); Morrison v.

11  Estelle, 981 F.2d 425, 429 (9th Cir. 1992) (same).

12       Moreover, as Petitioner acknowledges, Counsel did object, on corpus delicti grounds, to

13  use of his extrajudicial statements to prove murder.  (See ECF No. 107 at 97-98; see also Claim

14  25.)  The record also reflects Counsel's extensive corpus delicti argument in support of his

15  pretrial probable cause challenge under Penal Code section 995.  (See April 23, 1984 RT 13-95.)

16  The trail court denied the 995 motion relative to Counsel's claim that the corpus delecti of

17  murder as to Levoy was not proven at the preliminary hearing.  The trial court heard and rejected

18  similar argument during Counsel's pretrial motion to sever Counts 1 and 2, stating that "the

19  corpus of Count 2 can be quite easily established by finding the body [of Levoy] in the shallow

20  grave covered over by the platform . . . that establishes a homicide."  (RT May 11, 1984 at 16.)

21            *(2)   Prior Criminal Acts*

22       Petitioner faults Counsel for adducing testimony from Petitioner that prior to the capital

23  crimes, he assaulted Bonnie Brown in Humboldt County with the same kind of weapon, a pipe,

24  used to kill Radman, opening the door to damaging cross-examination.  (ECF No. 107 at 93;

25  ECF No. 210 at 128; see also RT 3936, 4081-82, 4336.)

26       However, the state supreme court could find Counsel reasonably was motivated by the

27  chosen trial defense.  The adduced testimony, that Petitioner struck Brown on the head with a

28  metal cheater bar leaving her unconscious and requiring a few stitches, supported his "lack of

1   intent to kill" defense to the Radman murder charge by explaining why he believed striking

2   Radman with a cheater pipe similarly would result only in unconsciousness.  (See e.g., RT 4336.)

3       Additionally, to the extent Petitioner suggests that Counsel unreasonably failed to

4   investigate his prior conviction out of Humboldt County (see ECF No. 210 at 103), the state

5   supreme court reasonably could find insufficient argument and support in the factual record.

6   The state supreme court reasonably could reject the allegation on that basis, for the reasons

7   stated.

8       *(3)   Juror Misconduct*

9       Petitioner faults counsel for failing to challenge jurors who voiced a security concern

10  relating to Petitioner, that he was too close to the jury box during his guilt phase testimony.  (See

11  ECF No. 107 at 98 citing RT 3951-52; ECF No. 210 at 108-09 citing 1SHCP Ex. 34 at ¶ 11.)  He

12  argues that Counsel deficiently and prejudicially "failed to investigate or make a motion to

13  question and/or remove the jurors who exhibited their fear of and distaste for [him]."  (ECF No.

14  210 at 109.)

15      However, the state supreme court could find Counsel was tactically motivated not to

16  pursue the juror's concern.  The record reflects the jurors' concern related to Petitioner being

17  within arm's length of the jury during the single occasion he left the witness box to draw on a

18  chart placed in the courtroom by Counsel.  (RT 3983-84.)  Counsel, the prosecutor and the trial

19  court were in apparent agreement the matter need not be pursued further.  (Id.).  Absent any

20  apparent legal or factual basis to question juror impartiality based solely upon a passing question

21  of courtroom security arising from Petitioner's appearance and status as a capital defendant,

22  Counsel reasonably could have chosen to move on.

23      Especially so as to Petitioner's personal appearance, given Counsel's tactical decision to

24  have Petitioner "appear before the jury . . . unkempt with a beard and long hair" as part of a

25  "strategy to make [him] look like he was indeed insane."  (ECF 209 at 60-61.)  This Court

26  previously determined that the strategy did not warrant federal habeas relief because "[t]he state

27  supreme court could reasonably have concluded . . . that reasonable counsel might employ such a

28  strategy" in the hope of securing a verdict of not guilty by reason of insanity.  (Id. at 61.)

1        *(4)      Impeachment of Rickey Gibson*

2        Petitioner faults counsel's decision to impeach the testimony of jailhouse informant

3   Rickey Gibson, that Petitioner expressed his intent to kill Radman and Levoy, solely with

4   Petitioner's guilt phase testimony to the contrary.  (See ECF No. 107 at 93-95 citing Claim 11;

5   see ECF No. 210 at 105 citing Claim 11; see also e.g., RT 3729-31.)  He argues that Gibson was

6   a mentally ill drug user with serious prior convictions.  (ECF No. 107 at 93-95; see also Claim

7   11.)  Particularly, he argues Counsel should have impeached Gibson's testimony admitting to a

8   prior conviction for "accessory to robbery" (RT 3727), with evidence Gibson had been arrested

9   for the more serious crimes of armed robbery and attempted murder in relation to that conviction

10  (ECF No. 107 at 93-94).

11       But as discussed in Claim 11, herein, Gibson was significantly impeached by evidence

12  otherwise in the trial record.  For example, the jury was aware that: Gibson admitted to two prior

13  felony convictions; was in prison when Petitioner confessed involvement in the capital crimes;

14  demanded money from the state in exchange for his testimony in Petitioner's proceeding; and

15  that a bench warrant for his arrest was recalled by the prosecution in exchange for his testimony.

16  To the extent Petitioner suggests s disparity between Gibson's arrest record and his record of

17  conviction, the state supreme court reasonably could conclude the impeachment value thereof to

18  be minimal, given the presumption of innocence upon arrest.  (See Penal Code § 1096.)

19       Additionally, the state supreme court reasonably could find Petitioner failed to show on

20  the factual record what additional investigation and discovery of admissible evidence counsel

21  reasonably should have conducted.  (See Claim 11, herein.)

22       *(5)      Pretrial Motions*

23       Petitioner argues Counsel failed properly to prepare and present pretrial motions for

24  change of venue, suppression of evidence from the search of his home, and suppression of his

25  statements to law enforcement.  (ECF No. 107 at 76-77, 83, 97-98; ECF No. 210 at 102-06.)

26  However, the state supreme court reasonably could find that Counsel was not deficient as alleged

27  because the noted motions lacked merit, as discussed below.

28       Regarding venue, as noted, the record shows that Counsel filed a motion for change of

1    venue, alleging therein highly prejudicial newspaper, television, and radio coverage, including

2    false and inadmissible information, that made a fair and impartial trial impossible. (ECF No. 107

3    at 76-77, 232-33; CT 312-318; see also Claim 10, herein.) The motion included and discussed

4    multiple newspaper articles about the crime and Petitioner as well as a defense commissioned

5    public opinion survey. (Id.; see also RT September 6, 1983 at 3-7; CT 312-342; Claim 10,

6    herein.) The state supreme court reasonably could find Counsel was not deficient in these

7    regards, as the motion lacked merit, for the reasons stated. (See Claim 10, herein.)

8         Regarding the search of Petitioner's backyard, as noted, the record shows Counsel moved

9    to suppress the fruits of the search including the physical evidence found in his backyard. (See

10   CT 296-301, 384-422; see also Weaver, 26 Cal. 4th at 924; see also Claim 13, herein.) The state

11   supreme court reasonably could find the suppression motion was premised in an adequate

12   investigation and controlling authority, and represented reasonable trial tactics. (See CT 384-

13   422); see also Strickland, 466 U.S. at 688. Particularly, that court reasonably could find

14   substantial evidence supported the trial court's decision that Barbara Weaver consented to a

15   search of her yard, discounting on credibility grounds Barbara Weaver's testimony that her

16   consent was involuntary, for the reasons stated by that court and those discussed above. (See CT

17   419-420); Claim 13, herein; see also Weaver, 26 Cal. 4th at 924.

18        Barbara Weaver's suggestion her consent was the result of intimidation arising from the

19   many officers digging in her backyard reasonably appears unsupported by facts that her volition

20   was overcome. (Id.) The facts and circumstances faced by her reasonably could be seen not to

21   rise to the level of coercion by law enforcement. (Id.); see also United States v. Marquez, 503 F.

22   Supp. 3d 1002, 1007 (S.D. Cal. 2020) (citing Schneckloth, 412 U.S. at 227) (a consent to search

23   is valid if the consent was freely and voluntarily given and not the result of duress or coercion,

24   express or implied; whether a consent to a search was in fact voluntary or was the product of

25   duress or coercion, express or implied, is a question of fact to be determined from the totality of

26   all the circumstances). Significantly, the noted record suggests that Barbara Weaver signed the

27   written consent form before officers began digging.

28        Regarding Petitioner's extrajudicial statements confessing to the capital crimes, the state

252

1  supreme court reasonably could have rejected mental state defenses to his <u>Miranda</u> waivers,

2  given the trial court's credibility findings and the facts underlying those findings, and the

3  detailed nature of Petitioner's statements of confession including the previously unknown

4  location of the Levoy murder site and remains.  (<u>See</u> Claim 14, herein; <u>see also</u> RT 105-108, 121,

5  132-33, 149, 155; CT 162.)  Finally, the fact these pretrial motions were denied is not alone a

6  basis to find ineffective assistance of counsel.  <u>See Rupe</u>, 93 F.3d at 1445 (the failure to make a

7  futile argument is not alone ineffective assistance of counsel); <u>see also Strickland</u>, 466 U.S. at

8  689 (warning against second-guessing counsel's tactical decisions through the distorted lens of

9  hindsight).

10         *(6)    Pretrial Discovery*

11         Petitioner faults counsel for failing to take all appropriate steps to obtain discovery of any

12  and all items to which he was entitled, specifically including the items discussed above in Claim

13  11.

14         However, the state supreme court reasonably could reject the allegation, for the reasons

15  stated.  (<u>See</u> Claim 11, herein.)  Particularly, Petitioner fails to identify specific psychosocial,

16  institutional, criminal, military, or other records or items to which he was entitled, but lacked

17  possession at trial.  (<u>Id.</u>)   Also, as noted, the record reflects Counsel's thirteen (13) item

18  discovery motion (CT 258-265, 267); forty-seven (47) item motion for disclosure of facts, things,

19  and information in the possession, control, or knowledge of the prosecution and law enforcement

20  (CT 437-448); and motion for release of physical evidence to defense expert for independent

21  examination (CT 449-456; <u>see also</u> CT 505-516).

22         *(7)    Proffered Rebuttal Testimony of Petitioner's Mother*

23         Petitioner faults Counsel for failing to object to the prosecutor's offer of proof, in open

24  court, regarding proposed testimony from his mother rebutting his unconsciousness defense, by

25  denying that she ever bit him.  (ECF No. 107 at 270; RT 4293-4307.)  Petitioner contends that

26  Counsel should have requested the matter be argued in chambers, rather than in open court.  (<u>Id.</u>;

27  <u>see</u> Claim 12, herein.)  He points to the prosecutor's statement that he would have argued in

28  chambers if the defense had insisted on it.  (RT 4326-27.)

1       However, the state supreme court reasonably could reject the allegation.  The record

2  shows Counsel did object to the prosecutor's out-of-court comments to the media regarding the

3  mother's proposed rebuttal testimony, and sought sequestration.  (See ECF No. 107 at 269 citing

4  RT 4324-25.)  Moreover, the prosecution's offer of proof, while made in open court, was outside

5  the presence of the jury.  (See RT 4293.)  The state supreme court reasonably found that any

6  error in admitting the proffer of testimony from prosecution investigator Carol Bender regarding

7  difficulty in serving Petitioner's mother and her proposed testimony "was manifestly harmless."

8  Weaver, 26 Cal. 4th at 946.

9       (ii)   Prejudice

10       Petitioner argues that Counsel's above noted allegedly deficient conduct forced him to

11  stand trial while incompetent and prevented presentation of an adequate defense during the guilt,

12  sanity, and penalty phases of the trial.  He argues it is reasonably likely that absent Counsel's

13  deficient conduct and given the state habeas proffer, the proceeding would have resulted in guilt

14  phase verdicts other than first-degree murder with special circumstances, and/or a not guilty by

15  reason of insanity verdict on one or more Counts, and/or a new trial, and/or reduction of the

16  death sentence to a sentence of life imprisonment without possibility of parole.  (ECF No. 107 at

17  88, 99; see also ECF 210 at 102-03, 111-12 (citing Parle v. Runnels, 505 F.3d 922, 927 (9th Cir.

18  2007)) (cumulative effect of multiple errors can violate due process even where no single error

19  rises to the level of a constitutional violation or would independently warrant reversal).

20       The Court observes that:

21

22       To establish prejudice, the defendant must show "a reasonable probability that,
         but for counsel's unprofessional errors, the result of the proceeding would have

23       been different. A reasonable probability is a probability sufficient to undermine
         confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. To make

24       this assessment, we "compare the evidence that actually was presented to the jury
         with the evidence that might have been presented had counsel acted differently."

25       Clark v. Arnold, 769 F.3d 711, 728 (9th Cir. 2014) (quoting Murtishaw v.
         Woodford, 255 F.3d 926, 940 (9th Cir. 2001) ).

26

27  Hernandez, 923 F.3d at 551.

28       As to competence to stand trial, the state supreme court reasonably could find Petitioner

1  failed to show preponderating evidence that he was incompetent, and that absent Counsel's

2  allegedly deficient failure to develop and present trial incompetence the outcome of the

3  proceeding would have been different, for the reasons discussed above. See Simmons, 110 F.3d

4  at 41. It follows that court reasonably could find Petitioner failed to show structural error, and to

5  the extent alleged, prejudice under Strickland. See Walters, 309 F.3d at 593; Strickland, 466

6  U.S. at 694.

7          As to defenses to murder, Petitioner must show a reasonable probability of a different

8  outcome as to both murder theories presented by the prosecution: (i) willful, deliberate, and

9  premeditated murder, and (ii) felony murder with rape as the predicate felony. While the jury

10  was required to find that the killing was willful, deliberate, premeditated, and with malice

11  aforethought under the first theory, it needed only to find that Petitioner had the specific intent to

12  rape under the second theory of felony murder. See Hernandez, 47 Cal. 3d at 346–51.

13          Here, as to premeditated murder, the state supreme court reasonably could find

14  Petitioner's mental state proffer that he was incapable of forming the necessary mens rea,

15  relatively weak, for the reasons stated. See Clark, 769 F.3d at 728 (quoting Murtishaw, 255 F.3d

16  at 940). Notably, this Court previously found that "Petitioner's actions over the extended period

17  comprising the capital murders, goal oriented planning and attempts at concealment could all be

18  seen as not reasonably suggestive of diminished capacity" and thus not prejudicial. (ECF No.

19  209 at 53); see also Weaver, 26 Cal.4th at 898-903.

20          As to felony murder-rape, the state supreme court reasonably could Petitioner's primary

21  criminal purpose was to get rid of Radford and then rape Levoy. The noted evidence in this

22  regard included Radford's roadside beating near Tehachapi, California, crushing his skull and

23  killing him; Levoy's body, partially clad in the clothing she wore when she disappeared,

24  discovered eighteen months later buried in a shallow grave, concealed under a structure in

25  Petitioner's backyard near Oroville, California; Petitioner's extrajudicial statements to authorities

26  confessing to the capital crimes; and Petitioner's testimony at trial consistent with his statements

27  to authorities.

28          Petitioner's further arguments, relating to trial, evidentiary, motion and argumental errors

1    lack merit for the reasons stated, and thus are not a basis upon which to find prejudice under the

2    Strickland standard.

        d.    Conclusions

4        A fair-minded jurist could find the state supreme court's denial of these Claims was not

5    contrary to, or an unreasonable application of, clearly established federal law, as determined by

6    the Supreme Court, or based on an unreasonable determination of the facts in light of the

7    evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

8        Claims 6 and 7 shall be denied.

        3.    Claim 11

10        Petitioner alleges Counsel was ineffective by failing to take all appropriate steps to obtain

11    discovery of material exculpatory evidence withheld by the prosecution to which Petitioner was

12    entitled, requiring reversal of his conviction and sentence.  (ECF No. 107 at 263; see Claim 11,

13    herein.)

        a.    State Court Direct and Collateral Review

15        Claim 11 allegations that Counsel was ineffective by failing to discover withheld

16    exculpatory information relevant to impeachment of prosecution witnesses Gibson and Galbraith

17    were raised in the first state habeas petition (Lod. Doc. 7 at 446-55), and summarily denied on

18    the merits (Lod. Doc. 8).

19        Claim 11 allegations that Counsel was ineffective by failing to discover withheld material

20    exculpatory information relevant to impeachment of prosecution witnesses Gibson, Sneed and

21    Galbraith and the prosecutor's presentation of false testimony were raised in the second state

22    habeas petition (Lod. Doc. 23 at 22-37), and summarily denied on the merits and on procedural

23    grounds (Lod. Doc. 24).

        b.    Legal Standard

25        The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b,

26    (ii), herein.

        c.    Analysis

28        Petitioner argues Counsel was ineffective by failing to discover material exculpable

1   evidence, withheld by the prosecution, relevant to impeaching jailhouse informants and penalty

2   phase witnesses and demonstrating their false testimony.

3   (i)   Deficient Conduct

4   Petitioner argues Counsel was ineffective by failing to discover prosecution withheld

5   "evidence of the criminal and mental health histories of the witnesses, evidence that one of the

6   penalty phase witnesses was hypnotized, and evidence that the prosecution secured witness

7   statements by promising benefits such as monetary payments or freedom from prosecution to the

8   witnesses." (ECF No. 107 at 239.)  He revisits the factual predicate discussed above in the

9   context of claimed prosecutorial misconduct, summarized below.  (See Claim 11, ante.)

10   The record reflects Counsel's multiple motions for pretrial discovery and disclosure by

11   the prosecution and law enforcement.  Counsel filed a thirteen (13) item pretrial discovery

12   motion for items and information including felony convictions of any trial witnesses.  (CT 258-

13   267.)  Counsel filed a forty-seven (47) item motion for pretrial disclosure of exonerating and

14   impeaching facts, things, and information in the possession, control, or knowledge of the

15   prosecution and law enforcement including, as to prosecution witnesses: felony criminal histories

16   and background information, leniency grants, deals and inducements to testify, and probation

17   status/records.  (CT 437-448.)  Counsel filed a motion for release of physical evidence to defense

18   expert for independent examination.  (CT 449-456.)   The trial court granted this discovery and

19   disclosure, subject to certain modifications.  (CT 471.)

20   (A)   Impeachment of Jailhouse Informant Rickey Gibson

21   Petitioner argues Counsel failed to discover evidence the prosecution promised benefits

22   such as monetary payments or freedom to Gibson in exchange for his testimony.  (ECF No. 107

23   at 239.)  He argues Counsel failed to discover that the prosecution, subsequent to its rejection of

24   Gibson's 1982 requests that he be placed in witness protection and paid for his testimony in

25   Petitioner's proceeding (see ECF No. 107 at 244-48 citing RT 3770), was involved in Gibson's

26   1984 placement in a witness protection program that paid living expenses, and repeatedly

27   interceded on Gibson's behalf, helping him avoid criminal charges and extradition and

28   facilitating release on probation.  (See id.; see also Claim 11, herein.)  He argues the significant

1  impeachment value of this evidence given Gibson's contrary testimony he was motivated solely

2  as a "good samaritan" (RT 3745) and that he faced danger by testifying against Petitioner (RT

3  3764-69, 4339-50).

4        But Gibson recanted his initial testimony wherein he denied seeking personal gain from

5  this testimony (see RT 3743-45, 4349-50), later admitting he requested, and the prosecution

6  denied money in exchange for testimony (id., RT 3770).  Petitioner also failed to demonstrate

7  that Gibson, in 1984, was ineligible for placement in a witness protection program after being

8  shot at in Los Angeles, or that such placement was other than consistent with Gibson's testimony

9  he was endangered by assisting the prosecution's case against Petitioner.

10       Petitioner argues Counsel failed to discover prosecution withheld impeaching evidence of

11 Gibson's criminal history.  (ECF No. 107 at 240-41.)  He argues that as a result, Gibson testified

12 falsely by understating the nature and extent of his prior felony convictions (see Claim 11, ante;

13 see also ECF No. 107 at 241-43 citing RT 3727, 3733; CT 187-88; ECF No. 210 at 151-52 citing

14 2SHCP Ex. 5 at 19, Ex. 6 at 35-36, Ex. 7 at 38-40), and by stating that he was then out of prison

15 and not on parole (see ECF No. 107 at 244, citing RT 3762).

16       However, Gibson testified that he had been convicted of multiple felonies.  (RT 3733-

17 34.)  He told the jury that he elicited Petitioner's confession while both were incarcerated in a

18 correctional mental hospital, in order to turn such information over the authorities.  (RT 3727,

19 3738, 3743-50.)  To the extent Petitioner suggests Gibson may have been motivated to testify out

20 of fear his parole might be revoked and that he would be returned to prison, where he allegedly

21 feared being killed  (RT 3769), the jury was aware that Gibson was testifying under the specter

22 of a bench warrant and the threat of again being incarcerated.  (See RT 3743-50, 3762-70, 4349-

23 50; see also CT 1024, 1328.)

24       Petitioner argues that Counsel failed to discover prosecution withheld evidence that

25 Gibson, contrary to his testimony, had a history of informing on inmates in order to curry favor

26 with authorities.  (ECF No. 107 at 243 citing RT 3738.)  But petitioner does not point to facts in

27 the state record that Gibson previously purposefully elicited information from fellow inmates in

28 order to turn that information over to authorities, as he did in this case.  (See Claim 11, herein;

1 | see also RT 3743-50, 3762-70, 4349-50; CT 1024, 1328.)

2 |       Petitioner argues that Counsel failed to discover prosecution withheld evidence that at the

3 | time of Petitioner's alleged confession to Gibson, the latter was experiencing severe psychiatric

4 | symptoms impacting his ability to accurately perceive and relate what was said.  (ECF No. 107 at

5 | 248; see also 2SHCP, Ex.  2 at 2-4; Ex. 3 at 5-7, Ex. 4 at 8-10; ECF No. 107 at 241.)  He

6 | suggests that Gibson was life-long abuser of substances including marijuana, methamphetamine,

7 | and alcohol (see e.g., 2SHCP Ex. 8 at 44), was repeatedly institutionalized in psychiatric clinics

8 | and hospitals starting in his early teens (see ECF No. 210 at 151-52 citing 2SHCP Ex.'s 2, 3),

9 | and had been placed at the California Medical Facility at Vacaville where he met Petitioner, for

10 | psychiatric observation and mental health treatment (see ECF No. 107 at 248-49, citing RT

11 | 3758.  He suggests that while at Vacaville, Gibson tried to kill himself (ECF No. 107 at 249;

12 | CITE), and that staff there diagnosed him with a "schizotypal personality" and "antisocial

13 | personality disorder."  (ECF No. 107 at 249-50.)  He suggests that Gibson was medicated with

14 | the antipsychotic Mellaril at the time he interacted with Petitioner.  (Id., citing 2SHCP Ex. 8 at

15 | 44.)

16 |       However, as discussed above, the state supreme court reasonably could find only scant

17 | support for these allegations in the state evidentiary record, which suggests only Gibson had a

18 | history of mental disturbance and intravenous drug use and on occasion was briefly incarcerated

19 | at state mental hospitals in California and Massachusetts.  (2SHCP Ex.'s 2-8.)  Notably, Gibson

20 | testified he was not taking medication at Vacaville state hospital.  (RT 3758.)

21 |       Additionally, the state supreme court reasonably could find Gibson's credibility was

22 | otherwise supported in the evidentiary record.  Gibson testified to statements about the capital

23 | crimes made to him by Petitioner, in the Vacaville California state mental facility, more than two

24 | years before Petitioner's capital proceeding.  (See RT 3727-49, 3758.)  Gibson's statements and

25 | testimony included facts apparently known only to law enforcement and the killer.  (RT 3728,

26 | 3727-58.)

27 |       (B)   Impeachment of David Galbraith

28 |       Petitioner argues Counsel failed to discover impeaching evidence of Galbraith's complete

1  psychosocial and criminal history.  (ECF No. 107 at 251-56; ECF No. 210 at 152-54.)  He argues

2  that contrary to the prosecutor's representation during trial, that he did not have Galbraith's

3  Washington state rap sheet (RT 6858-60), the prosecutor had requested and obtained Galbraith's

4  September 10, 1984 rap sheet showing: (i) multiple juvenile cases relating to theft, drugs and

5  running away from home, (ii) sex offenses in addition to his activities with DeLong, his

6  underage co-victim in the Ventura proceeding, and (iii) multiple burglary convictions.  (See ECF

7  No. 107 at 252-53; 2SHCP Ex. 10 at 80-85, Ex. 11 at 140-46.)

8      Petitioner argues the undisclosed evidence also would have shown Galbraith falsified a

9  monthly probation report and repeatedly violated his probation.  (ECF No. 107 at 253-54; see

10  also 2SHCP Ex. 10 at 96-98, 105-06.)

11      However, the state supreme court reasonably could find Petitioner offered only his

12  surmise that Counsel was unaware of Galbraith's material criminal history.  (See generally

13  Claims 6, 7, and 11, herein.)  As discussed above, Counsel conceded during Petitioner's

14  arraignment that the prosecutor handed him a 2-inch thick file from the Ventura proceeding.  (CT

15  382.)  Petitioner does not point to facts in the state record supporting his allegation the

16  prosecutor possessed the noted version of rap sheet prior to trial.

17      Moreover, Galbraith himself testified to his multiple felonies including five or six

18  burglary and narcotic offenses, and to his current incarceration.  (RT 6861-63, 6877, 6883.)

19  Galbraith also testified to his sexual activity with then sixteen-year-old DeLong (RT 6879; see

20  also 6906); the prosecution's agreement to pay him $120 in inmate wages lost due to his

21  testimony in Petitioner's proceeding (RT 6875-76); and the prosecution's agreement to apprise

22  Washington state parole and prosecuting authorities of Galbraith's cooperation in Petitioner's

23  proceeding (id.).

24      Furthermore, the record reflects that out of the presence of the jury, the prosecutor told

25  Counsel and the trial court that Galbraith was in custody in Washington state on a parole

26  violation and a pending burglary charge (RT 6858-60); he did not have a rap sheet on Galbraith

27  because it would be out of Washington state and he did not request one (id.); Galbraith had five

28  or six impeachable felony convictions for burglary, theft or drug offenses, (id.); Washington state

1   parole and prosecuting authorities would consider Galbraith's assistance in this case with a view

2   toward possible concessions (id.); the Kern County District Attorney would reimburse Galbraith

3   $120 for inmate work pay he would miss while in California waiting to testify in this case (id.);

4   and the trial court would inform the Washington state parole board of Galbraith's testimony in

5   this case with a view toward protective custody (id.).

6       To the extent Petitioner argues Counsel failed to discover undisclosed evidence that

7   would have shown Galbraith suffered behavioral issues, mental impairments, and substance

8   abuse, exacerbated by injuries suffered when Petitioner's accomplice in the Ventura crimes,

9   Jerry Daniels, shot Galbraith in the head leaving him with hearing loss and memory lapses, the

10  state supreme court reasonably could find no more than minimal impeachment value.  (See ECF

11  No. 107 at 253-54; see also 2SHCP Ex. 10 at 82-84.)  As noted, Counsel was aware Galbraith

12  exhibited certain behavioral and drug related issues.  Moreover, the state record suggests

13  Galbraith tested to an IQ of 120.  (Id.)  Galbraith's testimony in Petitioner's proceeding appeared

14  coherent, cogent, and grounded in the factual record (RT 6861-92), and in the main was

15  corroborated by his co-victim in the Ventura crimes, DeLong (RT 6893-6921).

16      Petitioner argues the undisclosed evidence would have shown that Galbraith was

17  disqualified from testifying in the Ventura County proceeding because authorities there had him

18  hypnotized prior to his testimony.  (ECF No. 107 at 254-55 citing Shirley, 31 Cal. 3d at 18,

19  Guerra, 37 Cal. 3d 385 (1984); see also ECF No. 210 at 153 citing 1SHCP Ex.'s 34, 129.)   But

20  as Petitioner concedes, this Court, in its prior denial of Claims 8 and 9, concluded the

21  impeachment value of evidence of hypnosis was minimal.  (See ECF No. 210 at 54 n.30 citing

22  ECF No. 230 at 73-74; see also Claim 11, herein; ECF No. 209 at 74.)

23      Petitioner argues the undisclosed evidence would have shown that Galbraith, in the

24  Ventura proceeding, colluded with a jailhouse informant James Prizzi, who provided testimony

25  of Petitioner's confessed intention to kill Galbraith and DeLong.  (ECF No. 107 at 255-56.)  But

26  Petitioner supports the allegation only with the unspecified contents of an alleged inmate "kite"

27  passed between Galbraith and Prizzi.  (ECF No. 107 at 255-56.)  Moreover, to the extent the

28  "kite" was included in the Ventura County materials received by the prosecutor, all such

1   materials were provided to Counsel.  (RT 6969.)

2        Additionally, Galbraith's credibility otherwise found support in the evidentiary record.

3   Galbraith testified in Petitioner's proceeding as a victim in Petitioner's crimes in Ventura County

4   which included the attempted murder of Galbraith and the kidnap and rape of Galbraith's

5   girlfriend, Delong.   (See RT 6872-92; see also ECF No. 209 at 74-76.)  As noted, Galbraith's

6   testimony was corroborated by Delong's testimony in Petitioner's proceeding.  (See RT 6893-

7   6921.)

8        (C)    Impeachment of Cecil Sneed

9        Petitioner argues that Counsel failed to discover evidence impeaching sanity phase

10  witness and jailhouse informant Sneed, whose testimony discounted that of other inmates

11  regarding alleged dissociative behavior of Petitioner in the Lerdo Jail facility.  (ECF No. 107 at

12  256-57 citing RT 6521-28; see also 2SHCP Ex.'s 12-13.)

13       Petitioner argues the undiscovered evidence would have shown Sneed suffered

14  intellectual limitations and poor mental health (ECF No. 107 at 257-58 citing 2SHCP Ex. 15 at

15  319), including evidence of Sneed's multiple arrests for alcohol-related offenses and his inability

16  to read and write.  (ECF No. 107 at 257-58 citing 2SHCP Ex. 15 at 319.)  He argues the

17  undiscovered evidence would have shown the prosecution provided undisclosed assistance in

18  resolving Sneed's parole violation on a grand larceny count out of Oklahoma (ECF No. 107 at

19  256-57 citing 2SHCP Ex. 14 at 302; see also ECF No. 210 at 154 citing 2SHCP Ex.'s 12-15), as

20  well as monetary assistance (cf. ECF No. 107 at 256 citing RT 6525, 6531).

21       Still, the record reflects that prior to Sneed's testimony, the prosecutor stated on the

22  record that he had provided Sneed's rap sheet to the defense which included felony convictions.

23  (RT 6512-15.)  The prosecutor also stated that as a condition of his testimony, Sneed's sentence

24  would be modified to time served and he would be given up to $150 for transportation to leave

25  the area.  (Id.)  Counsel acknowledged receipt of Sneed's rap sheet showing an extensive

26  criminal history going back over 25 years including charges of embezzlement and a conviction

27  for burglary both out of Oklahoma, and questioned Sneed about his rap sheet and criminal

28  history outside the jury's presence, such that ultimately the parties agreed Sneed's 1974 burglary

1  conviction and 1983 auto theft conviction and the escape charge on which he was then in custody
2  would be available for presentation to the jury. (RT 6518.)

3        Moreover, Sneed testified that he was then incarcerated in the Lerdo Jail facility (RT
4  6522-23), and that he agreed to testify against Petitioner in exchange for his release from custody
5  for time served on his one year sentence (RT 6525) and a bus ticket (RT 6531). Petitioner's
6  suggestion Sneed received assistance in resolving violation of parole on his 1983 Oklahoma
7  conviction relating to theft of a rental vehicle is only thinly supported in the state record. (See
8  e.g., 2SHCP Ex. 14 at 302.) Sneed also admitted from the stand his convictions for burglary and
9  grand theft auto. (RT 6534.)

10       Sneed testified that he could not read. (RT 6532; see also RT 6579.) Petitioner does not
11 otherwise identify in the state record, with any sufficient degree of specificity, undisclosed
12 mental state evidence relating to Sneed.

13       Sneed conceded during cross-examination that prior to trial he was interviewed by and
14 told Counsel that he would testify for Petitioner, and that Petitioner talked to imaginary people.
15 (RT 6526-27, 6533.) Sneed's testimony also was countered by that of fellow Lerdo jail inmates.
16 (RT 5716-18, 5723-25, 6573, 6580-83.)

17       Furthermore, as noted, Petitioner concedes that the Court, in its prior denial of Claims 8
18 and 9, concluded that Sneed's testimony was significantly impeached even without this
19 additional information, which the Court found of "little evidentiary value." (See ECF No. 209 at
20 39-40; ECF No. 210 at 154 n.31.)

21             (D)    Other Material Exculpatory Evidence

22       Petitioner argues Counsel failed to discover evidence that would have shown his alleged
23 incompetence to stand trial. Particularly, he points to evidence the prosecutor knew of
24 statements Petitioner made during breaks in the sanity phase trial suggesting he had difficulty
25 understanding expert testimony and had to ask Counsel for help (ECF No. 107 at 258); and
26 evidence that he was confused as to current events unrelated to his trial. (Id.) He also points to
27 undiscovered prosecution evidence of Petitioner's truck driving records and timecards relevant to
28 alleged amphetamine abuse and a potential "speed psychosis" defense. (ECF No. 107 at 258-

263

62.)

However, Counsel independently was aware that Petitioner had difficulty understanding the sanity phase expert testimony; Second Counsel acknowledged as much on the record. (See Claim 4, herein; see also RT 4857-58.)  Moreover, the issue of Petitioner's competence to stand trial and expert opinion thereon was extensively litigated. (See Claims 3, 4, herein.)  Anecdotal evidence of Petitioner's noted confusion regarding current events, even if admissible, reasonably appears no more than innocuous.   (See Id.)  As to Petitioner's alleged use of amphetamines while working as a truck driver, Petitioner himself testified during the guilt phase to his continuous use of "speed" over his one and one-half years as a truck driver preceding the capital crimes and that his employer at the time of the capital crimes, Bellegante Trucking, was aware he used "speed." (RT 4072-74.)

Petitioner also argues that Counsel failed to discover evidence that his co-perpetrator in the Ventura County proceeding, Jerry Daniels, was mentally ill and claimed responsibility for the attempted murder of Galbraith.  (ECF No. 107 at 260-61.)  However, at the penalty phase, co-victims Galbraith and DeLong testified in detail to Petitioner's role in the crimes against them.  (See RT 6867-76; 6891-92; 6895-06.)  Moreover, the Court previously denied Petitioner's claimed ineffective assistance of counsel at the sanity and penalty phases.  (See ECF No. 209 at 1-2.)

### (ii)   Prejudice

Petitioner argues that absent Counsel's above allegedly deficient conduct, there is a reasonable probability of a different outcome at trial, requiring reversal of his conviction and death judgment.  (ECF No. 107 at 263.)

> To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. To make this assessment, we "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)).

1  Hernandez, 923 F.3d at 551.

2       Here, the state supreme court reasonably could find the allegedly deficient conduct was

3  not prejudicial under the Strickland standard as to the murder theories presented by the

4  prosecution, i.e. (1) willful, deliberate, and premeditated murder, and (2) felony murder with

5  rape as the predicate felony.  While the jury was required to find that the killing was willful,

6  deliberate, premeditated, and with malice aforethought under the first theory, it needed only to

7  find that Petitioner had the specific intent to rape under the second theory of felony murder.  See

8  Hernandez, 47 Cal. 3d at 346–51.  Moreover, the allegedly undiscovered exonerating and

9  impeaching guilt phase evidence, considered cumulatively and in the context of the entire record,

10 did not raise a reasonable probability of a more favorable outcome, for the reasons stated.  See

11 Strickland, 466 U.S. at 693-95.

12          d.    Conclusions

13      A fair-minded jurist could find the state supreme court's denial of Claim 11 as ineffective

14 assistance of counsel was not contrary to, or an unreasonable application of, clearly established

15 federal law, as determined by the Supreme Court, or based on an unreasonable determination of

16 the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

17      Claim 11 allegations of ineffective assistance of counsel shall be denied.

18      4.    Claim 12

19      Petitioner alleges that Counsel was ineffective at the close of the guilt phase by failing to

20 object to the prosecutor's open court proffer of his  mother's testimony and by failing to request

21 the matter be argued in chambers, violating his rights under the Fifth, Sixth, Eight and

22 Fourteenth Amendments.  (ECF No. 107 at 270.)

23          a.    State Court Direct and Collateral Review

24      The Claim 12 allegation that Counsel was ineffective by failing to object to the

25 prosecutor's offer of proof of Petitioner's mother's testimony in open court and instead request it

26 be argued in chambers, was presented to the California Supreme Court in Petitioner's second

27 state habeas petition (Lod. Doc. 23 at 38-60), and summarily denied on the merits, and on

28 procedural grounds (Lod. Doc. 24).

b. Legal Standard

The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b, (ii), herein.

c. Analysis

Petitioner argues Counsel was ineffective at the guilt phase closing by allowing the prosecutor to discuss, in open court, his comments to the media relating to proposed rebuttal testimony by Petitioner's mother regarding his unconsciousness defense. (See ECF No. 107 at 268-70; see also Claim 12, ante, discussing the factual predicate in the context of claimed trial court error and prosecutorial misconduct; RT 4324-27.)

(i) Deficient Conduct

Petitioner argues Counsel unreasonably failed to object to the prosecutor's proffer regarding proposed guilt phase testimony from Petitioner's mother as to whether she ever bit him as a childhood disciplinary measure. (RT 4324-27.) He also argues Counsel unreasonably failed to request the matter be argued in chambers; something to which the prosecutor was agreeable. (Id.)

However, the state supreme court reasonably could reject these arguments. As the trial court observed in denying Counsel's related motion for jury sequestration (see Claim 24), the substance of the prosecutor's statements to the media regarding the mother's proposed testimony already was in the public record (see RT 4326-27).

Moreover, while Counsel did not request an in camera hearing on the proffer of the mother's proposed testimony, Counsel did object to the proffer itself and the trial court overruled the objection following its observation that the proffer could not be prejudicial because the jury was not present for the proffer. (RT 4293-95, 4326.) Counsel reasonably could have determined not to follow the unsuccessful objection by asserting the same grounds as a basis for an in camera session. See Rupe, 93 F.3d at 1445 (the failure to make a futile argument is not alone ineffective assistance of counsel); see also Strickland, 466 U.S. at 689 (warning against second-guessing counsel's tactical decisions through the distorted lens of hindsight).

1

(ii)     Prejudice

2      Petitioner argues that absent Counsel's allegedly deficient acts and omissions, there is a

3    reasonable probability of a more favorable guilt and penalty phase outcome, requiring reversal of

4    his conviction and death judgment.  As noted above:

5

6          To establish prejudice, the defendant must show "a reasonable probability that,
          but for counsel's unprofessional errors, the result of the proceeding would have
7          been different. A reasonable probability is a probability sufficient to undermine
          confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. To make
8          this assessment, we "compare the evidence that actually was presented to the jury
          with the evidence that might have been presented had counsel acted differently."
9          *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v.
          Woodford*, 255 F.3d 926, 940 (9th Cir. 2001) ).

10

11   Hernandez, 923 F.3d at 551.

12      Here, the state supreme court reasonably could find the allegedly deficient conduct was

13   not prejudicial under the Strickland standard as to the murder theories presented by the

14   prosecution, i.e. (1) willful, deliberate, and premeditated murder, and (2) felony murder with

15   rape as the predicate felony.  As noted, the jury was not exposed to the prosecutor's offer of

16   proof regarding the proposed rebuttal testimony of Petitioner's mother.  Also, Petitioner does not

17   make a factual showing that the mother's proposed rebuttal testimony materially would have

18   rebutted Petitioner's testimony relating to his unconsciousness defense and alleged reaction to

19   being bitten.  For example, Petitioner's first wife, Patricia Budrow, testified to Petitioner's

20   reaction to being bitten.  (See RT 3891-94.)

21      Additionally, the state supreme court reasonably could find the noted weight of the expert

22   opinion at trial not to support guilt phase mental state defenses, for the reasons stated.  (See

23   Claims 3, 4, 5, herein.)

24      d.     Conclusions

25      A fair-minded jurist could find the state supreme court's denial of Claim 12 allegations of

26   ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly

27   established federal law, as determined by the Supreme Court, or based on an unreasonable

28   determination of the facts in light of the evidence presented in the state court proceeding.  28

267

U.S.C. § 2254(d).

Claim 12 allegations of ineffective assistance of counsel shall be denied.

5.      Claim 13

Petitioner alleges that Counsel was ineffective by inadequately motioning to suppress physical evidence of Levoy's body found buried in his backyard that was seized without warrant or voluntary consent, and the fruits thereof including his confession, violating his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 107 at 76, 282-85.)

a.      State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 133-37), and denied on the merits, and on procedural grounds as follows:

> Defendant further contends his suppression motion should have been granted because Barbara Weaver's consent to the search was involuntary. We agree with respondent that defendant did not preserve this issue for appeal. A claim based on the voluntariness of Barbara Weaver's consent appears nowhere in defendant's moving papers, defense counsel's oral argument at the suppression hearing, or in the trial court's oral decision. The issue is thus not properly before us. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1038.)
>
> Assuming the issue was preserved, we reject it on the merits. Six or seven officers presented themselves at Barbara Weaver's home (Sergeants Davis and Johnson, as well as four or five other officers who were there to dig), and defendant suggests they were an intimidating force. Although the state has the burden of proving that Barbara Weaver's "consent was ... freely and voluntarily given," and the "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority" (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548-549 [88 S.Ct. 1788, 1792, 20 L.Ed.2d 797]), the prosecution satisfied this burden with evidence of Barbara Weaver's signed consent form and her testimony that she freely consented to a search of her house. Nothing in this record suggests Barbara Weaver's free will was overborne by the searching officers. We thus reject defendant's claim that her consent to search the yard was involuntary.

Weaver, 26 Cal. 4th at 924.

b.      Legal Standard

The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b, (ii), herein.

The legal standard for Fourth Amendment claims in federal habeas is set out in section VII, B, 3, b, (ii), herein.

### c.   Analysis

Petitioner argues Counsel was ineffective by failing to understand the scope of the motion to suppress evidence seized from the backyard of his home by law enforcement officers acting without benefit of a warrant and while acting outside the scope of a narrowly drawn and involuntary consent, and the fruits thereof, and by failing to bring controlling law to the trial court's attention, whereupon the motion was denied.  (ECF No. 107 at 282-84; ECF No. 210 at 162; CT 296-301, 344;  see also Claims 6, 13, herein.)

### (i)   Deficient Conduct

Petitioner argues Counsel failed to research and assert the involuntariness of the consent to search allegedly given by his then wife, Barbara Weaver.  He also argues his extrajudicial statements at San Quentin to Kern County Sergeants Davis and Johnson should be suppressed as fruit of the unlawful search of his backyard.  Particularly, he argues Counsel failed to provide the trial court with legal authority defining "voluntary consent" including the then prevailing standard that included consideration of the number of law enforcement officers present when the consent was given.  (ECF No. 107 at 284.)

However, the state supreme court reasonably found that on the totality of the circumstances before it, Barbara Weaver freely consented to the backyard search and that her free will was not overborne by the searching officers.  See Weaver, 26 Cal. 4th at 922–25.

As discussed above, when the subject of a search is not in custody, the state must show voluntary consent; voluntariness being a question of fact to be determined from all the circumstances.  Schnecklothe, 412 U.S. at 227; see also United States v. Escobar, 309 F. Supp. 3d 778, 784 (N.D. Cal. 2018) (citing Jimeno, 500 U.S. at 251 (the standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness).

The determination whether consent to search is voluntary considers the need for the search and the requirement there be no express or implied coercion.  Schneckloth, 412 U.S. at 227.  In determining whether consent is "free and voluntary" rather than the result of coercion or duress, the Ninth Circuit considers factors such as whether compliance was sought versus ordered; any efforts to mislead; number of officers present; day search versus night search; and

1   the maturity and emotional condition of the person giving consent.   Alexander, 2013 WL

2   1821101 at *6 (N.D. Cal. Apr. 30, 2013) (citing Brown, 563 F.3d at 415); see also Sierra–

3   Hernandez, 581 F.2d at 764 (the number of officers present is an element contributing to the

4   totality of circumstances reviewed to determine whether consent was freely and voluntarily

5   given).

6        Here, the state supreme court reasonably could find Barbara's Weaver's consent was not

7   coerced by any implied threat or covert force.   Schneckloth, 412 U.S. at 228.   Nothing in the

8   record suggests the officers required compliance, misled Barbara Weaver in order to gain her

9   consent, conducted a nighttime search, or that her maturity and emotional state played a role in

10  the consent given.   While Petitioner suggests Barbara Weaver was intimidated by the number of

11  searching officers, he raises the suggestion only in the context of Barbara's alleged belief they

12  were exceeding the limited scope of her consent; scope limitations the state supreme court

13  reasonably rejected on credibility grounds, for the reasons stated.   (See CT 101-102, 180, 403-

14  421; Claims 6, 13, herein; see also Yerger, 12 F.3d at *3 (the objectively reasonable standard

15  includes an analysis of whether the suspect reasonably understood her consent to extend to the

16  search conducted).

17       Notably, Barbara Weaver did not raise intimidation as to the voluntariness of her consent

18  *ab initio*.   Barbara Weaver never testified that she consented to the search because she was

19  coerced by the searching officers to do so.   (See CT 401-420.)   Nor are there facts in the record

20  reasonably suggesting such coercion, or even that at the time of oral and written consent, Barbara

21  Weaver was aware of and considered the number of searching officers.   Rather, she confirmed

22  the officers did not threaten her, or show weapons, or do anything to make her afraid.   (CT 407-

23  408.)   Nor did she tell the officers that she was afraid.   (Id.)

24       Accordingly, the state supreme court could find Counsel reasonably investigated,

25  developed, and presented the motion to suppress the fruits of the backyard search including the

26  physical evidence found in his backyard, and that Counsel was not deficient by failing to

27  supplement that motion with argument that any oral consent given by Petitioner's wife Barbara

28  was involuntary.   (See Claim 6, Claim 13, herein; CT 296-301, 384-421; Weaver, 26 Cal. 4th at

1    924; see also Strickland, 466 U.S. at 688.  The fact the suppression motion was denied is not

2    alone a basis to find counsel was deficient.  See Rupe, 93 F.3d at 1445 (the failure to make a

3    futile argument is not alone ineffective assistance of counsel); see also Strickland, 466 U.S. at

4    689 (warning against second-guessing counsel's tactical decisions through the distorted lens of

5    hindsight).

6           Additionally, the state supreme court reasonably could find Counsel was not deficient

7    regarding admission of Petitioner's related extrajudicial confession, for the reasons stated.  (See

8    Claim 14, post; see also CT 472-479; RT 3794-3801.)  Also, Petitioner has not demonstrated on

9    the factual record that he was aware Levoy's body had been found at the time he confessed, and

10   that the confession was a fruit of the backyard search.  The record could suggest otherwise.  (See

11   CT 384-385, but cf. id. at 389.)

12          (ii)    Prejudice

13          Petitioner argues that absent Counsel's allegedly deficient conduct and the resultant

14   evidence wrongfully admitted against him, he would not have been convicted or subjected to the

15   death penalty absent (ECF No. 107 at 285.)  The Ninth Circuit Court of Appeals  has observed

16   that:

17
18          To establish prejudice, the defendant must show "a reasonable probability that,
            but for counsel's unprofessional errors, the result of the proceeding would have
            been different. A reasonable probability is a probability sufficient to undermine
19          confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. To make
            this assessment, we "compare the evidence that actually was presented to the jury
20          with the evidence that might have been presented had counsel acted differently."
            Clark v. Arnold, 769 F.3d 711, 728 (9th Cir. 2014) (quoting Murtishaw v.
21          Woodford, 255 F.3d 926, 940 (9th Cir. 2001) ).

22
23   Hernandez, 923 F.3d at 551.

24          Here, the state supreme court reasonably could find the allegedly deficient conduct was

25   not prejudicial under the Strickland standard as to the murder theories presented by the

26   prosecution, i.e. (1) willful, deliberate, and premeditated murder, and (2) felony murder with

27   rape as the predicate felony.  As noted, Petitioner has not shown he was denied a full and fair

28   opportunity to litigate the Fourth Amendment issue at the suppression  hearing pursuant to Penal

                                               271

Code section 1538.5.  Petitioner is not entitled to federal habeas relief on this ground.  See Stone, 428 U.S. at 481-82; Moormann, 426 F.3d at 1053.

Additionally, the state supreme court reasonably could find the noted weight of the expert opinion at trial not to support guilt phase mental state defenses, for the reasons stated.  (See Claims 3, 4, 5, herein.)

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 13 allegations of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 13 allegations of ineffective assistance of counsel shall be denied.

### 6.    Claim 15

Petitioner alleges that Counsel was ineffective at voir dire by failing to request that prospective jurors be admonished not to discuss, investigate, or form an opinion as to Petitioner's case, and by failing to object to the trial court's failure to so admonish prospective jurors.  (ECF No. 107 at 38, 292-93; ECF No. 210 at 168.)

### a.    State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court on direct appeal (Lod. Doc. 1 at 84-93), and denied on the merits, and in part on procedural grounds, as follows:

> In preliminary proceedings, the court organized the jury pool into groups, telling certain prospective jurors to return for voir dire after lunch, while assigning others future times and days in which they were to return to court for voir dire. Before the latter jurors left the courtroom, the trial court did not admonish them against discussing the case, reading or listening to media accounts, or visiting the scene of the crimes. Defendant acknowledges that the statutory requirement that jurors be admonished (§ 1122) applies only after a jury is sworn and thus does not expressly apply to this preliminary period in the jury selection process. (*People v. Horton* (1995) 11 Cal.4th 1068, 1094 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Nevertheless, he contends the trial court's failure to admonish the jury violated his federal constitutional rights to a fair trial, an impartial jury, and a reliable guilt and penalty verdict, as well as his analogous rights under the state Constitution.
>
> We have explained that "the giving of the admonition to prospective jurors during

the voir dire process constitutes a sound judicial practice" (*People v. Horton*, *supra*, 11 Cal.4th at p. 1094), but that failure to do so does not constitute error. Because our *Horton* opinion makes no mention of whether we considered all the constitutional bases defendant now asserts, *Horton* does not fully dispose of defendant's claim. We nevertheless find three reasons why the claim is meritless.

First, defendant failed to object or call the trial court's attention to the lack of an admonishment. The issue is thus forfeited on appeal. (Cf. *People v. Heishman* (1988) 45 Cal.3d 147, 175 [246 Cal.Rptr. 673, 753 P.2d 629] [where § 1122 applies, a timely objection is necessary].) Second, even assuming the issue were preserved for appeal, we are unaware of any constitutional requirement that our trial courts admonish prospective jurors so far in advance of a trial. Certainly, defendant does not cite any authority to that effect.

Third, any prospective jurors who discuss the case, form opinions, view the crime scene, or do legal research can be discovered during the voir dire process and be either excused or rehabilitated at that time. Although defendant directs our attention to a few jurors who may have acquainted themselves with the law after being notified they might be chosen for the jury, he fails to explain why his right to a fair trial and an impartial jury could not be protected by rehabilitating those jurors or excusing them for cause or peremptorily if they could not be rehabilitated. He thus fails to show prejudice. (*People v. Heishman*, *supra*, 45 Cal.3d at p. 175.) Defendant's ability to strike such jurors also protects his rights under both the state and federal Constitutions to a reliable verdict.

Defendant also contends his trial attorney provided ineffective assistance of counsel by failing to ask the court to admonish the prospective jurors. He claims his counsel could have had no conceivable tactical reason for the omission. Even assuming that to be true, defendant fails to demonstrate how he was prejudiced. Accordingly, he does not show his trial attorney was constitutionally ineffective under either the state or federal Constitution. (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [104 S.Ct. 2052, 2066-2067, 80 L.Ed.2d 674].)

Weaver, 26 Cal. 4th at 908–09.

The Claim also was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc. 7 at 456-58), and summarily denied on the merits, and in part on procedural grounds (Lod. Doc. 8).

b.    Legal Standard

The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b, (ii), herein.

The legal standard for trial by an impartial jury is set forth in section VII, B, 2, b, (ii), herein.

c.    Analysis

Petitioner argues Counsel was ineffective at voir dire by failing to request admonishment,

1    and object to the trial court's failure to admonish prospective jurors not to investigate, discuss, or

2    form an opinion about Petitioner's case.

3         (i)    Deficient Conduct

4         Petitioner argues that Counsel unreasonably failed to object to the trial court's failure to

5    admonish potential jurors at voir dire not to converse among themselves or with anyone else

6    regarding the trial; to refrain from reading or listening to accounts or discussions of the case in

7    the media; and to refrain from visiting or viewing any premises or place involved in the case.

8    (See Claim 15, ante, discussing the factual predicate in the context of trial court error; Weaver,

9    26 Cal. 4th at 908-09.)

10        However, the state supreme court reasonably could deny the allegations.  It remains that

11   Petitioner has not identified legal authority that a trial court must admonish jurors before they are

12   sworn.  (Id.)  Petitioner does not show trial counsel was denied or constrained in the opportunity

13   to voir dire and as appropriate challenge these and the other prospective jurors.  (Id.)

14   Particularly, as to the noted prospective jurors in issue, the state supreme court reasonably could

15   find Petitioner argues inference insubstantially supported by facts in the record.  (Id.)  He has not

16   demonstrated Counsel was deficient by failing to make a request that lacks merit.   See Rupe, 93

17   F.3d at 1445 (the failure to make a futile argument is not alone ineffective assistance of counsel);

18   see also Strickland, 466 U.S. at 689 (warning against second-guessing counsel's tactical

19   decisions through the distorted lens of hindsight).

20        (ii)    Prejudice

21        Petitioner argues that as a result of Counsel's allegedly deficient acts and omissions,

22   several prospective jurors including some who served at his trial, discussed the case, or

23   researched applicable law prior to being admonished to refrain from doing so.  (ECF No. 107 at

24   295-96.)  Particularly, he argues his trial jury included at least two persons who acquainted

25   themselves during the jury selection process with legal principles applicable to the definition of

26   sanity; jurors who then voted to find Petitioner sane and sentenced him to death.  (ECF No. 107

27   at 296.)  The Ninth Circuit Court of Appeals has observed that:

28

1

> To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. To make this assessment, we "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001) ).

2

3

4

5

6 <u>Hernandez</u>, 923 F.3d at 551.

7      Here, the California Supreme Court reasonably could find Petitioner failed to establish

8 prejudice under <u>Strickland</u>. Even if Counsel was deficient by failing to request the noted

9 admonishment during voir dire, the state supreme court reasonably could find no reasonable

10 probability of a different guilt phase outcome as to the murder theories presented by the

11 prosecution, i.e. (1) willful, deliberate, and premeditated murder, and (2) felony murder with

12 rape as the predicate felony.  None of the prospective jurors in issue served on Petitioner's guilt

13 phase jury.  Counsel had the opportunity to and did engage the noted potential jurors on their

14 voir dire responses, and seek rehabilitation or excuse thereof.  (See Claim 15, <u>ante</u>); <u>see also</u>

15 <u>Weaver</u>, 26 Cal. 4th at 909.  Rather, the voir dire record suggests that, with the exception of

16 prospective juror Dugger who was excused for cause, Counsel engaged in substantial

17 questioning of these prospective jurors.  (See e.g., RT 1171-40, 2489-2505, 1947-64, 2079-2085,

18 2396-2422.)

19      It remains Petitioner has not demonstrated admissible evidence that the jury considered

20 extrinsic evidence, failed to deliberate consistent with their instructions, or otherwise engaged in

21 misconduct.  (See Claims 17, 18, herein); <u>see also Weeks</u>, 528 U.S. at 234.  Additionally, this

22 Court previously denied claimed ineffective assistance of counsel at the sanity and penalty

23 phases.  (See ECF No. 209 at 1-2.)

24      d.    Conclusions

25      A fair-minded jurist could find the state supreme court's denial of Claim 15 allegations

26 of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly

27 established federal law, as determined by the Supreme Court, or based on an unreasonable

28 determination of the facts in light of the evidence presented in the state court proceeding.  28

1  U.S.C. § 2254(d).

2       Claim 15 allegations of ineffective assistance of counsel shall be denied.

3       7.      Claim 18

4       Petitioner alleges that Counsel was ineffective by failing to request inquiry into

5  inattentive jurors, and seek disqualification of any jurors found to be inattentive. (ECF No. 107

6  at 312-13.)

7       a.      State Court Direct and Collateral Review

8       The Claim was presented to the California Supreme Court in Petitioner's second state

9  habeas petition (Lod. Doc. 23 at 61-77), and summarily denied on the merits, and in part on

10  procedural grounds (Lod. Doc. 24).

11      b.      Legal Standard

12      The legal standard for ineffective assistance of counsel claims is set out in section VII, E,

13  1, b, (ii), herein.

14      The standard for a fair and impartial jury is set out in section VII, B, 2, b, (ii), herein.

15      c.      Analysis

16      Petitioner argues Counsel unreasonably failed to request trial court inquiry into and

17  disqualification of sanity phase jurors who were inattentive, i.e., falling asleep, during the sanity

18  phase testimony of psychologist Dr. Edward Dietiker, and not paying attention during jury

19  instructions.  (ECF No. 107 at 312-13; see also ECF No. 210 at 312-13; Claim 18, ante,

20  discussing the factual predicate in the context of claimed trial court error and juror misconduct;

21  RT 5421-24, 6801, 6929.)

22      (i)      Deficient Conduct

23      Petitioner argues Counsel unreasonably failed to request the trial court investigate and

24  disqualify jurors found to be inattentive.  He argues Counsel's tactic of reserving this issue and

25  combining it with other instances of juror misconduct in a pre-penalty phase motion was not a

26  reasonable trial tactic.

27      As noted, the record reflects on March 5, 1985, at the start of the penalty phase, Counsel

28  made an oral motion for a new trial (Penal Code § 1181) on grounds that the sanity phase verdict

1    had "been decided by lot or by means other than a fair expression of opinion on the part of all the

2    jurors." (RT 6800.) Therein, Counsel stated that "three jurors, Juror Nos. Nine, Ten, and

3    Eleven, were not paying attention to the jury instructions and were talking and laughing as the

4    jury instructions were being read." (RT 6801.) Counsel stated that "[i]t seems to me that this

5    jury had already made up its mind as a whole . . . and has been predisposed after hearing the first

6    phase of this case not to listen to anything in the second phase." (RT 6800-01.) The trial court

7    deferred the motion to the end of trial and ultimately denied the motion as renewed. (RT 7070-

8    92; CT 1711-22; see also Claim 24, herein.)

9        Under state law, the trial court, at any time during trial and upon "good cause shown,"

10   may discharge any juror "found to be unable to perform his duty." Penal Code § 1089; see also

11   McNeal, 90 Cal. App. 3d at 838 ("Once the court is alerted to the possibility that a juror cannot

12   properly perform his duty to render an impartial and unbiased verdict, it is obligated to make

13   reasonable inquiry into the factual explanation for that possibility.").

14       A trial judge "must conduct a sufficient inquiry to determine facts alleged as juror

15   misconduct whenever the court is put on notice that good cause to discharge a juror may exist."

16   Davis, 10 Cal.4th at 547; see also Bradford 15 Cal.4th at 1348; Williams, 16 Cal.4th at 231. The

17   determination of "good cause" rests in the sound discretion of the court, Abbott, 47 Cal.2d at

18   371, and the court's finding thereof will be upheld if substantial evidence supports it, Burgener,

19   41 Cal.3d at 520. A juror's inability to perform as a juror must "appear in the record as a

20   demonstrable reality." Compton 6 Cal. 3d at 60; accord see Williams, 16 Cal. 4th at 229.

21       On the facts and circumstances of this case, the state supreme court reasonably could find

22   that Counsel was motivated by reasonable trial tactics in initially placing the trial court on notice

23   of the alleged juror inattention, and then revisiting the matter in a post-penalty phase motion.

24   Particularly, Petitioner presented only a possible inference, not evidence of a demonstrable

25   reality, that one or more jurors was inattentive during the sanity phase. (See Claim 18, herein;

26   see also 28 U.S.C. § 2254(e)(1)); James, 24 F.3d at 26 ("Conclusory allegations which are not

27   supported by a statement of specific facts do not warrant habeas relief."). Petitioner failed to

28   point to facts in the record showing any allegedly inattentive juror actually missed essential

1   portions of the trial and thus was unable fairly to deliberate thereon.  (See e.g., Lod. Doc. 23 at

2   68, citing RT 5387-5423); see also Barrett, 703 F.2d at 1083 n.13 (citing Hendrix, 549 F.2d at

3   1229) (where a juror has been found to be sleeping, a new trial may not be required if the court

4   determines the juror "did not miss essential portions of the trial and was able fairly to consider

5   the evidence).

6       Even t\he presence of a sleeping juror during trial does not per se deprive a defendant of

7   the right to due process, a fair trial, or an impartial jury.  See Tanner, 483 U.S. at 126–27 (juror

8   who falls asleep during testimony is not per se incompetent); Springfield, 829 F.2d at 864 (no

9   violation of due process or the right to a fair trial and impartial jury when juror napped through

10  part of testimony); see also Olano, 62 F.3d at 1189 ("[T]he presence of all awake jurors

11  throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to reliably

12  serve its function as a vehicle for determination of guilt or innocence.  A single juror's slumber

13  thus is not per se plain error.")

14      Furthermore, the Court previously denied allegations of deficient conduct by Counsel

15  during the sanity and penalty phases.  (See ECF No. 209 at 1-2.)

16      Additionally, Counsel's failure raise a solely state law objection is not a basis for federal

17  habeas relief.  See McGuire, 502 U.S. at 67-68; Park, 202 F.3d at 1149.  Federal habeas relief is

18  not available to retry a state issue that does not rise to the level of a federal constitutional

19  violation.  McGuire, 502 U.S. at 67–68.  Alleged errors in the application of state law are not

20  cognizable in federal habeas corpus.  Souch, 289 F.3d at 623.  The Court accepts a state court's

21  interpretation of state law.  Langford, 110 F.3d at 1389.

22      (ii)   Prejudice

23      Petitioner argues that as a result of Counsel's allegedly deficient acts and omissions,

24  inattentive jurors who missed essential portions of the trial, denied him a fair trial and reliable

25  verdict.  (See ECF No. 107 at 312; see also Lod. Doc. 23 at 68 citing RT 5387-5423.)  Petitioner

26  argues that as a result, he did not receive a fair trial by an impartial jury and was denied a reliable

27  verdict. (ECF No. 107 at 313.)

28      The Ninth Circuit Court of Appeals has observed that:

> To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. To make this assessment, we "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001) ).

*Hernandez*, 923 F.3d at 551.

Here, the California Supreme Court reasonably could find Petitioner failed to establish prejudice under <u>Strickland</u>. Even if Counsel was deficient by failing to request the trial court investigate and disqualify jurors found to be inattentive, the state supreme court reasonably could find no reasonable probability of a different guilt phase outcome as to the murder theories presented by the prosecution, i.e. (1) willful, deliberate, and premeditated murder, and (2) felony murder with rape as the predicate felony. Particularly, Petitioner has not shown jurors prejudged the case, and missed essential portions of the trial, and were unable to deliberate on the facts and law consistent with the trial court's instructions, for the reasons stated. (<u>See</u> Claims 17, 18, <u>ante</u>.) It remains Petitioner has not demonstrated admissible evidence that the jury failed to deliberate consistent with their instructions, or otherwise engaged in misconduct. (Id.); <u>see also</u> <u>Weeks</u>, 528 U.S. at 234.

Additionally, this Court previously rejected claimed denial of competent counsel (<u>see</u> ECF No. 162 at 100, 123), and ineffective assistance of counsel at the sanity and penalty phases (<u>see</u> ECF No. 209 at 1-2).

### d.   Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 18 allegations of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 18 allegations of ineffective assistance of counsel shall be denied.

8. Claim 19

Petitioner alleges that Counsel was ineffective by allowing him orally to waive presence in court during the taking of sanity phase evidence. (ECF No. 107 at 320-25.)

a. State Court Direct and Collateral Review

The Claim was presented to the state supreme court in Petitioner's first state habeas petition (Lod. Doc. 7 at 285-87 ), and summarily denied on the merits (Lod. Doc. 8).

b. Legal Standard

The legal standard for ineffective assistance of counsel claims is set out in section VII, E, 1, b, (ii), herein.

The standard for presence of a defendant during a capital trial is set out in section VII, B, 11, b, (ii), herein.

c. Analysis

Petitioner argues Counsel was ineffective by allowing him to waive presence in the courtroom during sanity phase presentation of the VESI videotaped wartime mental state evidence. (See Claim 19, ante, discussing the factual predicate in the context of trial court error.)

The noted record reflects that on February 13-14, 1985, when the VESI videotape and related evidence was presented, Petitioner showed signs of emotional distress and asked guards to escort him from the courtroom. (RT 5822-23.) Second Counsel advised the trial court that Petitioner wished to waive his appearance until the playing of the VESI videotape was concluded because he "didn't want to lose control and wants to apologize to the court." (RT 5823; see also ECF No. 107 at 320-21.)

The trial court advised Petitioner of his right to be present and took his oral waiver of that right on the record. (RT 5823-24; see also ECF No. 107 at 320-21; ECF No. 210 at 189-91.) The record reflects that Petitioner was absent from the courtroom while the remainder of the VESI videotape was played. (RT 5824-26.)

(i) Deficient Conduct

Petitioner argues Counsel unreasonably failed to perfect the waiver of presence by having him review, understand, and voluntarily sign a written waiver of appearance as required by state

law.  (ECF No. 107 at 321 citing Penal Code § 977.)  He argues the waiver in open court was not knowing, intelligent, and voluntarily.  (ECF No. 107 at 320-21; ECF No. 210 at 191-92.)  He supports the argument by pointing to the noted evidence of his mental illness and impairments and alleged incompetence to stand trial which, he argues, led him to defer to Counsel's recommendation that he leave the courtroom lest he become volatile and violent during playing of the VESI tapes.  (See Claims 3, 4; Claim 19, ante, discussing the factual predicate in the context of trial court error; ECF No. 107 at 321-23; Lod. Doc. 7 at 286.)

Petitioner also argues he was unaware state law prohibited his absence from the courtroom during the taking of evidence.  (See  ECF No. 210 at 190); see also Penal Code §§ 977, 1043).  He points out that neither Counsel nor the trial court told him of the state law requirement.  (Id.)

But Petitioner failed to demonstrate his departure from the courtroom for the balance of the VESI videotapes violated his federal rights, for the reasons stated.  Particularly, Petitioner failed to point to facts in the record that his presence during playing of the balance of the VESI videotape would have benefitted his defense.  Moreover, he had the opportunity to discuss the matter with Counsel and provide any desired input, and waived presence during preview of the videotapes, outside the presence of the jury, upon colloquy with the trial court and Counsel.  (RT 5634-35.)  The jury was able to view Petitioner's reaction to the videotape during that portion played while he was present in the courtroom, which constituted most of the first videotape.  Moreover, Counsel offered the videotapes as an alternative to Petitioner's testimony at the sanity phase, suggesting Counsel and Petitioner, as a matter of trial tactics, relied upon demeaner evidence apparent in the videotapes.  (RT 5638); see also Reyes, 764 F.3d at 1193; ECF No. 209 at 59-61; Weaver, 26 Cal.4th at 968.

Still, this Court, in its prior order denying Claim 8 ineffective assistance of counsel at the sanity phase, while concluding the state supreme reasonably found Petitioner's waiver of presence during VESI videotape evidence presentation to be knowing and voluntary, nonetheless found the waiver of presence violative of state law.  (ECF No. 209 at 53-60.)

Accordingly, the state supreme court reasonably found Counsel was deficient as a matter

1  of state law in this regard.  (See Claim 19, ante.)

2          (ii)    Prejudice

3          Petitioner argues Counsel's deficient conduct was prejudicial under Strickland because he

4  was denied the opportunity to "advise and consult with counsel regarding appropriate areas to

5  question witnesses or to point out areas that needed to be clarified for the jury."  (ECF No. 107 at

6  324.)   For example, he observes that "[a]t least one juror, Emery Hubbard, has declared that

7  presentation of combat-related evidence would have caused him to vote for life."  (ECF No. 107

8  at 324; 1SHCP Ex. 16 at 1.)   He also argues the jury was denied mitigating evidence of his

9  humanity, redeeming qualities, trauma, and remorse.  (ECF No. 107 at 321, 324-25.)

10         But as noted, the Constitution is not implicated every time a defendant is excluded from a

11  trial stage.  Reyes, 764 F.3d at 1193; see also Moore, 344 F.3d at 1323 ("the issue of whether a

12  defendant must be present at all times in a capital trial has not yet been settled by the Supreme

13  Court"); Allen, 397 U.S. at 338 (a criminal defendant has the right to presence at all critical

14  stages of the trial).

15         Here, the state supreme court reasonably could find Petitioner did not suffer prejudice

16  under the Strickland standard.  Notably, that court observed that:

17

18         In this case, no live witnesses testified in defendant's absence, reducing the
       potential value of any assistance defendant could have given to defense counsel.
19         Although the jury was deprived of its ability to observe defendant's demeanor
       during the playing of the videotapes, it is unclear which way this factor cuts, as
20         defendant apparently was afraid he would become overly emotional before the
       jury, harming his case. His absence, and the concomitant inability of the jury to
21         observe him, may actually have helped him. In any event, such speculation does
       not support a finding that it was reasonably probable defendant would have
22         achieved a more favorable sanity or penalty phase verdict had he been forced to
       appear before the jury against his will. Any state law error was thus harmless
23         under *People v. Watson*, *supra*, 46 Cal.2d at page 836. The speculative nature of
       any possible harm defendant suffered by his absence also precludes a finding the
24         error affected the penalty phase verdict in any way.

25  Weaver, 26 Cal. 4th at 968.  That court, considering the same facts under the Strickland standard,

26  could find no reasonable probability of a different outcome, as this Court previously found in

27  denying Claims 8 and 9.  (See ECF No. 209 at 58-60.)  Petitioner acknowledges as much.  (ECF

28  No. 210 at 192 n.38 citing ECF No. 209 at 58-60.)

Significantly, Petitioner participated in the VESI interview and apparently reviewed the videotape with trial court and Counsel prior to the jury viewing it. Petitioner had the opportunity to discuss the matter with Counsel and provide any desired input. (See e.g., RT 5633-35.)

Also, the jury was able to view Petitioner's reaction to the videotape during that portion played while he was present in the courtroom. Petitioner has not demonstrated beyond the level of speculation how his absence deprived the jury of otherwise unavailable demeanor and remorse evidence benefitting the defense.

Finally, during his absence from the courtroom, Counsel continued to represent him in court during playing of the remainder of the VESI videotapes. (RT 5824-26); see Nunes, 350 F.3d at 1052-53 ("It has long and clearly been held that criminal defendants are entitled to effective assistance of counsel during all critical stages of the criminal process."); cf. Bustamante, 456 F.2d at 274-75 (the presence of counsel alone at trial can never be harmless per se).

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 19 allegations of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 19 allegations of ineffective assistance of counsel shall be denied.

### 9.    Claims 20 and 21

Petitioner alleges that Counsel was ineffective by failing to request and object to guilt, sanity, and penalty phase instructions (i.e., Claim 20), including particularly a guilt phase instruction on the burden of proving the essential elements of the offenses beyond a reasonable doubt (i.e., Claim 21), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[29] (ECF No. 107 at 325-55.)

---

[29] Petitioner states that he incorporates the factual basis of Claims 1, 2, 6, 7, 8, and 9, into Claim 20. (ECF No. 107 at 326.) Petitioner states that he incorporates the factual basis of Claims 7, 20, and 22, into Claim 21. (Id. at 351.)

1     a.      State Court Direct and Collateral Review

2     (i)     Claim 20

3     The Claim was presented to the state supreme court on direct appeal (Lod. Doc. 1 at 290-

4  95, 334-41, 346-84, 388-99, 411-31, 442-44), and denied on the merits, as stated above. (See

5  Claim 20, ante, discussing the factual predicate as trial court error, at section VII, B, 8, a, (i).)

6     (ii)    Claim 21

7     The Claim was presented to the California Supreme Court in Petitioner's second state

8  habeas petition (Lod. Doc. 23 at 78-87), and summarily denied on the merits, and in part on

9  procedural grounds (Lod. Doc. 24).

10     b.      Legal Standard

11     The standard for ineffective assistance of counsel claims is set out in section VII, E, 1, b,

12  (ii), herein.

13     The standard for instructional error is set out in section VII, B, 8, b, (ii), herein.

14     c.      Analysis

15     Petitioner argues multiple events of ineffective assistance of counsel relating to

16  instructional error, discussed separately below.

17     (i)     Guilt Phase

18     (A)     Deficient Conduct

19     Petitioner argues Counsel was deficient by failing to request and object to instructions

20  relating to proof beyond a reasonable doubt of the essential elements of the charged offenses.

21  Particularly, Petitioner argues Counsel was deficient by failing to object to the trial court's

22  mistaken reading of CALJIC 2.02, which he suggests lessened the prosecution's burden of

23  proving the essential elements of the charged offenses beyond a reasonable doubt. As noted in

24  the above discussion of Claim 20, the trial court misread CALJIC 2.02, which instructs on the

25  sufficiency of circumstantial evidence to prove specific intent, as follows:

26

27
> [I]f the evidence as to any such specific intent or mental state is susceptible of two
> reasonable interpretations, one of which points to the existence of a specific intent
> or mental state and the other to the absence of the specific intent or mental state, it
> **is *fair* [should be "your duty"]** to adopt that interpretation which points to the

28

absence of the specific intent or mental state. If, on the other hand, one
interpretation of the evidence as to such specific intent or mental state appears to
you to be reasonable and the other interpretation to be unreasonable, it would be
your duty to accept the reasonable interpretation and to reject the unreasonable.

(RT 4447-48; cf. CT 1391.)  Relatedly, Petitioner purports to incorporate Claim 22 allegations

and also suggests Counsel was ineffective by failing to object to CALJIC 2.90, which, he asserts,

contains an improper definition of proof beyond a reasonable doubt.

The record reflects that Petitioner's jury was instructed on the presumption of innocence

until the contrary is proved beyond a reasonable doubt (RT 4446-47; see also CT 1388, CALJIC

2.90); the sufficiency of circumstantial evidence generally (RT 4440; CT 1371, CALJIC 2.01);

the sufficiency of circumstantial evidence to prove specific intent (RT 4447-48; CT 1391,

CALJIC 2.02);[30] the sufficiency of circumstantial evidence to prove required intent for special

circumstances (RT 4465; CT 1441-1442, CALJIC 8.83.1 as modified); and the weighing of

conflicting testimony (RT 4442-43; CT 1378, CALJIC 2.22).

Due process requires that the government prove every element of a charged offense

beyond a reasonable doubt.  Victor, 511 U.S. at 5.  However, "the Constitution neither prohibits

trial courts from defining reasonable doubt nor requires them to do so as a matter of course."  Id.,

citing Hopt, 120 U.S. at 440-41.  A court must instruct the jury "on the necessity that the

defendant's guilt be proven beyond a reasonable doubt," but "the Constitution does not require

that any particular form of words be used in advising the jury of the government's burden of

proof."  Id.

For the reasons stated, the state supreme court reasonably could find the guilt phase

instructions, considered in their entirety, sufficiently informed the jury of the prosecutions

burden of proving the essential elements of the charged crimes beyond a reasonable doubt on the

evidence before them.  (See Claims 20, 21, and 22, ante, discussing the factual predicate in the

context of claimed trial court error.)  As noted, the trial court's error in reading CALJIC 2.02 was

corrected in the written version of instructions provided to the jury room.  (Id.)  The other

instructions given the jury regarding circumstantial evidence also corrected that error.  (Id.)

[30] The trial court erred in reading this instruction, as discussed in Claim 20, section VII, B, 8, c, (i), herein.

It also remains that the CALJIC 2.90 standard of proof beyond a reasonable doubt has been upheld by federal courts.  See Drayden, 232 F.3d at 715; see also Victor, 511 U.S. at 5 (no particular words to inform the jury the burden of proof beyond a reasonable doubt).  The state supreme court reasonably could find Petitioner failed to demonstrate clearly established federal law that additionally instructing the jury with CALJIC 2.01, 2.02 and 8.83.1 was constitutional error, for the reasons stated.  (See Claims 20, 21, and 22, herein.)  Especially so here, as the state supreme court could find the guilt phase record not suggestive of multiple reasonable interpretations of evidence relating to Petitioner's specific intent or mental state (see Claims 20, 21, and 22, ante), and an error of only state law is not a basis for federal habeas relief.  McGuire, 502 U.S. at 67-68.

Accordingly, the state supreme court reasonably could find Petitioner failed to demonstrate clearly established federal law that the noted guilt phase instructions were constitutional error.  The court reasonably could find Counsel was not deficient by failing to make or persist in futile challenge thereto.  See Rupe, 93 F.3d at 1445.

### (B)   Prejudice

Petitioner argues Counsel's alleged deficiencies, individually and cumulatively were prejudicial under the Strickland standard.  He argues the alleged guilt phase instructional errors lessened the prosecution's burden of proving the specific intent and mental state for first degree murder beyond a reasonable doubt from mandatory to discretionary, and left the instructions unconstitutionally vague.  (ECF No. 107 at 353-54 citing RT 4483-85; see also ECF No. 210 at 206-10 citing Bloyd, 43 Cal. 3d at 377-78 (stating that CALJIC 2.01 and 2.02 should not be given together).)

Assuming arguendo the instructions given were deficient as alleged, the state supreme court could find no reasonable probability of a different outcome.  The instructions, considered in their entirety, sufficiently informed the jury of the prosecution's burden of proving the charged crimes beyond a reasonable doubt on the evidence before them.  See In re Winship, 397 U.S. at 364 (due process requires that the government prove beyond a reasonable doubt every fact necessary to constitute the charged offense).  (See Claims 20, 21, and 22, ante.)

Furthermore, the state supreme court could find no reasonable likelihood the jury applied the guilt phase instructions in their entirety in an unconstitutional manner. <u>Boyde</u>, 494 U.S. at 380. To the extent Petitioner argues CALJIC 2.01, 2.02, and 8.83.1 were erroneous, those instructions do not expressly alter the CALJIC 2.90 standard. The state supreme court reasonably could find Petitioner failed to demonstrate clearly established federal law that instructing the jury with CALJIC 2.01, 2.02 and 8.83.1 was error.

Moreover, as noted, the trial court's error in reading CALJIC 2.02 was corrected in the written version of instructions provided to the jury room. (CT 1391.) The other noted instructions given the jury regarding circumstantial evidence also corrected the error. California's pattern instruction on the standard of proof beyond a reasonable doubt, CALJIC 2.90, has been upheld by federal courts. <u>Harris</u>, 692 F.2d at 1195-96 (upholding California's death penalty process).

Finally, the guilt phase record is not suggestive of multiple reasonable interpretations of evidence relating to Petitioner's specific intent or mental state, for the reasons stated. (<u>See</u> Claims 20, 21, 22, <u>ante</u>.) Also, an error of only state law is not a basis for federal habeas relief. <u>McGuire</u>, 502 U.S. at 67-68.

Accordingly, the state supreme court reasonably could find Petitioner failed to demonstrate the allegedly erroneous guilt phase instructions were prejudicial under <u>Strickland</u>. Counsel was not ineffective by failing to make or persist in futile challenge thereto. <u>Rupe</u>, 93 F.3d at 1445.

(ii)     Sanity Phase

(A)     Deficient Conduct

Petitioner argues Counsel was ineffective to the extent the jury was inadequately instructed on the law and the evidence it was to consider in its sanity determination. (ECF No. 107 at 325-30.) Particularly, Petitioner argues Counsel was ineffective by failing to research and argue against the trial court's erroneous use of the prosecution's special instruction, based upon <u>People v. Fields</u>, 35 Cal. 3d. 329, 369 (1983), modifying CALJIC 4.02-4.05 (defining mental disease or defect) to provide that "[t]he term mental disease or mental defect does not include an

287

1  abnormality manifested only by repeated criminal or otherwise anti-social acts." (ECF No. 107
2  at 326-27 citing RT 6603-05; <u>see also</u> Claim 20, <u>ante</u>, discussing the factual predicate in the
3  context of trial court error.)

4          As discussed above, the jury was instructed on the defense of insanity, including that "[a]
5  person is legally insane if, as a result of mental disease or mental defect, he lacks substantial
6  capacity either to appreciate the criminality of his conduct or to conform his conduct to the
7  requirements of law." (CT 1603, CALJIC 4.00 (1978 Revision).)   The jury also was given the
8  special instruction that "[t]he terms mental disease or mental defect do not include an
9  abnormality manifested only by repeated criminal or otherwise antisocial conduct." (CT 1608;
10 <u>see also</u> ECF No. 107 at 326.)

11         Petitioner revisits his above argument the special instruction was confusing and
12 misleading, unwarranted on the facts of his case, and in inaccurate statement of the law as
13 applied to his case. (ECF No. 107 at 327.)  He argues the special instruction errantly failed to
14 inform the jury that "if that illness manifests itself in some other way as well, then it can be
15 considered as a mental disease . . . and instances of criminal or antisocial conduct can be ascribed
16 to that disease or cited as evidence of its severity."  (ECF No. 107 at 326; <u>see also id.</u> at 327
17 citing <u>Fields</u>, 35 Cal. 3d. at 369.  He argues that <u>Fields'</u> discussion of insanity in the context of
18 commission of continuous  criminal conduct was not meant to eliminate the insanity defense for
19 persons with "legitimate major mental illnesses."  (ECF No. 107 at 327-28.)

20         However, the state supreme court reasonably could find Petitioner has not demonstrated
21 the special instruction was constitutional error, for the reasons stated.  (<u>See</u> Claim 20, <u>ante</u>.)  As
22 the state supreme court observed, a reasonable juror would view the special instruction as
23 implying that where, as here, evidence of more than criminal conduct is present, such evidence
24 could be considered proof of mental disease or defect.  <u>See Weaver</u>, 26 Cal.4th at 968.

25         Moreover, this Court previously denied claimed ineffective assistance of counsel at the
26 sanity phase, including as to the special instruction under <u>Fields</u>.  (ECF No. 209 at 1-2, 77-78.)
27 Therein, the Court observed that Counsel did object to the special instruction on grounds <u>Fields</u>
28 should not be retroactively applied to Petitioner's offense and the instruction was misleading.

1  (See ECF No. 209 at 62-65; see also RT 6603-06; Claims 3, 4, ante.)  The trial court overruled

2  Counsel's objection, such that Counsel reasonably might have determined to move on, given the

3  unsuccessful objection, the common terms used in the instruction, and the noted significant

4  evidence of psychological problems (such as PTSD symptoms for which he sought treatment,

5  hearing voices, and going off to war so that he could be killed), i.e., problems that were other

6  than criminal or antisocial.   (Id.); see also Weaver, 26 Cal.4th at 968.

7         It remains that the state supreme court reasonably could find Petitioner failed to

8  demonstrate clearly established federal law that the sanity phase instructions including the

9  special instruction on Fields were constitutional error, for the reasons stated.  Especially so here,

10  as the sanity phase record includes evidence readily suggesting Petitioner's mental impairments

11  manifested in ways other than repeated criminal or otherwise anti-social acts (see id.), and an

12  error of only state law is not a basis for federal habeas relief.  McGuire, 502 U.S. at 67-68.

13         Accordingly, the state supreme court reasonably could find Petitioner failed to

14  demonstrate clearly established federal law that the noted sanity phase instructions were

15  constitutional error.  The court reasonably could find Counsel was not deficient by failing to

16  make or persist in futile challenge thereto.  Rupe, 93 F.3d at 1445.

17         (B)    Prejudice

18         Petitioner argues Counsel's alleged deficiencies, individually and cumulatively were

19  prejudicial under the Strickland standard.  He argues the alleged sanity phase instructional errors

20  individually and cumulatively kept the jury from considering whether he suffered from a mental

21  illness or defect that would have rendered him insane at the time the crimes were committed.

22  (ECF No. 107 at 329-30.)

23         However, assuming arguendo that Counsel was deficient as alleged, the state supreme

24  court reasonable could find no prejudice under Strickland.  This Court previously found

25  Petitioner did not demonstrate prejudice arising from Counsel's failure to seek clarification

26  regarding the prosecution's special instruction defining mental disease or defect as stated in

27  Fields.  (ECF No. 209 at 1-2, 77-78.)  The Court found the instruction not to be misleading, and

28  that clarification was not reasonably required.  (Id.; see also Claims 20, 21, and 22, ante; Rupe,

93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.")   The Court then observed the sanity phase included significant testimony of facts underlying the guilt phase defense, that: Petitioner suffered the effects of amphetamine use and sleep deprivation, heard voices, and dissociated while he strangled Levoy.  (See ECF No. 209 at 61-65; see also ECF No. 107 at 139.)

Additionally, Petitioner has not demonstrated cumulative error arising from the sanity phase instructions, given the absence of individual error.   (See Claims 20-21, section VII, B, 8, c, ante.)

Accordingly, the state supreme court reasonably could find Petitioner failed to demonstrate the allegedly erroneous sanity phase instructions were prejudicial under Strickland. Counsel was not ineffective by failing to make or persist in futile challenge thereto.  See Rupe, 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.")

(iii)    Penalty Phase

(A)    Deficient Conduct

Petitioner argues Counsel was ineffective by failing to request adequate instruction on the law and the evidence the jury was to consider in making its sentencing determination.  (See generally ECF No. 107 at 330-51.)  Particularly, he argues Counsel failed to object or clarify which previously given instructions applied the penalty phase, and ambiguities in the penalty phase instructions created thereby.   (Id.)   He argues Counsel failed to object or clarify instructions providing insufficient guidance on aggravating and mitigating evidence including the weighing process.  (Id.)  He argues Counsel failed to object or clarify instructions errantly precluding jury consideration of Petitioner's statements on the VESI tapes as substantive mitigating evidence.  (Id.)

However, as discussed above, the jury was instructed on the process of weighing aggravating and mitigating factors and the scope of sentencing discretion.  (ECF No. 107 at 335-37; ECF No. 210 at 194-95 citing CT 1651-52, CALJIC 8.84.1 [sentencing factors]; CT 1677-78 (CALJIC 8.84.2 [sentencing discretion]; CT 1651-55, CALJIC 8.84.1.1 [proof beyond a reasonable doubt as to facts supporting aggravating criminal activity and prior felony

1  convictions]; CT 1643-1644, CALJIC 8.84 [consideration of sympathy or pity for the defendant]

2  (CT 1644); and CT 1645, CALJIC 1.01 [instructions to be considered in their entirety].)

3      Here, the state supreme court reasonably denied Petitioner's instant allegations because

4  the instant instructions were constitutionally adequate, for the reasons stated.  (See Claims 20,

5  21, and 22, ante.)  The Supreme Court repeatedly has upheld California's death penalty process

6  and pattern instructions.  Harris, 692 F.2d at 1195-96 (upholding California's death penalty

7  process); see also Williams, 52 F.3d at 1484-85 (California's death penalty statute "ensures

8  meaningful appellate review, and need not require written jury findings in order to be

9  constitutional").

10     As to the VESI statements, the jury was instructed that it was precluded from

11  "considering the truth of Petitioner's statements on the Vietnam Era Stress Inventory (VESI)

12  videotape during penalty phase deliberations."  (ECF No. 107 at 348-49; see also CT 1591,

13  CALJIC 2.10, statements made by defendant to physician.)  Petitioner argues the state supreme

14  court erred under the Eighth Amendment by finding state evidentiary (hearsay) rules prevented

15  consideration of this evidence in mitigation of the death penalty.  (ECF No. 210 at 202 citing

16  Weaver, 26 Cal. 4th at 980); see also Green, 442 U.S. 95 (the hearsay rule may not be applied

17  mechanistically to defeat the ends of justice).

18     However, the state supreme court reasonably could find the VESI tape evidence was not

19  admissible as substantive evidence, for the reasons discussed above.  (See Claims 20, 21, and 22,

20  ante); see also Weaver, 26 Cal. 4th at 979-82.  As noted, state court rulings on admissibility of

21  evidence are not a basis for federal habeas relief unless Petitioner was denied a fundamentally

22  fair trial.  McGuire, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to

23  reexamine state court determinations on state law questions.").  The Supreme Court has "never

24  questioned the power of States to exclude evidence through the application of evidentiary rules

25  that themselves serve the interests of fairness and reliability - even if the defendant would prefer

26  to see that evidence admitted."  Crane, 476 U.S. at 690.  The state supreme court reasonably

27  could find, contrary to Petitioner's argument, that the VESI statements were not the kind of

28  "highly reliable and relevant" extrinsic evidence admitted in Green.  442 U.S. at 97.  Notably,

1 Petitioner's statements were made by him in preparation of his insanity defense, whereas in
2 Green the statements were made by and against the penal interests of a co-perpetrator and
3 otherwise corroborated.

4        Moreover, this Court previously rejected the argument, finding that: (i) the state supreme
5 court reasonably determined that Petitioner's statements on the VESI tapes were hearsay and not
6 particularly reliable when considered for their truth, and (ii) objection would have been futile.
7 (See ECF No. 209 at 59-60; see also Weaver, 26 Cal.4th at 980-82; Green, 442 U.S. at 97
8 (quoting Chambers, 410 U.S. at 302) ("the hearsay rule may not be applied mechanistically to
9 defeat the ends of justice.").   Furthermore, any state law evidentiary error alone is not a basis for
10 federal habeas relief.  Pulley, 465 U.S. at 41 ("A federal court may not issue the writ on the basis
11 of a perceived error of state law.")

12        Accordingly, the state supreme court reasonably could find Petitioner failed to
13 demonstrate clearly established federal law that the noted penalty phase instructions were
14 constitutional error.  The court reasonably could find Counsel was not deficient by failing to
15 make or persist in futile challenge thereto.  See Rupe, 93 F.3d at 1445 ("[T]he failure to take a
16 futile action can never be deficient performance.")

17        (B)    Prejudice

18        Petitioner argues Counsel's alleged deficiencies, individually and cumulatively were
19 prejudicial under the Strickland standard.  (ECF No. 107 at 330-51.)  He argues a reasonable
20 likelihood the alleged errors denied the jury full use of the mitigating evidence including of his
21 mental impairments.  (Id.)

22        However, assuming arguendo that Counsel was deficient as alleged, the state supreme
23 court could find no reasonable likelihood the jury misunderstood the noted instructions, for the
24 reasons stated.  (See Claims 20, 21, and 22, ante; see also Weaver, 26 Cal. 4th at 980-84; Boyde,
25 (1990) 494 U.S. at 380-381 ("We think the proper inquiry in such a case is whether there is a
26 reasonable likelihood that the jury has applied the challenged instruction in a way that prevents
27 the consideration of constitutionally relevant evidence.")

28        Although the jury was instructed at the penalty phase to consider "all other instructions

1   previously read to you which you find to be applicable to this part of the trial[,]" (CT 1644), the

2   jury was specifically instructed with the Penal Code section 190.3 sentencing factors including

3   the noted subfactors (d) and (h), as well as subfactor (k) [modified by the trial court to be read as

4   subfactor (j)] ("[a]ny other circumstances which extenuates the gravity of the crime even though

5   it is not a legal excuse for the crime [and any other aspect of the defendant's character or record

6   that the defendant offers as a basis for a sentence less then death].") (CT 1651-1652.)

7          The jury also was instructed that any argument of the prosecutor and counsel otherwise

8   was not evidence.  (CT 1646, CALJIC 1.02 [statements of counsel].)  Jurors are presumed to

9   understand and following instructions  See Weeks, 528 U.S. at 234 (federal courts presume that

10  juries follow instructions, including cautionary instructions).

11         As to the difference between the standard for insanity on the one hand and the process for

12  considering mitigating evidence under the Penal Code section 190.3 factors (d), (h) (k) on the

13  other, the state supreme court reasonably could find those differences to be "readily apparent."

14  (See Claims 20, 21, and 22, ante; see also Weaver, 26 Cal. 4th at 980-84; People v. Babbitt, 45

15  Cal.3d 660, 721 (1988) (the insanity standard requires that a defendant lack "substantial

16  capacity" to appreciate the criminality of his conduct or to conform his conduct to the law,

17  whereas Penal Code section 190.3(h) requires only that his capacity to do so be "impaired.").

18         Petitioner has not demonstrated on the factual record that the allegedly ambiguous

19  instruction prevented the jury from giving effect to all mitigating evidence.  See Tuilaepa v.

20  California, 512 U.S. 967, 972-79 (1994); see also Boyde, 494 U.S. at 380–81 (jurors do not parse

21  instructions for subtle shades of meaning, but rather deliberate with a commonsense

22  understanding of the instructions in the light of all that has taken place at the trial.)

23         Moreover, this Court previously found that any error as to the VESI videotapes was

24  harmless because the videotapes included Petitioner's potentially aggravating statements (e.g.,

25  women existed for his sexual satisfaction; he hated all women except his mother; he had raped

26  other women), that would have damaged the penalty phase defense if taken as true.  (See ECF

27  No. 209 at 53-61.)  As observed by the state supreme court, the jury was free to consider

28  Petitioner's  demeanor or physical reactions in the VESI tapes.  Weaver, 26 Cal. 4th at 979–82.

1   The evidence before the penalty phase jury also included the noted substantial mental state
2   evidence relating to Petitioner's service in Vietnam.   (See e.g., Claims 3, 4, 5, 8, herein.)

3   Additionally, this Court previously found that Petitioner failed to demonstrate evidence in
4   the state record suggesting the jury failed to consider mitigating mental state evidence due to
5   confusion over the legal standards applicable at the penalty phase.  (See ECF No. 209 at 68-71;
6   see also Noguera, 2021 WL 3043458 at *26 (citing Tuilaepa, 512 U.S. at 973) ("[V]agueness
7   review is deferential because the proper degree of definition' of [the] eligibility . . . factor[] often
8   'is not susceptible [to] mathematical precision.").

9   Accordingly, the state supreme court reasonably could find Petitioner failed to
10  demonstrate the allegedly erroneous penalty phase instructions were prejudicial under Strickland.
11  Counsel was not ineffective by failing to make or persist in futile challenge thereto.  Rupe, 93
12  F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.")

13           d.     Conclusions

14  A fair-minded jurist could find the state supreme court's denial of Claims 20 and 21
15  allegations of ineffective assistance of counsel was not contrary to, or an unreasonable
16  application of, clearly established federal law, as determined by the Supreme Court, or based on
17  an unreasonable determination of the facts in light of the evidence presented in the state court
18  proceeding.  28 U.S.C. § 2254(d).

19  Claim 20 and 21 allegations of ineffective assistance of counsel shall be denied.

20       10.    Claim 23

21  Petitioner alleges that Counsel was ineffective by failing to raise trial court errors
22  occurring at the hearing on the motion to modify the penalty phase verdict, violating his rights
23  under the Fourth, Sixth, Eight, and Fourteenth Amendments.  (ECF No. 107 at 358-60.)

24           a.     State Court Direct and Collateral Review

25  The Claim was presented to the state supreme court on direct appeal (Lod. Doc. 1 at 432-
26  41), and denied on the merits, as stated above.  (See Claim 23, ante, discussing the factual
27  predicate in the context of trial court error, at section VII, B, 12, a.)

28

### b. Legal Standard

The legal standard for ineffective assistance of counsel claims is set forth in section VII, E, 1, b, (ii), herein.

The legal standard for a fair and reliable verdict is set out in section VII, B, 12, b, (ii), herein.

### c. Analysis

Petitioner argues that Counsel unreasonably failed to raise to the trial court its use of an inappropriate standard when considering mitigating mental state evidence, and it failure to fully consider all the mitigating evidence, denying him an individualized and reliable penalty phase verdict.  Particularly, he argues Counsel was not motivated by reasonable trial tactics when he failed to challenge the trial court's alleged use of the sanity phase standard when considering mental state evidence upon motion to modify the penalty phase verdict.  (See ECF No. 210 at 212-13.)

### (i) Deficient Conduct

Petitioner argues Counsel should have alerted the trial court to its alleged improper use of the sanity phase standard during its consideration of mitigating circumstances including especially Penal Code section 190.3(h, k) mitigating evidence of impaired mental capacity and extenuating circumstances, and its failure to consider fully all the mitigating evidence before it. He also argues the trial court's failure to specifically mention (Penal Code section 190.3(k)) mitigating evidence including his good acts arising from his family, military, and institutional history, shows the trial court improperly failed to consider such evidence.

As noted above in the discussion of this factual predicate in the context of trial court error, the trial court, in ruling on the motion, specifically found three factors in aggravation (i.e., the circumstances of the crime; the presence of other violent criminal activity; and a prior conviction), and one factor in mitigation (i.e., the offense was committed under circumstances involving the influence of extreme mental or emotional disturbance).  (See Claim 23, ante; see also ECF No. 210 at 212; RT 7105-107.)

The record reflects the trial court denied the motion for modification, concluding that

1    "the aggravating circumstances do outweigh the mitigating circumstances."  (Id., citing RT

2    7108-09.)

3         Here, the state supreme court reasonably denied the Claim, for the reasons stated by that

4    court.  See Weaver, 26 Cal. 4th at 989–91.  Particularly, the state supreme court reasonably could

5    find the evidence of extreme mental disturbance was not mitigating evidence of impaired

6    capacity to appreciate the criminality of his conduct and conform himself with the requirements

7    of the law.  As noted by that court, evidence in the record suggested Petitioner, notwithstanding

8    his mental disturbance, understood and manifested consciousness of guilt as to the crimes he

9    committed against Radford and Levoy.   See e.g., CT 172; see also Sansing v. Ryan,  997 F.3d

10   1018, 1032 (9th Cir. 2021) (no impaired capacity where deliberate actions taken by defendant

11   after the crime "[E]stablish[ed] that the drug use did not overwhelm [his] ability to control his

12   conduct[.]").

13        The state supreme court also reasonably found the trial court considered Penal Code

14   section 190.4(k) mitigating evidence in the record, notwithstanding that court's failure to

15   specifically mention such presumably insubstantial and unpersuasive evidence.   The state

16   supreme court observed the trial court's statement in the record that it independently reviewed

17   "all the evidence" and found the jury's findings and verdicts to be "not only supported by the

18   weight of the evidence, but the [c]ourt in its own independent review of all the evidence finds the

19   jury's verdicts and findings are consistent with the law and evidence."  (RT 7109); see also

20   Harris, 465 U.S. at 52 (a defendant is entitled to a fair and reliable verdict based upon an

21   individualized determination of the appropriate sentence given his record and character).

22        Petitioner does not point to facts in the record that the trial court failed to independently

23   reweigh the evidence of aggravating and mitigating circumstances and determine, in its

24   independent judgment, that the weight of the evidence supported the jury's verdict.  See Lockett,

25   438 U.S. at 604 (the Eighth Amendment requires full consideration of "any aspect of the

26   defendant's character or record and any of the circumstances of the offense that the defendant

27   proffers as a basis for a sentence less than death"); see also Eddings, 455 U.S. at 113-114

28   (sentencer must consider any relevant mitigating evidence).

1    Given the foregoing, the state supreme court reasonably could find counsel was not

2    deficient by failing to make a meritless and futile objection. Rupe, 93 F.3d at 1445 ("[T]he

3    failure to take a futile action can never be deficient performance.")

4         (ii)    Prejudice

5         Petitioner argues that absent such allegedly deficient conduct, it is reasonably likely that

6    the trial court would have granted the motion to modify the death verdict and sentenced him to

7    life in prison without possibility of parole. (ECF No. 107 at 360.) He also argues Counsel's

8    alleged failure to raise such errors to the trial court arose from a breakdown of the adversarial

9    process, structural error that left his death verdict unreliable. (Id.)

10        However, the state supreme court reasonably could find that absent Counsel's allegedly

11   deficient conduct there was no reasonable probability of a different outcome, and no structural

12   error, for the reasons stated. As the state supreme court observed in denying the allegations on

13   direct appeal:

14

15        It was not required [the trial court] recount every detail of matters ... it already
          deemed mitigating. Moreover, the court's ruling indicates its clear understanding
16        of its duty to weigh all the aggravating and mitigating evidence. The court
          carefully set forth the evidence to which it assigned significant aggravating or
17        mitigating weight. Under these circumstances, the failure to mention other
          specific matters in mitigation implies, not that they were overlooked or deemed
18        legally irrelevant, but simply that the court found them insubstantial and
          unpersuasive." (*People v. Arias*, *supra*, at pp. 191-192.) [...] [W]e find
19        defendant was not deprived of the effective assistance of counsel by defense
          counsel's failure to object or otherwise call the trial court's attention to the alleged
20        error.

21   Weaver, 26 Cal. 4th at 989–91. Notably, this Court previously found, in this case, no breakdown

22   in the adversarial process. (ECF No. 162 at 98-100, 123.)

23        d.    Conclusions

24        A fair-minded jurist could find the state supreme court's denial of Claim 23 allegations of

25   ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly

26   established federal law, as determined by the Supreme Court, or based on an unreasonable

27   determination of the facts in light of the evidence presented in the state court proceeding. 28

28   U.S.C. § 2254(d).

1    Claim 23 allegations of ineffective assistance of counsel shall be denied.

2        11.    Claim 26

3        Petitioner alleges that Counsel was ineffective by failing to object to California's death

4    penalty statute on grounds of its unconstitutional failure to narrow the class of offenders eligible

5    for the death penalty, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth

6    Amendments.  (ECF No. 107 at 368-69, 387.)

7        a.    State Court Direct and Collateral Review

8        The state supreme court considered the Claim on direct appeal (Lod. Doc. 1 at 402-410),

9    and denied it on the merits, as follows:

10

11    Defendant next raises several arguments that the state's death penalty law is
     unconstitutional under the state and federal Constitutions. As outlined below, we
12    have addressed and rejected these claims in previous opinions, and defendant does
     not convince us we should revisit those decisions. Thus, defendant claims various
13    of his constitutional rights were violated because the death penalty law, and the
     jury instructions implementing that law:

14    [...]

15    Failed adequately to narrow eligibility for the death penalty. (*People v. Kraft*,
     *supra*, 23 Cal.4th at p. 1078; *People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94
16    Cal.Rptr.2d 17, 995 P.2d 152].)

17

18    Weaver, 26 Cal. 4th at 991-92.

19        b.    Legal Standard

20        (i)    Narrowing the Application of the Death Penalty

21        A state capital sentencing system must: "(1) rationally narrow the class of death-eligible

22    defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination

23    based on a death-eligible defendant's record, personal characteristics, and the circumstances of

24    his crime."  Kansas v. Marsh, 548 U.S. 163, 173-74 (2006).  If the "state system satisfies these

25    requirements," then the "state enjoys a range of discretion in imposing the death penalty,

26    including the manner in which aggravating and mitigating circumstances are to be weighed."

27    Id., (citing Franklin v. Lynaugh, 487 U.S. 164, 179 (1988)) (plurality opinion); see also Zant v.

28    Stephens, 462 U.S. 862, 875-76, n.13 (1983).

298

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder.  Sawyer v. Whitley, 505 U.S. 333, 342 (1992).  A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors."  Id.; see also Gregg, 428 U.S. at 196-97.

### (ii)    Ineffective Assistance of Counsel

The legal standard for ineffective assistance of counsel claims is set forth in section VII, E, 1, b, (ii), herein.

### c.    Analysis

Petitioner argues that Counsel unreasonably failed to challenge the overbreadth of California's death eligibility mechanism and its lack of inter-case proportionality.  He argues that absent Counsel's allegedly deficient conduct, the outcome of his proceeding would have been different.

As noted, Petitioner was convicted of first degree murder (Penal Code § 187(a)), with special circumstances of multiple murder (Penal Code § 190.2(a)(3)) and two Counts of kidnap murder found true (Penal Code § 190.2(a)(17)(B)).  (ECF No. 107 at 369.)

### (i)    Deficient Conduct

Petitioner argues that Counsel unreasonably failed to challenge California's death penalty process on grounds it fails to narrow the class of first degree murderers eligible for the death penalty, resulting in arbitrary and capricious imposition.  He argues California's statute fails to narrow the class of death eligible individuals, separating out a small group of particularly serious, more culpable, murderers from the others found guilty of murder.  (ECF No. 210 at 225 citing Stephens, 462 U.S. at 877.)  He argues statutory overbreadth and overlap because all first-degree felony murder cases also are special circumstance cases.  He argues a lack of safeguards against arbitrary imposition of the death penalty including failure to require inter-case proportionality.  (See Claims 26, 27, 31, herein.)  He argues California's expansive list of special circumstances, twenty-seven at the time of his crime and conviction, makes virtually every murderer factually eligible for the death penalty, violating Furman and its progeny.  Furman v. Georgia, 408 U.S. 238, 309 (1972) (the Eighth and Fourteenth Amendments preclude arbitrary

1   and capricious imposition of the death penalty).  He argues California's process for weighing

2   aggravating and mitigating factors (Penal Code § 190.3) is internally inconsistent, arbitrary,

3   biased in favor of death, and thus insufficient to ameliorate the <u>Furman</u> error.

4        However, the state supreme court reasonably could find California's death penalty

5   process is not constitutional overbroad.  California's death penalty scheme, which narrows the

6   class of death eligible offenders to less than the definition of first-degree murder and permits

7   consideration of all mitigating evidence, has been approved by the Supreme Court.  <u>Tuilaepa</u>,

8   512 U.S. at 972-79; <u>Pulley</u>, 465 U.S. at 38.  In <u>Brown v. Sanders</u>, 546 U.S. 212 (2006), a case

9   arising under California's 1978 death penalty statute, the Court again observed that special-

10  circumstance findings "are sufficient to satisfy <u>Furman's</u> narrowing requirement."  <u>Id.</u> at 224.  In

11  <u>Karis v. Calderon</u>, the Ninth Circuit said:

12

13       [W]e reject Karis' argument that the scheme does not adequately narrow the class
         of persons eligible for the death penalty. The California statute satisfies the

14       narrowing requirement set forth in *Zant v. Stephens*, 462 U.S. 862 [] (1983). The
         special circumstances in California apply to a subclass of defendants convicted of

15       murder and are not unconstitutionally vague. *See id.* at 972 []. The selection
         requirement is also satisfied by an individualized determination on the basis of the

16       character of the individual and the circumstances of the crime. *See id.* California
         has identified a subclass of defendants deserving of death and by doing so, it has

17       "narrowed in a meaningful way the category of defendants upon whom capital
         punishment may be imposed." *Arave v. Creech*, 507 U.S. 463, 476 [] (1993).

18

19  283 F.3d 1117, 1141 n.11 (2002); <u>accord Mayfield v. Woodford</u>, 270 F.3d 915, 924 (2001).

20  Petitioner's argument that <u>Karis</u> and <u>Mayfield</u> are distinguishable by their facts and procedural

21  posture, respectively (<u>see</u> ECF No. 214 at 58), is unpersuasive.  Contrary to Petitioner's

22  suggestion, the failure to narrow issue raised in <u>Karis</u> arose under California's 1978 statute,

23  applicable here.  The <u>Mayfield</u> court, while reversing the lower court on ineffective assistance

24  claims, found that "[t]he 1978 death penalty statute pursuant to which <u>Mayfield</u> was convicted

25  and sentenced narrows the class of persons eligible for the death penalty at both the guilt and the

26  penalty phases . . . [and] was constitutional."  270 F.3d at 924.

27        As noted, a state capital sentencing system must rationally narrow the class of death-

28  eligible defendants and permit a jury to render a reasoned, individualized sentencing

1    determination based on a death-eligible defendant's record, personal characteristics, and the
2    circumstances of his crime.  Marsh, 548 U.S. at 173-74.  A state may narrow the class of
3    murderers eligible for the death penalty in part by defining degrees of murder and limiting the
4    penalty to first degree murder.  Sawyer, 505 U.S. at 342.  A state may further narrow the class of
5    murderers eligible for the death penalty by "specifying [a number of] statutory aggravating
6    circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before
7    a death sentence can ever be imposed."  Gregg, 428 U.S. at 196-97.

8        So long as a state's death penalty statute "rationally narrow[s] the class of death-eligible
9    defendants" and "permit[s] a jury to render a reasoned, individualized sentencing determination,"
10   states "enjoy[] a range of discretion in imposing the death penalty . . . ."  Marsh, 548 U.S. at 173-
11   74; see also Gregg, 428 U.S. at 195.  Similarly, the Supreme Court in California v. Ramos stated
12   that "once the jury finds that the defendant falls within the legislatively defined category of
13   persons eligible for the death penalty[,]" the jury's consideration of a myriad of factors and
14   exercise of "unbridled discretion" in determining whether death is the appropriate punishment is
15   not arbitrary and capricious.  463 U.S. 992, 1008-09 (1983).

16       Petitioner concedes the Ninth Circuit and courts in this District have repeatedly rejected
17   the claim that California's death penalty scheme fails to narrow the pool of death-eligible
18   defendants in the constitutionally required manner.  (See ECF No. 210 at 221, cases cited
19   therein.); see also Karis, 283 F.3d at 1141 n.11 (California's sentencing scheme adequately
20   narrows the class of persons eligible for death).

21       Petitioner's other constitutional challenges to California's death penalty statute, including
22   the lack of inter-case proportionality review, fare no better, for the reasons discussed below.
23   (See Claims 26, 27, 31, herein.)  As stated, California's death penalty process, which narrows the
24   class of death eligible offenders to less than the definition of first-degree murder and permits
25   consideration of all mitigating evidence, has been approved by the Supreme Court.  Tuilaepa,
26   512 U.S. at 972-79; Pulley, 465 U.S. at 38.

27       Accordingly, the state supreme court reasonably could find Counsel was not
28   unreasonable in failing to pursue a meritless challenge on the federal grounds alleged.  Pulley,

465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law."); Rupe, 93 F.3d at 1445 ("[T]he failure to take a futile action can never be deficient performance.");  see also Reeves, 141 S. Ct. at 2407 ("[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.")

(ii)     Prejudice

Petitioner argues that Counsel's allegedly deficient acts and omissions resulted in an arbitrary and unreliable death penalty verdict.

However, the state supreme court reasonably could find Petitioner failed to show prejudice under the Strickland standard because there was no constitutional error, for the reasons stated.   That court, on the record before it, reasonably could find that Petitioner failed to demonstrate an underlying constitutional violation, a denial of counsel, or a reasonably probability of a different outcome absent Counsel's allegedly deficient conduct.

d.     Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 26 allegations of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 26 allegations of ineffective assistance of counsel shall be denied.

12.     Claim 27

Petitioner alleges that Counsel was ineffective by failing to raise available challenges to the constitutionality of capital charging decisions generally in California and specifically in this case, as disproportionately determined by the race and gender of the victim, the race and gender of the accused, and the economic class of the accused, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 107 at 387-92)

a.     State Court Direct and Collateral Review

The state supreme court considered the Claim on direct appeal (Lod. Doc. 1 at 385-87),

302

and denied it on the merits, as follows:

> Defendant next raises several arguments that the state's death penalty law is unconstitutional under the state and federal Constitutions. As outlined below, we have addressed and rejected these claims in previous opinions, and defendant does not convince us we should revisit those decisions. Thus, defendant claims various of his constitutional rights were violated because the death penalty law, and the jury instructions implementing that law:
>
> Granted prosecutors "unbounded" discretion in deciding when to seek the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at p. 278.)

Weaver, 26 Cal. 4th at 991-92.

### b.    Legal Standard

### (i)    Prosecutorial Discretion

The standard for prosecutorial discretion is set out in section VII, C, 3, b, (ii), herein.

### (ii)    Ineffective Assistance of Counsel

The legal standard for ineffective assistance of counsel is set out in section VII, E, 1, b, (ii), herein.

### c.    Analysis

Petitioner argues Counsel was ineffective by failing to present appropriate challenges to the charging decision which, in his case, was not based upon "any constitutionally permissible factors that were consistently applied across all death penalty-eligible murder cases[,]" and was disproportionate to charging decisions made by the Kern County District Attorney's Office in other cases. (ECF No. 107 at 391-92; see also the discussion of the Claim 27 factual predicate in the context of constitutional error, post.)

### (i)    Deficient Conduct

Petitioner argues Counsel unreasonably failed to challenge California's charging scheme generally, and particularly in this case where the capital charging decision discriminated on the basis of race, class, gender, and other unspecified impermissible considerations in determining to seek the death penalty.

Petitioner argues race-based discrimination in his capital charging decision. He argues

1   the Kern County District Attorney's Office had a history of racially biased charging decisions

2   and that the white prosecutor in this case considered the white victims' race in determining

3   whether the pursue the death penalty.  In support, he points to empirical studies that "the death

4   penalty is imposed and executed upon petitioners whose victims were white with a frequency

5   that is disproportionate to their representation among the number of persons arrested for, charged

6   with, or convicted of death-eligible crimes."  (ECF No. 107 at 389 citing Developments in the

7   Law, Race and Criminal Process, 101 Harv. L. Rev. 1472, 1526-29 (1988)).

8       Petitioner argues gender-based discrimination in his capital charging decision.  He

9   argues the Kern County District Attorney's Office had a history of gender biased charging

10  decisions and that the male prosecutor in this case considered Petitioner's male gender in

11  determining whether to seek the death penalty.  In support, he points to empirical studies that

12  "[t]he death sentence is imposed and executed upon men with a frequency that is

13  disproportionate to their representation among the general population, the number of persons

14  arrested for, charged with, or convicted of death-eligible crimes."  (ECF No. 107 at 389.)

15      Petitioner argues socioeconomic-based discrimination in his capital charging decision.

16  He argues the Kern County District Attorney's Office had a history of charging decisions that

17  were biased by the economic status of the defendant and that the prosecutor in this case

18  considered his low-income status in determining whether to seek the death penalty.  In support,

19  he points to statistics that "[t]he death sentence is imposed and executed upon low-income and

20  poor people with a frequency that is disproportionate to their representation among the number

21  of persons arrested for, charged with or convicted of death-eligible crimes."  (ECF No. 107 at

22  390.)

23      However, the state supreme court reasonably could have denied these allegations.  The

24  Supreme Court has rejected equal protection challenges to death penalty schemes and has

25  refused to limit prosecutorial discretion in charging decisions absent some showing that a

26  particular decision was based on a discriminatory standard.  See e.g., Bordenkircher v. Hayes,

27  434 U.S. 357, 364 (1978) ("So long as the prosecutor has probable cause to believe that the

28  accused committed an offense defined by statute, the decision whether or not to prosecute, and

1  what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

2  Here, Petitioner offers no evidence specific to his case that would support an inference

3  that his race, gender, or socioeconomic status, or the victim's race or gender played a part in his

4  charging decision and sentence.  (See Claim 27, post); see also e.g., Cornwell, 2018 WL 934542

5  at *122 (empirical study factually insufficient to support prima facie constitutional violation);

6  Richmond v. Lewis, 948 F.2d 1473, 1490–91 (9th Cir. 1990), vacated on other grounds, 986 F.2d

7  1583 (9th Cir. 1993) (holding that statistical evidence that Arizona's death penalty is

8  discriminatorily imposed based on race, sex, and socio-economic background is insufficient to

9  prove that decision-makers in the petitioner's case acted with discriminatory purpose); Reeves,

10  141 S.Ct. at 2407.

11  Accordingly, the state supreme court reasonably could find Counsel was not deficient by

12  failing to challenge California's charging scheme and the charging decision in this case, on

13  grounds of unconstitutional discrimination.  Rupe, 93 F.3d at 1445 ("[T]he failure to take a futile

14  action can never be deficient performance.")

15  (ii)  Prejudice

16  Petitioner argues that Counsel's allegedly deficient acts and omissions denied him Sixth

17  Amendment rights and a fair sentencing proceeding, constituting prejudicial error under

18  Strickland, and structural error.  (ECF No. 107 at 391-92.)

19  However, the state supreme court reasonably could find Counsel's allegedly deficient

20  conduct not to be prejudicial error under Strickland or structural error under the Sixth

21  Amendment.  That court, on the record before it, reasonably could find that Petitioner failed to

22  demonstrate an underlying constitutional violation, a denial of counsel, or a reasonably

23  probability of a different outcome absent Counsel's allegedly deficient conduct, for the reasons

24  stated.

25  d.  Conclusions

26  A fair-minded jurist could find the state supreme court's denial of Claim 27 allegations

27  of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly

28  established federal law, as determined by the Supreme Court, or based on an unreasonable

1  determination of the facts in light of the evidence presented in the state court proceeding. 28

2  U.S.C. § 2254(d).

3      Claim 27 allegations of ineffective assistance of counsel shall be denied.

4      **F.      Claims Alleging Ineffective Assistance of Appellate and Post-Conviction Counsel**

5      **1.      Claim 30**

6      Petitioner alleges that state appellate and habeas counsel provided ineffective assistance

7  as to any Claims herein that are procedurally barred, violating his rights under the Fifth, Sixth,

8  Eight, and Fourteenth Amendments.  (ECF No. 107 at 414-16.)

9      **a.      State Court Direct and Collateral Review**

10     The allegations were presented to the California Supreme Court in Petitioner's second

11  state habeas petition (Lod. Doc. 23 at 116-18), and summarily denied on the merits (Lod. Doc.

12  24).

13     **b.      Legal Standard**

14     The legal standard for ineffective assistance of counsel claims is set out in section VII, E,

15  1, b, (ii), herein.

16     **c.      Analysis**

17     Petitioner argues that any procedural bar to the Claims in the Amended Petition resulted

18  from the ineffective assistance of state appellate and post-conviction counsel, who "failed to

19  discover and present these claims to the California Supreme Court in a procedurally appropriate

20  manner."  (ECF No. 107 at 415; ECF No. 210 at 262.)

21     **(i)      Deficient Conduct**

22     Petitioner argues that any default in state court resulted from the unreasonable failure of

23  state appellate and habeas counsel to investigate, develop, and present such claims to the state

24  supreme court in a procedurally appropriate manner.

25     It is well-established that Petitioner had a right to the effective assistance of counsel on

26  appeal.  Evitts v. Lucey, 469 U.S. 387, 396–97 (1985).  To prevail on a claim that appellate

27  counsel was ineffective, Petitioner must meet the Strickland standards by showing counsel acted

28  unreasonably and that there is a reasonable probability that had counsel acted reasonably, the

1  result of the proceeding would have been different.  Smith v. Robbins, 528 U.S. 259, 285 (2000).

2  A reasonably effective appellate counsel should raise all "arguably meritorious issues."

3  1989 ABA Guidelines, Guideline 11.9.2.E.  Even so, appellate counsel has no constitutional

4  obligation to raise every nonfrivolous issue, even if requested by the appellant.  Jones v. Barnes,

5  463 U.S. 745, 751-752 (1983) (holding that an attorney need not advance every colorable

6  argument on appeal).

7  The Supreme Court has recognized that "since time beyond memory" experienced

8  advocates "have emphasized the importance of winnowing out weaker arguments on appeal and

9  focusing on one central issue if possible, or at most on a few key issues."  Id.; see also Knowles

10  v. Mirzayance, 556 U.S. 111, 127 (2009) ("Counsel also is not required to have a tactical reason

11  - above and beyond a reasonable appraisal of a claim's dismal prospects for success - for

12  recommending that a weak claim be dropped altogether."); cf. Banks v. Reynolds, 54 F.3d 1508,

13  1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" - an issue obvious from the record

14  which would have resulted in reversal - is ineffective).

15  It follows that the appropriate inquiry is not whether raising a particular issue on appeal

16  would have been frivolous, but whether raising it would have led to a reasonable probability of

17  reversal.  Miller v. Keeney, 882 F.2d 1428, 1435 (9th Cir. 1989).  Where Petitioner had only a

18  remote chance of obtaining reversal based upon an issue, neither of the Strickland prongs is

19  satisfied.  Id.

20  Here, the state supreme court reasonably could reject the Claim.  The record reflects that

21  appellate counsel filed a 445-page opening brief raising 43 issues of law with numerous sub-

22  issues (see Appellant's Opening Brief lodged November 15, 2002, Lod. Doc. 1) and an 11 page

23  supplemental opening brief raising an additional issue of law with numerous sub-issues (see

24  Appellant's Supplemental Brief lodged November 15, 2002, Lod. Doc. 87).   Appellate counsel

25  also filed a 193 page reply brief (see Appellant's Reply Brief lodged November 15, 2002, Lod.

26  Doc. 3) and a 30 page petition for rehearing (see Appellant's Petition for Rehearing lodged

27  November 15, 2002, Lod. Doc. 3).  The appeal was disposed of by the noted lengthy merits

28  opinion of the California Supreme Court.  Weaver, 26 Cal. 4th 876 (see Appeal Opinion lodged

November 15, 2002, Lod. Doc. 4).  Petitioner presented claims not raised on appeal in collateral proceedings, and the California Supreme Court considered and denied those claims on the merits.  (See Lod. Doc. 8 & 24.)

Petitioner's federal Claims fail on the merits, for the reasons discussed above and below. Thus, Petitioner has not shown appellate counsel was deficient by failing to raise on direct appeal any of the Claims included in the Amended Petition.  Thus, Petitioner fails to establish his claim for ineffective assistance of appellate counsel.

As for state habeas counsel, Petitioner fails to identify clearly established authority showing a right to effective assistance of counsel in habeas proceedings.  See Coleman, 501 U.S. at 752 (no right to counsel beyond first appeal as a matter of right).  Furthermore, the Court need not reach allegations raised by Petitioner only to establish "cause" to overcome procedural bar under Martinez, 566 U.S. at 1.  The Court has stated that it will consider any procedural default issues only after resolution of the § 2254(d) issues.  There is no need to consider Petitioner's ineffective assistance of habeas counsel arguments at this time.  In any event, Petitioner has not demonstrated state habeas counsel was deficient as alleged.  As noted, Petitioner's federal Claims all fail on the merits, for the reasons stated ante and post.

(ii)    Prejudice

Petitioner argues he would be prejudiced if the allegedly deficient conduct of state appellate and habeas counsel prevented this Court from reaching his federal claims.  (ECF No. 107 at 416.)

However, for the reasons discussed above and below, all Petitioner's federal Claims shall be denied.  Therefore, Petitioner fails, under Strickland, to show prejudice arising from procedural bar of Claims stated in the Amended Petition.

d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 30 shall be denied.

G.      Claims Alleging Unconstitutionality of Death Sentence

1.      Claim 26

Petitioner alleges that California's death penalty statute fails to narrow the class of offenders eligible for the death penalty, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 107 at 368-87.)

a.      State Court Direct and Collateral Review

The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 402-410), and denied it on the merits, as follows:

> Defendant next raises several arguments that the state's death penalty law is unconstitutional under the state and federal Constitutions. As outlined below, we have addressed and rejected these claims in previous opinions, and defendant does not convince us we should revisit those decisions. Thus, defendant claims various of his constitutional rights were violated because the death penalty law, and the jury instructions implementing that law:
>
> [...]
>
> Failed adequately to narrow eligibility for the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Weaver, 26 Cal. 4th at 991-92.

b.      Legal Standard

The standard for constitutional narrowing of the application of the death penalty is set out in section VII, E, 12, b, (i), herein.

c.      Analysis

Petitioner argues that California's death penalty statute is arbitrary and capricious because it fails to genuinely narrow the class of persons eligible for the death penalty.  He argues California's statute "[fails to] narrow the class of death eligible individuals, separating out a small group of particularly serious, more culpable, murderers from the "others found guilty of murder."  (ECF No. 210 at 225 citing Stephens, 462 U.S. at 877.)  He argues statutory overbreadth and overlap because all first-degree felony murder cases also are special

circumstance cases.

Petitioner points to California's expansive list of special circumstances, twenty-seven at the time of his crime and conviction, which make virtually every murderer factually eligible for the death penalty, violating Furman and its progeny.  Furman, 408 U.S. at 309 (the Eighth and Fourteenth Amendments preclude arbitrary and capricious imposition of the death penalty).  He points to allegedly unguided capital charging discretion exercised by individual California prosecutors.  He points to the absence any requirement at the penalty phase for unanimous written jury findings beyond a reasonable doubt and inter-case proportionality.

Petitioner also points to empirical evidence, "[a] survey of published and unpublished decisions, from 1988 through 1992, on appeals from first-degree murder convictions [which] establishes that more than eighty-four percent of first-degree murder cases are factually special circumstance cases under the statute in place in 1997, thus rendering such murders death-eligible."  (ECF No. 107 at 370 citing Schatz & Rivkind, The California Death Penalty Scheme: Requiem for Furman, 72 N.Y.U.L. Rev. 1283, 1332-35 (1997).)

Petitioner further argues California's process for weighing aggravating and mitigating factors (Penal Code § 190.3) is itself internally inconsistent, arbitrary, biased in favor of death, and thus insufficient to ameliorate Furman error.

As noted, Petitioner was convicted of first degree murder (Penal Code § 187(a)), with special circumstances of multiple murder (Penal Code § 190.2(a)(3)) and two Counts of kidnap murder found true pursuant (Penal Code § 190.2(a)(17)(B)).  (ECF No. 107 at 369.)

This Court, in its discussion of the Claim 26 predicate facts in the context of ineffective assistance of counsel, ante, observed that a state capital sentencing system must rationally narrow the class of death-eligible defendants and permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime.  See Gregg, 428 U.S. at 189  (opinion of Stewart, Powell, and Stevens, JJ.); accord Tuilaepa, 512 U.S. at 973; Stephens, 462 U.S. at 874; see also Marsh, 548 U.S. at 173-74 ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion

must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.")

The Supreme Court has stated that:

> To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. See, e.g., Lowenfield v. Phelps, 484 U.S. 231, 244-46 [] (1988); Zant v. Stephens, 462 U.S. 862, 878 [] (1983). The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both). Lowenfield, supra, at 244-46 []. As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. See Arave v. Creech, 507 U.S. 463, 747 [] (1993) ("If the sentence fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague. Godfrey v. Georgia, 446 U.S. 420, 428 [] (1980)' see Arave, supra, 507 U.S. at 471 [] (court "'must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer'") (quoting Walton v. Arizona, 497 U.S. 639, 654 [] (1990)).

Tuilaepa, 512 U.S. at 971-72.

A state may narrow the class of murderers eligible for the death penalty in part by defining degrees of murder and limiting the penalty to first degree murder. Sawyer, 505 U.S. at 342. A state may further narrow the class of murderers eligible for the death penalty by "specifying [a number of] statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed." Gregg, 428 U.S. at 196-97. Such a statutory scheme, in use in most states, "narrows the class of persons eligible for the death penalty according to an objective legislative definition." Lowenfield v. Phelps, 484 U.S. 231, 244 (1988). As long as a state's death penalty statute "rationally narrow[s] the class of death-eligible defendants" and "permit[s] a jury to render a reasoned, individualized sentencing determination," states "enjoy[] a range of discretion in imposing the death penalty . . . ." Marsh, 548 U.S. at 173-74; see also Gregg, 428 U.S. at 195.

Under the California Statute, a defendant becomes eligible for the death penalty, or a sentence of life imprisonment without the possibility of parole, only if the jury finds (or the

defendant admits) one or more "special circumstances" listed in Penal Code section 190.2 to be true.   Penal Code §§ 190.1, 190.4.   If the prosecution elects to seek a death sentence, the sentencing decision is made by a jury (unless waived) following a separate penalty phase at which the parties have the opportunity to present evidence in support of aggravating or mitigating factors.   Penal Code § 190.3; see Tuilaepa, 512 U.S. at 975.

As noted, Petitioner concedes the Ninth Circuit and courts in this District have repeatedly rejected the claim that California's death penalty scheme fails to narrow the pool of death-eligible defendants in the constitutionally required manner.   (ECF No. 210 at 221, cases cited therein.)   Still, he argues "the question whether the California statute complies in practice with the constitutionally mandated narrowing requirement remains unresolved."   (Id., citing Tuilaepa, 512 U.S. at 983-84 (Stevens, J., concurring).)

However, the state supreme court could reasonably determine that California's death penalty scheme did not fail to genuinely narrow the class of murderers eligible for the death penalty.   California's scheme, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court.   Tuilaepa, 512 U.S. at 972-79; Pulley, 465 U.S. at 38; see also Sanders, 546 U.S. at 224 (special-circumstance findings "are sufficient to satisfy Furman's narrowing requirement"); Karis, 283 F.3d at 1141 (the California statute satisfies the narrowing requirement set forth in Stephens); accord Mayfield, 270 F.3d at 924.

### d.   Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 26 allegations of constitutional error was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d).

Claim 26 allegations of constitutional error shall be denied.

### 2.   Claim 27

Petitioner alleges that his death sentence was imposed arbitrarily and resulted from race, class, gender, or other unconstitutional considerations, violating his rights under the Fifth, Sixth,

Eighth, and Fourteenth Amendments.[31]   (ECF No. 107 at 387-92.)

a.     State Court Direct and Collateral Review

The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 385-87, 400-01), and denied it the merits, as follows:

> Defendant next raises several arguments that the state's death penalty law is unconstitutional under the state and federal Constitutions. As outlined below, we have addressed and rejected these claims in previous opinions, and defendant does not convince us we should revisit those decisions. Thus, defendant claims various of his constitutional rights were violated because the death penalty law, and the jury instructions implementing that law:
>
> Granted prosecutors "unbounded" discretion in deciding when to seek the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Williams*, *supra*, 16 Cal.4th at p. 278.)

Weaver, 26 Cal. 4th at 991-92.

b.     Legal Standard

The standard for prosecutorial discretion is set out in section VII, C, 3, b, (ii), herein.

c.     Analysis

Petitioner argues the prosecutor's capital charging decision discriminated against him on the basis of race, class, gender, and other unspecified constitutionally impermissible considerations in determining to seek the death penalty.  (See Claim 27, ante, discussing the factual predicate in the context of ineffective assistance of counsel; ECF No. 210 at 227.)  He argues the capital charging decision in his case was not based upon "any constitutionally permissible factors that were consistently applied across all death penalty-eligible murder cases[,]" and was disproportionate to charging decisions made by the Kern County District Attorney's Office in other cases.  (ECF No. 107 at 391.)  According to Petitioner, multiple impermissible considerations, factored into the capital charging decision in his case.

Petitioner argues the Kern County District Attorney's Office had a history of racially biased charging decisions.  He argues the white prosecutor in this case considered the white victims' race in determining whether the pursue the death penalty.  He argues this pattern of

---

[31] Petitioner states that he incorporates the factual basis of Claim 11. (ECF No. 107 at 388.)

1 racial discrimination in charging decisions is consistent with empirical studies that "the death

2 penalty is imposed and executed upon petitioners whose victims were white with a frequency

3 that is disproportionate to their representation among the number of persons arrested for, charged

4 with, or convicted of death-eligible crimes."  (ECF No. 107 at 389.)

5         Petitioner argues the Kern County District Attorney's Office had a history of gender

6 biased charging decisions.  He argues the male prosecutor in this case considered Petitioner's

7 male gender in determining whether to seek the death penalty.  He argues this pattern of gender

8 based discrimination in charging decisions is consistent with empirical studies that "[t]he death

9 sentence is imposed and executed upon men with a frequency that is disproportionate to their

10 representation among the general population, [and] the number of persons arrested for, charged

11 with, or convicted of death-eligible crimes."  (ECF No. 107 at 389.)

12        Petitioner argues the Kern County District Attorney's Office had a history of charging

13 decisions that were biased by the economic status of the defendant.  He argues the prosecutor in

14 this case considered his low-income status in determining whether to seek the death penalty.  He

15 argues this pattern of economic status discrimination in charging decisions is consistent with

16 statistics that "[t]he death sentence is imposed and executed upon low-income and poor people

17 with a frequency that is disproportionate to their representation among the general population,

18 [and] the number of persons arrested for, charged with or convicted of death-eligible crimes."

19 (ECF No. 107 at 390.)

20        However, as discussed above, the Supreme Court has held that the mere existence of

21 prosecutorial discretion over charging decisions does not deny equal protection or render a

22 capital punishment scheme unconstitutional absent some showing that a particular decision was

23 based on a discriminatory standard, and thus arbitrary and capricious.  See McCleskey, 481 U.S.

24 at 306-07; Hayes, 434 U.S. at 364; ("So long as the prosecutor has probable cause to believe that

25 the accused committed an offense defined by statute, the decision whether or not to prosecute,

26 and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

27        The state supreme court reasonably could find that Petitioner offered no evidence specific

28 to his case which would support an inference that his race, gender, or socioeconomic status, or

the victim's race or gender played a part in his sentence.  See e.g., Cornwell, 2018 WL 934542 at *122 (E.D. Cal. Feb. 15, 2018) ("The United States Supreme Court has rejected equal protection challenges to death penalty schemes and has refused to limit prosecutorial discretion in charging decisions absent some showing that a particular decision was based on a discriminatory standard."); Richmond, 948 F.2d at 1490–91 (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socio-economic background is insufficient to prove that decision-makers in the petitioner's case acted with discriminatory purpose).

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of Claim 27 allegations of constitutional error was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 27 allegations of constitutional error shall be denied.

### 3.    Claim 29

Petitioner alleges he is mentally disordered such that his death sentence violates customary international law and jus cogens binding on the United States, in turn violating his rights under Article VI, section 2 of the Constitution of the United States.[32]  (ECF No. 107 at 408-14.)

### a.    State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc. 23 at 108-15), and summarily denied on the merits (Lod. Doc. 24).

### b.    Legal Standard

### (i)    Federal Habeas Jurisdiction

Federal courts have habeas jurisdiction only to the extent that the petition asserts a violation of "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Federal courts may grant habeas relief to persons who are in state custody as a result of

---

[32] Petitioner states that he incorporates the factual basis of Claims 3, 4, 5, 6, 7, 8, 9, and 28.  (ECF No. 107 at 409.)

1  judgment rendered in violation of the Constitution or laws or treaties of the United States. 28
2  U.S.C. § 2241(c)(3).

3      (ii)    Cruel and Unusual Punishment

4      The Eighth Amendment prohibits punishments that are "incompatible with the evolving
5  standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S.
6  97, 102 (1976). Executions that "involve the unnecessary and wanton infliction of pain," Gregg,
7  428 U.S. at 173, or that "involve torture or a lingering death," In re Kemmler, 136 U.S. 436, 447
8  (1890), are not permitted.

9      "[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and
10 inhuman punishments. The State, even as it punishes, must treat its members with respect for
11 their intrinsic worth as human beings. A punishment is 'cruel and unusual,' therefore, if it does
12 not comport with human dignity." Furman, 408 U.S. at 270.

13     The mental suffering, demoralization, uncertainty and consequent psychological hurt
14 inherent in the punishment must be considered in interpreting Eighth Amendment. Id. at 271,
15 272.

16     An execution "cannot be so totally without penological justification that it results in the
17 gratuitous infliction of suffering." Gregg, 428 U.S. at 183.

18     The assessment should be whether punishment is cruel and unusual in consideration of
19 the standards of decency that mark the progress of a maturing society, or standards of decency
20 that are more or less universally accepted. Id.

21     c.    Analysis

22     Petitioner argues that international law, also known as jus cogens, and particularly the
23 customary law of human rights precluding execution of the mentally disordered, is enforceable
24 as supreme federal law. (ECF No. 107 at 409-11 citing The Paquete Habana, 175 U.S. 677, 700
25 (1900)); Rest.3d Foreign Relations Law of the United States § 702, Comment "c" (1987) ("[T]he
26 customary law of human rights is part of the law of the United States to be applied as such by
27 state as well as federal courts"); Filartiga v. Pena-Irala, 630 F.2d 876, 877 (2d Cir. 1980) ("Upon
28 ratification of the Constitution, the thirteen former colonies were fused into a single nation, one

which, in its relations with foreign states, is bound both to observe and construe the accepted norms of international law."); see also ECF No. 210 at 252-57 citing Simmons, 543 U.S. at 575 (explaining that the Supreme Court historically "has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments'"), the International Covenant on Civil and Political Rights ("ICCPR"), the Universal Declaration of Human Rights, the American Declaration of the Rights and Duties of Man, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Convention Against All Forms of Racial Discrimination, and the Vienna Convention on the Law of Treaties.)

Petitioner argues that on the facts and circumstances of this case as argued in the Amended Petition, application of the death penalty is contrary to the ICCPR's evolving international norms and mores moving away from the death penalty. (Id.) He points to evidence that he is mentally disordered and exempt from execution under international law. He points to evidence of his "lifelong mental and psychological impairments" including "temporal lobe damage and schizophrenia." (ECF No. 210 at 252 citing Claims 3, 4, 5, and 28, herein.)

Still, Petitioner concedes that federal courts have not embraced the ICCPR. The United States Supreme Court and the Ninth Circuit have both held that the ICCPR is not enforceable in the federal courts. Sosa v. Alvarez-Machain, 542 U.S. 692, 735 (2004); Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir. 2010). (ECF No. 210 at 256.). Moreover, the United States ratified the ICCPR subject to reservation of the right to impose capital punishment subject only constitutional constraints. See 138 Cong. Rec. S-4781-01, S4783 (1992). Even if the ICCPR were viewed as self-executing, its provisions do not prohibit the death penalty, but rather merely limit its application including as to arbitrary deprivation of life and execution of the severely mentally ill. See e.g., Atkins, 536 U.S. at 316 n.21 (death penalty held unconstitutional for the intellectually disabled).

The state supreme court reasonably could reject the Claim. Notably, that court has found California's death penalty process, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law. People v. Lewis, 43 Cal.4th 415,

539 (2008), rejected on other grounds by People v. Black, 58 Cal. 4th 912 (2014).  International

norms of human decency do not render the death penalty, applied as a regular form of

punishment, violative of the Eighth Amendment.  People v. Curl, 46 Cal.4th 339, 362-63 (2009).

Petitioner fails to point to clearly established Supreme Court precedent at the time his

conviction became final, that capital punishment was illegal in this country based on

international law.  To the contrary, it appears that such challenges to imposition of the death

penalty have been repeatedly rejected.  See Buell v. Mitchell, 274 F.3d 337, 376 (6th Cir. 2001)

("[C]ourts that have considered the question of whether international law bars capital punishment

in the United States have uniformly concluded that it does not.").  In Carter v. Chappell, 2013

WL 781910 at *80, (C.D. Cal. Mar. 1, 2013), the district court noted that "[c]learly established

federal law does not hold the death penalty to violate international law or the federal

Constitution."  Similarly,  in Rowland v. Chappell, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012),

the district court rejected an essentially identical claim,  stating that "[p]etitioner cannot

demonstrate that any claim of a violation of international law is even cognizable on federal

habeas review, given that such review is designed to address claims that a petitioner is in custody

in violation of the Constitution or laws or treaties of the United States."

In Coleman v. Mitchell, the Sixth Circuit explained that "the claim that international law

completely bars this nation's use of the death penalty is unsupportable since the United States is

not party to any treaty that prohibits capital punishment  per se, and since total abolishment of

capital punishment has not yet risen to the level of customary international law."  268 F.3d 417,

443 n.12 (6th Cir. 2001); see also Medellin v. Dretke, 544 U.S. 660, 664 (2005) (Vienna

Convention did not create individual judicially enforceable rights); Sosa, 542 U.S. at 734-35 (UN

Charter, Universal Declaration of Human Rights, and International Convention on Civil and

Political Rights do not create obligations enforceable in federal court); People v. Ghent, 43 Cal.

3d 739, 778-79 (1987) (United Nations charter does not supersede domestic legislation);  People

v. Brown, 33 Cal. 4th 382, 404 (2004) ("International law does not prohibit a sentence of death

rendered in accordance with state and federal constitutional and statutory requirements.").

The  determination of whether customary international law prevents a State from carrying

1   out the death penalty, when the State otherwise is acting in full compliance with the Constitution,

2   is a question that is reserved to the executive and legislative branches of the United States

3   government, as it their constitutional role to determine the extent of this country's international

4   obligations and how best to carry them out.  See Buell, 274 F.3d at 376; accord Vieira, 2015 WL

5   641433 at *178.

6          Moreover, Petitioner has not demonstrated that international law creates a private right of

7   action prohibiting application of the death penalty in his case.  The principles of international law

8   apply to disputes between sovereign governments and not between individuals.  Hanoch Tel-

9   Oren v. Libyan Arab Republic, 517 F. Supp. 542, 545-47 (D.D.C. 1981).  The Ninth Circuit is in

10  accord that "customary international law is not a source of judicially enforceable private rights in

11  the absence of a statute conferring jurisdiction over such claims."  Serra, 600 F.3d at 1197.  Also,

12  Petitioner fails to provide persuasive evidence demonstrating that the abolition of capital

13  punishment has "risen to the level that the international community as a whole recognizes it as

14  jus cogens, or a norm from which no derogation is permitted."  See Buell, 274 F.3d at 373.

15         Petitioner also fails to proffer clearly established federal law that that customary

16  international law bars the imposition of the death penalty on a defendant who suffers from a

17  mental disorder.  (See ECF No. 210 at 252-61.)  The state supreme court reasonably could reject

18  Petitioner's argument that this Court should extend clearly established federal law precluding

19  execution of children (see Roper, 543 U.S. at 568–69), and the incompetent and insane (see

20  Atkins, 536 U.S. at 320–21; Ford, 477 U.S. at 410), to prohibit execution of the merely mentally

21  ill.  He argues that his mental impairments and mental illness are similar to the mentally retarded

22  persons and children protected from execution by Atkins, 536 U.S. at 320–21, and Roper, 543

23  U.S. at 568–69.

24         Although the Constitution prohibits the execution of children and persons whose mental

25  illness renders them insane or incompetent, it does not prohibit the execution of defendants like

26  Petitioner.  See Roper, 543 U.S. at 568–69; Atkins, 536 U.S. at 320–21; Ford, 477 U.S. at 410

27  (establishing that the Eighth Amendment prohibits the execution of the insane).  Further, neither

28  the Supreme Court nor this circuit has extended the Atkins/Roper protections to the mentally ill

1  whose illness does not reach that of incompetency or insanity.  See e.g., Cornwell, 2018 WL
2  934542 at *129.

3  To extend Atkins and Roper to prohibit the execution of the merely mentally ill would
4  constitute a new rule of constitutional law.  See Woodall, 572 U.S. at 426 ("AEDPA's carefully
5  constructed framework would be undermined if habeas courts introduced rules not clearly
6  established under the guise of extensions to existing law.  Absent a decision from the Supreme
7  Court barring the execution of mentally ill prisoners, this Court rejects Petitioner's claim that he
8  is exempt from execution because he is mentally ill.

9  Additionally, incompetency-to-be-executed claims do not become justiciable until an
10 execution becomes imminent, and no execution date has yet been set for Petitioner.  See Panetti,
11 551 U.S. at 947; Martinez–Villareal, 523 U.S. at 644–45; see also Pizzuto v. Tewalt, No. 20-
12 36044, 2021 WL 1904595 at *5 (9th Cir. May 12, 2021) (in a 42 U.S.C. § 1983 proceeding
13 considering ripeness in context of Idaho's alleged failure to provide information relevant to
14 execution protocol, method of execution claim becomes ripe when the method is chosen).

15 The California Supreme Court has found that international norms of human decency do
16 not render the death penalty, applied as a regular form of punishment, violative of the Eighth
17 Amendment.  People v. Cowan, 50 Cal. 4th 401, 510 (2010).  That court specifically has rejected
18 international law as a basis for finding unconstitutional capital punishment and the lengthy
19 delays it can entail.  See People v. Bolden, 29 Cal. 4th 515, 567 (2002) ("[W]e are not persuaded
20 that international law prohibits a sentence of death rendered in accordance with state and federal
21 constitutional and statutory requirements.").

22 Finally, to the extent Petitioner supports alleged international law violations with certain
23 of his other Claims in this proceeding, those Claims all fail for the reasons stated ante and post.

24 d.   Conclusions

25 A fair-minded jurist could find the state supreme court's denial of the Claim was not
26 contrary to, or an unreasonable application of, clearly established federal law, as determined by
27 the Supreme Court, or based on an unreasonable determination of the facts in light of the
28 evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

1    Claim 29 shall be denied.

2        4.      Claim 31

3        Petitioner alleges the method of execution in California violates his rights under the Fifth,

4    Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 107 at 417-24.)

5        a.      State Court Direct and Collateral Review

6        The Claim was presented to the California Supreme Court in Petitioner's first state

7    habeas petition (Lod. Doc. 7 at 463-77), and summarily denied on the merits (Lod. Doc. 8).

8        b.      Legal Standard

9        The standard for cruel and unusual punishment claims is set out in section VII, H, 4, b,

10   (ii), herein.

11       c.      Analysis

12       Petitioner argues that lethal injection under California's protocol violates the prohibition

13   against cruel and unusual punishment.  (ECF No. 107 at 417-18 citing Department of

14   Corrections and Rehabilitation Operational Procedure 0-770; Morales v. Tilton, 465 F. Supp. 2d

15   972 (2006).)  He argues that California's alternative method of execution by lethal gas, is

16   likewise cruel and unusual punishment.  (ECF No. 107 at 417 citing Penal Code § 3604; Fierro

17   v. Gomez, 865 F. Supp. 1387, 1415 (N.D. Cal. 1994), vacated by Fierro v. Terhune, 147 F.3d

18   1158 (9th Cir. 1998).)

19       Even so, Petitioner suggests the Court should not issue a final ruling on this Claim

20   because he does not know the method by which California intends to execute him; litigation over

21   California's lethal injection protocol continues; and a 42 U.S.C. § 1983 proceeding may be

22   available to provide appropriate relief.  (ECF No. 210 at 264.)

23       The Court finds the Claim is premature, and shall deny it as moot, as discussed below.

24       (i)      Lack of Jurisdiction and Standing

25       The state supreme court reasonably could find Petitioner failed to demonstrate habeas

26   jurisdiction over the Claim.  The Supreme Court has explained that "a method-of-execution

27   claim must be brought under 42 U.S.C. § 1983 because such a claim does not attack the validity

28   of the prisoner's conviction or death sentence."  Glossip v. Gross, 576 U.S. 863, 879 (2015) ; see

1   also Hill v. McDonough, 547 U.S. 573, 582 (2006) (habeas relief unavailable on "as applied"

2   challenge under § 1983 to application of the state's lethal injection protocol on grounds of

3   unnecessary suffering); see also Brown v. Ornoski, 503 F.3d 1006, 1017 n.5 (9th Cir. 2007)

4   (same).

5          Even if the Claim were cognizable in federal habeas, the state supreme court reasonably

6   could find Petitioner lacks standing to raise it.  California allows inmates to choose, not later than

7   ten (10) days following service upon the inmate of an execution warrant, whether execution shall

8   be by lethal injection or lethal gas.  Penal Code § 3604(b).

9          Here, Petitioner retains the option of choosing either of the statutory methods of

10  execution because no execution warrant has issued.  See Fierro, 147 F.3d at 1160 (inmate lacked

11  standing to challenge constitutionality of California's method of execution by lethal gas where

12  inmate did not choose and was not subject to execution by lethal gas); see also Pizzuto, 2021

13  WL 1904595 at *5 (in a § 1983 proceeding considering ripeness in context of Idaho's alleged

14  failure to provide information relevant to execution protocol, method of execution claim

15  becomes ripe when the method is chosen); Payton v. Cullen, 658 F.3d 890, 893 (9th Cir. 2011)

16  (dismissing as unripe plaintiffs' challenge to California's execution protocol, because the extant

17  protocol had been judicially invalidated and no new protocol had been issued); Andrews, 944

18  F.3d at 1122 n.16 (dismissing as unripe an Eighth Amendment lethal injection claim where no

19  execution protocol was in place).

20          (ii)     Habeas Challenge to California's Lethal Injection Protocol is Premature

21          To the extent Petitioner challenges the use of lethal injection generally, his claim is

22  precluded by the Supreme Court's decision in Baze v. Rees.  553 U.S. 35, 48 (2008) ("[The

23  Supreme Court] has never invalidated a State's chosen procedure for carrying out a sentence of

24  death as the infliction of cruel and unusual punishment.").  The Supreme Court in Baze,

25  reviewing an Eighth Amendment challenge to Kentucky's lethal injection protocol, upheld the

26  use of lethal injection as a method of carrying out the death penalty.  Id. at 48, 62-63.  The Court

27  observed that the Eighth Amendment prohibits "wanton exposure to objectively intolerable risk,

28  not simply the possibility of pain."  Id. at 61-62.

1    To the extent Petitioner challenges California's lethal injection protocol specifically, his

2 claim is premature on the grounds discussed below.

3    (A)    Petitioner's Execution is not Imminent

4    Petitioner has not shown an execution date has been set in his case.  His execution is not

5 imminent.  See Martinez-Villareal, 523 U.S. at 644-45 (claim concerning competency to be

6 executed previously dismissed as premature because execution was not imminent); Poland v.

7 Stewart, 117 F.3d 1094, 1104-05, (9th Cir. 1997) (claim relating to lethal gas as method of

8 execution not ripe for judicial decision); Cook v. Brewer, 649 F.3d 915, 918 (9th Cir. 2011)

9 (Eighth Amendment violation requires showing of risk that is sure or very likely to cause

10 needless suffering and sufficiently imminent dangers); Andrews, 944 F.3d at 1122 n.16

11 (dismissing as unripe an Eighth Amendment lethal injection claim where no execution protocol

12 was in place).

13    (B)    California is Without a Lethal Injection Protocol

14    The execution protocol in place when Petitioner filed his 2009 Amended Petition was

15 subsequently revised and then repealed by gubernatorial executive order in the form of an

16 executive moratorium on the death penalty.  See Cal. Code Regs. tit. 15 § 3349.1(i) (2018);

17 Briggs, 3 Cal. 5th at 831; Executive Order N-09-19 (repealing California's lethal injection

18 protocol).

19    A method-of-execution challenge is not ripe when the respondent state has no protocol

20 that can be implemented at the time of the challenge.  See Payton, 658 F.3d at 893; accord Floyd,

21 949 F.3d at 1152.

22    For the reasons stated, the Claim fails to allege the unconstitutionality of California's

23 repealed lethal injection protocol.

24    Additionally, to the extent Petitioner requests that his death sentence be vacated, he fails

25 to provide legal authority that the alleged unconstitutionality of California's method of execution

26 of sentence impacts the validity of his death sentence.  (See ECF No. 107 at 444; see also People

27 v. Welch, 20 Cal. 4th 701, 771 (1999) (constitutionality of the method of execution bears solely

28 on the legality of the execution of sentence and not on the validity of the sentence itself).

### d.    Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 31 shall be denied as moot.

### 5.    Claim 32

Petitioner alleges that execution following a long period of confinement while under sentence of death violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 107 at 424-30.)

### a.    State Court Direct and Collateral Review

The Claim was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc.7 at 478-82), and summarily denied on the merits (Lod. Doc. 8).

### b.    Legal Standard

The standard for cruel and unusual punishment is set out in section VII, H, 4, b, (ii), herein.

### c.    Analysis

Petitioner argues that execution following extended confinement under sentence of death is cruel and unusual punishment under the Eighth Amendment and international law, devoid of penological justification in the form of retribution and deterrence.  (ECF No. 107 at 427 citing Lackey v. Texas, 514 U.S. 1045 (1995) (Stevens, J., joined by Breyer, J., respecting the denial of certiorari); ECF No. 210 at 266-270.)

Petitioner argues that "California['s] death penalty post-conviction procedures failed to provide [him] with a constitutionally full and fair [and] timely review of his conviction and death sentence." (ECF No. 107 at 424.)   He argues "[t]he delays in [his] case were caused by factors over which he exercised no discretion or control." (ECF No. 107 at 425.)  He states that, while he was sentenced to death on April 4, 1985 and his notice of appeal was filed on April 11, 1985, his direct appeal was not finally denied until October 24, 2001, and his first state petition for writ

1 of habeas corpus was not denied until November 14, 2001.  (ECF No. 107 at 424.)  The record
2 reflects Petitioner's second state petition for writ of habeas corpus was not denied until August
3 26, 2009.  (Lod. Doc. No. 24.)

4       Petitioner argues that during his many years on death row, he has suffered "the anxiety of
5 impending death and the restricted activity allowed death row inmates."  (ECF No. 107 at 425.)
6 He points out the international community recognizes that "prolonged confinement under these
7 circumstances is cruel and degrading and in violation of international human rights law."  (ECF
8 No. 107 at 426 citing Pratt v. Attorney General for Jamaica, 4 All. E.R. 769 (Privy Council)
9 (1993); Soering v. United Kingdom, 11 E.H.R.R. 439, 111 (Euro. Ct. of Human Rights).

10       The Supreme Court has stated that the mental suffering, demoralization, uncertainty and
11 consequent psychological hurt inherent in the punishment must be considered in interpreting
12 Eighth Amendment.  See Furman, 408 U.S. at 271-72.  Furthermore, an execution "cannot be so
13 totally without penological justification that it results in the gratuitous infliction of suffering."
14 Gregg, 428 U.S. at 183.

15       Here, the California Supreme Court's rejection of this claim was not unreasonable.
16 Petitioner does not cite any clearly established Supreme Court authority that a prolonged
17 detention is cruel and unusual punishment.  He concedes the Ninth Circuit has rejected the claim
18 that extraordinary delay and lengthy confinement under sentence of death renders the death
19 sentence invalid.  (ECF No. 210 at 266 citing Allen v. Ornoski, 435 F.3d 946, 956-59 (9th Cir.
20 2006) ("The Supreme Court has never held that execution after a long tenure on death row is
21 cruel and unusual punishment . . . Allen cannot credibly claim that there is any clearly
22 established law, as determined by the Supreme Court, which would support this . . . claim."));
23 see also McKenzie v. Day, 57 F.3d 1461, 1466-67 (9th Cir. 1995) (casting doubt that delays
24 caused by satisfying the Eighth Amendment can violate it); Smith v. Mahoney, 611 F.3d 978,
25 997-98 (9th Cir. 2010) (citing McKenzie and finding Lackey claim barred by Teague v. Lane,
26 489 U.S. 299, 316 (1989); Andrews v. Davis, 866 F.3d 994, 1039 (9th Cir. 2017) (same),
27 (rehearing en banc) 944 F.3d 1092 (9th Cir. 2019); People v. Taylor, 26 Cal. 4th 1155, 1176-77
28 (2001) (rejecting claim that relatively lengthy period of incarceration constitutes cruel and

unusual punishment on grounds such delay is necessary to permit careful appellate review).

Justice Stevens, in his memorandum respecting denial of certiorari in Lackey, suggested this issue needed further study.  514 U.S. 1045.  Lackey indicates that the issue has never been squarely addressed by the Supreme Court, nor have lower courts in the United States given the issue ample consideration.  Id.

Four years later, Justice Thomas stated in concurring on a denial of certiorari, that:

> I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.

Knight v. Florida, 528 U.S. 990 (1999).

At least one other circuit has held that the time consumed by a petitioner's direct and collateral review proceedings "is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." Johns v. Bowersox, 203 F.3d 538, 547 (8th Cir. 2000) (quoting Chambers v. Bowersox, 157 F.3d 560, 570 (8th Cir. 1998)).

In any event, since the Supreme Court has not decided the issue, the state court's decision could not be contrary to or an unreasonable application of Supreme Court precedent.  Musladin, 549 U.S. at 77; Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005) (same).

### d.   Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Claim 32 shall be denied.

### 6.   Claim 33

Petitioner alleges that he was denied a jury determination of the facts necessary to sentence him to death, violating his rights under the Fifth, Sixth, Eight, and Fourteenth

1   Amendments.  (ECF No. 107 at 430-38.)

2        a.    State Court Direct and Collateral Review

3        The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 372-

4   76), and denied it on the merits, stating that:

6        Defendant next raises several arguments that the state's death penalty law is
         unconstitutional under the state and federal Constitutions. As outlined below, we
7        have addressed and rejected these claims in previous opinions, and defendant does
         not convince us we should revisit those decisions. Thus, defendant claims various
8        of his constitutional rights were violated because the death penalty law, and the
         jury instructions implementing that law:

9        Failed to inform the jury it must unanimously find an aggravating factor exists
10       before that factor may be considered. (*People v. Kipp*, *supra*, 18 Cal.4th at p.
         381.)

11       Failed to inform the jury it must find aggravating circumstances outweigh
         mitigating circumstances and that death is an appropriate penalty beyond a
12       reasonable doubt. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d
         69, 5 P.3d 130].) Counsel was not ineffective for failing to request a reasonable
13       doubt instruction at the penalty phase.

14       Failed to impose on the jury a standard of proof for the penalty phase. (*People v.
         Carpenter* (1997) 15 Cal.4th 312, 417-418 [63 Cal.Rptr.2d 1, 935 P.2d 708].)
15       Counsel was not ineffective for failing to request that the jury be instructed on
         some standard of proof at the penalty phase.
16
         Failed to require the jury provide written findings. (*People v. Kraft*, *supra*, 23
17       Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at pp. 276-277.) Counsel
         was not ineffective for failing to request that the jury be required to return written
18       findings at the penalty phase.

19

20  Weaver, 26 Cal. 4th at  991-92

21       b.    Legal Standard

22       (i)   Sentencing Determination

23       Facts supporting an increase in sentence greater than jury's guilty verdict must be proved

24  beyond a reasonable doubt.  Apprendi v. New Jersey, 530 U.S.466, 490 (2000).

25       Once a jury finds the defendant to be death eligible, the jury may be given "unbridled

26  discretion in determining whether the death penalty should be imposed" upon a death eligible

27  defendant.  Tuilaepa, 512 U.S. at 979-80.

28       "[T]here is no . . . constitutional requirement of unfettered sentencing discretion in the

jury, and States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." Boyde, 494 U.S. at 377 (quoting Franklin, 487 U.S. at 181) (plurality opinion); see also Marsh, 548 U.S. at 175 (no specific method for balancing aggravating and mitigating factors in a capital case sentencing proceeding is constitutionally required).

(ii)    Due Process

Due process is violated where the resulting criminal trial is fundamentally unfair. Chambers, 410 U.S. at 294, 303.

c.    Analysis

Petitioner argues that his death sentence is unconstitutional because "jurors were not instructed that all aggravating factors must be proven beyond a reasonable doubt, that aggravation must be found to outweigh mitigation beyond a reasonable doubt, that death must be found to be the appropriate penalty beyond a reasonable doubt and that they must unanimously agree on the circumstances in aggravation that supported their verdict."[33]  (ECF No. 107 at 430-32 citing Jones v. United States, 526 U.S. 227, 243 n.6 (1999); Apprendi, 530 U.S. at 471-72, 494, and Ring, 536 U.S. at 606, 609; see also ECF No. 210 at 272, 430-31.)

The record reflects that Petitioner's penalty phase jury was instructed pursuant to Penal Code section 190.3 that:

> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.
>
> You shall now retire and select one of your number to act as foreman, who will preside over your deliberations.  In order to make a determination as to the penalty, all twelve jurors must agree.

---

[33] Petitioner concedes his jury was required to find beyond a reasonable doubt aggravation under Penal Code section 190.3(b) for "prior violent criminal activity."  (See ECF No. 107 at 431 n.21.)

1   (CT 1677, CALJIC 8.84.2 as modified.)

2   Particularly, Petitioner argues that under Penal Code section 190.3, the weighing finding
3   during the penalty phase exposes a defendant to a greater punishment (i.e. death) than that
4   authorized by the jury's verdict of first degree murder with a true finding of a special
5   circumstance (i.e. life in prison without parole). The weighing determination, according to
6   Petitioner, is therefore the functional equivalent of a fact finding. (ECF No. 214 at 75, citing
7   Woodward v. Alabama, 134 S.Ct. 405, 410-11 (2013) (Sotomayor, J., dissenting from denial of
8   cert.). He cites Apprendi and suggests that before a defendant to may sentenced to death, the
9   jury must make additional factual findings unanimously and beyond a reasonable doubt in the
10  penalty phase including that aggravating factor(s) are true and outweigh mitigating factor(s). Id.;
11  see also Penal Code § 190.3; Apprendi, 530 U.S. at 490.

12  However, the capital sentencing determination by California jurors is moral and
13  normative and does not require unanimous written findings pursuant to a standard of proof or
14  presumption in favor of life. See e.g., Weaver, 26 Cal. 4th at 984–87. The Supreme Court has
15  held that no "specific method of balancing mitigating and aggravating factors in a capital
16  sentencing proceeding is constitutionally required." Marsh, 548 U.S. at 175.

17  As noted, California's death penalty sentencing scheme has been consistently upheld as
18  constitutional by the Supreme Court. Tuilaepa, 512 U.S. at 975-80; Pulley, 465 U.S. at 53; see
19  also Williams, 52 F.3d at 1485 (failure to require a specific finding that death is the appropriate
20  penalty beyond a reasonable doubt does not render California's death penalty statute
21  unconstitutional).

22  Petitioner has not pointed to clearly established Supreme Court authority that under
23  California's death penalty statute, penalty phase determinations implicate any burden of proof
24  much less a reasonable doubt standard of proof. See Floyd, 949 F.3d at 1144 (observing that the
25  federal courts of appeals have uniformly rejected the argument that Apprendi and Ring require a
26  reasonable doubt instruction at the penalty phase because a jury's balancing inquiry in a capital
27  case is a subjective and moral one, not a factual one). His reliance upon Ring and Apprendi is
28  misplaced. Apprendi does not require a jury to find beyond a reasonable doubt the applicability

of a specific section 190.3 sentencing factor.   See Tuilaepa, 512 U.S. at 975.   Moreover, Petitioner has not demonstrated that Ring, which was decided on June 4, 2002, applied to his proceeding in which his conviction became final prior to that date.

Also, Petitioner was not being tried for the unadjudicated conduct offered at the penalty phase.   Thus, the unanimity safeguard was unnecessary.   Aggravating circumstances are not separate penalties, but are standards to guide the making of the choice between death and life imprisonment.   People v. Raley, 2 Cal. 4th 870, 910 (1992), superseded by statute as stated in People v. Brooks, 3 Cal. 5th 1 (2017).   A factor set forth in Penal Code section 190.3 does not require a "yes" or "no" answer to a specific question, but points the sentencer to the subject matter which guides the choice between the two punishments.   Tuilaepa, 512 U.S. at 975.

Petitioner does not identify any clearly established Supreme Court precedent that a jury must unanimously find prior unadjudicated criminal activity to be true in order to consider it as a factor in aggravation during the penalty phase of a capital case.   Rather, the Supreme Court has made clear that "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." Ramos, 463 U.S. at 1008 n.22 (quoting Zant, 462 U.S. at 875).

Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror."   People v. Samayoa, 15 Cal. 4th 795, 853 (1997); see also Walton v. Arizona, 497 U.S. 639, 651 (1990), overruled on other grounds by Ring, 536 U.S. at 589 (a defendant constitutionally may be required to establish by a preponderance of the evidence the existence of mitigating circumstances, a conclusion manifestly inconsistent with Petitioner's assertion that the Constitution requires the jury to determine beyond a reasonable doubt that death is the appropriate penalty).

Thus, the state supreme court reasonably could find California's death penalty process is constitutional without requiring unanimous written findings pursuant to a standard of proof or

1  presumption in favor of life.  See Tuilaepa, 512 U.S. at 979-80 (jurors need not be instructed at

2  the penalty phase on the weighing process.)    Nor was Petitioner's jury precluded from

3  considering all mitigating evidence in the trail record; jurors were instructed to consider

4  sentencing factors to the extent relevant.  (See CT 1651.)

5      Petitioner's further argument, that absent a unanimous capital sentencing verdict beyond

6  a reasonable doubt, he was denied equal protection with non-capital defendants who are entitled

7  to a unanimous verdict beyond a reasonable doubt (ECF No. 107 at 436-37), fails because he

8  does not point to clearly established law in support, and for the reasons stated.  (ECF No. 107 at

9  436-37; see also Claims 20-22, 26, ante.)

10      It follows that, to the extent Petitioner claims structural error based upon denial of the

11  right to a jury, he fails, for the reasons stated.  (See ECF No. 107 at 437 citing Cage v. Louisiana,

12  498 U.S. 39 (1990), disapproved by McGuire, 502 U.S. at 72; see also ECF No. 210 at 275 citing

13  Jones, 526 U.S. at 251-52).

14          d.    Conclusions

15      A fair-minded jurist could find the state supreme court's denial of the Claim was not

16  contrary to, or an unreasonable application of, clearly established federal law, as determined by

17  the Supreme Court, or based on an unreasonable determination of the facts in light of the

18  evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

19      Claim 33 shall be denied.

20      H.   Claims Alleging Cumulative Error

21      1.   Claim 34

22      Petitioner alleges that the cumulative effect of trial counsel's ineffective assistance,

23  prosecutorial misconduct, juror misconduct, and trial court error renders his conviction and

24  sentence unreliable under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[34]  (ECF No. 107

25  at 438-43.)

26

27

28  ———————————————
[34] Petitioner states that he incorporates Claims 1-33 into Claim 34.  (ECF No. 107 at 439.)

a.      State Court Direct and Collateral Review

The California Supreme Court considered the Claim on direct appeal (Lod. Doc. 1 at 442-44), and denied on the merits, stating that:

> Defendant finally contends the cumulative effect of the errors at his trial requires that we reverse the guilt, sanity, and penalty judgments. We have identified only three errors, all of which were harmless individually: (1) the appointment of Dr. Cutting and Dr. Criswell to examine defendant for sanity when the only issue at the time was his competence to stand trial; (2) permitting the same psychiatrists to testify at the sanity phase; and (3) violating sections 977 and 1043 by permitting defendant voluntarily to absent himself from his trial. We have also explained that permitting Carol Bender to testify she had trouble serving defendant's mother with a subpoena, and giving a limiting instruction concerning the jury's consideration of the VESI videotapes, if error, were both harmless. Considering these matters together, we conclude their cumulative effect was minor. Accordingly, we reject the claim that the aggregate effect of these errors at defendant's trial requires reversal.

Weaver, 26 Cal. 4th at 993.

The Claim was presented to the California Supreme Court in Petitioner's first state habeas petition (Lod. Doc.7 at 483-85), and summarily denied on the merits (Lod. Doc. 8).

The Claim was presented to the California Supreme Court in Petitioner's second state habeas petition (Lod. Doc.23 at 119), and summarily denied on the merits (Lod. Doc. 24).

b.      Legal Standard

(i)      Cumulative Error

The Ninth Circuit has stated "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." Parle, 505 F.3d at 928 (citing DeChristoforo, 416 U.S. at 643). In the Ninth Circuit, the cumulative effect of trial errors can be a basis for habeas relief where there is a "substantial and injurious effect or influence in determining the jury's verdict[.]" Brecht, 507 U.S. at 637.

c.      Analysis

(i)      State Court Modification of Strickland Standard for Prejudice

Petitioner argues that the state supreme court, on review of his ineffective assistance of counsel Claims, improperly modified Strickland's prejudice standard. He argues the state

332

1  supreme court applied an incorrect test for determining prejudice by using Lockhart v. Fretwell,
2  506 U.S. 364 (1993), to modify the Strickland standard, and relatedly unreasonably presume "the
3  truth, accuracy, and fairness of the conviction and sentence." (See ECF No. 210 at 112-13 citing
4  People v. Duvall, 9 Cal. 4th 464, 474, 476 n.3 (1995) (respondent must set forth facts responsive
5  to the factual allegations in the petition).)

6      In Fretwell, counsel unreasonably failed to object to an unconstitutional aggravating
7  factor, later found to be constitutional.   506 U.S. at 367, 369 n.1.   The Supreme Court,
8  recognizing that strict application of the Strickland standard would result in "an error in [the
9  petitioner's] favor," looked beyond Strickland's outcome determinative standard and considered
10 whether the failure to object rendered the defendant's trial "unreliable or the proceeding
11 fundamentally unfair." Fretwell, 506 U.S. at 372. It held that the result of Fretwell's sentencing
12 proceeding "was neither unfair nor unreliable." Id. at 371.   Accordingly, the Court found
13 Fretwell suffered no prejudice.

14     Subsequently, the Supreme Court concluded that a state court holding that Fretwell
15 modified Strickland "was contrary to, or involved an unreasonable application of, clearly
16 established Federal law." Williams, 529 U.S. at 399. The Supreme Court recognized that there
17 may be limited situations in which "it would be unjust to characterize the likelihood of a
18 different outcome as legitimate prejudice." Id. at 391–92. The Court characterized cases such as
19 Fretwell as involving an unreasonable action of a trial attorney that did "not deprive the
20 defendant of any substantive or procedural right to which the law entitles him." Id. at 393 n.17.

21     Here, Petitioner offers only surmise that the state supreme court must have considered
22 presumptions and a prejudice standard inconsistent with Strickland.  He supports the argument
23 solely by citation to other California Supreme Court cases allegedly containing such errors. (See
24 ECF No. 210 at 112-116 and cases cited therein.)  But he does not demonstrate on the facts and
25 circumstances of this case, that the state supreme court failed to apply the Strickland standard, or
26 show how the cases he cites support his argument in this case.

27     As discussed above, the record reflects the state supreme court applied the Strickland
28 standard in analyzing and rejecting Claims herein.  Cf., In re Avena, 12 Cal. 4th 694, 726 (1996)

1  (applying both Strickland and Fretwell standards in finding counsel's deficient conduct non-

2  prejudicial); Hardy, 849 F.3d at 818-19 (finding that although the California Supreme Court

3  recited the Strickland standard, it erroneously concluded that because there was "substantial

4  evidence" against Hardy, he suffered no prejudice from counsel's deficient performance).

5      Notably, both before and after Williams, the California Supreme Court could be seen to

6  rely upon Strickland as the standard for determining prejudice in cases of alleged ineffective

7  assistance of counsel.  See e.g., People v. Alexander, 49 Cal. 4th 846, 888 (2010); People v.

8  Friend, 47 Cal. 4th 1, 46–47 (2009); People v. Hester, 22 Cal. 4th 290, 297 (2000); People v.

9  Smithey, 20 Cal. 4th 936, 986–87, 1012 (1999); People v. Musselwhite, 17 Cal. 4th 1216, 1260

10  (1998).

11      When determining whether a state court's decision was contrary to, or an unreasonable

12  application of, federal law, the court must "presum[e] that state courts know and follow the

13  law[,]" including as to the Strickland standard.  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).

14  While Petitioner may rebut this presumption, he has not done so.  The state court decision is

15  entitled to the benefit of any doubt.  Visciotti, 537 U.S. at 24.  See e.g., Cornwell, 2018 WL

16  934542 at *20–21 (petitioner's showing is insufficient to convince this court that the California

17  Supreme Court likely applied an incorrect prejudice standard to petitioner's claims).  Particularly

18  so here, as Petitioner does not demonstrate the state supreme court relied upon Fretwell or a non-

19  Strickland presumption or standard in analyzing and rejecting Claims herein.[35]   (See e.g.,

20  Weaver, 26 Cal. 4th at 925-26, 955.)

21      (ii)    Cumulative Effect of Alleged Errors

22      Petitioner argues the cumulative effect of errors alleged in Claims 1-33.  (ECF No. 210 at

23  276-77 citing Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978) (cumulative effect of the

24  potentially damaging circumstances of this case violated the due process guarantee of

25  fundamental fairness); Harris By & Through Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir.

26

27  [35] These arguments based upon an alleged modification of the Strickland standard or application of an alternative standard, to the extent raised by Petitioner's other Claims for ineffective assistance of counsel, are rejected for the reasons stated.

28

1   1995) (prejudice may result from the cumulative impact of multiple deficiencies); <u>United States</u>

2   <u>v. McLister</u>, 608 F.2d 785, 791 (9th Cir. 1979) (prejudicial effect of combined errors requires

3   reversal).  He argues that "[a]bsent the errors complained of, at each phase, the jury would have

4   reached results more favorable to Petitioner, and would not have rendered a death verdict."

5   (ECF No. 107 at 443.)

6        Although individual errors looked at separately may not rise to the level of reversible

7   error, their cumulative effect may nevertheless be so prejudicial as to require reversal.  <u>U.S. v.</u>

8   <u>Necoechea</u>, 986 F.2d 1273, 1282 (9th Cir. 1993); <u>see also Alcala v. Woodford</u>, 334 F.3d 862,

9   883 (9th Cir. 2003) ("[E]rrors that might not be so prejudicial as to amount to a deprivation of

10  due process when considered alone, may cumulatively produce a trial setting that is

11  fundamentally unfair.").

12       However, the fact that errors have been committed during a trial does not mean that

13  reversal is required.  "While a defendant is entitled to a fair trial, [she] is not entitled to a perfect

14  trial, for there are no perfect trials."  <u>United States v. Payne</u>, 944 F.2d 1458, 1477 (9th Cir.

15  1991); <u>see also McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 553 (1984)

16  (quoting <u>Brown v. United States</u>, 411 U.S. 223, 231-232 (1973)).  Moreover, errors of state law,

17  such as whether instructions were correct under state law, are not cognizable in federal habeas,

18  and should play no part in cumulative error analysis.  <u>McGuire</u>, 502 U.S. at 71-72; <u>see also Parle</u>

19  <u>v. Runnels</u>, 387 F.3d 1030, 1045 (citing <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990)) (no habeas

20  relief for state law errors whose combined effect does not violate the federal constitution).

21       Here, the state supreme court reasonably denied Claims 1-33, for the reasons stated in the

22  Court's prior orders (<u>see</u> ECF Nos. 162, 209 denying Claims 1,2 and 8,9 respectively) and those

23  stated herein.  Particularly, the three trial court errors noted by the state supreme court in its

24  rejection of the allegation of cumulative error on direct appeal, considered cumulatively and to

25  the extent asserted as federal constitutional error, did not render the trial fundamentally unfair.

26  <u>See United States v. Karterman</u>, 60 F.3d 576, 580 (9th Cir. 1995) ("Because each error is, at best,

27  marginal, we cannot conclude that their cumulative effect was 'so prejudicial' to [defendant] that

28  reversal is warranted.").

Petitioner's claims of constitutional error are harmless individually and cumulatively, for the reasons stated. The state supreme court reasonably could find Petitioner failed to demonstrate the combined effect of alleged error was prejudicial under Strickland, or by rendering his defense "far less persuasive" so as to exert a "substantial and injurious effect or influence" on the verdict. Parle, 505 F.3d at 928 (citing Chambers, 410 U.S. at 294, and Brecht, 507 U.S. at 637); see also Thompson v. Calderon, 86 F.3d 1509, 1521 (9th Cir. 1996) (reversed on other grounds by Calderon v. Thompson, 523 U.S. 538 (1998) ("finding no prejudice from the errors considered separately, we also find no cumulative prejudice.").

Accordingly, after examining the asserted errors cumulatively, the state supreme court reasonably could find Petitioner failed to show that his constitutional rights were violated. The Court is not persuaded otherwise.

### d. Conclusions

A fair-minded jurist could find the state supreme court's denial of the Claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

Claim 34 shall be denied.

## VIII. MOTIONS FOR EVIDENTIARY HEARING AND RECORD EXPANSION

Petitioner moves for: (i) evidentiary hearing on Claims 3, 4, 6, 7, 11 and certain procedural default allegations relating to claims 11, 12 and 18, and (ii) expansion of the record with additional documentation relating to claims 3, 4, 6, 7 and 11. (See ECF Nos. 216, 217.)

The Court shall deny Petitioner's motion in its entirety, for the reasons discussed below.

### A. Legal Standard

As noted, § 2254(d), as amended by the AEDPA, provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review." 563 U.S. at 181, 185. Although the central holding of Pinholster pertained to § 2254(d)(1), the Supreme Court observed that "[28 U.S.C. §] 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,' " providing "additional clarity" that review under § 2254(d)(2) is also limited to the record before the state court. Id. at 185 n.7. Therefore, for claims that were adjudicated on the merits in state court, a petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d). See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

The federal court, upon motion for evidentiary hearing, is limited to the evidence presented in state court when it assesses whether 28 U.S.C. § 2254(d) bars a claim. Pinholster, 563 U.S. at 185. An evidentiary hearing is unnecessary if § 2254(d) is a bar to relief. However, if § 2254(d) is not a bar, the federal court must review the substantive issues and assess evidence challenging the constitutionality of the conviction and sentence. Panetti, 551 U.S. at 953-954 (inadequate state court fact-finding where § 2254(d) satisfied); accord Godoy, 861 F.3d at 966; Frantz, 533 F.3d at 737. This review contemplates factual development and an evidentiary hearing to the extent necessary to resolve the constitutional claim.

Also, a petitioner requesting an evidentiary hearing must "show that he has not failed to develop the factual basis of the claim in the state courts [pursuant to 28 U.S.C. § 2254(e)(2)] . . . [and] meet one of the Townsend factors and make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief."[36] Insyxiengmay v. Morgan, 403 F.3d

---

[36] In Townsend v. Sain, the Supreme Court concluded that a defendant is entitled to a federal evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by

657, 670 (9th Cir. 2005); see also Pinholster, 563 U.S. at 185-186 (noting that § 2254(e)(2) still applies even after § 2254(d) is satisfied).  That is, once the statutory provisions of 28 U.S.C. § 2254(d) and § 2254(e) have been satisfied, the entitlement for an evidentiary hearing in a habeas case turns on two things: first, whether there was an opportunity to develop the facts in state court, and second, whether the petitioner has pled a colorable claim entitling him to relief. Lambright v. Stewart, 241 F.3d 1201, 1206 (9th Cir. 2001).

### B.   Analysis

### 1.   Petitioner's Request for Evidentiary Hearing

Petitioner moves for evidentiary hearing as to Claims 3, 4, 6, 7 and 11, and certain procedural default allegations as to claims 11, 12 and 18, pursuant to habeas rule 8.  (ECF No. 216.)  In doing so, Petitioner concedes that "it is as yet unclear exactly what facts are actually disputed by the Respondent." (ECF No. 216 at 30.)

Habeas Rule 8 provides that:

> If the petition is not dismissed, the judge must review the answer, any transcripts and records of state court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

SECT 2254 Rule 8(a); see also Townsend, 372 U.S. at 319 (complete state court record ordinarily includes the transcript of testimony or adequate substitute, the pleadings, court opinions, and other pertinent documents).

However, Claims 3, 4, 6, 7, 11, 12 and 18 do not survive § 2254(d) analysis, for the reasons stated.  Petitioner has not shown an evidentiary hearing on those Claims is available. 28 U.S.C. § 2254(d); see also Stankewitz v. Woodford, 365 F.3d 706, 708 (9th Cir. 2004) (petitioner entitled to evidentiary hearing upon raising colorable claim of ineffective assistance); accord Siripongs v. Calderon, 35 F.3d 1308, 1310 (1994) (only a habeas petitioner who asserts a colorable claim to relief is entitled to an evidentiary hearing).  Pinholster effectively bars a

---

the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  372 U.S. at 313.

1   habeas court from any further factual development of these claims at evidentiary hearing.  563

2   U.S. at 203 n.20.  Regarding these Claims, and to the extent Petitioner further argues that he is

3   entitled to a hearing under 28 U.S.C. § 2254(e)(2), Pinholster suggests this is not so.  "Section

4   2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief." Id. at

5   185.  Analysis of the Claims under § 2254(d) must precede the granting of an evidentiary hearing

6   under § 2254(e)(2).  Id. at 184.  Thus, only if Petitioner overcomes § 2254(d) can the Court

7   consider a hearing under § 2254(e)(2).

8           2.      Petitioner's Request for Record Expansion

9           Petitioner moves for expansion of the record as to Claims 3, 4, 6, 7 and 11 with the

10  following additional documentation:

12          As to Claims 3, 4, 6 and 7, Petitioner requests that the Court expand the record
            with the following exhibits, previously submitted to the Court in ECF Nos. 149,
            198-203, relating to the mental state of Petitioner and his trial counsel: Exhibits
13          A, B, C, H, N (N-1 through N-319), O, P, S, T, U, V, W, X, Y, Z, AA, BB, CC,
            and DD.[37]

15          As to Claim 11, Petitioner requests that the Court expand the record with the
            following exhibits, included as supplemental exhibits in support of the Amended
16          Petition (see ECF No. 217), relating to alleged Brady information impeaching
            prosecution witnesses Rickey Gibson, David Galbraith, and Cecil Sneed:
            Supplemental Exhibits  FF, GG, HH, II, JJ and KK.

17          The Court observes Habeas Rule 7 provides that:

19          [T]he judge may direct the parties to expand the record by submitting additional
            materials relating to the petition … includ[ing] letters predating the filing of the
20          petition, documents, exhibits, and answers under oath to written interrogatories
            propounded by the judge. Affidavits may also be submitted and considered as part
21          of the record.

23  SECT 2254 Rule 7(a-b).

24          A petitioner who seeks to expand the record without a hearing must meet the same

---

[37] Petitioner acknowledges that: the Court, in the course of its denial of Claims 1 and 2, denied expansion of the
record with Exhibit A and H, and granted expansion of the record with Exhibits B and C but not for the truth of the
matter asserted therein.   (ECF No. 216 at 24-25 n.3 & n.4 citing ECF No. 162 at 95-96, 108.)  The Court, in the
course of its denial of Claims 8 and 9, denied expansion of the record with Exhibits N and O,  (ECF No. 216 at 26
n.6 citing ECF No. 209 at 81-82.)  Also, Petitioner states that "many" of the documents contained in Exhibit N-1
through N-319 are in the state record (ECF No. 216 at 28 n.7, citing ECF No. 197-1).

1   requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. §

2   2254(e)(2).  See Holland v. Jackson, 542 U.S. 649, 652–53 (2004) (finding that the restrictions

3   of § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an

4   evidentiary hearing"); accord Colegrove v. Hoshino, No. 13-CV-00096-BLF, 2014 WL 4421393

5   at *2 (N.D. Cal. Sept. 5, 2014).  It follows that where a state court denies the claim on the merits,

6   an expanded record cannot be considered in determining whether the state court's decision was

7   objectively unreasonable.  Rogovich, 694 F.3d at 1096-97  (citing Pinholster, 563 U.S. at 180).

8          Here, Claims 3, 4, 6, 7 and 11 were denied on the merits.  For the reasons discussed

9   above, petitioner fails to demonstrate that Claims 3, 4, 6, 7 and 11 overcome the limitation of §

10   2254(d).  Thus, Pinholster effectively bars a habeas court from any further factual development

11   on these Claims.  563 U.S. at 203 n.20.  Nor has Petitioner shown an evidentiary hearing on

12   those Claims is available, for the reasons stated.  28 U.S.C. § 2254(d); see also Johnson v. Finn,

13   665 F.3d 1063, 1069 (9th Cir. 2011) (observing post-Pinholster unavailability of evidence

14   outside the state record in resolving 28 U.S.C. § 2254(d)(1)).

15          Additionally, Petitioner concedes that certain of the documents requested for expansion

16   are already in the state record.  (See ECF No. 216 at 28 n.7 citing ECF No. 197-1.)  To that

17   extent, the motion to augment with evidence already in the state record is moot.  See e.g.,

18   NovelPoster v. Javitch Canfield Grp., 140 F. Supp. 3d 954, 960 n.7 (N.D. Cal. 2014) (litigant

19   need not seek judicial notice of documents previously filed in the same case).

20      C.     Conclusions

21          Petitioner's request for evidentiary hearing on Claims 3, 4, 6, 7, 11, 12 and 18 shall be

22   denied.

23          Petitioner's request to expand the state record with the noted additional documentation

24   relating to Claims 3, 4, 6, 7 and 11 shall be denied.

25               IX.   CERTIFICATE OF APPEALABILITY

26          Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing

27   Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA").

28   Accordingly, the Court *sua sponte* has evaluated the Claims within the Amended Petition for

suitability for the issuance of a COA.  28 U.S.C. § 2253(c); <u>Turner</u>, 281 F.3d at 864-65.

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. <u>Miller-El</u>, 537 U.S. at 335-36.  The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides that:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> (B) the final order in a proceeding under section 2255.
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district court's resolution of [petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El</u>, 537 U.S. at 327; <u>see also Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (same).  While a petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part."  <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claims, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further:

Claims 3, 7, 8, and 9.

Therefore, a COA shall be granted as to these four Claims.  As to the remaining Claims and requests for record expansion and evidentiary hearing, the Court concludes that reasonable

jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further. The Court shall decline to issue a COA as to the remaining Claims and the requests for record expansion and evidentiary hearing.

## X.    ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.  The Amended Petition (ECF No. 107) is DENIED, Claims 1 and 2 were denied on the merits by order issued on March 24, 2014 (ECF No. 162), Claims 8 and 9 were denied on the merits by order issued on March 31, 2016 (ECF No. 209), Claims 3-7, 10-30, and 32-33 herein are denied with prejudice, and Claim 31 herein is denied without prejudice as moot.

2.  Petitioner's motion for record expansion and evidentiary hearing (ECF. No. 216) is DENIED.

3.  A Certificate of Appealability is ISSUED as to the Court's resolution of Claims 3, 7, 8, and 9, and DECLINED as to the remaining Claims and the requests for evidentiary hearing and record expansion.

4.  Any and all scheduled dates are VACATED, and

5.  The Clerk of the Court is directed to substitute Ron Broomfield, Acting Warden of San Quentin State Prison, as the Respondent warden in this action, and to enter judgment accordingly.

IT IS SO ORDERED.

Dated:   September 19, 2021          _____

SENIOR  DISTRICT  JUDGE